**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. \_\_\_\_

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**IN RE COREY JOHNSON,**

**Movant.**

---

**CAPITAL CASE**

**MOTION FOR AUTHORIZATION TO FILE MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER THE EIGHTH AMENDMENT**

---

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7983
Fax: (202) 661-9063
Email: donald.salzman@skadden.com

*Counsel for Corey Johnson*

**INTRODUCTION**

Corey Johnson is intellectually disabled. He stayed in the second grade for three years, did not know his birthday at age eight, and could barely write his own name at 13. He could not navigate any but the most familiar streets as a teenager and has never been able to live on his own. His IQ has been measured in the 60s and low 70s, placing him in the lowest second percentile of the population.

Despite a clear case of intellectual disability, Mr. Johnson has remained on federal death row for years. This is because no court or jury has ever heard the complete evidence establishing his infirmity. And despite the prohibition on executing the intellectually disabled (formerly called "mentally retarded"), the federal government plans to execute him on Thursday, January 14. If it succeeds, Mr. Johnson will become the only federal prisoner to have been executed without the benefit of a full evidentiary hearing to assess whether he is in fact eligible for the ultimate punishment.

Corey Johnson's case is unique. His was the first federal capital trial of a man with intellectual disability. He was tried before *Atkins*[1] was decided and well before any federal standards or procedures were developed for a legal

---

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002) announced that the Eighth Amendment barred the execution of the intellectually disabled. The federal capital sentencing statute has had a similar bar since 1988. Mr. Johnson was tried in 1993.

determination of what was then known as mental retardation. His mitigation specialist at trial was a psychologist who believed that Mr. Johnson's single IQ score of 77 on the test he gave precluded the diagnosis and testified to that effect.[2] That finding, debatable at best at the time but clearly rejected since, has followed him throughout his appeal and 28 U.S.C. § 2255 proceedings.

Under legal or medical guidelines, Corey Johnson should not be under a sentence of death and must not be executed. But for a prisoner, federal or state, to plead any claim at this juncture, even ineligibility for the death penalty, he must ordinarily pass through the gatekeeping requirements of 28 U.S.C. § 2255(h), which govern most second-in-time habeas applications. Mr. Johnson seeks to do just that here. His proposed attached § 2255 motion raises two separate claims both dealing with his intellectual disability: an *Atkins* claim, and a claim establishing the unreliability of his sentencing proceeding. His *Atkins* claim meets the authorization standard of 28 U.S.C. § 2255(h)(2).[3] The Supreme Court's *Atkins* decision indisputably set out a retroactive new rule and, as shown below, it was previously unavailable to Mr. Johnson under the unique circumstances of his case. His Eighth

---

[2] The jury at the time was not told that the score should be understood as a 73 to reflect the necessary adjustments that an old IQ instrument requires. Nor was any other evidence offered in support of a intellectual disability diagnosis.

[3] This provision allows a successive filing based on "a new rule of constitutional law, made retroactive" which was "previously unavailable."

Amendment reliability claim meets the authorization standard of 28 U.S.C. § 2255(h)(1).[4] As discussed *infra,* Mr. Johnson can show that there are newly discovered IQ scores from his childhood placing him in the range of mental retardation and that new scientific developments establish his intellectual disability.

Should his case fail to be authorized, he could soon become the only prisoner in the history of the federal death penalty to have been executed without any judge or jury ever having heard or tested the full evidence of his intellectual disability.

## I.     MR. JOHNSON'S INTELLECTUAL DISABILITY

Corey Johnson meets the clinical and legal diagnostic criteria for intellectual disability. Three nationally recognized experts[5] tested and evaluated him in person,

---

[4] Permitting a successive filing where "newly discovered evidence" "establish[es] by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense."

[5] These are Dr. J. Gregory Olley, a clinical psychologist and professor emeritus at the University of North Carolina with more than 40 years of experience focused on the diagnosis of intellectual disability in children and adults; Dr. Daniel J. Reschly, a psychologist and professor emeritus at Vanderbilt University with more than 40 years of expertise in intellectual disability and learning disabilities; and Dr. Gary N. Siperstein, a psychologist with more than 50 years of expertise on intellectual disability and founder and director of the Center for Social Development and Education at the University of Massachusetts at Boston.

reviewed IQ and achievement tests, records and reports from his childhood,[6] conducted dozens of interviews with family members, friends, counselors, teachers and other childcare professionals, and administered instruments to three "reporters" to obtain standardized measures of his functioning throughout his youth. Based on their investigation and analysis, all agree that Mr. Johnson meets the three diagnostic criteria established in legal and clinical definitions for a person with an intellectual disability. *First*, he has significant deficits in intellectual functioning, as determined by IQ tests that put him in the bottom two to three percent of the American population. *Second*, he has significant deficits in adaptive functioning; that is, he lacks the skills necessary to navigate the world on his own, to engage in normal social interaction, and to respond to changing circumstances. *Third*, these intellectual and adaptive impairments are documented in childhood records and existed well before his 18th birthday. A person who meets these three criteria is a person with intellectual disability.

### A. Mr. Johnson Has Significant Deficits in Intellectual Functioning Diagnostic of an Intellectual Disability

Mr. Johnson satisfies the first prong of intellectual disability with four valid and reliable full-scale IQ scores within the presumptive range for intellectual

---

[6] This includes records from both the public schools he attended and the residential school to which he was sent when it became clear he could not learn at the rates necessary to keep up with his peers.

disability.  The following table shows the results of three IQ tests administered to

Mr. Johnson during his childhood and one IQ test administered on the eve of his

capital trial, with the scores listed with and without correction for the Flynn Effect,

a testing phenomenon that causes IQ scores to inflate over time and requires scores

to be adjusted accordingly.[7]

---

[7] Research scientist James Flynn discovered that IQ tests across populations increase slowly over time—approximately .3 points per year or 3 points over ten years.  In the context of an intellectual disability assessment, at the time an IQ test is normed, the upper limit of IQ scores in support of an intellectual disability diagnosis ranges from approximately 70 to 75.  According to the Flynn Effect, if the same IQ test were given to a subject ten years after the IQ test was normed, the upper end of the intellectual disability range would have risen from approximately 75 to approximately 78.  E.g., Ex. 1 at 8-10 (Reschly Report); Ex. 2 at 3-5 (Olley Report); Ex. 3 at 3-4, 10 (Siperstein Letter).

| Corey Johnson's IQ Tests | | | | |
|---|---|---|---|---|
| IQ Test | Year | Age | Full Scale IQ Score | Flynn Corrected IQ Score |
| WISC-R | 1977[8] | 8 | 73 | 71 |
| WISC-R | 1981[9] | 12 | 78 | 75 |
| WISC-R | 1985[10] | 16 | 69 | 65 |
| WAIS-R | 1992[11] | 23 | 77 | 73 |

These four IQ scores fall within the requisite range when corrected for the Flynn Effect. Even *uncorrected* (though law and science demand they must be) two of Mr. Johnson's scores are within the requisite intellectual disability range.

Experts—Drs. Reschly, Olley, and Siperstein—agree that Mr. Johnson's IQ test results show a person with significant intellectual functioning deficits. *See* § 2255 Motion at 27.

### B.    Mr. Johnson Has Significant Deficits in Adaptive Functioning Diagnostic of an Intellectual Disability.

Mr. Johnson also meets the adaptive deficit prong of the diagnostic standard of intellectual disability.  In order to meet this prong, one need only have

---

[8] Ex. 33 at 1 (3/25/77 Psychiatric Exam).

[9] Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.).

[10] Ex. 51 at 1 (4/15/85 Psychological Eval.).

[11] Ex. 8 at 12 (Excerpt of Cornell Mitigation Information and Report).

significant limitations in a single domain of adaptive behavior. Mr. Johnson has significant deficits in all three domains—conceptual, social, and practical—as evidenced by the wide universe of sources from which the evaluating experts drew their conclusions.[12]

The deficits in each domain are described in detail in section III.A.2.b of the attached § 2255 Motion.  In brief, though, his adaptive skill deficits can be seen clearly with reference to the deficits charted in the DSM-5, which describes

---

[12] Adaptive deficits are typically established by records from childhood, retrospective interviews using modern standardized assessment tools with people who knew the individual well during childhood, and testimonial evidence supplied by family members, friends, teachers, employers, mental health professionals, and others who interacted regularly with him or her. *See United States v. Davis*, 611 F. Supp. 2d 472, 492 (D. Md. 2009) (There is a "relative consensus that the best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible and to look for consistency and convergence over time."); *see also, e.g.*, *United States v. Roland*, 281 F. Supp. 3d 470, 478 (D.N.J. 2017) ("'A valid diagnosis of ID is based on multiple sources of information that include a thorough history (social, medical, educational), standardized assessments of intellectual functioning and adaptive behavior, and possibly additional assessments or data relevant to the diagnosis.' [AAIDD-11 at 100]."); Ex. 76 at 27 (AAIDD-11 User's Guide).

characteristics expected of someone with mild[13] intellectual disability. *See* Ex. 77 at 34 (DSM-5).[14]

*Conceptual domain.* For the conceptual domain, the DSM-5 notes that for school-age children and adults, "there are difficulties in academic skills involving reading, writing, arithmetic, time or money, with support needed in one or more areas to meet age-related expectations." *Id.* Childhood testing, school records, and interviews with teachers and counselors demonstrate that Mr. Johnson was never able to read beyond a second or third grade level, tell time, do more than basic arithmetic, or count or change money. He stood out to staff and evaluators at his residential placements because of his intellectual deficits. One staff member observed, for example, "I do not remember anyone else at Pleasantville who was similarly slow intellectually." Ex. 19 ¶ 6 (11/21/11 Decl. of A. Harding.). This was a common reaction of those who knew Corey. When he was 13, a school evaluation noted that he was barely able to write his own name or recite all the

---

[13] Experts previously referred to three categories of intellectual disability: mild, moderate, and severe. Given the more extreme impairments in functioning associated with the other two categories, most of the intellectually disabled offenders to whom *Atkins* applies will have what was called "mild" intellectual disability.

[14] The DSM-5 is the *Diagnostic and Statistical Manual of Mental Disorders, 5th Ed.*, published by the American Psychiatric Association in 2013. This text represents standard of the medical profession and is relied upon by the Supreme Court as an authoritative guide to the diagnosis of intellectual disability.

months of the year.  At 14, he scored in the bottom one percent on an achievement test.  At age 16, his reading and oral comprehension, sight vocabulary and arithmetic abilities remained on a second- to third-grade level.

All three intellectual disability experts agree Mr. Johnson has significant deficits in the conceptual domain.

*Social domain.*  In the social domain, too, Mr. Johnson fits the description of a person with mild intellectual disability.  Friends, family and teachers report that he has always exhibited immaturity in social interactions, has always had a limited understanding of risk in social situations, and was often manipulated by others.  He did not engage with other children easily. When he was ten, it was reported in school records he had "poor peer relations" (Ex. 34 at 1 (12/11/78 Case Service)); at age 13, records indicate that he "relate[d] like a younger child and appear[ed] limited." Ex. 41 at 3 (3/15/82 Psychosocial Summary). A psychiatric evaluation done when Mr. Johnson was an adult reports that "placement records indicate that although he clearly was willing to do anything to be liked, he lacked the social skills required to successfully do that in appropriate ways."  Ex. 5 at 7 (Dudley Report). He was described by teachers and counselors as a follower, who was more easily influenced than other children, and by his family as someone easily taken advantage of.  "He wouldn't understand others but didn't want to look bad, so

10

other children easily tricked and manipulated him." Ex. 20 ¶ 44 (4/30/11 Aff. of M. Hodges).

Mr. Johnson's experts have concluded that Mr. Johnson has significant deficits in the social domain.

*Practical domain*. The DSM-5 notes that people with mild intellectual disabilities "need some support with complex daily living tasks in comparison to peers" such as grocery shopping, transportation, home organizing, food preparation, banking and money management, or maintaining a job. Ex. 77 at 34 (DSM-5). Mr. Johnson's inability to manage without supports was documented repeatedly at the residential schools he attended. Goals listed for him repeatedly included "learn[ing] how to handle money so that he can shop for himself," and "us[ing] opportunities offered to him to learn independent livings skills." Ex. 48 at 2 (4/13/84 Change in Permanency Plan); see also Ex. 50 at 8 (12/12/84 Visitation Plan) (setting the same goals); Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan) (same); Ex. 54 at 6 (11/21/85 Service Plan Review 6 Month) (same); Ex. 55 at 7 (6/28/86 Service Plan Review 6 Month) (same). There are no indications in the records that Mr. Johnson ever achieved these goals. One close family friend reported, "He's the kind of kid who I don't think could make it on his own—pay his rent, etc. Some people should stay in a protected setting all their lives." Ex. 2 at 37 (Olley Report).

All three intellectual disability experts agree that Mr. Johnson has significant deficits in the practical domain.

*Overall Adaptive Deficits.* Each of the standardized measures of adaptive functioning administered to a close relative, close family friend, and teacher who knew Mr. Johnson well in his residential placement, yielded a "general adaptive composite score" diagnostic of intellectual disability, and all three intellectual disability experts agreed he meets the adaptive behavior prong of a person with intellectual disability.

## C. Onset before the age of 18.

Mr. Johnson's significant limitations in intellectual and adaptive functioning manifested themselves in childhood, as documented by this wide range of childhood reporters and records, and confirmed through interviews and clinical evaluations.

In sum, and as confirmed by all three renowned experts in the field, Mr. Johnson is a person with intellectual disability and meets all the requirements for such a diagnosis according to the standards identified by the medical community and in federal capital case law.  Nonetheless, for the reasons set out below, no court has considered the evidence of his intellectual disability under those standards as *Atkins* and the Eighth Amendment require.

12

## II.    PROCEDURAL BACKGROUND

### A.    The Trial and Direct Appeal

Mr. Johnson's trial in 1993 was among the first federal capital trials in the modern era of the death penalty and the first ever to grapple—even poorly—with the notion of mental retardation. In April 1992, Corey Johnson and six co-defendants were charged in a 33-count indictment with offenses arising from a drug conspiracy pursuant to the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the "ADAA").  (4/24/92 Indictment, Dkt. 1.)  The government sought the death penalty for three of the co-defendants[15]—Mr. Johnson, Richard Tipton, and James Roane—and tried them together.

---

[15] The government initially filed a notice of intent to seek the death penalty against co-defendant Vernon Lance Thomas who was eventually convicted of killing four people. Ex. 62 (10/28/92 Notice of Intention to Seek Death Penalty as to Mr. Thomas). Mr. Thomas's case was severed from that of the other three defendants for reasons related to the availability of his appointed counsel. Following authorization, but prior to trial, Mr. Thomas presented an expert report to the government that concluded Mr. Thomas had an IQ of 71 and was "mentally retarded" and argued that Mr. Thomas was ineligible for the death penalty under federal law. Ex. 66 (4/15/93 Mot. to Have Def. Declared Mentally Retarded). Shortly thereafter, the government withdrew its death authorization, and Mr. Thomas faced a maximum penalty of life without parole at his trial. Although Corey Johnson had IQ scores as low as 69 at that time, his attorneys, relying on the defense psychologist, made no similar argument on his behalf.

13

In February 1993, the jury convicted Mr. Johnson of all 27 counts in the government's superseding indictment, including seven murders in the course of a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A).[16]

At the penalty phase hearing that took place shortly thereafter in front of the same jury, Mr. Johnson's defense team presented mitigating evidence, much of it through Dewey Cornell, Ph.D., a University of Virginia psychologist hired by the defense to evaluate Mr. Johnson as part of a standard mental health evaluation and to offer mitigation to the jury. Dr. Cornell testified about Mr. Johnson's tumultuous and traumatic childhood, and what he characterized as a severe learning disability that left Mr. Johnson "unprepared to function in society, unprepared to survive on his own when he left institutional care . . . and made him unable to cope and adapt to society in a way that a normal individual would." Ex. 7 (2/10/93 Trial Tr. 3574). But because the psychologist[17] believed that the IQ score of 77 that he had

---

[16] The indictment also charged Mr. Johnson with conspiracy to violate provisions of the ADAA under 21 U.S.C. § 846, murder in the course of a CCE under 21 U.S.C. § 848(e)(1)(A), using a firearm during a crime of violence under 18 U.S.C. § 924(c), possession of cocaine base with the intent to distribute under 21 U.S.C. § 841(a)(1), and killing and maiming in aid of racketeering under 18 U.S.C. § 1959(a).  (4/24/92 Indictment, Dkt. 1.)

[17] Trial counsel did not seek an expert in intellectual disability, but hired a psychologist they knew from other litigation. The defense specifically asked Dr. Cornell to: (1) determine whether Mr. Johnson was competent to stand trial; (2) determine if he was criminally responsible for his crimes; and (3) gather, analyze, and prepare potential mitigation evidence for the capital sentencing hearing. Ex. 15 ¶¶ 9, 10 (9/20/16 Aff. of C. Cooley).

obtained for Corey Johnson, meant he could not be deemed intellectually disabled, Dr. Cornell (and the defense) affirmatively told the jury that he did *not* have that disability, and that he suffered instead from a profound learning disability. Ex. 7 (2/10/93 Trial Tr. 3547); Ex. 9 (2/12/93 Trial Tr. 3921).  But this conclusion was based, in part, on a confused understanding of Mr. Johnson's IQ scores,[18] which, under prevailing medical and legal standards today, would be an indicator of Mr. Johnson's intellectual disability.  Not presented with a case for mental retardation pursuant to the three prongs, nor asked to make a determination, the jury recommended that Mr. Johnson be sentenced to death on each of his CCE convictions.[19]

---

[18] As discussed below, newly discovered evidence now proves that the score of 88 was invalid, a fact which, if known at trial, would have ruled out a diagnosis of learning disability.

[19] Ex. 65 (2/16/93 Special Findings, Dkt. 508). Mr. Johnson's death sentences, it should be noted, are infirm on several grounds.  He is therefore currently seeking authorization from the this Court to challenge his § 924(c) convictions under *United States v. Davis*, 139 S. Ct. 2319 (2019).  Mot. for Authorization to File a Successive Mot. Pursuant to 28 U.S.C. § 2255(h)(2), *In re Corey Johnson*, No. 20-8 (4th Cir. May 22, 2020), ECF No. 2-1.  He is also appealing to this Court the denial of relief he sought pursuant to the First Step Act.  Mem. Order (E.D. Va. Nov. 19, 2020), ECF No. 75, *appeal docketed*, *United States v. Johnson*, No. 20-15 (4th Cir. Nov. 23, 2020).  On January 4, 2021, Mr. Johnson filed a notice of appeal from a January 2, 2021 order of the district court dismissing, on jurisdictional grounds, a second but not successive motion pursuant to 28 U.S.C. § 2255 seeking an order barring his execution pursuant to 18 U.S.C. § 3596(c).  Mr. Johnson expects to file a merits brief and request for certificate of appealability in United States v. Johnson, 21-1, imminently.

Mr. Johnson timely appealed to the Fourth Circuit, raising issues relating to the guilt and penalty phases of his trial. No issue regarding intellectual disability was raised.

## B.     Post-conviction Proceedings

In June 1998—four years prior to the Supreme Court's decision in *Atkins* v. *Virginia*, 536 U.S. 304 (2002), prohibiting the execution of the intellectually disabled, and, as discussed below, well before any substantive criteria were developed in federal capital law for determining whether an individual was intellectually disabled—Mr. Johnson's attorneys filed a motion for collateral relief pursuant to 28 U.S.C. § 2255, asserting for the first time, among other claims, that Mr. Johnson could not be sentenced to death pursuant to 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596[20] because he was intellectually disabled. The crux of this assertion was that these statutes categorically barred Mr. Johnson's execution because he was "mentally retarded"; that his trial counsel were ineffective for failing to recognize that Mr. Johnson was intellectually disabled; and that if Dr. Cornell had

---

[20] Mr. Johnson was sentenced pursuant to the ADAA but the Federal Death Penalty Act was passed while his case was on appeal. Both include the identical (word-for-word) prohibition on the execution of anyone with intellectual disability (then called mental retardation) and appellate counsel cited both.

adjusted all of Mr. Johnson's IQ scores using the Flynn Effect, that would have led him to fully evaluate Mr. Johnson for intellectual disability.[21]

The district court, in 2003, granted the government's motion for summary judgment, denying relief on all grounds. *See* Ex. 73 (5/1/03 Mem. Op., Dkt. 896). In light of the fact that no new evidence had been offered with respect to the issue of Mr. Johnson's intellectual disability, the Court relied again on the conclusion below about the 77 IQ, finding that "the record before the Court demonstrates that Johnson is not mentally retarded" and that Mr. Johnson's trial counsel were not ineffective for failing to raise the issue that Mr. Johnson's IQ score was overstated because counsel had reasonably relied on Dr. Cornell's assessment at trial. Ex. 73 at 80-84 (5/1/03 Mem. Op., Dkt. 896).

In 2004, § 2255 counsel appealed the issue of Mr. Johnson's intellectual disability to the Fourth Circuit, arguing that the district court had made a mistake

---

[21] Although at the time it was not widely accepted, the Flynn Effect is now routinely regarded as valid, "persuasive," and "best practice" by the courts considering federal capital cases, including those in the Fourth Circuit, and must be taken into account when expert testimony supports its use. *See Davis*, 611 F. Supp. 2d at 488; *Roland*, 281 F. Supp. 3d at 503; *see also United States v. Salad*, 959 F. Supp. 2d 865, 872 n.10 (E.D. Va. 2013) ("The Flynn Effect describes a documented increase in IQ levels over time. As a result, IQ tests must be periodically re-normed to account for the population becoming more intelligent; a score on an outdated test might overstate IQ relative to the contemporary population.").

17

in refusing to consider scores corrected for the Flynn Effect because the court had simply assumed that Dr. Cornell had considered the Flynn Effect, even though no evidence supported that assumption. Ex. 74 at 145-46 (Br. for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt)).  This Court did not address that issue but instead adopted the district court's rationale—that the IQ score Dr. Cornell had assigned Mr. Johnson placed him outside the diagnostic range and that ended the inquiry.[22]

Relying still on the need to adjust that single score, post-conviction counsel petitioned for rehearing, sought certiorari, and in late 2005 made an attempt to recall the mandate in light of new decisions by this Court remanding cases for consideration of the Flynn Effect. These attempts failed.[23]  The understanding

---

[22] *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).  This Court also agreed with the district court that Mr. Johnson's counsel were not ineffective for failing to consider the Flynn Effect at sentencing because they were "under no mandate to second-guess" Dr. Cornell's report.  *Id.*

[23] When an execution date was set in late 2005 for Mr. Johnson and others, his counsel raised the issue again in a clemency petition. When a stay of execution was granted on a challenge to the then lethal injection protocol. Mr. Johnson and the other applicants withdrew their petitions, as only one clemency application may ever be processed to completion according to Justice Department guidelines. 28 C.F.R. § 1.10(e).

18

remained that Mr. Johnson's psychologist determined that the one IQ score of 77 was decisive, and as a result he was not mentally retarded.

### C.    Subsequent Proceedings

In 2006, new counsel took over the representation of Mr. Johnson to handle lethal injection and clemency matters. However, counsel soon become convinced that their client's intellectual limitations had not been adequately explored and were concerned that a full case for intellectual disability had never been presented. They searched for and located additional records, that included two scores from IQ tests administered to Corey as a child.  One was a 73 and the other a 75 (both Flynn-adjusted)[24] thus constituting further evidence of a significant intellectual deficit. Counsel asked experts in intellectual disability to review all of Mr. Johnson's scores, as well as his records from his developmental years, and to conduct interviews and testing to determine whether their client had deficits in any of the legally and medically specified domains.

All of the evidence now strongly supports a strong diagnosis of intellectual disability—and thus that Mr. Johnson is ineligible for a sentence of death.

On November 20, 2020, the Department of Justice scheduled Mr. Johnson's execution.  With strong proof of his disability, he is seeking to have a court look at

---

[24] All scores should be Flynn-adjusted and the adjusted score is often referred to as the "true" or "actual" IQ score.

19

the evidence and determine—based not on a single unadjusted score but on all the evidence, and according to prevailing and accurate legal and medical standards—whether he can legally be executed. He therefore comes to this Court, pursuant to the requirements of the AEDPA, requesting the opportunity to show that he is ineligible for execution on January 14.

## III.   COREY JOHNSON'S § 2255 MOTION MEETS THE REQUIREMENTS FOR AUTHORIZATION.

Mr. Johnson requests authorization from this Court to file a second or successive motion pursuant to 28 U.S.C. § 2255 so that the evidence of his intellectual disability and his ineligibility for the death penalty may, for the first time, be properly considered under the appropriate medical and legal standards. His proposed successive motion (which accompanies this request) raises two distinct legal claims: (1) that he is a person with intellectual disability and is therefore entitled to *Atkins* relief; and (2) that developments in science, as well as new facts about his case, have rendered his death sentence unreliable in violation of the Eighth Amendment.

When presented with a motion for authorization, it is the role of this Court to determine whether "a prima facie showing that the application satisfies the requirements of [Section 2244(b)(3)]" has been made. 28 U.S.C. § 2244(b)(3); § 2255(h); *United States v. MacDonald*, 641 F.3d 596, 609 (4th Cir. 2011) ("§ 2255(h) spells out the standard applicable to those in federal custody."). A

grant of authorization is thus a preliminary determination, and is considered "tentative" in that it merely allows the district court to more fully consider whether the requirements for filing a second motion are met. *In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003).  Because this is the standard at this stage, a movant need not prove at this point that he would win. *Id.* at 282; *see also In re McDonald*, 514 F.3d 539, 544 (6th Cir. 2008) ("'Prima facie' in this context means simply sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'" (citations omitted)); *In re Hubbard*, 825 F.3d 225, 231 (4th Cir. 2016) ("[I]t is for the district court to determine whether the new rule extends to the movant's case, not for this court in this proceeding."); *In re Pendleton*, 732 F.3d 280, 282 n.1 (3rd Cir. 2013) (quoting *Goldblum v. Klem*, 510 F.3d 204, 219 (3d Cir. 2007) ("'[S]ufficient showing of possible merit' in this context does not refer to the merits of the claims asserted in the petition. Rather, it refers to the merits of a petitioner's showing with respect to the substantive requirements of [authorization]."")); *In re Lott*, 366 F.3d 431, 432-33 (6th Cir. 2004) (standard is "lenient" and "not a difficult standard to meet.").

At the authorization stage, "the focus of the inquiry must always remain" on the prima facie standard. *In re Williams*, 330 F.3d at 282.  Mr. Johnson's burden here, therefore, is that he make a prima facie showing that he meets the

requirements of 28 U.S.C. § 2255(h)(1) and (h)(2). As the following demonstrates, Mr. Johnson's evidence clearly meets this standard.

**A.    Corey Johnson's *Atkins* Claim Meets the Standard for a Successive Motion Under 28 U.S.C. §2255(h)(2)**

Mr. Johnson seeks authorization to proceed on his *Atkins* claim pursuant to 28 U.S.C. § 2255(h)(2).

1.    <u>Mr. Johnson has made a prima facie showing that he is intellectually disabled.</u>

As described above, there is strong, compelling evidence that Corey Johnson meets all the diagnostic criteria for a finding of intellectual disability. His IQ scores, from early childhood through adulthood, place him squarely within the range of the intellectually disabled. He has deficits in the conceptual, social and practical domains, all determined by leading experts in the field of intellectual disability applying approved norms. And onset of his disability was very clearly in childhood, prior to age 18, as both IQ tests and observations of teachers, counselors, family members, and neighbors attest.  This evidence more than meets the requirements at this stage, as authorization in the context of an *Atkins* claim is required even where there is conflicting evidence supporting the claim. *See, e.g.*, *In re Henderson*, 462 F.3d 413, 416-17 (5th Cir. 2006) (authorizing *Atkins* claim despite IQ score of 83 and adverse expert testimony); *see also In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (Higginbotham, J., concurring) (even while

"dubitante" on merits, a judge should not "dissent from an order allowing the district court to make a more informed judgment than is available to us, as a second gate to leave to file a successive writ").

2.      Mr. Johnson *Atkins* claim satisfies the requirements of § 2255(h)(2)

To be authorized to proceed under 28 U.S.C. 2255(h)(2), Mr. Johnson must show that his claim is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." Because it is clear that *Atkins* is such a rule, *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), the sole question here is whether Mr. Johnson's attached claim was "previously unavailable." A claim is generally considered available if the new rule on which it is based was announced while a first habeas petition is pending. However, in certain narrow situations a claim may be unavailable even if the rule existed. A circuit court must therefore also carefully scrutinize the particular circumstances of the previous habeas proceeding to determine if the claim was "feasible." If it was not, the claim cannot be considered previously available despite the existence of the underlying new rule. *See In re Wood*, 648 F. App'x 388, 391 (5th Cir. 2016); *In re Everett*, 797 F.3d 1282, 1288 (11th Cir. 2015).

In the *Atkins* context, a claim, such as Mr. Johnson's, can become "feasible" at a later date when there appear "reasons that an *Atkins* claim is possibly

meritorious when it had not previously been." *In re Johnson*, 935 F.3d 284, 294 (5th Cir. 2019). The Supreme Court declined to establish substantive criteria to determine which prisoners were intellectually disabled but instead left that determination to the individual jurisdictions. *Atkins*, 536 U.S. at 317. In jurisdictions where the legislature declined to adopt specific, substantive guidelines (as in the federal system), an *Atkins* claim like Mr. Johnson's can become "possibly meritorious" long after the Supreme Court's initial decision when those substantive criteria are finally implemented. As the Fifth Circuit explained in the *Dexter Johnson* case, having actual standards for litigating an *Atkins* claim can be the key issue in determining its availability. *In re Johnson*, 935 F.3d at 293. Successor litigation in the *Atkins* context, therefore, is a unique situation where "it is correct to equate legal availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *Id.* at 294.

This is the case for Corey Johnson. His initial 2255 motion was filed on June 1, 1998, almost four years before *Atkins* was decided. He amended his motion multiple times between September 1998 and August 2001, and all briefing was completed prior to the *Atkins* decision. Although the May 2003 *opinion* (unlike the pleadings) denying Mr. Johnson's initial § 2255 motion cited to *Atkins*, Ex. 73 at 80 (5/1/03 Mem. Op., Dkt. 896), it did not delineate any criteria for establishing

24

mental retardation in a federal capital case. Instead, the opinion simply pointed out that *Atkins* appeared to require an IQ score of "70 or below" and that the American Association on Mental Deficiency ("AAMR") had "revised its classification to identify individuals with an IQ of 75 or below as presumptively retarded." *Id*. The court then noted that the defense trial expert "was aware that if Johnson was found to have an IQ of 75 or lower, Johnson might be deemed mentally retarded" but had determined his full-scale IQ was 77. *Id*. at 81. The court made no mention of adaptive deficits or of any diagnostic criteria required by medical associations to establish mental retardation.

On appeal, this Court, again relying on the trial psychologist's interpretation, reaffirmed that Mr. Johnson's score of 77 placed him outside the scope of *Atkins*. It rejected an argument that that score was inflated based on the district court's finding that the expert "double-checked his findings and consulted with colleagues" before rejecting the assertion of score inflation. *Roane*, 378 F.3d at 409. In the intervening years it has become clear that Mr. Johnson's *Atkins* claim is meritorious even though it did not appear so in 2003: it is now clear that IQ scores must be adjusted for the passage of time; that one or more (unadjusted) scores outside the range does not preclude the diagnosis; and that the other prongs of the

25

diagnosis must be considered. Given the context of the previous decisions in his case, it is obvious that Mr. Johnson's *Atkins* claim was not feasible at that time.[25]

### a. Federal capital law lacked any substantive criteria for determining who had intellectual disability

After the Supreme Court in *Atkins* left to individual jurisdictions the task of enforcing the restriction on executing the intellectually disabled, many states passed legislation to comply with the decision. Congress, however, provided no substantive guide. Federal courts were left to haphazardly create or adopt guidelines for determining which prisoners were persons with intellectual disability. Because of this patchwork approach, the standards that ultimately coalesced in federal capital cases were not accessible to Mr. Johnson during his post-conviction review. Thus, many crucial aspects of an intellectual disability determination which would have established the feasibility of Mr. Johnson's claim were simply not available to him during his § 2255 proceedings.

The first mentions of *Atkins* in federal cases are *United States v. Daryl Johnson*, No. 02 C 6998, 2003 WL 1193257 (N.D. Ill. Mar. 12, 2003) and *Webster v. United States*, No. 00-CV-1646, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003). Neither case propounds standards for determining intellectual disability but both instead adopt a "know it when you see it" approach. In *Daryl Johnson*, the court

---

[25] It must be remembered that this was the first time the issue of intellectual disability ever even came up at a federal capital trial.

26

did not rule out intellectual disability based on an IQ score of 76 but denied the claim without prejudice because there was no evidence of adaptive deficits. *Id.* at *12. In *Webster*, decided four months after Mr. Johnson's post-conviction case, the court noted that the federal statute barring execution of the mentally retarded "does not outline a burden of proof, and does not set forth any standards for defining mental retardation." *Id*. at 11, and then incorrectly held that *Atkins* provided all the guidance that was necessary. *Id*.

Even as late as 2005 (a year after Mr. Johnson's appeal of his § 2255 had been denied) federal courts in Mr. Johnson's district of conviction were struggling with the substantive contours of *Atkins*. In *United States v. Cisneros*, 385 F. Supp. 2d 567, 570 (E.D. Va. 2005), for example, the court adopted the AAMR definition in the absence of any federal statute. According to the court, these requirements defined "significantly sub-average intellectual functioning" as an IQ score of 70 or below. *Id*. The court did not mention adjustments for a standard error of measurement or for the Flynn Effect.

Recognizing the absence of federal standards or procedures, the Department of Justice endorsed a legislative proposal in the 109th Congress "as a means for introducing consistency into the federal practice." Congressional Research Service Report to Congress, The Death Penalty: Capital Punishment Legislation in the 110th Congress, at 15 (Sept. 7, 2007). And when that failed to pass, similar

legislation was again proposed in the 110th Congress to establish criteria for determining which federal defendants were intellectually disabled, including an IQ of 70 or less and "continuously impaired mental functions." *Id*. That also was not enacted.

The first opinion setting forth a comprehensive guide to determining intellectual disability in federal death penalty cases was issued in April of 2009 in *United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009). This was the first federal case to address basic aspects of the intellectual disability determination, several of which are critical to Mr. Johnson's case. To begin with, the court held that the Flynn Effect applied to federal capital cases and must be considered in conjunction with the standard error of measurement. *Id*. at 485-88.[26] Thus, Davis's IQ scores of 75 and 76 when Flynn-adjusted resulted in scores within the standard error of measurement of 75 and thus supported a finding of intellectual disability. *Id*. at 478, 489. This approach to federal capital cases was reaffirmed the next month in *United States v. Shields*, No. 04-20254, 2009 WL 10714661 (W.D. Tenn. May 11, 2009), where the court concluded "that the Flynn Effect must be

---

[26] Some federal courts had previously discussed the Flynn Effect's application to state cases. As the Fifth Circuit has pointed out, "the first mention of "Flynn Effect" in the case law . . . was in a 2003 Western District of Virginia district court case." *In re Cathey,* 857 F.3d 221, 231 (5th Cir. 2017). This, however, was also after Mr. Johnson's § 2255 motion had been denied.

28

considered." *Id.* at \*12. The *Shields* court found the defendant mentally retarded despite a high IQ score by applying the Flynn Effect to a 40-year-old testing instrument and determining its result of a 93 IQ was likely inflated "by roughly 25 to 30 points." *Id.* at \*10.

Mr. Johnson's case is not unlike *In re Cathey*, 857 F.3d 221 (5th Cir. 2017), where an IQ score of 77 was used to rule out intellectual disability.[27] In *Cathey*, just as in Mr. Johnson's case, that 77 IQ score fell "outside of the range that was then understood to satisfy the subaverage intellectual functioning prong of an *Atkins* claim." *Id.* at 230. It was not until at least 2006 when the Fifth Circuit began to recognize and apply the Flynn Effect that Mr. Cathey's 77 IQ could satisfy the legal requirements for a Texas *Atkins* claim. *Id.* at 231. Because, prior to that time, his 77 IQ score would have ruled out such a claim, the Fifth Circuit held Mr. Cathey's successive claim was not previously "feasible" and therefore was "previously unavailable." *Id.* at 233-34.

---

[27] In fact, the psychologist in Mr. Johnson's case, who was not an expert in intellectual disability, explained that the question was utterly dependent on that analysis:

> The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation.

Ex. 7 (2/10/93 Trial Tr. 3692).

Mr. Johnson's claim faced the same hurdles. Indeed, until the *Davis* opinion (discussed above), every federal court considering an *Atkins* claim where an IQ score was above 75 had rejected it just as the Texas court had in *Cathey*. *Id*. at 232 (noting benchmark IQ in Texas state cases as 70 plus "a five-point margin of error"). Thus, as was the case for Mr. Cathey, at the earlier stage of his case, the *Atkins* rule was not feasibly accessible to Mr. Johnson. It was not until federal capital law developed—in *Davis* and *Shields*—to acknowledge the substantive aspects of a claim of mental retardation that *Atkins* became available in the context of Mr. Johnson's case. As the Fifth Circuit noted, "it was more than just a reassessment by medical professionals of this inmate's particular mental abilities. The significant change was in the medical methodology for evaluating the relevant disabilities and in courts' recognition of those changes." *In re Johnson*, 935 F.3d at 293.

> b. *The DSM-5 underscored the previous unavailability of Mr. Johnson's* Atkins *claim*

Viability of an intellectual disability claim was dependent, in part, on the emergence of federal substantive *Atkins* law; scientific developments were another component. In 2013, a new diagnostic manual, the DSM-5, was released. Where the DSM-IV-TR defined significantly subaverage intellectual functioning as "an IQ of approximately 70 or below on an individually administered IQ test," the first prong in the DSM-5 requires "deficits in intellectual functions . . . confirmed by

30

both clinical assessment and individualized, standardized intelligence testing." Ex. 77 at 33 (DSM-5). This change affects Mr. Johnson's case in two important ways. First, the DSM-5's discussion of diagnostic features notes that IQ scores indicating mild intellectual disability are approximately 65-75 and that both the standard error of measurement and the Flynn Effect must be taken into account. However, it also eliminates a cut-off IQ score altogether. Instead, it recognizes that "IQ test scores are approximations of conceptual functioning" only and must be assessed in the context of adaptive functioning. *Id.* at 37. It makes clear that a person with significant adaptive deficits may have an IQ above what was previously considered the cut-off score but may yet be considered intellectually disabled because his "actual functioning is comparable to that of individuals with a lower IQ score." *Id.* A strict upper limit on IQ is thus no longer dispositive; "clinical judgment is needed in interpreting the results of IQ tests." *Id.*

Mr. Johnson's proposed § 2255 motion establishes his myriad and signficant adaptive deficits, many of which are vividly documented in his childhood records. He presents both lay and expert witnesses attesting to these deficits and explaining how they have affected Mr. Johnson's life. These experts also, using clinical judgment, explain why Mr. Johnson has deficits in intellectual functioning consistent with intellectual disability. In light of this substantive development of law, the retroactive opinion of *Atkins* now creates a probable meritorious claim for

31

Mr. Johnson where law and science previously had not. Under these circumstances, Mr. Johnson's claim was previously unavailable despite the emergence of the *Atkins* decision during post-conviction and deserves to be authorized. *In re Johnson*, 935 F.3d 284 (5th Cir. 2019).

          *c.*      *Mr. Johnson's claim is not barred by 2244(b)(1)*

Even though this Court has previously addressed the applicability of *Atkins* to Mr. Johnson's case in a prior appeal—though without evidence, and in sole reliance again on a single unadjusted IQ score of 77—there is no bar to his current claim. Section 2255(h) provides that a "second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals." That procedure is set forth in § 2244(b)(3), which provides that: (A) the applicant shall "move in the appropriate court of appeals for an order authorizing the district court to consider the application," (B) the "motion in the court of appeals . . . shall be determined by a three-judge panel," (C) the panel may authorize the filing "only if it determines that the application makes a prima facie showing" that it "satisfies the requirements" of § 2244(b)(2)(A) or (B) for state prisoners, or of § 2255(h)(1) or (2) for federal prisoners, (D) the court of appeals "shall grant or deny the authorization . . . not later than 30 days after the filing of the motion," and (E) the "grant or denial of an authorization by a court of

appeals . . . shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3).

In other words, the federal successor bar refers only to the certification procedures of § 2244(a) and does not incorporate the same claim successor bar found in 28 U.S.C. § 2244(b)(1). Section 2244(b)(1) unambiguously states: "A claim presented in a second or successive habeas corpus *application under section 2254* that was presented in a prior application shall be dismissed." (Emphasis added.) By the plain language of § 2244, it is clear that Congress intended for the same claim successor bar to apply *only* to claims brought by state prisoners under 28 U.S.C. § 2254, not to claims by federal prisoners, like Mr. Johnson. *See, e.g.*, *United States v. Winestock*, 340 F.3d 200, 204-05 (4th Cir. 2003) (noting that § 2244(b)(1) "is limited by its terms to § 2254 applications"); *United States v. MacDonald*, 641 F.3d 596, 614 n.9 (4th Cir. 2011) (noting application of 2244(b)(1) to 2255 motion is an open question in the circuit); *see also Stanko v. Davis,* 617 F.3d 1262, 1269 n.5 (10th Cir. 2010) (subsections 2244(b)(1) & (2) "concern only 'habeas corpus application[s] under section 2254'" (citation omitted)).

Nothing in section 2244(a) or section 2255(h) requires dismissal of a second or successive claim that was presented in a prior motion. Unlike second or successive applications "under 2254," 28 U.S.C. § 2244(b)(1)-(2), the same

33

substantive prerequisites apply for authorization of a second or successive § 2255

motion, whether it contains a claim that was presented in a prior motion or not.

*See* Hertz & Liebman, *Federal Habeas Corpus Practice and Procedure* § 41.7[d]

(2017) ("For section 2255 movants, successive relief continues to be available for

either previously raised or new claims, whereas state-prisoner successive petitions

are limited to new claims.").

The point is so obvious that even the Criminal Division of the Department of

Justice has readily conceded it. For example, in response to the en banc Sixth

Circuit's recent request for briefing on the specific question whether § 2244(b)(1)

applies to federal prisoners, it answered: "Section 2244(b)(1) does not apply to

federal prisoners."  U.S. Supp. Br. at 23, *Williams v. United States*, No. 17-3211

(6th Cir. May 8, 2018) (argued June 13, 2018).

This Court should authorize Mr. Johnson's *Atkins* claim and remand to the

district court for a fuller review.

> **B.**     **Mr. Johnson Can Make a Prima Facie Showing That His Eighth Amendment Reliability Claim Meets the Requirements of 28 U.S.C. § 2255(h)(1)**

Corey Johnson's death sentence rests on an inaccuracy. In the attached

proposed motion, Mr. Johnson alleges that developments in science, as well as the

discovery of additional IQ scores, render his death sentence unreliable and in

contravention of the Eighth Amendment. *Johnson v. Mississippi*, 486 U.S. 578,

34

584 (1988) (Eighth Amendment demands "reliability in the determination that death is the appropriate punishment." (citation omitted)).  A death sentence based on "evidence that has been revealed to be materially inaccurate" violates the Eighth Amendment's reliability guarantee.  *Id.* at 590.

The limitations on successive applications cannot be so strictly applied as to condone an unconstitutional execution. As the Ninth Circuit has opined:

> [R]ecognizing such a claim is essential in an age where forensics that were once considered unassailable are subject to serious doubt. And it's particularly important to permit claims of constitutional error grounded in faulty science in a second or successive petition. After all, flawed analytical methods may not be debunked until well after the expiration of a petitioner's one-year deadline to file a habeas petition under AEDPA.

*Gimenez v. Ochoa*, 821 F.3d 1136, 1144 (9th Cir. 2016) (footnote omitted).

Under today's prevailing scientific standards, Mr. Johnson is plainly a person with intellectual disability and cannot be executed. His claims warrant further exploration in the district court, establishing the need for authorization.

### 1.    Mr. Johnson's Claims Are Based on Newly Discovered Evidence

The evidence supporting Mr. Johnson's claims is newly discovered, i.e. it could not have relied on it in his prior § 2255 motion. *In re Williams*, 364 F.3d 235, 240 (4th Cir. 2004); *see also In re Provenzano*, 215 F.3d 1233, 1236 (11th Cir. 2000) (per curiam) (holding, in the context of an authorization motion, that

35

previous availability "means at least as late as the time of the filing of the first federal habeas petition").

At his trial, Mr. Johnson's jury was incorrectly informed that he was not a person with intellectual disability. This error was premised almost entirely on two IQ scores: a 77 derived from the testing by the trial psychologist and an 88 from testing conducted when Mr. Johnson was 13-years old. Ex. 7 (2/10/93 Trial Tr. 3702). New evidence proves this testimony and the underlying IQ test results are materially inaccurate.

### a.     Scientific developments

In the years since Mr. Johnson's trial and § 2255 proceedings, there have been at least three significant developments in the scientific understanding of intellectual disability that render his death sentence unreliable. First, as discussed above, the Flynn Effect has now been embraced by all reputable experts in the fields of IQ testing and intellectual disability. Employing today's standards, the scores on tests administered to Mr. Johnson must be adjusted to account for the age of the instruments (i.e., using the Flynn Effect) or they must be deemed unreliable. With a Flynn adjustment, the score of the test administered by Dr. Cornell would be 73, not 77, and would demonstrate the requisite significant deficit in intellectual functioning diagnostic of intellectual disability.

36

Second, the modern medical view (reflected, for example, in the DSM-5) recognizes that an individual even with a reliable IQ score slightly above the generally accepted range for intellectual disability (such as Mr. Johnson's non-adjusted 77) can nevertheless be diagnosed with intellectual disability if he exhibits compelling evidence of significant limitations in adaptive behavior during the developmental period. The DSM-5 suggests, for example, that such a person "may have such severe adaptive behavior problems" in "areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score." Ex. 77 at 37 (DSM-5).  This represents a marked difference from earlier and more rigid reliance on IQ scores as hard cut-offs than existed at the time of Mr. Johnson's trial and for years afterwards. Compare, for example, DSM-5 at 37 with the DSM-IV-TR, published in 2000, which has no such provison.

Such evidence of severe adaptive deficits exists in Mr. Johnson's case, and are documented throughout his childhood records. Where the conceptual skills of a person with mild intellectual disability may enable that person to perform academic skills at a sixth-grade level, Mr. Johnson's general achievement testing scores have never been above the fourth-grade range. And where adaptive deficits need only exist in one adaptive skill domain to be diagnostic of intellectual disability, Mr. Johnson has been adjudged by three experts in intellectual disability to have significant deficits in all three domains. The convergent validity of these

37

wide-ranging adaptive failures is significant and compels a conclusion of intellectual disability under contemporary understanding of intellectual disability.[28]

Third, current standards in the scientific and clinical communities have increased the importance of adaptive behavior. The use of tests for objective, standardized measurements of adaptive functioning to perform a retroactive assessment were unavailable at the time of Mr. Johnson's trial yet today are routinely used and considered reliable. Dr. Olley has now administered the ABAS-II to three reporters who knew Mr. Johnson well during childhood—an aunt, a close family friend, and a teacher from one of Mr. Johnson's residential schools. The results of these assessments, which were not reliable enough to have been used when Mr. Johnson was first tried or at the time of his 2255 proceedings, support the diagnosis of intellectual disability, as well.

### b.     Newly discovered IQ scores

After Mr. Johnson's trial and § 2255 proceedings were completed, undersigned counsel became involved in his case and learned of previously undiscovered childhood records containing several additional IQ scores. These newly discovered scores undermine the understanding of Mr. Johnson's disability at trial and underscore the unreliability of his sentence. In 1997, when Mr. Johnson

---

[28] Ex. 1 at 25-32 (Reschly Report); Ex. 2 at 16-40 (Olley Report); Ex. 3 at 4-6 (Siperstein Letter).

was eight years old, his Flynn-adjusted IQ was determined by a WISC-R[29] to be 72 (raw score: 72). This score clearly placed him in the category of intellectually disabled. Had it been discovered prior to trial, it alone could have supported a finding of intellectual disability.

Undersigned counsel also discovered another IQ score, this one from 1981 when Mr. Johnson was 12 years old. It was also from a WISC-R administration and it revealed a full-scale Flynn-adjusted score of 75 (an unadjusted 78). This score also places Mr. Johnson in the range of mild intellectual disability and could have supported such a finding at trial. It also was significant in other ways. First, it was the *third* IQ score prior to the age of 18 that placed Mr. Johnson squarely in the category of the intellectually disabled. If these newly discovered scores had been known, their convergent validity would have made obvious that the IQ score of 77, obtained post-arrest when Mr. Johnson was 23-years old, was the outlier rather than a prior score of 69, obtained when Corey was 16, which the jury also heard about. Indeed, it would have shown that every one of Mr. Johnson's valid IQ scores obtained prior the age of 18 was in the range of intellectual disability.

Second, the discovery of this 1981 test would have put into proper context the 88 IQ score introduced at the penalty phase. There is a well-known phenomenon in IQ testing known as the practice effect.  "The *practice effect* refers

---

[29] The WISC-R is the version of the Wechsler IQ test administered to children.

to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument." Ex. 75 at 38 (AAIDD-11). According to the AAIDD, "established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence." *Id.*; *see also* Ex. 76 at 23 (AAIDD-11 User's Guide). The APA also recognizes that practice effect is one of the factors that can affect test scores. *See* Ex. 77 at 37 (DSM-5). *Roland*, 281 F. Supp. 3d at 509; *see also Salad*, 959 F. Supp. 2d at 872 (noting "the court should be cognizant of the 'practice effect' . . . phenomenon [that] describes the likelihood of inflated scores on re-administrations of similar IQ tests within a short period of time"); *United States v. Hardy*, 762 F. Supp. 2d 849, 857 (E.D. La. 2010) (disregarding higher score due to practice effect); *United States v. Nelson*, 419 F. Supp. 2d 891, 897-99 (E.D. La. 2006) (giving higher scores less weight because of the practice effect); Ex. 1 at 12-13 (Reschly Report) (discussing practice effect); Ex. 2 at 14-15 (Olley Report) (same); Ex. 3 at 3 (Siperstein Letter) (same).

Though Dr. Cornell, trial counsel, and § 2255 counsel were unaware of it, the 1982 IQ test that yielded the score of 88 was the same test that had been administered to Mr. Johnson just four months earlier, and that yielded a Flynn-adjusted score of 75. Dr. Galluadet herself, a young, inexperienced (and at the time, as yet to be licensed) psychologist, was unaware when she administered the

40

1982 test that Mr. Johnson had just recently been administered any IQ test, let alone the *same* test she gave him. *See* Ex. 18 ¶¶ 13-15 (3/19/12 Decl. of C. Gallaudet) (declaring that she would not have administered the same test had she known Corey's recent experience taking it). As a result, she had no context into which to put his higher score, either. Worse yet, this indisputable practice effect inflation distorted subsequent assessments. When Mr. Johnson was tested again at the age of 16, and was again administered the WISC-R, yielding a Flynn-adjusted score of 65, the psychologist who tested him had no basis to account for the score of 88 just three years earlier so assumed the enormous difference in scores was characteristic of a learning disability, rather than understanding it as an unreliable testing artifact resulting from the practice effect. Ex. 51 at 1 (4/15/85 Psychological Eval.); Ex. 11 ¶¶ 18-19 (7/22/14 Decl. of K. Barish).

As a result of the discovery of the inadvertent mistake made by Dr. Gallaudet, clemency counsel interviewed her and her supervisor at the time and learned of yet another problem with the administration of the test that yielded the 88 score. That is, during the course of the testing, Dr. Gallaudet took steps to *help* Mr. Johnson better focus his attention on the tasks at hand. Such actions are known to artificially inflate IQ scores, as the ability to concentrate is a component that affects performance. As Dr. Reschly explains, "during the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the

41

report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results." Ex. 1 at 11 (Reschly Report).

Each of these developments makes clear that the testimony in 1993 that Mr. Johnson was not a person with intellectual disability was reached without today's current understanding in the medical and legal community of what constitutes intellectual disability and without an accurate or complete picture of his intellectual functioning, based on valid, properly adjusted IQ scores. The prior sentencing determination was "premised on unreliable science and was therefore itself unreliable." *Lee v. Glunt*, 667 F.3d 397, 407 (3d Cir. 2012). Accordingly, such a sentence does not satisfy the Eighth Amendment's reliability guarantee.

**2.     Mr. Johnson's Claim should be authorized pursuant to 2255(b)(1) because he is ineligible to be put to death**

While unavailable to state court petitioners in § 2254 proceedings (who must seek authorization pursuant to 28 U.S.C. § 2244(b)), the Fourth Circuit has left open the question of whether a federal death row inmate may seek authorization by establishing that he is "'innocent' of the death penalty." *In re Vial*, 115 F.3d 1192, 1198 n.12 (4th Cir. 1997). The Tenth Circuit has also declined to resolve the issue. *LaFevers v. Gibson*, 238 F.3d 1263, 1267 (10th Cir. 2001) ("[T]here is a split among the three circuits that have addressed the question. . . . This court need not resolve that difficult question . . . ."). But other circuits have affirmatively

42

embraced this position as to death-eligibility. *See, e.g.*, *Thompson v. Calderon*, 151 F.3d 918, 924 n.4 (9th Cir. 1998), as amended, (July 13, 1998) (en banc) ("We disagree with the Seventh and Eleventh Circuit decisions rejecting a petitioner's claim of innocence of the death penalty as not cognizable under § 2244(b)(2)(B)"); *Webster v. Daniels*, 784 F.3d 1123, 1148 n.1 (7th Cir. 2015) (en banc) (Easterbrook, J., dissenting) ("[I]t is most sensible to understand § 2255(h)(1) as authorizing a successive petition when newly discovered evidence shows, clearly and convincingly, that no rational trier of fact could have thought a given person death-eligible.").

The fact that § 2255 is the first and only opportunity for post-conviction relief for federal inmates—and that there are no federal-state comity concerns in the § 2255 process—weigh heavily in favor of allowing authorization of claims that would establish "innocence" of the death penalty. Mr. Johnson's underlying claim establishes an absolute exclusion from the death penalty. If he prevails on his *Atkins* claim he is not merely "innocent" of the death penalty; he is ineligible for that punishment. If no rational trier of fact could find him death-eligible in light of the newly presented evidence, this Court should not interpret § 2255(h)(1) in such a way that allows an unconstitutional execution.

43

**CONCLUSION**

The death penalty is no longer tolerable as a punishment for people with intellectual disability.  The Supreme Court has placed "a substantive restriction on the [government's] power to take the life' of a mentally retarded offender." *Atkins,* 536 U.S. at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986). The Government nonetheless seeks to execute Corey Johnson on January 14, 2021 because of the unfortunately and ultimately arbitrary fact that his trial was the first federal capital prosecution of an offender with intellectual disability and it preceded the legal and scientific understanding of intellectual disability that exists today. If Mr. Johnson were indicted today, he would be ineligible for the death penalty, and would be able to rely on facts, standards and procedures to prove it.

No court or jury has ever heard the evidence establishing his infirmity, yet the Government invokes procedural technicalities to block that review and ensure his execution. This Court should not countenance such a result; it contravenes both the letter and the spirit of the law. As the Supreme Court has repeatedly stated "There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose." *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) (quoting *Mackey v. United States*, 401 U.S. 667, 693 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)).

44

This Court is never likely to see a case like this again. Corey Johnson's was one of the first federal death penalty trials and the very first where the question of intellectual disability even arose. Few individuals facing a federal death sentence can purport to raise these claims; fewer still will have such strong proof of the diagnosis; and none should be in the position again where that proof was never presented in any Court. Mr. Johnson asks this Court to grant authorization and allow his evidence to be heard.

Dated: January 7, 2021                    Respectfully submitted,


                                          /s/ Donald P. Salzman
                                          Donald P. Salzman
                                          Jonathan Marcus
                                          David E. Carney
                                          Skadden, Arps, Slate, Meagher & Flom LLP
                                          1440 New York Avenue, NW
                                          Washington, DC 20005
                                          Telephone: (202) 371-7983
                                          Fax: (202) 661-9063
                                          Email: donald.salzman@skadden.com

                                          *Counsel for Corey Johnson*

45

## CERTIFICATE OF COMPLIANCE

1.      This motion contains 10,557 words, excluding the parts of the motion exempted from the word count by Local Rule 27(d)(2) and Rule 32(f).  To the extent that this word count exceeds any applicable limit, Appellant requests that it be accepted notwithstanding its non-compliance.  If the Court requires a motion to exceed limits, counsel is prepared to promptly file one.

2.      This motion complies with the font, spacing, and type size requirements set forth in Local Rule 32(a)(5) and (a)(6).

/s/ Donald P. Salzman

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of January 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ Donald P. Salzman
Donald P. Salzman
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7983
Fax: (202) 661-9063

Email: donald.salzman@skadden.com