**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| COREY JOHNSON, | : | |
| | : | |
| Defendant. | : | |

**MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO
BE EXECUTED UNDER THE EIGHTH AMENDMENT**

David E. Carney, VA Bar # 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF RELEVANT PROCEDURAL HISTORY............................................3

      A.      Trial Proceedings ........................................................................................3

      B.      The Penalty Hearing ....................................................................................5

      C.      Direct Appeal ...............................................................................................9

      D.      Post-Conviction Proceedings .....................................................................10

      E.      Appeal of Post-Conviction Proceedings ....................................................13

      F.      Subsequent Proceedings and Discovery of Additional IQ Scores ............14

III.    ARGUMENT.....................................................................................................16

      A.      THE EIGHTH AMENDMENT CATEGORICALLY BARS THE
           EXECUTION OF COREY JOHNSON.................................................................16

           1.      The Supreme Court's Eighth Amendment Jurisprudence on
                Intellectual Disability...................................................................16

           2.      Mr. Johnson Has Intellectual Disability Under the Supreme
                Court's Eighth Amendment Jurisprudence ...................................24

                a)      Mr. Johnson Has Significant Deficits in Intellectual
                      Functioning Diagnostic of an Intellectual Disability ....................24

                b)      Mr. Johnson Has Significant Deficits in Adaptive
                      Functioning Diagnostic of an Intellectual Disability ....................27

                      (1)     Conceptual Domain .......................................................28

                    (2)     Social Domain................................................................36

                      (3)     Practical Domain............................................................40

                      (4)     Adaptive Behavior Composite........................................44

                c)      The Onset of Mr. Johnson's Intellectual and Adaptive
                      Deficits Began Well Before the Age of Eighteen..........................45

      B.      MR. JOHNSON'S DEATH SENTENCE WHICH IS BASED ON
            DISCREDITED SCIENCE VIOLATES THE EIGHTH AMENDMENT ..........46

1.    The Evidence on Which Mr. Johnson Was Sentenced to Death Is Materially Inaccurate ......................................................................................47

(a)    Dr. Cornell's Evidence Did Not Account for the Flynn Effect, Which Must Be Applied to Make the Evidence Reliable ..........................................................................48

(b)    The Failure to Have Reliable IQ Evidence Led to Unreliable Evidence on Deficits in Adaptive Behavior.................52

(c)    The Evidence of Intellectual Disability Did Not Include Any Standardized Adaptive Behavior Instruments.......................53

(d)    Newly Discovered IQ Scores Make Clear that the Evidence at Mr. Johnson's Trial Was Inaccurate .........................................55

2.    Reliance on Invalidated Science in Mr. Johnson's Case Was Prejudicial ...........................................................................................58

IV.    CONCLUSION.................................................................................................59

## I.    INTRODUCTION

Corey Johnson[1] is scheduled to be executed on January 14, 2021, but he is intellectually disabled.[2] Three renowned experts have concluded that he is a person with intellectual disability based on significant diagnostic analysis using relevant medical standards and records from Mr. Johnson's youth. Under the Constitution, Mr. Johnson is barred from execution. Decades ago, evidence was presented in Mr. Johnson's capital sentencing hearing that decisively asserted he was not intellectually disabled. That evidence was and is decisively and conclusively invalid and unreliable, under current medical standards.

Mr. Johnson seeks relief here, pursuant to 28 U.S.C. § 2255, effectuating the Constitutional bar. To proceed with his execution next week based on demonstrably unreliable evidence and without the benefit of newly discovered evidence would be an afront to the collective values of the nation as set forth in the law and Constitution:

- Mr. Johnson has never had an evidentiary hearing on the merits of his claim at which the factfinder was presented all of the relevant facts to consider under modern medical standards.

- Mr. Johnson, at the time of his sentencing, was determined to not be intellectually disabled based on the testimony of a single psychologist, who did not qualify as or purport to be an expert in intellectual disability, and who instead presented mitigating evidence to the jury.

- The mitigation psychologist's testimony relied an incomplete set of evidence that was unreliable at the time and is unreliable now based the comprehensive record and advances in medicine and the law.

- Despite testifying that Mr. Johnson's IQ test scores prevented Mr. Johnson from being diagnosed as intellectually disabled, the evidence reflected a qualifying test

---

[1] Mr. Johnson's correctly spelled first name is Corey. When referring to his childhood years herein, Mr. Johnson is referred to as Corey.

[2] The modern convention is to refer to individuals as "intellectually disabled," replacing the previous term "mentally retarded." However, this motion uses the term "mentally retarded" when citing statutes, case law or testimony or describing documents that use the term.

score that was discounted for reasons now known to be erroneous but were not appreciated at the time.

- The score that the psychologist testified was disqualifying in 1993 would not be disqualifying today.

- On appeal and in his collateral challenge, the Fourth Circuit affirmed the conclusion of the district court that Mr. Johnson was not intellectually disabled without the benefit of additional fact and expert evidence.

- Notwithstanding the foregoing, Mr. Johnson is indisputably a person with intellectual disability. The evidence set forth below establishes multiple qualifying IQ test scores from before and after his 18th birthday, and extensive adaptive deficits, including a lack of the skills necessary to navigate the world on his own, to engage in normal social interaction, and to respond to changing circumstances.

- The evidence below negates the reliability of the evidence offered in the penalty phase of his trial that he failed to meet the diagnostic criteria.  Under modern standards, even if he were not adjudged to be a person with disability at the time of his conviction (and he was a person with intellectual disability at that time), he would be so adjudged today on the eve of his execution.  While his intellectual disability had its onset before the age of 18, modern medicine and law has evolved to define more clearly the standards for determining that an individual is intellectually disabled.

- Mr. Johnson's perfect record over more than 20 years as a model inmate in the Bureau of Prisons without a single disciplinary infraction—reflecting his functioning in a predictable environment with clear rules, clear consequences, clear responsibilities—is consistent with and a reflection of his intellectual disability because prison life provides structure and stability to inmates with intellectual disability, and Mr. Johnson's prison record demonstrates beyond any question that he does not pose a risk within the prison community.

- Mr. Johnson is uniquely situated.  No other current federal death-row inmate can press the claim he advances here; only he was convicted before the relevant Supreme Court precedent discussed below.  An order barring his execution does not open any floodgates for litigation.

For federal prisoners such as Mr. Johnson, the Eighth Amendment stands as the bulwark against an illegal and unconstitutional execution.  In Mr. Johnson's case, the Eighth Amendment, in addition to barring the execution of an individual with intellectual disability, demands "reliability in the determination that death is the appropriate punishment." *Johnson v.*

2

*Mississippi*, 486 U.S. 578, 584 (1988) (citation omitted).  A death sentence based on "evidence that has been revealed to be materially inaccurate," and the use of which is prejudicial, violates the Eighth Amendment's reliability guarantee.  *Id.* at 590.  Specifically, testimony based on invalid science is unreliable.  *Lee v. Glunt*, 667 F.3d 397, 407 (3d Cir. 2012) ("[T]he testimony was premised on unreliable science and was therefore itself unreliable.").  The evidence that Mr. Johnson did not qualify for a diagnosis of intellectual disability was and is materially inaccurate and its use was prejudicial to Mr. Johnson.  Accordingly, he cannot be executed based on it.

Mr. Johnson asks this Court to issue an order scheduling briefing on this motion and setting an evidentiary hearing to allow him to present the evidence of, and establish, his disability, and granting argument and post-hearing briefing on any factual matters the government may dispute.  In order to allow time for such an evidentiary hearing, the Court is respectfully requested to prohibit Mr. Johnson's execution on January 14, 2021.  After hearing the abundant evidence of his intellectual disability, the Court should permanently enjoin the implementation of his death sentences to avoid an "intolerable result" prohibited by the Constitution.  *Webster v. Daniels*, 784 F.3d 1123, 1139 (7th. Cir. 2015); *see also United States v. Davis*, 611 F. Supp. 2d 472, 507 (D. Md. 2009) ("The [FDPA] and the Eighth Amendment preclude the machinery of death from turning when a defendant is mentally retarded.").

## II.     STATEMENT OF RELEVANT PROCEDURAL HISTORY

### A.     Trial Proceedings

In April 1992, Corey Johnson and six co-defendants were charged in a 33-count indictment with offenses arising from a drug conspiracy pursuant to the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the "ADAA").  (4/24/92 Indictment, Dkt. 1.).  The government sought death for three of the co-defendants, Mr. Johnson, James Roane, and Richard Tipton.  Ex. 64 (2/8/93 Notice of Intention to Seek Death Penalty as to Mr. Johnson); Ex. 60

3

(5/1/92 Notice of Intention to Seek Death Penalty as to Mr. Roane); Ex. 59 (5/1/92 Notice of Intention to Seek Death Penalty as to Mr. Tipton).[3] This was among the first federal capital trials prosecuted in the modern era of the death penalty, and the very first in which the government charged and tried co-defendants together.

In the superseding indictment under which he was ultimately tried, Mr. Johnson was charged with 27 counts, including conspiracy to violate provisions of the ADAA under 21 U.S.C. § 846, murder in the course of a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A), using a firearm during a crime of violence under 18 U.S.C. § 924(c), possession of cocaine base with the intent to distribute under 21 U.S.C. § 841(a)(1), and killing and maiming in aid of racketeering under 18 U.S.C. § 1959(a). Ex. 61 (7/20/92 Second Superseding Indictment, Dkt. 115).[4] On February 3, 1993, the jury convicted Mr. Johnson of all 27 charged

---

[3] The government initially filed a notice of intent to seek the death penalty against co-defendant Vernon Lance Thomas who was eventually convicted of killing four victims. Ex. 62 (10/28/92 Notice of Intention to Seek Death Penalty as to Mr. Thomas). Mr. Thomas's case was severed from that of the other three defendants for reasons related to the availability of his appointed counsel. Following authorization, but prior to trial, Mr. Thomas presented an expert report to the government that concluded Mr. Thomas had an IQ of 71 and was "mentally retarded." Shortly thereafter, the government withdrew its death authorization, and Mr. Thomas faced a maximum penalty of life without parole at his trial. *See, e.g.*, Ex. 66 (4/15/93 Mot. to Have Def. Declared Mentally Retarded).

[4] Mr. Johnson's death sentence is itself infirm on several grounds. He is therefore currently seeking authorization from the U.S. Court of Appeals for the Fourth Circuit to challenge his § 924(c) convictions under *United States v. Davis*, 139 S. Ct. 2319 (2019). Mot. for Authorization to File a Successive Mot. Pursuant to 28 U.S.C. § 2255(h)(2), *In re Corey Johnson*, No. 20-8 (4th Cir. May 22, 2020), ECF No. 2-1. He is also appealing to the Fourth Circuit the denial of relief he sought pursuant to the First Step Act. Mem. Order (Nov. 19, 2020), ECF No. 75, *appeal docketed*, *United States v. Johnson*, No. 20-15 (4th Cir. Nov. 23, 2020). And, finally, on January 4, 2021, Mr. Johnson filed a notice of appeal from a January 2, 2021 order of the district court dismissing, on jurisdictional grounds, a second but not successive motion pursuant to 28 U.S.C. § 2255 seeking an order barring his execution pursuant to 18 U.S.C. § 3596(c). Mr. Johnson expects to file a merits brief and request for certificate of appealability in *United States v. Johnson*, 21-1, imminently.

counts, including seven CCE murders. *See* Ex. 63 (2/3/93 Verdict Form, Dkt. 466); Ex. 6 (2/3/93 Trial Tr. 3259-63).

### B. The Penalty Hearing

A penalty phase hearing followed shortly after conviction in front of the same jury. Mr. Johnson's defense team presented evidence in mitigation, which included his difficult and tumultuous childhood and his severe mental impairments and their manifestations in his day-to-day life. The defense presented much of the mitigating evidence through Dewey Cornell, Ph.D., a University of Virginia psychologist hired by the defense to evaluate Mr. Johnson as part of a standard mental health evaluation and to offer mitigation to the jury.[5] As described below, while the mitigation case noted Mr. Johnson's severe limitations, the defense informed the jury, in both opening and closing arguments, that Mr. Johnson was *not* intellectually disabled and that jurors would not be asked to make such a determination. Ex. 7 (2/10/93 Trial Tr. 3547); Ex. 9 (2/12/93 Trial Tr. 3921).

Instead, although Dr. Cornell testified that Mr. Johnson's mental impairments made him "unprepared to function in society, unprepared to survive on his own when he left institutional care . . . and made him unable to cope and adapt to society in a way that a normal individual would," Ex. 7 (2/10/93 Trial Tr. 3574), Dr. Cornell also affirmatively told the jury that Mr. Johnson did not meet the criteria for a diagnosis of mental retardation. He explained that Mr. Johnson did not satisfy that diagnosis because, on an IQ test Dr. Cornell had administered, Mr. Johnson had scored 77, "just above the level of mental retardation," "two points above that." Ex.

---

[5] The defense specifically asked Dr. Cornell to: (1) determine whether Mr. Johnson was competent to stand trial; (2) determine if he was criminally responsible for his crimes; and (3) gather, analyze, and prepare potential mitigation evidence for the capital sentencing hearing. Ex. 15 ¶ 9 (9/20/16 Aff. of C. Cooley).

7 (2/10/93 Trial Tr. 3691-92). (Dr. Cornell testified that he double checked his scores, saw Mr. Johnson a second time, and consulted with his colleagues, Ex. 7 (2/10/93 Trial Tr. 3691), but there was no testimony about what this double checking entailed or whether the colleagues were qualified experts in intellectual disability.) This score, he said, failed to satisfy the first prong of a such a diagnosis—that Mr. Johnson had a significant intellectual deficit, as represented by this one IQ score.[6]

Because Dr. Cornell did not believe Mr. Johnson satisfied prong one, no attempt was made during these proceedings to establish that Mr. Johnson met the clinical definition of intellectual disability,[7] and neither the judge nor the jurors were asked to determine whether Mr. Johnson is a person with intellectual disability.[8] The defense, through Dr. Cornell's testimony, simply presented as mitigation Mr. Johnson's documented, ongoing educational failures;

---

[6] Dr. Cornell reached this conclusion even though he also testified that Corey had received an IQ score of 69 when he was 16, which Dr. Cornell acknowledged was a score below the threshold for a mental retardation diagnosis. Ex. 7 (2/10/93 Trial Tr. 3607-09). Dr. Cornell's disregard of this IQ score of 69, which satisfies the first prong of the diagnosis, can only be explained by a belief that a single score above the default threshold disqualifies one for the diagnosis even when there are scores that satisfy the prong. This view is contrary to current medical standards and law. *See infra* Section III.

[7] The test for intellectual disability generally accepted in both the legal and medical communities is a three-pronged analysis requiring findings of a significant intellectual deficit, significant adaptive deficits, and onset before the age of 18. *See infra* Section III.A.1.

[8] Because he believed Mr. Johnson failed to qualify under the first prong, requiring a significant deficit in intellectual functioning as measured by IQ scores, Dr. Cornell never engaged in the full consideration of the second prong—deficits in adaptive behavior—which under modern diagnostic standards is given relatively more weight in an intellectual disability diagnosis than the intellectual functioning prong. *See infra* Section III.B.1.b. Nevertheless, his testimony described many documented adaptive impairments observed during Mr. Johnson's childhood that would have satisfied that prong, and which have since been corroborated by numerous other witnesses.

6

diagnoses he had received as an adolescent of diffuse organic brain damage;[9] and standardized

test scores that placed him in the bottom one to two percent of children his age, Ex. 7 (2/10/93

Trial Tr. 3580-3602).  Dr. Cornell also identified concrete ways Mr. Johnson fell far below his

age-peers in his life skills.[10]  These included Mr. Johnson's inability into early adolescence to

make it through the night without wetting or soiling himself, or to recite all the months of the

year by age 13, Ex. 7 (2/10/93 Trial Tr. 3576, 3585); and by late adolescence, his inability to

read beyond a second-grade level, tell time, count money, do math beyond simple arithmetic, or

to navigate any but the most familiar streets, Ex. 7 (2/10/93 Trial Tr. 3545-3714), though he did

not describe these pronounced deficits as being indicative of a diagnosis of mental retardation for

Mr. Johnson.

While he ruled out mental retardation as an explanation for Mr. Johnson's deficits, Dr.

Cornell did testify to other afflictions Mr. Johnson had been diagnosed with or appeared to

manifest.  During the course of his testimony, Dr. Cornell referred to records created during Mr.

Johnson's childhood showing he had been diagnosed with brain damage, resulting in serious

deficits in nonverbal abstract reasoning, perception organization, visual perception and

---

[9] Brain damage is considered one of several potential causes of, and a contributing factor to, intellectual disability.  Mr. Johnson's brain damage is so severe and widespread that, unlike many people who have localized damage, Mr. Johnson is unable to develop "workarounds" that employ healthy sections of his brain.  Dr. Cornell himself testified, "The problem with Cory (sic) is that his—his disability was so severe, so diffuse, he couldn't compensate."  Ex. 7 (2/10/93 Trial Tr. 3592, 3678-79).

[10] Unaware (because trial counsel had not found them) that Mr. Johnson had two additional childhood IQ scores—one from a test given to him when he was eight years old that at the time of his trial would have placed him in the diagnostic range for intellectual disability and another from a test administered at age twelve that under modern standards is also within the intellectual disability range—Dr. Cornell mistakenly understood these impairments as only being indicative of a calamitous learning disability and noted that, but for his out-of-range IQ, these impairments aligned with the adaptive deficits one would find in a person who was mentally retarded.  Ex. 7 (2/10/93 Trial Tr. 3692-97).

perceptual motor functioning, comparable to a child five years below his chronological age.  Ex. 7 (2/10/93 Trial Tr. 3583-84).  Dr. Cornell discussed records showing that Mr. Johnson had severe neurologic dysfunctions, including reading and arithmetic disorders, and that observations of these disorders were consistent across evaluators and across time.  Ex. 7 (2/10/93 Trial Tr. 3604).  He recounted notations in records from adolescent institutionalization in residential treatment and group homes in which professional staff (who routinely dealt with special education students) noted that Corey was among the most severely learning-disabled children they had taught.  Dr. Cornell told the jury that one doctor deemed Corey the *most* severe case of learning disability—a misdiagnosis of Corey—he had ever seen, despite Corey's valiant efforts to learn.  Ex. 7 (2/10/93 Trial Tr. 3589, 3591).[11]  Dr. Cornell also testified that achievement test scores Corey received throughout his childhood placed him in the range of mental retardation.  Ex. 7 (2/10/93 Trial Tr. 3592, 3600, 3608).[12]  The childhood records that Dr. Cornell discussed in detail in his sentencing phase testimony are filled with descriptions by case managers, social workers, psychologists, psychiatrists, and other professionals documenting Mr. Johnson's broad

---

[11] An intellectual disability can be a co-morbid state with learning disabilities.  Ex. 77 at 39-40 (Diagnostic and Statistical Manual of Mental Disorders ("DSM-5")); Ex. 75 at 60-62, 65-66 (American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11")); *see, e.g.*, *Davis*, 611 F. Supp. 2d at 482, 485; *United States v. Roland*, 281 F. Supp. 3d 470, 480, 546 (D.N.J. 2017).  An expert who has since evaluated Mr. Johnson, however, believes Mr. Johnson was misdiagnosed as having a learning disability and did not meet the diagnostic criteria for one.  Ex. 1 at 32-38 (Reschly Report).

[12] During the period of time Corey was attending public schools and living in a residential facility and later in a group home while in foster care, he was receiving the same social and educational supports a person with intellectual disability would receive.  He was not, however, given a designation of intellectual disability.  This was likely due in part to the then-prevalent notion that if an intellectually disabled child already had access to individualized services it was preferable not to stigmatize the child with a label of mental retardation.  *See* Ex. 1 at 37-45 (Reschly Report).  In addition, the evidence strongly suggests that those evaluating Mr. Johnson did not have access to all his IQ test scores, or sufficient documentation or expertise to evaluate the outlying higher scores he had received.  *See infra* Section III.B.1.

8

and significant impairments in adaptive functioning.  But because Dr. Cornell concluded that Mr. Johnson's IQ score of 77 was just two points too high to qualify for a "mental retardation" diagnosis, as noted above, Dr. Cornell apparently did not believe it was necessary to further assess Mr. Johnson with respect to the second prong of the diagnosis for intellectual disability.

The mitigation evidence Dr. Cornell testified to, that Mr. Johnson had diffuse brain damage, neurologic dysfunction, and learning disabilities, was all consistent with a diagnosis of intellectual disability; these are considered risk factors for and comorbidities with, intellectual disability.[13]  Additional evidence from family members likewise described biomedical, educational, and social circumstances the medical community deems risk factors for intellectual disability.  But the jury was never asked to consider this extensive evidence for any purpose other than as mitigating evidence of disadvantage and general impairment.

Even though the jury found several mitigating factors associated with Mr. Johnson's cognitive impairments, it returned a verdict of seven death sentences, one for each of his CCE convictions.  Ex. 65 (2/16/93 Special Findings, Dkt. 508); Ex. 10 (2/15/93 Trial Tr. 4027-31).  Considering mental retardation was not an option.

### C.     Direct Appeal

Mr. Johnson's attorneys timely appealed to the Fourth Circuit, raising issues relating to the guilt and penalty phases of his trial.  No issue regarding intellectual disability was raised in his direct appeal.

---

[13] Given the current state of the law and medical science (including the Flynn Effect) as well as the discovery of two additional childhood IQ results, a finding today that Mr. Johnson is intellectual disabled would be virtually indisputable.  *See infra* Section III.

9

### D.       Post-Conviction Proceedings

In June 1998, Mr. Johnson's attorneys filed a motion for collateral relief pursuant to §

2255.  In both initial and supplementary pleadings, counsel asserted for the first time that Mr.

Johnson was ineligible for a death sentence pursuant to 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596

because he was mentally retarded.

In their pleadings, recognizing that Dr. Cornell had failed to take into account the age of

the IQ tests on which he had relied during his trial testimony, post-conviction counsel asserted

that Dr. Cornell should have adjusted all of Mr. Johnson's IQ scores using the Flynn Effect—a

testing phenomenon that causes IQ scores to inflate over time and requires scores to be corrected

accordingly[14]—and that, had Dr. Cornell made these necessary adjustments, Mr. Johnson's IQ

scores would have fallen within the standard error of measurement ("SEM") diagnostic of mental

retardation, and a full evaluation would not have been ruled out.  Habeas counsel also asserted

that trial counsel was constitutionally ineffective for not pursuing a claim that Mr. Johnson was

mentally retarded, regardless of the advice and assessment they had received from Dr. Cornell.

Ex. 67 at 108-11 (6/15/98 Mem. in Supp. of Initial Petition for Writ of Habeas, Dkt. 714

---

[14] Research scientist James Flynn discovered IQ tests across populations increase slowly over time—approximately .3 points per year or 3 points over ten years.  In the context of an intellectual disability assessment, at the time an IQ test is normed, the upper range of IQ scores in support of an intellectual disability diagnosis would range from approximately 70 to 75. According to the Flynn Effect, if the same IQ test were given to a subject ten years after the IQ test was normed, the upper end of the intellectual disability range would have risen from approximately 75 to approximately 78.  For example, as applied in Mr. Johnson's case, his 1992 IQ score of 77 would be adjusted to approximately 73, which is in the range for mild intellectual disability.  While experts in intellectual disability have now weighed in on this issue, § 2255 counsel did not present expert support for this proposition during § 2255 proceedings and relied exclusively on scientific literature.  *E.g.*, Ex. 1 at 8-10 (Reschly Report); Ex. 2 at 3-5 (Olley Report); Ex. 3 at 3-4, 10 (Siperstein Letter).

(Excerpt)).  To support both these claims, counsel attached to the reply to the § 2255 motion three IQ test results (which had been admitted into evidence at trial), Ex. 68 (3/15/99 Reply Br., Dkt. 761 (Excerpt)), Ex. 69 (3/15/99 Reply Br. Ex. 14), and a single social services record, Ex. 70 (3/15/99 Reply Br. Ex. 15).  An excerpt from the same social services record that § 2255 counsel attached to the reply was admitted in evidence at trial, and Dr. Cornell mentioned the record in his testimony as well.  *See* Ex. 7 (2/10/93 Trial Tr. 3617-18, 3712); *compare* Ex. 55 at 1, 7-9 (6/28/86 Service Plan Review 6 Month), *with* Ex. 8 at 10 (Excerpt of Cornell Mitigation Information and Report) (admitted into evidence at trial and same as Ex. 55 at 1), *and* Ex. 70 (3/15/99 Reply Br. Ex. 15) (same as Ex. 55 at 7-9).

In light of Dr. Cornell's failure to adjust the IQ scores to account for the Flynn Effect, an omission on which his opinion hinged, counsel made relevant discovery requests during these post-conviction proceedings.  They asked for information about the criteria the Department of Justice used to evaluate whether a defendant charged with a capital crime was mentally retarded. They also sought to learn in what specific federal capital cases defendants had asserted their execution should be barred due to mental retardation, and also requested all reports and memoranda specifically related to the application of the mental retardation bar against the defendants in the case.[15]  Finally, they sought any documents regarding the government's knowledge of Mr. Johnson's "mental impairments."  Ex. 71 at 32 (6/24/99 Joint Mot., Dkt. 770).

Mr. Johnson also requested an evidentiary hearing. Ex. 68 at 74 (3/15/99 Reply Br., Dkt. 761 (Excerpt)).

---

[15] This discovery was especially relevant because of the outcome of Vernon Lance Thomas's case.  *See supra* at n.3.

The district court denied Mr. Johnson's mental retardation-related discovery requests as unnecessary, summarily resolving the question of whether Dr. Cornell's scoring should have been modified on the grounds that "[e]vidence at trial indicated that [Mr. Johnson's] I.Q. is 77, and he is therefore not mentally retarded . . . clearly Johnson cannot prevail on this claim in light of the evidence presented at trial." Ex. 72 at 12 (5/3/00 Mem. Op., Dkt. 803).

In 2003, the district court granted the government's motion for summary judgment, denying Mr. Johnson relief on all grounds without granting Mr. Johnson's request for an evidentiary hearing. *See* Ex. 73 (5/1/03 Mem. Op., Dkt. 896). In light of the fact that no new evidence had been offered with respect to the issue of Mr. Johnson's mental retardation, the Court found that "the record before the Court demonstrates that Johnson is not mentally retarded" and that Mr. Johnson's trial counsel was not ineffective for failing to raise the issue that Mr. Johnson's IQ score was overstated because counsel had reasonably relied on Dr. Cornell's assessment.[16] Despite § 2255 counsel's explanation of the Flynn Effect and the fact that Mr. Johnson had childhood scores under 75 as reported by Dr. Cornell, the district court relied on Dr. Cornell's conclusion that Mr. Johnson was not mentally retarded.[17] The court

---

[16] Ex. 73 at 80-84 (5/1/03 Mem. Op., Dkt. 896). The district court rejected counsel's argument that Mr. Johnson's IQ score was inflated on the basis that Dr. Cornell's testimony "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." *Id.* at 81-82. But Dr. Cornell merely testified that he double-checked his findings and consulted colleagues before concluding that Mr. Johnson was not mentally retarded because he was aware that finding Mr. Johnson's IQ to be above 75 made him death penalty-eligible. Ex. 7 (2/10/93 Trial Tr. 3691). Dr. Cornell never mentioned the Flynn Effect at trial nor was evidence provided to the court in § 2255 proceedings that Dr. Cornell had taken the Flynn Effect into account.

[17] To the extent that the court's decision could be read to require that all of one's IQ scores must be under 75 to be considered intellectually disabled or that a court can ignore adaptive deficits if a single score is above 75, such requirements would be inconsistent with the consensus of the

12

concluded that Mr. Johnson could, therefore, not be deemed mentally retarded; with Dr. Cornell

having testified at trial he had "rechecked" that Mr. Johnson's score of 77 was accurate, his IQ

was simply too high to qualify.  Ex. 73 at 81 (5/1/03 Mem. Op., Dkt. 896).  Had § 2255 counsel

introduced expert testimony about the Flynn Effect, as is now routinely done,[18] or if counsel had

located the childhood IQ scores that Dr. Cornell was not aware of, the district court almost

certainly would not have come to its conclusion, on the limited record before it, that Mr. Johnson

is not mentally retarded.

### E.     Appeal of Post-Conviction Proceedings

In 2004, Mr. Johnson appealed to the Fourth Circuit.  Counsel argued with regard to Mr.

Johnson's mental retardation claim that the district court had made a mistake in refusing to

consider scores corrected for the Flynn Effect because the court had simply assumed that Dr.

Cornell had considered the Flynn Effect, even though no evidence supported that assumption.

Ex. 74 at 145-46 (Br. for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*,

No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt)).  The court sidestepped the issue

and instead adopted the district court's rationale—that the IQ score Dr. Cornell had assigned Mr.

Johnson placed him outside the diagnostic range for mental retardation and that ended the

---

current legal and medical communities.  *See Hall v. Florida*, 572 U.S. 701, 712 (2014); *Moore*,
137 S. Ct. at 1049; Ex. 77 at 37 (DSM-5); Ex. 76 at 23 (AAIDD-11 User's Guide).

[18] The Flynn Effect is now routinely regarded as valid, "persuasive," and "best practice," by the
courts considering federal capital cases, including those in the Fourth Circuit, and must be taken
into account when expert testimony supports its use.  *See Davis*, 611 F. Supp. 2d at 488; *Roland*,
281 F. Supp. 3d at 503; *see also Salad*, 959 F. Supp. 2d at 872 n.10 ("The Flynn Effect describes
a documented increase in IQ levels over time.  As a result, IQ tests must be periodically re-
normed to account for the population becoming more intelligent; a score on an outdated test
might overstate IQ relative to the contemporary population.")  As noted above, hundreds of
studies have proven that an IQ test will overstate a person's actual IQ by a specifically
measurable amount (.3 points per year) for every year after the IQ test was normed.  Ex. 2(b) at
4-5 (Olley Supplement).

inquiry. The Fourth Circuit also agreed with the district court that Mr. Johnson's counsel were not ineffective for failing to consider the Flynn Effect at sentencing because they were "under no mandate to second-guess" Dr. Cornell's report. *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

Subsequently, the Fourth Circuit denied Mr. Johnson's petition for rehearing. Still convinced of Mr. Johnson's intellectual disability, counsel again raised the issue, along with several others, in a petition for certiorari to the U.S. Supreme Court. The Court denied the petition. *Johnson v. United States*, 546 U.S. 810 (2005).

In late 2005, counsel filed a motion to recall the mandate and for rehearing in light of new Fourth Circuit decisions remanding cases to trial courts to consider evidence of Flynn Effect adjustments to IQ scores above 75 that would bring the scores below 75—exactly what Mr. Johnson had asked the district court to do in his own § 2255 motion. The Fourth Circuit, however, denied the motion to recall, without opinion.

### F.    Subsequent Proceedings and Discovery of Additional IQ Scores

In 2005, the government set an execution date for Mr. Johnson. Mr. Johnson applied for executive clemency, a feature of which was a plea that then President George W. Bush reduce his sentence from death to life without possibility of parole because of his intellectual disability. Because Mr. Johnson's execution was stayed as a result of litigation challenging the government's planned method of execution, counsel withdrew his clemency application before it was ruled upon.[19]

---

[19] Because Department of Justice regulations provide a petitioner with only one determination on a request for clemency, 28 C.F.R. § 1.10(e), applicants often withdraw their petitions if a ruling becomes unnecessary because of a stay or for another reason.

14

Following the entry of the lethal injection stay, new counsel began representing Mr. Johnson. Convinced that their client's intellectual limitations had not been adequately explored and concerned that a full case for intellectual disability had never been presented, counsel searched for and located additional childhood records, including two additional scores from IQ tests he had been administered as a child. One of these scores was a 73 at age eight; the other was a 75, when properly corrected for the Flynn Effect at age 12. Both of these scores constitute evidence of a significant intellectual deficit, satisfying the first prong for a diagnosis of intellectual disability. Counsel also arranged to have three nationally renowned experts in intellectual disability conduct full evaluations of Mr. Johnson.[20] Dr. J. Gregory Olley interviewed numerous witnesses, both old and new, who described Mr. Johnson's pervasive adaptive deficits.[21] Many of these witnesses—teachers, psychologists, counselors at the institutional boarding schools Mr. Johnson attended—had documented their observations of Mr. Johnson during his childhood. All three experts, considering all three prongs, concluded that Mr. Johnson is intellectually disabled.

---

[20] Dr. J. Gregory Olley is a clinical psychologist and professor emeritus at the University of North Carolina with more than 40 years of experience and a researcher and clinician focused on the diagnosis of intellectual disability in children and adults. *See* Ex. 2(a) (Olley CV). Dr. Daniel J. Reschly is a psychologist and professor emeritus at Vanderbilt University with more than 40 years of expertise in intellectual disability and learning disabilities. *See* Ex. 1(a) (Reschly CV). Dr. Gary N. Siperstein is a psychologist with more than 50 years of expertise on intellectual disability and is founder and director of the Center for Social Development and Education at the University of Massachusetts at Boston. *See* Ex. 3(a) (Siperstein CV).

[21] Dr. Olley conducted in-person and phone interviews with more than two dozen witnesses. This included family and friends who had known Mr. Johnson all his life and professionals trained to work with children, who had spent time with, observed, and/or evaluated Mr. Johnson at various points in his development.

Although he had no scheduled execution date, Mr. Johnson again requested clemency in 2016 at the close of the Obama Administration.[22] As before, he (along with other applicants at the time) withdrew his petition in early 2017 before it was ruled upon by the departing Administration.[23]

On December 14, 2020, Mr. Johnson filed a second, but not successive, motion pursuant to 28 U.S.C. § 2255 raising a claim of ineligibility to be executed under 18 U.S.C. § 3596(c). This Court ordered briefing regarding whether it had jurisdiction to address the merits of the claim. The government and Mr. Johnson responded. On January 2, 2021, the Court dismissed the § 2255 motion on jurisdictional grounds and declined to issue a certificate of appealability. Order (Jan. 2, 2021), ECF No. 102 (dismissing § 2255 Petition).

## III.    ARGUMENT

### A.    THE EIGHTH AMENDMENT CATEGORICALLY BARS THE EXECUTION OF COREY JOHNSON

#### 1.    The Supreme Court's Eighth Amendment Jurisprudence on Intellectual Disability

On June 20, 2002, almost a decade after Mr. Johnson's conviction, the Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. *Atkins v. Virginia*, 536 U.S. 304 (2002). "Those mentally retarded persons who

---

[22] A central feature of Mr. Johnson's clemency request was a plea to reduce his sentence from death to life without parole in light of the strong evidence of his intellectual disability, based on the assessments of top experts in the field who, applying up-to-date diagnostic standards, were able to take into account all the evidence amassed during the course of trial and § 2255 proceedings, plus the newly found childhood IQ scores and other childhood records, and extensive lay witness records and declarations.

[23] Mr. Johnson submitted a commutation petition to President Donald J. Trump on December 20, 2020. The petition is centrally focused on his intellectual disability but also notes—among other reasons supporting his request to commute his sentences—Mr. Johnson's model prison record. Mr. Johnson's commutation petition is pending.

meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes.  Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."  *Id*. at 306.  The Court found that "the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal."  *Id.* at 315-16.

Focusing on the importance of standards "that currently prevail,"[24] the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction."  *Id*. at 311, 317 (citation omitted).  At the time *Atkins* was decided, the execution of a mentally retarded person was barred under federal law pursuant to Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959 (the "FDPA"), 18 U.S.C. § 3596(c), and the ADAA, 21 U.S.C. § 848(*l*) (repealed 2006).  Indeed, *Atkins* observed that the FDPA "prohibited any individual with mental retardation from being sentenced to death or *executed*."  *Atkins*, 536 U.S. at 314 n.10 (emphasis added); *see also Salad*, 959 F. Supp. 2d at 868 ("Both *Atkins* and the FDPA, however, are silent

---

[24] As to the definition of mental retardation, *Atkins* states, "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."  *Id.* at 318.  The Court adds that "statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions" provided by the American Association of Mental Retardation  ("AAMR") and the American Psychiatric Association ("APA") and cites 1992 and 2002 diagnostic manuals published by these organizations—which were the most current diagnostic manuals at the time *Atkins* was decided.  *Id.* at 308 n.3; 317 n.22.  *See United States v. Cisneros*, 385 F. Supp. 2d 567, 569 (E.D. Va. 2005) (deciding to use "the definition of mental retardation . . . based on the [AAMR's] definition, as cited by the Supreme Court in *Atkins*").

17

on matters of procedure and substance; they provide neither the protocols for conducting an inquiry into. [*sic*] intellectual disability, nor a substantive, bright-line test.").

When *Atkins* was decided in 2002, Mr. Johnson had been tried, convicted, and sentenced to death, his direct appeal was resolved, and his initial § 2255 petition was fully briefed and before the district court. *See supra* Section II.[25]

In the wake of *Atkins*—and after Mr. Johnson exhausted the appeal of his initial § 2255 petition—the Supreme Court issued significant decisions regarding the bounds of the intellectual disability bar. First, in *Hall*, the Supreme Court made clear that *Atkins* did not give the states (and Congress in the case of federal defendants) "unfettered discretion to define the full scope of the constitutional protection." 572 U.S. at 702. Relying on *Atkins*, the Court in *Hall* noted, "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.* at 721. The Court rejected a "rigid rule" that foreclosed further examination into an individual's disability even when that individual has met the threshold requirement of a valid reliable IQ score within the range for intellectual disability because that rule "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." *Id.* at 704. The Supreme Court ruled, accordingly, that once a petitioner establishes an IQ score of 75 or below (taking into account the standard error of measurement ("SEM")), the sentencing court must consider the

---

[25] During the post-conviction litigation and prior to *Atkins*, Mr. Johnson's counsel made discovery requests related to the Department of Justice's criteria for mental retardation determinations and the history of other federal capital defendants who raised their mental retardation as a bar to execution. *See supra* Section II. Despite the clear relevance of this information in light of the lack of implementation guidance from the FDPA and the ADAA, the district court denied these requests. *Id.*

18

adaptive functioning prong of the intellectual disability test (even if the petitioner had other IQ scores that were higher than 75). *Id.* at 722-23.

Second, in *Moore v. Texas*, 137 S. Ct. 1039 (2017), the Supreme Court ruled that courts' intellectual disability determinations must be informed by the "prevailing clinical standards" for both the cognitive and adaptive functioning prongs of an intellectual disability diagnosis. *Id.* at 1050. And, the Supreme Court held that courts must consider adaptive functioning in terms of an individual's deficits rather than in terms of his relative strengths, which is in line with the medical community's practices. *Id.*

In sum, to determine if an individual's execution is barred by the Eighth Amendment under *Atkins* and its progeny, a court must apply the prevailing medical and legal standards to the evidence. Accordingly, under these standards, a finding of intellectual disability requires proof of three elements: (1) significant deficits in intellectual functioning, usually represented by IQ scores of 75 or below; (2) significant deficits in adaptive functioning (*i.e.*, "the inability to learn basic skills and adjust behavior to changing circumstances"); and (3) onset before the age of 18. *Moore*, 137 S. Ct. at 1042, 1045 (quoting *Hall*, 572 U.S. at 710), 1048 (recognizing these standards and emphasizing that the AAIDD-11[26] and DSM-5 are "the most recent (and still current) versions of the leading diagnostic manuals"); *see also* Ex. 75 (AAIDD-11); Ex. 77 (DSM-5).[27]

---

[26] Between the publication of its 10th and 11th edition diagnostic manuals, the AAMR changed its name to the American Association on Intellectual and Developmental Disabilities ("AAIDD"); accordingly, its 11th edition manual is referred to as "AAIDD-11."

[27] These are the standards that district courts within the Fourth Circuit have adopted in federal capital cases, *e.g.*, *Salad*, 959 F. Supp. 2d at 868-69 (applying the AAIDD-11 and DSM–IV–TR standard and holding that "[a]ll three elements are essential to a finding that an individual is intellectually disabled"); *Davis*, 611 F. Supp. 2d at 475, as have other district courts around the country, *e.g.*, *United States v. Hardy*, 762 F. Supp. 2d 849, 856 (E.D. La. 2010); *United States v.*

*Significant deficits in intellectual functioning.* A deficit in intellectual functioning is typically demonstrated by proof of a valid, reliable IQ score that falls approximately two or more standard deviations below the norm for the general population. An IQ score of approximately 75 or below falls within the presumptive range for intellectual disability because it takes into account the SEM.[28] *Hall*, 572 U.S. at 713, 723; *see also Moore*, 137 S. Ct. at 1049 ("[T]he [SEM] is 'a statistical fact, a reflection of the inherent imprecision of the test itself.' . . . [T]his imprecision in the testing instrument 'means that an individual's score is best understood as a range of scores on either side of the recorded score'" within which the individual's true score must be understood to lie. (citations omitted)).

Although not commonly understood at the time Mr. Johnson was tried, it is now well-recognized that IQ tests administered years after such tests were originally developed produce measurably inflated scores, a phenomenon known as the Flynn Effect. *Davis*, 611 F. Supp. 2d at 488 (finding that because Flynn Effect evidence is "both relevant and persuasive," adjusted scores should be used in place of raw scores, and the failure to do so "would be unwise—if not reckless" where a life and death categorization depends on a strict numerical cutoff ); *Shields*,

---

*Shields*, No. 04-20254, 2009 WL 10714661, at *1-2 (W.D. Tenn. May 11, 2009); *United States v. Smith*, 790 F. Supp. 2d 482, 485 (E.D. La. 2011).

[28] A score of 75 represents an IQ that is two standard deviations below the population mean and accounts for the typical five-point SEM. *See, e.g.*, *Davis*, 611 F. Supp. 2d at 475 ("[T]he SEM in IQ assessments is approximately 5 points, therefore raising the operational definition of mental retardation to 75."); *Hardy*, 762 F. Supp. 2d at 856-57 ("[T]he [American Psychiatric Association or "APA"] and [the American Association on Mental Retardation] direct that the test's measurement error must be taken into account when interpreting its result," and there is "almost universal agreement" that "a score of 75 should be used as the upper bound of the IQ range describing mild mental retardation."); *Smith*, 790 F. Supp. 2d at 490 (same); *see also* Ex. 1 at 8 (Reschly Report).

2009 WL 10714661, at *12 (finding that Flynn Effect "must be considered").[29]  Scores on such

older tests must be adjusted to correct for this effect; without such adjustments, the scores are

invalid reflections of the subject's true intellectual functioning.  *Hardy*, 762 F. Supp. 2d at 860

(observing that "where a test with aging norms is used, a correction for the age of the norms is

warranted" and collecting cases from the Fourth and Eleventh Circuits, explicitly endorsing use

of the Flynn Effect).

An individual needs only one qualifying score of 75 or below, even if other scores are

above 75.  *Hall*, 572 U.S. at 704; 719-20; *see also United States v. Wilson*, 170 F. Supp. 3d 347,

366 (E.D.N.Y. 2016) (holding that prong two adaptive deficit analysis is necessary "if any IQ

test, evaluated in the context of a 95% interval, reflects a range falling to 70 or below").  Thus,

once a defendant establishes an IQ score of approximately 75 or below, the sentencing court

must consider the adaptive functioning criterion of the intellectual disability test.  For example,

the court in *Wilson* ruled that a federal inmate who had taken *nine* IQ tests between the ages of

six and 30, with full-scale scores ranging from 70 to 84 (seven of which were higher than 75)

met the intellectual deficit prong for significantly subaverage intellectual functioning because

*one* test was reasonably reliable and below the threshold.  170 F. Supp. 3d at 351.

*Significant deficits in adaptive functioning.*  Adaptive functioning describes "how

effectively individuals cope with common life demands and how well they meet the standards of

personal independence expected of someone in their particular age group, sociocultural

background, and community setting."  *Salad*, 959 F. Supp. 2d at 877 (quoting DSM-IV-TR at

42); *see also Davis*, 611 F. Supp. 2d at 491 (observing that adaptive functioning encompasses

---

[29] The experts in intellectual disability who evaluated Mr. Johnson employed this standard approach.  Ex. 1 at 9-10 (Reschly Report); Ex. 2 at 3-4 (Olley Report); Ex. 3 at 4 (Siperstein Letter).

"skills that are required for people to function in their everyday lives").  Thus, a diagnosis of intellectual disability requires significant deficits in at least one of three areas of adaptive functioning: (1) conceptual functioning, (2) social functioning, or (3) practical functioning. *Moore*, 137 S. Ct. at 1050 (citing AAIDD-11 at 47; DSM-5 at 33, 38).  Conceptual functioning "includes language, reading and writing, money and time/number concepts, and a range of skills related to self-direction."  *Salad*, 959 F. Supp. 2d at 881.  Social functioning "includes interpersonal skills, social responsibility, self-esteem, and gullibility."  *Salad*, 959 F. Supp. 2d at 880 n.32.  Practical functioning involves "skills related to daily living, personal care, occupational skills, and safety."  *Id*. at 882.

The adaptive deficits prong is satisfied by a showing of impairment in just one of the three adaptive functioning domains.  *Webster v. Watson*, 975 F.3d 667, 685 (7th Cir. 2020) ("*Webster II*") (citing DSM-5 at 38; AAIDD-11 at 27).  Moreover, legal and medical standards recognize that within any individual, strengths co-exist with weaknesses; thus, a relative strength in one domain does not serve as a counterweight to an established deficit.  *Moore*, 137 S. Ct. at 1050; Ex. 75 at 47 (AAIDD-11).  In *Moore*, the Supreme Court emphasized that

> the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*.  *E.g.*, AAIDD-11 at 47 ("significant limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills."); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits).

137 S. Ct. at 1050 (alterations in original).[30]

---

[30] Intellectual disability evaluations focus on the limitations, not the relative strengths, because it is the impairments that characterize and define an intellectual disability diagnosis.  Many people with mild intellectual disability can hold simple jobs, maintain relationships, and sometimes live independently, but they often require significant support.  This group of the intellectually

Adaptive deficits are typically established by records from childhood, retrospective interviews using modern standardized assessment tools with people who knew the individual well during childhood, and testimonial evidence supplied by family members, friends, teachers, employers, mental health professionals, and others who interacted regularly with him or her. *See Davis*, 611 F. Supp. 2d at 492 (There is a "relative consensus that the best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible and to look for consistency and convergence over time."); *see, e.g.*, *Roland*, 281 F. Supp. 3d at 478 ("'A valid diagnosis of ID is based on multiple sources of information that include a thorough history (social, medical, educational), standardized assessments of intellectual functioning and adaptive behavior, and possibly additional assessments or data relevant to the diagnosis.' [AAIDD-11 at 100].''); Ex. 76 at 18-20 (AAIDD-11 User's Guide).

*Onset before the age of 18.* Intellectual disability is considered a developmental disability. Thus, evidence that supports findings of intellectual and adaptive deficits will stem from observations of behavior and capabilities made during the defendant's childhood.[31] Ex. 77 at 38 (DSM-5).

---

disabled (those who are not the severely impaired) can have relative strengths that co-exist with their significant impairments. Ex. 75 at 47 (AAIDD-11).

[31] Additionally, causation is often informative of, but not necessary to, a finding of intellectual disability. A diagnosis of intellectual disability does not require any determination of a cause; a person must be found to have an intellectual disability if he or she meets the diagnostic criteria, irrespective of causation. The origins of a person's intellectual disability can be manifold and apparent, or remain unknown. Still, experts recognize four categories of risk factors— biomedical, social, behavioral, and educational—that form a common pathway that can result in the disability. *See, e.g.*, *Roland*, 281 F. Supp. 3d at 479; Ex. 77 at 39 (DSM-5); Ex. 75 at 57-61 (AAIDD-11). Poor education and socialization, and brain damage, for example, do not explain away intellectual disability—rather, they can contribute to it.

### 2. Mr. Johnson Has Intellectual Disability Under the Supreme Court's Eighth Amendment Jurisprudence

Drs. Reschly, Olley, and Siperstein, three nationally-recognized experts in intellectual disability who have extensively reviewed Mr. Johnson's life history, testing data, and records, agree that Mr. Johnson is intellectually disabled. Their opinions are based on a broad universe of information, much of which comes from test results and observations recorded during Mr. Johnson's childhood. This Motion seeks to place before this Court evidence that, when judged by prevailing legal and medical standards, establishes, as a matter of law, Mr. Johnson's intellectual disability and prohibits the implementation of his death sentence.

### a) Mr. Johnson Has Significant Deficits in Intellectual Functioning Diagnostic of an Intellectual Disability

Mr. Johnson satisfies the first prong of intellectual disability with four valid and reliable full-scale IQ scores within the presumptive range for intellectual disability. The following table shows the results of three IQ tests administered to Mr. Johnson during his childhood and one IQ test administered to Mr. Johnson on the eve of his capital trial, with the scores listed with and without correction for the Flynn Effect.

24

| Corey Johnson's IQ Tests | | | | |
|---|---|---|---|---|
| IQ Test | Year | Age | Full Scale IQ Score | Flynn Corrected IQ Score |
| WISC-R | 1977[32] | 8 | 73 | 72 |
| WISC-R | 1981[33] | 12 | 78 | 75 |
| WISC-R | 1985[34] | 16 | 69 | 65 |
| WAIS-R | 1992[35] | 23 | 77 | 73 |

Ex. 1 at 13-22 (Reschly Report).

These four IQ scores fall within the requisite range when corrected for the Flynn Effect. Even *uncorrected* (though law and medicine demand they all should be corrected), two of Mr. Johnson's scores are within the requisite intellectual disability range.[36] *See Moore*, 137 S. Ct. at

---

[32] Ex. 33 at 1 (3/25/77 Psychological Exam).

[33] Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.).

[34] Ex. 51 at 1 (4/15/85 Psychological Eval.).

[35] Ex. 8 at 12 (Excerpt of Cornell Mitigation Information and Report).

[36] In addition to these four valid tests, Corey was administered two additional tests that suffered serious methodological flaws and must be disregarded as invalid. *See Webster II*, 975 F.3d at 686 ("Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." (citing DSM-5 at 37)). First, in 1979, when Corey was ten, he was given the original Wechsler Intelligence Scale for Children ("WISC") test. Ex. 36 at 6-8 (5/21/79 Comm. on the Handicapped Records). This severely outdated test (from 1949), which yielded a score of 91, was over 30 years old at the time of testing and had been replaced with an updated version of the WISC, five years earlier. Using an outdated test violates the APA's *Standards for Educational and Psychological Testing*, at that time and now. Ex. 1 at 15-16 (Reschly Report); Ex. 2 at 13-14 (Olley Report) ("By current psychometric standards, the norms were so old and so culturally out-of-date that their use was inexcusable and their results invalid."); *see also Shields*, 2009 WL 10714661 at *10 (concluding that a test that had been standardized nearly 40 years prior to its administration could have resulted in a "significant" inflation of 25-30 points and was not a true indicator of the defendant's intellectual functioning).

Second, when Corey was twelve and thirteen, he was given the same WISC-R IQ test twice in a span of four months. In October 1981, Dr. Ernest Adams, staff psychologist at the Council's

25

1049-50 (concluding that IQ score of 74 satisfied the intellectual-functioning prong); *Brumfield*

*v. Cain*, 135 U.S. 305, 315 (2015) (concluding that IQ score of 75 was "squarely in the range of

potential intellectual disability"); *Davis*, 611 F. Supp. 2d 472 (concluding that IQ scores ranging

---

Center for Problems of Living, administered the WISC-R to Corey, yielding a Flynn Effect adjusted score of 75. Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.); Ex. 1 at 17 (Reschly Report). Then, four months later, on February 8, 1982, Dr. Cary Gallaudet, an inexperienced and unlicensed psychologist, administered the same test and obtained an IQ score of 88. *See* Ex. 39 at 1 (2/1/82 Psychological Eval.); Ex. 18 ¶ 5 (3/19/12 Decl. of C. Gallaudet); Ex. 29 ¶ 13 (6/17/11 Decl. of G. Sakheim). The Gallaudet test administration was flawed for two main reasons. The first was its re-administration. Dr. Gallaudet was unaware that Corey had taken the exact same IQ test four months prior. Ex. 18 ¶¶ 13-15 (3/19/12 Decl. of C. Gallaudet) (declaring that she would not have administered the same test had she known Corey's past experience taking it).

Re-administration of IQ testing typically results in an inflated score on the second administration due to the "practice effect." The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument." AAIDD-11 at 38. According to the AAIDD, "established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence." *Id.*; *see also* Ex. 76 at 23 (AAIDD-11 User's Guide). The APA also recognizes that practice effect is one of the factors that may affect test scores. *See* DSM-5 at 37. *Roland*, 281 F. Supp. 3d at 509; *see also Salad*, 959 F. Supp. 2d at 872 (noting "the court should be cognizant of the 'practice effect' . . . phenomenon [that] describes the likelihood of inflated scores on re-administrations of similar IQ tests within a short period of time"); *Hardy*, 762 F. Supp. 2d 849, 857 (disregarding higher score due to practice effect); *United States v. Nelson*, 419 F. Supp. 2d 891, 897-99 (E.D. La. 2006) (giving higher scores less weight because of the practice effect); Ex. 1 at 12-13 (Reschly Report) (discussing practice effect); Ex. 2 at 14-15 (Olley Report) (same); Ex. 3 at 3 (Siperstein Letter) (same).

Dr. Gallaudet also improperly took steps to help Corey better focus his attention on the tasks at hand, actions known to artificially inflate IQ scores. Ex. 39 at 1 (2/1/82 Psychological Eval.) ("Frequently Corey would interrupt his own work with irrelevant questions about toys, games, and at those times, the examiner would have to help him refocus on the task at hand."); *see also* Ex. 29 ¶¶ 13-21 (6/17/11 Decl. of G. Sakheim); Ex. 1 at 11 (Reschly Report) ("During the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results (see the detailed discussion below)."); *id.* at 19; Ex. 2 at 14 (Olley Report).

from 62 to 73 supported intellectual disability finding); *Hardy*, 762 F. Supp. 2d at 863, 878-79

(concluding that IQ scores of 68 to 71 supported intellectual disability finding); *United States v.*

*Lewis*, No. 1:08 CR 404, 2010 WL 5418901 at \*12-13 (N.D. Ohio Dec. 23, 2010) (concluding

that IQ scores of 67 and 72 supported intellectual disability finding).

Drs. Reschly, Olley, and Siperstein agree that Mr. Johnson's IQ test results show a person

with significant intellectual functioning deficits. Ex. 1 at 3 (Reschly Report) ("Corey Johnson's

reliable IQ scores were consistently two standard deviations below the mean. This satisfies the

intellectual functioning prong."); Ex. 2 at 15 (Olley Report) ("Corey Johnson meets the

intellectual functioning prong of the intellectual disability framework, because his IQ test results

show significant limitations in his intellectual functioning before the age of 18."); Ex. 3 at 4

(Siperstein Letter) ("[B]ased on my 50 years of work in the field of intellectual disability, the

conclusions Dr. Reschly draws concerning Corey Johnson's intellectual functioning are

irrefutable.").

Mr. Johnson meets the intellectual deficit prong of the diagnostic standards for

intellectual disability.

> **b)** **Mr. Johnson Has Significant Deficits in Adaptive Functioning Diagnostic of an Intellectual Disability**

Mr. Johnson also meets the adaptive deficit prong of the diagnostic standard of an

intellectual disability. In order to meet this prong, one need only have significant limitations in a

single domain of adaptive behavior. Mr. Johnson has significant deficits in all three domains—

conceptual, social, and practical—as evidenced by childhood records, standardized assessment

tools, information obtained from more than two dozen family members, friends, teachers, and

27

mental health professionals who knew Corey throughout his childhood, and expert evaluations conducted by Drs. Reschly, Olley, and Siperstein.[37]

### (1)    Conceptual Domain

As his academic performance records document, and interviews with family and teachers and assessment instruments confirm, Mr. Johnson has had significant deficits in the conceptual domain since childhood. "The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." *Roland*, 281 F. Supp. 3d at 528 (quoting the DSM-5).

*Academic failures.* Mr. Johnson's school records document his consistent academic failure, reflective of deficits in the conceptual domain, from a young age. He repeated several grades, including second grade three times, and, as he got older, he fell further and further behind. Ex. 3 at 35 (Nelson Report); Ex. 2 at 18-19 (Olley Report); Ex. 35 at 2 (2/26/79 Referral to the Comm. on the Handicapped). At age eight, Corey had "no concept of number facts, no reading skills, [could not] retain sight vocabulary words," and "had difficulty saying the alphabet." Ex. 31 at 1 (3/4/77 Social History); Ex. 32 at 3 (3/18/77 Learning Consultant Evaluation). Two years later, at age ten, Corey was referred to the Committee on the Handicapped for "school failure" and, after testing, was placed in Special Education classes. Ex. 36 at 1, 4 (5/21/79 Comm. on the Handicapped Records); Ex. 2 at 19-20 (Olley Report).

---

[37] Dr. Cornell's mitigation testimony at trial, *see e.g.*, Ex. 7 (2/3/93 Trial Tr.), would have fully supported a finding of the adaptive deficit prong, as well, had he conducted a comprehensive adaptive functioning evaluation. As noted, the childhood records he relied upon for much of his mitigation testimony are crowded with stark examples of Corey's significant impairments across all three domains of adaptive functioning.

28

Corey's academic failures continued in his teens. At age 13, a social worker reported, "Corey's academic deficits have been a serious problem and he has been left back twice in 3rd and 4th grade. . . . He currently reads on 2nd grade level and has not improved in quite some time." Ex. 41 at 1 (3/15/82 Psychosocial Summary). That same year, another assessment concluded that Corey's reading level was "not quite up to second-grade level." Ex. 43 at 2 (6/9/82 Current Assessment and Transfer Summary). A year later, when he was 14, a psychiatrist who evaluated Corey concluded, "He needs very Special Education, and I know of no methods to suggest to remediate his defects, beyond a great deal of individual attention and drill." Ex. 46 at 2 (8/26/83 Psychiatric Eval.). And the next year, when he was 15, Corey's academic year was classified as "ungraded" and his assessment once again notes that he "never progressed beyond the 2nd grade reading level." Ex. 49 at 1 (9/4/84 Current Assessment).

While at the Elmhurst Boys Residence, a group home, from ages 16 to 18, he attended high school but was placed in remedial, special education, and vocational classes. Even then, Corey failed or got Ds in nearly every class. Ex. 2 at 21 (Olley Report); Ex. 57 at 1-2 (12/7/87 Scholastic Transfer Record). His teachers determined that he was unable to pass school competency tests, and he ultimately left high school without graduating. Ex. 2 at 21 (Olley Report); Ex. 56 at 3 (2/23/87 Form D Final Discharge).

Mr. Johnson stood out to staff and evaluators at his residential placements because of his intellectual deficits. Ann Harding, a staff member at Pleasantville, observed, "Corey was very slow intellectually. . . . I do not remember anyone else at Pleasantville who was similarly slow intellectually." Ex. 19 ¶ 6 (11/21/11 Decl. of A. Harding). Gerald Lefkowitz, Unit Administrator at Pleasantville Cottage Center, noted, "Corey stood out as being particularly slow intellectually compared to the other residents at the Cottage." Ex. 27 ¶ 9 (12/5/11 Aff. of G.

29

Lefkowitz).  Corey's caseworker at Elmhurst, Odette Noble, saw Corey's comparatively weaker intellectual abilities.  "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."  Ex. 28 ¶ 7 (12/1/11 Aff. of O. Noble).  And, David Washington, a childcare worker at Elmhurst, had a similar perspective.  "My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than Corey."  Ex. 30 ¶ 7 (3/1/12 Aff. of D. Washington).

Corey failed academically despite having an evident strong self-motivation to learn.  He "wanted to live [at Pleasantville Cottage School] to get help."  Ex. 7 (2/10/93 Trial Tr. 3601); *see also* Ex. 39 at 3 (2/1/82 Psychological Eval.) (reporting that "he continues to be an ambitious boy who is motivated to improve his situation"); Ex. 44 at 1 (1/31/83 Current Assessment) ("He is truly motivated to do well and to succeed and has not yet given up on himself. . . .  Corey's progress in his class has been very, very, very slow almost to the point where one might feel that he is not learning.").  Throughout his time there, Corey generally "remained cooperative, eager to learn, and willing to take on the challenge of his disability."  Ex. 7 (2/10/93 Trial Tr. 3584).

*Reading, writing, and math deficiencies.*  When he was 13, one school evaluator noted that Corey was barely able to write his own name and "was unable to read single syllable short vowel words in isolation" and "did not know the sounds of g and c[,] . . . was not sure of the consonant sound of m and y, [and] did not know the rule of silent e."  Ex. 40 at 1-2 (2/22/82 Screening Upon Admission).  In 1983, when Corey was 14, he scored in the bottom one percent on an achievement test, which means he scored "as low as you go" and "at the bottom."  Ex. 7

(2/10/93 Trial Tr. 3590).[38]  At age 16, Corey's reading comprehension, oral comprehension, sight vocabulary, and arithmetic ability were on a second- to third-grade level.  Ex. 2 at 20-21 (Olley Report); *see also* Ex. 53 at 3 (7/1/85 IEP - Phase 1).  When Mr. Johnson was 24, Dr. Cornell administered the Test of Written Language and the Woodcock-Johnson Test of Achievement-Revised, which measures both language and math skills.  Mr. Johnson scored grade-level equivalents between second and sixth grades.  Ex. 2 at 21 (Olley Report); Ex. 8 at 14-17 (Excerpt of Cornell Mitigation Information and Report).  As Dr. Cornell testified, achievement test scores at the sixth-grade level or below are consistent with intellectual disability.  Ex. 7 (2/10/93 Trial Tr. 3693) ("We now know that a mildly retarded person can be educated up to about the sixth-grade level.").

Although experts caution against evaluating behavior in an institutional setting when assessing intellectual disability, prison testing may, in certain instances, be relevant.  Prison records note that obtaining his GED by passing the required examination is one of Mr. Johnson's lifetime goals.  Since his incarceration almost 30 years ago, Mr. Johnson has diligently studied to become eligible to take GED exams.  However, he has remained in the pre-GED stage, never having passed the test.  In 2014, when Mr. Johnson was 45, Dr. Reschly administered the then-latest version of the Woodcock-Johnson Test of Achievement III.  Mr. Johnson's results placed him in the second- to fourth-grade range for every subject area except concrete math

---

[38] This testimony by Dr. Cornell was based on the results of an achievement test administered in March 1983 by Dr. Kenneth Barish.  Ex. 45 at 2 (4/29/83 Psychological and Educational Eval.).  Dr. Barish later stated, "Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning.  Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice."  Ex. 11 ¶¶ 8-9 (7/22/14 Decl. of K. Barish).  Dr. Barish considered Corey's deficit "so profound that [he has] used it over the past 30 years as a teaching example in [his] classes."  *Id*. ¶ 11.

31

calculations,[39] and his overall total grade equivalent, even accounting for his relative strength in math, was still in the fourth-grade range, as represented in the table below.

| Achievement Cluster | Standard Score | Grade Equivalent |
|---|---|---|
| Broad Written Language | 74 | 2.8 |
| Oral Language | 83 | 3.5 |
| Broad Reading | 76 | 4.1 |
| Broad Math | 89 | 8.2 |
| Total Achievement | 77 | 4.6 |

Ex. 1 at 30 (Reschly Report).

*Language and communications deficiencies.*  Mr. Johnson's records show that his significant deficits in language and communication started at an early age.  Dr. Olley, after reviewing scores of records, concluded, "Corey Johnson has never demonstrated the conceptual aspects of communication appropriate for his age, and, instead, his language and communication abilities are significantly impaired."  Ex. 2 at 24 (Olley Report).  When Corey was eight, Dr. F. A. Figurelli, a psychiatrist, noted that he "reveal[ed] a speech defect."  Ex. 2 at 23 (Olley Report).  Similarly, Mr. Johnson's records from Pleasantville repeatedly described him as having speech difficulties and deficits as a teenager.  Ex. 2 at 23 (Olley Report).  When Corey was just shy of 15, speech, language, and vocabulary testing revealed that he was approximately two or five years below his chronological age in several categories, leading the evaluator to conclude that he had "a significant speech and language disorder of a receptive and expressive nature."  Ex. 47 at 4 (10/5/83 Speech and Language Eval.).  Dr. Cornell testified to Mr. Johnson's

---

[39] Dr. Olley attributes this improvement in prison to significant practice and efforts on Mr. Johnson's part to improve his performance.  Ex. 2 at 22 (Olley Report).

"communication deficits with his speech impairment and communication problems."  Ex. 7
(2/10/93 Trial Tr. 3691).

Mr. Johnson's friends and family recall similar limitations in his communication and
comprehension skills.  Both his aunt, Minnie Hodges, and his grandmother, Esther Johnson,
recall that Corey had trouble following oral directions and that they often had to repeat
themselves many times before he understood.  Ex. 2 at 23-24 (Olley Report).  His cousin,
Queenie Hodges, recalls, "[W]henever [Corey] talked, he was disorganized in his speaking and
would frequently change topics.  Over the past 19 years, I have seen a number of letters Corey
has written.  The letters he writes are similarly disorganized; the letters are almost nonsensical."
Ex. 22 ¶ 5 (4/30/11 Aff. of Q. Hodges).  In general, Corey "had difficulty communicating."  Ex.
16 ¶ 13 (5/21/11 Aff. of C. Daniels).

*Problems with numbers, money, and time.*  Mr. Johnson fares badly with concepts
involving numbers, money, and time.  At age eight, contemporaneous records document that he
had "[n]o concept of number facts," and, when asked his date of birth, "[h]e thought he was born
in March," although he was actually born in November.  Ex. 2 at 24-25 (Olley Report); Ex. 33 at
1 (3/25/77 Psychological Exam).

When he was 13, although he understood that there are twelve months in the year, he
could recite them in sequence only up to August.  Ex. 40 at 3 (2/22/82 Screening Upon
Admission); *see also* Ex. 22 ¶ 12 (4/30/11 Aff. of Q. Hodges).  At 13, Corey was also unable to
tell time.  Ex. 26 ¶ 13 (6/3/11 Decl. of L. Klerer).  He was assessed to have, at best, third-grade
math skills; he could not divide a single digit number by two, multiply by three, or read numbers
that were more than four digits long.  Ex. 40 at 2 (2/22/82 Screening Upon Admission).

33

Multiple family members reported that he was not trusted with money because he was unable to calculate change. Ex. 22 ¶ 12 (4/30/11 Aff. of Q. Hodges); Ex. 20 ¶ 40 (4/30/11 Aff. of M. Hodges); Ex. 24 ¶ 62 (6/29/11 Aff. of R. Johnson); Ex. 23 ¶ 26 (4/30/11 Decl. of E. Johnson); Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph). When Corey was 16, social worker Gerald Maier included as an objective for Corey to work toward: "learn[ing] enough simple arithmetic th[at] he will be able to figure out correct change." Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan).

*Lack of judgment, planning, and problem-solving skills.* Mr. Johnson has deficits in judgment, planning, and problem solving that manifested themselves in childhood. Corey displayed the naïve and highly gullible behavior often associated with those suffering from intellectual disabilities. Also indicative of intellectual disability, in his teens and later, Mr. Johnson exhibited poor judgment and made rash decisions, often to his own detriment and physical harm. Ex. 2 at 25-26 (Olley Report); Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph); Ex. 21 ¶ 15 (4/30/11 Aff. of P. Hodges).

Mr. Johnson lacks problem-solving skills. For example, Darold Brown, a member of the Trenton drug group with which Mr. Johnson was involved, observed, "Corey could not handle a job where unexpected problems came up, as he would not know what to do." Ex. 14 ¶ 29 (6/15/11 Aff. of Darold Brown). When Mr. Johnson was living in Trenton, his girlfriend once asked him to pay a phone bill in downtown Trenton. She reported that he went downtown to do so but did not pay the bill. He claimed he had forgotten, but she believed he could not figure out how to do it. Ex. 17 ¶ 5 (7/16/12 Decl. of M. Dawkins).

*Expert opinions and results of the ABAS-II test of adaptive deficits.* Each of the experts has concluded that Mr. Johnson has significant adaptive deficits in the conceptual domain. Ex. 2

34

at 27 (Olley Report); Ex. 1 at 32 (Reschly Report); Ex. 3 at 4-5 (Siperstein Letter).[40]  The three

expert witnesses arrived at this conclusion based on their review of contemporaneous records of

Mr. Johnson's youth from teachers, social workers, psychologists, and psychiatrists who knew or

treated Mr. Johnson, the results of achievement tests administered to Mr. Johnson, and

statements from more than two dozen family members, friends, acquaintances, other prisoners,

and professionals who knew him as a child, adolescent, and/or adult.[41]

In addition, Dr. Olley administered the ABAS-II, a standardized tool developed to assess

adaptive functioning,[42] to three adults who knew Mr. Johnson well when he was a child.  Much

like IQ scores, ABAS-II scores are reported as standardized scores with a mean of 100, a

standard deviation of 15, and the intellectual disability range beginning approximately two

standard deviations below the mean (approximately 70).  As noted in the table below, one of his

---

[40] Dr. Cornell also found deficits in Mr. Johnson's language skills and judgment.  Ex. 7 (2/10/93 Trial Tr. 3685-86) (describing the results of a written language test Dr. Cornell had given Mr. Johnson and noting his writing and spelling were "very immature"); *id.* 3693-94 (acknowledging Mr. Johnson had "impaired ability to use good judgment to control his behavior" and "impaired ability to understand and foresee the consequences of his actions").

[41] Drs. Olley and Reschly met with Mr. Johnson in person, and Dr. Reschly administered the achievement tests to him.  In addition, Dr. Olley interviewed approximately two dozen people who have known Mr. Johnson at various stages of his life.  For a complete recitation of information considered in reaching their opinions, see Exhibits 1 and 2.

[42] As described in Dr. Olley's report, the ABAS-II is a rating scale administered to individuals familiar enough with the subject to rate the subject in certain areas related to adaptive functioning.  Ex. 2 at 16 (Olley Report).  Dr. Olley administered the ABAS-II to three individuals, who provided responses to standardized questions, which produced scores that assess Mr. Johnson's adaptive functioning.  The individuals were Antoinette Daniels Joseph, the best friend of Mr. Johnson's mother and Corey's godmother; Minnie Hodges, Mr. Johnson's maternal aunt; and Richard Benedict, Mr. Johnson's former teacher and administrator at Pleasantville Cottage School.

conceptual domain scores fell two standard deviations below the mean when accounting for the

SEM; and the others fell well below that.[43]

| ABAS-II RATERS | CONCEPTUAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 63 |
| Minnie Hodges | 57 |
| Richard Benedict | 74 |

Ex. 2 at 27 (Olley Report).

### (2)    Social Domain

Mr. Johnson has significant impairments in the social domain, as reflected in

contemporaneous records created during his childhood and anecdotes reported by people who

knew him during his childhood, adolescence, and adulthood, as well as standardized adaptive

functioning test results.  The social domain of adaptive functioning includes interpersonal skills,

friendships, leadership, gullibility, naivete, and victimization.[44]

*Interpersonal skills and friendships.*  In his youth, Mr. Johnson was a loner who was

often taken advantage of by his family and school peers.  Corey's grandmother, Esther Johnson,

---

[43] Richard Benedict was a teacher for several years at Mr. Johnson's institutional school placement.  It is well documented that people with intellectual disability will fare better within almost any institutional setting because they are getting the very supports they need in such placements.  *See infra* at n.48.

Yet even with the substantial aids provided in the highly supportive institutional setting of this boarding school for children requiring special education, Mr. Johnson still performed at a significantly impaired level.  This is borne out by Mr. Benedict's own assessment.  He noted that "[w]hile the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities.  Corey performed worse in an uncontrolled environment." Ex. 12 ¶ 9 (12/5/11 Aff. of R. Benedict).

[44] Ex. 75 at 43-45 (AAIDD-11); Ex. 76 at 15 (AAIDD-11 User's Guide).

observed that "growing up, Corey did not engage much with other children and did not make friends easily." Ex. 2 at 29 (Olley Report). She viewed him as "withdrawn socially both as a child and a teenager." *Id.* When he was ten, a teacher referred Corey for special education services, noting that he had "poor peer relations." Ex. 34 at 1 (12/11/78 Case Service). At age 13, records indicate that Corey "relate[d] like a younger child and appear[ed] limited. . . . Corey does not have friends." Ex. 41 at 3 (3/15/82 Psychosocial Summary). Later that year, another caseworker observed that Corey was "frequently isolated from the other children," did "not appear ready to engage with other children," and was "frightened and expects to be rebuffed." Ex. 43 at 2-3 (6/9/82 Current Assessment and Transfer Summary). She concluded that Corey "will need a good deal of experience and contact before he will be ready to engage." *Id.* at 3. Dr. Olley concluded that Corey was "a solitary, fearful child who had few friends and felt most comfortable playing by himself or with younger children." Ex. 2 at 27 (Olley Report). And, as he got older, "Corey had real problems in understanding how to interact with his peers and adults and marked difficulty in understanding social cues and norms." *Id.* at 28.

Psychiatrist Richard Dudley, a trauma expert who evaluated Mr. Johnson in person as an adult and conducted an extensive review of his social and educational history, noted that Mr. Johnson's "placement records indicate that although he clearly was willing to do anything to be liked, he lacked the social skills required to successfully do that in appropriate ways." Ex. 5 at 7 (Dudley Report).[45]

---

[45] Dr. Dudley attributed much of this to the "extremely difficult childhood that [Mr. Johnson] endured [which] also directly resulted in other underlying developmental difficulties" related to his social functioning, including interpersonal relationships, self-image, affects, and decision-making, all important aspects of the social domain. Ex. 5 at 11 (Dudley Report).

*Leadership, gullibility, naivete, and victimization.* Multiple reporters described Mr. Johnson as a follower, not a leader. This, too, can be a hallmark of intellectual disability.[46] Ms. Harding, who knew Corey from 1982 to 1985 when Corey was a teenager, observed, "I do not think Corey possessed leadership qualities. To the contrary, he was more of a follower than a leader in his interactions." Ex. 2 at 31 (Olley Report). Janet Valentine, a counselor at Pleasantville Cottage School, noted, "He was a follower. He was not a leader at all." *Id.*; Ex. 58 at 2 (Outline for Cottage Report) ("Most of the time he stays by himself. He [is scared] of the other kids."). Mr. Benedict thought Corey wanted to "please" adults and was not a leader. Rather, "[b]eing a leader doesn't match Corey." Ex. 2 at 31 (Olley Report); Ex. 27 ¶ 14 (12/5/11 Aff. of G. Lefkowitz) ("Corey was more easily influenced than the other children at the Cottage and was a follower."); *see also* Ex. 12 ¶ 12 (12/5/11 Aff. of R. Benedict).

Mr. Johnson was victimized by his peers. Mr. Johnson's aunt, Minnie Hodges, reported:

> Other people took advantage of him, such as taking his lunch money. People found it easy to take advantage of him all throughout his childhood and teen years. He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him.

Ex. 20 ¶ 44 (4/30/11 Aff. of M. Hodges). His cousin, Priscilla Hodges, said other kids "would take his money, ball, or other possessions. Corey would not assert himself with these other kids." Ex. 21 ¶ 14 (4/30/11 Aff. of P. Hodges). She continued:

> Corey was easily influenced by others and could be persuaded to do things that, in my view, showed very poor judgment. He would go to great lengths—and jeopardize his own well-being—just to fit in with the crowd.

*Id.* ¶ 15; *see also* Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph) ("[P]eople took advantage of [Corey] because he would readily give his money away.").

---

[46] Ex. 75 at 43-45 (AAIDD-11); Ex. 77 at 38 (DSM-5).

Similarly, at Elmhurst, people knew him "as someone who could be convinced to do what you asked him to do." Ex. 30 ¶ 13 (3/1/12 Aff. of D. Washington). Mr. Washington, a childcare worker at Elmhurst, recalled that Corey "would generally go along with what others wanted to do." *Id.* ¶ 12. Corey's caseworker also reported that he was "susceptible to peer pressure" and "did not have a good 'read' of situations or other people." Ex. 28 ¶¶ 17-18 (12/1/11 Aff. of O. Noble). She explained:

> Corey could be easily influenced into doing what his peers wanted him to do. If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so. He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

*Id.* ¶ 20.

Mr. Johnson was a "poor social decisionmaker." *Id.*; *see also* Ex. 7 (2/10/93 Trial Tr. 3694-95). He "lacked the ability to understand the consequences that his actions could have." Ex. 28 ¶ 16 (12/1/11 Aff. of O. Noble). Corey's desire to be accepted by his peers led him to engage in risky behavior. Ex. 2 at 35 (Olley Report); Ex. 21 ¶ 16 (4/30/11 Aff. of P. Hodges) (describing an incident when peers persuaded Corey to roller skate down "an incredibly steep hill, an act that no one else would attempt"); *id.* ¶ 17 ("[W]hen Corey was also a young teen, Corey's 'friends' told him to ride his bike across a busy two-way street in the middle of traffic. I warned Corey not to do it, but he did it anyway. He made it across the street but was nearly hit by a car. The driver had to slam on his brakes to avoid hitting Corey.").

*Expert opinions and results of the ABAS-II test of adaptive deficits.* The ABAS-II results noted in the table below show that one of the raters' observations resulted in a score for the social domain considerably lower than two standard deviations below the mean. The two other scores were significantly above this level, but Dr. Olley notes in reporting these two scores that

they are inconsistent with information the raters provided in interviews with him. Ex. 2 at 33 (Olley Report).

| ABAS-II RATERS | SOCIAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 56 |
| Minnie Hodges | 81 |
| Richard Benedict | 88 |

*Id.*

Drs. Olley, Reschly, and Siperstein all believe that interviews conducted with an extensive array of professionals, family, and friends who provided vivid descriptions of Mr. Johnson's social abilities, along with the documented historical evidence, provide strong corroboration that Mr. Johnson has significant limitations in the social domain, consistent with intellectual disability. Ex. 2 at 34 (Olley Report); Ex. 1 at 32, 37 (Reschly Report); Ex. 3 at 4 (Siperstein Letter); *see also* Ex. 5 at 7, 11 (Dudley Report).

### (3)    Practical Domain

As with the conceptual and social domain, Mr. Johnson's inability to perform practical tasks and life skills are consistently reflected in contemporaneous records created during his childhood, achievement testing results, anecdotes described during interviews with people who knew him during his childhood, and the ABAS-II test results. The practical domain is generally considered to encompass skills that involve navigating through the typical tasks that one faces on a regular basis, including things like personal and self-care; travel and transportation; health and safety; home living; and work. Ex. 77 at 37 (DSM-5). Those who know him have observed that Corey did not have the capacity to take care of himself.

*Self-care.* Corey wet and soiled his bed until he was about 12 years old. Ex. 2 at 34 (Olley Report); Ex. 20 ¶ 36 (4/30/11 Aff. of M. Hodges); Ex. 21 ¶ 9 (4/30/11 Aff. of P. Hodges);

40

Ex. 22 ¶ 9 (4/30/11 Aff. of Q. Hodges); Ex. 7 (2/10/93 Trial Tr. 3576).  Corey neglected his

teeth, and dental problems resulted.  Ex. 2 at 34 (Olley Report); Ex. 37 at 1 (12/9/81 Child

Assessment Eval.) (noting Corey's dental cavities and gingivitis).  He needed constant reminders

to keep himself clean.  Ex. 2 at 34 (Olley Report).  When he was living in Trenton as a young

adult, people who visited him described his home as "filthy," "old, dark, and dirty" and "strewn

with trash, dishware, and clothes."  Ex. 24 ¶ 70 (6/29/11 Aff. of R. Johnson); Ex. 2 at 34 (Olley

Report).

*Transportation and travel.*  As a child through adolescence and his teen years, Corey was

not trusted to travel alone, and he relied on others to get around.  As a child, caregivers asked

Corey's *younger* half-brother, Robert, to lead Corey around when they went out together.  Ex. 2

at 34 (Olley Report).[47]  His individualized education plan from Pleasantville notes, "Corey needs

travel training until he is familiar with route and new neighborhood."  Ex. 53 at 7 (7/1/85 IEP -

Phase 1); Ex. 2 at 36 (Olley Report).  Mr. Benedict, Corey's teacher when he was 16-17,

reported that the Pleasantville staff "assigned an aide to accompany Corey to the bathroom and

waited outside when Corey was using it.  Previously, when no aide was assigned to do so, Corey

would get lost on his way back to our class and wander into other classrooms."  Ex. 12 ¶ 17

(12/5/11 Aff. of R. Benedict).  Corey never obtained a driver's license; as an adult, he relied

primarily on cabs for transit.  Ex. 2 at 34 (Olley Report).

*Home living.*  Mr. Johnson has never been able to develop the skills necessary to live on

his own.  This was not surprising given the limitations recognized in records from Pleasantville

---

[47] Records indicate Corey even had trouble navigating his residential placement.  Ex. 42 at 5
(5/21/82 Reassessment Summary) ("[Corey] [age 13 and a half] is slow to understand things.
Cottage staff will make special effort to acclimate him to routine and provide a predictable
environment for him.").

41

(age 13, 15 and 16) and Elmhurst (age 17).  According to Gloria Caro, a caseworker at Pleasantville, at 13 and a half, Corey was "slow to understand things.  Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him."  Ex. 42 at 5 (5/21/82 Reassessment Summary).  Both Pleasantville and Elmhurst established goals for him such as, "Corey will use opportunities offered him to learn independent living skills," and "Corey will learn how to handle money so that he can shop for himself."  Ex. 48 at 2 (4/13/84 Change in Permanency Plan); *see also* Ex. 50 at 8 (12/12/84 Visitation Plan) (setting the same goals); Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan) (same); Ex. 54 at 6 (11/21/85 Service Plan Review 6 Month) (same); Ex. 55 at 7 (6/28/86 Service Plan Review 6 Month) (same).  There are no indications in the records that Corey ever achieved these goals.

After leaving institutional school settings, Corey moved in with his mother and half-brother, had a brief stay with the father of his half-brother and his wife, and then lived with a series of girlfriends and acquaintances.  Ex. 2 at 8 (Olley Report).  Ms. Noble told Dr. Olley, "He's the kind of kid who I don't think could make it on his own—pay his rent, etc.  Some people should stay in a protected setting all their lives."  *Id*. at 37; *see also* Ex. 28 ¶ 38 (12/1/11 Aff. of O. Noble).

Corey's aunt remembers his inability to do simple tasks to take care of himself.  For example, "[a]t age 10-13, he couldn't prepare a meal or even a simple sandwich.  By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals.  I didn't give him much to do because he couldn't do it."  Ex. 20 ¶ 38 (4/30/11 Aff. of M. Hodges).  When Corey was 18 and living with Ann and Robert Butler, Ms. Butler noted, "[H]e was still like a little boy. He could not have taken care of himself on his own."  Ex. 2 at 38 (Olley Report).

42

*Work.* Mr. Johnson has a very limited work history. While at Pleasantville, he had a couple of summer jobs doing manual labor, which he could not maintain. Ex. 2 at 39 (Olley Report). His family and friends did not recall that he ever held a job. *Id.*; Ex. 52 at 6 (5/28/85 Discharge/Transfer Plan) ("[Corey] work[ed] for a few weeks in a grocery store. He was not able to maintain this, an indication of how much work needs to be done in this area.").

Other than participating in structured job programs while at Elmhurst, Mr. Johnson's only "job" was selling drugs. Even his acquaintances in these activities depicted Corey as challenged in his ability to count money and keep track of drug sales. They described him as a passive participant who followed the directions of others. Ex. 24 ¶¶ 60-63 (6/29/11 Aff. of R. Johnson); Ex. 13 ¶¶ 9-11 (10/14/11 Aff. of Darnell Brown); Ex. 14 ¶¶ 11-12, 20, 25-26 (6/15/11 Aff. of Darold Brown).

At trial, Dr. Cornell concluded, "Self care . . . work, the ability to maintain a job, to have good work habits, to use the kinds of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level." Ex. 7 (2/10/93 Trial Tr. 3691).

*Expert opinions and results of the ABAS-II test of adaptive deficits.* The ABAS-II results noted in the table below show that two of the raters' observations resulted in scores for the practical domain considerably lower than two standard deviations below the mean. Mr. Benedict's scores were significantly above this level, but Dr. Olley noted that this was understandable given that Mr. Benedict only knew Mr. Johnson while he was living in an institutional setting where supports and structure can artificially inflate the scores.[48]

---

[48] Experts caution against evaluating institutional behavior when assessing adaptive functioning. *See Hardy*, 762 F. Supp. 2d at 899 (noting that "an institutional environment of any kind necessarily provides 'hidden supports'"); *Roland*, 281 F. Supp. 3d at 544 (Experts testified that institutional settings, including prisons, typically provided ongoing support and a structured environment that enabled intellectually disabled persons to improve.). As a result, modern

43

| ABAS-II RATERS | PRACTICAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 60 |
| Minnie Hodges | 65 |
| Richard Benedict | 88 |

Ex. 2 at 40 (Olley Report).

Drs. Olley, Reschly, and Siperstein all believe the records, interviews, and ABAS-II results strongly support a finding that Mr. Johnson has significant limitations in adaptive functioning in the practical domain, beginning in childhood and continuing through adolescence, and into adulthood.  Ex. 2 at 1-2, 34-41 (Olley Report); Ex. 1 at 3, 25, 32 (Reschly Report); Ex. 3 at 4-6 (Siperstein Letter).

### (4)    Adaptive Behavior Composite

As noted earlier, in order to meet the adaptive behavior prong of an intellectual disability diagnosis, an individual need only have significant limitations in a single domain.  As noted above, Mr. Johnson has significant deficits in all three.

In addition, the ABAS-II produces a composite score, the General Adaptive Composite (the "GAC"), which both measures the degree to which a person's overall adaptive functioning

---

scientific standards emphasize, for example, assessing skills "not within the structured prison environment but 'within the context of ordinary community environments typical of the person's age peers and tied to the person's individualized needs for support.'"  *Webster II*, 975 F.3d at 686 (citing AAIDD-11 at 16 and DSM-5).

Yet even with the substantial aids provided in the highly-supportive institutional setting of this boarding school for children requiring special education, Mr. Johnson still performed at a significantly impaired level.  This is borne out by Mr. Benedict's own assessment.  He noted that "[w]hile the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities. Corey performed worse in an uncontrolled environment."  Ex. 12 ¶ 9 (12/5/11 Aff. of R. Benedict).

44

departs from the mean, and identifies the percentile of the population into which an individual fits, relative to the general population.  A score of 75 or below meets the standard for the adaptive prong of an intellectual disability diagnosis.  Ex. 2 at 40 (Olley Report).

The table below shows the GAC for each of the three raters.  Mr. Johnson has GAC scores below 75 from each of them.

| ABAS-II RATER | GENERAL ADAPTIVE COMPOSITE SCORE | PERCENTILE OF POPULATION |
|---|---|---|
| Antoinette Joseph | 60 | 0.4 |
| Minnie Hodges | 64 | 1 |
| Richard Benedict | 74 | 4 |

*Id*.

Drs. Olley, Reschly, and Siperstein agree that Mr. Johnson meets the adaptive behavior prong of an intellectual disability diagnosis and has deficits in all three domains.  Ex. 2 at 2, 17, 40 (Olley Report); Ex. 1 at 3, 25, 32 (Reschly Report); Ex. 3 at 4-5 (Siperstein Letter).

### c)    The Onset of Mr. Johnson's Intellectual and Adaptive Deficits Began Well Before the Age of Eighteen

Mr. Johnson's significant limitations in intellectual and adaptive functioning manifested themselves during his developmental period, as evidenced by the IQ test scores he achieved during childhood and the contemporaneous records created during his childhood, and corroborated by interviews with numerous reporters who knew Mr. Johnson during his formative years as well as the results of standardized adaptive functioning instruments.  This evidence has been assessed by Drs. Reschly, Olley and Siperstein, who all agree his disability began in childhood.  Ex. 2 at 1 (Olley Report); Ex. 1 at 45 (Reschly Report); Ex. 3 at 7 (Siperstein Letter).  These experts also have reported that Mr. Johnson experienced the biomedical, behavioral,

45

educational, and social risk factors that can result in intellectual disabilities.[49] While an

intellectual disability diagnosis does not require proof of causation, Mr. Johnson's personal,

family, and social history lend support to the corroborated evidence of his intellectual disability.

*Roland*, 281 F. Supp. 3d at 479.

In sum, Mr. Johnson is a person with intellectual disability and meets all requirements for

such a diagnosis according to the standards identified by the medical community and in federal

capital case law. Under the Eighth Amendment, his death sentence is barred.

## B. MR. JOHNSON'S DEATH SENTENCE WHICH IS BASED ON DISCREDITED SCIENCE VIOLATES THE EIGHTH AMENDMENT

The Eighth Amendment demands "reliability in the determination that death is the

appropriate punishment." *Johnson v. Mississippi*, 486 U.S. at 584 (quoting *Gardner v. Florida*,

430 U.S. 349, 363-64 (1977) (White, J., concurring in judgment) (quoting *Woodson v. North

Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion))). This heightened reliability requirement

is grounded in the long-standing recognition that "the penalty of death is qualitatively different

from a sentence of imprisonment, however long." *Woodson*, 428 U.S. at 305 (plurality opinion);

*see also Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural

consequence of the knowledge that execution is the most irremediable and unfathomable of

---

[49] Mr. Johnson's childhood trauma is well documented. Debra Nelson, a mitigation specialist, prepared a comprehensive report of his life. Ex. 4 (Nelson Report). Dr. Dudley provided an analysis of the systematic trauma that Corey suffered throughout his childhood and adolescence. Ex. 5 (Dudley Report). Mr. Johnson's childhood history includes many specific risk factors as well, including: young parents, poverty, domestic violence, parental drug use, parental immaturity, parental abandonment, and child abuse and neglect. *See Hall*, 572 U.S. at 706 (recognizing that the defendant's upbringing, which was "under the most horrible family circumstances imaginable," "appeared to make his deficits in adaptive functioning all the more severe" (citation omitted)); *Moore*, 137 S. Ct. at 1051 ("[T]raumatic experiences, however, count in the medical community as "risk factors" for intellectual disability").

46

penalties; that death is different."). A death sentence based on "evidence that has been revealed to be materially inaccurate" and the use of which is prejudicial violates the Eighth Amendment's reliability guarantee. *Johnson v. Mississippi*, 486 U.S. at 590.

### 1. The Evidence on Which Mr. Johnson Was Sentenced to Death Is Materially Inaccurate

A death sentence is unreliable in violation of the Eighth Amendment if it is predicated on testimony or evidence that is demonstrably invalid or inaccurate. *Johnson v. Mississippi*, 486 U.S. at 586 (overturning a death sentence because invalidated evidence "provided no legitimate support for the death sentence imposed on petitioner"); *see also Boyde v. California*, 494 U.S. 370, 380 (1990) (describing, in the context of the Eighth Amendment, that "[t]here is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case"). In *Johnson v. Mississippi*, the Supreme Court overturned a death sentence because it was based, in part, on a prior conviction that was later determined to be invalid. Likewise here, Mr. Johnson's death sentence rests on an intellectual disability determination that was materially inaccurate.

At Mr. Johnson's penalty phase hearing, the defense informed the jury, in both opening and closing arguments, that Mr. Johnson was *not* intellectually disabled and that jurors would not be asked to make such a determination, and the prosecution adopted this position. Ex. 7 (2/10/93 Trial Tr. 3547); Ex. 9 (2/12/93 Trial Tr. 3898-99). Dr. Cornell told the jury that Mr. Johnson did not meet the criteria for a diagnosis of mental retardation. Although Dr. Cornell testified that Mr. Johnson's mental impairments made him "unprepared to function in society, unprepared to survive on his own when he left institutional care . . . and made him unable to cope and adapt to society in a way that a normal individual would," Ex. 7 (2/10/93 Trial Tr. 3574), Dr. Cornell explained that Mr. Johnson did not satisfy a diagnosis of mental retardation because, on an IQ

47

test Dr. Cornell had administered, Mr. Johnson had scored 77, "just above the level of mental retardation," "two points above that." Ex. 7 (2/10/93 Trial Tr. 3691-92). So, as Dr. Cornell said, it was "a matter of one or two questions on an intelligence test would make the difference there." Ex. 7 (2/10/93 Trial Tr. 3692).

Dr. Cornell's testimony and the underlying IQ test results are materially inaccurate. Three significant developments in the scientific understanding of intellectual disability invalidate this testimony.

### (a) Dr. Cornell's Evidence Did Not Account for the Flynn Effect, Which Must Be Applied to Make the Evidence Reliable

First, the score Dr. Cornell relied upon was inaccurate because it was not adjusted to account for the Flynn Effect, which recognizes that IQ tests administered years after a test was originally developed produce measurably inflated scores.[50] The IQ test given to Mr. Johnson by Dr. Cornell shortly before his 1993 capital sentencing hearing had been developed over ten years earlier. But under the common practice in 1993 and for years after, IQ scores for individual tests were not corrected to account for the Flynn Effect.

The modern scientific consensus is that older IQ tests with aging norms, like the IQ test administered by Dr. Cornell, must be corrected for the Flynn Effect.[51] The validated scientific phenomenon recognizing that, after a test is "normed," IQ scores across populations rise at a constant rate over time. Hundreds of studies have proven that an IQ test will overstate a person's

---

[50] The process used to validate an IQ test after it has been developed is called "norming," and the Flynn Effect is "normed obsolescence" or "aging norms." *See* Ex. 1 at 9-10 (Reschly Report); Ex. 2 at 3-4 (Olley Report); Ex. 3 at 4 (Siperstein Letter).

[51] Hundreds of studies over the past decades, including two meta-analyses conducted within the past six years, have verified the necessity of correcting outdated tests for the Flynn Effect. Ex. 2(b) at 5 (Olley Supplement); Ex. 3 at 4 (Siperstein Letter).

48

actual IQ by a specifically measurable amount (.3 points per year) for every year after the IQ test was normed.  Lisa Trahan, Karla K. Stuebing, Merril K. Hiscock & Jack M. Fletcher, National Institutes of Health, The Flynn Effect: A meta-analysis, 140 Psychological Bulletin 1332 (2014) (a meta-analysis of almost 300 studies conducted world-wide that verified the slow, steady, and measurable rise in IQ test results across populations over time).

This phenomenon, which was first identified in 1984 by James R. Flynn, a political science professor from New Zealand, did not gain the widespread support of the psychiatric community until well after Mr. Johnson's sentencing.  *See* James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978,* 95 Psychol. Bull. 29 (1984).  In fact, the AAMR, which later became the AAIDD, did not mention the Flynn Effect in its 9th Edition Manual, which was published in 1992 and relied upon by Dr. Cornell at Mr. Johnson's sentencing hearing.  AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) (the "9th Edition Manual"); *see also* Ex. 8 at 1, 21 (Excerpt of Cornell Mitigation Information and Report) (citing the 9th Edition Manual)*;* Ex. 2(b) at 5 (Olley Supplement). Likewise, neither the 10th Edition Manual, published 2002, nor the versions of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") available at the time of Mr. Johnson's trial, sentencing, or § 2255 proceedings reference the Flynn Effect.  *See id.*

In 2006, after Corey Johnson's § 2255 proceedings ended, the AAIDD published the 10th Edition User Guide, which appears to be the first AAIDD/AAMR publication explicitly recognizing the Flynn Effect.  Robert L. Schalock, *et al.*, eds., *User's Guide: Mental Retardation: Definition, Classification, and Systems of Supports* (10th ed. 2006) (the "10th Edition User's Guide").  Specifically, it directs clinicians to "Recognize the Flynn Effect":

> The main recommendation resulting from this work is that all intellectual
> assessments must use a reliable and appropriate individually administered

49

intelligence test. . . . In cases where a test with aging norms is used, a correction for the age of the norms is warranted. . . . Thus, the clinician needs to use the most current version of an individually administered test of intelligence and take into consideration the Flynn Effect as well as the standard error of measurement when estimating an individual's true IQ score.

Ex. 76(a) at 20-21 (10th Edition User's Guide). The 11th Edition Manual, published in 2010, elaborates:

The Flynn Effect raises potential challenges for the diagnosis of ID. Because Flynn reported that mean IQ increases about 0.33 points per year, some investigators have suggested that any obtained IQ score should be adjusted 0.33 points for each year the test was administered after the standardization was completed. For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the WAIS-III Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years x 0.33 = 2.9). Hence, using the significant limitations of approximately two standard deviations below the mean, the Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

Ex. 75 at 37 (AAIDD-11 Manual). Like the 11th Edition Manual, the 11th Edition User's Guide advocates adjusting scores for tests with aging norms. Under the heading "Fostering Justice When Dealing with Forensic Issues," the 11th Edition User's Guide describes the same example as the Manual. Ex. 76 at 23 (AAIDD-11 User's Guide).[52]

The DSM-5, published 2013, mentions the "'Flynn effect' (i.e., overly high scores due to out-of-date test norms)" when identifying "[f]actors that may affect test scores." Ex. 77 at 37 (DSM-5). Accordingly, the American Psychiatric Association has stated that IQ tests can "fail to accurately assess a person's general intellectual functioning for a number of reasons, including, among others . . . failing to address the 'Flynn effect,' (aka, test norm obsolescence), which

---

[52] Without an explanation, the User's Guide identifies a 0.30 rather than 0.33 per year adjustment for the Flynn Effect. *Id*.

identifies the steadily increasing average IQ scores that distort the accuracy of older test scores."

Brief of American Psychiatric Ass'n. *et al.* as Amici Curiae in Support of Petitioner at 20-21,

*Hall v. Florida*, 572 U.S. 701 (2014).

The IQ evidence in Mr. Johnson's case was inaccurate. It was not adjusted for the Flynn

Effect which would have lowered Mr. Johnson's score on the test administered by Dr. Cornell

from a 77 to a 73, satisfying the first prong of the intellectual disability diagnostic. Dr. Cornell

did not adjust for the Flynn Effect.[53] Mr. Johnson's trial counsel, who relied on Dr. Cornell

when not presenting Mr. Johnson as having intellectual disability, has confirmed as much.

> During the time I represented Corey Johnson, I was not aware that after IQ tests
> are published, there is a slow but measurable increase over time in the IQ scores
> of populations to whom the IQ tests are administered, which I now understand is a
> scientifically proven phenomena known as the "Flynn effect" . . . . In retrospect,
> knowing what I know now, I would have sought to use evidence related to the
> Flynn effect to show that Corey Johnson was intellectually disabled and was
> statutorily ineligible for the death penalty if I was aware of it at the time.

Ex. 15 ¶¶ 23-24 (9/20/16 Aff. of C. Cooley).

By today's standards, all of the known tests administered to Corey Johnson would have

been adjusted for the Flynn Effect but that did not happen previously. Ex. 1 at 10 (Reschly

Report) ("In Mr. Johnson's case, all of known IQ tests administered to him as a child and

adolescent had outdated norms necessitating the corrections described by Flynn."); Ex. 2 at 15

(Olley Report) (describing the differences between the reported Full Scale Scores and the

properly adjusted scores).

---

[53] Dr. Cornell never mentioned the Flynn Effect at trial nor was evidence provided to the court in § 2255 proceedings that Dr. Cornell had taken the Flynn Effect into account. Dr. Cornell testified that he double-checked his findings and consulted colleagues before concluding that Mr. Johnson was not mentally retarded because he was aware that finding Mr. Johnson's IQ to be above 75 made him death penalty-eligible. Ex. 7 (2/10/93 Trial Tr. 3691). But this does not evidence consideration of the Flynn Effect. To the contrary, the fact that he reported an unadjusted full-scale score on a test that was more than a decade old is proof that he did not apply the Flynn Effect. Ex. 8 at 12 (Excerpt of Cornell Mitigation Information and Report).

**(b)**      **The Failure to Have Reliable IQ Evidence Led to Unreliable Evidence on Deficits in Adaptive Behavior**

Dr. Cornell never engaged in the full consideration of the second prong of the intellectual disability diagnostic—deficits in adaptive behavior—which under modern diagnostic standards is given relatively more weight in an intellectual disability diagnosis than the intellectual functioning prong.[54]  Decades ago, the consensus view within the scientific community (and the courts) required a threshold score of 70 or below (or 75 or below applying the standard error of measurement) in order to potentially diagnose a person with intellectual disability.  "At the time of Mr. Johnson's trial, a frequent practice was to consider these three components in a sequential process.  As a result, psychologists often did not assess adaptive behavior if the person being assessed had one IQ score higher (even very slightly higher) than the conventional cut-off of 70 (or sometimes 75, as explained below, when applying the standard error of measurement)."  Ex. 2(b) at 1 (Olley Supplement).  True to this practice, Dr. Cornell did not conduct a comprehensive assessment of Mr. Johnson's adaptive behavior impairments because he believed Mr. Johnson failed to qualify under the first prong based on one IQ score.

The modern scientific view recognizes that an individual with an IQ score somewhat above the generally accepted range for intellectual disability (such as Mr. Johnson's non-adjusted 77) can nevertheless be diagnosed with intellectual disability if the individual exhibited compelling evidence of significant limitations in adaptive behavior during the developmental period, applying the practitioner's clinical judgment.  Ex. 2(b) at 1-2, 5-6 (Olley Supplement) (citing DSM-5).  Specifically, the DSM-5 states:

> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical

---

[54] The test for intellectual disability generally accepted in both the legal and medical communities is a three-pronged analysis requiring findings of a significant intellectual deficit, significant adaptive deficits, and onset before the age of 18.  *See infra* Section III.

tasks. For example, a person with an IQ score above 70 may have such severe
adaptive behavior problems in social judgment, social understanding, and other
areas of adaptive functioning that the person's actual functioning is comparable to
that of individuals with a lower IQ score. Thus, clinical judgment is needed in
interpreting the results of IQ tests.

Ex. 77 at 37 (DSM-5).

For this reason, the modern scientific consensus is that Corey Johnson could be

diagnosed with intellectual disability with an IQ test of 77, even without correcting for the Flynn

Effect, if he had very significant adaptive behavior impairments. The comprehensive adaptive

behavior assessments conducted by Mr. Johnson's experts produced overwhelming evidence of

significant limitations in his adaptive behavior during his childhood, grounded significantly in

his childhood records and corroborated by dozens of interviews with those who knew him well

and the results of the standardized adaptive behavior results, and led all three experts to conclude

that Mr. Johnson has significant impairments in adaptive behavior.[55]

### (c)     The Evidence of Intellectual Disability Did Not Include Any Standardized Adaptive Behavior Instruments

Dr. Cornell did not administer any standardized adaptive behavior instruments to anyone

who knew Mr. Johnson. Although standardized adaptive behavior instruments existed at the

time of Mr. Johnson's trial and his first § 2255 proceedings, the quality of these standardized

adaptive behavior assessments has improved significantly. Ex. 2(b) at 6 (Olley Supplement).

"Beginning in the early 1990s, new scales to measure adaptive behavior were developed with

---

[55] Ex. 2 at 16-40 (Olley Report); Ex. 3 at 4-6 (Siperstein Letter); Ex. 1 at 25-32 (Reschly Report).

improved psychometric properties.  Gradually the emphasis on adaptive behavior increased in the scientific and clinical communities."[56]

In addition, the *retrospective* use of standardized adaptive behavior instruments (administering the instruments to individuals familiar with the subject's everyday functioning in the past, as opposed to assessing the subject's current functioning) is a recent development.  Ex. 2(b) at 6-7 (Olley Supplement).  Leading experts began suggesting the retrospective use of standardized adaptive behavior tools several years after Mr. Johnson's capital trial.  *See* Marc J. Tasse, "*Adaptive Behavior Assessments and the Diagnosis of Mental Retardation in Capital Cases.*"  Applied Neuropsychology, 15: 114-123 (2009) ("Tasse"); Ex. 2(b) at 6-7 (Olley Supplement).  Tasse states:

> The reliance on standardized measures of adaptive behavior as part of the mental retardation diagnostic process was first prescribed by Barclay et al. (1996) in their definition endorsed by APA's Division 33.  AAIDD (Luckasson et al., 2002) and Reschly, Myers, and Hartel (2002) reiterated the importance of establishing that the individual has 'significant limitations' in adaptive behavior based on the results of an individually administered measure of adaptive behavior.  Luckasson et al. also emphasized the importance of using standardized adaptive measures that had been normed on the general population and assessed the broad array of adaptive behavior, including conceptual, practical, and social skills.

Tasse at 116 (citation omitted).  Tasse continues:

> A retrospective assessment of adaptive behavior is often considered as the only viable option when the assessed individual is incarcerated. Interviewing a respondent while asking them to recall a time prior to the individual's incarceration is the proposed means of capturing the individual's typical adaptive behavior in the community and establishing a retrospective diagnosis (Schalock et al., 2007).[57]

Tasse at 120.

---

[56] *Id.*  Standardized adaptive behavior instruments are normed in similar ways to how IQ tests are validated.  Ex. 2(b) at 6 (Olley Supplement).

[57] Ex. 76(a) (10th Edition User's Guide).

54

As noted, *supra* Section III.A.2.b, long after his trial and original § 2255 motion, Dr. Olley administered standardized adaptive behavior instruments to three people who knew Corey Johnson well when he was a child. These assessments support the diagnosis of Mr. Johnson as a person with intellectual disability. Ex. 2 at 17 (Olley Report).

In sum, each of these developments makes clear that the testimony that Mr. Johnson was not a person with intellectual disability "was premised on unreliable science and was therefore itself unreliable." *Lee*, 667 F.3d at 407. Accordingly, such a sentence does not satisfy the Eighth Amendment's reliability guarantee.

### (d)    Newly Discovered IQ Scores Make Clear that the Evidence at Mr. Johnson's Trial Was Inaccurate

After Mr. Johnson's trial and § 2255 proceedings were completed, undersigned counsel became involved in his case and learned of several previously undiscovered IQ scores. These newly discovered scores undermine the understanding of Mr. Johnson's disability at trial and underscore the unreliability of his sentence. In 1997, when Mr. Johnson was eight years old, his Flynn-adjusted IQ was determined by a WISC-R[58] to be 72 (raw score: 72). This score clearly placed him in the category of the intellectually disabled. Had it been discovered prior to trial, it alone could have supported a finding of mental retardation.

Undersigned counsel also discovered another IQ score, this one from 1981 when Mr. Johnson was 12-years old. It was also from a WISC-R administration and it revealed a full-scale Flynn-adjusted score of 75 (an unadjusted 78). This score also places Mr. Johnson in the range of mild mental retardation and could have supported such a finding at trial. It also was significant in other ways. First, it was the *third* IQ score prior to the age of 18 that placed Mr.

---

[58] The WISC is the version of the Wechsler IQ test administered to children.

Johnson squarely in the category of the intellectually disabled. If these newly discovered scores had been known, their convergent validity would have made obvious that the IQ score of 77, obtained post-arrest when Mr. Johnson was 23-years old, was the outlier rather than a prior score of 69, obtained when Corey was 16, which the jury also heard about.  Indeed, it would have shown that every one of Mr. Johnson's valid IQ scores obtained prior the age of 18 was in the range of mental retardation.

Second, the discovery of this 1981 test would have put into proper context the 88 IQ score introduced at the penalty phase.  There is a well-known phenomenon in IQ testing known as the practice effect.  The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument.  AAIDD-11 at 38.  According to the AAIDD, "established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence."  *Id.*; *see also* User's Guide at 23.  The APA also recognizes that practice effect is one of the factors that can affect test scores.  *See* DSM-5 at 37.  *Roland*, 281 F. Supp. 3d at 509; *see also Salad*, 959 F. Supp. 2d at 872 (noting "the court should be cognizant of the 'practice effect' . . . phenomenon [that] describes the likelihood of inflated scores on re-administrations of similar IQ tests within a short period of time"); *Hardy*, 762 F. Supp. 2d 849, 857 (disregarding higher score due to practice effect); *United States v. Nelson*, 419 F. Supp. 2d 891, 897-99 (E.D. La. 2006) (giving higher scores less weight because of the practice effect); Ex. 1 at 12-13 (Reschly Report) (discussing practice effect); Ex. 2 at 14-15 (Olley Report) (same); Ex. 3 at 3 (Siperstein Letter) (same).

Though Dr. Cornell, trial counsel, and § 2255 counsel were unaware of it, the 1982 IQ test that yielded the score of 88 was the same test that had been administered to Mr. Johnson just

56

four months earlier, and that yielded a Flynn-adjusted score of 75.  Dr. Galluadet herself, a young, inexperienced counselor at the time, was unaware when she administered the 1982 test that Mr. Johnson had just recently been administered any IQ test, let alone the *same* test she gave him. *See* Ex. 18 ¶¶ 13-15 (3/19/12 Decl. of C. Gallaudet) (declaring that she would not have administered the same test had she known Corey's recent experience taking it).  As a result, she had no context into which to put his higher score, either.  Worse yet, when Mr. Johnson was tested again at the age of 16, and was again administered the WISC-R, yielding a Flynn-adjusted score of 65, the psychologist who tested him had no basis to account for the score of 88 just three years earlier so assumed the enormous difference in scores was characteristic of a learning disability, CITE, rather than understanding it as an unreliable testing artifact resulting from the practice effect.

As a result of the discovery of the inadvertent mistake made by Dr. Gallaudet, clemency counsel interviewed her and her supervisor at the time and learned of yet another problem with the administration of the test that yielded the 88 score.  That is, during the course of the testing, Dr. Gallaudet took steps to *help* Mr. Johnson better focus his attention on the tasks at hand.  Such actions are known to artificially inflate IQ scores, as the ability to concentrate is a component that affects performance.  As Dr. Reschly explains, "During the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results."  Ex. 1 at 11 (Reschly Report).

Each of these developments makes clear that the testimony in 1993 that Mr. Johnson was not a person with intellectual disability was reached without today's current understanding in the medical and legal community of what constitutes intellectual disability and without an accurate

57

or complete picture of his intellectual functioning, based on valid, properly adjusted IQ scores. The prior sentencing determination was "premised on unreliable science and was therefore itself unreliable." *Lee v. Glunt*, 667 F.3d 397, 407 (3rd Cir. 2012). Accordingly, such a sentence does not satisfy the Eighth Amendment's reliability guarantee.

### 2. Reliance on Invalidated Science in Mr. Johnson's Case Was Prejudicial

The evidence that Mr. Johnson was not a person with intellectual disability was "'decisive' in the 'choice between a life sentence and a death sentence.'" *Johnson v. Mississippi*, 486 U.S. at 586 (quoting *Gardner*, 430 U.S. at 359) (finding even the "possibility" that the invalid predicate "would be decisive" sufficiently prejudicial). A person with intellectual disability is categorically ineligible for the death penalty. 18 U.S.C. § 3596(c); 21 U.S.C. § 848(*l*) (repealed 2006); *Atkins*, 536 U.S. at 321. When the full scope of evidence relating to his impairments are considered and when Mr. Johnson is evaluated according to accurate, modern medical standards, he must be adjudged a person with intellectually disabled. *See supra* Section III.A. But for the invalidated testimony regarding his status, Mr. Johnson would have been found ineligible for the death penalty. The jury's choice would have been clear. Indeed, a death sentence would not have been an option.

In sum, disregarding the exhaustive evidence of his intellectual disability, *see supra* Section III.A, and allowing his sentence to stand on unreliable evidence violates the Eighth Amendment's prohibition against cruel and unusual punishment and repudiates the principle that "death is different."

## IV.   CONCLUSION

Mr. Johnson is a person with intellectual disability and his execution is, therefore, prohibited by federal law.  For these reasons, Mr. Johnson respectfully requests that this Court provide the following relief:

1.   Require the government to file an answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, specifically admitting or denying the factual allegations set forth above;

2.   Permit Mr. Johnson to file a Reply to the government's answer, responding to any affirmative defenses raised by the answer;

3.   Conduct an evidentiary hearing to resolve any factual disputes raised by the government's answer to this Motion, or by Mr. Johnson's reply to any affirmative defenses raised by the government.  Because Mr. Johnson has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

4.   Enter an order prohibiting the carrying out of a death sentence on Mr. Johnson due to his intellectual disability; and

5.   Grant such further and additional relief as may be just and proper.

Dated: January [],  2021                    Respectfully submitted,


_____

David E. Carney, VA Bar #: 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*


## CERTIFICATION PURSUANT TO RULE 2(b)(5) OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

The undersigned, being authorized to sign for the movant, declares under penalty of

perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: January [], 2021


_____David E. Carney,

VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

60

**CERTIFICATE OF SERVICE**

I hereby certify that on the [] of January, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

                                      _____

David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com