# EXHIBIT 2



**UNC**
CAROLINA INSTITUTE FOR
DEVELOPMENTAL DISABILITIES

101 RENEE LYNNE COURT
CARRBORO, NC  27510

T 919-966-5171
F 919-966-2230
www.cidd.unc.edu

*Mailing Address*
CAMPUS BOX 7255
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
CHAPEL HILL, NC 27599-7255

## Psychological Evaluation

JOHNSON, Corey James
Date of Report: August 24, 2016

Date of Birth: ███████
Age:  47

### I.     Introduction and Summary of Opinions

I conducted an evaluation of Corey Johnson at the request of Mr. Johnson's attorneys in order to address the question of whether Mr. Johnson has intellectual disability (formerly referred to as mental retardation).  In my opinion, Corey Johnson has intellectual disability that originated during his childhood and has persisted into adulthood.

Corey Johnson was raised in poverty and experienced a chaotic, abusive,  and extremely unstable childhood.  He lived in nearly a dozen different homes from his birth until he was 12 years old, and attended nearly as many different schools during that period.  He failed at every level of school, repeatedly demonstrating that it was extremely difficult for him to learn and progress across all academic subjects.  Corey also failed to learn how to interact with others, to read social situations, to communicate clearly, logically, and effectively, and to use judgment to solve problems.  He further failed to learn how to care for himself and never developed the range of skills necessary to live independently as an adult.

My opinion concerning Corey Johnson's intellectual disability is based in part on my analysis of his intellectual functioning as reflected in the IQ tests administered to him between the time he was 7 years old and 23 years old.  Four of those IQ tests produced valid and reliable results, but two of them were so flawed that their results have inadequate validity, and I did not consider them in my analysis.  My analysis of the results for the four valid IQ tests is that they are consistent with significant impairments in intellectual functioning.

My opinion is also based on my comprehensive review of a broad array of records and other information related to Corey Johnson's adaptive functioning in the community.  My assessment of his adaptive behavior revealed persuasive evidence that he has significant limitations in adaptive functioning in many areas, beginning in the developmental period before he was 18 years old and continuing into adulthood.  More specifically, I reviewed contemporaneous educational, social services, treatment, and evaluation records created during Corey Johnson's childhood and adolescence.  I

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

interviewed more than two dozen family members, friends, and professionals who had significant interactions with him and knew him well during various times throughout his life, and I reviewed written statements submitted by many of those individuals. Finally, I administered a standardized adaptive behavior instrument to three individuals who knew Corey Johnson particularly well in varied contexts. The information I considered as part of my adaptive behavior evaluation led me to conclude that Corey Johnson has significant limitations in all three domains of adaptive behavior—Conceptual, Social, and Practical—that are related to his intellectual functioning deficits. Based on my thorough evaluation and detailed analysis of the available information, discussed in detail below, the evidence is compelling and consistent that Corey Johnson is intellectually disabled and that his intellectual disability originated during his childhood and has continued into adulthood.

## II.     Overview

This report is sequenced chronologically and addresses the key factors that must be considered in determining a diagnosis of intellectual disability ("ID"). My qualifications are set out in Appendix A to this report.

As part of my evaluation, I reviewed records related to Corey Johnson's childhood, adolescence, and adulthood, including all available school records; foster care and social services records; psychological, psychiatric, and educational/achievement evaluations and treatment records; and residential placement and treatment records. I also interviewed over two dozen individuals who have known Corey Johnson, including family members; friends; peers; teachers; mental health evaluators and treatment professionals; and residential placement staff. I have reviewed declarations and statements obtained by Mr. Johnson's attorneys from these individuals and from others who have known Corey Johnson. I also administered a standardized adaptive behavior instrument to three individuals who knew Corey Johnson well. Finally, I have reviewed materials related to the criminal charges that led to Corey Johnson's 1993 death sentences. I have attached as Appendix B a list of the materials that I have reviewed as part of my evaluation.

### a.  Intellectual Disability Definition and Diagnosis

The most widely accepted definitions of intellectual disability are those of the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA"). The framework for defining intellectual disabilities by the AAIDD and the APA has been in substantial agreement for many years and consists of significant impairment in general intelligence (which has been recognized to mean approximately two standard deviations below the mean using properly administered and scored standardized IQ tests) concurrent with significant impairment in adaptive behavior, both of which must have originated in childhood before the age of 18, which is also referred to as the developmental period.

Specifically, the AAIDD, in its *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed., 2010) (hereafter "AAIDD Manual") states:

2

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

"Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  The AAIDD stresses the importance of clinical judgment in the accurate diagnosis of intellectual disability.  The AAIDD defines clinical judgment as "a special type of judgment rooted in a high level of clinical expertise and experiences that emerge directly from extensive data."

The APA, in its *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., 2013) (also known as the "DSM-5"), states: "Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains."   The APA states that adaptive behavior deficits must be related to deficits in intellectual functioning in order to clarify that the three parts of the diagnostic criteria are not separate characteristics but interrelated parts of one disability.

### b.  Factors that influence IQ test scores and adaptive behavior assessment

Clinicians and research scientists recognize the research-supported factors that influence intelligence test scores and adaptive behavior assessment.  Several of the factors summarized below, but not all of them, were not widely known or were not customarily applied by practitioners at the time Corey Johnson was sentenced to death:

i.  While the essential diagnostic framework for intellectual disability diagnoses has remained constant, there has been significant shift over time in the emphasis and weight accorded to the general intelligence and adaptive behavior prongs of the diagnosis and stress on the importance of clinical judgment in making an accurate diagnosis.  The most recent example of this shift, as far as APA is concerned, is its DSM-5, which was released in 2013, and states that:

> IQ scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks.  For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score.  Thus, clinical judgment is needed in interpreting the results of IQ tests.

This is a significant change from the diagnostic criteria existing in 1993 when Corey Johnson was sentenced to death.

ii.  Extensive research has indicated that average IQ scores have been rising and continue to rise at a rate of approximately three points per decade (the actual calculation is .33 points per year), although the reasons for this phenomenon are

3

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

not well understood. The phenomenon, known as norm obsolescence, aging norms, or the Flynn effect, should be taken into account by correcting IQ scores obtained from older tests. As an example, an individual given an IQ test in 1980 that was normed in 1980 and who received an IQ score of 70 (two standard deviations below the mean) would meet the intellectual functioning prong for an intellectual disability diagnosis. An individual given that same test (normed in 1980) 10 years later, in 1990, and who obtained an IQ score of 73 would also meet the intellectual functioning prong for an intellectual disability diagnosis, because .33 point per year rise in average IQ scores, identified as the Flynn effect, demonstrates that two standard deviations below the mean would then be a score of 73.3, rather than a score of 70. The validity of the Flynn effect is noted in the DSM-5.[1] Flynn first published his research related to norm obsolescence in the mid-1980s, but his research did not become widely known and generally accepted until well after Corey Johnson was sentenced to death.

iii.   Experience with repeat administration of IQ tests commonly results in higher scores, particularly when repeat administration of the same IQ tests occurs close in time. This "practice effect" should be taken into consideration when a defendant has taken multiple IQ tests or multiple administrations of the same test or when the same test is given to an individual close in time to a previous administration of the same test, and when there is a demonstrated and unexplained rise in test scores.

iv.   Whether considering assessment of intelligence or adaptive behavior, the examiner must acknowledge that people of low intelligence frequently have relative strengths that accompany their deficits. Because intellectual disability is defined by deficits, its diagnosis is a matter of documenting deficits (in both intelligence and adaptive behavior). Further, because relative strengths often accompany deficits, documenting strengths is not a valid method for ruling out intellectual disability.

v.   The retrospective use of standardized adaptive behavior instruments is currently recognized as one method for gathering information on adaptive functioning. However, before the time that Corey Johnson was sentenced to death, there were few instances in which retrospective analyses were needed.

---

[1] *See*, Trahan, L., Stuebing, K. K., Hiscock, M. K., & Fletcher, J. M. (2014). *The Flynn effect: A meta-analysis*, *Psychological Bulletin*. *140*, 1332–1360.

4

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

### III.     Corey Johnson's Social History

In order to diagnose a person with intellectual disability, it is not necessary to identify the causes of his or her impairment; in fact in about half of the cases of individuals with a mild intellectual disability, no specific cause can be determined. However, there are risk factors that can increase the probability that someone might develop intellectual disability.  I have found several of these risk factors in Corey Johnson's social history.

In the AAIDD Manual, risk factors for intellectual disability are organized by type of risk.  During Corey Johnson's prenatal development and his childhood, he was exposed to most of these risk factors.

**a.  Risk factors for intellectual disability**

    **i.  Biomedical factors:** genetic disorders; prenatal nutrition and disease; young parental age.

- Emma Johnson was Corey Johnson's mother, and James Sykes was his father. Both his parents were 17 years old when Corey was born.

    **ii.  Environmental factors**: poverty, domestic violence; lack of access to prenatal care; impaired child-caregiver interaction; lack of adequate stimulation; family poverty; parental drug use; parental alcohol use; parental smoking; parental immaturity; parental rejection of caretaking; parental abandonment of child; child abuse and neglect; domestic violence; inadequate safety measures; social deprivation; parental lack of preparation for parenthood; impaired parenting; inadequate early intervention services; and inadequate family support.

- James Sykes was in prison when Corey was born, and Corey did not meet his father (other than a brief encounter when Corey was an infant) until Corey was approximately 9 or 10 years old.
- Corey lived in poverty through his childhood.  His mother, Emma, rarely worked and was often on public assistance.
- Corey and his mother and brother lived in at least 11 different apartments between his birth and age 13 in Brooklyn, Manhattan, Queens, Long Island, and New Jersey.
- Corey's mother was emotionally and physically abusive toward Corey. She was also involved in several relationships with men who were not Corey's father; one of them was emotionally abusive toward Corey, his brother, and his mother, and another was physically abusive toward all three.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

- Both Corey's mother and father had serious drug problems as did one of the men with whom Corey and his mother lived for several years. Corey's maternal grandfather, with whom he lived on several occasions, was a chronic alcoholic.
- Emma Johnson was an immature parent who was more focused on her own needs and desires, rather than on those of her children. She was often emotionally distant from Corey.
- Corey's mother often left him with other caregivers while she was out of the home using drugs or partying, sometimes for weeks at a time.
- Corey's mother voluntarily surrendered Corey and his brother to foster care under the custody of the Department of Social Services when Corey was about 13 years old, because she was unable to care for her children and was focused on her own needs and desires.
- Corey attended at least ten different schools (mostly public schools but also two private schools) between age 5 and age 13 in the Bronx, Brooklyn, Manhattan, Queens, and New Jersey.
- Corey apparently retained in the second grade for three years and may have repeated third grade as well.
- Corey was not placed in a special education program until approximately age 10.

### b. Corey Johnson's Background and History

#### i. Corey Johnson's parents and siblings

Corey Johnson was born on ▮▮▮▮▮▮▮▮ in Brooklyn, New York. His parents, Emma Johnson and James Sykes, were both 17 years old when he was born. James Sykes was a gang member who went to prison before Corey was born. James returned from prison when Corey was 18 months old but then was sent back to prison, and Corey did not meet his father until he was 9 or 10 years old, and Mr. Sykes never played a significant role in raising Corey.

Corey Johnson has two half-brothers. Emma Johnson had another son, Robert Johnson, with a later boyfriend, Robert Butler. Corey's half-brother, Robert, is two years younger than Corey, and he and Corey were raised and spent their childhood together. James Sykes had a second son too, named James, Jr., with another woman, but Corey did not have much, if any, relationship with his half-brother, James, Jr.

#### ii. Parental substance abuse

Both Emma and James Sykes developed drug addictions at a young age. Emma, Corey's mother, battled substance abuse for most of her life, including addictions to powder and later crack cocaine. She experimented with drugs before she was pregnant

6

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

with Corey at age 17, and her family members believe she likely continued her drug use while pregnant with Corey. According to family members, Emma's drug abuse became progressively worse after she had Corey and his younger half-brother Robert Johnson. Emma lost multiple jobs due to her drug use, was on and off welfare, and spent much of her money on drugs when she was using heavily. Emma left drug paraphernalia around their apartment and spent time with drug users. In 1995, after many years of chronic drug use, Emma died of a cocaine overdose at the age of 45.

Corey's father, James became a heroin user at age 18 when he was released from incarceration sometime after Corey was born. James Sykes has battled a heroin addiction for most of his adult life.

### iii.     Family academic/educational history

Both Emma and James experienced significant academic challenges during their school-aged years. Emma was a poor student and usually received grades in the 60s on her school work. In high school, Emma still could not read well and dropped out. Emma's younger son, Robert Johnson, also faced significant learning challenges. Robert took intelligence tests in 1979 and 1983 at the ages of 8 and 12 and obtained IQ scores of 76 and 75, respectively. Robert was placed in Special Education in the first grade but failed to make any progress in the special classes. At the age of 11, he was still reading at a second grade level and could not relate to his peers and adult caretakers in an age-appropriate manner.

Corey's father, James Sykes, dropped out of high school in the ninth grade. At the time, he was reading at a fifth grade level. As he got older, James discovered that he had a learning disability and spatial deficits. He was diagnosed as learning disabled and dyslexic. As an adult, James Sykes was evaluated by the Office of Vocational and Educational Services for Individuals with Disabilities (VESID) and was found to qualify for services. Years after Corey's birth, James had a son, James, Jr. (Corey's other half-brother), with another woman. James, Jr. was in Special Education classes growing up and never attended high school.

### iv.     Transient home life

Corey spent his first years in Brooklyn with Emma and his maternal grandmother, Esther Johnson. When Corey was a toddler, Emma began to date Robert Butler, and they had Corey's half-brother, Robert Johnson, when Corey was 2-years-old. Corey, Robert, Emma, and Robert Butler lived with Emma's mother before moving into an apartment in Manhattan together.

When Corey was about 6 years old, Robert Butler left Emma due to her drug use and associated lifestyle. After the breakup, Emma moved frequently because of her drug use, volatile relationships with men, and inability to hold a job. Between boyfriends and apartments, Emma, Corey, and Robert Johnson stayed with Esther or with Emma's father, Love Johnson, in Brooklyn. At times, Corey and Robert also stayed with other relatives and friends for prolonged periods.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

When Corey was 7, Emma moved with her sons to Jersey City, New Jersey to live with her then boyfriend, Robert "Mitch" Mitchell. Mitch lived in public housing and was unemployed. After about 18 months, Emma and Mitch split up. Emma and her sons moved in with Emma's brother Amos, and his family in Hollis, Queens. After a few months, Emma again moved with her sons, this time to an apartment in Harlem.

In Harlem, Emma met a new boyfriend named Bobby Koger, who was a violent heroin addict. When Corey was about 9 years old, Emma and her children moved in with Bobby Koger in an apartment in Harlem. When Corey was about 10 years old, after his mother lost her temper and was physically abusive toward him, Corey lived with his mother's close friend, Antoinette Joseph, for approximately six months.

When Corey was about 11 years old, his mother sent him to live with her father, Love Johnson, in Brooklyn, because she claimed that Corey exhibited behavior problems that she could not handle. Love Johnson was an active alcoholic. After living with his grandfather for several months, Corey returned to live with his mother and brother in Manhattan. When Corey was 13 years old, his mother surrendered custody of him to the foster care system, and Corey was placed in the Pleasantville Cottage School. Corey remained at the Cottage school for three years and then was transitioned to a group home in an attempt to prepare him for independent living. For about two years, he lived in the group home called Elmhurst Boys Home and attended Newtown High School.

Shortly before graduation, Corey was suspended from school and left Elmhurst to return to live with his mother. He then lived for several months with his mother's former boyfriend, Robert Butler and his wife, Ann, in Goldsboro, North Carolina before returning to Brooklyn. Not long after his return, Corey moved to Trenton, New Jersey with a group of people selling drugs there, and he lived in Trenton for several years, sometimes with his drug associates and other times with girlfriends. Finally, after the leaders and others in that drug gang were arrested, Corey and two of his later co-defendants in his capital case moved to Richmond, Virginia and continued selling drugs there.

### v.    Domestic abuse and neglect

Emma was volatile and angry toward her children. She screamed at her sons, hit them, and threw things when she got mad. Corey wet the bed fairly often as a child, and he sometimes had bowel-movement accidents while sleeping as well (encopresis). When Emma found wet or soiled sheets that Corey hid after having an accident, she screamed at Corey, sometimes beat him, and sometimes refused to wash Corey's sheets, making him sleep in the soiled sheets. Although she got angry frequently at both her sons, Emma was particularly physically abusive to Corey, and she would smack and hit him, sometimes on the head. Emma's best friend, Antoinette Joseph, reported that Emma said she was tired of her sons, described them as getting on her nerves, and even threatened to kill them. During this period Emma continued to be physically and emotionally abusive toward her children. She repeatedly punished Corey for bedwetting, which he continued to do until he was 11 years old.

8

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Even when Corey and Robert were young, Emma would leave them home alone while she was out on the streets or with friends and abusing drugs. Sometimes she would leave them with family, friends, and acquaintances for days upon end. In general, family members and friends stated that Emma shirked her responsibilities of motherhood and did not show much affection or concern for her sons.

Emma was also the victim of abuse. Robert Butler was emotionally abusive to Emma, and the children regularly witnessed their arguments. Emma's next boyfriend, Mitch Mitchell, was militant and inflexible. He and Emma constantly fought and created a turbulent environment for Corey and Robert.

After breaking up with Mitch Mitchell, Emma dated Bobby Koger, and she and the children lived with him. Koger was violent and abusive man. Corey, Emma, and Robert were all the targets of Koger's emotional and physical abuse. Other family members, including Emma's sister, Minnie, Corey's grandmother, Esther, Corey's biological father, James Sykes, Corey's godmother, Antoinette, and Bobby Koger's older son, Kevin Koger, have reported seeing bruises on Corey, Robert, and Emma on several occasions during Emma's relationship with Bobby Koger. Koger inflicted injuries on Emma that required hospital visits and once set fire to her apartment. Emma later acknowledged to social workers that Koger was a violent heroin addict who was "abusive to the kids" and that she and Bobby were prone to violent conflict. One social worker noted:

> Mrs. Johnson stated that her home environment has been unstable and chaotic since she started living with Mr. Krager [Koger]. He required numerous emergency hospitalizations and Corey and his brother witnessed many fights and arguments between Mrs. Johnson and Mr. Krager . . . . This has been a destructive and chaotic relationship and Mrs. Johnson who has been quite depressed over this relationship has not been able to extricate herself. Mr. Krager has been drug addicted and has been involved with another woman over the past two years and this has been a very painful situation for Mrs. Johnson who feels trapped and, wants help to reorganize her life.

### vi. Corey Johnson's academic/educational failure

Corey attended at least six different elementary schools before he finished the second grade, and he attended at least ten schools by the time he was 13 years old, all because his family repeatedly moved as his mother began and later ended relationships with a series of boyfriends. Corey struggled in school from an early age and exhibited profound difficulties in all academic subjects. Although detailed school records from all of his elementary school years and some of his middle school years could not be located, the records that have been obtained paint a uniform picture of complete academic failure.

When Corey was 8, he was referred for an academic evaluation, and records note that he was kept in second grade and required evaluation, because he "[c]ouldn't perform third grade work," or follow directions. Corey's results on an achievement tests demonstrated that he was performing at the first grade level, though he was repeating

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

second grade for the second time.  Despite being 8 years old, Corey's developmental age was 4 years and 9 months on one test and 5 years and 5 months on another.  Corey ultimately was retained in second grade for three years as he continued to struggle both at school and at home.

Corey was referred to the Committee on the Handicapped for counseling and services in 1978 and again in 1979 due to "ongoing school failure . . . ."  Based on the results of those evaluations, the Committee on the Handicapped determined that Corey had special education needs and placed him in Special Education classes in August 1979.  Corey was only in Special Education for that one school year, as his mother then sent him to live with his grandfather in Brooklyn, where he apparently briefly attended a private parochial school.

In October 1981, when Corey was almost 13 years old, Emma brought Corey to a mental health center, the Council's Center for Problems of Living in West Harlem.  The Council's Center was an outpatient treatment facility for adolescents and children.  After an evaluation by the Center in January 1982, Emma signed papers to voluntarily place both Corey and his brother Robert in foster care; at the time, Corey was 13 and Robert was 11 years old.  Corey was placed by a court in the care and custody of the Department of Social Services, which then placed Corey in a foster care placement under the supervision of the Jewish Child Care Association ("JCCA").  The JCCA placed Corey in the Pleasantville Cottage School in Pleasantville, NY.  The Pleasantville Cottage School was a residential program for youths with troubled backgrounds.  Corey lived in a residential cottage and spent several months in the Pleasantville Diagnostic Center.  He then he was placed in the Mount Pleasant School, which is also part of the larger Pleasantville facility.

One of Corey's Pleasantville evaluators, Leona Klerer, who worked with children with significant learning disabilities, said that the other children with whom she worked, unlike Corey, all learned to read at a reading level higher than a second grade level.  Based on her assessment of Corey and the "unusual and significant" facts that he was in Special Education classes, was over 13 years old, and still was reading at a second grade level, Ms. Klerer concluded that Corey could be mentally retarded.

Throughout the approximately three years Corey spent at Pleasantville, he stood out as being particularly slow intellectually compared to the other residents.  Corey's initial adjustment to school at Pleasantville was problematic, and he often wandered from class like "a frightened animal," unable to sit or pay attention.  June 9, 1982, Report of Gloria Caro.  By the beginning of 1983, Corey's teacher reported that his "progress in class ha[d] been very, very, very slow almost to the point where one might feel that he is not learning."  Even with Special Education and tutoring in reading and Pleasantville's efforts to use a variety of teaching strategies with Corey, his academic skills did not progress, and Corey kept falling further behind his peers as he failed to respond to any of Pleasantville's teaching methods.  Despite being placed in a small class setting, his academic performance did not improve, and his reading and math performances were consistently below his grade level.  Corey's reading ability plateaued at the second grade level.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

During another assessment in March 1983, when Corey was almost 14 and a half years old, Dr. Kenneth Barish, psychologist, "confirm[ed] the presence of severe learning disabilities in reading, spelling and arithmetic . . . ." Corey obtained a reading score and spelling score at the first percentile, or lowest one percent of the population, and an arithmetic score at the second percentile, or lowest two percent of the population.

In 1985, after three years at Pleasantville, the JCCA transitioned Corey to an off-campus school program, because Corey was 16 years old, his mother, Emma, was not willing to have him return to her care, and he needed to learn independent living skills to prepare him to live on his own. JCCA, therefore, moved Corey to a residential program in New York City called the Elmhurst Boy's Residence.

Corey arrived at Elmhurst Boys' Residence in June 1985. Elmhurst consisted of two apartments and housed up to eight boys at a time, with staff living in a separate apartment on site. To staff members and the social worker at Elmhurst, Corey stood out as having significant intellectual limitations and being cognitively slower than the other residents at the group home.

While living at Elmhurst, Corey attended Newtown High School where, unlike most of the other boys in the residence who attended mainstream classes and were expected to move on to college, he was placed in Special Education classes. Despite receiving three years of special education and remediation at Pleasantville, Corey, at age 16, was still functioning at second and third grade levels for reading and math. After arriving in Elmhurst, Corey was enrolled in Special Education and Vocational Education classes at Newtown High School. He attended remedial math and reading classes in summer school but failed those and many of his other classes as well. He also exhibited significant attendance problems. Corey's teachers noted that he would not be able to pass any of the school competency tests and, therefore, would not be able to graduate but would receive a certificate of completion if he completed his senior year. However, just a short time before the end of his senior year, Corey was suspended for misbehavior and ended his attendance at Newtown.

### IV.    Intellectual Disability Evaluation

I have concluded, based on my thorough examination of a wide and comprehensive array of materials and more than two dozen interviews, that Corey Johnson is intellectually disabled, and his intellectual disability began before age 18 and persisted into his adulthood, including at the time he committed the capital crimes for which he is currently sentenced to death, which is the relevant time period. In my opinion, the evidence for Corey Johnson's intellectual disability diagnosis is strong and deep, and it is corroborated by contemporaneous records created by professionals during his childhood and adolescence, by my interviews of a diverse group of people who knew him best from an array of perspectives, by statements given by many of those individuals and by others, and by standardized testing.

My evaluation has also led me to conclude that no similar comprehensive, exhaustive evaluation of Corey Johnson by experts in intellectual disability has been

11

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

previously conducted before two other experts, Drs. Daniel Reschly and Gary Siperstein, and I were retained by Corey Johnson's attorneys. Instead, my review of the available materials related to Corey Johnson makes clear that despite many referrals and evaluations during his childhood, beginning at age 8 through at least age 16, including at least five known administrations to him of IQ tests, there was never a sophisticated analysis of Corey Johnson's IQ test results, and there does not appear to have been consideration in later years (after he had taken several IQ tests) of the factors that may have affected those IQ results. Nor was there a comprehensive evaluation that included a thorough review of his adaptive functioning to determine if Corey Johnson was mentally retarded (the term at the time, but what is now referred to as intellectually disabled). Instead, the records contain, at times, the conclusion that Corey had a severe learning disability, seemingly based almost exclusively on IQ test results, but lack any discussion or analysis of whether he had limitations in adaptive functioning that would support a diagnosis of mental retardation (intellectual disability).

The psychologist who conducted a mitigation evaluation of Corey in preparation for the sentencing phase of his capital trial, Dr. Dewey Cornell, collected some of the educational, social services, evaluation and treatment records related to Corey Johnson. The records Dr. Cornell obtained labeled Corey as a severely learning disabled child, and Dr. Cornell also spoke to a handful of staff members from his residential placements. But Dr. Cornell did not obtain many critical records that would have revealed flaws in the administration of some of the IQ tests nor did he interview some of the staff professionals who knew Corey Johnson best. In addition, Dr. Cornell did not correct the results of the IQ test he administered for the Flynn effect (likely because the Flynn effect was not a widely known or discussed phenomenon in 1993 nor had it been at that point validated by the enormous body of research that exists today). Finally, apparently because Dr. Cornell concluded that Corey Johnson just missed the IQ score threshold for a mental retardation (intellectual disability) diagnosis by a few points, he did not conduct a comprehensive assessment of Corey's adaptive functioning.

I have divided my discussion and analysis of Corey Johnson's appropriate diagnosis into two parts. First, I analyze the intellectual functioning prong, including the six IQ tests administered to Corey and the factors that affected the results of those tests. Next, I thoroughly review all of the relevant material to analyze Corey Johnson's adaptive functioning as a child, adolescent, and young adult.

a. **Prong 1: Deficits in Intellectual Functioning**

Psychologists, psychiatrists, and social workers conducted many evaluations of Corey Johnson during his childhood and adolescence. This summary will refer only to those tests that are relevant to a diagnosis of intellectual disability. For example, personality tests and tests of motor skills are not discussed, nor are some neuropsychological tests that are not directly related to the determination of whether Mr. Johnson has intellectual disability.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

IQ tests are approximations of intellectual functioning. The customary cutoff for the intellectual functioning prong of a diagnosis of intellectual disability is two standard deviations below the population mean. However, as noted in section II.b.i. above, the APA's most current expression of the diagnostic criteria for intellectual disability in the DSM-5 notes that attained scores above two standard deviations, if accompanied by such severe adaptive behavior problems, can support the conclusion by a practitioner applying clinical judgment that the person's actual functioning is comparable to that of individuals with lower IQ scores.

Proper interpretation of obtained IQ scores takes into account the error inherent in all tests. This error is expressed in the statistic called the standard error of measurement (SEM). By applying the SEM of the test, one can compute a confidence interval around the obtained score and note the probability that the "true" score lies within this range. Applying the customary 95 percent confidence interval to this cutoff results in a range of 65-75 as the upper end of the range for intellectual disability for a typical IQ test. Thus, obtained scores of 75 or lower have for many years been considered sufficient to support a diagnosis of intellectual disability, assuming they are accompanied by significant limitations in adaptive functioning.

Psychologists apply other psychometric principles to the interpretation of obtained scores. These include the practice effect and the effect of aging or obsolete norms, known as the Flynn effect. These factors are discussed below as they apply.

It is important to understand the context for Corey Johnson's history of IQ testing. During Corey's childhood, he and his mother moved repeatedly from New York City borough to borough, as well as from New York City to New Jersey and back to New York City. He attended many different schools and was referred for educational and psychological evaluations in New Jersey, Manhattan, and Westchester. It is clear from the records from these agencies that they were not always aware of the results of previous evaluations or of the specific test instruments that were used during those evaluations.

i.    **Corey Johnson IQ Testing**

With regard to intelligence testing, Mr. Johnson's first test for which records are available was on March 25, 1977, when he was 8 years, 4 months old. Jennifer Figurelli, Ph.D. of the Jersey City Schools administered the Wechsler Intelligence Scale for Children-Revised (WISC-R) and obtained a Full Scale IQ of 73. Corrected for aging norms, this IQ score would be corrected to 71.8.

Two years later on May 3, 1979, Nathalie Smith, of the Evaluation Unit of the West Manhattan Center administered the original Wechsler Intelligence Scale for Children, which yielded a much higher IQ of 91. It must be noted that there are serious problems with the choice of this test. First, the updated version of the Wechsler IQ test for children, the WISC-R, had been available for 5 years, so administration of the WISC, which had been published in 1949 and was 30 years old and well out of date when Smith selected it, was a violation of the American Psychological Association's *Standards for Educational and Psychological Testing* at that time and now. Significantly, the norming of the WISC, as noted, was more than 30 years old when Smith administered it to Corey

13

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Johnson. By current psychometric standards, the norms were so old and so culturally out-of-date that their use was inexcusable and their results invalid. Finally, not all of the subtests of the WISC were administered, and the score was obtained by prorating. In my opinion, these cumulative problems make this score uninterpretable, invalid, and unreliable.

In October 1981, Ernest Adams, M.S., from the Council Center for Problems of Living in Manhattan, administered the WISC-R to Corey Johnson again, and Corey obtained an IQ of 78. Corey was 12 years, 1 month old, and this was his third administration of a Weschler IQ test in 4 and a half years. Further, the WISC-R had been normed almost nine years earlier. Taking into consideration norm obsolescence, the obtained score should be corrected by nearly three points, to a fraction above 75 (specifically 75.36).

Only three or four months later, on February 8, 1982, Cary Gallaudet, Psy.D., administered another WISC-R to Corey at the Pleasantville Diagnostic Center in Westchester, New York; this was the fourth administration of a Weschler IQ test to Corey in 5 years. Dr. Gallaudet obtained an IQ of 88 on the WISC-R, which correcting by three points for the Flynn effect, would become a score of 85. In addition, Dr. Gallaudet has indicated that she was not aware that Mr. Adams had administered the identical WISC-R test just a few months earlier at a different agency in Manhattan. Dr. Gallaudet has also said that she would not have given Corey the WISC-R test if she had known that Corey had taken it so recently. The practice effect surely inflated this score to some unknown but likely significant extent.

Moreover, Dr. Gallaudet acknowledged in her test report that she provided assistance to Corey during the testing process by refocusing him to keep him on task when his attention strayed. Dr. Gallaudet has also acknowledged that she was an inexperienced psychologist in 1982, and this has been substantiated by her supervisor at the time. It is likely that Dr. Gallaudet's assistance to Corey during testing also artificially inflated his score. Her supervisor at the time, George Sakheim, Ph.D, has indicated that providing this type of assistance compromises the results of the testing. For all of these reasons, the February 8, 1982, WISC-R results have compromised validity and cannot be properly interpreted.

On March 15, 1985, when Corey was 16 years, 4 months old, Kenneth Barrish, Ph.D. again administered the WISC-R to Corey Johnson and obtained an IQ of 69. Corrected for aging norms, the IQ test given to Corey Johnson by Dr. Barish is 65.04. I interviewed Dr. Barrish who remembered Corey Johnson well. Dr. Barish described Corey Johnson as the child with "the most profound impairment in learning" of any child he evaluated in his more than 3 decades of clinical practice. Dr. Barish was an experienced psychologist when he evaluated Corey Johnson. He also has stated that he was not aware of the October 1981 administration of the WISC-R to Corey Johnson by Adams and of the likely practice effect due to Dr. Gallaudet's administration of the identical IQ test just a few months later. This is corroborated by Dr. Barish's report at the time, because he noted that the significant drop in Corey's IQ results from the results obtained by Gallaudet "was difficult to account for." In any event, Dr. Barish's results

14

placed Corey Johnson solidly in the intellectual disability range on the intellectual functioning prong of the diagnostic framework.

Finally, on October 9, 1992, when Corey Johnson was 23 years, 11 months old, Dewey Cornell, Ph.D. of the University of Virginia, administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and obtained a score of 77. This was Corey's sixth administration of a Wechsler test, and the norms of the test were over 14 years old. If corrected for aging norms, the score would be 72.8.

In summary, correcting scores for aging norms (without any consideration of practice effects) would yield four scores compatible with the diagnosis of intellectual disability (Figurelli 71.8; Adams 75.6; Barish 65.4; and Cornell 72.8). The 1979 administration of the extremely outdated WISC test, both temporally and culturally, renders the results of that test invalid. Thus, only the February 1982 WISC-R was an outlier, but that test was surely significantly artificially inflated by the practice effect, as it was given on the heels of the same test in October 1981 and by the admitted assistance given to Corey by an inexperienced examiner; its results lack validity. Based on my clinical judgment and experience, I find the four IQ test administered by Figurelli, Adams, Barish, and Cornell to be the only IQ tests valid for diagnosis. In my opinion, based on my analysis of the valid IQ tests in this case and on the comprehensive analysis conducted by Dr. Daniel Reschly, an expert in both intellectual disability and learning disorders, Corey Johnson meets the intellectual functioning prong of the intellectual disability framework, because his IQ test results show significant limitations in his intellectual functioning before the age of 18.

**b. Prong 2: Deficits in Adaptive Behavior**

**i.    Adaptive Behavior Standards**

As noted earlier, significant deficits in adaptive behavior is the second prong of a diagnosis of intellectual disability. The current definition used by the AAIDD refers to three areas of adaptive behavior and requires a significant impairment in at least one of the three areas—Conceptual skills; Social skills; and Practical skills—or significant impairment in a measure of overall adaptive functioning.

The American Psychiatric Association in its DSM-5 uses a very similar construct for an adaptive behavior assessment. Like the AAIDD structure, the DSM-5 identifies three domains of adaptive behavior—Conceptual; Social; and Practical. Like the AAIDD, the DSM-5 provides that in order to establish significant impairments in adaptive functioning sufficient to support a diagnosis of intellectual disability, a person must have significant limitations in at least one of the three areas or domains of adaptive functioning. Moreover, as mentioned above, compelling evidence of adaptive behavior impairments can be considered in the interpretation of intellectual functioning under prong one of an intellectual disability diagnosis, according to the DSM-5.

15

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

### ii.    Adaptive Behavior Assessment Methodology

A comprehensive collection of information concerning adaptive functioning requires gathering information from a wide array of people who knew the individual at different times in the person's life, in a variety of settings, and from different perspectives.  The purpose of obtaining a broad spectrum of information is to try to identify consistencies in functioning across times and settings.  It is important to note that some inconsistency is to be expected, and clinical judgment is, therefore, required to synthesize all of the available information to reach a diagnostic conclusion.

In order to assess Corey Johnson's adaptive functioning, I reviewed a wide array of contemporaneous school, social services, treatment, and institutional records created during his childhood, adolescence, and young adulthood before his current incarceration. I also interviewed over 25 family members, friends, members of the drug dealing groups with whom Mr. Johnson associated; and teachers, staff members, and other professionals who knew him when he was placed in schools and institutional environments.  I reviewed statements prepared by many of these individuals and by others whom I did not interview.

To complement the information obtained from documents and interviews and to obtain a retrospective standardized assessment of Mr. Johnson's adaptive functioning, I administered a standardized adaptive behavior rating instrument to three people who knew Corey Johnson well, although each had a different relationship with him.  The Adaptive Behavior Assessment System (2nd ed.) ("ABAS-II") is a rating scale of adaptive behavior administered to people who knew the individual well enough to provide ratings in each of the areas used to assess adaptive functioning.  In Mr. Johnson's case, I was not able to obtain a standardized assessment of his work history, because he did not have enough of a work history to allow for valid ratings.

The three raters were (1) Antoinette Daniels Joseph, best friend of Corey Johnson's mother, (2) Minnie Hodges, maternal aunt of Corey Johnson, and (3) Richard Benedict, former teacher and administrator at Pleasantville Cottage School.  Ms. Joseph and Ms. Hodges completed ratings using the Parent Form of the ABAS-II, and Mr. Benedict completed the Teacher Form.  The items on the Teacher Form are limited to adaptive behavior shown in school.

It is important to note that Mr. Benedict knew Corey Johnson only in an institutional setting, the Pleasantville Cottage School, where staff and other professionals provided many supports to residents.  As I noted above, while administering standardized instruments to raters who knew or observed an individual only in an institutional setting is permissible, caution should be used when interpreting the results, because adaptive functioning for purposes of an intellectual disability diagnosis is focused on adaptive behavior in the community setting, which is significantly different from an institutional setting.  Mr. Benedict's ratings must be considered in this context; institutional settings can artificially inflate assessments of adaptive functioning, because they do not take into account the significant institutional supports provided to residents.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

On the ABAS-II, scores for the three areas of adaptive behavior are derived from scores in nine areas. A mean score on the nine areas rated is 10 with a standard deviation of three. Thus, a score indicating significant impairment (two standard deviations below the mean) is a score of 4 or lower. Attached as Appendix C are charts depicting the full ABAS-II results.

As I explain below, I have concluded that Corey Johnson demonstrates significant limitations in all three adaptive behavior domains. Corey Johnson's adaptive behavior limitations are well documented in contemporaneous school and treatment records. They are also reflected in numerous statements from the people who knew him best during his childhood, adolescence, and adulthood. And they are corroborated, particularly in the Conceptual and Practical domains, by the results of the retrospective administration of standardized adaptive behavior instruments.

As noted above, significant limitations in only one domain is all that is required to support a diagnosis of intellectual disability, as long as there are accompanying significant limitations in intellectual functioning as measured by standardized IQ tests and as long as the significant limitations in intellectual functioning and adaptive functioning were manifested in the developmental period.

I have structured my evaluation and analysis below for each of the three domains in the same manner, starting with an explanation of the skills encompassed by the three separate domains. I then include a summary of my significant findings and conclusions for each domain, followed by selected examples of support found in the contemporaneous institutional records created during Corey Johnson's childhood and adolescence and from the recollections of professionals who worked with, evaluated, or treated Corey. I then highlight relevant observations from Corey's family, friends, and others who have known him over the years. Finally, I summarize the results from my administration of the ABAS-II standardized adaptive behavior instrument for each domain and the relevant categories.

### iii.    Conceptual Adaptive Behavior Domain

The AAIDD definition of the Conceptual domain encompasses the following areas: language; reading and writing; and money, time, and number concepts. The DSM-5 definition is very similar, as it includes: competence in memory; language/reading/writing; math reasoning; acquisition of practical knowledge; problem solving and judgment in novel situations; among others. For ease of analysis, I have grouped these areas into the following four areas for the Conceptual domain: (a) Academic performance; language and communication; (b) Number comprehension, money, and time; and (c) Judgment, planning and problem solving.

As the discussion below vividly demonstrates, Corey Johnson had significant limitations in all of the areas encompassed by the Conceptual functioning domain during his childhood and adolescence, and into adulthood. Corey failed educationally and academically. He was never able to learn to read or write adequately, to analyze or understand rudimentary subjects, or to develop a more than superficial store of

17

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

knowledge. For these reasons, Corey repeated grades over and over without success and never came close to graduating from high school. Various achievement tests administered to Corey over the years placed him far below his age and grade level, and even as an adult, his achievement plateaued at a young middle school level for the most part.

Corey Johnson also demonstrated from an early age significant challenges with language and communication. As a youngster, he stuttered and had a lisp. But his limitations went well beyond those obvious speech impediments. In addition to his rudimentary reading and writing ability, Corey's oral language abilities and comprehension have been compromised throughout his life. He has often had to rely upon simple language or slang to communicate with others, and those who have known him have limited their conversations with him to basic, concrete language. But even so, they report that he often did not grasp what was being said to him.

Similarly, Corey Johnson lacked proficiency in math, particularly when tasks involved more than basic computation. Those challenges expressed themselves in related life skills, such as telling time or correctly calculating change when making purchases.

Finally, the results of the standardized ABAS-II instrument that I administered corroborate that Corey Johnson had significant limitations in the Conceptual domain. For all of these reasons, in my opinion, there is overwhelming evidence that Corey Johnson has significant limitations in adaptive functioning for skills encompassed within the Conceptual domain that manifested when he was child, adolescent, and an adult at the time of the crime in this case.

### A. Academic performance

Corey Johnson's school and academic performance history reflects a persistent pattern of failure. As I described above, Corey experienced a chaotic childhood characterized by constant upheaval and repeated moves from place to place—a pattern that involved living with his mother and close family members, then living with his mother and one of her boyfriends, and back with family—in various boroughs in New York City and in New Jersey. That disruptive and transient life led to Corey's being enrolled and attending school after school. He attended at least ten different schools in Manhattan, Brooklyn, New Jersey, and the Bronx before he was placed in the Pleasantville residential program in Westchester County, New York at age 13 for middle school and high school. Corey also attended a high school in Queens after his transfer from the Pleasantville residential facility.

From the very beginning, Corey's contemporaneous school and treatment records show that he was failing academically and far behind his peers. At times, Corey repeated grades because he could not progress. However, despite remaining in the same grade as his peers advanced, Corey could not improve his performance. At other times, the records suggest that Corey was advanced to the next grade, despite his continued

18

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

academic failure. As he got older, the records show that Corey fell further and further behind, because, simply put, he could not learn.

Nevertheless, school and treatment records created when Corey was a child reflect numerous attempts by educators and clinical treatment providers to assist him. They document a variety of strategies and efforts by those professionals to assist him in his academic performance and a range of supports to address his significant needs. The records also regularly reported that Corey tried hard, exhibited good effort, and the records repeatedly noted that he was motivated to learn. Despite the variety of strategies and supports he received and his sincere efforts, Corey could not learn and failed academically at every turn. Corey's academic deficits in childhood cut across all academic subjects and generalized to applications in community life, such as shopping and reading for pleasure or for general information.

Despite significant efforts by Corey Johnson's current attorneys to gather his school records, comprehensive educational records could not be located. However, references in later records help fill in some of the gaps in his school history. Most importantly, the contemporaneous records summarized below starkly demonstrate Corey Johnson's educational and academic failure.

Corey appears to have attended first grade at both PS 103 and PS 63. This is corroborated by later records from the Bureau of Child Guidance, Upper West Side Center when Corey was in third grade, which indicate that he was retained in the first grade and had a history of poor academic performance.

There are also records suggesting that, for a period of time in 1974 (when Corey was 6 years old), he attended first grade at St. Rita's, a private Catholic school. Records show that Corey was in the second grade at PS 309 in Brooklyn when he was 6 years old in 1975 and that he repeated the second grade at PS 16 in Jersey City, New Jersey when he was 7 years old. Records also show that Corey was still in the second grade when he attended PS 134 in Queens in 1978 when he was 9 years old, and they show that he remained in the second grade at PS 76 in Manhattan in 1979 after he turned 10 years old.

The first documented concern about Corey's academic performance that has been located was when he was identified for testing when he was 8 years old and repeating the second grade in New Jersey. In March 1977, at the age of 8 years, 4 months and in the second grade, Corey participated in an evaluation by the Learning Consultant to the Child Study Team of the Jersey City Public Schools. The report of this evaluation by Cheryl Spillane, Learning Consultant, indicated that Corey was enrolled in PS 16 Elementary School in Jersey City and that he was referred for evaluation because he:

> [c]ouldn't perform third grade work. Being retained in second. Cannot follow directions. No concept of number facts, low comprehension. No reading skills. Unable to retain sight vocabulary.

In February 1979, when Corey was 10, he was referred to the Committee on the Handicapped, by the Bureau of Child Guidance for reason described as "school failure." Records from the Evaluation Unit of the West Manhattan Center in May 1979 (age 10

19

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

years, 5 months) included an Education Assessment.  Corey was administered the Peabody Individual Achievement Test, Reading Recognition subtest, and scored a grade equivalent of 1.3, which placed him at the first grade level with visual discrimination and reversals noted.  Arithmetic on the Wide Range Achievement Test was at the 3.9 grade level.  This evaluation determined that Corey had special education needs and placed him in Special Education classes with a curriculum that included (1) a special reading program to teach visual discrimination of letters and words; (2) perceptual motor training to improve writing skills; and (3) maximize auditory processing by giving small chunks of information which Corey could act upon in meaningful ways.

Records show that Corey was placed in the third grade in the fall of 1979 at PS 200, when he was 10 years old.  But the next academic year (in the fall of 1980), records show that Corey was placed in Special Education classes in the fifth grade at PS 92.  There is no explanation for why Corey skipped from the third grade to the fifth grade, and it is not clear if he ever was placed in the fourth grade at any school.

A Social History at Pleasantville Cottage School (3-19-85) noted, "Corey was left back in school in the 3rd and 4th grade[s] and was placed in a special class in 1980." Records of St. Rita's Catholic School indicate that Corey also attended that school in 1980 at age 11, when his mother then sent him to live with his grandfather in Brooklyn. Corey was only enrolled briefly at St. Rita's, and then he enrolled at a public school, PS 213, in Brooklyn.

A Child Assessment Evaluation Summary dated December 9, 1981, when Corey was 13 years old, indicates that Corey's mother took him to the Washington Heights-West Harlem Community Mental Health Center for assistance "due to academic failure and behavior problems."

When Corey was 13, his mother placed him in foster care through the supervision of the Department of Social Services ("DSS"), and the DSS put Corey in the care of the JCCA.  The JCCA placed Corey in its facility at the Pleasantville Cottage School in Pleasantville, NY and conducted a diagnostic screening of Corey upon his admission. The screening records noted that his Wide Range Achievement Test scores showed functioning on second and third grade levels in word recognition, spelling, and arithmetic.  He could only recite the months of the year up to August.

Despite the specialized services at Pleasantville, his report cards indicate that Corey continued to perform far below grade level, even though he demonstrated "sustained . . . effort" and was seen as "extremely cooperative."  The Pleasantville records repeatedly describe Corey as having a severe learning disability, a label that does not have any diagnostic significance for intellectual disability.  The records note time and again that Corey was barely able to read.

Pleasantville prepared an Individualized Education Program ("IEP") for Corey in June 1985, when he was 16 years old and when he was at the end of his last academic year at Pleasantville before transferring to a group home and Newtown High School. Corey's IEP notes an assessment of his reading comprehension on the Brigance Inventory of Essential Skills as 40 percent at the third grade level and his oral comprehension

20

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

ability on the Gray Oral Reading Test at 75 percent at the second and third grade level. Other achievement testing assessed his sight vocabulary level on the Wide Range Achievement Test as a grade equivalent of 3.7 (third grade) and his arithmetic ability on the Wide Range Achievement Test as a grade equivalent 3.4 (also third grade). Thus, after three years in Special Education and remediation classes at Pleasantville, Corey was still functioning at the second and third grade levels for reading and math at age 16.

It should be noted that every staff member from Pleasantville who provided an interview or declaration remembered Corey Johnson, and each described Corey as the slowest student or the most impaired student they had ever known to come through that institution. For instance, Ann Harding, a residential staff member wrote, "Corey was very slow intellectually. I knew this by the way he would talk to me. I do not remember anyone else at Pleasantville who was similarly slow intellectually."

The JCCA placed Corey at the Elmhurst Boys Residence when he was 16 years old and aged out of Pleasantville. This placement was supposed to prepare Corey for independent living, because his teachers and counselors concluded that returning to the care of his mother was not an option that was in Corey's best interest. Ms. Odette Noble conducted individual and group therapy sessions while Corey was at Elmhurst, and Corey Johnson attended those weekly. Ms. Nobel stated in her affidavit, "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."

Corey attended Newtown High School, his last school placement, while he lived at Elmhurst. At Newtown, Corey was placed in remedial, Special Education, and Vocational Education classes. Corey failed almost all of his classes, despite regular support from his friend, Courtney Daniels. Courtney recalled helping Corey several times a week for a couple of hours in the afternoon, providing particular support to Corey in math by giving him step-by-step instructions about how to tackle a problem. Yet those efforts did not help Corey succeed. For example, in his "junior year" of high school, Corey took fifth and sixth grade English classes and barely passed with a D. He was placed in fundamentals of math both his junior and senior year and received a D his junior year and failed his senior year. He also received a D in typing his junior year. Corey attended remedial math and reading classes in summer school but failed those classes and failed nearly every class his senior year. During his time at Newtown, teachers determined that he was unable to pass school competency tests. Corey left Newtown without graduating or obtaining a certificate of attendance.

After Corey Johnson was charged with the capital offenses that have prompted this evaluation, his court-appointed defense psychologist, Dr. Dewey Cornell, conducted the mitigation evaluation noted above. Dr. Cornell testified briefly at the capital sentencing hearing in Corey's case about some of Corey's adaptive functioning. Dr. Cornell stated: "Certainly, functional academics, the ability to do academic work is one in which he has impairment."

Dr. Cornell also administered the Test of Written Language ("TOWL") and the Woodcock-Johnson Test of Achievement-Revised in January 1993, when Corey was 24-years-old. On both tests, Corey Johnson obtained age equivalents substantially below his chronological age and obtained grade equivalents between second and sixth grades.

21

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Since that time, Corey Johnson has diligently studied while in prison in pre-GED classes, because he has stated that one of his most important life goals is to pass the GED. Despite several decades of study, Corey Johnson's achievement has remained relatively constant. In 2014, Dr. Daniel Reschly administered the latest version of the Woodcock Johnson Test of Achievement-III to Corey Johnson. With the exception of concrete math calculations, on which his performance has improved after diligent study, the vast majority of Corey Johnson's grade equivalent achievement test results remain in the second to the fourth grade range.

### B. Language and communication

Corey Johnson's school and treatment records show that he had language and communication deficits that began at an early age and continued throughout his life. He had marked speech impediments at an early age. Records show that he exhibited "marked stuttering" when he was young up until age 5, and had "some stuttering problems" later on as well as a slight lisp.

While those obvious speech difficulties eased as he got older, his school and mental health evaluations during Corey's childhood and adolescence documented communication difficulties, debilitating disabilities in reading, writing, and oral expression, and limitations in his ability to understand others. Achievement testing showed that as an adolescent and even as an adult, his reading, comprehension, and oral communication skills were far below his age. As noted earlier, his oral comprehension ability on the Gray Oral Reading Test was at 75 percent at the second and third grade level. In other words, as a mid-teenager, he understood little of what people spoke to him.

Family members and friends similarly described Corey's having difficulty understanding what others say, which required that they communicate with him using simple words and phrases. Nevertheless, they said he often did not comprehend what they said to him. In my interview with Corey Johnson's capital defense attorney, he similarly stressed that he had more difficulty explaining issues to Corey than he had with "other low-intelligence" clients he has represented during his career. He had to explain thing to Mr. Johnson more times than with his typically low-intelligence clients and said that Mr. Johnson would sit there and nod his head but not understand. All of the information I reviewed, some of which is summarized below, demonstrates Corey Johnson's significant limitations in language and communication.

The earliest set of school records that have been located document his reading and communication deficits. In March 1977, at the age of 8 years, 4 months and in the second grade, Corey participated in an evaluation by the Learning Consultant to the Child Study Team of the Jersey City Public Schools. Cheryl Spillane, Learning Consultant, described Corey's speech as "at times quality is unclear . . . [s]ays v for b sometimes. Needs further investigation." The evaluations done at this time show that Corey was functioning below his chronological age on speech and language tests. Among other deficits, the evaluation shows that he could not perform the most basic function of

22

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

writing his own name.  The recommendations at the conclusion of the evaluation included a recommended referral for a speech evaluation.

Dr. F. A. Figurelli, a psychiatrist who evaluated Corey for the Jersey City Board of Education in October 1977, when Corey was 8 years old, wrote that "[h]e reveals a speech defect."  Additional records consistently show that serious concerns about Corey's speech and language development were repeatedly noted.  However, as late as when Corey was a teenager at Pleasantville, despite several evaluations recommending speech therapy from the time he was 10 until he was 15, he did not receive those services.  Elizabeth Clemmens, Psychiatric Summary, December 1984.

The Pleasantville records, beginning when Corey was 13, repeatedly describe him as having speech impediments and disorders, receptive and expressive language disorders, as well as noting that he is barely able to read and functions at a second grade level.  They note that Corey's deficits were evident during his initial evaluations.  Corey spoke with "markedly slurred speech," had very poor reading skills, a poor understanding of what he was reading and no understanding of how to read.   Barely able to write his own name and unable to recognize the sounds of many letters on the page, Corey was reading on a second grade level, indicating "a significant deficit in his abilities."  Lynda Coccaro Speech and Language Evaluation, October 5, 1983.

Janet Valentine (former counselor and clinical social worker at Pleasantville Cottage School) described Corey to me as follows: "He wasn't very expressive."  She reported that he didn't use many sentences, was basically a listener.  "I thought it was a processing problem."  She said that he had difficulty processing both receptive and expressive language.  She said that she "Didn't know if he couldn't express or just didn't understand."  "He could follow one or two step directions, but nothing elaborate."  "You had to show him, I'm talking about basic living things."  "I couldn't take for granted that he understood, so I showed him."  "I remember him because he just wasn't getting it."

As noted above in Section IV.a.iii.A., Corey's assessment on the Brigance Inventory of Essential Skills showed that he understood less than half of what he read at the third grade level and his oral comprehension was only 75 percent at the second and third grade level.

In January 1993, at age 24, Dr. Cornell administered the TOWL.  The oldest age group for the results of this test was 17 years old, and on two portions of the test, contextual vocabulary and syntactic maturity, Corey scored as low as one to two percent of the 17 year age group population respectively.  His score on the latter of those two tests was comparable to children aged 7 to 8.  Based on those TOWL results and the rest of Dr. Cornell's evaluation, he testified that, in the context of adaptive functioning, "communication deficits with his speech impairment and communication problems, he has some deficits there."

Corey's family members and friends described communication difficulties that mirrored the evaluations of his teachers, case workers, and mental health professionals and his performance on various evaluations.  Corey's Aunt Minnie Hodges stated that "Corey had difficulty following certain instructions, and I would have to repeat myself

23

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

many times before he could comprehend what I was directing him to do. (Esther Johnson said the same thing in her affidavit.) Sometimes he appeared to be puzzled or mixed up when I would tell him certain things." Corey's friend from childhood, Holly Scott, described his communication as all slang and said she had difficulty picking up on it. She said in her affidavit, "Our conversations were always very simple." Her comments were mirrored by Sonya Hilton, who dated Mr. Johnson when he was about 20. She stated that: "He had a limited vocabulary, and he spoke mostly using street words and slang." She further recalled that: "If Corey was in the room with four other people, it was clear that Corey was not on the same intellectual level as the other people and had difficulty keeping up with the conversation. For example, if the group was talking about the weather, Corey would abruptly talk about a race car show." Corey's cousin, Queenie Hodges, described Corey as "quiet; he may not have understood." She said that Corey would often change topics and was disorganized in his conversations. She stated that although someone had been helping him to write letters to her recently, his "letters are just nonsense." She described them as disorganized like his conversation.

Similarly, maternal aunt Minnie Hodges reported, "He wouldn't understand others but didn't want to look bad." She also felt that he had difficulty making himself understood. She said that even when he calls her today, she has to tell him to explain, because she doesn't understand him.

In my discussion with former Warden Mark Bezy, he indicated that he met with all death-row inmates weekly. He described his conversations with Mr. Johnson as "very simple" and noted that Mr. Johnson never raised any legal discussion or engaged in discussion of any other complex matter.

These comments and others by people who have known Mr. Johnson well indicate that his communication has been adequate for some of the simple communication demands of everyday life but were at the concrete level of a child. All of the information I reviewed clearly establishes that Corey Johnson has never demonstrated the conceptual aspects of communication appropriate for his age, and, instead, his language and communication abilities are significantly impaired.

### C. Number comprehension, money, and time

The records I reviewed and my interviews with those who knew Corey Johnson uniformly portray him as a child, adolescent and adult with impaired abilities with respect to number concepts, the use of money, and the concept of time. Even the leaders of the drug operation in New Jersey for whom Corey Johnson sold drugs recognized his unreliability in keeping track of how much money customers owed him for the drugs and how much money Corey owed his superiors. Corey's achievement testing at various stages during his educational career reinforce and corroborate those conclusions. His performance on the Arithmetic subtest on the valid IQ tests that Corey Johnson was administered also reflect his limitations with numbers.

Corey's first documented academic evaluation at age 8 revealed that he demonstrated "[n]o concept of number facts . . . ." That same evaluation showed that

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Corey: "had no understanding of his date of birth. He thought he was born in March," although he was born in November.

When he was repeating second grade for the first time, records note that Corey was not able to work out math problems that children his age and younger were able to do by themselves, and they describe Corey's math skills as similarly poor and state that they did not improve despite receiving help. In addition, Corey was only able to tell time on the hour, and although he knew there were 12 months in the year, he could only recite the months in sequence up to August. He also could not multiply by three, divide a single digit by two, or read numbers of more than four digits.

At Pleasantville Cottage School, as a teenager, records show that despite being placed in a small class setting, Corey's math performance was consistently below his grade level. Later, when Corey was 16 and 17 years old at the Elmhurst group home, one of his counselors, Odette Noble, recalled that: "Mr. Johnson's limitations in school achievement and functional academics continued in his later adolescence and adulthood." While at Elmhurst, goals for Corey included "learn how to handle money so that [Corey] can shop for himself." She also noted: "Caseworker, houseparents [sic] and teachers will help Corey learn enough simple arithmetic that he will be able to figure out correct change." These objectives were not obtained, because handling money was consistently identified as a goal for Corey throughout his stay at Elmhurst.

Interviews and statements from family and friends sketch a similar picture. Cousin Queenie Hodges reported to me in interview that at age 11 or 12, Corey could not tell time and that even at later ages, he consistently spelled her name wrong. Aunt Minnie Hodges recalls that when Corey was 12 or 13 years old, unlike other children his age, he could not count small change without making mistakes, a problem she said continued into his late teens. Priscilla Hodges and Antoinette Joseph said they ordinarily would have to accompany Corey to the store and would need to tell him whether he received the proper change after buying something.

The affidavit of Esther Johnson states that she did not feel comfortable trusting Corey with money and would send his younger brother, Robert, to accompany Corey to the store to make sure the purchase was done correctly and the proper change was received. Many similar examples of problems in both school achievement and functional academics in childhood can be found in affidavits and interviews.

After leaving Elmhurst and after about a 6 month stay with his mother's former boyfriend, Robert Butler and his wife, Ann, in Goldsboro, North Carolina, Corey began working under the Brown brothers in their drug selling operation in Trenton, New Jersey. Their statements to me during my interviews detail the problems that Corey Johnson had with handling money. The Browns limited Corey's role to be sure he did not handle and lose their money.

### D. Judgment, planning and problem solving

Corey Johnson also exhibited significant limitations in judgment, planning, and problem solving, the final aspect of the Conceptual adaptive behavior domain. In later

25

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

pages of Corey Johnson's adaptive functioning in the Social domain, I document the records and the anecdotes from a range of reporters who described Corey Johnson as highly gullible and naïve. Several of those anecdotes also demonstrate his poor judgment and rash, impulsive actions. For example, Corey's willingness on a dare to ride his bike across a street through traffic and to roller skate down a steep hill show his limited judgment and inability to consider the consequences of his actions, in addition to reflecting his susceptibility to peer pressure. Another time, when Corey was living with Robert Butler and his wife, they reported that he borrowed a 10-speed bicycle and rode it in the woods as if it were a dirt bike. He did this while wearing nice church clothes and returned from his ride in the woods covered in mud.

My evaluation also shows that Corey Johnson thought little about the future but instead simply reacted to events as they occurred to him. My review has also revealed that Corey Johnson had very limited problem solving skills. Those who knew him best said that he would do as he was told by peers, regardless of whether it was the best course of action or the right thing to do. As the records and anecdotes discussed below show, Corey Johnson exhibited significant impairment in judgment, planning, and problem solving.

When he was evaluated in 1979 at the West Manhattan Center, Nathalie Smith reported that at age 10 years, 5 months, "Corey would like to be a policeman when he grows up. His range of interests appeared very limited in view of his intelligence . . . ." In discussing Mr. Johnson's time at Pleasantville with Ms. Janet Valentine, I asked whether he had any plans for the future or independent living. Ms. Valentine replied that Corey did not take initiative in many things. "He didn't process things like that. I don't think he gave things like that a thought. I don't think he was on that level." She also said, "I saw no skills of being independent at all" compared to others his age.

By adolescence Corey Johnson still had not developed any plan for his future life. In reporting on Corey's time at Elmhurst, Ms. Odette Noble, social worker, said that he could not plan life decisions. She described such planning as "too complex a series of tasks for him." Ms. Noble discussed with Corey in counseling about the need to make good decisions, such as determining who is trustworthy. She said that he could talk about the future but "in the moment, he couldn't make sensible decisions that would help his future." She said Corey "lived in the moment." When I asked Robert Johnson whether his brother had plans for the future, Robert remembered that Corey said he planned to go to college, which given his complete academic failure, was impossible, and that he wanted to play basketball in the NBA, which, while a common teenaged boy's dream, was also unrealistic.

Dr. Dewey Cornell testified that in his early 20s, Corey Johnson had impaired ability to reason, use good judgment to control his behavior, and understand and foresee the consequences of his actions. This is consistent with Odette Noble's observation during Corey Johnson's time at Elmhurst that Corey "lacked the ability to understand the consequences that his actions could have."

In my interview with her and in her affidavit, Corey's friend, Holly Scott, said that he never discussed his future plans. Queenie Hodges reported (to me and in her

26

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

affidavit) that she did not remember Corey ever having stated any goals.  She stated in her affidavit, "Corey was definitely not a leader and he never took authority over anything.  He was a passive follower; he just went with the flow."  Robert Butler said he never heard Corey speak about his goals in life.  Darnell Brown stated in his affidavit that "Corey also seemed incapable of taking any initiative on his own . . . ."  In her affidavit, Priscilla Hodges stated, "Corey struck me as directionless."  Former girlfriend, Monica Dawkins, stated in her declaration, "[h]e would follow directions, whether they were good or bad."

### E.  Conceptual domain ABAS-II results

Using the current AAIDD and APA system of assessing adaptive behavior, the ABAS-II standardized results for all three raters demonstrate significant limitations in adaptive functioning in the Conceptual domain, as shown by the following chart.  The reported scores are standard scores with a mean of 100 and a standard deviation of 15 and can be interpreted in a similar way as IQ scores.  Thus, two raters provided scores below 70, and one rater provided a score approximately two standard deviations below the mean using the 95 percent confidence interval.

| ABAS-II Raters | Conceptual Domain Scores |
|---|---|
| | |
| Antoinette Joseph | 63 |
| Minnie Hodges | 57 |
| Richard Benedict | 74 |

### F.  Conceptual domain conclusion

Based on all of the information I reviewed, it is my opinion that that the evidence is persuasive that Corey Johnson had a significant impairment in all aspects of adaptive behavior domain of Conceptual beginning in childhood and continuing through his adolescence and adulthood.

### iv.    Social Adaptive Behavior Domain

The AAIDD defines the Social domain as encompassing the following: interpersonal skills; social responsibility; self-esteem; gullibility/naïveté (i.e., wariness); follows rules/obeys laws; avoids being victimized; and social problem solving.  Similarly, the APA DSM-5 definition of the Social domain includes: awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others.  For purposes of this evaluation, I have grouped these skills as follows: (a) Interpersonal skills and friendship; and (b) Leisure activities; and (c) Leadership, gullibility, naiveté, and victimization.

The records I reviewed and my interviews show that Corey Johnson was a solitary, fearful child who had few friends and felt most comfortable playing by himself or with younger children.  As an awkward, anxious child, he was teased by other children

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

and had few if any skills to cope, other than turning to adults to intervene. My review suggests that as he got older and became an adolescent, Corey had real problems in understanding how to interact with peers and adults and marked difficulty in understanding social cues and norms. His inability to master basic social interactions led him at times to engage in disruptive behavior, such as playing the role of class clown, and left him with few friends as an adolescent. The only close friends he had were girls, particularly those who took a protector role. While Corey had a few recreational activities that he enjoyed—sports and watching cartoons—family and friends repeatedly portrayed Corey as someone who was passive, who followed others' leads, and engaged in whatever activities those around him pursued. Corey is also described in contemporaneous records as naïve, easily influenced by others, and someone who was vulnerable to and succumbed to peer-pressure, which on a number of occasions led him to misbehave or even break the law.

Time and again, those I interviewed or the records and statements I reviewed described Corey as engaging in behavior suggested by others without considering the consequences to him or others. His lack of social skills led him to be easily victimized by others, including his mother, brother, and school peers. My review of contemporaneous records created during Corey's childhood and adolescence and the more recent statements and my interviews with those who knew him, provide support for the finding that Corey Johnson had significant limitations in the Social domain, starting in childhood and continuing as an adolescent and young adult. The retrospective standardized ABAS-II results are mixed, ranging from one reviewer whose responses clearly placed Corey in the significantly impaired range, another who placed him in the borderline range, and the third (the teacher who only knew Corey in the structured Pleasantville Cottage School setting, with its range of supports) rating him higher.

### A.  Interpersonal skills, friendship

Corey Johnson's school and treatment records are filled with references to his limitations in making friends and interacting with peers and adults. For example, a March 1977 home visit report when Corey Johnson was 8 years old stated that he could be easily manipulated and would become upset when teased by other children. In her psychological evaluation four months later, Dr. Jennifer Figurelli described Corey as a "solitary figure." In December 1978, when Corey was 10 years old and in third grade, an evaluation by the Bureau of Child Guidance, Upper West Side Center stated that Corey was referred by teacher due to, among other reasons, "poor peer relations."

During his time in the Pleasantville Diagnostic Center, a psychosocial summary in March 1982 noted that Corey "relates like a younger child and appears limited . . . . Corey does not have friends, he appears frightened of children and does not like any physical contact with them." A Cottage School Initial Conference, Current Assessment and Transfer Summary dated June 9, 1982, described Corey as "frequently isolated from the other children . . . . He does not appear ready to engage with other children . . . ." The Assessment went on to say: "He is frightened and expects to be rebuffed. He will need a good deal of experience and contact before he will be ready to engage."

28

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

In reflecting on Corey's time at Pleasantville, Janet Valentine told me that she observed "teasing by other children, poor social judgment, not being aware of why others were upset with him; he just didn't fit in." She added: "He could be quite vulnerable with other kids." "He initiated it (e.g., teasing, just outright lying) to get a rise out of kids." "Peer relations were a significant problem." "Initially, the other students ignored him, and then he would provoke others and he would go to the female staff for protection. He didn't seek out the staff except when he was in trouble with the other kids." Ms. Valentine also reported silliness and immaturity. She said that Corey never took initiative with the girls like the other boys did. "We used to have a prom. I don't remember him ever participating." This is despite other references to Corey being "girl-crazy" at the time, which suggests that his interest in girls exceeded his constrained ability to interact with them.

Odette Noble, a social worker at Elmhurst, remembers stark details about Corey's peer relations based on the 20 months that Corey participated in weekly individual and group counseling with her when Corey was ages 16 to 18. According to Ms. Noble, "[i]n social settings, he did not initiate action, but rather went along with what others did . . . . Corey did not have a good 'read' of situations or other people. He was not very sensitive to social cues. He had difficulty 'learning the rules of the game' and understanding who was in charge."

Observations by Corey's family and friends paralleled the observations from Corey's treatment professionals and educators. Corey's Aunt, Minnie Hodges, remembered that Corey played by himself as a child most of the time, because the other children would tease him or try to take the ball, money, candy, or other possessions away from him. Aunt Minnie described how his limitations constrained his interactions with peers when things did not go his way, noting: "He wouldn't understand others but didn't want to look bad." Similarly, his grandmother, Esther Johnson, said that growing up, Corey did not engage much with other children and did not make friends easily. She said he was withdrawn socially both as a child and a teenager and, even when he did have friends, he did not appear to be close to any of them.

Corey spent time from infancy through early adulthood with his mother's best friend, Antoinette Daniels Joseph, and her daughter, Courtney Douglas. Antoinette Joseph stated in her affidavit that "Both as a child and as a teenager, Corey was withdrawn socially." Ms. Joseph said that she thought hanging out with her family was a stabilizing influence for Corey. She expressed concern that "people would take advantage of him" (e.g., ask for money and never give it back)." "Robert [Corey's younger brother] took advantage of him."

Courtney Douglas is just a few months older than Corey. In an interview with me, Courtney described Corey as shy and withdrawn. She also described him as mild and meek. She said that as a teenager, Corey probably had friends, but he did not bring them home. She said that he hung out with Courtney, Holly Scott, and their friends. In Courtney Daniels' affidavit, she described Corey as he was growing up as "a cautious observer, rather than an active participant." "Corey rarely talked about himself or shared if he was upset by something. Instead Corey always asked me how I was doing and whether or not anyone was bothering me." She described how protective he was of

29

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

friends and family, particularly women. "Corey was generally very quiet around girls. I never saw him approach a girl on his own. Corey would ask me to talk to girls for him." "Through all the years that I knew Corey, Corey and I did not have serious conversations."

### B.  Leisure activities

With regard to leisure interests, the records I reviewed and my interviews paint a mixed picture. Janet Valentine reported that Corey never talked about sports. She said he would watch others play basketball, but she did not recall his playing. She said there was so much teasing going on, he would have been scapegoated if he played and was not good enough. (This report is inconsistent with records that show he played on the basketball team later at Newtown High School.)

Mr. Johnson did have an early interest in playing basketball, but apparently he had no other consistent interest and did not use his leisure time to do more than hang around the house of whomever he was staying with. He did not initiate leisure interests or explore available community leisure opportunities. Affidavits of Minnie Hodges, Antoinette Joseph, Sonya Hilton, and Darnell Brown.

With regard to leisure interests, JCCA conference notes (2-19-86) indicated that while at Elmhurst Boys Residence and attending Special Education classes at Newtown High School, Mr. Johnson was on the wrestling team. The same document identified a goal that "Corey will pursue his wrestling activity which will help build his self-esteem and build confidence." There is no indication that he followed up on this interest. Another goal was "Corey will learn to seek out leisure activities on his own and take initiative to participate." In his affidavit, David Washington, former staff member at Elmhurst, stated Corey "did not join other residents to play games or for other recreational activities."

Queenie Hodges reported (in my interview and her affidavit) that she could not remember Corey having any leisure activities other than basketball and TV cartoons. Minnie Hodges's affidavit also identified only cartoons and playing by himself as leisure activities. Courtney Daniels, Robert Johnson, and Kevin Koger also remembered Mr. Johnson's playing basketball when he was younger. His friend, Holly Scott, said that he just hung out when he visited her and Courtney; sometimes they would go to a park. She said that they never went to parties or movies. The leisure activities that Mr. Johnson participated in were usually initiated by someone else, as indicated in cousin Priscilla Hodges's affidavit. She gave the examples of skating and going to the movies together. Ms. Noble said that while at Elmhurst, Mr. Johnson engaged in passive activities, such as listening to music or hanging out at the mall, but she could not recall his having any particular interests.

In describing Mr. Johnson's role within the group of drug-sellers in New Jersey, Darold Brown described Mr. Johnson's leisure interests as going to people's houses, drinking, and listening to music. He went with the group when they went to hang out at someone's house. He did not go to clubs. Mr. Brown could not think of any other leisure interests besides hanging with the group. Although Mr. Johnson appeared to know his

30

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

way around the areas in which he lived, and by adolescence he had learned to use public transportation, he did not participate in community life or take advantage of the opportunities that his community offered.

### C.  Leadership, gullibility, naiveté, and victimization

Everyone whom I interviewed described Corey Johnson as a follower rather than a leader.  In describing Corey's time at Pleasantville, Ann Harding, a supervisor at the Pleasantville Cottage School's older boys' cabin, where Corey lived in 1984 and 1985, stated, "I do not think Corey possessed leadership qualities.  To the contrary, he was more of a follower than a leader in his interactions.  I believe that Corey was probably taken advantage of by the other students occasionally."

Janet Valentine, who was also a counselor at Pleasantville, said, "He was a follower.  He was not a leader at all."  "Peers could lead him to do things, but he never initiated except for that teasing thing (e.g., he wouldn't get a group of guys together to play basketball or something)."  She added: "He just did that immature teasing like a much younger child."  When asked if he had friends, Ms. Valentine said that the other kids tolerated him: "He'd play the role of 'victim' a lot. I didn't see any maturing.  He had poor self-esteem."

In describing Corey Johnson at Pleasantville, Richard Benedict reported that Corey wanted to "please" adults and was not a leader.  "It would baffle me if he could get a group to do anything.  He couldn't do it."  "Being a leader doesn't match Corey."  "In class he was more of a clown than a leader."  Mr. Benedict reported that Corey "sought out adult approval, but didn't have the ability to do it."  As noted above, Pleasantville records indicated that Mr. Johnson did not make friends easily, often stayed by himself, and was afraid of the other children at the facility.  In fact, Mr. Benedict said that Corey often required protection from the other children in his class, because they "frequently scapegoated him."  Benedict further explained that Corey was desperate to be accepted by his peers and would do anything that someone told him to do.

Odette Noble noted many things identified by others who knew Mr. Johnson, such as going along with others, susceptibility to peer pressure, failure to make good social decisions, and trusting the wrong people.  In her affidavit, Ms. Noble noted that in August 1986, Corey was persuaded to go along with an older resident's plan to rob another resident of his paycheck.  Although he was not the leader and went along with the plan just to be accepted and make friends, this incident resulted in Corey's being arrested and jailed at Riker's Island for robbery.

Dr. Dewey Cornell testified during the sentencing phase of Corey Johnson's death penalty trial about Corey's "social skills."  In the context of the consideration of Corey Johnson's adaptive functioning, Dr. Cornell testified that social skills were an area, among others, that Corey's functioning was not at a normal level.

Corey's family and friends provided similar descriptions.  Corey's cousin Priscilla Hodges and his Aunt Minnie Hodges both flatly said that Corey was a follower, not a leader.  Similarly, Holly Scott remembered, "Corey never seemed to be a leader during

31

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

any of the years I saw him – even the years in which I saw him less frequently. Courtney and I used to be able to talk him into just about anything. We would ask him to go places with us, and he would end up coming even when he did not want to."

Corey's Aunt Minnie Hodges reported that "Other people took advantage of him, such as taking his lunch money. People found it easy to take advantage of him all throughout his childhood and teen years. He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him." She further stated:

> He would cry much longer than the other children. He would get very upset when he was teased by the other children. When Corey would interact with the other children, he would mainly play by himself, but the other children would tease him and try to take his ball away from him. If my children or Robert didn't intervene, the children in the neighborhood would bully him and take his ball or candy away from him. He could not defend himself or stick up for himself without protection and chose to play by himself most of the time instead.

Cousin Priscilla Hodges described similar experiences in her affidavit. "As a child, Corey complained that other kids bothered him and would take his money, ball, or other possessions. Corey would not assert himself with these other kids." "Corey was a follower, rather than a leader, first as a child and then as a teenager. Corey was easily influenced by others and could be persuaded to do things that, in my view showed very poor judgment. He would go to great lengths – and jeopardize his own well-being – just to fit in with the crowd." Priscilla remembered an incident that captured Corey's poor judgment and susceptibility to peer-pressure: "Once, when Corey was in his early teenage years, his 'friends' dared him to roller skate down an incredibly steep hill, an act that no one else would attempt. I told him not to do it, but his friends insisted. He ended up falling and suffering a bruise and scrapes. I believe he accepted the dare only to please his 'friends.'" She gave another example of Corey's riding a bike across a busy 2-way street. "Corey would do whatever his 'friends' told him to do, even if it could have killed or seriously hurt him." This deficit in judgment is also indicative of a deficit in Safety, which is a component of the Practical adaptive behavior area.

Corey and Robert Johnson both spent time regularly with Emma's mother, Esther Johnson, whom many described as the ruler of the family and the strict one. At the time of my interview, she was 84 years old and in frail health. Her memory for details was poor; however, she did remember instances of other children taking advantage of Corey. She said, for instance, every time he got a new sweater, somebody at school took it. When I asked if the same was true for Robert, she clearly said no. When I asked if Robert could stand up better to the other kids (although 2 years younger), she said, "You know it!" She described Corey as the easy one to take advantage of. This same information is confirmed in Esther Johnson's affidavit.

Mr. Johnson's maternal aunt, Minnie Hodges, told similar stories of other children taking advantage of him (e.g., taking his lunch money). She said that throughout his life, he was easily taken advantage of. She said that he was never a leader and just followed

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

others.  Kevin Koger also described Corey in childhood as someone who "could be manipulated by others."

Corey Johnson spent most of his weekends before going to Pleasantville with his maternal aunt, Minnie Hodges and Ms. Hodges' daughters, Queenie and Priscilla.  In interview, Aunt Minnie remembered Corey as a child who liked to be by himself a lot. She felt that she needed to look after him and that he needed more attention because "he played by himself and his mind wandered."  "He liked to be alone."  Aunt Minnie said that other children teased him, because he was considered strange and maybe slow, and he could not keep up conversation like other kids his age.  Other kids took advantage of him by taking his ball and other toys.  Cousin Priscilla independently reported that kids realized that they could take advantage of Corey.  "They could get him to do anything."

### D.  Social domain ABAS-II results

Using the current AAIDD and APA system of assessing adaptive behavior, the ABAS-II standardized results by Antoinette Joseph demonstrate significant limitations in Corey Johnson's adaptive functioning in the Social domain.  In contrast to my interview with her and the descriptions she provided in a later statement, which highlight Corey's social limitations, Minnie Hodge's ratings of Corey on the ABAS-II Social domain are higher.  Similarly, Richard Benedict's ratings for Corey Johnson on the Social domain, are bit higher than and are inconsistent with the information he gave me in my interview of him.

| ABAS-II Raters | Social Domain Scores |
|---|---|
| | |
| Antoinette Joseph | 56 |
| Minnie Hodges | 81 |
| Richard Benedict | 88 |

### E.  Social domain conclusion

The contemporaneous records I reviewed contain numerous descriptions of Corey Johnson's deficiencies interacting with his peers and with adults at various times in his childhood and adolescence and in different social contexts and situations.  They also document his gullibility and susceptibility to peer pressure, and his poor judgment.  My interviews with the professionals who worked with Corey during that time and with family, friends, and associates who have known him throughout his life paint similar pictures of Corey Johnson's substantial deficiencies in social interactions and judgment.

As indicated earlier, the adaptive behavior evaluation relies upon information from as many different sources as possible.  This approach has the advantage of gathering information that describes the individual at different time in his life and from the vantage point of different individuals who knew him in different ways.  Thus, it is to be expected that there would be inconsistencies in the obtained information.  For example, Mr. Benedict knew Corey Johnson in the structured environment of a residential school where

33

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

students' performance would be expected to be higher than in the unstructured environment in their neighborhood. Further, ratings of adaptive behavior can be influenced by the rater's positive feelings toward the individual. Ms. Joseph and Ms. Hodges knew Corey Johnson in different settings and over a longer period of time than Mr. Benedict. Inconsistencies are not unusual when considering information from many sources spanning many years. What is important is to examine the comprehensive evidence to determine an overall assessment.

Overall, the historical, documentary evidence I obtained related to Corey Johnson's adaptive functioning with respect to the Social domain and my interviews provide strong support for the conclusion that he had significant limitations in the Social adaptive behavior domain, while the standardized test results are mixed. Corey's school and treatment records document a consistent pattern of social impairments and significant limitations in judgment. Many of the professionals and family and friends whom I interviewed also described significant adaptive functioning impairments in the Social domain. Given the strong support in the records and the vivid descriptions from a wide array of professionals and lay-persons describing Corey's social abilities, I have concluded that Corey Johnson has significant limitations in the Social Domain that manifested themselves during his childhood, adolescence, and adulthood.

v.     **Practical Adaptive Behavior Domain**

The AAIDD definition for the Practical adaptive behavior domain consists of the following skills: activities of daily living (personal care); occupational skills; use of money; safety/health care; travel/transportation; schedules/routines; and use of the telephone. The APA's DSM-5 defines the Practical domain as learning and self-management across life settings in similar terms to the AAIDD definition, including: personal care; job responsibilities; money management; recreation/leisure; self-management of behavior; and school and work task organization; among others. I have grouped my assessment of Corey Johnson's adaptive functioning in the Practical domain into the following categories: (a) Personal care/self-care; (b) Community use, travel, and transportation; (c) Health and safety; (d) Home living; and (e) Work.

The records and information I have considered demonstrate that Corey Johnson had significant limitations in personal and self-care from an early age that continued all the way up to his young adulthood. Corey wet his bed and soiled his sheets until he was about 12 years old. He needed constant reminders to clean himself after these accidents and to generally keep his body clean. He neglected cleaning his teeth and developed dental problems as a result. His self-care performance improved only slightly in the structured environments at Pleasantville and Elmhurst, and those who visited him as an adult, particularly when he lived in Trenton, described his living in apartments that were dirty and strewn with trash, dishware, and clothes. Corey demonstrated similar limitations in getting around in his neighborhoods. As a child, his caregivers did not trust him to travel alone, and his younger brother, Robert, was asked to lead Corey when they went out together. As a teenager and adult, Corey apparently never obtained a driver's license nor owned a car, and those who knew him recall that he often took cabs to get from place to place, although he sometimes used public transportation.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

During the last few years that he was in a structured environment, Corey's caseworkers recognized that he would need to focus on independent living skills, because returning to his mother would not be in his best interest. Despite this critical goal, Corey was not able to develop independent living skills, nor did he possess the judgment to ensure his safety. He continued to succumb to the influence of others to engage in risky and unhealthy behavior. As I noted in the previous section on Corey Johnson's limitations in the Conceptual domain, he also demonstrated long-standing limitations with math and counting as it relates to the use and managing of money. As a result, he was never able to learn how to perform simple money management tasks, such as paying bills or making and following a budget. When he did earn money through drug dealing, friends often kept it for him so he would not spend it. Sometimes, family members (including his mother) and others took advantage of Corey by borrowing money from him and never paying him back.

After leaving Elmhurst abruptly, Corey never was able to live on his own but instead moved from living with his mother and brother, to a brief stay with his mother's ex-boyfriend and his wife in North Carolina, and then with a series of girlfriends and drug colleagues in New Jersey and later in Richmond, Virginia. Other than participating in structured work programs while at Elmhurst, Corey never held a job other than dealing drugs. Those with whom he engaged in the drug trade described Corey as challenged in his ability to count money and to keep track of drug sales, and described him as a passive participant who followed the directions of others.

Finally, two of the raters on the ABAS-II standardized rating scale produced scores corroborating his significant limitations in the Practical domain. Richard Benedict's ratings, which again were based only on his interactions with Corey Johnson in a structured setting, were substantially higher. Based on the information I have reviewed, some of which is highlighted below, I have concluded that Corey Johnson has significant limitations in the Practical adaptive functioning domain that demonstrated themselves when he was a child, adolescent, and adult up to the time of his crime.

### A. Personal care/self-care

The Committee on the Handicapped records from the time when Corey was 10 years old noted that Corey was enuretic (wetting the bed) and encopretic (soiling himself) well into his middle school years.

When Corey was 13, a Child Assessment Evaluation Summary noted that he had dental cavities and gingivitis, evidence that he did not properly care for and brush his teeth. Consistent with that note, Janet Valentine said that Corey's self-care at Pleasantville was a problem initially, but over time he was able to slightly improve his self-care. As she put it: "He didn't come with those skills, but got a little better." However, a Comprehensive Service Plan for Corey from May 1985 indicates that by age 16 and a half and shortly before he was transferred to a group home as part of an attempt to transition him to independent living, Corey had not acquired independent living skills.

35

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Dr. Dewey Cornell testified during the sentencing phase of Corey Johnson's capital that self-care was one of areas in which Corey's functioning was not at a normal level. Specifically, Dr. Cornell stated:

> Self care . . . work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level.

The reports from Corey's family describe similar limitations in self-care. Affidavits of Minnie and Priscilla Hodges also indicate that Corey Johnson wet the bed until age 11 and also soiled himself sometime between ages 8 and 12. Corey's Aunt Minnie recalled that she needed to remind Corey not to drink too many fluids before he went to bed, but he would still wake up with wet clothes, a wet bed, and an embarrassed look on his face. After these accidents continued for a while, she started waking him up in the middle of the night to use the bathroom. Minnie's daughter, Priscilla Hodges, remembered that Corey would try to cover the wet sheets with a comforter to hide the fact that he had wet the bed. His brother, Robert and friend, Antoinette Joseph, also remember Corey's wetting the bed. Regarding self-care in childhood, Cousin Queenie Hodges reported that Corey needed reminders to "wash up." Her affidavit indicated that he needed these reminders to bathe when he wet the bed up to about age 10. Queenie's mother, Minnie similarly reported to me that Corey was slower than other children to learn habits of hygiene and that she was still looking after him at age 8 to 10 to wash up. As noted earlier, Corey relied on reminders and structure in his early years but apparently learned some minimal standards of self-care while living at Pleasantville and Elmhurst by the time he was 18.

### B. Community use, travel, and transportation

Mr. Johnson's Individualized Education Program (IEP) at Pleasantville (7-1-85, age 16 to 18) noted "Corey needs travel training until he is familiar with route and new neighborhood."

With regard to community use, in his affidavit, Robert Johnson noted, "Corey also had a hard time finding his way around. In terms of travelling, I would be able to pick up on a route the first time just by paying attention. But Corey needed a lot more training in that area. Around the ages of 8 to 10, my mother would choose me rather than Corey to go to my grandfather's house in Brooklyn, because she knew that Corey would get lost."

### C. Health and safety

With regard to health and safety, health decisions in childhood were made by others. Corey did have a history of compromising his safety in order to ingratiate himself to peers. Cousin Priscilla Hodges gave examples of times when "friends" dared Corey to do dangerous things, and he foolishly complied. In the earlier section of this report on Social adaptive behavior, the example is given of roller skating down a steep hill and

36

riding a bike across a busy street, which was unsafe.  Priscilla told him not to do it, but he did anyway and was nearly hit by a car.

### D.  Home living

With regard to home living, Mr. Johnson's Comprehensive Service Plan Child, dated May 28, 1985, when he was 16 and a half and winding down his time at Pleasantville, stated: "Corey will use opportunities offered him to learn independent living skills."

While at Elmhurst, Corey's team established goals for him to "learn how to handle money so that [Corey] can shop for himself" and "Caseworker, houseparents [sic], and teachers will help Corey learn enough simple arithmetic to figure out correct change."  However, these objectives were not achieved; handling money was consistently identified as a goal throughout Corey's stay at Elmhurst.

Describing his time at Elmhurst, Odette Noble told me, "He's the kind of kid who I don't think could make it on his own – pay his rent, etc.  Some people should stay in a protected setting all of their lives."  "He couldn't negotiate all of the things that community life means." Ms. Noble repeated her concerns in her affidavit, stating, "I questioned Corey's ability to negotiate even the simple, day-to-day tasks that community life requires, such as paying the bills, obtaining a driver's license, or purchasing and maintaining a car.  Somewhat more complex skills—like planning a budget—were clearly beyond Corey's abilities."

Ms. Noble reported that while living in the structured and supervised setting at Elmhurst, Corey Johnson kept clean, kept his room clean, did the dishes, and set the table.  However, she recognized that the support structure at Elmhurst was critical to Corey.  He did not have much occasion to cook or shop for food or household supplies.  And, more fundamentally, she questioned whether he could live successfully on his own.  "Because of Corey's intellectual limitations, I had concerns that Corey would not be able to hold a job.  In short, I doubted that Corey was equipped to make it on his own, to live independently as an adult.  Some people stay in a protected setting their entire lives and that may have been what was appropriate for Corey."

Corey's family and friends provide similar descriptions of his inability to care for himself and live on his own.  For example, Queenie Hodges stated in her affidavit, "I do not remember him ever preparing a meal for himself."  With regard to home living, Queenie Hodges reported that her mother had rules and expectations, but she had to remind Corey, "Pick up after yourself."  She said she did not remember Corey ever doing any meal preparation.  She also said that when he would pour milk in a bowl for cereal, he would make a mess, so Minnie would just do it for him.

Aunt Minnie Hodges's affidavit told a similar story.  She said, "At age 10 to 13, he couldn't prepare a meal or even a simple sandwich.  By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals.  I didn't give him much to do, because he couldn't do it . . . .  Even when he made a sandwich, I'd

37

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

have to stand there and check." In my interview with Ms. Hodges, she told me essentially the same thing.

Ann Butler noted that when Mr. Johnson was 18 and living with her and Mr. Butler in Goldsboro, "he was still like a little boy. He could not have taken care of himself on his own." As noted earlier, the Butlers described an incident when Corey rode a bike in the woods wearing nice clothes and returned covered in mud. Ms. Butler said that she did things for him around the house, because he could not do them. According to her, Corey was too child-like. Although he had been taught home living skills at Pleasantville and Elmhurst, he still had to be reminded to carry out the simplest home tasks.

Mr. Johnson's brother, Robert, like others, indicated that Corey never lived by himself. But Robert, unlike all other reporters who expressed an opinion, thought that Corey could have lived independently. He had help from girls and guys he knew in New Jersey. Robert indicated that Corey could not live in the streets, although he did not give a clear reason why. People Robert was involved with would let Corey into their group, because they knew Robert well. In his affidavit, Robert Johnson stated, "He lived in several different places while in Trenton, always with others. Corey never lived by himself." In my interview and in his affidavit, Robert Johnson said Corey lived in New Jersey with a young girl whose nickname was "Mudda" (Ayesha Harris). He described the place where they lived as a shack. Robert said, "I thought it must be a crack spot. It was not something I would have lived in. Everything was cold, dark, and untidy."

Darnell Brown who was a leader of the group with which Mr. Johnson sold drugs in New Jersey said with regard to living conditions that the group lived everywhere, often crashing with whichever woman would provide meals. The group members did not have to pay for meals or lodging. Mr. Brown pointed out that Mr. Johnson never had his own place to live, never paid bills, and never had any responsibilities beyond his minor role in selling drugs.

Monica Dawkins, who dated Corey for 2 and a half years during the time that he lived in Trenton, New Jersey, said she once asked him to pay the phone bill in downtown Trenton, because she had to go to school. She said that Corey went downtown but did not pay the bill and instead claimed that he had forgotten, but she thought that the reason was because he was not able to figure out how to pay the bill.

Corey's friend, Sonya Hilton, knew Corey when he was living in Trenton, New Jersey. She recalled that Corey was very forgetful, sometimes forgetting plans he made in the morning by the afternoon. She said he frequently lost his keys and lost money. In fact, she said that he began to leave the back door to his house unlocked, because he had lost the front door key and had been locked out so many times.

The institutional records and my interviews showed that from his early adolescence until he left institutional care, many of the staff attempted repeatedly to teach Corey Johnson independence and home living skills. In fact, those were considered important goals as he became an older teenager to prepare him for adult life. With supervision and support in his institutional settings, Corey was able to make limited

38

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

progress. However, when that support ended and he left the institutional settings, my evaluation shows that Corey failed to apply those skills.

### E. Work

All of Corey Johnson's work opportunities were in structured settings with significant supports. With regard to Work, Dr. Cornell reported in his 1993 testimony that Mr. Johnson had summer jobs involving manual labor while he was at Pleasantville Cottage. Dr. Cornell went on to say "He also was placed in a more vocational-oriented program called BOCES. It is a special educational program in which he was learning carpentry and did reasonably well. He tended to do best when he did things with his hands that did not involve language" (p. 3605). Mr. Benedict from Pleasantville said Corey "had a job at the school and liked making money – some kind of clean up."

A Psychiatric Summary from Pleasantville Cottage School (Elizabeth Clemmens, M.D., 1-18-85) stated: "During the summer, he worked at the Pace Farm as part of the Youth Employment Summer Program, doing manual labor. In September, he continued classes at BOCES where he learns carpentry and apparently is doing well."

Ms. Noble told me Mr. Johnson participated in a summer Neighborhood Youth work program while at Elmhurst. In my interview with Mr. Johnson, reported previously, he described several brief, unskilled jobs during this period. The jobs were, in Mr. Johnson's words, "simple."

Mr. Johnson fared well in structured work preparation programs that required manual labor. He did not demonstrate any skills or initiative at job-seeking, and he did not make the effort to stay in jobs for more than brief periods. Priscilla Hodges, Robert Johnson, Holly Scott, Darold Brown, and Darnell Brown each reported to me that Corey never had a job that they knew about. Commenting on Mr. Johnson's job prospects, Darold Brown stated in his affidavit that the only "job I could have believed Corey to be able to perform would have been a job requiring manual labor . . . where the work is repetitive and a supervisor would have been available to tell Corey what to do. Corey could not handle a job where unexpected problems came up, as he would not know what to do. Corey was not a problem solver." "Corey needed to be told what to do."

### F. Practical domain ABAS-II results

Using the current AAIDD and APA system of assessing adaptive behavior, the ABAS-II standardized results by Antoinette Joseph and Minnie Hodges demonstrate significant limitations in Corey Johnson's adaptive functioning in the Practical domain. The ABAS-II results from Richard Benedict were substantially higher. However, Mr. Benedict's results must be understood as having been based on observations that occurred in the context an institutional environment, where supports and structure can artificially inflate the scores.

39

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

| ABAS-II Raters | Practical Domain Scores |
|---|---|
| | |
| Antoinette Joseph | 60 |
| Minnie Hodges | 65 |
| Richard Benedict | 88 |

### G.  Practical domain conclusion

In my opinion, the records, statements, interviews, and adaptive behavior instrument in the Practical domain strongly demonstrate that Corey Johnson has significant limitations in adaptive functioning in this area starting in his childhood and continuing through his adolescence and into adulthood up until the time he committed the crimes in this case.

### vi.    Adaptive Behavior Conclusion

As I noted at the outset, in order to meet the adaptive behavior prong of an intellectual disability diagnosis, it is only necessary to find significant limitations in adaptive functioning on one of the three domains or significant impairment in a measure of overall adaptive functioning.   My review above of the contemporaneous records created during Corey Johnson's childhood and adolescence, my review of statements from those who knew him well, and my interview of those individuals led me to conclude that Corey Johnson demonstrated significant limitations in all three domains.

The ABAS-II results corroborate this conclusion, because the General Adaptive Composite ("GAC") score for all three raters, depicted below, demonstrates significant impairments in adaptive functioning.  A GAC score of 75 or below meets the diagnostic standard for the adaptive behavior prong of an intellectual disability diagnosis.

| ABAS-II Rater | General Adaptive Composite Score | Percentile |
|---|---|---|
| | | |
| Antoinette Joseph | 60 | 0.4 |
| Minnie Hodges | 64 | 1 |
| Richard Benedict | 74 | 4 |

### V.    Conclusion

This report summarizes extensive information regarding Corey Johnson's intelligence and adaptive behavior in childhood and in adolescence and adulthood.  This information supports my diagnostic opinion that Corey Johnson has significant impairment in intellectual functioning and adaptive behavior, and that these impairments originated in childhood.  This conclusion is based on IQ testing between ages 7 and 24,

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

adaptive behavior information from numerous and varied sources, corroborated by a standardized adaptive behavior scale.  Mr. Johnson was administered six Wechsler intelligence tests between ages 8 and 23, four of which produced valid and reliable results and all four demonstrate significant limitations in intellectual functioning.  Adaptive behavior information from my interviews, administration of the ABAS-II to three raters, and documents from numerous sources was consistent in indicating significant impairment in adaptive behavior.   Based on all of this information, it is my opinion that Corey Johnson has intellectual disability originating in childhood and persisting into adulthood.

J. Gregory Olley, Ph.D.
Psychologist

Date: August 24, 2016

41

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**Appendix A**

John Gregory Olley received a bachelor's degree in psychology from the College of William and Mary in 1966, a master's degree in general-experimental psychology from Wake Forest University in 1968, and a Ph.D. in psychology with emphasis in mental retardation (now intellectual disability) from George Peabody College (now George Peabody College of Vanderbilt University) in 1973. He completed a clinical psychology internship at the University of Kansas Medical Center in 1972. He has been licensed to practice psychology since 1974.

Dr. Olley has held positions as Assistant Professor in the Department of Psychology at the University of Massachusetts at Amherst and Clinical Associate Professor in the Department of Psychiatry and the School of Education at the University of North Carolina at Chapel Hill. During this period at UNC-Chapel Hill, Dr. Olley was Director of Training for Division TEACCH, the statewide program for children and adults with autism. After a brief stint at the Groden Center in Providence, Rhode Island, Dr. Olley returned to UNC-Chapel Hill as a psychologist in the Clinical Center for the Study of Development and Learning, which is now the Carolina Institute for Developmental Disabilities. Dr. Olley retired in July 2016 but continues to hold an academic appointment as Clinical Professor in the Department of Allied Health Sciences in the UNC School of Medicine.

Dr. Olley has published extensively in many aspects of developmental disabilities. In addition to his research and teaching roles, he has been engaged in a variety of professional and public service activities. Dr. Olley is a Life Member and Fellow in the American Psychological Association. He is a past President of the Division on Intellectual/Developmental Disabilities and Autism of APA and is a member of the Division's Executive Council. He is a Life Member and Fellow of the American Association on Intellectual and Developmental Disabilities.

Among his public service roles, Dr. Olley is a member of the Policy and Positions Committee of the Arc of the United States and the American Association on Intellectual and Developmental Disabilities, and he is Past Chairperson of the North Carolina Commission on Mental Health, Developmental Disabilities, and Substance Abuse Services.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**Appendix B**

The sources upon which this report is based are as follows:

- School and residential records from Mount Pleasant Cottage School (a.k.a. Pleasantville Cottage School) for Corey Johnson
- Records of Bureau of Child Guidance, Upper West Side Center
- Report of Learning Consultant Evaluation to the Child Study Team, Jersey City Schools, 3-18-77
- Report of Psychological Examination of Corey Johnson by Jennifer Figurelli, Ph.D., 3-25-77
- Report of Psychiatric Evaluation of Corey Johnson by F. A. Figurelli, M.D., 10-4-77
- Psychological Report for Corey Johnson by Nathalie Smith, Ph.D., Manhattan Center, 5-3-79
- Report of Psychodiagnostic Evaluation of Corey Johnson by Ernest H. Adams, The Council's Center for Problems of Living, 12-11-1981
- Report of Psychological Evaluation of Corey Johnson by Cary Gallaudet, Psy.D., Pleasantville Cottage School, 2-8-1982
- Report of Speech-Language Evaluation at the Donald Reed Speech Center, September and October 1983
- Memo from Louise Sciaruto, Jewish Child Care Association, regarding speech therapy, January 19, 1984
- Report of Psychological and Educational Evaluation of Corey Johnson by Kenneth Barish, Ph.D., Pleasantville Cottage School, 3-15-1985
- Newtown High School records for Corey Johnson
- Interview with Corey Johnson at Federal Correction Center, Terre Haute, IN, February 7, 2011
- Interview by telephone with Mark A. Bezy, former warden at the Federal Correction Center, Terre Haute, IN, January 19, 2011
- Interview by telephone with James Sykes, father of Corey Johnson, January 21, 2011
- Affidavit of James Sykes, May 17, 2011
- Interview with Robert West, former pastoral counselor to Corey Johnson, at his church in Salem, VA, June 2, 2010
- Interview with Sarah West, former pastoral counselor to Corey Johnson at her husband's church in Salem, VA, June 2, 2010
- Interview by telephone with Pernell Williams, friend of Corey Johnson, June 25, 2010

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

- Interview with Holly O. Scott, friend of Corey Johnson at her apartment, Brooklyn, NY, July 17, 2010
- Affidavit of Holly Scott, June 23, 2011
- Interview with Courtney Daniels, childhood friend of Corey Johnson, New York, NY, May 22, 2010
- Affidavit of Courtney Daniels, May 21, 2011
- Interview with Esther Johnson, grandmother of Corey Johnson at her apartment, New York, NY, May 21, 2010
- Affidavit of Esther Johnson, April 30, 2011
- Interview with Robert Lee Johnson, half-brother of Corey Johnson, New York, NY, May 7, 2010
- Affidavit of Robert Johnson, June 29, 2011
- Interview with Antoinette Daniels Joseph, best friend of Corey Johnson's mother, New York, NY, July 17, 2010
- Affidavit of Antoinette Daniels Joseph, May 21, 2011
- Interview with Minnie Lee Johnson Hodges, maternal aunt of Corey Johnson at her apartment, New York, NY, May 8, 2010
- Affidavit of Minnie Hodges, April 30, 2011
- Interview by telephone with Kevin Koger, step-brother of Corey Johnson, August 3, 2010
- Affidavit of Kevin Koger, May 26, 2011
- Interview by telephone with Dr. Claire Barabash, former Deputy Superintendent of the New York Board of Education, April 23, 2010
- Interview with John McGarvey, former defense attorney for Corey Johnson, Richmond, VA, June 3, 2010
- Interview with Craig Cooley, former defense attorney for Corey Johnson, Richmond, VA, June 3, 2010
- Interview with Darold Brown, friend of Corey Johnson, New York, NY, May 21, 2010
- Affidavit of Darnold Brown, June 15, 2011
- Interview with Darnell Brown, friend of Corey Johnson, New York, NY, May 21, 2010
- Affidavit of Darnell Brown, October 14, 2011
- Interview with Queenie Hodges, cousin of Corey Johnson, at her apartment, New York,
- NY, May 8, 2010
- Affidavit of Queenie Hodges, April 30, 2011
- Interview with Priscilla Hodges, cousin of Corey Johnson, at her apartment, New York, NY, May 8, 2010

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

- Affidavit of Priscilla Hodges, April 30, 2011
- Affidavit of Elizabeth Sykes, half-sister of Corey Johnson, October 15, 2011
- Affidavit of Sonya Hilton, former girlfriend of Corey Johnson, June 15, 2011
- Interview with Gerald Lefkowitz, M.S.W., former Unit Administrator of the Pleasantville Diagnostic Center, and Richard Benedict, former teacher and administrator at Pleasantville Cottage School, May 7, 2010
- Declaration of Leona Klerer, a reading teacher formerly employed at the Mount Pleasant Cottage School, June 3, 2011.
- Declaration of George Sakheim, Ph.D., formerly a supervising psychologist at the Pleasantville Diagnostic Center and Pleasantville Cottage School, June 17, 2011.
- Affidavit of Gerald Lefkowitz, December 5, 2011
- Interview with Ms. Odette Noble, M.S.W., former social worker at Elmhurst Residential Home, New York, NY, May 7, 2010
- Affidavit of Odette Noble, December 1, 2011
- DVD of interview of Corey Johnson by Dewey Cornell, Ph.D., January 8, 1993
- Transcript of testimony of Dewey Cornell, Ph.D. at trial of Corey Johnson, January 1993
- Transcript of testimony of Gerald Lefkowitz, M.S.W. at trial of Corey Johnson, January 1993
- Transcript of testimony of Odette Noble, M.S.W. at trial of Corey Johnson, January 1993
- Telephone interview with Janet Valentine, former counselor and clinical social worker at Pleasantville Cottage School, May 5, 2011
- Declaration by Ann Harding, former staff member at Pleasantville Cottage School, November 21, 2011
- Interview with Robert Lee Butler, step-father of Corey Johnson, at his home in Lawrenceville, Georgia, December 17, 2011
- Interview with Ann Butler, wife of Robert Lee Butler, at her home in Lawrenceville, Georgia, December 17, 2011
- Declaration by Robert Lee Butler, December 17, 2011
- Declaration by Ann Butler, December 17, 2011
- Affidavit of David Washington, former staff member at Elmhurst Boys Residence, March 1, 2012
- Declaration by Cary Gallaudet, Ph.D., psychologist formerly employed at the Pleasantville Diagnostic Center, March 1, 2012
- Affidavit of Mary Sitgraves, Ph.D., psychologist, July 5, 2012
- Declaration by Monica Dawkins, former girlfriend of Corey Johnson, July 16, 2012

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

- Declaration of Kenneth Barish, formerly a psychologist at the Pleasantville Cottage School, July 22, 2014.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**Appendix C**

### I. ABAS-II Results (3 Domains):

| ABAS-II: 3 Domains | Antoinette Joseph | Minnie Hodges | Richard Benedict |
|---|---|---|---|
| | | | |
| Conceptual | 63 | 57 | 74 |
| Social | 56 | 81 | 88 |
| Practical | 60 | 65 | 88 |
| | | | |
| GAC | 60 | 64 | 74 |
| Percentile | 0.4 | 1 | 4 |

### II. ABAS-II Results (10 Domains):

The mean score for the general population is 10.  A score of 4 or below indicates significant impairment (two standard deviations below the mean).

| ABAS-II: 10 Domains | Antoinette Joseph | Minnie Hodges | Richard Benedict |
|---|---|---|---|
| | | | |
| Communications | 7 | 2 | 1 |
| Functional Academics | 2 | 1 | 3 |
| Self-Direction | 1 | 4 | 4 |
| Leisure | 2 | 3 | 8 |
| Social | 1 | 9 | 7 |
| Community Use | 8 | 5 | 8 |
| Home Living | 3 | 1 | 8 |
| Health-Safety | 1 | 3 | 7 |
| Self-Care | 4 | 4 | 6 |
| Work | - | - | - |
| | | | |
| GAC | 60 | 64 | 74 |
| Percentile | 0.4 | 1 | 4 |

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*