# EXHIBIT 2(b)


UNC CAROLINA INSTITUTE FOR
DEVELOPMENTAL DISABILITIES

101 RENEE LYNNE COURT T 919-966-5171

CARRBORO, NC 27510 F 919-966-2230
www.cidd.unc.edu
*Mailing Address*
CAMPUS BOX 7255
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
CHAPEL HILL, NC 27599-7255

## Supplement to Psychological Evaluation of August 24, 2016

JOHNSON, Corey James
Date of Report: January 1, 2021

Date of Birth: ████████
Age: 52

Mr. Donald Salzman, one of Corey Johnson's attorneys, has asked me to provide a supplement to my report of August 24, 2016 (Report).[1] In the years since Corey Johnson's trial and sentencing, the accepted practices for the diagnosis of intellectual disability have evolved and provided those making such diagnoses with greater clarity in several areas. While I incorporated those accepted practices into the diagnosis set forth in my 2016 Report, I have now been asked to explain how these changes in the understanding and diagnostic criteria for intellectual disability affected an appropriate analysis made after Mr. Johnson's original capital sentencing hearing and his later federal habeas challenge.

The diagnostic procedures and interpretation of data that are widely accepted are closely related to the accepted definitions of intellectual disability (ID). The most widely accepted definitions are those of the American Association on Intellectual and Developmental Disabilities (AAIDD) and the American Psychiatric Association (DSM-5). The American Psychological Association (APA) also supports these definitions in its forthcoming APA Handbook of Intellectual and Developmental Disabilities.[2] For decades, these formal definitions and the definitions in state and federal statutes—and their predecessors—have had three common components. The definition of intellectual disability (and hence the diagnosis of intellectual disability) requires (a) a significant impairment in intelligence (known as "intellectual functioning"), accompanied by (b) significant impairment in adaptive behavior that (c) originate in the developmental period.

---

[1] In the course of reviewing my August 24, 2016, Report, I learned that there were a few minor corrections that should be noted, as follows: (1) pp. 5-6 concerning the age of Mr. Johnson's mother and father at the time of his birth (18 and 19 years old respectively); (2) p. 6 concerning additional half siblings not listed; (3) p. 9 concerning Mr. Koger's attempt to burn down Mrs. Johnson's apartment; (4) p. 19 concerning the year and Mr. Johnson's age when he attended P.S. 76 (1978 at age nine); (5) p. 23 concerning the name of the Pleasantville Cottage School staff member who noted in childhood records Mr. Johnson's speech impediments and disorders (Leona Klerer); (6) p. 24 concerning the placement of a parenthetical within a quotation ("Esther Johnson said the same thing in her affidavit."); and p. 25 concerning the age when Mr. Johnson was able to tell time only to the hour (age 13).

[2] Schalock, R., & Luckasson, R. (in press). Intellectual disability, developmental disabilities, and the field of intellectual and developmental disabilities. In L. Glidden (Ed.) APA *Handbook of intellectual and developmental disabilities*. New York, NY: American Psychological Association.

2

One important change in the understanding of the definitions relates to how the three diagnostic components of the definitions relate to each other and how practitioners consider the three factors when determining a diagnosis. At the time of Mr. Johnson's trial, a frequent practice was to consider these three components in a sequential process. As a result, psychologists often did not assess adaptive behavior if the person being assessed had one IQ score higher (even very slightly higher) than the conventional cut-off of 70 (or sometimes 75, as explained below, when applying the standard error of measurement).

The evolution of diagnostic standards for intellectual disability applies not only to two of these three components. It applies also to the standard for determining an overall diagnosis when it is particularly difficult to determine whether the intellectual functioning impairment is significant enough to, in and of itself, satisfy that component. It is now generally acknowledged that whether the examiner is assessing the intelligence component or the adaptive behavior component, or is considering an overall assessment in light of those two components, the examiner should follow the general standards in the Standards for Educational and Psychological Testing.[3] (Henceforth referred to as the Joint Testing Standards.)

### Intelligence

Psychologists are trained not only to administer and score intelligence tests but also to interpret them. Thus, obtaining a valid score in an *Atkins* case requires training and experience of the examiner, including experience with individuals with intellectual disability.[4] Scoring errors and improper administration are surprisingly common even among experienced examiners.[5] Interpreting scores includes such considerations as selection of appropriate tests, protecting against practice effects, and considering scores within a confidence interval derived from the test's standard error of measurement. These concepts have been widely understood for many years, dating back well before Corey Johnson's capital sentencing proceeding. However, there are other developments related to the intellectual functioning prong of the intellectual disability diagnosis that must be considered. These include the elimination of hard IQ score cut-offs and the consideration and the effect of aging norms (both of which I describe below). These factors either were not adopted until long after Mr. Johnson's sentencing (elimination of hard IQ cut-offs) or were not widely publicized and understood within the professional community at the time of his capital sentencing (aging norms). In my 2016 Report, I applied these considerations in light of the more recent developments, and I discuss them below to emphasize how the diagnostic criteria have evolved since Mr. Johnson's capital sentencing hearing and since his federal habeas proceeding.

---

[3] American Educational Research Association, American Psychological Association, National Council on Measurement in Education (2014). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

[4] Olley, J. G. (2009). Knowledge and experience required for experts in *Atkins* cases. *Applied Neuropsychology*, *16*, 135-140. doi:10.1080/09084280902864477.

[5] For example: Kuentzel, J. G., Hetterscheidt, L. A., & Barnett D. (2010). Testing intelligently includes double-checking Wechsler IQ scores. *Journal of Psychoeducational Assessment*, 29, 1-8.

3

## Standard Error of Measurement

Measurement methods in psychology and other fields vary in their accuracy. Thus, to interpret scores properly, it is important to know to what degree scores are inaccurate or contain error. This error is the extent to which an obtained score differs from the theoretical "true score." The most common indicator of the score's error is the standard error of measurement. Such a metric indicates the number of IQ points above or below the obtained score in which the true score is likely to lie. The standard error of measurement can be used to derive a confidence interval in which the true score lies. The most commonly accepted confidence interval is 95%. In general, the typically accepted IQ tests yield scores with a 95% confidence interval of about 5 points above and below the obtained score.

The Joint Testing Standards and virtually all texts on psychological testing recommend that obtained IQ scores be interpreted as a range of scores indicating the confidence interval. Thus, an obtained IQ score of 70 (the rough cutoff for diagnosis of ID) should be interpreted as a range of 65 to 75 within which the true score lies with 95% confidence. Similarly, an obtained score of 75 represents a range of 70-80. Thus, a score of 75 or below may be used as evidence for a diagnosis of intellectual disability (as long as the other two criteria are met).[6]

The application of the standard error of measurement to the interpretation of scores is (or should be) known and practiced by all licensed psychologists. However, for many years, including before and after Corey Johnson's capital sentencing and federal habeas proceedings, the definition of intellectual disability in some jurisdictions stated a firm cutoff score for ID of 70 without consideration of the standard error of measurement. Unfortunately, some practitioners ended any consideration of ID as a possible diagnosis if the individual had IQ scores above 70 or 75. In 2015, the Supreme Court of the United States in *Hall v. Florida* ruled that the standard error of measurement must be considered, thus effectively changing the cutoff score from 70 to 75. This standard was immediately applied in *Atkins* cases, resulting in some changed judicial decisions, such as in the 2016 case of *United States v. Wilson*.

In Mr. Johnson's case, the psychologist who evaluated him before his capital trial administered an IQ test that produced a score of 77. The psychologist concluded that Mr. Johnson's IQ test of 77 meant that he did not have intellectual disability, even though the records he reviewed contained an IQ test score of 69 from when Corey Johnson was 16 years old.[7] IQ tests administered to the same person several times seldom yield exactly the same scores, and research has shown that this variability of scores can be more extreme for people with ID.[8] Thus,

---

[6] As noted below, even scores above 75 can be considered to be consistent with an ID diagnosis if an examiner concludes that there existed severe deficits in adaptive behavior during the developmental period.

[7] The records the psychologist reviewed also contained an earlier IQ test score of 81 when Corey Johnson was about 13. Other records discovered long after Mr. Johnson's capital trial and about which I understand the psychologist was unaware demonstrated that this earlier test was flawed because it had been given within four months of a previous IQ test (the exact same test). Therefore, the IQ test given to Corey Johnson when he was 13 years old was artificially inflated by a well-documented phenomena known as the practice effect, is not valid or reliable, and should not be given weight in an intellectual disability evaluation, as I explained in my 2016 Report.

[8] Whitaker, S. (2008). The stability of IQ in people with low intellectual ability: An analysis of the literature. *Intellectual and Developmental Disabilities, 46*, 120-128.

individuals in *Atkins* cases may have one or more IQ scores below the 75 cutoff as well as one or more scores above 75. If a defendant has at least one valid IQ score of 75 or lower, the modern diagnostic procedure is to examine adaptive behavior and weigh that information carefully in an evaluation using the practitioner's clinical judgment. This reasoning is reflected in the Court's revised opinion in *Wilson*. However, that is not what happened in Mr. Johnson's case; despite the fact that Corey Johnson has valid IQ scores below 75, the psychologist who evaluated him before his capital sentencing hearing concluded that the IQ score of 77 was the end of the inquiry and determined that Corey Johnson did not have intellectual disability. That is not how an evaluation would be handled today; instead, in light of (among other below-75 IQ scores) Corey Johnson's valid IQ score of 69 obtained when he was 16 years old, the modern practice is to conduct a full adaptive behavior evaluation and then to consider the first two components together in determining whether intellectual disability is the appropriate diagnosis.

**Norm Obsolescence (aka the Flynn effect)**

Scientifically developed intelligence tests have been used for over 100 years for the diagnosis of intellectual disability (known by many other names during that period). These tests derive an overall score indicating level of intelligence by comparing the score obtained on one test to the performance of the general population. On these tests, the mean of the general population is a score of 100, and the distribution of all scores has a standard deviation of 15. The diagnosis of intellectual disability requires a score of approximately 70, or two standard deviations below the mean. As noted earlier, consideration of the test's standard error of measurement results in a cutoff score of approximately 75.[9]

The norm group of a test is a large representative sample of the general population. Certain characteristics of the norm group are necessary to assure the reliability and validity of the test. For example, the Joint Testing Standards indicate "…it is the test publisher's responsibility to renorm the test with sufficient frequency to permit continued accurate and appropriate score interpretations" (p. 104).[10] This requirement is important, because it has long been recognized that norms that are out of date affect scores. In the mid-1980s, James Flynn published several research studies that demonstrated the extent of this effect.[11] As a result of his work, this phenomenon is often referred to as the Flynn effect. After studying the effect of aging norms on the results of several intelligence tests, Flynn concluded that in general the average score increased by 3 IQ points per decade or .3 points per year. In other words, when a test is used 10 years after it was normed, the average score would no longer be 100, but 103. Although Flynn's work was published in journals in the mid and late 1980s, as noted below, the leading professional organizations did not adopt his findings until many years later, and not until after Corey Johnson's federal habeas proceedings. There is a consensus in the field that particularly in

---

[9] However, as noted below, even an IQ score above 75 can result in a diagnosis of intellectual disability if an individual had severe deficits in adaptive behavior during childhood.

[10] American Educational Research Association, American Psychological Association, & National Council on Measurement in Education (2014). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

[11] For example: Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95*, 29-51.

5

*Atkins* cases, the Flynn effect should be reflected in diagnoses—even though there are some dissenters from the consensus view.

In many applications of IQ tests, a small increase in scores does not have significant effect, but in *Atkins* cases, a few points can be the difference between a diagnosis that leads to a life sentence and one leading to a death sentence. In 2014, Trahan and colleagues[12] reviewed 285 studies related to the Flynn effect. Their large meta-analysis was published in the prestigious journal, Psychological Bulletin, and confirmed the validity of the Flynn effect. Further, these authors supported the application of these findings to correct individual scores that had been inflated by older norms. A year later, Pietschnig and Voracek[13] published another meta-analysis of 271 studies of nearly 4 million individuals over more than 100 years in 31 countries. These researchers also concluded that the Flynn effect is a valid phenomenon. After decades of argument among experts in intellectual disability, research scientists, and within the legal system regarding the validity of the Flynn effect and its application to individual IQ scores, these major studies provided clarification and confirmation of the validity of correcting IQ scores to reflect the Flynn effect. In *Atkins* cases, including Mr. Johnson's case now (but not at the time of his sentencing proceeding), the application of the Flynn effect to correct artificially inflated IQ scores is demanded as a matter of scientific integrity. The most recent classification manual of the American Association on Intellectual and Developmental Disabilities (AAIDD, 2010), the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-5, 2013), and the forthcoming APA Handbook of Intellectual and Developmental Disabilities[14] support this conclusion. In contrast, the American Association on Mental Retardation (the predecessor of the AAIDD)[15] did not include any discussion of or reference to the Flynn effect or the phenomenon of aging norms or "normed obsolescence" in its 1992 and 2002 manuals. Similarly, the American Psychiatric Association did not include any discussion of the Flynn effect or discuss that phenomena in editions of its Diagnostic and Statistical Manual of Mental Disorders before the Fifth Edition ("DSM-5), which it released in 2013.

In Mr. Johnson's case, he obtained a score of 69 when he was 16 years old and a score of 73 when he was eight years old, without any correction for the Flynn effect. It is also important to note that, with adjustment for the Flynn effect, Corey Johnson had a third valid and reliable IQ score below 75 during his childhood. I concluded in my 2016 Report, "In summary, correcting scores for aging norms (without any consideration of practice effects) would yield four scores compatible with the diagnosis of intellectual disability (Figurelli 71.8; Adams 75.6; Barish 65.4; and Cornell 72.8)." I believe that the most recent scientific studies based on meta-analysis of hundreds of studies of the Flynn effect powerfully support this conclusion. For these reasons, the modern understanding of intellectual disability clearly shows that Corey Johnson has

---

[12] Trajan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014). The Flynn effect: A meta-analysis. *Psychological Bulletin*, *140*, 1332-1360.

[13] Pietschnig, J., & Voracek, M. (2015). One century of global IQ gains: A formal meta-analysis of the Flynn effect (1909-2013), 10, 282-306.

[14] Floyd, R. G., Framer, R. L., Schneider, W. J., & McGrew, K. S. (in press). Theories and Measurement of Intelligence. In L. Glidden (Ed.). APA *Handbook of intellectual and developmental disabilities.* Washington, DC: American Psychological Association.

[15] The former name for the AAIDD.

significant impairment in his intellectual functioning,  Thus, following the modern principles for an ID diagnosis, an assessment of Corey Johnson's adaptive behavior, with significant weight given to the second prong of the intellectual disability diagnosis, is required.

### Adaptive Behavior

The second criterion for the diagnosis of intellectual disability is significant impairment in adaptive behavior.  Although there are many definitions of adaptive behavior, the most widely cited definitions are those of the AAIDD (2010) and the DSM-5 (2013).  Both definitions describe adaptive behavior as every day, unassisted functioning in three areas: conceptual, social, and practical adaptive behavior.

In the most recent manuals of the AAIDD (2010) and DSM-5 (2013), the emphasis has shifted significantly toward greater emphasis on adaptive behavior that co-exists with impaired intelligence. The DSM-5 states, "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks.  For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score.  Thus, clinical judgment is needed in interpreting the results of IQ tests." (p. 37).  Therefore, for a person who does not have even a single IQ score below 70 (or below 75 considering the standard error of measurement), a diagnosis of intellectual disability can still be made by a practitioner using his or her clinical judgment if the individual demonstrates severe adaptive behavior deficits during the developmental period.  However, in Corey Johnson's case, he had multiple childhood IQ scores within the intellectual disability range that are valid and reliable.

### Adaptive Behavior Scales

 For many decades, the diagnosis of intellectual disability relied heavily (sometimes exclusively) on scores on intelligence tests.  Beginning in the early 1990s, new scales to measure adaptive behavior were developed with improved psychometric properties.  Gradually the emphasis on adaptive behavior increased in the scientific and clinical communities.

Further, current professional practice calls for the use of a standardized scale of adaptive behavior when making a diagnosis of intellectual disability.  The AAIDD manual (2010) states, "For the diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population…" (p. 43).

This requirement creates an unusual challenge in *Atkins* cases.  Adaptive behavior scales derive scores indicating level of adaptive functioning by asking people who have known the individual well to rate his or her level of independent adaptive functioning.  Such scales contain about 150 items to be rated across the three areas of conceptual, social, and practical skills.  The scales derive scores based on comparisons to a norm group, which is similar to the procedure used to develop IQ tests.  In the process of scale development, raters are asked to rate the individual's adaptive behavior as it has been displayed recently.  In *Atkins* cases, the defendant is typically

7

incarcerated. The crime may have been committed recently, or more typically it was committed several years or even decades ago, and the defendant has been incarcerated since the time of the crime. Adaptive behavior is typical, unassisted behavior in an unstructured community setting. Thus, the rater must be asked to rate the defendant's adaptive behavior years earlier, before the individual entered a prison environment.

Unlike the assessment of intelligence, which often relies on a single test score, assessment of adaptive behavior draws upon information from as many relevant sources as possible. An adaptive behavior scale should be one of those sources, although it must be used with caution when used retrospectively. Olley and Cox (2008)[16] described these cautions in detail. Tassé (2009) urged caution as well but stated, "A retrospective assessment of adaptive behavior is often considered as the only viable option when the assessed individual is incarcerated. Interviewing a respondent while asking them to recall a time prior to the individual's incarceration is the proposed means of capturing the individual's typical adaptive behavior in the community and establishing a retrospective diagnosis" (p. 120).[17] The use of retrospective standardized adaptive behavior instruments has been recognized as valid by many practitioners and increasingly by courts in *Atkins* cases.

In my evaluation of Mr. Johnson described in my 2016 Report, I interviewed 24 people who knew him well in at least one setting. By exercising the required cautions in choosing people who would be appropriate raters, I administered the Adaptive Behavior Assessment System (2nd ed.) to three individuals who knew Mr. Johnson well in several community settings. One rater was a relative; one was a close family friend; and one was a former teacher/administrator. Current standards for assessing level of adaptive behavior support the methods and conclusions described in my 2016 Report. The results of these three adaptive behavior ratings combined with information from many other sources indicated to me that Corey Johnson had significant impairment in adaptive behavior beginning in his childhood.

## Developmental Origin

The third requirement for a diagnosis of intellectual disability is the origin of the documented deficits in intelligence and adaptive behavior in the developmental period. I reviewed extensive records from diverse sources that provide clear evidence that Corey Johnson's impairments originated in early childhood and continued to the time of the crimes for which he has been convicted.

## Conclusion

This review of the evolving standards for the diagnosis of intellectual disability as applied to my evaluation of Corey Jonson provides consistent evidence for my 2016 diagnosis. "This information supports my diagnostic opinion that Corey Johnson has significant impairment in

---

[16] Olley, J. G., & Cox, A. W. (2008). Assessment of adaptive behavior in adult forensic cases: The use of the Adaptive Behavior Assessment System-II. In T. Oakland & P. L. Harrison (Eds.), *Adaptive Behavior Assessment System-II: Clinical use and interpretation* (pp. 381-398). San Diego: Elsevier.

[17] Tassé, M. J. (2009). Adaptive behavior assessment and the diagnosis of mental retardation in capital cases. *Applied Neuropsychology*, *16*, 114-123.

8

intellectual functioning and adaptive behavior, and that these impairments originated in childhood."

*J. G. Olley*

J. Gregory Olley, Ph.D.
Psychologist