# EXHIBIT 3

UMASS. BOSTON

Center for Social Development and Education

December 19, 2016

Donald P. Salzman
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005

Re: Corey Johnson

Dear Mr. Salzman:

You have asked me to prepare a letter concerning my evaluation of Corey Johnson to determine whether he meets the diagnostic criteria for intellectual disability. You have also asked me to comment on reports prepared in 2016 by experts in the fields of intellectual disability and learning disability who also evaluated Corey Johnson, as well as a recent affidavit from an expert on the role of race in the classification of children as either intellectually disabled or learning disabled during the period when Corey Johnson was a child.

**Summary of review and records considered**

I was first asked to examine whether Corey Johnson has intellectual disability in late 2007 and early 2008 by Lisa Greenman, a counsel affiliated with the Federal Capital Habeas Project. At that time, I thoroughly reviewed an extensive set of materials that Ms. Greenman provided to me. Based on my review, I expressed my conclusion, in a January 11, 2008 letter to Ms. Greenman (which I have enclosed as Appendix A), that Corey Johnson's significant cognitive impairments and impairments in adaptive behavior, demonstrated before the age of 18, are consistent with mild mental retardation.[1]

Over the last several years, I have reviewed a significant number of additional records related to Mr. Johnson that I understand included contemporaneous records that had not been located at the time that Ms. Greenman asked me to conduct my earlier evaluation, plus extensive materials that were not in existence at the time of my January 2008 analysis. The new materials included intellectual disability evaluations conducted by two leading experts in the field, Daniel J. Reschly, Ph.D. and J. Gregory Olley, Ph.D. The new set of materials that were not available to me in 2007 and 2008 also included additional IQ test results from Corey Johnson's childhood that provide important insights in Corey Johnson's intellectual functioning and other new records concerning Corey Johnson's childhood related to his education and social services he received, among others. These materials also provide a significantly more expansive picture of Corey Johnson's adaptive functioning, one that is greatly enhanced by dozens of interviews with and

[1] "Mental retardation" is the term that was generally accepted in 2008 but has since been replaced by "intellectual disability," which is a synonym that describes the same level of impairment.

University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

statements by family, friends, teachers, mental health professionals and others as well as the results from the administration of a standardized adaptive behavior instrument given to key individuals who knew Mr. Johnson best in different settings.

Overall, the materials I reviewed in 2008 and again recently, as well as the new materials, are comprehensive and include: school, social services, and institutional records for Corey Johnson; reports of Corey Johnson's psychological evaluations as a child and adolescent; the mitigation report by Dr. Dewey Cornell, a psychologist retained by the defense before trial, and his subsequent testimony at Corey Johnson's sentencing hearing; the report by Dr. Edward Peck, a neuropsychologist retained by the defense, concerning his neuropsychological exam, also presented during Corey Johnson's sentencing hearing; several dozen affidavits, declarations, and witness interview summaries collected long after Corey Johnson was sentenced to death from professionals, family members, and friends who knew Corey Johnson in a variety of settings during childhood, adolescence, and/or adulthood concerning Corey Johnson's adaptive functioning. These materials were analyzed in a report dated August 26, 2016 prepared by Dr. Reschly and a report dated August 24, 2016 prepared by Dr. Olley, including the results of the standardized adaptive behavior instrument administered by Dr. Olley to three individuals, which I have carefully reviewed. Finally, I have reviewed a declaration from Dr. Jay Gottlieb. My thorough and independent review of all of this information has strongly reinforced and reconfirmed my previous opinion that Corey Johnson's significant cognitive impairment and impairments in adaptive behavior, demonstrated before the age of 18, clearly demonstrate that Corey Johnson has mild intellectual disability.[2]

**Background and experience**

To arrive at my conclusion that Corey Johnson has intellectual disability, I have drawn from my extensive background and experience in the field of intellectual disability, including nearly 50 years of teaching, research, program and policy development, and clinical service. As the founder and director of the Center for Social Development and Education at the University of Massachusetts Boston, I have managed more than $25 million of research in intellectual disability and related disabilities. I have authored over 100 articles, chapters, and books on intellectual disability; topics including the identification and diagnosis of intellectual disability and teaching children with intellectual disability. I have also served as associate editor and editor for major journals (AMERICAN JOURNAL OF MENTAL RETARDATION, AAMR's *Research Monograph* series) and as a consulting editor to numerous journals in developmental disabilities.

I have served in leadership roles at the local, state, and national levels including, for example, board memberships on the Governor's Council for Mental Retardation and as a consultant to the President's Commission on People with Intellectual Disabilities. As a licensed Psychologist, my work as a practitioner in the area of intellectual disability has also been extensive, particularly involving the intellectual assessment of children with intellectual

---

[2] When I use the term "mild intellectual disability," I am referring to Corey Johnson as someone who has *significant* impairments and who is at the upper range of all individuals with intellectual disability, but the adjective "mild" should not be interpreted to mean that he is not significantly impaired.



University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

disability. My educational background includes an APA Post-Doc Fellowship in the Developmental Evaluation Clinic (DEC), Children's Hospital, Harvard University.

I have directly tested and evaluated over 100 children and adolescents in diagnostic settings to determine whether they have intellectual disability. In addition, through my research, I have personally observed hundreds of children and adolescents with intellectual disability. I have also reviewed hundreds of students' records for the purpose of confirming the prior diagnoses by others of intellectual disability, and thus to determine whether or not they were eligible for inclusion in our federally funded research studies and our summer program for children with disabilities. I have enclosed my curriculum vitae as Appendix B.

**Intellectual disability criteria**

The diagnosis of intellectual disability has three parts, or prongs. To be intellectually disabled, a person must demonstrate significant limitations in intellectual (cognitive) functioning, which is measured through the administration of standardized IQ tests. The person also must demonstrate significant limitations in adaptive functioning (how their cognitive limitations are reflected in their behavior and functioning in every-day life), and specifically must show significant limitations in at least one of three areas (known as domains)—conceptual, social, and practical—of adaptive behavior. Finally, the individual's limitations in intellectual functioning and adaptive functioning must have originated during the developmental period (during childhood).

**Analysis of Corey Johnson's intellectual functioning**

I explained in my 2008 letter that it is clear that Corey Johnson meets the criteria for intellectual disability. The additional materials that I have reviewed recently only reinforce and strengthen my conclusion.

On the intellectual functioning prong, the discovery by Corey Johnson's current clemency counsel—after I wrote my 2008 letter—of two additional IQ tests whose existence was not known at the time he was sentenced to death is critical new corroboration of my previous conclusion. First, the test administered by Dr. Figurelli when Corey was eight years old produced a Full Scale IQ of 73, which is clearly within the mild intellectual disability range, and is consistent with the scores obtained by Dr. Barish, when Mr. Johnson was 16, and by Dr. Cornell, when he was 22. Second, the discovery of the WISC-R IQ test administered by Dr. Adams in October 1981 when Corey Johnson was age 12, is vital evidence that eviscerates any validity of the identical WISC-R IQ test given to Corey Johnson only four months later by Dr. Gallaudet. The Gallaudet test (a clear outlier) played a central role in the erroneous classification (which I discuss below) of Corey Johnson as a "severely learning disabled" child, rather than as a child with intellectual disability.

The opinions I expressed concerning Corey Johnson's significant impairments in intellectual functioning are echoed and expanded upon in Dr. Reschly's August 2016 report, which focuses principally on the intellectual functioning prong of the intellectual disability diagnosis. He provides a comprehensive explanation of the evolution in the understanding and



University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

conceptualization/definition of intellectual disability over the past several decades, particularly on the assessment of intellectual functioning. He clearly captures the essence of the Flynn effect and the statistical concept of the standard error of measurement (SEM), two critical components to interpreting the results of intelligence testing. For persons with mild intellectual disability, it is vital that we recognize, as Dr. Reschly does, the importance of up-to-date norms of intelligence tests, and understand that when "cut-off" points for intellectual disability are considered, confidence intervals (based on the standard error of measurement) must be taken into account. Today's definition of intellectual disability by the leading professional organizations, as discussed by Dr. Reschly, puts the Flynn effect and confidence intervals in bold relief. Their applications to diagnosing and applying the intellectual disability definition have become standard practice, as the meta-analysis demonstrating the Flynn Effect by Trahan *et. al.*,[3] and the Supreme Court's holding in *Hall v. Florida*, recognizing the consensus among practitioners that the SEM must be taken into account in any *Atkins* determination, make clear.

Applying these two elements to interpreting the multiple administration of the WISC and the WAIS to Corey Johnson, Dr. Reschly persuasively concludes that Corey Johnson has significant deficits in intellectual functioning, a conclusion that I had arrived at independently in 2008 and continue to share today. Dr. Reschly's report contains a detailed and in-depth analysis of Corey Johnson's IQ test results. He explains why four of the IQ tests given to Corey Johnson are valid, consistent with each other, and place Corey clearly within the range of intellectual disability. Dr. Reschly also persuasively shows why two other tests are severely flawed, hold little validity, and should be given little, if any, weight in assessing Mr. Johnson's intellectual disability. Dr. Reschly explains that one of those invalid tests (administered by Smith in 1979) was out-dated by decades at the time it was given to Corey Johnson, and had been superseded by a then-recent, culturally relevant version of the same test. He further describes how the other IQ test (the WISC-R test given by Gallaudet that I discuss above) was inadvertently administered to Corey Johnson just four months after he was given the identical WISC-R IQ test by Dr. Adams, artificially inflating the results of the Gallaudet test and rendering it invalid and useless. Overall, based on my 50 years of work in the field of intellectual disability, the conclusions Dr. Reschly draws concerning Corey Johnson's intellectual functioning are irrefutable.

**Analysis of Corey Johnson's adaptive behavior functioning**

In my 2008 letter, I concluded that, in addition to his significant cognitive impairment, Corey Johnson also demonstrated significant deficits throughout his childhood in all three areas of adaptive functioning—conceptual, social and practical skills—even though significant impairment in only one of these areas is necessary to support an intellectual disability diagnosis. I explained that those deficits were documented by the contemporary records from Corey Johnson's childhood and adolescence and by information contained within the psychological report prepared by Dr. Cornell and Dr. Cornell's 1993 sentencing hearing testimony, as well as other records and information I reviewed in 2008.

---

[3] Trahan, L.H, Stuebing, K.K., Fletcher, J.M., & Hiscock, M. (2014). *The Flynn Effect, A meta-analysis. Psychological Bulletin*, 140, 1332-1360.



University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

The new evidence developed by Corey Johnson's current clemency counsel and by Dr. Olley since 2008 provides a wealth of additional support for the conclusions I reached in 2008. They have gathered substantial new information demonstrating that Corey Johnson's adaptive functioning deficits are corroborated by numerous written statements from and interviews with Corey Johnson's teachers, mental health professional, relatives, and friends, who were interviewed by Dr. Olley and by Mr. Johnson's current clemency counsel. Those interview statements, affidavits, and declarations are further corroborated by numerous contemporaneous records created by professionals during Corey Johnson's childhood and adolescence.

Building upon and concurring with the thorough analysis of the intellectual functioning prong of the intellectual disability diagnosis by Dr. Reschly, Dr. Olley focuses the majority of his excellent report on the evidence supporting his conclusion that there is overwhelming, undeniable evidence that Corey Johnson suffered significant impairments in all three areas of adaptive functioning. His logic and the clarity of facts and interpretation contained in his comprehensive report impeccably reflect the most rigorous interpretation and explanation possible concerning Corey Johnson's intellectual disability, and the conclusions he draws are both sound and irrefutable. Dr. Olley employs the strictest reading and rigorous application of the standards incorporated in the definitions of intellectual disability put forth by the American Psychiatric Association (APA) in its most recent Diagnostic and Statistical Manual (DSM-5) and by the American Association on Intellectual and Developmental Disabilities (AAIDD), the two leading medical and professional organizations in the field.

Dr. Olley's assessment is extensive and goes well beyond what would be expected of an evaluation. He painstaking and thoroughly weighs all factors individually and in combination. He sought out multiple sources of information, recreating with clarity Corey Johnson's developmental, educational, and family history, placing it all within the context of the changing field of intellectual disability. Most importantly, Dr. Olley has illuminated the nexus between Corey Johnson's developmental history and the context within which that development took place. Throughout, he provides corroborating evidence, documenting with the utmost detail the overwhelming risk factors that were the pathway to a diagnosis of intellectual disability. At the same time, Dr. Olley provides a clear explanation of why a diagnosis of intellectual disability was never rendered when Corey Johnson was a child, adolescent, or even an adult facing the death penalty, a critical point that both Dr. Reschly and Dr. Gottlieb also address, and one that I discussed in my 2008 letter. And he has shown why a diagnosis of intellectual disability was called for at the time Corey Johnson was in elementary school, given the weight of overwhelming evidence of the breadth and severity of his impairments.

Guided by his rigorous interpretation of the standards for the diagnosis of intellectual disability established by the APA and the AAIDD, Dr. Olley utilizes well recognized best practices for extrapolating and assessing Corey Johnson's adaptive behavior. Dr. Olley addresses Corey Johnson's academic performance, including multiple grade retentions that did not help in improving Corey's academic performance, which characterized his repeated academic failure. In his early elementary years, he was clearly a candidate for special education services, yet he did not receive them. Without intensive services, Corey showed no improvement in learning during his elementary grades; in fact, his academic performance significantly deteriorated. And when he finally received special education services, first when he



University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

was about 10 years old, then as a teenager at the residential Pleasantville Cottage School program, and later as a high school student, Corey continued to show no improvements.

The corroboration of Corey Johnson's language deficits by Dr. Olley leaves no doubt of the seriousness of Corey's deficit in this area. Dr. Olley explains how Corey entered the early grades at a disadvantage. Later, when he entered the Pleasantville Cottage School, Corey's significant absence of both expressive and receptive language skills at his age is further evidence of an adolescent with intellectual disability.

Similarly, Dr. Olley's documentation of Corey's significant lack of social skills across his lifespan, from early childhood to adulthood, underscores the fact that intellectual disability was present since a young age. Notwithstanding all the attempts to support Corey Johnson through direct instruction and counseling, he showed little if any improvement in his social skills. As someone who has written two books on teaching social skills to children with intellectual disability, I can confirm that if Corey Johnson did not have an intellectual disability, there would been a natural improvement in his social skills over the years, yet his deficit in social skills was not remediable. This is a clear sign of his intellectual disability. Dr. Olley further recounts numerous practical skill deficits in support of his conclusion that Corey Johnson had significant impairments in the practical domain, a conclusion I share.

Finally, the conclusions that Dr. Olley draws from his review of all of the records and the information he collected from various sources were confirmed by the results of the administration of the ABAS-II, which he gave to three key sources. Thus, Dr. Olley's multiple prong approach to evaluating Corey Johnson's adaptive functioning in all three domains of adaptive behavior leads inexorably to only one conclusion. Using the expression "leaving no stone left unturned," Dr. Olley systematically and painstakingly demonstrates that Mr. Johnson's significant deficits in adaptive behavior were clearly recognizable at an early age and have lasted into adulthood. His summary of voluminous information and his careful interpretation of that information leave no room to doubt his conclusion that Corey Johnson has an intellectual disability, a conclusion that I wholeheartedly and unequivocally share and one that I reached in 2008.

**Failure to classify Corey Johnson as intellectually disabled as a child**

As I explained in my 2008 letter, Corey Johnson attended school during the 1970s and 1980s when the trend in education, particularly with respect to poor, minority children (especially African American children) in schools in urban districts, was to avoid labeling students as "mentally retarded." Instead, the less stigmatizing label of "learning disabled" was chosen for children who actually met the criteria for mental retardation. Forty-five years ago (1971), I had the opportunity to observe the clinical assessment of children referred for special education in the New York Public School system. As the program evaluator of the newly established Evaluation and Placement Centers throughout the five boroughs of New York City, I personally sat in and observed the deliberations of the interdisciplinary clinical teams. I can attest to the proclivity of the teams to not place children in special education classrooms designed for students with mental retardation, even when there were clear indications of mild intellectual disability. Dr. Gottlieb was one of the key social science researchers to study this



University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

trend and demonstrates its existence on a broad scale (as I had personally observed it occur on a more individual level). His declaration provides a detailed explanation of how well-meaning litigation efforts that began in the 1960s and other factors created a climate where educators and mental health professionals felt pressure not to label children with mental retardation, particularly when the label was not important to the services children received in school.

Dr. Reschly cogently explains in his report that the label of "severe learning disability"—which has no diagnostic meaning but was repeatedly applied to Corey Johnson—was a euphemism for mental retardation during the time that Corey was in school. He also describes why the learning disabled diagnosis did not then, and does not now, fit Corey Johnson's comprehensive, consistent, and significant impairments. He documents how Corey Johnson's impaired achievement was consistent with his impaired intellectual functioning, which is diagnostic of intellectual disability and inconsistent with learning disability. Finally, Dr. Reschly punctuates his report with statistics graphically demonstrating how the learning disability diagnosis exploded in numbers over the past few decades, while the "mental retardation" and later "intellectual disability" diagnosis declined, even though professionals have understood all along that the actual number of children fitting the diagnostic criteria for these conditions has not changed.

I concur with Dr. Reschly and in a past chapter, Learning Disabilities as Operationally Defined by Schools (MacMillan and Siperstein (2002)), we clearly explain how the process schools adopt to identify students with learning disabilities did not conform to the federal definition and resulted in almost a third of students with mild intellectual disabilities being otherwise diagnosed and incorrectly placed in programs for the learning disabled. Subsequent research by MacMillan and his colleagues documented that, in fact, up to one-third of minority students in classrooms for the learning disabled met the criteria for mild intellectual disability.

**Conclusion**

Based on all of the documents I reviewed, and my nearly 50 years of extensive involvement in the field of disabilities, I unequivocally conclude that Corey Johnson meets all three prongs of the most recent definition of Intellectual Disability (APA, AAIDD) and clearly is mildly intellectually disabled.

Sincerely,

Gary N. Siperstein, Ph.D.
Professor Emeritus
Director
Center for Social Development and Education
University of Massachusetts Boston

Enclosure

# APPENDIX A

UMASS. BOSTON

Center for Social Development and Education

January 11, 2008

Lisa Greenman, Esq.
3925 Morrison Street NW
Washington, DC 20015

Dear Ms. Greenman,

I have reviewed the documents pertaining to Corey Johnson and provide here, in summary form, my opinion on the question concerning a diagnosis of mental retardation. The material that I reviewed was extensive and included reports of Corey Johnson's psychological evaluations, his neuropsychological exam, information about his behavioral and emotional issues in a variety of settings as well as the mitigation report by Dr. Dewey Cornell and subsequent testimony. Based on my thorough review of all of this information, it is my opinion that Corey Johnson's significant cognitive impairment and impairment in adaptive behavior, demonstrated before the age of 18, is consistent with mild mental retardation, not a learning disability.

To arrive at this conclusion I have drawn from my extensive background and experience in the field of mental retardation including over 40 years of teaching, research, program and policy development, and clinical service. As the founder and director of the Center for Social Development and Education at the University of Massachusetts Boston, I have managed more than $20 million of research in mental retardation and related disabilities. I have authored over 100 articles, chapters, and books on mental retardation; topics including the identification and diagnosis of mental retardation and teaching children with mental retardation. I have also served as an editor for major journals (AMERICAN JOURNAL OF MENTAL RETARDATION, AAMR's *Research Monograph* series) and as a consulting editor to numerous journals in developmental disabilities. I have served in leadership roles at the local, state, and national levels including, for example, board memberships on the Governor's Council for Mental Retardation and as a consultant to the President's Commission on People with Intellectual Disabilities. As a licensed Psychologist, my work as a practitioner in the area of mental retardation has also been extensive, particularly involving the intellectual assessment of children with mental retardation. Not only have I directly tested and evaluated over 100 children and adolescents with mental retardation in diagnostic settings, through my research I have personally observed hundreds of children and adolescents with mental retardation and have reviewed hundreds of students' records for the purpose of substantiating students' diagnosis of mental retardation for inclusion in our federally funded research studies.

With regard to intellectual functioning, it is clear that Corey Johnson meets the criteria for mental retardation. The consistent pattern of strengths and weaknesses that emerges

University of Massachusetts Boston 100 Morrissey Boulevard Boston MA 02125-3393 Telephone 617.287.7250 Fax 617.287.7249

across the intelligence assessments administered by Drs. Barish and Cornell clearly point to significant intellectual impairment. On the administration of the WISC-R by Dr. Barish in 1985, Corey Johnson showed significant intellectual impairment (Full Scale IQ = 69). It is important to point out that there was no statistically significant difference between Corey Johnson's Verbal IQ (68) and Performance IQ (78) – the two major components that make up his Full Scale IQ score (it should be noted that when there is a significant difference between the Verbal and Performance IQ, this difference is often characteristic of a person with a learning disability). Furthermore, Corey Johnson's Verbal IQ subtest scores showed no significant scatter; that is all of the scores were similar (i.e., reflecting a flat profile of scores across the verbal subtests). In addition, with regard to his Performance IQ subtest scores, three of the five were not only similar to each other, but also similar to the Verbal IQ subtest scores. This flat profile of subtest scores is characteristic of someone with mental retardation, not a learning disability.

Corey Johnson's performance on the adult version of the Wechsler (WAIS-R), administered by Dr. Cornell in 1992, is strikingly similar to his previous performance particularly when one takes into account the Flynn effect. The Flynn effect, supported by extensive research by Dr. James Flynn, represents the well-established finding that intelligence test norms "age" or slowly go out of date at the rate of 0.3 Full Scale IQ points per year. The norms used to assess Corey Johnson's performance in 1992 were collected in approximately 1979, because the WAIS-R was published in 1981.The 13-year gap between the date when the norms were established and the year Corey Johnson was tested means that his Full Scale IQ would be overestimated by about 4 points (i.e., 13 X 0.3 = 3.9 points). As such, Corey Johnson's Full Scale IQ of 77 is inflated by approximately 4 points. [Note: See Flynn and Widaman (in press) for discussion of the need to adjust for outdated norms when identifying individuals with mental retardation.]

After adjustment for the Flynn effect, the best estimate of Corey Johnson's Full Scale IQ is 73. Dr. Cornell's decision not to factor in the outdated norms in light of the Flynn effect was mistaken. It is the established procedure in the field that the Flynn effect be invoked, and an adjusted Full Scale IQ calculated based on a correction for the changes in norms over time, before a decision is made regarding the presence of mental retardation. The adjusted Full Scale IQ score of 73 is notably consistent with the Full Scale IQ score of 69 obtained when Corey Johnson was tested in 1985. Indeed, the standard error of measurement, which is the standard deviation of scores obtained by an individual across multiple measurements, is about 3 points for the WAIS-R. The 95% confidence interval for his score would be calculated as his obtained IQ score plus or minus twice the standard error or measurement, or his score plus or minus 6 points. His adjusted Full Scale IQ score of 73 in 1992 falls only 4 points from the Full Scale IQ score of 69 he received in 1985, and this is entirely consistent with the standard error of measurement for the WAIS-R. Corey Johnson's adjusted Full Scale IQ score of 73 clearly falls within the IQ range of 70-75 that allows diagnosis of a person as having mental retardation.

Focusing specifically on his performance on the adult version of the Wechsler, as was the case on the child version, there was no statistically significant difference between his Verbal IQ (75) and Performance IQ (82). Also, across all eleven subtests, only the Object

Assembly subtest differed significantly from the other subtest scores. Here again, as with the WISC-R, Corey Johnson's performance is relatively flat across the subtests of the WAIS-R. Furthermore, Corey Johnson's performance on the specific subtests of the WAIS-R was strikingly similar to his performance on the subtests of the WISC-R administered 7 years earlier. [Note: Only two subtests - Block Design and Object Assembly - were different from the WISC-R subtests.] Overall, it is evident that Corey Johnson's performance on the WAIS-R in 1992 and his performance on the WISC-R in 1985 are both characteristic of a person with mild mental retardation.

In addition to his significant cognitive impairment, there are strong indications that Corey Johnson also experienced deficits throughout his childhood in all three areas of adaptive functioning: conceptual, social and practical skills. Although there was no direct assessment of Corey Johnson's adaptive behavior using a standardized measure, there is information in the documents provided that describes his adaptive behavior, or more descriptively his ability to perform activities required for everyday living. The available information, particularly that which was provided in the mitigation report by Dr. Cornell and his subsequent testimony, and in Dr. Peck's neuropsychological evaluation, indicates that Corey Johnson has significant difficulties with tasks common to everyday living. For example, Dr. Peck states in his evaluation that Corey Johnson, "...would be at risk for day-to-day difficulty in the area of logical thinking" and that his findings "indicate an increased risk for interpersonal difficulty wherein he might misinterpret situations." Comments from one of Corey Johnson's former social workers included in Dr. Cornell's report also allude to his adaptive limitations in that while in school, Corey Johnson was characterized as, "a follower who was so eager to be accepted by his peers that he would act without thinking." His deficits with practical skills were also referenced in several places. For example, Corey Johnson was (and still is) unable to handle money or tell time. Dr. Cornell also indicates in his report and during his testimony that Corey Johnson has significant impairment in adaptive behavior in several areas. He states, "certainly functional academics....communication deficits with his speech impairment and communication problems....self care, social skills.... the ability to maintain a job....all of those are possible areas in which his functioning is not at a normal level." Corey Johnson's deficits in adaptive behavior combined with his significant cognitive impairment are characteristic of mental retardation, not a learning disability.

I am fully aware that my conclusion of mental retardation is in stark contrast to the conclusion first rendered by Dr. Barish in 1983 when Corey Johnson was 15 years old. It is important to consider however, that while the initial diagnosis of a learning disability made by Dr. Barish was based on his personal administration of a number of tests (e.g. achievement level, visual motor coordination, language, speech sound discrimination etc.) significantly, there was no IQ testing done by Dr. Barish at that time. Rather, Dr. Barish's understanding of Corey Johnson's intellectual functioning was based on the report he received of an earlier administration of the WISC-R conducted by another clinician. Dr. Barish did not personally administer the IQ test which reported Corey Johnson's IQ to be in the normal range -- a conclusion that is inconsistent with all other reports about his intellectual functioning.

To clarify, the diagnosis of a learning disability Dr. Barish reached was based on his belief, based on the earlier IQ testing, that Corey Johnson had average intellectual functioning. This would make his seriously deficient academic achievement (i.e., in the 1st and 2nd percentile when compared to national norms) "unexpected" (MacMillan and Siperstein, 2002). It is unexpected in that in the absence of a learning disability, a person with an average IQ would not be so seriously deficient in his or her achievement; thus, this deficiency is explained by the presence of a learning disability. However, such deficient academic achievement in a child who also has a significant cognitive impairment is "expected". That is, it is expected that a person with significant intellectual impairment would also be deficient in his or her academic achievement; thus, this deficiency is explained by the presence of mental retardation. I believe that Dr. Barish would in fact have made the diagnosis of mental retardation if he had based his initial decision solely on his own administration of the WISC-R two years later in 1985 (Full Scale IQ = 69). In doing so it is clear that Corey Johnson's deficient academic achievement is attributable to his significant intellectual impairment – mental retardation. Instead Dr. Barish's diagnosis was based on what appears to be an invalid assessment of Corey Johnson's intellectual functioning in 1982 as it is inconsistent with all subsequent assessments of his intelligence.

I know from extensive experience in similar situations that there are several reasons why Corey Johnson's diagnosis of learning disability was perpetuated by psychologists and educators even when challenged with his performance on IQ assessments that represented mild mental retardation. Educators rarely change an initial diagnosis particularly if the change involves moving from the label of a learning disability to mental retardation. Educators generally lean toward the least stigmatizing diagnosis (in this case a learning disability) particularly when the educational programs and support services recommended are the same as those that would be recommended for a child with mental retardation. For example, in reviewing the educational plan in place for Corey Johnson while attending the Pleasantville Cottage School it is clear that there would have been minimal changes in his goals had his diagnosis been revised from a learning disability to mental retardation.

Another reason the diagnosis was perpetuated was due to the mindset of the 1980's regarding labeling children. The materials I reviewed in Corey Johnson's case paint a complex portrait of a child growing up during a time where the trend in education was to avoid labeling a student as having mental retardation; this was particularly true for African American children. In fact, in the late 1970's, African American children were found to be overrepresented in special education classes, which resulted in a series of landmark court cases (e.g. Larry P. v. Riles, 1972; Marshall v. Georgia, 1984) and position papers by the Office of Civil Rights. At the same time, attention was drawn to the inadequacy and inherent bias of IQ tests for assessing African American students (Mercer, 1973; 1974). During the time Corey Johnson was in school, teachers and administrators were hesitant to refer an African American child for special education services and, moreover, reluctant to administer an IQ test, even when the child was significantly at risk. This helps explain the school system's response to Corey Johnson's significant academic deficits. Only after he was retained in the 3rd grade and then again in

the 4th grade, and all intervention failed, was he (at the age of 12) finally referred for special education services.

Lastly, it is not at all surprising that there was not only a considerable delay in the referral of a child representing such significant academic problems for special education services, but also that the diagnosis of mild mental retardation was missed when Corey Johnson was a child. It is not unusual for this to happen; in fact it is frequently the case with mild mental retardation. Many teachers, as well as the public, perceive people with mental retardation as being moderately to severely impaired, i.e. those who need external supports for the most basic needs (Siperstein & Bak, 1980; Siperstein, Norins & Corbin, 2002; Siperstein, Parker, Norins Bardon & Widaman, 2007). It is expected that a person with mental retardation has physical stigmata and engages in stereotypic behavior that is often accompanied by motor problems. From the records I reviewed, Corey Johnson did not fit these preconceptions. Therefore, because he did not fit the stereotypic image of a child with mental retardation, his significant academic problems did not appear to be due to a significant cognitive impairment. Recent research supports this in that my colleagues MacMillan and Gresham have consistently found that up to 1/3 of children diagnosed by schools as having a learning disability actually meet the clinical criteria for mild mental retardation (MacMillan, Gresham & Bocian, 1998).

In order to be identified as having a learning disability, even a severe learning disability, an individual must display a range of abilities such that the learning disability affects a very circumscribed area of academic functioning, while other areas are unimpaired. Corey Johnson demonstrates a consistent pattern of significant subaverage intellectual functioning accompanied by a pattern of significant below average achievement in all areas that is inconsistent with a diagnosis of a learning disability. Furthermore, there is every indication that Corey Johnson displayed subaverage adaptive behavior when he was in school.

I have tried in this letter to set down the major points we discussed in our phone call, and I would be happy to elaborate further if needed. As I have said, even among mental health professionals and special educators, mild mental retardation is misunderstood and the diagnosis is frequently missed for the complex reasons we talked about. This typically happens in an effort to offer the child and his family an optimistic prognosis. Please let me know if I can be of further assistance.

Sincerely,

Gary N. Siperstein, Ph.D.
Professor
Director
Center for Social Development and Education
University of Massachusetts Boston