# EXHIBIT 9

                    IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                         RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,


                              Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                         VOLUME XXII

                      February 12, 1993
                      Richmond, Virginia
                         10:00 a.m.

BEFORE:          HONORABLE JAMES R. SPENCER
                 United States District Judge


APPEARANCES:     HOWARD C. VICK, JR., ESQ.
                 WILLIAM H. PARCELL, III, ESQ.
                 Office of the United States Attorney;
                     Counsel for Government;

                 ROBERT P. GEARY, ESQ.
                 ERIC D. WHITE, ESQ.
                     Counsel for Defendant Tipton;
                 CRAIG S. COOLEY, ESQ.
                 JOHN F. McGARVEY, ESQ.
                     Counsel for Defendant Johnson;
                 DAVID P. BAUGH, ESQ.
                 ARNOLD R. HENDERSON, V, ESQ.
                     Counsel for Defendant Roane;
                 ROBERT J. WAGNER, ESQ.
                     Counsel for Defendant Reavis.
                 JEFFREY B. KULL
                 OFFICIAL COURT REPORTER

                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Criminal Action Number 92CR68:
United States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twenty-second day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. GEARY: Defendant Tipton is.

MR. McGARVEY: Johnson is prepared.

MR. BAUGH: Defendant Roane is ready. We submitted an instruction pursuant to ZANT v. STEPHENS. I gave the Clerk a draft of it this morning.

THE COURT: I've considered it. I'm not going to give it, but I'm going to make a slight change. I think what I have already decided to give takes care of that problem, but I'm going to add a sentence. Come up here.

(At Bench.)

THE COURT: At the end of instruction Number 18, I will add this language: "Also, remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty. Also, remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty."

3880

MR. BAUGH: Also, while we are here we wanted to object to the Court's substantial planning and premeditation. "Ample planning and deliberation," which is the language the Court used, it doesn't really narrow the range of murderers. We cite GODFREY v. GEORGIA. These definitions are all-encompassing. I believe the purpose the statute is to specifically narrow the field of people to whom the death penalty applied. There is too many murders.

MR. WHITE: If I could make one comment, what concerns me, the very last sentence on the first page of Instruction 9, where it says "Substantial planning means planning which is considerable or ample for the commission of the crime at issue." Where it starts with "or," it seems to lower the standard in terms of what we are talking about, just that enough to get through the crime itself. "Substantial" means more than that.

THE COURT: The objection will be overruled.

MR. BAUGH: We renew our severance request in light of -- we are all going to have to step on each other's toes today. In the alternative, we would ask the Court for sequential verdicts.

3881

THE COURT: Objection overruled.

MR. McGARVEY: Defendant Johnson would join in all motions.

THE COURT: All right.

(In Open Court.)

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, this morning we are going to have the closing arguments in the aggravation and mitigation phase. Mr. Vick?

MR. VICK: Thank you, Your Honor. Good morning again, ladies and gentlemen. First, I'd like to take the time very briefly to thank you for your attention throughout this five weeks of trial. Your attention this week has also been admirable, and I'm sure that you will go back and apply that same sort of diligence to the verdict that you render on this phase of trial.

Ladies and gentlemen, now it is your time. The lawyers have had their time. The evidence has all been presented. Now it is time for you to go back and do your duty.

Each of you during the voir dire, prior to your selection as members of this jury, stated that in the appropriate case, given the appropriate circumstances, that you could indeed render a verdict of death against a defendant. Ladies and gentlemen, I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant.

You took an oath. It is an awesome responsibility. It is an awesome duty. But nonetheless, it is just that, a duty. Your duty, ladies and gentlemen of the jury, given the evidence that you have heard, requires no less verdict than death.

As I said in my opening this week, and as I remind you now, ladies and gentlemen, this is a case where you are deciding the fate of mass murderers. Each of these defendants has been convicted by you of being just that, a mass murderer. Each of these defendants comes before you for sentencing having killed a number of people.

The human cost of what these three men have done to support their drug dealing, to further their drug dealing, is immeasurable. Absolutely immeasurable. The evidence is clear, beyond a reasonable doubt, that they have laid waste to the lives of a number of people for their own personal gain, for their own personal satisfaction, for their own personal machismo. They have left ten dead people on the streets of the City of Richmond. They have left two people so seriously wounded that they will never recover. They have left one other seriously wounded person. They have shot one person in front of her children.

Think of the immeasurable harm that has been done to the minds of Montez McCoy and his sisters, who saw their uncle brutally mowed down in front of them, and saw their mother shot by James Roane and Cory Johnson. You can't quantify or qualify the amount of harm that has been caused by these people.

As I said at the beginning of this week and I remind you now, we have the burden -- that is, the United States, the government -- of proving the aggravating factors which need to be proven in order to impose the death penalty beyond a reasonable doubt. I also told you that we would not put on a great deal of evidence this week. And you saw. We did not put on a great deal of evidence. Our evidence came prior to this week, in the four weeks of testimony which led you to find these people guilty. That evidence, as you know, has already been reintroduced and is in front of you in total this week. That evidence is to be considered by you in total this week when rendering the appropriate sentence against these defendants.

The aggravating factors are listed in the jury's instructions, in the Court's instructions to you. There are specific aggravating factors as to each and every defendant. In most cases, they repeat themselves as to each defendant:

That the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim which resulted in the death of the victim; that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of the victim.

Those four aggravating factors are repeated as to each and every defendant in this case. And given the evidence that is presented to you, the government has shown beyond a reasonable doubt that each and every one of those factors has been satisfied. Each and every murder committed in furtherance of the Continuing Criminal Enterprise satisfies all four of those aggravating factors.

Remember I told you at the beginning of the week that the aggravating factors are to a certain extent duplicative or overlapping? But going back, applying your common sense, what you understand to be the normal meaning of those words, you will see that the government has proven each one of those aggravating

factors beyond a reasonable doubt as to each one of the defendants.

That is the first group of aggravating factors out of which you must find that at least one exists. I submit all four exist as to each and every defendant, each and every murder that they are being sentenced on here today.

In the second group of aggravating factors, defendant Cory Johnson and defendant Richard Tipton have been charged with, in the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. Clearly they have done that in the case of Gwendolyn and "Pepsi" Greene. That has been proven to you beyond a reasonable doubt. You have already

3886

found that aggravating factor beyond a reasonable doubt, as you have already found the other aggravating factors beyond a reasonable doubt, shown by the verdict you returned on the guilt phase of this case.

As to each one of the defendants, it is charged that the defendant committed the murders enunciated after substantial planning and premeditation. The Court will provide you instructions on that, and I submit to you that you have already found beyond a reasonable doubt that these murders were committed after substantial planning and premeditation. Each one of these murders was premeditated. You know that from the evidence that has been presented.

And I remind you just briefly of the evidence that indeed shows premeditation. Remind yourself of the clear testimony from the mouths of "J.R." and "Whitey" to Ronita Hollman and others in the Newtowne area. "We are going to take over up here." Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent

3887

fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation. But as to each one of the specific murders charged in the indictment, you also have clear premeditation based upon the evidence that you have heard, and substantial planning.

The Court's instruction to you as to substantial planning says that substantial planning means planning which is considerable, or ample, for the commission of the crime at issue. Ample for the

commission of the crime at issue.  Clearly, as to each one of the murders perpetrated by these defendants, they put in ample enough planning to carry it out.  Start with murder number one, the murder of Doug Talley by Richard Tipton and James Roane: 84 stab wounds, most of them to the head and upper body.  84 stab wounds where they clearly intended to plan that murder by taking him to South Richmond, by recovering the knife that was used to stab him 84 times.  They got out of the car and talked about it with each other, James Roane and "Whitey," got back in the car.  James Roane grabbed him around the neck, and "Whitey" began to stab him for four or five minutes.  They then took that knife, disposed of that knife by giving it to "Pepsi" Greene to hold.

And you have the lead-in to the clear premeditation and murder of the next victim, Douglas Moody.  They went and retrieved that knife.  Why did they retrieve that knife, ladies and gentlemen?  They retrieved that knife with one thought in mind: killing Doug Moody.  Clear premeditation, substantial planning.  They intended the consequences of their actions.  They intended to kill these people to clear their way for drug dealing in Newtowne.

Go next to the murder of Peyton Maurice Johnson.  They stalked that man.  "J.R." stalked that man.  They went and retrieved the weapons, which is further planning, further evidence of premeditation and planning, as indeed the purchase of the weapons themselves is evidence of premeditation and planning.  Why do you think they purchased those weapons?  To carry out their plan of taking over Newtowne.  And they used them beginning the day they got them, January 14th, 1992.  They stalked Peyton Maurice Johnson.  "J.R." found him.  "C.O." and "E.B." walked in that house and blew that man away like he was an animal.  They then took the guns and, planning and premeditating their next murder, gave them to "Papoose" to wipe down and hide.

They went and retrieved those guns and indeed killed Louis Johnson with those guns on January 29th.  Remember the statements of Sterling Hardy and Jerry Gaiters, where "J.R." told them "Keep him in the alley."  Keep Louis Johnson in the alley.  They pulled up clearly intending to kill that man.  They got out of the car, put the guns to his head, and blew him away like an animal in the street, also.  Clear planning and premeditation as to that murder.

The triple homicide in Church Hill, "Mousey" Armstrong, again hunted down like an animal by "C.O." He made Jerry Gaiters take him and find "Mousey"

Armstrong. Could there be any question in your mind as to the premeditation and planning of that.

Could there be any question in your mind as to the premeditation and planning of the killings on February 19th, 1992, where "C.O." and "Whitey" hunted down Linwood Chiles and Curt Thorne, found them with "Pepsi" and Gwen and mowed all of them down because they had received a telephone call from "V" in the jail indicating that they might be cooperating with the police? How much more clear planning and premeditation could there be than that particular murder.

3890

The aggravating factors, ladies and gentlemen, have been proven to you already beyond a reasonable doubt. Your jury verdict on the guilt phase of this trial establishes that. There is listed, as to each of the defendants, other factors, non-statutory factors, that you can consider when rendering the proper verdict of sentence against these defendants: that the defendants committed multiple murders. Indeed, that they are mass murderers. That the defendants have substantial criminal histories. In the case of James Roane, you will see a series of convictions against him. You will see two convictions against Cory Johnson. No convictions of record have been introduced into evidence as to Richard Tipton, but I suggest to you that based upon the evidence you have heard, Richard Tipton, Cory Johnson, and James Roane were virtual crime waves in and of themselves. Wherever they went, crime followed, be it New York, New Jersey, or Richmond. They were virtual crime waves with substantial criminal histories. Remind yourself of Anthony Howlen and his mutilated face; the arrest of Richard Tipton by the police in New Jersey. They are in and of themselves crime waves.

That the defendant, each of them, has been

3891

charged with seriously wounding individuals in the course of the murders outlined. Remind yourself again of Gwen and "Pepsi," of Martha, and the woundings that they received because these people wanted to carry out their drug business. And each of them has been charged in the statutory aggravating factor with knowingly and willfully being a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged. And that's important. You need to remember that.

Now, you can find that a verdict of death should be entered as to each one of these defendants only on the CCE murders that they have been found guilty of. So for example, you could find that Richard Tipton

deserves to die for the murder of Doug Talley, or that Cory Johnson deserves to die for the murder of Linwood Chiles, or that James Roane deserves to die for the murder of Peyton Maurice Johnson. You have got to decide that individually as to the murders charged in the indictment.

But in rendering that decision, you are free to remember all of the evidence of other murders and crimes that were carried out in furtherance of this conspiracy. You are not constrained in making that

3892

decision as to what the appropriate punishment is for that CCE murder to limit yourself only to that murder. You can consider the goals of the conspiracy. You can consider the actions of other co-conspirators and what they did in furtherance of this conspiracy when rendering that. You cannot kill James Roane, statutorily, because of his murder of Torrick Brown. But you can indeed consider that when determining whether that's the appropriate verdict for him based upon his murder of Peyton Maurice Johnson. You can consider the fact that he, in reptillian-like coldness went in and shot Torrick Brown. That can all be considered by you. It is in evidence. It has been proven beyond a reasonable doubt.

You can consider the evidence that's been put on this week by the government concerning the fact that from jail, while incarcerated, these defendants continued to try to have people killed. Specifically, you can consider that "Whitey" wanted C.T. Woody killed and wanted "Wildman" killed. You can consider that Cory Johnson wanted C.T. Woody killed and wanted Valerie Butler killed. You can consider that James Roane wanted Martha McCoy and Montez McCoy and the other witnesses killed, and was

3893

even going to take action against Doug Cunningham and the uncle of Martha McCoy if they testified at trial. You can properly consider that in rendering the right verdict and deciding what is the proper verdict in this situation of mass murder.

Go back and look at what the government has to prove. I submit to you each and every one of the aggravating factors has been proven to you beyond a reasonable doubt. You have already found them in your guilt phase verdict.

The defense case this week -- let me back up a second. In reaching your decision, what you need to do, and the Court will instruct you about this, what you need to do is take the government's aggravating factors that have been proven beyond a reasonable doubt, take the mitigating factors that you find to have been proven, and simply weigh them. It is not a

mathematical formula. You don't have to go back there and say the government has proven 16 aggravating factors and the defense has proven 83 based upon the Court's submission to me, so therefore, the defense evidence weighs more. No. Any one aggravating factor can be found by you to outweigh the entire defense case as to the mitigating factors that you must decide. It is a weighing

3894

decision that you must make. Given what you saw in the first four weeks of trial concerning these men's actions as opposed to given what you have seen this week concerning the mitigation, what is the appropriate sentence? What should these men be sentenced to?

And while we are speaking about that, let's talk about the evidence that you have heard this week in mitigation. The evidence that you have heard in aggravation is clear, clear beyond a reasonable doubt. What have you heard this week? From defendant Tipton, you heard that it is not his fault. His bad youth made him do it. His bad relationship with his mother made him do it. It is not his fault.

We are sorry he has had an unfortunate youth. He is not the only child who has had an unfortunate youth. Indeed, each one of these defendants has put on evidence this week about attention deficit problems, learning disabilities. I suggest that each one of you on that jury knows someone who has a learning disability. Is that an excuse for murder.

Each one of the defense counsel stood up and said to you, "We don't intend this as an excuse." That's a smokescreen, ladies and gentlemen. That's

3895

exactly what it is intended as. It is intended as a smokescreen. It is intended as an excuse. These people cannot be forgiven their actions because they had a hard time learning. And that's in essence what you have been asked to do this week. That would substantially negate all the hard work that has been done by all those other people with learning disabilities and bad backgrounds who overcome that. People with those learning disabilities and bad backgrounds don't have a license to kill. Indeed, you remember Dr. Bright's testimony about Richard Tipton. He has worked with thousands of children with learning disabilities. Never before, ever, has he worked or seen one who has committed six murders. None of the doctors who testified here this week, despite their extensive involvement with children with these problems, has testified that they ever have seen anybody commit the amount of murders that these defendants have been found guilty of

committing.  It is offered to you as an excuse.  It is not an excuse.

Indeed, defendant Tipton had that loving environment in certain situations that he complained he didn't.  His grandmother clearly loved him.  He was welcome in that house in New York.  He rejected that.  He walked away from it.  Brenda Williams came and testified as to the nice, loving environment she gave him.  He rejected that and walked away.  I'm not saying the man had a perfect upbringing.  I'm not saying life couldn't have been easier or better for him.  I'm just telling you that it does not excuse what he did.  I would bet that if you looked at the lives of each one of the victims, you would find similarities in their background, too.  Does that mean that they should be brutally mowed down in the streets?  No.

Ask yourself about the story you heard from Richard Tipton's witnesses as to why it is if his background is so bad that each and every one of his cousins is productive, hold jobs.  That background has produced productive people.  He cannot be excused his actions because of his background.

The evidence is clear, too, presented by the defense witnesses this week, that Richard Tipton is set in his ways; that he has cognitive rigidity.  He is impulsive and reacts violently to emotional stimuli.  That evidence is clear, presented by the defense, that that is Richard Tipton.  Given his unfortunate youth, given what went into making him what he is today is all unfortunate.  But it has created a virtual killing machine.  The doctors that have testified for Mr. Tipton have been clear in that regard.  Ask yourself if it was a smokescreen when the defense argued that indeed perhaps he might be able to rehabilitate himself in jail, when not in a period of one year since his incarceration has one step been taken for him to change his behavior, to change the way he is.  I submit to you he cannot.  He is who he is.

I remind you of another important fact concerning the testimony that you have heard this week from Richard Tipton.  A number of people have talked to him for hours.  Hans Selvog talked to him, Dr. Evans talked to him.  In fact, he has poured his heart out to these people concerning the deprivation of his youth, the unfortunate circumstances with his mother.  He has gone into intimate detail in his life with these people and they have testified to you based upon what he has told them.  I ask you, have you seen once from that witness stand this week an iota of remorsefulness from that man?

MR. GEARY: I object.

THE COURT: The objection is sustained. Mr. Vick, don't get stupid in the end of this, please.

MR. VICK: Yes, sir. As to Mr. Cory Johnson, he, too, says, "I've had a bad youth. I've got a learning disability. I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentlemen. The testimony of the doctors who testified for him have made it clear that he knew right from wrong; that he had a clear moral compass. Indeed, the testimony from the people from the New York Cottage School was clear: that he had a strong moral compass; that he has at some point in his life rejected it.

MR. BAUGH: I hesitate to rise, but we are going to have to object and approach the bench in the middle in light of that. We have discussed it and it has to be raised.

THE COURT: No, you don't have to come up. I'll do an instruction, cautionary instruction, after this is over.

MR. BAUGH: Objection.

MR. VICK: Remind yourself about the evidence presented from the experts in his defense. I would submit to you that that evidence was one-sided. I'll give you an example. In his testimony, the doctor said that he had an IQ of 77, two points above mentally retarded, and submitted that to you as if it were a fact. That's two points above mental retardation. He therefore is two points above where the law would not allow you to assess a penalty of death against him.

That's disingenuous, ladies and gentlemen. By the very definition given you by that same expert, it is clear that IQ goes only as to one factor of a man's mental retardation. And his ability to socialize and communicate is another factor, as are all the others. Cory Johnson has had absolutely no problem, based upon the evidence you have heard here in the last four weeks, in maintaining himself and keeping care of himself and keeping a home and dressing himself, in socializing, in talking. He is not mentally retarded. He is not close to mentally retarded. I submit to you the more accurate IQ test was given in 1982, where it was shown he had an IQ of 88. Remember, the last IQ test done of Mr. Johnson by Dr. Cornell was done in anticipation of testimony for this trial, done by Cory Johnson knowing that this would be the subject of that man's testimony in the penalty phase of trial. That is disingenuous, ladies and gentlemen. That man is not nearly

mentally retarded.  All the evidence you have heard this week rejects that.  Dr. Cornell told you, in essence, that he could not have run a drug organization, he could not have organized and supervised that.  You found that he had.  The evidence is clear that he did.  Contrasted by the testing that showed he was in the superior range in structure of word fluency.  He knew enough math to know that "Mousey" Armstrong owed him $400 for crack cocaine.  He certainly had no problem with that.  He is not mentally retarded.

Again, he might have had a learning disability and an unfortunate youth.  He was offered a structured environment.  He was offered everything that the State of New York had to offer him in an effort to right him.  And that was rejected by him.  He is, too, given the doctor's testimony, who he is.  He is, too, at this point, given his unfortunate youth, a killing machine.

As to defendant James Roane:  His case this week has basically amounted to it is not his fault, it is society's fault.  "They let me down.  They didn't take care of me the way I should have been taken care of.  Those four murders that I am charged with weren't really my fault; they are society's fault."  You can't accept that, ladies and gentlemen.  That is not an excuse for what he has done.

The doctors said clearly about James Roane that he is intelligent, that he knows right from wrong, that he can clearly premeditate.  They have also clearly testified that he rejected the help that was given him.  He did not do well in the Charlottesville school.  He went away.  The evidence is clear in their record.  He did not adjust.  He left Mr. Brunson, who tried to give him a loving environment.

MR. BAUGH:  I object.  That is not the record.

THE COURT:  Overruled.

MR. VICK:  And look at Mr. Brunson's last entry.  He said that the last phone call he got was from a friend of James Roane, who said that James was back into drugs.  It is the last time he heard from James Roane.  It is clear that James Roane walked away from Mr. Brunson.  You can't believe that Mr. Brunson would have cut him off and had no contact with him had James wanted continued contact with him.

Again the evidence is clear that in the last year he has been in jail he has made no efforts to change.  They will ask you to find a mitigating factor that he will make a good adjustment to jail.  There has been no evidence that he has attempted to

3902

change in any way over the last year.  Indeed, the evidence has shown that from jail he has tried to orchestrate murders.

The evidence has shown that he, too, is who he is.  He is impulsive and violent, with cognitive rigidity.  That is James Roane.  He, too, is a killing machine.

Some thoughts, ladies and gentlemen, about the propriety of the death penalty:  And I know each one of you have given a great deal of thought as to whether the death penalty is ever an appropriate sanction, and if indeed the death penalty is an appropriate sanction in this case.  I submit to you that the death penalty is an appropriate sanction for three reasons.  The first reason is that our laws act as a deterrence.

MR. BAUGH:  Objection.  They cannot argue deterrent effect in a capital case.  That's called billboard, and it is illegal.

THE COURT:  Sustained.

MR. BAUGH:  We would ask the jury be instructed that cannot be considered as an aggravator.

THE COURT:  The objection is sustained.

MR. VICK:  Is this the appropriate

3903

punishment given the actions of these defendants?  I submit to you, ladies and gentlemen, it is indeed the appropriate punishment.  As you know from the testimony that's come from that witness stand, people can get life, penitentiary terms, based only upon drug dealing.  Drug dealing alone could lead you to a life of incarceration.  And indeed, there are many people incarcerated for life from drug dealing alone.  These defendants have gone far further than simply dealing drugs.  They have killed ten people in furtherance of their drug-dealing operation.  They deserve a punishment greater than those other people who are in jail for life based upon drug dealing alone.

A sentence of life in the penitentiary by you will in essence tell them and other drug dealers that you can sell drugs and kill people and you will get punished no more severely  --

MR. BAUGH:  That's deterrent effect again.  That cannot be argued.

THE COURT:  Overruled.

MR. VICK:  -- than if you sell drugs only.  They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people.

3904

Ask yourself, should they be punished beyond

incarceration? I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

MR. McGARVEY: There is no evidence whatsoever of that in the record.

THE COURT: Sustained.

MR. BAUGH: Jesus.

MR. VICK: They have sentenced Richard Tipton and Cory Johnson, have sentenced Gwen Greene to a life of less mobility than that. Their punishment --

MR. BAUGH: I thought you just sustained the objection.

THE COURT: The objection is sustained.

MR. VICK: Given their actions, ladies and gentlemen, the punishment in this case should indeed be the maximum punishment; that is, the death penalty.

These people have continued in jail to try to harm others. Detective C.T. Woody, Valerie Butler,

3905

Martha McCoy, Doug Cunningham. You can consider that when determining whether life in the penitentiary is the appropriate punishment, or whether the death penalty is the appropriate punishment. And I suggest to you that it leads you to but one conclusion: That in this case, given their actions, death is the only appropriate sanction for these people.

I began this by saying that this is an awesome duty that you have undertaken, and indeed it is an awesome duty you have undertaken. But the law is clear that in certain cases, the death penalty should be imposed. It is the will of Congress. It is the law that you must follow. What you must determine is, given the evidence that you have heard, is this one of those appropriate cases? And I suggest to you, ladies and gentlemen, it is the appropriate case. Remind yourself of the pictures that you have seen of the people that they have laid waste to. Remind yourself of the clear choices that they made on each and every occasion which led to these murders. Each one of us make choices that could shorten our lives. We smoke, we ride motorcycles at 80 miles an hour, hand-glide. We make choices that might shorten our lives. These people made ten clear choices to kill other people that should result in

3906

the shortening of their life given the law that you operate under.

Ladies and gentlemen, it is a strong duty you

have.  But it is just that.  It is a duty.  This case warrants the imposition of the maximum punishment possible, the imposition of the death penalty as to each defendant:  Cory Johnson, Richard Tipton, and James Roane.  Thank you.

THE COURT:  All right.  Ladies and gentlemen, before we get started with the first defense argument, I have to give you a cautionary instruction.  Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense experts and they took the stand and discussed that.  He then followed that up with "But you haven't seen one iota of remorse from the witness stand."

You cannot, you will not, ever require a defendant to take the stand.  The defendant doesn't have to testify.  The defendant doesn't have any burden to prove that he should not be put to death.  The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.

As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of the counsel is just that.  It is not evidence.  And you must consider it in that light.  But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse.  Do you understand?

MR. BAUGH:  Can we reserve our motion at this time?

THE COURT:  All right.

MR. COOLEY:  Also on that and another point.

THE COURT:  All right.  Mr. Tipton's counsel?

MR. GEARY:  May it please the Court.  Back in April of 1992, Eric White and I were appointed to represent Richard Tipton.  And the point I didn't want to be at back then and through May, June, July, August, through January, February, was being here right now.  That's the point where a defense lawyer doesn't want to have to be, where his client has been convicted of capital murder, where 12 members of the jury have just heard a moral-authority argument from the prosecutor to put his client to death and he has to stand up here and try to find words to convince you that you shouldn't do that.

I have had the privilege, in over 22 years of doing this, of seeing what I consider to be two classic closing arguments.  One was in this Court

about seven years ago by a prosecutor in a murder case, and the other was about 15 years ago in Richmond Circuit Court by a defense lawyer in the first capital murder case brought in Central Virginia after the statute was changed in Virginia in 1978. I was co-counsel to that lawyer. And he made, he and the lawyer that I talked about before, made arguments that I can close my eyes and still see them. The other lawyer is now a judge in Richmond, and the prosecutor who made that closing argument was Judge Spencer here about six or seven years ago. I don't have that ability. I don't have that magic wand to wave to you to say, "Put him in prison for life." I don't know if I can do that. I don't know if David Baugh can do it, or John McGarvey can do it. The problem with having a case for eight months, ladies and gentlemen, is you get to know your client. I have been to the jail to see Richard Tipton anywhere from 70 to 90 times, and I've gotten to know him.

And this report that Mr. Selvog prepared tells

3909

you the bad background. And believe me, that's not a smokescreen. That's simply to tell you who that boy is over there. Because as he sits there, he is 22 years old. And I can tell you from what Mr. Selvog told me in here, from what Tina Wilkerson said, and Brenda Anderson, that he is about seven or eight years old. He has the maturity of a young, young boy because of what his mother and father did or didn't do to him.

When we started this case I thought if we could get the Marshal sitting here to move over and get Cory to move over a little bit, we should put two chairs next to Richard Tipton and put two people in there -- his father and mother -- and let them hear and find out what he did in the City of Richmond, the drug dealing he did before then, and to say to those two people, When you decide to bring a child into the world you must take care of that child. You must not abandon that child," like the Tipton family did. I mean exactly that: his father, paternal grandmother, Ruby Tipton, his uncles. They abandoned that boy to New York City to a very tiny apartment where a shooting gallery took place. His mother and her series of friends and junkies shot drugs day and night.

3910

When you go through this report, take a look, for instance, at page 21 in the report. I'm going to read some of it to you, where Mr. Selvog interviewed Martrice, his sister, and Tina Wilkerson. And Tina on page 21 talks about when Martrice moved out of the house; she couldn't stand it anymore. She went across the street, and the video showed you where the

grandmother lived as opposed to Charlene Tipton. He quotes Tina saying, "I remember when Martrice moved out of Charlene and "Pimp's" apartment and came to live with us." She was 14 years old, meaning Richard Tipton was ten. She said, "Can I come and sleep on your floor? If not, I'll put myself in a home. I can't stand it there anymore."

She came across the street. There wasn't any room for Richard to come, so he stayed with this woman that uses the term "mother." On page 21, Tina is asked about him, what he was like when he was a young boy. And she said Manny understood from a very early age that all he had was himself to rely on. He would often comment on self-reliance by saying, quote, "I don't ask for anything, I'm not a burden on anyone. I don't ask for any money."

This particularly exacerbated when grandfather died, Tina said. Henry Wilkerson died in 1986, richard Tipton's grandfather. He was a longshoreman, mechanic, forklift operator. Probably the only male influence that Richard Tipton had in his life as a young boy who was in any way positive and of assistance to him. Certainly Richard Tipton, the father, was of absolutely no weight in his life. He was abandoned when he was two years old in Richmond when Charlene Tipton went back to New York. This is all to point out to you in every kind of graphic detail that you could ask for in this report, which is based, as Mr. Selvog said, on numerous consultations, interviews with a lot of people.

Again, I suggest to you we are not here to put up a smokescreen on you, which the government says we are trying to do. We are trying to show you his upbringing, that's all. Because you have to decide between two punishments. It is not that you are going to let him go, but two very severe punishments. Which one should this kid get.

He is a kid. I tell you that. He is a kid. Because he is a child. He may be, in fact he was, as your verdict suggested, in January and February of last year, because he was convicted of six capital murders, he may have been a killing machine, as Mr. Vick said. But that's not the issue here. The issue is not whether he was then. The issue is what sentence you should give him.

The doctors in this case are not here again to offer you any excuses for Richard's behavior, but simply to indicate what his processes were. He is learning disabled, has all these very difficult problems that existed along with the violence and drug abuse that were so integral a part of his life. And the doctors say to you with medication and the

proper structure, this kid can survive.  This 22-year-old kid can survive.  He needs to survive for another reason.  He needs to make redemption, needs to do penance.  "Papoose" had it right, Robert Davis, when he testified.  "What are you here for 'Papoose?'"  "I'm not here for revenge.  God's going to take care of that."  And that's what's going to happen.  And Richard Tipton needs redemption for what he did, his involvement in six murders.

You know what your judgments were on the six murders in regard to the Talley and Church Hill and Stony Run murders.  We don't know what degree of involvement you have found in the last series of murders.  That's something you have decided.  We don't know.  But I suggest to you when you go through these instructions and deliberation process,

3913

Instruction Number 6, you are going to have the aggravating factors that Mr. Vick talked about and then you will come to the mitigating factors which, for Richard Tipton, are about three-and-a-half pages long.  And again, I'd like to go over, talk about some of these, not again as an excuse for his behavior, because I don't excuse his behavior.  Eric White doesn't.

Judge Spencer on Instruction 14 has listed ten of these, Instruction 12 lists about eight or ten others.  I ask that you do what you did in the first portion of the case; that you take your time.  You have over here the exhibits that are going to be given to you in terms of Mr. Selvog's report.  There is also a very thick book which is not replicated, but which has the appendices to all the data that Mr. Selvog selected.  That list of appendix on the back of each one of your social histories is supported by the documentation over there that tells you something about Richard Tipton.

The ultimate decision, ladies and gentlemen, is yours, as Mr. Vick says.  You have to decide if the aggravator has been proven by the government beyond a reasonable doubt; decide whether these many mitigators have been shown by a preponderance of the

3914

evidence.  I suggest when you listen to the witnesses that we had and read the social history, you will find most if not all the mitigators were proven beyond a reasonable doubt.  You must go into the weighing process then.

I suggest if you weigh, you will weigh in favor of life without parole.  If you get past that point, if you have to go to the next stage, the 12 of you collectively do not act anymore.  You become 12 individual jurors.  As the instruction indicates, any one of you can then say for whatever reason that you

care to have -- whether that reason is published to the rest of the jury or not makes no difference -- you simply say, "I do not vote for the death penalty." It can be a reason that you can keep in your head for the rest of your life without telling anyone. You can tell the rest of the members of the jury. You can do whatever you want. Because the death penalty is never required.

In one of the many tributes paid to Arthur Ashe this week, there was an article in the Times Dispatch that dealt with a visit that he paid to a Richmond public school, I don't know, six months or a year ago. And he spoke to a group of students that were about nine or ten years old. And the focus of the article was that Arthur Ashe told them that the best thing he could tell them was to stay off the streets. I thought about this: Suppose Arthur Ashe was in a Harlem elementary school back in 1978 when Richard Tipton was 8 or 9 years old, if he went to that school and said to him and his class, "My best advice to you is to stay off the streets." I would suggest to you as good as that advice was when Mr. Ashe gave it to these schoolchildren in Richmond and as good as that advice would have been back in 1978 to the schoolchildren in New York, for Richard Manny Tipton, it would have been bad advice. Because the streets were a far better place than his home.

You heard the testimony from Tina, who has firsthand knowledge, 32-year-old cherubic woman who came here to testify about the box that her cousin lived in, an oversized closet, of being punched in the face almost daily by his mother, having heroin parties going on endlessly. That's the environment he grew up in. That's not a privileged environment by any stretch of the imagination. That's not a perfect environment. It is horrible. It is living absolute hell. I can't imagine anybody growing up the way he did. I'm not suggesting to you, as Mr. Vick tried to tell you that I would, that that means he is going to kill somebody. Because it doesn't. It indicates to you that he has obstacle after obstacle to overcome. He couldn't do it. He fell in with some other people who accepted him. He finally found a family. Those family that he found were not blood relatives. They were people like Cory Johnson, people that accepted him.

And you heard the evidence in the beginning of the case in the first phase of the case that they referred to each other and cousins and brothers. They weren't legally, but they did, because they became a family. They finally found somebody who could accept them for what they were. That's a

horrible commentary on growing up, that I would have to come to that stage, when Mr. Vick makes these absurd suggestions to you that Richard Tipton walked away from love and caring. He never did. He never had it. He never had the seat next to him where his father should have been, and he obviously didn't have a mother. If he had Brenda Williams, the lady who works for the Henrico County Tax Department, if he had her all his life, I'll guarantee he wouldn't be here. If he had had the father that Arthur Ashe had, he wouldn't be here. I guarantee you. It is a lot like the doctor said in answering Mr. Baugh. "It is a guarantee." If he had had C.T. Woody as a father, Richard Tipton wouldn't be here. C.T. Woody wouldn't let his children do things like that. He would have kicked butt. If he had John Thompson, the coach at Georgetown, he wouldn't be here. But he didn't. That's not to excuse him, but to tell you, "Hey, look, there is something in this little fellow here. There is something in this eight-year-old. There is redemption possible here." It is to tell you that the death penalty in this case is not the answer.

Eric White asked Tina when she was on the witness stand, the last question, he said to her, "Tina, why are you and your brother Henry here?" She said to you 12, you 15, "I'm not here to excuse my cousin. I'm here because I love him."

Where was his mother? What was her comment to Eric about Charlene Tipton? Charlene said to Tina Monday before Tina got on the train to come down here, Charlene said, "Tina, make me look good when you testify." Do you have to know anything more about the environment he had? When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she wasn't here?

And Brenda Wilkerson, who has a very responsible position, who knows him for a six-month period as a son, she called him. He went to Highland Springs High School during that period of time, got a job. He didn't walk away from her. He felt the way she said, that things were getting to be a burden on her because she was having a bad financial problem. 16 years old, after his grandfather had died, after the Tiptons had virtually thrown him out again: "You are not staying with Vincent or your father." He did. Eric said to her, "Why did you come to this Court?" She said, "I'm a mother. I could not live with myself if I did not testify for Richard Tipton." Thank you.

THE COURT: All right. Just one brief thing before we get to the next argument. Mr. Geary

misspoke.  He was talking about considering the aggravating factors and then the mitigating factors, and he said before you have resolved what the mitigating factors are, found them beyond a reasonable doubt.  That is not the standard.  The standard that would relate to the mitigators is by a preponderance of the evidence.  I will explain this to you more in detail.  Go ahead.

MR. McGARVEY:  May it please the Court:  It has been an emotional five weeks.  And I'm going to

3919

start with asking you folks to do something.  The law says that each one of our defendants are entitled to individualized consideration.  So I'm going to ask you good folks to draw a curtain here and a curtain here.  And I'm going to ask you folks to focus on this man, my client, Cory Johnson.  I am going to ask you to tune out everything else, and I'm going to ask you to consider my client, Cory Johnson.  Mr. Geary quite artfully put it:  That when you represent someone who has been charged, and at this point convicted, of the types of crimes that he has been convicted of, we as defense counsel live with that person continuously.  We have lived with Cory, Mr. Cooley and myself, it seems like forever.  And we know what he did, but we have gotten to know him as a person.  And that person, that man, in quotes, is a man with the mind of a gradeschool child.  And you have heard that from the stand.  And that's who Cory Johnson is.

I came up here with a semi-set pat thing to say to you folks, and I found that I can't do it.  I'm going to do it the best that I can.

At the outset, I feel constrained to reply to the prosecutor in terms of what he said about the aggravation here or the aggravating factors.

3920

He talked about Cory Johnson trying to have Valerie Butler and C.T. Woody killed from the jail.  Do you folks remember Rodney Tucker?  When I stood up here in opening, I told you we are not trying to make excuses.  Cory is guilty of the crimes for which you have convicted him.  But to bring in a professional snitch in the aggravation stage to come in here and try to enhance the prosecution's case is beneath the prosecution.  Rodney Tucker was with Cory Johnson for a grand total of 14 days in the isolation section of the Richmond City Jail, the isolation section, with one cellblock in between them.  And supposedly, Cory Johnson is hollering across one cellblock to another individual one cellblock down, with guards and everybody else.  And the man, the man is a professional snitch.  There is no other way to put it.  He came in here, testified earlier in another

trial, got dispensation from the government, and came in here on the coattails and tried to enhance the government's story. And by God, the government used him. It is bad enough. They didn't have to try to enhance it.

I told you, we are not trying to make Cory Johnson not responsible. We are not trying to make excuses for Cory Johnson. He talked about Dewey Cornell, Dr. Cornell, being disingenuous. Dr. Cornell, by his own testimony, has testified more for the prosecution than he has for the defense. He knew what the standard for mental retardation was. 75. And that if Cory Johnson had an IQ of 75, then by law he could not be executed. If he was coming in here to be disingenuous to you folks, do you think he couldn't hedge on two points? But the prosecution has the gall to come in here and tell you folks that. That mitigation isn't disingenuous.

If you look at Dr. Lordi's testimony, he indicated that IQ's with age, especially with someone who has a severe learning disability, diminish. They diminish simply because that person has not been able to learn. And so logically, of course, their IQ's diminish. You couple that with severe brain dysfunction, you don't have to be a doctor, you don't have to be a rocket scientist to figure out that someone with a severe learning disability, who can't learn, and we are all dependent on what we can retain, obviously is going to have a diminishing IQ. And I would suggest that it is beneath the prosecution to come in here and blow smoke at you folks like that. As I said, it is bad enough, it is bad enough. They don't need to try to enhance it.

Once again, Cory's fate is in the hands of strangers. And I trust and I believe and I hope that they are compassionate strangers. There is nothing new to Cory about that. His fate has always been in the hands of strangers.

In January, early January of this year, in these batteries of tests that Cory was given by Dr. Cornell and Dr. Peck -- this is in your packet, folks -- he was asked to write a story. And when he wrote the story, he started it like this: "This is January of this year. Me and my mom went to the moon." This is the same mother who doesn't have the decency to even show up at this trial when her son's life hangs in the balance. Cory Johnson is alone. He is alone as he has been all his life. Not one family member comes here. Not one person, not even the mother who he spoke of as a goddess can come here when his life hangs in the balance. And they want to make light of that?

Cory Johnson in January of this year is still waiting for his mom to take him to the Pizza Hut.

(Counsel turns to face defendant Johnson.)

Cory, she is never going to show up. She is never going to show up.

Folks, you have heard a lot about mitigators and

3923

aggravators. You will be submitted a list of mitigators. The mitigation, as I indicated, was presented to you in the second phase of this trial. The burden is on the defense to prove those mitigators by a preponderance of the evidence, 51 as opposed to 50 percent of the evidence. I would respectfully suggest to you folks that that has happened here. The government hasn't produced an iota of evidence rebutting any of the mitigation. And as I indicated to you at the very beginning of this, the death penalty is a narrowing process by law, according to the Supreme Court of this nation. It is to narrow the class of people who can be executed. And I submitted to you folks earlier, and I submit to you again, that the death penalty is reserved for those who are totally blameworthy, who are fully responsible for those actions, for their actions. Fully.

I didn't stand before you folks and tell you that Mr. Johnson wasn't blameworthy. I didn't stand before you folks and tell you that he didn't know the difference between right or wrong. I didn't stand before you folks and tell you that he wasn't responsible. But I did stand and tell you that Cory Johnson, with that mind of a child, is not fully

3924

responsible. He is not totally blameworthy. There is mitigation before you folks that alleviates some of that responsibility. And those are factors that Cory Johnson had no control over. Cory Johnson was born into a family. That family consisted of no father, a mother, a narcissistic, selfish mother, drug-addicted mother, a mother who actually gave up her own kids when Cory was 13 years old and when his brother, who had attempted to commit suicide at the ripe old age of ten, when he was 11 years old, gave them up, put them in foster homes. She is a mother who expected of Cory to go to college. Cory, to go to college. Cory, who can't read beyond a second-grade level. Cory, who tried and tried and tried to learn to please his mother. But he couldn't do it. And that wasn't his fault. To be rejected by the only person who was family, the only semblance of family that he ever had, to be given up for adoption, what does that do to a normal, quote/unquote, person? And ask yourselves, what does that do to a person with a severe, severe learning disability,

with severe brain damage, neurological impairment, with severe impairment in the way that he reasons, with severe problems in the area of problem-solving, logical thinking, severe problems in terms of

3925

understanding the consequences of what he does?  And you have heard that testimony from our disingenuous expert who testifies more for the prosecution than the defense.

What does it do to a person?  Well, I'll tell you what it did to Cory Johnson.  Cory Johnson didn't have a family.  The only family he had was his mother.  And just as Dr. Lordi said, people with disabilities don't shop in the mezzanine.  They shop in the basement.  They shop in the basement.  Cory Johnson found a family.  He found something he could do.  He could deal drugs.  He found a family.  Let me introduce you to them.  This is his cousin over here; this is James Roane.  This is his brother; this is Richard Tipton.  And Cory, with those impairments, would do anything, anything, including murder, to protect his family from a threat that he perceived, or that he was led to believe was real.

Odette Noble told you that Cory was not a leader.  Why?  Because he wasn't smart enough.  But he would have been the point man.  And within the family, he was the point man.

Don't go any further than that, folks.  That's what happened here.  That is exactly what happened here.  And is he responsible for those murders?  No

3926

two ways about it.  Absolutely he is responsible for those murders.  Did he know the difference between right and wrong?  We didn't try to come up here and throw any wool over your eyes.  Yes, he is responsible.  He knew the difference between right and wrong.  But is he totally and completely blameworthy?  Were there factors in his life that he had no control over that contributed to the actions, the ill-fated actions for all involved that he took?

I don't quite understand the dynamic here.  But I do know that if you look back on Cory's history, you see a kid who tried, despite all of those limitations.  You see a kid who wanted to please.  You see a kid who was a good-hearted kid by all accounts.  And then suddenly he finds a family and he changes.

Folks, with what we presented to you, that much compassion, that much mercy; because the difference we are talking about here is whether or not you are going to kill Cory or whether or not he is going to die in the penitentiary.  That much compassion.  Was he completely and totally blameworthy?  Or were there factors in his life over which he had no control that

contributed to this?  And I think when you look at that packet and you think about the evidence that was

3927

presented to you, the conclusion is inescapable. Certainly there were.  It doesn't excuse it.  It doesn't lessen the pain of the families who have lost people here.  It doesn't lessen anything.  But I would submit to you that if you follow the logic of the prosecution, and you don't show that much compassion and that much mercy (Counsel indicating with fingers.) then what separates the neurologically-impaired, learning-disabled Cory Johnson from us?

As I told you, once again, and maybe for the last time, Cory Johnson finds his life, his fate, his existence, in the hands of strangers.  Once again, he is alone.  I believe you are compassionate strangers and I believe that you will show that much compassion.  Don't kill Cory Johnson.  Don't kill him.  Thank you.

THE COURT:  Mr. Baugh?

MR. BAUGH:  May it please the Court, counsel:  The United States, the government, the crown, whatever you want to call them, they would have you determine the death penalty based solely upon one issue; and that is, were the acts committed by these people bad?  And they are.  And it is not disingenuous when we tell you we do not make any

3928

excuse for them.  They are bad.  The acts are bad.  A lawyer that I respect once told me the difference -- and I was a prosecutor; I prosecuted for five years, in this courtroom, in fact -- the difference between prosecutors and defense attorneys is that prosecutors prosecute acts.  They want you to look at what happened.  Defense attorneys defend people.  And therein lies the difference.

In this part of the trial, that's what you are supposed to be about.  I'm reading from what I anticipate the Judge will give you in Instruction 11.  A mitigating factor, instead, versus an aggravating factor, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crime for which he has been convicted that would suggest a sentence of death is not appropriate.

We are here in this stage of the trial, according to the jury instructions, according to what Congress gave you, to determine whether or not there is something about their lives and their individuality that should justify not killing them. We are not here to look at the acts again.  We are here to look at the people.  We are charged with

3929

putting on evidence about their character.  And the United States, if they wished, they can put on evidence about their character.  And they chose not to.  Instead, they go back to the act, the acts.  Murder is horrible.  But under the law, and you have sworn an oath to follow the law.  All murderers cannot be sentenced to death.

Secondly, the United States, the prosecution, comes in here and they say they have left these bodies out in the street.  I'm going to tell you, we gave you these books yesterday.  And at the very least -- and first, you don't owe James Roane anything.  You have sworn an oath.  But you notice that Jeff, the court reporter, he doesn't go back there with you.  When you go in that room, you all can go back there and flip coins and no one will ever know.  So if you don't want to do anything, if you want to violate your oath, you can.  But for God's sake, don't sentence someone to death until you read about his life, understand him.  That's what this is about, understanding James Roane.

The United States gets up and says he never tried to get help for himself.  He was in Adventure Bound and he left.  I'll tab it for you.  First page behind Tab 1.  Up until approximately one-and-a-half

3930

years ago James Henry Roane was being regularly seen in the Lor-Berg Clinic.  The state, which was paying for these visits, terminated payment and James Roane's participation with Dr. Lordi ceased.  Did he walk away?  No.  His family didn't have the money, so they dropped him.

You read through, I think it is, page 74 of the chronology.  The United States, Mr. Vick, just got up here and told you that he walked away from Adventure Bound.  You read pages 74, 75, and 76.  No, he went and made application at the Job Corps because he wanted to be a heavy equipment operator.  And they told him, the people at Adventure Bound, said, "You go down there and make an application."  They helped him.  But he was told he couldn't get an interview for two months.  And they sent him home.  He tried.

In these records, and you heard Mr. Brunson, he asked to be kept on probation.  A youngster says, "Keep me under the restraint of the law because I need the supervision."  There is one statement here from his Probation Officer.  "It appears that James prefers jail to his home."  Is that lazy?  Now see, laziness is a nice thing because like I say, I used to prosecute.  That's a good thing.  You see, there was a time when we were less civilized, when we

3931

thought that all evil behavior was attributable to

the devil, you see.  Like for instance, epileptics. There was a time when the treatment for epileptics was to tie them to a post and we beat them with sticks to beat the devil out of them.  Because they are not really sick, they are just possessed.  They are just wrong.  And if we hurt them enough, they can develop the strength to resist the temptation to commit crimes.  Oh, drug addicts don't have an illness.  No, no, no.  They are just weenies.  They are not strong like me.  If they could stand up and just say no, their drug addiction go away.  These people aren't the products of a horrible society. No.  They are just morally lazy.  So therefore, let's just fry 'em.  And that will teach them a lesson.

We have gone beyond that.  Just like Dr. Semone yesterday said, 20 years ago we didn't know the stuff we know now.  And believe me, as an aside, nobody in this courtroom knows ADD better than I do.  Nobody knows better the difference between him and others.

The question for you now is, are the acts committed by James Roane the acts of a free and unimpaired mind, under the control of volition?  Or is it an attribute of something over which he had no control?  That's the question.  And I've got a question for you that he can't answer.  If it is a product of his free and unencumbered will, then how in the name of all that's good and holy could Lordi predict it 20 years ago.  Lordi says, "Unless he is treated he will have emotional and behavioral problems."  In there, it says, "Time is passing.  He is going to be dangerous to himself and to others." It couldn't be a product of his brain.  It couldn't be a free and unencumbered act.  It has to arise out of the condition.  Because the people that recognized the condition predicted it.

I will tell you something else.  You have heard about the records of these young men.  And you have heard that they were violent.  But you know what's fascinating -- oh, and my client has assaultive behavior.  Yes, fights with girlfriends and all kinds of stuff.  The real violence doesn't begin in their lives until one or two of them get together. Individually, it wasn't there.  Isn't that fascinating?

Now, does that mean that these doctors are right when they say that people with this problem gravitate to one another?  Yes, it does.  Now, one thing good about this trial is like most.  I went to law school in Texas.  We are real butch, you know.  My whole attitude toward the science of psychology and psychiatry has changed.

This was predicted.  Unless Dr. Lordi has a

crystal ball hidden in that locker of his, there is a science and there is predictability to this, and that's what caused this thing. It is not because James Roane is not as strong as I am, or Mr. Vick. No. He is not weaker than we are. He was born with a birth defect. And you don't kill people because of birth defects. They say, "No, we are not going to kill him because of the birth defect. We are going to kill him because of the acts." But the acts arose from the defect, because Dr. Lordi predicted it would. Was he weak in receiving treatment? No, he was broke.

"Wait a minute, everyone who has an ADD problem doesn't go out and kill." You heard that. And everyone from James Roane's environment doesn't go out and kill. You heard that. But then you heard me ask Dr. Semone, "A person with James Roane's mental impairment, his brain damage, and that environment, what is the likelihood he would end up this in courtroom today?" He said you could make book on it. You heard that. And he didn't try to question it. It was going to happen.

Now, one of the reasons I get emotional about this is that it was partially my fault. Because I don't get upset when everybody doesn't get the education my kids get. Yes, maybe I feel a little guilty. Maybe I should have been his Big Brother.

The United States next argues that my client, our client, James Roane, is a killing machine. I believe the term was "reptillian." I love that. A reptillian killing machine, incapable of formulating or making the moral judgments to constrain himself. And then he turns around and says, "Not only is he like that, but we want you to make him your teacher. We want you to suppress and repress your civilization and act like him to punish him."

Faith is hard. It is real hard being civilized. Because when you are civilized, sometimes you have to stand up to things you don't like and remind yourself by doing what I know is right, I will eventually win. By doing what is right I will make a difference, even though the person I'm dealing with doesn't appreciate it. I am a child of the 60's. SCLC, NAACP, Legal Defense Fund, all that good stuff. It was hard getting whipped during the national sit-ins, but we were told if we had faith and if we do this, it will get better, even though these people don't deserve what we are doing.

MR. VICK: This is objectionable.

THE COURT: Sustained. Quit personalizing the argument, please.

MR. BAUGH: It is going to be very hard for

you all not to kill.  It is going to be hard. Because you are going to have to, as the law says, just think about the people.  In fact, if you sit back and say nothing in that room, if you have a feeling and you don't say it, you will probably hasten his execution.  The law says you should consider the aggravators and, if proven beyond a reasonable doubt, that weighs down on one side, the aggravators.  They already proved the aggravators. We proved them guilty.

Then you have to look at the mitigators by a preponderance, a very low standard.  51 percent? They offered no evidence in mitigation, so we must have won those.  But then the law goes on to say that once you find the existence of these, regardless of how they come out, if you have something new, even if you can't articulate it, that says, "I don't think they should die, or I don't think Mr. Roane should die," you should vote not to, even if you can't even recognize what it is yourself that you are feeling,

3936

even if you can't articulate it to fellow jurors. And what could that feeling be?  Conscience?  I would submit it is not weakness.  And the law says in the instructions -- let's take a moment and find that. Excuse me.  It has been a long trial and I'm getting disorganized.  I can't begin to tell you how rough this is.

(Counsel perusing instructions.)

I believe the Judge will instruct you that if even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed, the jury may not sentence that defendant to death.  If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required, and it is underlined, to impose a death sentence.  For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant.

3937

In such a case, the jury must, must, render a decision against the death penalty.  Moreover, even where a sentence of death is fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy, to the high road, even for those who don't deserve it. That is going to be very hard.

It is remarkable when I sit here and realize I am asking on behalf of Mr. Roane and my co-counsel that you take a 26-year-old man and not give him death, but sentence him to life in prison without parole. These youngsters don't even understand what they are going to miss if they win that. Yesterday, Mr. Roane's seven-year-old daughter stood up. He isn't going to be there for any of the decisions. He is not going to be there when she comes home and says she met somebody. He isn't going to be there for prom night. He is not going to see that dress. He has given all that up.

You know, sometimes in the morning when you wake up, no matter how long you have been there, you are in a fog. "God, where am I?" He is going to wake up the same day at the same place. He is going to know it is never, ever, ever going to change. It is never going to get better. He will die in that room. His life is wiped out. And I don't want to say it is not his fault. God, no, I don't want to say that. Maybe it is Lordi's fault because Lordi wrote this down.

The United States also makes it sound as though my client -- and I want you to read this book. Please. If you are going to sentence somebody to death, if you are thinking about killing somebody, the least you can do is find out about them. They give the impression that my client came into this idyllic neighborhood and brought with him death and destruction and terrorized the neighborhood. My client was born of the death and destruction.

There are 30 death certificates, or about 30, in the back of this book: personal friends and acquaintances of my client, as testified to by Ms. Noakes. Look at how they died. In fact, these guys would have probably been killed in another year anyway.

To violently take their lives, to strap them into a chair and run electricity through them, is not going to bring these other people back.

I wish that I could show you, and I can't, to disassociate from the facts and talk about the things that our client wants. You have heard these other attorneys talk about meeting their clients and talking with them, seeing them as human beings. It is always easier to do things to people that we don't relate to, that are different from us. And one of the purposes of prosecution is to make these people as different from you as possible. They want you to view them as something else, because it is easier to give punishment.

We have to sit there. We get one shot, because it is the government's burden, and then we have to

sit down.  We don't get to get up here again and we don't get to rebut anything he comes up with this time.  But I do want to remind you of one or two points, and perhaps I'm reemphasizing them.  These reports are excerpts from reports that are in that book.  Read them.  Look at what was said.

I am convinced that we have proven to you that the acts that Mr. Roane committed were for foreseeable and predictable because they are a consequence of his birth defect.  The birth defect is not his fault.  In fact, the assignment of blame is for children.

I love the way the government always wants to figure out who is to blame.  But really, it doesn't matter who is to blame.  The bottom line is, did he suffer from it?  I don't care who caused it.  I know

3940

his mother tried hard with what she had.  I know Dr. Lordi is not supposed to provide services for free.  I don't know this young man's entitled to treatment.  But the bottom line is, everything that he is here for was caused by his life experience coupled with his brain defect.  We know of the seven siblings born in that house.  Five have had drug problems.  Is it coincidence, like the family got together and said, "My, why don't we all do drugs?"  Or is it perhaps something about that environment that encourages that?  We know that these three young men got together.  Was it coincidence?  Was it like the stars got crossed one day?  Or is it as these doctors say, that they gravitated?  It is a science.  It was predictable.

I know that Mr. Vick is going to get up here and argue that everybody who is ADD, everybody who has brain damage, doesn't murder.  And he is right.  And everyone who comes from this environment doesn't murder.  That is right.  Absolutely.  But Dr. Lordi said 50 percent of the people in the prison suffer from this disorder.  And even though it is redundant, and if I have to be redundant in order to save my client's life, I will:  There is only one person, or three people in this courtroom who have been found to

3941

have that environment and that birth defect.  And we know what Dr. Semone said.  You can make book on the fact they will end up in trouble with the law.  You can take it to the bank.

It has been very hard during this argument not to be emotional.  But according to these instructions, emotions are not weak.  Emotions are to be applied.  That's what the instructions say.  I hope that when you as jurors go back, emotions aren't comfortable.  I know when people get emotional, other people get uncomfortable.  I hope that when you go

back there, you feel the emotion that the law has asked you to feel; that you apply those human  -- don't be like what Mr. Vick says my client is like. No.  Be like someone who should teach them.  Don't use those values that my client has.

You have been very attentive, and I know you have worked hard.  And believe me, these people have worked hard, too.  It would be very simple for you to go back there and come back with an extremely efficient and extremely quick verdict, to go back there and not read these exhibits, not look at them. But I should remind you, we are not here for efficiency.  Democracy is inefficient.  The presumption of innocence is inefficient.  Everything that is beautiful is inefficient.  As my mother told me, Michaelangelo could have done the Sistine Chapel in three days with a roller, but it wouldn't be the same.  That's what you have to do here.  Look at these people.  Not about the acts.  Look at the people.  Ask yourself "Has the government rebutted what has been proven about the people?"  And I would submit to you that if you do  --

MR. VICK:  Your Honor, we don't need to rebut anything.

THE COURT:  Sustained.

MR. BAUGH:  Look at what evidence has been offered concerning their lives.  And we would submit that at the conclusion, you will find that life in prison without ever hope of release is significant enough punishment for James Henry Roane, Jr.  Thank you.

THE COURT:  All right.  Brief rebuttal?

MR. PARCELL:  Ladies and gentlemen, you have heard our colleagues once again telling you what they think their evidence was.  And we got through the first phase of this trial and in the rebuttal, I told you then my colleagues had done a good job of trying the government, police, and their witnesses. At the conclusion of phase two in rebuttal, I find myself once again realizing that they have once again tried in their phase two evidence the parents, society, the legal system, and the doctors and social workers who missed certain points in these young men's lives.  But that's not a defense.

They talk about their records, the things that led them to be where they are today.  Let's talk about that for a moment.  Because you know from what you have heard as far as Mr. Tipton that he and his friend, Cory Johnson, to his left, stabbed with razor blades a young man in New Jersey in 1989, 169 stitches' worth.  That is a choice and a decision they made.  They chased him down, as my colleague

said, like an animal in the street and with razor blades cut him in 1989.

Of course you are aware that Mr. Tipton had two other drug arrests in New Jersey in 1989 and 1990. They talk about their inability to think, their mental deficiencies. But what did Mr. Tipton tell them his name was? He told Officer McMillian it was Robert Baker. A lie. A deception. Why did he do that? To avoid getting caught again.

Then you had the second police officer, Keim, who arrested him. And what was his name that time? Manny Wilkerson. Another lie. Another deception.

And they tried to get us to believe they don't have the abilities or facilities to make those decisions and plan ahead. Their actions have spoken louder than any words any doctor, any social worker, has told you.

Cory Johnson, you know he was convicted of a robbery and possession of a controlled substance before 1991 when he came to Richmond. And go back to his arrest in New York City at the transit station in February 29th, 1992 carrying a concealed weapon. What name did he give that police officer? Kevin West. A lie. A deception. Why did he do that? As he told Valerie Butler, "I wanted to get bonded before they realize that gun has heads on it," and that gun did have heads on it. It had four: two alive and two dead.

James Henry Roane, Jr. Mr. Baugh talks about the fact of the seven-year-old daughter not being able to see him when she meets someone in life. He talks about his record of assaults. Strangely enough, six of those assaults and trespasses are against the mother of his children. Six of them. He had an unlawful wounding, too.

These crimes were between 1989 and 1990. There are certified copies that the government introduced Monday. He wants you to believe he is this great family man. And the government asked the social worker yesterday who gave you the family tree, "Did you interview Iris Smith, the mother of his children?" No. "Did you interview Robin Cooper, the mother of his children?" No. And he has committed at least six acts of violence against those two women.

Then we graduate to where we are now and we have gone through things this week about choices and decisions. They are important. The decision-making process you folks are going to engage in is very important, too. Let's think about choices and decisions for a few moments. We have been together in this trial for five weeks, the same length of time

within a week that these three people killed ten  --
        MR. WHITE:  Objection as to "these" and the
amount of murders.
        THE COURT:  Sustained.
        MR. PARCELL:  Well, we will go over it.
Mr. Tipton started on January 5th, 1992, with the
assistance of James Henry Roane, Jr.  This gentleman
made a decision in the life of Douglas Talley, who
had a family, too, who missed him at Christmas just
like their families will.  They made a decision.

3946

They made 84 of those decisions, 84 stab wounds in a
human being.  That's a choice those two people made.
Then we go to "Little Doug" Moody, shot twice, and 18
more decisions by James Henry Roane, Jr., stab
wounds.  Then we go next to Peyton Maurice Johnson.
As Mr. Vick told you, he was stalked by Mr. Roane.
Cory Johnson and "E.B." came in and made 15 decisions
for him with their 9mm handguns.  That was their
choice, their premeditation.  And every expert told
you all three of these men, all three of these
killers, have the ability to make premeditated
decisions; they know right from wrong.  And these are
the choices, these are the decisions they made.

    Then we go to Louis Johnson.  They made seven
decisions in his life.
        MR. WHITE:  Objection to "they."
        THE COURT:  Sustained.
        MR. PARCELL:  That's Henry Roane and Cory
Johnson and Lance Thomas.  Those are decisions those
three people made that took another life.
    And Torrick Brown.  Mr. Roane, Mr. Johnson, and
Mr. Thomas made 16 decisions for him as they shot him
in front of his sister and her three children.  They
made six decisions for Martha McCoy.
        MR. GEARY:  I object to "they."  We are

3947

right back in the beginning of the trial.
        THE COURT:  Sustained.  Be specific.
        MR. PARCELL:  Thank you, Judge.  Roane,
Johnson, and Thomas made six decisions for her.  Then
we go to Dorothy Armstrong.  Cory Johnson made nine
decisions for her, after having left South Richmond
and killing someone else and shooting him sixteen
times, 16 decisions for another victim.  He made
three decisions for Bobby Long, that being Mr.
Johnson.  He made two for Anthony Carter.
    Then we go to Linwood Chiles, Curt Thorne,
"Pepsi" Greene, and Gwen Greene.  Mr. Johnson and Mr.
Tipton got their new Glocks on February 4th, 1992.
        MR. GEARY:  No evidence of that, Judge.
        THE COURT:  Objection overruled.
        MR. PARCELL:  And what did they do?  We
keep hearing this thing about decisions and ability

to think. Before we discuss this last one, let's think a minute. They had Pam Williams purchase their first three handguns, that being Roane, Johnson, Tipton, and Lance Thomas, purchased their first three handguns that the police seized on February 1st, 1992. What did they tell her? They gave her the money. And what did they tell her when they got back from getting the guns? They gave her an extra $30.

3948

Mr. Roane and Mr. Johnson said, "Fake a breaking and entering, here is $30 to pay for your window, and tell the police somebody stole the guns so they can't be traced back to you or back to us." Does that sound like the mental processes that these charts lead you to believe? No. They knew how to do these crimes.

MR. McGARVEY: I object to "they" again.

MR. PARCELL: Roane, Johnson, and Tipton, all three collectively, continued discussing, planning, making decisions. Then after Roane was arrested on February 2nd, 1992, Mr. Johnson and Mr. Tipton were still on the loose, for lack of better terms. Then Tipton and Roane make arrangements through Charlotte Denise Moore to purchase two more Glocks.

MR. BAUGH: I have to object. That's not true. Mr. Roane was in jail at that time.

THE COURT: Sustained.

MR. PARCELL: I misspoke. It was Mr. Johnson and Tipton.

MR. McGARVEY: That's not the evidence, either.

THE COURT: Mr. Baugh's objection will be sustained.

3949

MR. PARCELL: After the weapons were purchased, "Whitey" gave Charlotte Denise Moore $100 for purchasing two more guns for he and Cory Johnson. And then we go to February 19th, 1992. These people can't make decisions? You heard the evidence of the phone call at 8:30 p.m. "Whitey" gets back in the car and says "'C.O.' has got them."

MR. BAUGH: Excuse me, wait, "they" again. My client was in jail for all of this.

THE COURT: Overruled. That was clear.

MR. PARCELL: And what happens at 10:17? An independent witness goes down a highway and sees someone he describes dressed as Gwen told you he was --

MR. GEARY: That is absolutely not the evidence. That's a total misstatement of the evidence.

THE COURT: Objection sustained.

MR. PARCELL: He testified that the person

he saw was tall, thin, had on jeans and a brown coat, the same thing Gwendolyn Greene told you he had on, richard Tipton. He saw someone flying in front of the automobile. And what was that? A human body. That night, Tipton and Johnson made two decisions for Linwood Chiles, two for Curt Thorne, one for "Pepsi" Greene and one for Gwen Greene. We know the results of that decision.

The doctors and social workers have basically told you they have learning problems, low to moderate IQ's, bad upbringing, 10 to 20 percent of society has the same learning disability these folks have.

MR. McGARVEY: Once again, he is collectivizing, and that is not the evidence with respect to Mr. Johnson at all.

THE COURT: The objection will be sustained. Mr. Parcell, if you are going to refer to somebody, do it individually, please.

MR. PARCELL: But they told you Roane, Tipton, and Johnson all had opportunities as they grew up for structured environments. Mr. Tipton left his. Mr. Johnson left his. Mr. Roane left his.

Roane, Tipton, and Johnson, all three then, all three now, know the difference between right and wrong.

Tipton, Johnson, and Roane, all three are responsible for their activities or their actions. And once again, Tipton, Johnson, and Roane all had the ability then and now to premeditate their crimes. I'm sure they have taken cheap shots at the government. Two weeks ago Rodney Tucker was called as a witness for Sandra Reavis, the defense. You heard no one call him a snitch then, did you?

MR. McGARVEY: That is a mischaracterization. Ms. Reavis' counsel called her, not the rest of us.

THE COURT: The objection is sustained.

MR. PARCELL: And today, he is the snitch of the world. Take that for what it is worth.

As I said before, you do not have an easy responsibility. But contrary to what Mr. Baugh told you, you are not killing these people. You are making a decision based on the law and the evidence. And you have a choice: the death penalty or life in prison. Once again, the government would urge you to come back with a death penalty verdict, and don't let them insinuate you are making some --

MR. BAUGH: Objection to "them."

MR. PARCELL: Don't let Mr. Baugh make you believe you are making some immoral or uncivilized decision. Because that's an oath, an obligation you made to all of us five weeks ago.

I will leave you with this thought.  And as you go through your deliberations, remember:  No longer should the innocent suffer a punishment greater than the person who caused that injury.  Thank you.

3952

THE COURT:  All right.  I think we will stop now for lunch.  The next thing is instructions, and that's going to take awhile.  We have heard a lot of talking this morning, and I'll give you a break before we hear some more.  I need to say this before you go, though.  I will emphasize it in my instructions, but I need to say it over and over again, and I'm sure you know it by now.  This is argument that you have heard.  The lawyers are putting the facts before you as they recall them and in the light that reflects best on their case.  Your recollection controls in regard to the evidence, and you are to take argument in that way.

I believe your food will probably be arriving around 12:30.

THE CLERK:  Yes.

THE COURT:  So we will say 1 o'clock, and we will get back in and finish up.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right.  I'll hear your motions.

MR. BAUGH:  First, on behalf of the defendant, James Roane, we have a motion for mistrial because of the United States' comment upon a defendant's failure to testify.  As the Court

3953

adequately indicated, it was a stupid statement to make.  I'm not asking the Court to declare  --  I'm asking the Court to declare the mistrial, but the act was not committed by the Court.  The United States, after a five-week trial, makes a comment on the most basic constitutional right there is to the point where the Court has to give an instruction.  And the Court is well aware that when you have to do that, not only are you clearing it up, but at the same time mentioning it again.  It has to be done that way.  And this is a capital case.

For that reason we move for mistrial.  Additionally, we move for mistrial again on the issue of severance.  Mr. Parcell just got up and said that because these attorneys did not object to Mr. Wagner's witness, who was gone, because we didn't call him names and attack him on cross-examination, that in some kind of way we were accepting or condoning his credibility.  He did not offer testimony against our clients.  If it had been an individual trial, it would not have been an issue.  And all of us had to suffer as a consequence of that.

For those reasons, Your Honor, we have urged

severance all along.  We knew this was going to be a problem, and it was.  Lastly on severance, the word they was said so often, and we have had to object to it often, and we have emphasized it inadvertently or we have to emphasize it every time we object.  As the Court pointed out during opening, "Counsel, your butt wasn't nailed to the seat."  That's what you told us.  We have to object to preserve it.  We had to.  Your Honor, we would move for a mistrial and reurge our severance.

THE COURT:  All right.  Mr. Geary?

MR. GEARY:  On the point that Mr. Vick involved Mr. Tipton, it is quite unbelievable to me that a prosecutor with his experience didn't do that intentionally.  He brought up two factors which the jury was not to consider.  One, that Tipton didn't testify.  Two, he brought up an aggravating factor that the government, for whatever reason -- probably neglect, since they didn't pay that much attention to the case -- failed to put that in as an aggravator, that a defendant failed to show remorse.  Rather than give that up or ask you for cause to amend that, they do it knowingly and intentionally to let the jury know that Tipton didn't testify and that there has been no remorse by the defendant.  Clearly, that was done because they wanted the jury to know that.  This is in the fifth week of trial, in the closing arguments on a death case.  I think the Court knows the way the appeal courts and the United States Supreme Court go over these death penalty cases from the states.  To have a prosecutor who has done as many conspiracy cases as he has done, and who knowingly violates the Code of Ethics like that, is reprehensible.

MR. COOLEY:  I would join in the comments and arguments made by both co-counsel.  And I would add to that that in the course of the opening summation by Mr. Vick, he commented throughout that "they" have killed ten people.  And "These people have to die."  Or "These people deserve to die."  That flies in the face of the mandate of this statute: that we have individual consideration.

It was continued in the final summation to the point that every other sentence had to be objected to.  And the sustaining of those objections does not cure it in the eyes or in the minds of the jury.  Just as Mr. Baugh said, in the opening statement, when a prosecutor stands and comments upon the failure of a defendant to testify and breaches the very gravamen of the Fifth Amendment right of each of these young men to that right, to remain where they are seated and not take the stand, and the Court's

3956

only ability to cure that is to give a cautionary instruction which exacerbates the condition which the prosecutor has thrust upon the jury, is simply fundamentally unfair.

Respectfully, Your Honor, for all of those reasons, those mentioned by co-counsel and my comments, on behalf of defendant Johnson we respectfully move for a mistrial.

MR. BAUGH: We adopt the eloquent arguments of both counsel.

MR. VICK: Your Honor, I did not say -- I made it very clear in my closing. I said that the doctors had come and talked to each one of these defendants. That's the clear evidence in front of the jury. These defendants, each one of them, spoke through those doctors on repeated occasions about their background, about what they were involved in. As to Mr. Johnson, his expert said that he talked to him extensively about his criminal involvement. I predicated what I said very clearly upon they spoke to the doctors about their involvement. And not once was a bit of remorse indicated through the doctors. I didn't comment on their inability to take the stand. In the case of UNITED STATES v. CHISEM, C-H-I-S-E-M, Fifth Circuit, 1982, the Fifth Circuit

3957

addressed an issue similar to this where an attorney had made arguments and the prosecutor said, "You know, you have to believe the defendant's story as told by the attorney," which is exactly what I have done, and that was held to be proper comment upon the evidence in front of the Court, and that's what I was commenting on.

As to the "they," Your Honor, this is repeated, but they have been found guilty of Count One, conspiring together to kill all these people.

THE COURT: All right. Let me make it crystal clear, Mr. Vick, that I do not buy your argument at all. It was astonishing to me that you would even come close to making this kind of fundamental error. I have every faith that this jury -- I've been watching them closely, they are a profoundly proficient group -- that they will listen to the instructions and follow them just as they did at the first phase of the case. Therefore, I believe that any error can be relieved by the cautionary instructions.

The motion for mistrial based on the comment of the prosecutor and the motion for severance will be denied. We will be back at 1 o'clock.

MR. BAUGH: We also preserved our right to

3958

raise the motion concerning the deterrent. Do you

want it now?

THE COURT: Might as well deal with that now.

MR. BAUGH: Your Honor, we preserved our right. We would also urge the motion for mistrial. The United States twice during their opening on the punishment phase -- well, when they opened they tried to bring up deterrent effect at that time. We objected and it was sustained. Again, we come in here today and the United States again raises deterrent effect in the presence of the jury, which, as the Court is well aware, is not an applicable standard for justifying the death penalty under available case law. It is calculated solely to prejudice the minds of the jurors at a critical phase of a critical trial. In fact, I believe the language is something to the effect of "It is like justification by billboard." "If we kill this guy, your life will be better." That is improper. And the United States was on notice because they did it in the opening portion. And just like the United States fascinatingly comes in today on the comment on the failure of the defendants to testify -- and by coincidence has the case law -- we would submit this was also done intentionally. There were several significant objections made during that argument on pivotal constitutional issues. And this is another one for which mistrial is required.

MR. WHITE: We join.

MR. COOLEY: We join.

MR. VICK: Your Honor, the Court, as I understand your instructions to me in opening when that was sustained, said "This is opening. This is your beginning." This is not closing. And that's why that was sustained. I believe, and I still believe -- and obviously the Court does not believe that it is proper to address such things with a jury that is going to be the ultimate sentencer for these people based upon the law -- it is as if I was addressing the Court. And certainly I would properly address that to the Court.

THE COURT: All right. The objection was made and the objection was sustained, and I will not grant a mistrial based on that. The fact is, as I read the law, there are two kinds of deterrence, general deterrence and specific deterrence. Within the range of discussion regarding general deterrence, one might be able to make an argument that could stand up. I had, at that point, not enough confidence in Mr. Vick to think that he would make the appropriate argument, and that's why I sustained the objection. I will not grant a mistrial based on

that.  Let's come back at 12:15.

(Luncheon recess taken from 12:15 p.m. to 1:20 p.m.)

THE COURT:  Mr. Baugh, I understand you wanted to reurge your  --

MR. BAUGH:  The full text of it.

THE COURT:  It is there.  You can give it to the Clerk.  I'm going to do what I said I was going to do.

MR. BAUGH:  The other one was on the, even though we wrote it, on the verdict form as to 9-A, we would like to urge this in the disjunctive, take out the word "and" and put in "or," that defendant James Roane was subjected to emotional and physical sexual abuse, abandonment.  It sounds like unless you find all of them, it doesn't count.  I know we submitted it that way.  It is not your Clerk's fault.  We know that.  If the Court could pencil in "or" over the "and."

THE COURT:  I would have to change it everywhere it appears.

MR. BAUGH:  I'll do it.

THE COURT:  No, that's all right.  I'll do it.

MR. WHITE:  If the Court please, just making sure that the record accurately reflects the nature of our objection to the N1 findings, it is our position that with regard to special findings on statutory aggravators that the jury should be instructed to pick one of the four and shouldn't be allowed to pick all of the four.  The last three, we would take the position, are lesser-included to the nature of the first.  We don't believe they should be allowed to do all four.

THE COURT:  Your position is noted.
All right.  Let's bring in the jury.
(The jury entered the courtroom.)
Members of the jury, you have now heard all of the evidence in this case as well as the final arguments of the lawyers for the parties.  It again becomes my duty, therefore, to instruct you on the rules of law that you must follow and apply in arriving at your decision as to the very serious question of whether or not Richard Tipton, Cory Johnson, and James H. Roane, Jr. should be sentenced to death.
Regardless of any opinion you may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that which I give you in these instructions.
Some of the legal principles that you must apply

to this sentencing decision duplicate those you followed in reaching your verdict in the first phase of the trial. Others are different. I have prepared a full set of instructions on the applicable law in order to insure that you are clear in your duties at this stage of the case. I have also prepared forms that detail special findings you are asked to make in this case, and four possible decisions you can render as to each of the capital crimes for which each defendant has been convicted.

By law, Congress has expressly provided that any person who intentionally kills another while engaging in or working in furtherance of a Continuing Criminal Enterprise may be sentenced to death. Because you have found Richard Tipton, Cory Johnson, and James H. Roane, Jr. guilty beyond a reasonable doubt of intentionally killing certain individuals while engaged in or working in furtherance of a Continuing Criminal Enterprise, you must now consider whether justice requires imposition of the death penalty for those crimes.

This is a decision left exclusively to the jury. I will not be able to change any decision you reach in this regard. You and you alone will decide whether or not Mr. Tipton, Mr. Johnson, or Mr. Roane should be executed. Thus, I again stress the importance of your giving careful and thorough consideration to all evidence before you. I also remind you of your obligation to follow strictly the applicable law.

Although Congress has left it to you to decide whether any or all of these defendants should be executed, it has narrowed and channeled your discretion in specific ways, particularly by asking you to consider and weigh any aggravating and mitigating factors present in this case. These factors have to do with the circumstances of the crime and the personal traits, character, and background of the defendants.

Aggravating factors are those that would tend to support imposition of the death penalty as to a particular defendant and a particular capital offense. Mitigating factors, of course, are those that suggest that some punishment less than execution is sufficient to do justice with respect to a particular defendant and offense.

Your task is not simply to decide whether aggravating and mitigating factors exist in this case. Rather, you are called upon to evaluate any such factors and to make a unique, individualized judgment about the appropriateness of the death penalty as a punishment for each capital offense and

each defendant.  In short, the law does not assume that every defendant found guilty of committing murder while engaged in or working in furtherance of a Continuing Criminal Enterprise should be sentenced to death.  The law does not assume that Mr. Tipton, Mr. Johnson, or Mr. Roane, as each sits before you, should be sentenced to death.  The burden of proving that a defendant should be sentenced to death rests at all times with the government.  It must satisfy that burden beyond a reasonable doubt.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the government prove beyond all possible doubt that a defendant should be sentenced to death.  It is only required that the government's proof exclude any reasonable doubt.

If, after fair and impartial consideration of all the evidence in this case, any one of you has a

3965

reasonable doubt as to whether justice mandates a defendant's execution, then you must return a decision against capital punishment for that defendant.

In this regard, this second phase of the trial differs from the first.  In the first phase, I instructed you to deliberate with the goal of reaching a unanimous decision one way or the other as to whether the government had proven each defendant guilty beyond a reasonable doubt of the crimes charged against them.  In this phase, I instruct you that unanimity beyond a reasonable doubt is required for you to sentence a defendant to death.  But if any of you, even a single juror, is not persuaded beyond a reasonable doubt that a defendant's execution is justified in this case, then the entire jury must render a decision against his being put to death.

In short, if you find after thorough deliberation that you are not unanimous in your views, you have, nevertheless, reached a decision: namely, that the government has not met its burden of proof as to the death penalty.

Now, the defendants at this hearing do not have to present any evidence.  The defendant does not have to prove to you that he should be permitted to live.

3966

Each defendant was, however, entitled to present any mitigating facts to you.

Let me now discuss with you the deliberative steps you should follow in considering as to each individual defendant the very serious issue before you.

First, you must consider whether the government has proven beyond a reasonable doubt and to your unanimous satisfaction at least one aggravating

factor for each of the two statutory categories established by Congress as to any of the killings of which a defendant stands convicted.  I will discuss these categories further in a moment.

Second, you must consider whether any non-statutory aggravating factors cited by the government are proven to your unanimous satisfaction beyond a reasonable doubt.  I'll discuss this more in a minute, too.

Third, you must consider whether any of you think that mitigating factors have been established by a preponderance of the evidence.

Fourth, you must decide whether the aggravating factors which have been proven as to a particular capital crime outweigh the mitigating factors, and whether they are sufficiently serious to support a

3967

unanimous finding beyond a reasonable doubt that justice requires imposition of the death penalty as to that crime and that defendant.

Fifth, you must individually decide for yourselves whether you choose not to impose the death penalty in this case.  For even if you make all of the above findings relating to aggravation or mitigation adverse to a defendant, you are never required to impose the sentence of death upon a defendant.  Absent the unanimous findings as to certain aggravating factors that I have just discussed, however, you cannot vote for a defendant's execution.

You must first consider whether you are unanimously persuaded beyond a reasonable doubt that the government has proven at least one aggravating factor in each of two statutory categories established by Congress.  In this case, as to each defendant and each capital offense, the government cites four aggravating factors from the first statutory category.  One, that the defendant intentionally killed the victim.  Two, that the defendant intentionally inflicted serious bodily injury which resulted in the death of the victim. Three, that the defendant intentionally engaged in

3968

conduct intending that the victim be killed, or that lethal force be employed against the victim which resulted in the death of the victim.  And four, that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense, and that such conduct resulted in the death of the victim.

Now, as you will recall, you are required to find that the killings in this case were intentional as a precondition to your finding Mr. Tipton, Mr.

Johnson, and Mr. Roane guilty of each of the capital crimes in the first phase of this trial.  In order to insure that this factor was considered by you at the first phase, or guilt phase, I ask you to indicate on the verdict forms that will be provided for you whether you are or are not unanimously persuaded beyond a reasonable doubt that each of the capital murders for which you convicted Mr. Tipton, Mr. Johnson, and Mr. Roane were committed intentionally within the meaning of at least one of the four aggravating factors that I have just discussed with you.

Now, that is the first statutory category.  You must find at least one from the first statutory

3969

category of aggravators.

Now, moving to the second category:  From this second statutory category, the government cites three possible aggravating factors.  Note, however, that not all of these aggravating factors are alleged against each of the three defendants, or in reference to each capital offense for which the defendants have been convicted.  The verdict forms will specify which statutory aggravating factors are alleged as to each individual defendant and each individual capital offense.

Now, aggravating factors that are cited:  One, that in the commission of a capital offense, the defendant knowingly created a grave risk of death to one or more persons in addition to the victim of the offense.

Two, that the defendant committed a capital offense after substantial planning and premeditation.

And three, that the defendant committed a capital offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim.

The government must prove at least one of the statutory aggravating factors in this second category

3970

to your unanimous satisfaction beyond a reasonable doubt, as well as one of the factors from the first statutory category, for a defendant to be eligible for the death penalty for a particular capital offense.

Let me therefore explain in more detail what you must find proven with respect to these aggravating factors in the second category.

The first cited factor requires proof that in committing a murder, the defendant knowingly created a grave risk of death to one or more persons in addition to the victim.  A grave risk of death is a risk that is very serious and dangerous to life.

The second cited factor requires proof that a murder was committed after substantial planning and premeditation.  A premeditated murder is one committed upon deliberation and prior design.  In short, the government must prove that a defendant killed the victim only after thinking the matter over and deliberating whether to act.  There is no requirement that the government prove that the defendant deliberated for any particular period of time in order to show premeditation.  It must, however, show that the defendant had some period of time to become fully aware of what he intended to do and to think it over before he acted.

Now, the government must also establish beyond a reasonable doubt that the murder was committed after substantial planning for you to find this factor proved.  The words "substantial planning" should be given their ordinary, every day meaning.  "Planning" refers to the creation or development of a method of doing something or achieving some end.  "Substantial planning" means planning which is considerable, or ample, for the commission of the crime at issue in this case: murder.

The third cited factor requires proof beyond a reasonable doubt that the defendant killed the victim in an especially heinous, cruel, and depraved manner in that the killing involved serious physical abuse to the victim.  What you must recognize about this factor is that Congress has specifically limited the meaning of heinous, cruel, or depraved conduct.  It is this limiting language, "serious physical abuse," that must be the focus of your consideration.

Serious physical abuse means harm to the victim while he is alive and conscious; that is, significantly more than that necessary to accomplish an act of murder.  The evidence must persuade you beyond a reasonable doubt that such abuse was deliberately inflicted; that is, inflicted intentionally by the defendant for the express purpose of seriously abusing the victim physically while he or she was still alive.

Put another way, you must find that the defendant had as his purpose more than just committing a homicide.  As you can tell from these instructions, in considering this factor, you may look only to conduct occurring while the victim was still alive and conscious, and not to evidence of conduct occurring after death.

Section 1 of your verdict form inquiries as to your findings with respect to these statutory aggravating factors.  First, under the heading "Category 1," you are asked if you are unanimously

persuaded beyond a reasonable doubt that each crime was intentional within the meaning of the first four factors that I have explained to you. Under Category 2, you are asked whether you are unanimously persuaded beyond a reasonable doubt that one of the second group of aggravating factors is applicable to each capital offense. You must find both: one factor at least from Category 1, and one factor at least from Category 2, proven beyond a reasonable doubt as to the same capital offense -- that is, the same

3973

victim's murder -- for you to proceed in your deliberations as to the death penalty for that offense. If you do not find a factor from each category proven beyond a reasonable doubt as to a particular murder, you cannot consider the death penalty with regard to that capital offense. In such a case, you will, on the decision forms that you will be receiving, relating to that defendant and that victim, complete the decision section labeled "A."

If you do find both a Category 1 and a Category 2 aggravating factor proved beyond a reasonable doubt as to a particular capital offense, you must then consider whether any other aggravating factors cited by the government have been proven to your unanimous satisfaction beyond a reasonable doubt with respect to that defendant.

I instruct you that the law permits you to consider only those aggravating factors specifically cited by the government with respect to each defendant. The jury is not free to consider any other facts or factors in aggravation. The government alleges the following non-statutory aggravating factors in this case. Note again, however, that some of these factors are not alleged against all three of these defendants. Again, your

3974

verdict forms will specify which non-statutory factors are alleged against each defendant.

Now, the non-statutory factors: That the defendant committed multiple murders. Two: That the defendant had a substantial criminal history. Three: That the defendant seriously wounded an individual in the course of committing the murders for which he has been convicted. And four: That the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been convicted.

I emphasize again that because these are the only non-statutory aggravating factors cited by the government, they are by law the only additional aggravating factors you may consider. This aspect of the law may strike you as odd, but your oath compels

you to follow the law.  For example, you may not consider the effect of the murders on the victims' families.  It simply is not a cited aggravating factor.

Section 2 of your verdict form asks whether you are unanimously persuaded that the government has proven these non-statutory aggravating factors beyond a reasonable doubt.  I note that even if you are not

3975

so persuaded, a unanimous jury finding that the government has proven at least one aggravating factor in each of the two statutory categories which I've just discussed with you does permit you to consider the death penalty.  In short, you may only consider the death penalty if the required statutory factors have been proven.  But if you so find, you may then consider the death penalty, even in the absence of any proof of the non-statutory aggravating factors.

You must next consider any mitigating factors that may be present in this case as to each defendant.  A mitigating factor is not offered to justify or excuse a defendant's conduct.  Indeed, if the homicide was justifiable or excusable, a defendant would not be guilty of murder.  A mitigating factor, instead, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crimes for which he has been convicted that would suggest that a sentence of death is not appropriate.

It is the defendant's burden to establish any mitigating factors by a preponderance of the evidence.  This is a lesser standard of proof under the law than proof beyond a reasonable doubt.  It

3976

means that the defendant has to produce evidence which, considered in the light of all of the facts, leads you to believe that what the defendant claims is more likely true than not.  To put it differently:  If you were to put the defendant's evidence and the government's evidence as to a mitigating factor on opposite sides of the scales, the defendant would have to make the scales tip slightly to his side.  If the defendant fails to meet this burden, he has not proven that mitigating fact,

Congress has designed a number of specific mitigating factors.  And the defendants in this case may have attempted to prove some or all of these mitigating factors with respect to their individual circumstances.  These statutory mitigating factors are as follows:  One, that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the

capacity was so impaired as to constitute a defense to the charge against him; Two, that the defendant is punishable as a principal in an offense which was committed by another, but the defendant's participation was relatively minor regardless of whether the participation was so minor as to constitute a defense to the charge; Three, that the defendant could not reasonably have foreseen that his conduct in the course of the commission of the murders would cause or would create a grave risk of causing death to any person; Four, that the defendant is youthful, although not under the age of 18; Five, that the defendant does not have a significant prior criminal record; Six, that the defendant committed the offense under severe mental or emotional disturbance; Seven, that another defendant or defendants equally culpable in the crime will not be punished by death, and, Eight, that the victims consented to the criminal conduct that resulted in their death.

Now, in addition to these specific statutory factors which are outlined by Congress or defined by Congress, the law also permits you to consider whether other factors in the defendant's background or character mitigate against imposition of a death penalty. Indeed, you may consider any other factor, whether specifically argued by defense counsel or not, that you believe to be mitigating if such a factor has been established by a preponderance of the evidence.

In short, your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors. This was a choice expressly made by Congress in enacting the capital punishment statute at issue in this case.

Now, each defendant has submitted to the Court a list of additional mitigating factors which they have endeavored to prove through the evidence that they put on at this hearing. I will discuss these factors as to each defendant with you now, and they will also appear on your verdict form for each defendant.

Now, with respect to the defendant, Richard Tipton, the additional mitigating factors that he has attempted to prove are the following: First, that defendant Tipton, if not sentenced to death, will be sentenced to life in prison without any possibility of parole. I now instruct you that this is factually correct; that is, you must consider this factor to be proven. The weight you give to this fact as a mitigating factor is, of course, up to each of you individually.

Second, that defendant Tipton was subjected to emotional and physical abuse and neglect as a child and was deprived of the parental guidance and protection that he needed.

Third, that defendant Tipton suffers from Attention Deficit Disorder and Hyperactivity Disorder that was untreated when he was a child.

Fourth, that defendant Tipton suffers from frontal lobe brain dysfunction that was untreated when he was a child.

Fifth, that defendant Tipton has a history of birth complications, illness, disease, and head injury, and suffers brain dysfunction which has affected his ability to function and his behavior.

Six, that defendant Tipton was introduced to addictive drugs and alcohol while still a child.

Seven, that defendant Tipton is impulsive and is impaired in thinking about the consequences of his actions, and in adjusting his thinking to changing events.

Eight, that defendant Tipton's full-scale IQ is 85.

Nine, that defendant Tipton grew up in an impoverished, violent and brutal environment and was exposed to extreme violence as a child and throughout his life.

And ten, that other factors in defendant Tipton's childhood background or character mitigate against imposition of the death penalty.

Now, the non-statutory mitigating factors as they relate to Cory Johnson:  First, that defendant Johnson, if not sentenced to death, will be sentenced to life in prison without the possibility of parole. Again, I instruct you as I indicated before that this is factually correct.  Of course, the weight due this fact as a mitigating factor is left to each of you individually.

Two, that defendant Johnson was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of the parental guidance and protection that he needed.

Third, that defendant Johnson suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

Fourth, that defendant Johnson suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support and guidance.

Fifth, that defendant Johnson was introduced to addictive drugs and alcohol while still a child.

Six, that defendant Johnson has responded well

to structured environments and would likely make a reasonable adaptation to prison if he was sentenced to life in prison.

Seven, that defendant Johnson's full scale IQ is 77.

Eight, that defendant Johnson grew up in an impoverished and violent environment and was exposed to extreme violence as a child and throughout his life.

Nine, that defendant Johnson suffers from an extremely severe learning disability which impairs his ability to use good judgment, to control his behavior, and to understand and foresee the consequences of his actions.

Ten, that defendant Johnson suffers from a neurological impairment of brain damage that impairs his ability to exercise good judgment, to control his behavior, and to understand and foresee the consequences of his actions.

Eleven, that defendant Johnson was brought up in an extremely unstable, abusive, and neglectful family.

Twelve, that defendant Johnson's severe learning disability affected his intelligence, his speech, and his ability to read, write, and learn.  Those limitations impaired his ability to exercise good judgment and to control his behavior.

Thirteen, that defendant Johnson had no parental involvement or support from or by his father.

Fourteen, that other factors in defendant Johnson's childhood background or character mitigate against imposition of the death penalty.

Now, the non-statutory mitigating factors as they relate to defendant James H. Roane, Jr.

First, that defendant Roane, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.  I have already told you that is factually correct.  The weight which you will give to this fact is up to each individual juror.

Second, that defendant Roane was subjected to emotional, physical, and sexual abuse, abandonment, and neglect as a child, or was deprived of the parental guidance and protection that he needed.

Third, that defendant Roane suffers from neurological impairments which were identified and which could have been treated when he was a child or adolescent.

Fourth, that defendant Roane suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support and guidance.

Fifth, that defendant Roane has developed a

paranoid mental disorder as a result of his untreated neurological impairment.

Six, that defendant Roane has responded well to structured environments and would likely make an adaptation to prison if he were sentenced to life imprisonment.

Seven, that defendant Roane's full scale IQ is 85.

Eight, that defendant Roane grew up in an impoverished, violent, brutal environment and was exposed to extreme violence as a child and throughout his life.

And nine, that other factors in defendant Roane's childhood background or character mitigate against imposition of the death penalty.

Now, on the verdict form you are asked to identify any additional mitigating factors outside of those I have discussed that any one of you considers. If, however, you think that there is some other mitigating factor present that you are simply not able to articulate it with any specificity, you may still give that factor your full consideration.

Now, any evidence relating to the mitigating factors should be fully discussed by all of you to insure that each juror considers the matter carefully. It is important to note, however, that unlike aggravating factors, which you must unanimously find proven beyond a reasonable doubt for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. If any one of you is persuaded of the existence of a mitigating factor by a preponderance of the evidence, even if the rest of the jurors disagree, that juror may still consider it in reaching his or her individual decision in this case. For that reason, on the section of the verdict forms relating to mitigating factors, you are asked to report the number of jurors that find each mitigating factor to have been established.

Now, once you have decided upon the aggravating and mitigating factors present in this case, the law requires you to evaluate these factors and decide whether you are unanimously persuaded beyond a reasonable doubt that the aggravating factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that have been proven are themselves sufficient to justify a sentence of death. Passion, prejudice, and arbitrary considerations have no role to play in your

efforts to reach a just result in this case.

In carefully weighing the various factors at issue in this case, you are called upon to make a unique, individualized judgment about the appropriateness of executing each of these individual defendants. This is not a mechanical process. Neither is it determined by raw numbers. You do not simply count factors. Instead, you must consider them qualitatively. Any one aggravating factor proven by the government, if sufficiently serious in your mind, may outweigh several mitigating factors. Thus, even if you were to find only the two required statutory aggravating factors proven to a particular defendant, and no other aggravating factor, you will still have to weigh those two aggravating factors carefully against the mitigating factors.

On the other hand, you must also recognize that a single mitigating factor may outweigh several aggravating factors. In short, what is called for in weighing the various factors is not mathematical skills. You must use your careful, considered, judgment. At this final stage in the weighing process you are not simply called upon to find relevant factors. You are called upon to decide

3986

whether each individual defendant shall live or die. Only if you are unanimously persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified may you return a decision in favor of capital punishment.

Each individual juror must decide whether the law requires that each defendant be put to death for a particular capital crime. If even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed were proven, then the jury may not sentence the defendant to death. If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required to impose a death sentence. For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant. In

3987

such a case the jury must render a decision against the death penalty.

Moreover, even where a sentence of death is

fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy.  Also remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty.

You are instructed that in your consideration of whether the sentence of death is justified as to each of these defendants, you shall not consider the race, color, religious belief, national origin, or sex of the defendant or of the victims.  You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crimes in question no matter what the race, color, religious belief, national origin or sex of the defendant or the victims may have been. Whatever decision you return, each of you is required by law to sign a certificate as to each defendant attesting to the fact that you have followed this instruction.

I recognize that these instructions are complex and provide you with a variety of conclusions that you can reach as to each defendant.  Because your decisions in this phase of the case, unlike the first, cannot be reported by pronouncing as simple a conclusion as guilty or not guilty, I have prepared with respect to each defendant a form on which your Foreperson will report your findings as to the existence of aggravating and mitigating factors, a form which each of you must sign, certifying that you have reached your decision without considering unlawful discriminatory factors, and several alternative decision forms that you will complete depending upon your findings.  Now, let me go through this verdict form.  And they are more involved.

Now, the first thing that you will see, they will come to you in three packets, one for each defendant.  At the top of the packet is a document entitled "Special Findings."  And you have to go through this.  Just to give you an example, special findings, the first part of it has to do with the statutory aggravating factors.  It says, "We the jury find as follows:  That defendant Richard Tipton," using Tipton as an example, "intentionally killed the victim of a capital crime proven to the jury's satisfaction beyond a reasonable doubt."  And below that would be the name of each victim of a capital offense.  And you would have to answer Question 1-A as it relates to each victim.  That is, "That defendant, Richard Tipton, intentionally killed the victim of a capital crime."  The answer is yes or no.  That he intentionally killed the victim of a capital crime is one of the first categories of

statutory aggravators.  And you would go through this as it relates to all of the first category statutory aggravators.  When you finish that, the Category 1 statutory aggravators, you will see these words at the bottom of that consideration:  "At this point, review your findings on the Category 1, aggravating factors, as to each individual victim.  Each victim represents a separate capital crime.  If as to any victim you have not found one of the Category 1 aggravating factors proven to your unanimous satisfaction beyond a reasonable doubt, you must now complete Section A of the decision form for defendant Richard Tipton that relates to that victim."

In other words, since you are required to find at least one aggravating factor from Category 1, and one aggravating factor from Category 2, if you find none from Category 1, by definition, you could not find that defendant guilty  --  find that the death penalty should be imposed as it relates to that defendant.  That's simply what that's telling you.

If you do find a Category 1 statutory aggravator, you would then move on to Category 2, and they would be handled in the same way.  Category 2 aggravators are laid out, and you are to answer yes or no as it relates to each individual victim.

Again, when you finish that, you will find at the end of that similar advice:  "Review your findings.  Here again, if you don't find any statutory aggravators out of Category 2, that would be the end of the matter in terms of the death penalty as it relates to a particular victim and a particular defendant.  You would not be able to impose the death penalty."

Now, if in fact you find one out of each of the Category 1 and Category 2, then you can go on.  Next would be the non-statutory aggravating factors.  Here again, they are outlined, what the government has cited as non-statutory aggravating factors as it relates to that defendant.  And again, for instance, that defendant Richard Tipton committed multiple murders.  You would answer yes or no, decide that.

After you finish the non-statutory aggravating factors, then you would come to the mitigating factors.  And here again, you would  --  there is a difference here.  You have the consideration of the following mitigating factors specifically provided by statute.  And then they are outlined.  After each one of these, instead of having yes or no, you have a number.  It says, "Number of jurors who so find by a preponderance of the evidence."  And the difference is obvious, because with the aggravating factors you have to find them unanimously beyond a reasonable

doubt. So the answer would be yes or no. With the mitigating factors, one person who finds a mitigating factor by a preponderance of the evidence, then that's fine, you put that in. If it is one person, six people, how many care to find a particular mitigating factor, you simply plug in the number.

Now, a second category of mitigating factors, non-statutory; it describes them and it would be the same process. You simply look at them again. For example, "That defendant Richard Tipton was subjected to emotional and physical abuse and neglect as a child and he was deprived of the parental guidance and protection that he needed." And then, "Number of jurors who so find by a preponderance of the evidence." Again, you would plug in a number. It could be 12, it could be one, if any member find by a preponderance of the evidence. Then after you have dealt with non-statutory mitigating factors, you come to another page which gives the juror or jurors or jury an opportunity to consider any additional mitigating factors that you might find, perhaps not argued or cited by the defense lawyers. But if there is something that you find to be a mitigating factor in addition to what was cited, then again, any juror who makes such a finding by a preponderance of the evidence can say so. "I think X is a mitigating factor." And you write it down. X, mitigating factor, number of people who agree. All right.

When you have gone through all of that, the Foreperson will sign and date these special findings.

Now, after you have completed the special findings, you have to make a decision regarding each defendant and each capital case. So there will be a decision form relating to each victim, the decision form relating to Douglas Talley, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, Linwood Chiles. Now you will start out, you pick one of these decision forms up and it has to do with Douglas A. Talley. "As to the crime of killing Douglas A. Talley while engaged in or in furtherance of a Continuing Criminal Enterprise," and you have got options. A: "We the jury do not unanimously find proven beyond a reasonable doubt the existence of the statutory aggravating factors required by law as prerequisites to the imposition of capital punishment, and therefore, do not consider the death penalty as to this capital crime for which defendant Richard Tipton has been convicted." If that's what you find, based on your earlier findings, then you would fill that in. B: "We the jury unanimously find beyond a reasonable doubt that the aggravating

factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime. We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors and are themselves so serious that justice mandates the sentence of death. We vote unanimously that Richard Tipton," or the named defendant, "shall be sentenced to death for this capital crime." That's one option.

C: "We the jury do not unanimously find that the aggravating factors proven in this case as to this capital crime and this defendant so outweigh the mitigating factors that justice mandates the sentence of death. We therefore return a decision that Richard Tipton not be sentenced to death for this capital crime."

The final option: "We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court are not unanimously persuaded that a death sentence should be imposed for this capital crime. We therefore return the decision that Richard Tipton not be sentenced to death." Let me explain this. Option A would mean that you did not find the statutory aggravating factors that are required, and that would result in a finding that the death penalty is not in order. B would be a finding that you have found the statutory aggravating factors as necessary; that you have found mitigating factors; that you have gone through the weighing process, and you find that the aggravating factors outweigh the mitigating factors; and thus, you unanimously find a sentence of death is appropriate.

In C, you will be indicating that you have again found aggravating factors, mitigating factors, gone through the weighing process, and find that the aggravating factors do not outweigh the mitigating factors, which would lead to a sentence that does not impose the sentence of death.

And finally, the last option which also leads to a finding by the jury that the sentence of death is not appropriate, that last option would come about if you had considered other factors and decided that you are not going to impose the death penalty. If one of your number came to that conclusion, you could use Option D to indicate that conclusion.

As I say, there will be a decision form for every victim. The Foreperson will just have to sign and date the appropriate option.

Now the final thing is a certificate indicating

the non-discriminatory consideration of the case, certifying that you haven't considered race, color, sex, religion, or national origin of the victim or the defendants in coming to your decision. Each juror will have to sign that no matter what you decide. That certificate has to be signed by each juror.

All right. We have got a few more instructions that I have to give you.

As was the case in the first phase, in reaching your decisions in this sentencing here, you must consider only the evidence I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses, the exhibits admitted in the record at both phases of the trial. Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you. Also, during the course of this hearing I occasionally may have made comments to the lawyers or asked questions of a witness or admonished a witness or a lawyer, for that matter. Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the hearing in arriving at your decisions.

Also, as before, you should not be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of one who asserts actual knowledge of the fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating that a certain fact is true. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, I have said that you must consider all the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate. You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony. In weighing the testimony of a witness, you should consider his or her relationship to the government or defendant; his or her interest, if any, in the outcome of the case; his

or her manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she testified; his or her candor, fairness, and intelligence, and the extent to which he or she has been supported or contradicted by other credible evidence.

You may, in short, accept or reject the testimony of any witness in whole or in part.  Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact.  You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

A witness may be discredited or impeached by contradictory evidence by showing that he or she testified falsely concerning a material matter or by evidence that at some other time the witness has said or done something or has failed to do or say something which is inconsistent with the witness' present testimony.  If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

The fact that a witness has previously been convicted of a felony or a crime involving dishonesty or false statement is also a factor you may consider in weighing the credibility of that witness.  The fact of such a conviction does not necessarily destroy the witness' credibility, but is one of the circumstances you may take into account in determining the weight to be given to his testimony.

In the guilt phase of this case, the government called as one of its witnesses an alleged accomplice named as a co-defendant in the indictment with whom the government has entered into a plea agreement providing for the dismissal of some charges or providing that the government may in its discretion file a motion informing the Court that the witness has provided substantial assistance to the government in its investigation or prosecution of the defendants in this case or of other persons.  If such a motion is filed by the government, the court may elect to impose a lesser sentence than the witness would otherwise have received for the offense to which he pled guilty.  Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court.  An alleged accomplice, including one who has entered into a plea agreement with the government, is not

prohibited from testifying.  On the contrary, the testimony of such a witness alone may be sufficient, be of sufficient weight, to sustain a verdict of guilty.  However, the jury should keep in mind that such testimony is always to be received with caution and weighed with great care.  In sum, you should look at all of the evidence in deciding whether to believe an accomplice witness and what weight, if any, his or her testimony deserves.

The testimony of an alleged accomplice and the testimony of one who provides evidence against the defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You the jury must decide whether the witness' testimony has been affected by any of these circumstances or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of being immunized from prosecution.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  The jury must determine whether the testimony of a drug or alcohol abuser has been affected by the drug or alcohol abuse or the need for drugs or alcohol.

In this case, you have also heard testimony from various expert witnesses.  An expert is a witness allowed to express an opinion on matters about which he or she has a special knowledge and training.

Expert testimony is presented to you on the theory that someone who is experienced in a particular field may assist you in understanding the evidence or in reaching an independent decision on the facts.  In weighing expert testimony, you may consider the expert's qualifications, the opinion given, the witness' reason for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness.  You may give expert testimony whatever weight, if any, you find it deserves in light of all the other evidence before you.  You should not, however, accept a witness' testimony merely because he or she is an expert in her field, nor should you substitute for your own judgment, reason, and common sense.  The determination of the facts in this case rests solely with you.

Remember that a defendant has an absolute right not to testify or offer evidence. The fact that the defendant did not testify or offer any evidence should not be considered by you in any way, or even discussed in your deliberation. I remind you that it is up to the government at this stage in the proceedings to prove beyond a reasonable doubt the existence of aggravating factors sufficient to justify the death penalty. It is not up to the defendant to prove that he should not receive the death penalty.

In making your determinations regarding the existence or nonexistence of aggravating and mitigating factors, each defendant should be given separate and individual consideration. Likewise, in determining whether any defendant should be sentenced to death or to life imprisonment without possibility of parole, you must consider each defendant as an individual. The fact that one defendant was sentenced to death by you may not provide any reason to sentence any other defendant to death.

As was the case in the first phase of this trial, your Foreperson will preside over your deliberations and will speak for you here in open Court. The importance of your deliberations should be obvious. I remind you that you can return a decision sentencing a defendant to death, only if you are unanimously persuaded after weighing the aggravating and mitigating factors that such a sentence is justified. Even if one juror is not so persuaded, if any one of you concludes that the death penalty is not justified, you must return a decision against the death penalty.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the issues for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. Do not surrender your honest conviction, however, solely because of the opinion of fellow jurors. Remember at all times that you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence you have heard and to weigh those facts carefully in reaching your decisions.

As before, if during your deliberations you desire to communicate with me, please reduce your message or question to writing signed by the

Foreperson and summon the Marshal, who would then bring it to my attention.  I will then respond as promptly as possible, either in writing or by bringing you back into the courtroom to address you orally.  When you have reached your decisions as to the death penalty with respect to all defendants, send me a note signed by your Foreperson that you have completed your deliberations.

As before, the Marshal and Bailiff will be outside, right outside the jury room.

Now, we have a number of exhibits, and some of it is extensive.  It will be coming in, all of these books.  I believe we have enough for everybody.  I think so.  In any event, you take your time, go through all of the exhibits, and have your deliberations and discussions.  When you have completed those, let us know and the matter will be resolved and your findings will be, or at least the decisions, will be called out in open court.

Now, are there any objections other than those previously made?

(No response.)

Apparently not.  All right.

It is now 2:30.  I will send you out to begin your deliberations.  The lawyers will take a few minutes to look through the exhibits, make sure everything is there, and the exhibits will come in with the verdict form.  Madam Forewoman, remember, three packets of verdict forms, one for each defendant, and you have got to kind of keep control of these.  They are to be held together so you can get through them completely.

All right, ladies and gentlemen, we are going to release you now to start your deliberations.  I am going to excuse the alternates, again, not quite permanently.  We won't do that until the base jury has returned with their deliberations.  We will still keep you available just in case.  What we will do is call you and let you know the result.  In the interim, you are still a juror; you cannot discuss this matter with anyone.  And again, thank you very, very much.  "Thank you" is just hollow under these circumstances.  I cannot begin to express the gratitude that we have for your service.  Thank you so very, very much.  And you three may now be excused.

(The alternate jurors left the courtroom.)

Now, another word.  If you have not completed your deliberations somewhere between 5:00 and 5:30, the Marshals will come, we will go out of session, then the Marshals will assist you in getting your cars and getting those secure, and then will take you

in for dinner and lodging.

All right, everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

4006

MR. COOLEY:  Your Honor, this may or may not be appropriate, but before we get to the conclusion of the case, I think at least from our point of view it would be appropriate for us to commend to the Court the outstanding work that the Clerk's Office and the Marshal's Service has done throughout this trial and in preparation for trial, particularly Ms. McDonald.

THE COURT:  Thank you.

MR. GEARY:  We would say the same except for one exception in the Clerk's Office, which we all know about.

THE COURT:  All right.  Okay, you all check your exhibits and make sure everything gets in there, and we will be in recess to await the jury's call. Mr. Marshal, remove the defendants.

MR. BAUGH:  While we are still on the record, my co-counsel would like to have these go back.  Is it permissible?

THE COURT:  That's fine with me.

(Counsel referring to blow-up charts displayed to experts.)

(The defendants were removed from the courtroom.)

All right.  We will be in recess and await the

4007

jury's call.

(Recess taken from 2:35 p.m. to 5:20 p.m.)

THE COURT:  All right.  I am going to stop the jury's deliberation at this point and bring them back tomorrow morning.  Bill, bring in the jury.

(The jury entered the courtroom.)

All right.  We are going to adjourn for the evening and I'm going to have the Marshals bring you back tomorrow at 9:30.  And we will do it as we did before in the first phase.  When you come in, don't start deliberating until I've brought you into Court and then sent you back out to start your deliberations again.  When you leave now, go back to the jury room.  The Marshals will come by and explain to you how we are going to deal with the cars, get that taken care of, and you will be in their hands for the rest of the evening.

All right.  Everyone remain seated while the jury leaves the courtroom.  Let me say this before you go, just out of an abundance of caution: Continue to adhere to my admonitions.  Do not discuss the case with anyone else; don't let anyone else discuss it with you; and do not deliberate until you

are brought into Court and given the go-ahead on that.  Do not listen to any television or radio that has any coverage of this.  Do not read any newspaper articles that might relate to this trial.

All right.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right, Mr. Marshal, the jury is in your hands.  Make sure that they get the cars, get them secured, and take care of them.  We will be in adjournment until tomorrow morning at 9:30.

(Proceedings adjourned at 5:25 p.m.)