# EXHIBIT 29

## AFFIDAVIT

State of Pennsylvania     )
                       ) ss:
County of Montgomery    )

**GEORGE SAKHEIM, PH.D., being duly sworn, deposes and says:**

1. My address is 1614 Foulkeways, Gwynedd, PA 19436-1033.

2. I was born on ███████ in Hamburg, Germany.

3. I am currently retired. I hold a Ph.D. in psychology, and became a licensed psychologist in 1966.

4. From 1972 through 1990, I was Chief of Psychological Services for the Pleasantville Diagnostic Center and Pleasantville Cottage School (collectively referred to as "Pleasantville"), both located in Pleasantville, New York. I was responsible to the director of the Pleasantville Cottage School as Chief Psychologist and Director of Psychological Services of the Jewish Childcare Association of New York. My responsibilities included hiring psychologists, supervising them, and evaluating their performance individually on testing. I conducted therapy and carried a caseload of therapy patients at Pleasantville. I also conducted in-service training for the psychologist staff and interns.

5. During my time with Pleasantville, Corey Johnson was evaluated on several occasions by psychologists and psychiatrists there, including, but not limited to, Cary Gallaudet, Ph.D., Ken Barish, Ph.D., and John Stadler, M.D.

6. In evaluations conducted by Dr. Gallaudet in February 1982 and by Dr. Barish in March 1985, Corey was administered IQ testing.

7.    I was familiar with Dr. Gallaudet, including her experience, expertise, and evaluation style in or about the time she conducted her evaluation of Corey Johnson in 1982. In fact, at the time she conducted the evaluation, I was her supervisor. Likewise, I was familiar with Dr. Barish, including his experience, expertise, and evaluation style in or about the time he conducted his evaluation of Corey Johnson in 1985. I was familiar with Dr. Stadler, who was my supervisor during some of the period I worked at Pleasantville. I was familiar with Dr. Clemmens, who was a psychiatrist at Pleasantville.

8.    I have reviewed the following materials:

   a) Psychodiagnostic Evaluation by Ernest Adams, MS staff psychologist at the Council's Center for Problems of Living, dated December 11, 1981 (attached hereto as Exhibit A);

   b) Psychological Evaluation by Dr. Cary Gallaudet, dated February 5 and 8, 1982 (attached hereto as Exhibit B);

   c) Psychiatric Evaluation by John Stadler, M.D., dated September 23, 1983 (attached hereto as Exhibit C);

   d) Psychiatric Summaries by Elizabeth Clemmens, M.D., dated June 29, 1984 and December 27, 1984 (attached hereto as Exhibit D);

   e) Psychological and Educational Evaluation by Ken Barish, Ph.D., dated March 1983 (attached hereto as Exhibit E);

   f) Psychological Evaluation by Ken Barish, Ph.D., dated March 15, 1985 (attached hereto as Exhibit F); and

   g) Current Assessment, dated August 10, 1984 (attached hereto as Exhibit G).

9.    I submit this affidavit based on my training and experience and my review of the materials identified above.

2

**<u>Dr. Barish's IQ Testing of Corey is More Reliable Than That of Dr. Gallaudet and Is Consistent with a Diagnosis of Mental Retardation</u>**

10. On February 5 and 8, 1982, Dr. Gallaudet evaluated Corey Johnson. As part of her evaluation, Dr. Gallaudet administered, among other tests, the WISC-R, an IQ test. As reflected in her report, Corey's summary scores were as follows: Verbal IQ 85, Performance IQ 93, and Full Scale IQ 88.

11. Approximately three years later, on March 15, 1985, Dr. Barish also administered the WISC-R to Corey, as part of an evaluation that included other testing. Dr. Barish's report reflects Corey's summary scores on the WISC-R, which were substantially lower than in Dr. Gallaudet's testing: Verbal IQ 68-70, Performance IQ 78-81, and Full Scale IQ 69-74. For the reasons explained below, I interpret Corey's actual full scale IQ score on the test administered by Dr. Barish to have been a 69.

12. As set forth more fully below, I agree with Dr. Barish's manner of assessing Corey Johnson's IQ and recommend relying on Dr. Barish's findings rather than those of Dr. Gallaudet -- for a number of reasons.

13. First, at the time Dr. Gallaudet conducted her evaluation of Corey Johnson, she was a young and very inexperienced psychologist.

14. Dr. Gallaudet joined the Diagnostic Center in November 1981 and therefore had only approximately three months of experience at Pleasantville at the time she evaluated and administered tests to Corey.

15. In my experience, younger and less-experienced psychologists sometimes have a tendency to be overly helpful to examinees when conducting tests.

16. While I did not directly witness Dr. Gallaudet provide assistance to Corey during testing, her report suggests that she may have provided such assistance.

3

That is, her report states: "Frequently Corey would interrupt his own work with irrelevant questions about toys, games and other activities, and at those times, the *examiner would have to help him* refocus on the task at hand." Ex. B at 1 (emphasis added).

17. In addition, Dr. Gallaudet's limited experience and her friendly personality and desire to be helpful were consistent with the profile of a test administrator who might assist a distracted examinee.

18. Part of what an IQ test like the WISC-R is designed to measure is an examinee's ability to focus and perform certain tasks independently and within a fixed time period – absent any guidance or assistance from a test administrator or extra time.

19. While it is not uncommon for a psychologist administering an IQ test to provide some help or extra time as an experiment designed to evaluate the possible effect of academic or clinical intervention, it is customary and appropriate for a tester conducting such an experiment to segregate the results obtained under those different, experimental conditions from the results obtained under the defined testing conditions -- the latter being the true results.

20. To the extent that an examinee is provided assistance or extra time, and the results obtained under those conditions are not segregated from the true results, the test's findings are compromised.

21. I believe that the results from Dr. Gallaudet's 1982 testing may have been so compromised.

22. In contrast, Dr. Barish's results from the 1985 testing do not appear to be compromised.

4

23. As an initial matter, Dr. Barish was a more experienced psychologist at the time he conducted his evaluation in 1985 than Dr. Gallaudet was in 1982.

24. Dr. Barish had a few years of experience at Pleasantville at the time of his evaluation of Corey whereas, as mentioned above, Dr. Gallaudet had only a few months' experience when she evaluated Corey.

25. Moreover, even apart from experience, I believe Dr. Barish was a more objective psychologist at the time he conducted his examination of Corey than Dr. Gallaudet was when she conducted hers.

26. Further, I believe Dr. Barish was stricter in his construction of the test than Dr. Gallaudet had been three years earlier.

27. As noted above, Dr. Barish's report indicates a range of scores.

28. Importantly, Dr. Barish appeared to acknowledge engaging in the very type of experiment I describe in paragraph 18 above.

29. Dr. Barish reported two sets of subtest scores for certain categories and explained that "[a]lternate scores reflect improvement in performance with additional time and/or assistance from the examiner." Ex. F at 1.

30. As mentioned above, such an experiment is entirely appropriate and such alternate scores may provide clinically useful information – as long as they are segregated from the results obtained under the defined testing conditions.

31. Appropriately, Dr. Barish segregated the alternate subtest scores.

32. Further, the ranges of summary scores Dr. Barish reported appear to account for the fact that there were alternate subtest scores.

5

33.    Thus, for example, I interpret Corey's Full Scale IQ score of "69-74" as follows.    Corey's actual Full Scale IQ score obtained under the defined testing conditions was 69.  The range above 69 (up to 74) appears to me to reflect what the full scale IQ score *would have been* if the some or all of the alternate subtest scores – obtained outside the scope of the defined testing conditions – were used in lieu of the actual subtest scores.

34.    The second reason I recommend relying on Dr. Barish's testing relates to the timing of the testing.

35.    I understand that, in October 1981, approximately three to four months prior to Dr. Gallaudet's administration of the WISC-R test in February 1982, Corey had been given the identical test, the WISC-R, in connection with another evaluation.

36.    It is well-recognized that an examinee can demonstrate a "practice effect" on a second test when that test is the same one that was given in the recent past.

37.    While Mr. Adams' very proximate, prior administration of the WISC-R would not have impacted all areas of Corey's scoring on Dr. Gallaudet's administration of the test, the practice effect very likely had a significant impact on Corey's scores, in particular by (artificially) increasing his scoring in the performance area of the test.

38.    I note that Corey scored very poorly on the comprehension portion of Dr. Barish's test.  Comprehension is a test of judgment that consists of questions such as, "Why do we have laws?"  Corey scored terribly low in this area, revealing significant

6

cognitive deficiencies. This would have implications for his judgment in social situations.

39. Based on all of the foregoing, Corey's testing while at Pleasantville indicates to me that his IQ fell within the mentally retarded range.

## Corey's Evaluations Reflect Notable Deficiency in Intellectual Functioning

40. Corey also showed notable deficiency in intellectual functioning.

41. As reflected in the attached evaluations, Corey was given every opportunity through the Pleasantville Cottage School to improve academically. He was placed in a small class setting with a number of advantages. However, Corey's academic performance did not improve. See Exhibit C.

## Other Limitations Noted in the Evaluations Are Relevant to Corey's Behavior

42. As Dr. Stadler observed in his evaluation (see Exhibit C at 1), there was a neurological basis for Corey's cognitive difficulties. Corey was neurologically handicapped and thus could not control his impulses as well as a normal person.

43. Additionally, based on the evaluations, Corey clearly profiled as a "follower" and by no means as a leader.

44. Corey's lower capacity for inhibiting his emotions, his being a follower, and his wanting to please someone he was following were all qualities that would have affected Corey's decision making.

## Summary Description of Corey

45. Ultimately, in my view, the results of his evaluations indicate that Corey was a very intellectually handicapped person with emotional difficulties, organic neurological deficits and an IQ consistent with his having mental retardation.

## Corey's Placement in the Pleasantville Cottage School versus Edenwald Center

46. The Jewish Child Care Association (JCCA) had a number of facilities in which children would be placed based on their emotional and cognitive capacities.

47. When and where a student was placed occurred at intake with the JCCA.

48. The intake division would meet with families at intake and determine where the child would be placed.

49. If a child was diagnosed with mental deficiency, the child would be placed in the Edenwald Center, a placement within the Pleasantville Cottage facility designed for young people with emotional and cognitive deficiencies. Other children were placed in the Pleasantville Cottage School.

50. Based on my memory, at the time Corey was evaluated for placement, an IQ score of 65 was generally considered the upper limit of mental deficiency, for purposes of placement within Edenwald by the JCCA.

51. Thus, only a child whose IQ score was 65 or lower was placed in Edenwald.

52. During my tenure (but after Corey was placed), the JCCA – appropriately, in my view – began to move away from looking exclusively at an

8

individual's IQ scores below 65 when making placement decisions, and instead incorporated in its analyses considerations of somewhat higher IQ scores as well as the general adaptive behavior of the child.

53.    Therefore, in this later time frame, if an individual had an IQ score of 72 or 73, combined with low scores on other tests or other indications of adaptive behavior deficits consistent with a diagnosis of mental retardation, the child would be eligible for placement at Edenwald – although, for reasons I discuss next, such a placement may still not have taken place.

54.    During my tenure at Pleasantville, it appeared that many experienced social work administrators were reluctant to diagnose children with IQ scores in or around 70 and other cognitive deficiencies as mentally retarded. This was because, at the time, many in the social work profession were sensitive to the risk of stigmatizing youth.

55.    As a result, if a child did not have IQ test scores well below 70, notwithstanding indications of adaptive behavior deficits or other characteristics of mental retardation, there was likely some avoidance of diagnosing a child as mentally retarded.

GEORGE SAKHEIM, PH.D.

Sworn to before me on this
17ᵗʰ day of June, 2011

Lori A. Schmidt
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Lori A. Schmidt, Notary Public
Lower Gwynedd Twp., Montgomery County
My Commission Expires May 29, 2014
Member, Pennsylvania Association of Notaries

9

**Exhibit A**

THE COUNCIL'S CENTER FOR PROBLEMS OF LIVING

C M H C

PSYCHODIAGNOSTIC EVALUATION

| | | |
|---|---|---|
| Name of Client: | Corey Johnson | TESTS ADMINISTERED |
| Address of Client: | 640 Riverside Drive | Westchester Intelligence Scale for |
| | New York, N. Y. 10031 | Children – Revised (WISC-R) |
| Examiner: | Ernest H. Adams, M.S. | Thermatic Apperception Test (TAT) |
| | Staff Psychologist | Rorschach Ink Blot Test |
| | | Draw-A-Person |
| Supervisor: | Mary Sitgraves, Ph.D. | Bender Visual Motor Gestalt |
| Date: | December 11, 1981 | Testing Date:   October, 1981 |

### IDENTIFYING BIOGRAPHICAL INFORMATION AND REFERRAL QUESTION:

Corey Johnson is a 13-year-old average size, black boy. He was referred by his mother, Emma Johnson, who is employed as a receptionist. Ms. Johnson has requested a complete evaluation of Corey so that she can place him outside of their current living situation. Corey will be placed by Special Children's Services (BCW) which intends to place Corey in Children's Village, a residential treatment center in Dobbs Ferry, New York. A complete psychological battery was given to assess his current level of intellectual and emotional functioning.

### CLINICAL TEST BEHAVIOR:

During our initial session Corey was warm and friendly, even though he was quite anxious with nervous gestures. He recurrently pulled his hair, face, and spoke with a quiver in his voice. Corey appeared to be somewhat depressed, needy and quite frightened. The balance of the sessions Corey was less anxious, the nervous gestures ceased, and the quiver in his voice disappeared. Overall, Corey was warm, friendly, cooperative, and seemd to have a ready capacity for interpersonal relatedness. Corey appeared to have tried his best.

### PERSONALITY ORGANIZATION AND DYNAMICS:

Corey presents as a somewhat depressed and sad boy who is terrified of the environment in which he lives. A primary conflict is his fear of people versus his desire for interpersonal relatedness. His general view is that people wantonly do harm to others with impunity. In novel situations or in meeting new people he will experience a great deal of anxiety and discomfort until he can determine whether it's a safe place to be. Notwithstanding, his fearful perception of people, Corey still maintains an active desire and capacity to establish and develop interpersonal relatedness. Moreover, he still retains the ability to navigate through the social world in a warm and friendly manner. Corey presently fears his mother will abandon him, which exacerbates his negative self image and low self esteem. He feels a lack of nurturance, support, and feels the circumstances in his life are out of his control, which increases his anxiety and depression. Corey is fearful of losing control and becoming emotionally aroused. His chief defense, which is slowly being eroded, is to distance himself from his associations when stimulated and aroused. That is, he attempts to cut off or suppress his feelings. The use of such

(Continued)

Client:  Corey Johnson                     - 2 -                    December 11, 1981

an internal defense means his reality testing has the potential to degenerate unless his concerns, fears, and feelings are allowed to be expressed and explored.  In summary, Corey's strength is his "social intelligence", i.e., his ability to communicate in a warm and friendly manner with the capacity and desire for mutual exchange.  He's somewhat depressed with low self-esteem and negative self-image.  In general he views people as hurtful but maintains a ready capacity to relate on an individual basis.

INTELLECTUAL FUNCTIONING:

Summary of WISC-R

| Verbal Tests | Scale |
|---|---|
| Information | 6 |
| Similarities | 3 |
| Arithmetic | 7 |
| Vocabulary | 7 |
| Comprehension | 8 |

| Performance Tests | |
|---|---|
| Picture Completion | 10 |
| Picture Arrangement | 9 |
| Block Design | 5 |
| Object Assembly | 10 |
| Coding | 4 |

| | | |
|---|---|---|
| Verbal IQ | 77 | Borderline |
| Performance IQ | 84 | Dull Normal |
| Full Scale IQ | 78 | Borderline |

RECOMMENDATIONS:

Individual insight oriented psychotherapy is recommended (twice weekly) so Corey may begin to express and explore his concerns, fears, and feelings.  A small classroom situation is recommended with individual tutoring.  It's highly recommended that Corey be allowed to develop an individual relationship with one of the Children's Village volunteers.  This should enhance Corey's development and increase his self-esteem.


Ernest H. Adams
Staff Psychologist


Mary Sitgraves, Ph.D.
Coordinator
Children/Adolescent Services

EHA/mla

**Exhibit B**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child: COREY JOHNSON          Dates Evaluated: 2/5, 2/8/82
Date of Birth: ████████               By: Cary Gallaudet, Psy. D.
CA:            13.3                     Worker: Amira Offer
Date of (PCS) Adm: 2/1/82

### PSYCHOLOGICAL EVALUATION

Corey was referred to the Pleasantville Diagnostic Center (2/1/82) on a PINS Petition. Background history revealed long standing school problems culminating in Corey's truancy since September of 1981.

### Behavioral Observations:

Corey was a tall, slender and friendly 13.3-year old boy who spoke with markedly slurred speech. Although his face was a bit scarred Corey impressed as a good looking boy. He entered the testing easily yet his affect initially seemed depressed and flat. He was a co-operative boy who complied readily with all the examiner's requests. As the evaluation proceeded, and rapport developed Corey became more spontaneous and talkative. He seemed ambivalent about the testing; enjoying the individual attention he was receiving, but unsure about the actual assessment. At times Corey impressed as in immature boy whose playful and friendly nature often interfered with his performance. Frequently Corey would interrupt his own work with irrelevant questions about toys, games and other activities, and at those times, the examiner would have to help him refocus on the task at hand. Corey was always agreeable and pleasant, and while expressing concern over "the tests" he never seemed resistant to anything that was asked of him.

### Tests Administered:

> Bender-Gestalt
> Figure Drawings
> WISC-R
> Sentence Completion
> TAT
> Rorschach

### Intellectual Evaluation:

On the WISC-R Corey achieved a Verbal I.Q. of 85 (Low Average), a Performance I.Q. of 93 (Average) and a Full Scale I.Q. of 88 placing him within the Low Average range of intellectual functioning. Average potential is suggested by his Performance I.Q., which was slightly higher than his Verbal I.Q. There was no variability within the verbal area, however, performance tests were characterized by signficant variability. Subtest scores were as follows:

Corey Johnson                                                              -2-

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 7 | Picture Completion | 11 |
| Similarities | 7 | Picture Arrangement | 9 |
| Arithmetic | 7 | Block Design | 6 |
| Vocabulary | 7 | Object Assembly | 13 |
| Comprehension | 10 | Coding | 7 |
| Digit Span | 2 | | |

In the verbal area Corey achieved his highest score on Comprehension. His average score here suggests that Corey has a maturing conscience and moral sense. His thinking is appropriate and his ability to use practical judgment in every day social situations is a strength. On the other hand, a significant weakness was evidenced in his short term auditory memory. Corey's score on Digit Span fell in the Mentally Deficient range, indicating a severe deficit in his auditory attention for nonmeaningful material. Emphasis is made on nonmeaningful because, when using the same skill (short term auditory memory) with arithmetic problems, Corey was able to function within the Low Average range. Significant too is the fact that Corey demonstrated considerable more difficulty with Digits reversed than forward. A performance such as this, characterizes concrete rigid thinking, with a corresponding inability to shift the frame of reference from digits forward to digits reversed.

In the performance area Corey achieved his highest score on Object Assembly. His High Average score here reflects a strength with the following: the ability to anticipate part/whole relations, synthesize concrete visual forms, and assemble materials drawn from life into a meaningful whole. Significantly lower and falling within the Low Average range was Corey's score on Block Design. His score here reflects deficits in non-verbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning. Corey demonstrated real difficulty here, nearly rotating designs early on, and finally failing later designs for the same reason (rotation). These weaknesses were also evident in his Bender-Gestalt performance which was characterized by a number of rotations and distortions. He made three scorable errors, producing a Bender performance which was comparable to a child five years below his chronological age, and of those errors made two suggested the presence of an underlying neurological deficit. Visual recall was adequate but 6 out of the 9 designs reproduced were marked by severe rotations - again suggesting that a perceptual motor deficit interferes with Corey's functioning.

Personality Dynamics:

Corey is a depressed, dependent and frightened 13.3-year old who is struggling with independent strivings at this time in his life and feels immobilized as a result. This struggle presents a real conflict for Corey because on the one hand he is an ambitious boy who is searching for independence, but on the other he feels deficient, dependent and frightened. Essentially he feels unable to make it on his own and while he knows he needs help it conflicts

Corey Johnson                                                    -3-

with his reach for independence. While depressive tendencies are pervasive (many references to dying and killing one's self) Corey offsets these tendencies with fantasies whereby he feels if he tries hard enough he will fulfill his ambition. He is an ambitious boy who feels caught in the middle - being pushed and pulled - and while his independence is critical to him there is also a longing for nurturance and affection. These needs stir up considerable anxiety which he initially tries to deal with through denial. Denial is ineffective, however, and as Corey becomes more anxious he eventually regresses to an earlier stage where he is an immature boy with strong dependency needs. Hostile impulses also emerge at this time and serve to overwhelm the boy even more. Object relations are developing and Corey is an empathic and sensitive boy who can relate in a mature manner. A sensitive boy, with genuine emotional responsiveness, Corey often feels at the mercy of others' wishes, and his strong conscience causes him to respond accordingly. These conflicts are exacerbated by an organic component which clearly interferes with Corey's ability to function successfully in school. While abstracting abilities are being more and more emphasized at this time Corey falls further and further behind. It is an area of weakness for him and when challenges are not concrete and meaningful Corey is unable to integrate the experience and becomes easily overwhelmed.

Summary and Recommendations:

In summary, Corey is a sensitive and dependent boy who is struggling with issues revolving around independence. An underlying organic component serves to exacerbate the anxiety, dependence, affectional needs and hostile impulses and as a result Corey has an extremely hard time trying to integrate emotional challenges. Although evidence of a learning disability exists he continues to be an ambitious boy who is motivated to improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy. Corey needs to gain greater insight into his struggle over his ambitions, his reading deficits and his willingness to accept help. From an academic standpoint it is important that if Corey is to learn more effectively that the material be presented in the most concrete and meaningful way.

Cary Gallaudet:ww  D-2/1/82      T-232/82

Cary Gallaudet, Psy. D.

Supervised by:
George A. Sakheim, Ph.D.
Chief of Psychological Services

**Exhibit C**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON          Date of Evaluation: 9/23/83
Date of Birth:  ▆▆▆▆▆▆          By:  John B. Stadler, M.D.
Date of (PDC) Adm: 2/1/82          Social Worker:  Gayle Turnquest
Date of (PCS) Adm: 4/26/82

## PSYCHIATRIC EVALUATION

The family consists of Corey, his mother and his two years younger
half-brother.  About two years ago the mother placed the brother,
and a few months later brought Corey to SSC, which led to his admis-
sion to PDC and PCS.  She said that he had been stealing from her
(and her live-in boyfriend) and he ran away a lot, was truant and in
particular he had a long standing learning problem.  At the present
time, therefore, both boys are in placement and the mother lives
essentially alone.  Corey says she is going to school, studying
business in college.

At the Cottage School Corey has a reputation of being a good boy,
one who stays out of trouble, even though he lives in a cottage
where there is a good deal of trouble.  He does not drink or smoke
pot.  He does not run away.  I have never known him to be suspected
of stealing.  On the other hand his learning disorder is not respond-
ing to any of our teaching methods.  He seems absolutely refractory
to phonics.  His math abilities are a little bit better than his
reading ability (approximately mid-3rd grade compared to approximate-
ly beginning 2nd grade).  Psychological examinations performed by
Dr. Gallaudet in February 1982 and Dr. Barish in March 1983 indicate
a neurologic basis for his learning disorder, but no specific educa-
tional method was suggested.  PDC psychiatrist, Dr. Sundar, also
found evidence of neurologic disease.

Seen today Corey is his usual cooperative self.  He is tall (68 3/4"),
good looking, modest, self-effacing somewhat, and he still has some
remnants of his previous speech defect.

He described in a simple but descriptive way, the adventure of meet-
ing his natural father after almost thirteen years of absence.  Af-
fects would appear to be intact, judging by this experience (and
throughout the interview).  He described the reasons for his place-
ment and his brother's placement, as entirely due to "the stupid
things we do" the stealing, the running away, etc.  When I asked if
there was anthing wrong with the mother, both of whose children were
in placement, he quickly denied it, and attributed everything to the
boys' misbehavior.  The referral material says that for four years
she lived with a drug addicted, abusive man, but Corey does not have
anything to say about this person, who has since moved out of her
life.

He is well oriented, his sense of reality is good, he has a diminished
sense of the future.  Caught in a conflict between a mother who wants
him to go to college and an educational experience which has been a
hundred percent negative, he still says he thinks he should try to
find a job in computers or some other kind of professional work.  How-
ever, this is clearly rather an embarrassing subject for him.

Corey Johnson                                                    -2-

A kinetic family drawing was done in a very light hand.  The people
are drawn as stick figures in the lower left hand corner of the page,
about one-and-a-half inches high.  He drew himself and his mother play-
ing paddle ball, while his brother "is playing with his car."

Diagnosis:

Axis I.     No Diagnosis
            (History of running away and stealing, with Differential
            Diagnosis between Conduct Disorder, Socialized, Non-Aggressive
            and Parent-Child Problem, Severe; however, these are not
            present now.)

Axis II.    Long Standing Developmental Reading and Arithmetic Disorders,
            Severe.

Axis III.   Positive Soft Neurological Signs (and evidence on psychologic;
            testing of central neurologic dysfunction, diffuse).

Within the structure of this institution, Corey's behavior is quite
adequate.  He needs very Special Education, and I know of no methods
to suggest to remediate his defects, beyond a great deal of individual
attention and drill.  I leave these questions to experts of Special
Education.  It would seem, however, that with his attitudes, work
skills and behavior, he should be considered for both an on-grounds job
and vocational education at B.O.C.E.S., as soon as possible.
      John B. Stadler, M.D.:ww  D-8/23/83   T-8/26/83

                                    John B. Stadler, M.D.
                                    Clinical Director

Sec. 392 SSL                                                State Case No. _____

FAMILY COURT OF THE STATE OF NEW YORK – COUNTY OF __Manhattan_____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                                            PETITION
In the Matter of the Review of the Foster Care Status of
                                                            (Authorized Agency)

__Corey Johnson_____               :   Docket No. _____
                                                        :
                                                        :
Pursuant to Section 392 of the Social Services Law      :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   The petitioner herein respectfully alleges upon information and belief that:

   1. Petitioner is an authorized agency with offices at 250 Church Street, Borough of Manhattan, City and State of New York.

   2. The above-named child is a (fe)male child born on or about ___████████___. The names of the natural parents of said child and their residence addresses are as follows:

   Emma Lee Johnson
   640 Riverside Dr., #AE
   New York, New York 10031

   3. Petioner is charged with the care, custody and guardianship of said child, in that

   Parents signed Vol. placement papers 4/26/82


   4. Said child was placed in the foster care of the person(s)/institution named at the residence address set forth below and has remained in such foster care for a continuous period of at least twenty-four months:

Name of Foster Parent/Institution         Address                    Period of Foster Care

   JCCA/Pleasantville Cottage School, P.O. Box 237,                  4-26-82 to present
         Pleasenatville, N.Y. 10570

   5. There are no persons interested in this proceeding other than those hereinbefore specified, except




   6. That it would be in the best interest of the child to continue in foster care because
Child has severe learning disabilities and emotional problems.  He receives special
education, Casework counseling and therapy. Mother maintains interest in child,
but has not formulated plans for his return.  Child visits home regularly.  Agency
is going to counsel child toward educational and vocational planning.  Continued
care is recommended until discharged to own responsibility.

WHEREFORE, petitioner prays for a review of the foster care status of said child, pursuant to Section 392 of the Social Services Law, and that the Court enter an order of disposition continuing the present foster care of the above-named child and granting such other and further relief as to the Court may seem just and proper.

   SSC #4766716-28
   Agency #567
   Team #                              Commissioner of Social Services of the City of New York
   Expir. 10/85
                                       BY _____
                                                        Attorney

Form W-864B
Rev, 4/21/80

**Exhibit D**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child: COREY JOHNSON        Date of Evaluation: 6/29/84, 12/27/8
Date of Birth: ██████             By: Elizabeth B. Clemmens, M.D.
Date of Adm: 4/26/82               Social Worker: Christine Aaron

## PSYCHIATRIC SUMMARY

Corey was placed at PCS over 2½ years ago, after having spent two months
at the Pleasantville Diagnostic Center. His mother felt unable to take
care of his problems while she was apparently struggling with her own.
Corey had serious academic deficits in addition to problems with his
behavior. He fought in school, was often truant, and stole from the
family. A half-brother was in placement at Children's Village at that
time; a few weeks ago, he was admitted to our Diagnostic Center. The
family's home life has been unstable and often chaotic with much
violence and abuse.

For historical details, the reader is referred to the Psychosocial
Summary of 3/82.

The psychiatrist at the Diagnostic Center diagnosed an adjustment disord
and a special developmental reading disorder. A later psychiatric
examination (9/83) found him to have a developmental reading and arith-
metic disorder. The psychologist found Corey to have an I.Q. of 88.
More important though, Corey has severe learning disabilities in
reading, spelling and arithmetic, but adequate comprehension. The
psychologist recommended teaching him with a whole word sight vocabulary
approach, bypassing phonics.

In June of 1984, Corey was transferred to a Senior Cottage. He made an
easy transition and        has not been a management problem. During the
summer, he worked at the Pace Farm as part of the Youth Employment
Summer Program, doing manual labor. In September, he continued classes
at BOCES where he learns carpentry and apparently is doing well. Corey
has made only slow progress in academics. He is supposed to receive
remedial reading and speech therapy but, for reasons not clear, has
had no one-to-one instruction for several months.

In my office, Corey has been friendly and polite, and has answered
questions in a relevant way but with few words and without spontaneous
comment, with a few exceptions. Last June, when I asked him about his
father, he replied that he saw him when he was 13 at his grandfather's
home. He then added, "We see each other then and there, like father
and son do," a very evasive answer.

Corey's goals have become more realistic since his last evaluation.
He enjoys carpentry work and would like some day to be a carpenter or
a construction worker. At our last meeting, Corey was sarcastic and
extremely resentful about receiving neither remedial reading nor
speech therapy: "Schoolwise, they haven't done a thing for me. They
helped me with home." When I questioned the lack of remedial teaching,
he answered angrily, "They get my hopes up high and then you do no
shit. That's why I want to depend on nobody no more...You are all
full of shit, everyone of you...Nobody has raised a finger." Corey

COREY JOHNSON                                                        -2-

made all these comments after he had told me that he did not want to
talk about academics. He denied having a girlfriend (I think she left),
which might have contributed to his bad mood. He worries about
receiving "young adult" status which would give him special privileges.

Corey is now 16 years old. He is tall, cooperative and mostly polite.
Today, though, he was resentful and sarcastic. He grew up in a
disorganized and at times chaotic home. Outside of being raised in a
problematic family            he.has to cope with a severe learning
disability which is highly frustrating and embarrassing. It is
understandable that he feels bitter and resentful about not receiving
adequate help. In addition, it is difficult for him that he had to
relate to five different social workers within one year. Corey's
vocational training seems to be satisfactory. His psychological
testing gives evidence of organic symptomatology with an overlay of
emotional problems. The latter, though, have considerably improved
during the past 2½ years. The former is a permanent handicap Corey
has to learn to live with. Much encouragement and praise for his
motivation and good manual skills will help him face up to reality.

### DIAGNOSIS

Axis I          1. Conduct Disorder, Socialized, Nonaggressive, in
                remission
             2. Parent/child problem

Axis II         Mixed Specific Developmental Disorder, Severe

Axis III        Evidence of diffuse neurological dysfunction (see psycho-
                logical testing and positive soft neurological signs)

### RECOMMENDATIONS

1.  Continue vocational training and prepare for independent living.

2.  Continue remedial reading and speech therapy as recommended by the
    psychologist.

3.  Psychotherapy to encourage him and help him cope with reality.

4.  Discharge to a group residence.
    Dr. Clemmens:ww  D-1/18/85 T-1/31/85


                          Elizabeth B. Clemmens, M.D.
                          Psychiatrist

**Exhibit E**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON          Date of Testing: 3/83
Date of Birth:  ████████              By:  Ken Barish, Ph.D.
Date of (PCS) Adm:  ███/              Social Worker: Gayle Turnquest

PSYCHOLOGICAL AND EDUCATIONAL EVALUATION

Referral:

Corey was evaluated at Pleasantville Diagnostic Center in February
1982.  At that time Corey achieved a Full Scale I.Q. of 88, with a
Verbal I.Q. of 85 and a Performance I.Q. of 93.  Indications of
diffuse neurological dysfunction were evident as well as very strong
depressive tendencies and an emphasis on denial as a defense.  Corey
remained ambitious, however, with a strong conscience and capacity
for empathy.

In conference it was reported by Corey's teacher that his academic
skills are very poor.  This evaluation was requested to provide addi-
tional clarification of the nature and extent of Corey's learning
difficulties and to make recommendations for remedial strategies.

Tests Administered:

                    Wide Range Achievement Test
                    Neuropsychological Screening Tasks
                    Bender-Gestalt
                    Benton Visual Retention Test
                    Spreen-Benton Aphasia Tests
                    Raven's Progressive Matrices
                    Purdue Pegboard
                    Gilmore Oral Reading Test
                    Human Figure Drawings

Observations:

Corey was cooperative throughout the evaluation and demonstrated gener-
ally good frustration tolerance despite the very real difficulty he en-
countered on many of the tasks presented to him.  Corey's willingness
to continue to put forth effort on academic tasks without impulsivity
or withdrawal is an impressive strength, particularly considering the
severity of his learning disabilities.

Test Findings:

The present test findings confirm the presence of severe learning dis-
abilities in reading, spelling and arithmetic.  There is an abundance
of findings which strongly suggest diffuse neurological dysfunction
with associated impairment in many aspects of cognitive functioning.
Difficulties in attention and concentration are a prominent factor
in Corey's learning difficulties.  In addition, Corey demonstrates
specific language deficits (i.e. speech sound discrimination, phonic
associates, sound blending) and also deficits in visual-spatial
analysis, visual-motor and fine motor coordination and perhaps also
visual memory.  These findings will be discussed below.

Corey Johnson                                                          -2-

On the Wide Range Achievement Test Corey obtained a Reading Score
at the 1st percentile (SS 62), a Spelling Score at the 1st percentile
(SS 64) and an Arithmetic Score at the 2nd percentile (SS 68).  Corey
understands basic arithmetic operations including borrowing and carry-
ing but has difficulty with division and more complex operations.
Some of Corey's errors seem to result from inability to sustain at-
tention on problems, and also from some confusion in the spatial
analysis on arithmetic problems.  With regard to reading, Corey has
a small sight vocabulary but has great difficulty in analyzing words
phonetically.  Reversals were occasionally noted in Corey's naming
of letters and sound sequencing errors were common in his reading.
Attentional errors also appeared to impair Corey's reading.  Corey
can spell only a few simple words.  His ability to read or spell
using a phonetic approach is severely limited, and Corey's attempt
to spell even some simple words (e.g. "arm") are unrecognizable.
Also apparent is some difficulty in the formation of letters and
numbers, perhaps also some difficulty in discriminating letters of
similar shape.

Corey's reproductions of the Bender designs reveals a significant
deficit in visual-motor coordination.  His performance on the Benton
Visual Retention Test strongly suggests a deficit in visual memory
or visual-motor functioning.  A significant problem in visual-spatial
analysis was evident on the Raven's Progressive Matrices.  Attentional
difficulties also contribute to Corey's poor performance on this task.
Corey's performance on the Purdue Pegboard reveals significant prob-
lems also in fine motor coordination.  Corey is right dominant in
hand, foot and eye preference.  Left-right awareness is well establish-
ed on self, but not for mirror rotation; Corey consistently misplaced
right and left on an examiner facing him.  Finger recognition is un-
impaired.  Corey showed no difficulty with tongue and mouth movements.

Several tests of language functions were also administered.  Language
comprehension (Token Test) is unimpaired, except for occasional in-
attention.  Naming of colors, body parts, and common objects was also
unimpaired.  Corey's immediate memory for digits, although improved
over previous testing remains poor.  Mild articulation errors were
noted.

A specific deficit in speech sound discrimination was apparent.  Corey
knows the names of all the letters of the alphabet and the consonant
sounds.  Discrimination of vowel sounds, however, is very poor.  When
asked to say the sounds of different vowels, Corey produced essential-
ly the same sound for each vowel.  When asked to blend sounds into
nonsense words, Corey would blend adequately but often misprounced
the vowel sounds.

Conclusions and Recommendations:

This evaluation confirms the presence of severe learning disabilities
in reading, spelling and arithmetic.  Corey's learning difficulties
result from wide spread cognitive deficits, including problems in

Corey Johnson                                                            -3-

attention and concentration, visual processing, and speech sound dis-
crimination and phonics.  It is probably because of this that Corey
has been unable to find compensations that would enable him to achieve
a higher level of academic skill.  With regard to remediation, it
would appear that a whole word sight vocabulary approach, bypassing
phonics and sound blending would be more productive in improving
Corey's reading and spelling.  Corey and his family should be counsel-
led regarding the nature of his learning difficulties and a school
program with less focus on academic skills should be considered.
    Ken Barish, Ph.D.:ww D-4/11/83    T-4/29/83

                              Ken Barish, Ph.D.
                              Psychologist

**Exhibit F**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON                    Date Tested: 3/15/85
Date of Birth:  ████████                         By:  Kenneth Barish, Ph.D.
Date of (PCS) Adm:  _____                 Social Worker: Christine Aaron

### PSYCHOLOGICAL EVALUATION

Referral:

Corey was referred for re-evaluation to assess his current cognitive
and emotional functioning.  Corey was last tested in March 1983, by
this examiner, and in February 1982 at Pleasantville Diagnostic
Center.  These evaluations reveal severe learning disabilities in
Reading, Spelling and Arithmetic, associated with impairment of
attention and concentration, visual-spatial skills and specific
language deficits; significant depressive tendencies were also
noted.

Tests Administered:

                    WISC-R
                    Rorschach
                    TAT

Test Findings:

On the WISC-R Corey achieved a Verbal I.Q. of 68-70 (Mentally De-
ficient-Borderline range), a Performance I.Q. of 78-81 (Borderline-
Low Average range), and a Full Scale I.Q. of 69-74 (Deficient-Border-
line range).  Subtest scaled scores are presented below:

| | | | |
|---|---|---|---|
| Information | 4 | Picture Completion | 8(9) |
| Similarities | 5(6) | Picture Arrangement | 9 |
| Arithmetic | 6(7) | Block Design | 1(5) |
| Vocabulary | 5 | Object Assembly | 5(6) |
| Comprehension | 4 | Coding | 6 |
| (Digit Span | 6) | | |

(Alternate scores reflect improvement in performance with addition-
al time and/or assistance from the examiner.)

These scores reflect a significant decline in both Verbal and Per-
formance I.Q. since Corey was tested in 1982.  At that time a Ver-
bal I.Q. of 85, a Performance I.Q. of 93 and a Full Scale I.Q. of
88 were reported.  There is also some difference in a pattern of
subtest scores.  Corey achieved significantly lower scores on the
current testing on both the Comprehension and Object Assembly sub-
tests.  This decline in I.Q. scores is difficult to account for.
However, several factors may be involved.  The current scores
may reflect in part, the increasing demands that the tasks pre-
sented as well as Corey's failure to learn at an expected pace.

Corey Johnson                                                                   -2-

They also undoubtedly reflect the effects of Corey's severe dis-
couragement and depression with respect to cognitive tasks.  For
example, with minimal assistance, Corey was able to improve his
performance considerably in many instances.  This was evident on
the Similarities, Arithmetic, Block Design and Object Assembly sub-
tests.  Corey's very deficient score on the Block Design subtest
is the result of several rotations of designs that he easily cor-
rected when his error was pointed out to him.  These scores, should,
therefore, not be taken as an indication of Corey's intellectual
potential.  Corey's intellectual difficulties remain clearly evident,
however, and my recommendation now, even more strongly than two years
ago, is that Corey needs a highly vocationally oriented school pro-
gram.  Some efforts should be made to help Corey achieve a level
of literacy that will enable him to function in the working world,
however, Corey is unlikely to improve significantly in this area.

Personality Functioning:

Personality assessment reveals a thoughtful, highly reflective, but
affectively constricted adolescent.  Corey expends considerable
energy in his efforts to suppress anger.  He appears vulnerable to
periods of depression and frustration.  There is also evidence of
feelings of aloneness and a desire for help, that is not being
heard.  Several responses suggest that Corey feels that he is not
being listened to.

Corey's test responses also reveal an effort toward maturity that
is particularly impressive, considering his severe learning dis-
abilities.  Corey's TAT stories reveal, for example, an awareness
that life has trials and tribulations that must be coped with and
an acceptance of the reality that life is sometimes painful, for
example, that there are painful separations.  Corey's stories empha-
size his concerns regarding the future and his constructive and
mature goals.  For example, he tells a story about a young man
"wondering if he's going to have a job and a nice life, maybe some
kids and a wife to support and help him move on in life."  This
effort towards maturity is at the cost of a constriction of Corey's
emotional life, particularly a suppression of anger and rebellious-
ness and an overly compliant attitude towards authority.  Corey
also tends towards extremes of either/or, good/bad in his thinking
about himself and his life.  Corey could benefit from greater ac-
knowledgement and acceptance of his anger, integrating anger into
his identity along with a less narrow definition of maturity.

Recommendations:

As indicated earlier, Corey needs a vocational school program with
some remediation in literacy skill.  He could also benefit from
counselling and supportive psychotherapy both in regard to prob-
lems of self-esteem related to his learning disabilities and also
supporting and broadening his efforts to become a mature adult.
        Kenneth Barish, Ph.D.:ww  D-4/15/85      T-4/15/85

                                    Kenneth Barish, Ph.D.
                                    Psychologist

**Exhibit G**

PLEASANTVILLE COTTAGE SCHOOL

<u>CURRENT ASSESSMENT</u>

Name of Child:   COREY JOHNSON
Date of Birth:   ███████
School Grade:    Ungraded
Nature of Place-
        ment:    Voluntary

Date of Admission (PCS):
                4/26/82
Date of Adm. (PDC): 2/1/82
Date of Conference: 8-10-84

<u>Conference Participants:</u>

Jerry Lefkowitz, Unit Administrator; Gordon Hilton, Child Care Worker; Gerard Maier, Social Worker; Corey Johnson, Mrs. Johnson did not attend the conference.

<u>PRESENTING PROBLEM:</u>

Corey Johnson was initially placed at Pleasantville Cottage School due to truancy, acting out in school and at home. An emotionally disturbed boy with organic deficits, he was raised in an unstable and chaotic environment. His mother was unavailable to him, unable to provide structure and support. Corey's developmental history included stuttering until age five and encopresis from age eight to twelve. He was left back in school in the 3rd and 4th grade. He was placed in a special class in 1980. He has severe learning disabilities, has never progressed beyond the 2nd grade reading level. Upon admission he was seen as a depressed youngster with soft neurological signs, was reacting to the family's chaotic situatio: and to his mother's unavailability.

<u>CURRENT FUNCTIONING:</u>

Child:

Corey was transferred into Cottage 7 in June. It was felt that this was an appropriate placement for him due to his age and the fact that many of the boys in Cottage 7 are moving towards independent living, a plan that seems appropriate for Corey. He was reluctant to make this change but had several months to work it through. He's made the transition to the older cottage easily. Corey is not a management problem. He's had no difficulty learning the routine of the cottage, following cottage expectations. A good athlete, Corey enjoy's sports particularly baseball and basketball. He's friendly with the other boys and appears to be developing a particu: friendship with Larney Hunter. He's friendly and related to all the cottage staff. Corey does not draw attention to himself. It would seem that he could become "lost" in the cottage with attentio being deferred to the more verbal or acting out boys. Corey has spent the summer working at the Pace Farm as part of the Youth Employment summer program. This is difficult manual labor.

Corey Johnson                                                    -2-

As with his previous job Corey worked in a responsible and consistent
way.  It is seen as a real strength for him that he is able to
take the responsibility for a job and follow through with it.

School as always      is a major concern for Corey and an important
part of his treatment plan.  This fall he will again attend the
B.O.C.E.S. Program.  He will also receive Speech Therapy once a
week.  Corey puts a great deal of pressure on himself to do well
in school.  As noted, he is handicapped with severe learning dis-
abilities.  Educational goals are geared towards helping him achieve
some competency with the work to enable him to gain a functional
literacy.  The plan is to work towards a G.E.D. diploma and vocationa:
experience.  Corey has appeared less depressed and upset with his
functioning in school.  The team feels that he will benefit from
another year in the B.O.C.E.S. Program.  Corey is also interested
in taking a part-time job at Caldor's in Elmsford.  Considering
his learning handicaps  and his competency on the job, it would
seem that such a plan would be beneficial to this boy.  In the
fall we will investigate the possibility of combining the school
and a part-time work program for him.

During the Spring, in individual and family meetings
        Corey chose to remain at Pleasantville Cottage School for
another year.  It is questionable that he will ever return home
permanently.  Visits, however, were increased to provide him with
more contact in the community to enable him to function more independ
in the community, (i.e. to learn how to travel and to plan for
himself) and to help him to "test out the waters" regarding
his home situation.  Home visits have gone without incident.  Corey
claims he ejoys them.


Mrs. Johnson continues to be available to attend some meetings
with the agency and                                 plan's on having
Corey returned to her.  She is unable, however, to name a specific
time.  The treatment team does not believe that such a plan will
work.  Mrs. Johnson is experiencing serious problems with her
youngest son Robert who has just been returned to her care from
Children's Village.  She describes Robert as difficult to manage
in the home and acting out in the community.  Children's Village
has referred Robert to several day treatment programs in the communit
however, Mrs. Johnson is not satisfied with these referrals and
is interested in re-placing her son.  She continues to deny any
conflict and any ambivalence regarding Corey.  However, what is
currently going on with Robert can be seen as a reflection of
what will happen if Corey were _ to return to her care.  Our major
goal in the upcomming months is to work with Mrs. Johnson on the
                                        reality of the situation
possibly help    her maintain regular contact with Corey (i.e.
through home visits)                                  and encourage
move towards some type of Group Residence.

<u>Corey Johnson</u>                                                    -3-

In sessions Corey is related and quite verbal. He's anxious to make a good impression and seeks approval. Early meetings have centered on his loss and the confusion he's experienced over changing cottages as well as having several social workers over the past few months. He's enthusiastically discussed plans for the upcomming school year. As noted he's interested in working off campus and achieving a young-adult status. Corey is very comfortable with the structure and support of Pleasantville Cottage School. Home and family issues are presented as conflict-free. This is consistent with the way Corey has presented his home situation since placement with us. He's unable to express any ambivalence regarding his unavailable though outwardly conforming mother. Corey states that he would like to return home, however he is also considering the possibility of a Youth Residence Center or a Group Residence. problem solving, encouraging his planning for himself and encouraging strives towards growth and individuation. The issue of where he will go in the future and when is closely tied to dynamics of this boy and his family. The difficulty with denial is demonstrated by both Mrs. Johnson and her son.

<u>History and Present Functioning</u> indicates that it would not be in Corey's interest to return home. Mrs. Johnson has consistently demonstrated ambivalence regarding him. The situation with Robert indicates her difficulty in being available and also settting limits. Both parties will need help in maintaining some separation while continuing contact. Living in a Group Residence will provide the structure and a less conflictual environment that will enable Corey to grow and develop.

<u>CONFERENCE RECOMMENDATIONS</u>:

1. Corey will continue in the B.O.C.E.S. Program as well as in Speech Therapy.

2. The team will investigate the possibility of including a part-time job in his daily activities.

3. Caseworker will focus on providing support and encouragement to individuate.

4. As noted, the focus must be kept on the discharge planning for this boy. In May we applied for and received an approval for a plan of discharge to self. The treatment team considers this the most appropriate plan for this boy. Work must be done with Mrs. Johnson as well as Corey in accepting the concept of Corey living in a Residence but maintaining regular contact with his family.

Gerard Maier:ww    D-8/31/84        T-9/4/84

                                        Gerard Maier
                                        Social Worker