# EXHIBIT 71

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FILED
JUN 24 1999
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| COREY JOHNSON, )<br><br>Petitioner, )<br><br>v. )<br><br>SAMUEL PRUETT, WARDEN, )<br><br>Respondent. ) | Criminal No. 92CR68<br><br>Civil No. 97CV895 |
| RICHARD TIPTON, III, )<br><br>Petitioner, )<br><br>v. )<br><br>RONALD ANGELONE, WARDEN, )<br><br>Respondent. ) | Criminal No. 92CR68<br><br>Civil No. 98CV361 |
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>JAMES H. ROANE, Jr. )<br><br>Defendant. ) | Criminal No. 92CR68<br><br>Civil No. 98CV360 |

**PETITIONERS' JOINT MOTION FOR LEAVE TO TAKE DISCOVERY**

Pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings For the United States District Courts, petitioners Richard Tipton, Corey Johnson and James Roane respectfully request leave of the Court to take discovery. The grounds for this motion are stated below.

## INTRODUCTION

On June 1, 1998, Petitioners moved this Court for post-conviction relief pursuant to 28 U.S.C. § 2255. Petitioners also filed memoranda of law detailing their compelling claims for post conviction relief, including, *inter alia,* claims that in its zeal to convict, the government (1) presented false testimony and misrepresented evidence; (2) concealed exculpatory evidence; (3) misled the Court in order to avoid its obligation to disclose the addresses of its witnesses; (4) improperly purchased testimony in violation of 18 U.S.C. § 201(c); and (5) improperly discriminated against women in selecting the jury. Petitioners also raised claims of ineffective assistance of counsel, possible jury taint and failure of proof of participation in a CCE. Petitioner Tipton presented his claim that the evidence before the jury was insufficient to support his murder convictions or his death sentences, and Petitioner Johnson also presented his claim that his execution is barred due to mental impairments.

Petitioner Tipton's motion and opening memorandum included a request for discovery and an evidentiary hearing, in which petitioners Johnson and Roane joined. Petitioners' filings with the Court have established that they are entitled to discovery and an evidentiary hearing on certain claims , while on other claims, they are entitled to relief without discovery or an evidentiary hearing. Presently, petitioners seek the Court's leave to take discovery pursuant to the Rules Governing Section 2255 Proceedings for the United States District Courts ("Section 2255 Rules").

## ARGUMENT

### 1.  Legal Standards[1]

Upon a showing of "good cause," a petitioner under Section 2255 is entitled "to invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure or elsewhere in the usages and principles of law."  Section 2255 Rule 6(a).  Although "good cause" is not defined in the Rule, courts have applied a standard for granting habeas discovery that first was articulated by the United States Supreme Court in *Harris v. Nelson*, 394 U.S. 286 (1969).[2]

In *Harris*, the Court held that federal courts have inherent power to grant discovery in habeas cases, despite the absence of legislation expressly providing for it.  Specifically, the Court noted that the All Writs Act, 28 U.S.C. § 1651, gave federal courts the power to "fashion appropriate modes of procedure," including discovery, to dispose of habeas petitions "where necessary to accomplish the objective of the proceedings."  394 U.S. at 299-300.  The Court then concluded that:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the ***duty*** of the court to provide the necessary facilities and procedures for an adequate inquiry.

*Harris*, 394 U.S. at 300 (emphasis added).

---

[1] *See also* Reply Memorandum in support of Motion of Richard Tipton, III to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. Section 2255 at 29-39.

[2] Although *Harris* was decided before enactment of Rule 6, the Advisory Committee Notes to Rule 6 make it clear that the rule is intended, at a minimum, to codify *Harris*.

Although the Advisory Committee note to Rule 6 embraces the Supreme Court's decision in *Harris*, the rule in fact authorizes **broader** discovery than *Harris*. For example, while *Harris* suggested that a petitioner might have to establish a "prima facie case for relief" as a prerequisite to discovery, *Harris*, 394 U.S. at 290, the Advisory Committee's discussion of *Harris* omits the "prima facie case" language used by the Court in the decision, *see* Advisory Committee Section 2255 Rule 6, indicating that Rule 6(a) permits **the use of discovery to establish** a prima facie case for relief.

The Supreme Court's decision in *Blackledge v. Allison*, 431 U.S. 63 (1977), decided just after the adoption of Rule 6, supports this broad interpretation of "good cause." In *Blackledge*, the Court held that the district court should not have dismissed a petition summarily and without further factual inquiry. The Court cited with approval the Advisory Committee's suggestion that federal judges use pre-hearing discovery as one means of determining, without resort to an evidentiary hearing, whether there is a factual basis for the petitioner's claims. The Court ruled that habeas petitions should not be dismissed without discovery or an evidentiary hearing unless the allegations themselves are so ("vague [or] conclusory . . . " as to warrant dismissal for that reason alone." 431 U.S. at 75. The Court explained that:

> The critical question is whether these allegations . . . [are] so palpably incredible, so patently frivolous or false as to warrant summary dismissal. In light of the nature of the record of the proceeding at which the guilty plea was accepted, and of the ambiguous status of the process of plea bargaining at the time the guilty plea was made, we conclude that Allison's petition should not have been summarily dismissed.

431 U.S. at 76 (citation omitted). The Court noted that even if, in the end, a full evidentiary hearing might not be required upon remand, a habeas petitioner is entitled to careful consideration and plenary processing of [his claim,] including full opportunity for a presentation

of the relevant facts. *Id.* at 82-83. (alteration in original) (citing *Harris v. Nelson*, 394 U.S. at 298).

The Supreme Court recently affirmed that discovery should be the rule, and not the exception, for well-pled habeas claims. In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court underscored that Rule 6(a) is intended, in essence, to weed out frivolous claims, and to allow development of well-pled claims.

Petitioner Bracy had been tried and convicted of capital murder by a judge who had bribed other judges as a defense lawyer, and accepted bribes after ascending to the bench. The judge tried Bracy's case between cases that he had fixed after accepting bribes. The judge had appointed one of his former partners to represent Bracy, and Bracy was tried quickly and sentenced to death. Bracy theorized that to avoid detection, the judge balanced his leniency in fixed cases with undue harshness in others.

The Seventh Circuit agreed that this theory was "plausible", but found it not "sufficiently compelling [an] empirical proposition" to justify presuming actual bias in Bracy's case. 520 U.S. at 903 (*quoting Bracy v. Gramley*, 81 F.3d 684, 689-90 (7th Cir. 1996)). The Seventh Circuit also held that Bracy had not shown "good cause" for discovery to prove his claim, as is required by Rule 6(a). The Circuit Court reasoned that, even if Bracy were able to uncover evidence that the judge sometimes "came down hard" on defendants who did not bribe him, that would not demonstrate that this bias infected Bracy's trial. 81 F.3d at 690-91.

In a unanimous decision, the Supreme Court reversed, and held that Bracy was entitled to develop his claim in federal district court. The Court noted that Bracy's claims were "quite speculative," "only a theory at this point," and were "not supported by any solid evidence of petitioner's trial lawyer's participating in any such plan." Nevertheless, the Court remanded for

- 5 -

further proceedings because "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he . . . is entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Bracy,* 520 U.S. at 908-09 (quoting *Harris v. Nelson,* 394 U.S. at 299). The Court put "difficulties of proof aside," permitting discovery despite the recognized possibility that Bracy would not uncover the evidence he sought. 520 U.S. at 905, 907. The Court's unanimous decision in *Bracy* underscores the federal district court's ***duty*** to permit discovery if a petitioner has pled a claim upon which relief ***may*** be granted.

Thus, Rule 6(a) does not impose a high hurdle intended to make habeas discovery the exception, rather than the rule. Instead, it serves a gatekeeper function, weeding out obviously specious claims. *See Harris,* 394 U.S. at 300. Petitioners' claims are anything but specious, and where, as here, a petitioner presents specific allegations demonstrating that, if the facts are fully developed, he may be entitled to relief, it is the duty of the Court to provide appropriate discovery.

Petitioners' claims are precisely the types of claims for which Court-ordered discovery is ***essential***. Several of these claims involve, either directly or indirectly, allegations of Government misconduct. For obvious reasons, such claims rarely, if ever, can be developed fully without access to documents not otherwise available to petitioners, and witnesses who otherwise are unwilling to cooperate, as is the case here.

In *Machibroda v. United States,* 368 U.S. 487 (1962), the Supreme Court explained why claims of prosecutorial misconduct typically cannot be resolved on the pleadings and summarily dismissed. Petitioner Machibroda claimed that his guilty plea was induced by a prosecutor's unkept promise, and the district court, believing reasonable inferences suggested the claim was

- 6 -

false, and crediting a prosecutor's affidavit denying the allegations, dismissed the claim without an evidentiary hearing. *Id.* at 491-93.

The Supreme Court found the claim "improbable," but reversed because it was not "incredible." 368 U.S. at 495. The Court held that Section 2255 requires an evidentiary hearing "unless the motion and the files and records of the case conclusively show the prisoner is entitled to no relief," and that "[t]his was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court." *Id.* at 494. Rather, the claims "related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light," and could not be resolved by the judge "drawing upon his own personal knowledge or recollection." *Id.* at 494-95. The Court concluded:

> Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge. The government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

*Id.* at 495 (citation omitted); *see also United States v. Banks*, 1998 WL 808408 (4th Cir. 1998) (noting that, despite the discretion afforded the district court, there is "a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court") (quoting *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970); *Blackmon v. Scott*, 22 F.3d 560, 565-66 (5th Cir. 1994) (requiring evidentiary hearing on claim that prosecutor used perjured testimony, to determine both falsity of testimony and materiality, where state vigorously denied allegations made by petitioner, creating an issue of material fact). Similarly, the court cannot resolve petitioners' claims by the counter-allegations contained in the government's

memorandum seeking to dismiss their Section 2255 motions. Petitioners are entitled to discovery, and it would be an abuse of discretion to deny their requests.

## 2. Prosecutorial Misconduct

### a. Perjured Testimony

A prosecutor's knowing use of false testimony violates the Due Process Clause. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. *Kyles v. Whitley*, 514 U.S. 419 (1995). Reversal is "virtually automatic" where the government knowingly permits the introduction of false testimony, *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975), but a conviction procured with such testimony should also be set aside if the government *should have known* it was false, or merely allows false testimony to pass uncorrected. *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994).

#### (1) Factual Background

##### (a) Maurice Saunders

As Tipton's opening and reply memoranda make clear, government witness Maurice Saunders gave material false testimony when he claimed to have traveled to New York on two occasions to buy large quantities of powder cocaine for Tipton. Tipton Mem. at 58-60; Tipton Reply at 39-45. Saunders' materially false testimony was critical to the government's case for a number of reasons. First, the government used Saunders' testimony as evidence that the alleged Newtowne CCE had its origins in New Jersey and New York. Second, Saunders' testimony also provided evidence that the Newtowne CCE was an extension of the New York Boyz conspiracy. The government also established a nexus between the alleged New York Boyz conspiracy and

- 8 -

the Newtowne CCE by highlighting the consistency between Greg Scott's and Saunders' testimony.

The third critical aspect of Saunders' testimony was his statement to the jury that Tipton and his co-defendants sold substantial quantities of cocaine. Similarly, his testimony provided evidence that the CCE generated substantial income. Finally, the government used Saunders' testimony to rebut one of the defense's major themes – that the prosecution orchestrated its case against Tipton and his co-defendants. The Government used Saunders' testimony to argue they could not have orchestrated the case because Saunders' and Scott's testimony was consistent.

The allegations contained in this claim are specific and serious. Moreover, petitioners have substantiated them to the best of their ability through the efforts of their investigator, who has interviewed and taken statements from persons with first-hand knowledge about these events. Petitioners require discovery on this claim, in order to permit them to develop fully the facts showing that Saunders' trial testimony was false, that the prosecutors knew it was false, should have known it was false, or let it pass uncorrected.

### (b)    Greg Scott

Greg Scott gave material false testimony concerning the allegedly highly organized, violent drug organization he referred to as the New York Boyz. Petitioners' allegations are set forth in detail in Tipton's opening and reply memoranda. Memorandum of Law in Support of Tipton's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 ["Tipton Mem."] at 62-69. Scott's testimony was critical to the government's case because his testimony established the conspiracy that formed the roots of the CCE. The government orchestrated Scott's and Saunders' testimony to create the illusion of a continuing connection between the New York Boyz and the alleged Newtowne Gang. Without Scott's testimony, the government

- 9 -

could not prove the murders in this case occurred in furtherance of a CCE, in which case petitioners could not have received death sentences.

In the course of post-conviction investigation, petitioners have interviewed several members of the alleged New York Boyz conspiracy. These individuals, although they admit they were friends and did deal drugs, dispute that they operated as a highly organized, violent drug operation. Most importantly, post-conviction investigation has revealed that "Light,"[3] the supposed leader of the New York Boyz and the Newtowne Gang's purported supplier of bulk cocaine, was incarcerated in New Jersey during the entire existence of the alleged Newtowne Gang. *Id.* at 59-60. It is therefore clear that Scott's testimony was false, and petitioners are entitled to discovery to determine whether the government knew it, should have known it, or allowed it to pass uncorrected.

### (c) Hussone Jones

At trial, Hussone Jones gave devastating and detailed testimony that he witnessed Tipton murder Douglas Talley and saw first-hand the events preceding and following Talley's murder. Tipton's opening and reply memoranda assert that Jones' testimony was a lie and violated Tipton's right to due process. Tipton Mem. at 69-71; Tipton Reply at 49-50. Tipton's claim is supported by evidence contained in the record and by Tipton's post-conviction investigation that includes the sworn statement of "Wildman," a.k.a. Marcus Tyler Stevens, that Jones' testimony was false. In his affidavit, Wildman makes three critical statements. He states that he never saw Tipton with a knife and that Tipton never gave him a knife to wash. These sworn statements clearly contradict Jones' trial testimony that Tipton gave a knife to Wildman. Finally, Wildman states that he

---

[3] "Light's" real name and other aliases are defined in Exhibit A.

spoke to and provided information to lead prosecutor Vick, who asked Wildman many questions.

Tipton has produced evidence supporting this claim. See Reply Memorandum in Support of Motion of Richard Tipton, III to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 ["Tipton Reply"] at 49. Mr. Vick's affidavit, Memorandum for the United States in Response to Petitioners' Motions for Collateral Relief ["Gov't Mem."] Exh. B, stating that his notes contain no exculpatory materials merely creates an issue of material fact pursuant to *Machibroda, supra*, and therefore makes this claim ripe for discovery. A failure to allow discovery on this claim would be an abuse of discretion.

### (d)    Priscilla Greene

Priscilla "Pepsi" Greene provided testimony at Roane's trial that was crucial to James Roane's conviction and death sentence. Her claim that Douglas Moody was killed "because [Johnson] and [Tipton] and them didn't want . . . [Moody] to work in that area . . . [s]elling cocaine," Tr. at 2553, was the *only* evidence that Moody was killed in furtherance of the CCE, and thus the only evidence supporting his death sentence. However, it is clear that Ms. Greene lied at Roane's trial regarding her role as a drug seller, *see* Richard Tipton's First Amendment to Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 and to Memorandum in Support of Petition at 4-7, but more importantly, concerning the murder of Douglas Moody. It also seems clear that the prosecution knew or should have known that her testimony was false or, at a minimum, allowed it to pass uncorrected.

The government theorized that Moody was shot in an apartment at the back of a house, and that he then leapt through a window, after which Roane stabbed him. "Pepsi" Greene testified at Roane's trial that on the night of the murder, she was on the corner across the street,

- 11 -

when she heard gun shots, after which Roane and Tipton came out of the house. Tr. 2548-49. She testified that she then went back in the house from which Moody, Tipton and Roane had just come, to "straighten up." She claimed that Roane then came in the house and asked her for a knife. Tr. 2550. According to Ms. Greene, she then went back outside, and after Roane "finished killing" Mr. Moody,[4] he asked her to dispose of the knife. Tr. 2548, 2551.

However, Ms. Greene's testimony in the subsequent trial of Vernon Lance Thomas reveals that her testimony against James Roane was not true. Ms. Greene testified at Thomas' trial that prior to the killing, she was in fact *inside* the apartment in which Moody allegedly was shot. *See* Amended Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, Exh. A at 426. In addition, she revealed in Thomas' trial what she had concealed in Roane's – that her boyfriend and drug-selling partner, Curt Thorne, was also in the apartment at the time Moody was shot. Ms. Greene claimed that "they excused [her] out of the house," and she went out to the corner. She then heard gunshots, after which *Thorne* ran out of the house, followed by Roane, who "ran up the street." *Id.* Then, she claimed, Moody jumped out the window, and lay on the porch, while Ms. Greene returned to the apartment to "clean up." *Id.* at 426-27.

The discrepancies in Ms. Greene's accounts are critical. Her testimony at Thomas' trial regarding her own and Curt Thorne's presence in the apartment where Moody was shot would have further undermined her already shaky credibility in James Roane's trial. Thorne was Ms. Greene's boyfriend, Tr. 2544, and, as Ms. Greene finally revealed in the Thomas trial, she sold drugs with him. Exh. A at 421-22. Ms. Greene's obvious motive to lie – to prevent exposure of Thorne's and, possibly, her own role in the murder – was hidden from the defense in Roane's

---

[4] Despite her claim that Roane "finished killing" Mr. Moody, Greene admitted

trial. Ms. Greene's credibility is all the more important in light of the fact that an eyewitness to the Moody murder has come forward to say that James Roane did not commit the killing. See Declaration of Paul F. Enzinna, Exhibit B to Reply Memorandum in Support of Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

Ms. Greene testified in Mr. Thomas' trial on April 28, 1993. It simply strains credulity to believe that, when she testified at Roane's trial barely three months earlier, the government was unaware of her drug selling activities, or that she and her boyfriend/drug-selling partner Curt Thorne were in the apartment where Douglas Moody allegedly was shot.[5] Moreover, James Roane was sentenced to death *after* Ms. Greene's testimony in the Thomas case, and after prosecutors unquestionably knew of the discrepancies in her testimony.

"The government violates its duty to deal fairly with a defendant where it either solicits testimony it knew or should have known to be false or allows such testimony to pass uncorrected." *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). Reversal is required where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Ellis*, 121 F.3d at 927 (*quoting United States v. Agurs*, 427 U.S. 97, 103 (1976)).

There can be no question that Ms. Greene's false testimony "could have" affected the judgment of the jury in this case. Ms. Greene claimed that James Roane killed Moody after he

---

that she did not see Roane use the knife on Mr. Moody. Tr. 2551.

[5] In any event, James Roane is entitled to discovery to determine whether the prosecution in fact knew at the time she testified that Ms. Greene's testimony at his trial was false. See Bracy v. Gramley, 520 U.S. 899, 908 (1997) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry" (citation omitted)).

- 13 -

and Tipton emerged from the apartment where Moody was shot. Had the jury known that, as Greene testified in the *Thomas* trial, Greene and her boyfriend – with whom Greene sold cocaine – were in the apartment prior to the killing, and that Greene's boyfriend emerged from the apartment after the shooting, the jury likely would have discounted her testimony in its entirety. Granted, Denise Berkeley also claimed that Roane stabbed Douglas Moody, but as noted, Ms. Greene's testimony that "[Johnson] and [Tipton] and them didn't want . . . [Moody] to work in that area . . . selling cocaine," Tr. 2553, was the *only* evidence that Moody had been killed "in furtherance" of the alleged CCE. Had the jury known of her changing story, it is at least "reasonably likely" the jury would have found no evidence sufficient to support James Roane's death sentence for this murder.

### (e)    Misconduct Regarding Proof of the CCE

Johnson has presented claims of prosecutorial misconduct related to the evidence supporting the CCE convictions. He has alleged that the government improperly influenced its witnesses to use the terms "partner," "worker," and "employee" during pretrial interviews and then during their trial testimony. He has also presented claims of insufficient evidence and actual innocence based on the government's failure to satisfy the supervision element of the CCE statute.

Discovery is necessary on this claim in order to permit petitioner to develop fully the facts showing that he never exercised the CCE supervisory or management role alleged by the government, that he was no more than a drug supplier (who, as a matter of law, is not a CCE supervisor), that persons interviewed by government agents gave statements negating any inference that Johnson was a CCE supervisor or manager, and that government agents

- 14 -

improperly influenced trial witnesses to use those terms which indicated Johnson had a supervisory or management role in the alleged CCE.

### (2)    Requested Discovery[6]

Discovery is necessary on these claims in order to permit petitioners to develop fully the facts showing that trial testimony was false, that prosecutors knew it was false, should have known it was false, or let it pass uncorrected. Petitioners request leave to take the following discovery:

### Interrogatories

1.    Please identify any person with any knowledge relating to any statements concerning this case made by any trial witness to:

   a.    any agent of government;

   b.    the prosecution in this case;

   c.    any agent of the Commonwealth of Virginia; or

   d.    any person who provided the government or the prosecution in this case with information concerning any statement made by any witness in this case.

2.    Please identify any person with any knowledge that relates to, or any document that relates to, the trial testimony of

   a.    Maurice Saunders concerning his alleged trips to New York with Tipton;

   b.    Greg Scott;

   c.    Hussone Jones concerning the murder of Douglas Talley; or

   d.    Priscilla "Pepsi" Greene concerning her own involvement in drug sales or the murder of Douglas Moody.

---

[6] The discovery requests contained herein should be read to incorporate the definitions and instructions contained in Exhibit A.

3.      Please identify all persons with any knowledge that relates to, and any documents that relate to, any plea agreement between the government and any trial witness in this case.

4.      Please describe the government's efforts to prepare the following trial witnesses for their trial testimony, including, without limitation, an identification of the individuals who performed this task:

> Denise Berkeley
> Anita Bracey
> Antwoine Brooks
> Valerie Butler
> Johnny Lee Byrd
> Robert Davis
> Jerry Gaiters
> Gwendolyn Greene
> Priscilla Greene
> Sterling Hardy
> Ronita Hollman
> Anthony Howlen
> Hussone Jones
> Martha McCoy
> Montez McCoy
> Dennis Moody
> Charlotte Moore
> Greg Noble
> Jeannette Pauley
> Maurice Saunders
> Gregory Scott
> Leroy Slater
> Stanley Smithers
> Charles Townes
> Pamela Williams

5.      Please identify all agents of the government who obtained any information about "Light" from the date of the beginning of the Newtowne investigation to the present, and describe this information.

6.      Please identify all documents in the custody, control or possession of the government that relate to or discuss Light, the murder of Douglas Talley, or the murder of Douglas Moody.

7.      Please identify all documents in the custody, control or possession of the government that relate to or discuss the testimony of any trial witness for the government in this case.

- 16 -

## Production of Documents[7]

1.    All documents consisting of or relating to any statements concerning this case made by any trial witnesses to:

      a.    any agent of the government;

      b.    the prosecution in this case;

      c.    any agent of the Commonwealth of Virginia; or

      d.    any person who provided the government or the prosecution in this case with information concerning any statement made by any witness in this case.

2.    All documents identified in response to any interrogatory answers.

## Request for Depositions

1.    The following trial witnesses:

        Denise Berkeley
        Anita Bracey
        Antwoine Brooks
        Valerie Butler
        Johnny Lee Byrd
        Robert Davis
        Jerry Gaiters
        Gwendolyn Greene
        Priscilla Greene
        Sterling Hardy
        Ronita Hollman
        Anthony Howlen
        Hussone Jones
        Martha McCoy
        Montez McCoy
        Dennis Moody

---

[7] The terms "document" or "documents" are used throughout this motion and memorandum in support as defined in Exhibit A. This motion assumes that all documents petitioners seek are in the possession of the government. To the extent the documents are not in the possession of the government, however, the court should construe any document request contained in this motion as a request for the issuance of a subpoena *duces tecum* to the party in possession, custody or control.

> Charlotte Moore
> Greg Noble
> Jeannette Pauley
> Maurice Saunders
> Gregory Scott
> Leroy Slater
> Stanley Smithers
> Charles Townes
> Pamela Williams

2.      Any and all agents of the government who participated in any way in preparing any of the above witnesses for their trial testimony.

3.      William H. Parcell, III
Howard C. Vick, Jr.

## Request for Admissions

1.      Admit that at the time of trial, the government knew that "Light" was an alias for John Matthews .

2.      Admit that at the time of trial, the government should have known that "Light" was an alias for John Matthews.

3.      Admit that at the time of trial, that the government knew that John Matthews was also known as "Rufus Alvarez".

4.      Admit that at the time of trial, the government should have known that John Matthews was also known as "Rufus Alvarez".

5.      Admit that at the time of trial, the government knew that John Matthews, a.k.a., "Light" and/or "Rufus Alvarez", was incarcerated in the State of New Jersey's correctional system from 1991 through 1995.

6.      Admit that at the time of trial, the government should have known that John Matthews, a.k.a., "Light" and/or "Rufus Alvarez", was incarcerated in the State of New Jersey's correctional system from 1991 through 1995.

- 18 -

### b.    Suppression of Exculpatory Evidence

#### (1)    Factual Background

##### (a)    Hussone Jones

Tipton has asserted a claim under *Brady v. Maryland*, 373 U.S. 83 (1963) and its

progeny, based on the same facts set forth in his claim that Hussone Jones testified falsely

about the murder of Douglas Talley. In addition to what is sought below, this *Brady*

claim requires the same discovery as the false testimony claim. Moreover, petitioners

have requested by letter that the government disclose any materials relevant to either guilt

or punishment that have not been disclosed thus far. *See Imbler v. Pachtman*, 424 U.S.

409, 427 n.25 (1976) (prosecutor's obligation to disclose all significant evidence

suggestive of innocence or mitigation continues after conviction); *Thomas v. Goldsmith*,

979 F.2d 746, 749-50 (9th Cir. 1992) (*Brady* obligation continues throughout federal

habeas proceedings). *See* Exhibit B.

##### (b)    John Knight and "Studie" Green

The claim that the government possessed, but failed to disclose, the exculpatory

statements of John Knight and Thomas "Studie" Green is set forth in detail in Tipton's

opening and reply memoranda. Tipton Mem. at 74-75; Tipton Reply at 51-52. In

summary, these individuals told the government that they were with Tipton when he

received a telephone call from Johnson. Knight and Green told the government that

during this phone conversation Johnson told Tipton that he had murdered Linwood Chiles

and Curt Thorne, and injured the Greene sisters. Tipton discovered this evidence in the

course of his post-conviction investigation when his investigator interviewed Knight and

- 19 -

Green. Knight's and Green's statements are attached to his reply memoranda as an Exhibit.

### (2)    Discovery Requested[8]

### Interrogatories

1.    Please identify any person with any knowledge relating to any statements concerning this case made to any person by Hussone Jones, John Knight or "Studie" Green.

2.    Please identify all agents of the government who obtained any information about Hussone Jones, John Knight or Studie Green from the date of the beginning of the Newtowne investigation to the present, and describe this information.

### Production of Documents

1.    All documents consisting of or relating to any statements concerning this case made to any person by Hussone Jones, John Knight or Studie Green.

2.    All documents in the custody, control or possession of the government that relate to or discuss Hussone Jones, John Knight or Studie Green.

### c.    Witness List

### (1)    Factual Background

The prosecution in this case clearly violated the command of 18 U.S.C. § 3432 by failing to provide petitioners with the "place of abode" of each of the witnesses against them. The only excuse ever offered by the government for its refusal to obey the statute was that it had "placed these witnesses in the witness protection program because of fear for their safety." This Court excused the government's failure to comply with the statute on this basis, holding that it was "consistent . . . with the letter and intent" of the federal Witness Protection Program.

With all due respect, this Court erred in permitting the government to refuse to comply with Section 3432. *See* Petitioner Roane's Reply Memorandum in Support of his Motion to Set

- 20 -

Aside, Vacate or Correct Sentence at 1-7. But putting that error aside, there is strong reason to believe the government misled the Court with respect to its treatment of the witnesses at issue.

The statute establishing the Witness Protection Program imposes strict limits on its use. An individual may participate in the program only if it is determined that a crime of violence is "likely to be committed" with respect to the individual as a result of their testimony. 18 U.S.C. § 3521(a)(1). Each participant must also agree to undertake certain responsibilities, 18 U.S.C. § 3521 (d)(1), and must be found "suitab[le]" for participation. 18 U.S.C. § 3521(c). Of critical importance is the fact that the statute requires the Attorney General to make these determinations, and limits her authority to delegate that task to five specific Justice Department employees. 18 U.S.C. § 3521(d)(3).

Some of the witnesses for whom the defense was given no address were identified on the government's witness list as participating in the federal Witness Protection Program, but others – including critical prosecution witnesses – were simply listed as "In Protection" (Priscilla Greene, Gwendolyn Greene, Swain Ball, Gregory Scott ) or in "Protective Custody" (Jerry Gaiters, Sterling Hardy ). The statutory requirements of the Witness Protection Program were evidently not followed with regard to these latter witnesses. Instead, the line prosecutors in this case simply decided not to obey the statute, leading the Court to believe that the decision was grounded in the formal analysis and review contemplated by the Witness Protection Program, rather than simply a desire for a tactical edge in the instant case. In fact, it may well be that the *only* step the government took to "protect" these witnesses was to refuse to provide their addresses, as required by Section 3432.

**(2)    Discovery Requested**

Discovery is necessary on this claim in order to allow petitioners to determine whether the prosecution misled the Court with regard to its witness list. Defendants respectfully request leave to take the following discovery:

**Interrogatories**

1.    Identify all individuals included in the Government's List of Proposed Witnesses filed in this matter on January 11, 1993 (the "Witness List") who were at any time placed in the Witness Protection Program ("WPP"). For each, state:

  a.    the reason(s) why they were placed in the WPP;

  b.    the date on which they were placed in the WPP.

2.    Identify any of the individuals listed in your response to Interrogatory 1 who were not in the WPP as of January 11, 1993.

3.    For each individual described in the Witness List as in "Protective Custody" or "In Protection," (*i.e.*, Priscilla Greene, Jerry Gaiters, Sterling Hardy, Gwendolyn Greene, Swain Ball Gregory Scott), identify:

  a.    the reason(s) why they were placed in "Protective Custody" or "In Protection;"

  b.    the dates on which they were in "Protective Custody" or "In Protection;" and

  c.    describe any and all the measures taken to safeguard each of these individuals while in "Protective Custody" or "In Protection."

4.    Identify all individuals included in the government's witness list that at any time were denied placement in the WPP. For each, state (a) the reason(s) why they were denied placement and (b) the date on which they were denied placement.

**Document Requests**

1.    Documents sufficient to show that each individual listed in the Witness List as participating in the WPP was, in fact, a participant in the WPP as of January 11, 1993.

2.    Any and all documents related to the decision to place Priscilla Greene, Jerry Gaiters, Sterling Hardy, Gwendolyn Greene, Swain Ball Gregory Scott in "Protective Custody" or "In Protection."

- 22 -

3.      Any and all documents related to the measures taken to safeguard Priscilla Greene, Jerry Gaiters, Sterling Hardy, Gwendolyn Greene, Swain Ball Gregory Scott while in "Protective Custody" or "In Protection."

4.      Any and all documents related to decisions refusing placement of potential witnesses in the WPP.

## Depositions

At the present time, petitioners propose to depose the following individuals in connection with this claim:

> Priscilla Greene
> Jerry Gaiters
> Sterling Hardy
> Gwendolyn Greene
> Swain Ball
> Gregory Scott
> Howard C. Vick, Jr.
> William H. Parcell, III

### d.      Violations of 18 U.S.C. § 201(C)(2)

#### (1)      Factual Background

Section 201(c)(2) of Title 18 of the United States Code punishes whoever:

> [D]irectly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing or other proceeding, before any court . . . .

Petitioners' convictions and death sentences rest squarely upon testimony purchased by the prosecution in violation of this statute, and must therefore be set aside. *United States v. Singleton*, (10th Cir.), 144 F.3d 1343, *vacated*, 144 F.3d 1361 (10th Cir.), *decision of District Court affirmed*, No. 97-3178 (10th Cir. Jan. 8, 1999); *United States v. Fraguela*, Cr. No. 96-0339 1998 U.S. Dist. LEXIS 14347(E.D. La. Aug. 27, 1998), *vacated on procedural grounds*, 1998 U.S. Dist. LEXIS 22060 (E.D. La. Oct. 6, 1998); *United States v. Lowery*, 15 F. Supp.2d 1348

- 23 -

(S.D. Fla. 1998); *rev'd,* 166 F.3d 1119 (11th Cir. 1999); *but see United States v. Reid,* 19 F. Supp. 2d 534 (E.D. Va. 1998).

Nearly every fact witness against petitioners received a "thing of value" from the government in exchange for his or her testimony. We know from their testimony that some witnesses were immunized, some were placed in the Witness Protection Program, and some received governmental assistance in obtaining reduced sentences. The following are merely examples of the tainted testimony.

The statute pursuant to which petitioners were sentenced to death, 21 U.S.C. § 848(e)(1), requires a finding that they committed a murder while "engaging in or working in furtherance of a continuing criminal enterprise." The government's claim that petitioners engaged in such a highly-organized "continuing criminal enterprise" turned largely upon the testimony of Greg Scott, concerning events occurring in New York and New Jersey. At the trial's outset, the government told the jury that its CCE case would be proved by evidence of those events. For example, in his opening statement, Mr. Vick promised that Scott would testify that the "New York Boyz":

> [S]at around in New Jersey, in Trenton, and had meetings and discussed what physical acts of retaliation they should take against people who had wronged them and decided whether it would hurt business to hit this person or whether it would not hurt business.

Tr. 789-90. In closing, the government made explicit its theory that "the New York Boyz continued their actions here in the City of Richmond." Tr. 2962. To prove the required element of supervision, the government turned to Greg Scott's testimony, asking the jury to superimpose the New York/New Jersey organization on the Richmond events. Tr. 2983. Prosecutors also turned to Scott's testimony to connect Torrick Brown's murder to racketeering, arguing that

other "New York Boyz" joined James Roane in a domestic killing in order to maintain their

position in the CCE:

> Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? . . . [W]hen they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the New York Boyz.

Tr. 3004; see also Tr. 3005, 3007.

In addition, the *only* evidence supporting the claim that Douglas Moody was killed in

furtherance of the CCE was "Pepsi" Greene's bald assertion – unsupported by any facts – that

the killing was drug-related. Tr. 2553. In closing, the government buttressed that testimony with

Scott's:

> Remember, Doug Moody worked for Peyton Maurice Johnson. They didn't want anyone else operating in their territory, *consistent with the testimony of Greg Scott.*

Tr. 2995 (emphasis added). In the penalty phase, there was no evidence that James Roane had

ever expressed an intention to kill Moody prior to the murder. In fact, Denise Berkley testified

for the government that she heard that *Moody* instigated the confrontation, and that Moody had

been purchasing drugs from Corey Johnson. Tr. 1700-02. In order to bolster its case that Moody

was murdered after "substantial planning and premeditation" – an aggravating factor necessary

to the death penalty – the government again turned to Scott:

> Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation.

Tr. 3886-87. ). Thus, Roane's death sentence in particular hinges on Scott's testimony.

- 25 -

That testimony was bought and paid for by the government. Scott himself testified that the government agreed to seek a sentencing departure in exchange for his testimony. Tr. 897-98. Petitioners seek discovery with regard to any other benefits provided to Scott in return for testimony favorable to the government's case.

Sterling Hardy also provided critical, inflammatory testimony, including testimony that James Roane shot Louis Johnson, Tr. 2171, because he "didn't like the guy." Tr. 2174. He also testified that after Martha McCoy and Torrick Brown were shot, and Anthony Mack said that Martha McCoy had not been killed, James Roane assured him that "'[t]he bitch is dead' because he knows he can shoot." Tr. 2184. Hardy also testified to supposed jailhouse conversations in which the killing of witnesses was discussed. Tr. 2191. These allegations regarding Martha McCoy and "the fact that from jail, while incarcerated, these defendants continued to try to have people killed" became a centerpiece of the government's argument for the death penalty. Tr. 3892. Hardy testified that he "anticipate[d]" a reduction in sentence in return for his testimony, Tr. 2228, and petitioners seek discovery with regard to any other inducements provided Hardy by the government.

Jerry Gaiters' testimony was similarly damning. Gaiters provided critical evidence regarding the necessary "supervision" element of the CCE allegations. Tr. 2324. He also tied Roane to the murders of Louis Johnson, Tr. 2334, and Peyton Maurice Johnson. Tr. 2328. Finally, Gaiters testified that Roane told him that Roane, Tipton and Johnson were "planning on taking over" the Newtowne area. Tr. 2330. Like Scott's and Hardy's, Gaiters' testimony was purchased by the government -- Gaiters admitted that he testified in exchange for a downward departure. Tr. 2192.

This kind of bartering for favorable testimony is illegal. Section 201(c)(2), by its terms, expressly forbids it. By its use of the unmodified term "[w]hoever," the statute's broad language clearly applies to the actions of prosecutors, and this Court is "bound to take Congress at its word." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998). As the Supreme Court has stated:

> [I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy – even assuming that it is possible to identify that evil from something other than the text of the statute itself. . . . Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.

*Brogan v. United States,* 522 U.S. 398, 403, 408 (1998).

Section 201(c)(2) "could not be more clear." *Singleton, supra,* 144 F.3d at 1345. Moreover, the statute is to be broadly construed to further its purpose of deterring corruption. *United States v. Hernandez,* 731 F.2d 1147, 1149 (5th Cir. 1984); *United States v. Evans,* 572 F.2d 455, 480 (5th Cir. 1978).

Section 201(c)(2) operates "to prevent fraud upon the federal courts in the form of inherently unreliable testimony." *Singleton, supra,* 144 F.3d at 1346. To do so, the statute must govern not only the actions of the defendant, but also those of the prosecution. The statute "indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so." *Id.*

There can be no serious dispute that leniency is a "thing of value." Again, the statutory term "anything of value" is unmodified, and "has consistently been given a broad meaning" to carry out the status' purpose. *United States v. Williams,* 705 F.2d 603, 622-23 (2d Cir. 1983). Courts have consistently rejected arguments that the term "anything of value" is limited to

tangible things of monetary value. *United States v. Marmolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996); *Williams*, 705 F.2d at 622-23. In fact, "[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987); *see also United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir. 1980) ("[w]e think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case").

### (2)    Discovery Requested

For the foregoing reasons, petitioners seek discovery with regard to any inducements the government promised or provided to witnesses in this case in exchange for their testimony, and any effects those inducements had on the testimony. This discovery includes:

### Interrogatories

1.    Identify each and every "thing of value" provided by the government to any trial witness in this case in exchange for, or because of, any testimony given in this case, including, without limitation, immunity, recommendations with regard to sentencing, and any financial or other material incentives.

### Document Requests

1.    All documents consisting of or relating to any statements made by any witness in this case to (1) any agent of the United States government, (2) the prosecution in this case, (3) any agent of the Commonwealth of Virginia, or (4) any individual interviewed by any agent of the United States government, or by the prosecution in this case, or who otherwise provided the United States or the prosecution in this case with information concerning any statement made by any witness in this case.

2.    All documents relating to any statements made by (1) the prosecution in this case; (2) any agent of the United States government, or (3) any agent of the Commonwealth of Virginia, to any witness in this case concerning any benefit that might be obtained by any witness testifying in this case.

## Depositions

Petitioners seek leave to depose the following individuals in connection with this claim:

Denise Berkeley
Anita Bracey
Antwoine Brooks
Johnny Lee Byrd
Robert Davis
Jerry Gaiters
Gwendolyn Greene
Priscilla Greene
Sterling Hardy
Ronita Hollman
Anthony Howlen
Hussone Jones
Martha McCoy
Montez McCoy
Dennis Moody
Charlotte Moore
Greg Noble
William H. Parcell, III
Jeannette Pauley
Maurice Saunders
Gregory Scott
Leroy Slater
Stanley Smithers
Charles Townes
Pamela Williams
Howard C. Vick, Jr.

## 3.    Impermissible Discrimination by Prosecutors in Jury Selection

Petitioners have alleged a *prima facie* case of improper discrimination against women in the prosecution's exercise of peremptory strikes. *See* Petitioner Roane's Reply Memorandum in Support of his Motion to Set Aside, Vacate or Correct Sentence at 9-13. Assuming the government is able to offer non-discriminatory reasons for its strikes, petitioners will be required to demonstrate that those proffered reasons are pretextual. *United States v. Lewis*, 117 F.3d 980, 983 (7th Cir.), *cert denied*, 118 S. Ct. 642 (1997). To do so, petitioners respectfully seek leave to conduct discovery concerning the government's use of peremptory strikes. The evidence

- 29 -

relating to this claim is uniquely in the government's possession and control, and denial of discovery would an abuse of discretion. *See Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996)(reversing district court's denial of discovery pursuant to Rule 6 where physical evidence was in possession of state); *East v. Scott*, 55 F.3d 996, 1001-02 (5th Cir. 1995) (reversing district court's denial of discovery pursuant to Rule 6 where district attorney and his staff were pertinent witnesses and petitioner had not obtained access to witnesses or their files). Petitioners respectfully request leave to take the following discovery:

## Interrogatories

1.     Identify each and every individual involved in or consulted with regard to the government's exercise of peremptory challenges in this case including, without limitation, attorneys, paralegals, and jury consultants.

2.     Identify the reason(s) for the government's exercise of peremptory strikes to exclude from the petit jury in this case each woman struck by the government.

## Document Requests

1.     Any and all documents, including, without limitation, notes, memos, and correspondence, concerning the government's exercise of peremptory strikes in this case.

2.     Any and all documents, including, without limitation, notes, memos, manuals, policies and correspondence, prepared or circulated between 1984 and 1993 by the United States Attorney's Office for the Eastern District of Virginia, or prepared by the United States Department of Justice and circulated to the United States Attorney's Office for the Eastern District of Virginia concerning the use of peremptory strikes against women.

3.     Any and all documents prepared for or provided to the United States Attorney's Office for the Eastern District of Virginia by any other person or entity between 1984 and 1993 concerning the performance of women on criminal juries.

## Depositions

Howard C. Vick, Jr.
William H. Parcell, III

- 30 -

## 4.    The Jury

On June 10, 1998, this Court denied petitioners' motion for leave to interview the trial jurors. For the reasons stated in that motion, petitioners respectfully request that the Court reconsider its order, and allow the Juror Questionnaire attached as Exhibit C hereto to be provided to each juror in this case, with instructions that each juror complete the questionnaire and return it to the Court for distribution to the parties.

Petitioners also note that in addition to their claim of jury taint, discovery regarding the jury also affects their claims of ineffective assistance. On direct appeal, the Fourth Circuit rejected petitioners' claim that their convictions and sentences must be reversed because they were denied their right to be present during voir dire. *United States v. Tipton*, 90 F.3d 861, 873-74 (1996), *cert. denied*, 520 U.S. 1253 (1997). The Fourth Circuit held that petitioners' failure to object at trial required that this claim be reviewed under the plain error standard of *United States v. Olano*, 507 U.S. 725 (1993), which required petitioners to show "actual prejudice," for example, that, had they been present, petitioners would have insisted on striking jurors who were "demonstrably biased." *Tipton, supra*, 90 F.3d at 876.

Petitioners now claim that their trial counsel provided ineffective assistance by allowing them to be excluded from voir dire. The showing of prejudice required for a claim of ineffective assistance differs from *Olano*'s, requiring only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *E.g., Pruett v. Thompson*, 771 F. Supp. 1428, 1445 (E.D. Va. 1991), *aff'd*, 996 F.2d 1560 (4th Cir. 1993). However, a showing that a "demonstrably biased" juror was seated as a result of trial counsel's failure to protect petitioners' right to presence would clearly establish a "reasonable probability" that, but for trial counsel's error, the juror would have been struck and the result of the

- 31 -

proceeding would have been different. Petitioners therefore respectfully request leave to take the depositions (subject to any limits the Court may deem necessary) of those jurors whom petitioners would have struck had they been present for voir dire, including Frances Hodson, Bonita Faircloth and Jerome Harrison.

**5.    Johnson's Execution Is Barred Due To Mental Impairments**

In the second amendment to his petition, Johnson argued that his execution was barred under 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(1), which prohibit the execution of a mentally retarded defendant. As set forth in that amendment, in his original petition, and at the sentencing phase of his trial, Johnson has severe, well documented, and long standing mental deficiencies. However, the guidelines for the application of the relevant statutes have not been interpreted by the courts.

Discovery is necessary on this claim so Johnson may determine what guidelines the Department of Justice has employed when deciding whether to pursue or carry out a capital sentence against a defendant, including the petitioners in this case.

### Document Requests

1.    All Department of Justice guidelines and policy statements concerning the interpretation and application of 18 U.S.C. §3596(c) and 21 U.S.C. §848(1).

2.    All reports and memoranda concerning the application of 18 U.S. C. sec. 3596(c) and 21 U.S.C. §848(1) to all defendants, including the petitioners, indicted in this case.

3.    All cases where the Department of Justice declined to seek or carry out the death penalty in light of 18 U.S.C. §3596(c) and 21 U.S.C. §848(1).

4.    Any documents showing the government's knowledge of Johnson's mental impairments.

**6.    Tipton Received Ineffective Assistance of Counsel**

Tipton's trial and appellate counsel failed to provide effective assistance of counsel to the government's charge that Tipton murdered Douglas Talley. Tipton's

allegations are set forth in detail in his opening and reply memoranda. Tipton Mem. at 122-26, 136-37; Tipton Reply at 99-102, 107. In summary, counsel was ineffective because, first, they failed to argue that Dr. Fierro's testimony conflicted with Hussone Jones' testimony. Dr. Fierro stated that it was unlikely that a right-handed person inflicted the stab wounds that killed Talley. Tipton is right-handed and Jones testified that Tipton stabbed Talley. Second, counsel failed to locate "Wildman"—who was found, with little difficulty, by habeas counsel--to challenge the government's evidence and the testimony of Jones about the alleged events immediately following the Talley murder. Third, counsel failed to test a knife found at the murder scene in Talley's car inside Johnny Lee Byrd's jacket pocket to see if it was the murder weapon. The government in its reply to this ineffective assistance of counsel claim chides habeas counsel for failing to subject the knife to forensic testing. This is the reason discovery is required: Without this court's order providing for discovery, habeas counsel does not have access to the knife to subject it to testing. For this claim Tipton requires the following discovery:

- 33 -

## Production of Documents and Things

1.     Any and all documents concerning of or relating to the knife discovered in Johnny Lee Byrd's jacket pocket, which jacket the government discovered by in Talley's car.

2.     Produce the knife itself so that habeas counsel may subject it to independent forensic testing.

Respectfully submitted,

RICHARD TIPTON, III

By:     _____

Donald R. Lee, Jr., VSB #25235
Frederick R. Gerson, VSB #39968
Macaulay Lee & Powell, P.C.
1015 E. Main St., 4th Floor
Richmond, VA 23219
(804) 649-4009

*Counsel for Richard Tipton, III*

COREY JOHNSON

By:     _____

Barbara L. Hartung, VSB # 38062
1001 E. Main St., #504
Richmond, VA 23219
(804) 649-1088

Edward E. Scher, VSB #23064
Thorsen Marchant & Scher, L.L.P.
316 West Broad Street
Richmond, VA 23220
(804) 644-0711

*Counsel for Corey Johnson*

- 34 -

JAMES H. ROANE, Jr.

By: _____

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
  & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

DATED: 6/24, 1999          *Counsel for James H. Roane, Jr.*

- 35 -

**EXHIBIT A**

**INSTRUCTIONS AND DEFINITIONS**

1.    "Government" is intended to mean the United States, as it is the real party in interest, but shall also include all departments, offices, officers, employees, and other representatives of the United States, including but not limited to, the United States Attorney's Office for the Eastern District of Virginia, the Federal Bureau of Investigation, the Department of the Treasury's Division of Alcohol, Tobacco and Firearms, as well as the Virginia State Police, Richmond Police Department, the Chesterfield County Police Department, the Henrico County Police Department, the Office of the Commonwealth Attorney for the City of Richmond, the Office of the Commonwealth Attorney for Henrico County, the Office of the Commonwealth Attorney for Chesterfield County, the Office of the Chief Medical Examiner, the Virginia Division of Forensic Science.

2.    The name "John Matthews" or "Matthews", unless otherwise specified, includes his aliases, "Light" and "Rufus Alvarez." Use of any alias for Matthews also includes his real name and any other of his other alias.

3.    The name "Jorge Delao" or "Delao", unless otherwise specified, includes his aliases, "James Wilkerson" and "Hess." Use of any alias for Delao also includes his real name and any other of his other alias.

4.    The name "Thomas Green" or "Green", unless otherwise specified, includes his alias, "Studie." Use of Green's alias also includes his real name.

5.    "Identify" shall mean

    a.    with respect to a natural person:

        (1)    to state his or her full name;

        (2)    to state his or her home telephone number and home address with sufficient specificity to permit service of process thereon;

        (3)    to state his or her business telephone number and business address with sufficient specificity to permit service of process thereon; and

        (4)    to state his or her present or last known position, job title, and job description;

    b.    with respect to a company, corporation, association, partnership, joint venture, other business, government entity, or any legal entity other than a natural person:

        (1)     to state the full name and type of organization or entity;

        (2)     to state such entity's president, general partners, owners, or officers;

        (3)     to state such entity's business address; and

        (4)     to identify the individual(s) at the entity with whom you or representatives of the respondent have had contact or communication.

    c.    with respect to a document, as defined *infra*:

        (1)     to state the date of origin, type of document, and the document's title;

        (2)     to state the document's present location and custodian;

        (3)     to state the persons to whom the document has been sent; and

        (4)     to otherwise describe the document with sufficient specificity to form the basis for a request for production of documents.

6.     As used herein, the term "person" means, unless otherwise specified, the plural as well as the singular, and includes any natural person, corporation, joint venture, partnership, proprietorship, association, organization or group of natural persons, and every other form of entity cognizable at law.

7.     "You" or "Your" refers to the respondent.

8.     The term "document" or "documents" has the same definition as that set forth in the Federal Rules of Civil Procedure and shall mean and include without limitation any and all:

    a.    correspondence, memoranda, records, reports, notes, drafts, work papers, minutes of meetings, books, papers, computations, tabulations, schedules, summaries,  contracts, agreements, lists, preproposals, proposals, diagrams, invoices, receipts, reports, accounting books, ledgers, journals, purchase orders, invoices, vouchers, drawings, schedules, telegrams, books of account, catalogues, checks, check stubs, audio recordings or written memoranda of conversations or interrogations, diaries, appointment books, calendars, drawings, blueprints, photostats, motion pictures, slides, photographs, sketches, charts, graphs, instructions and other similar objects; written statements by witnesses or other persons having knowledge of the pertinent facts; any other written or printed matter or tangible thing on which any words, or phrases are affixed, such

as computer tapes or diskettes, magnetic tapes, punch cards, computer printouts, microfilms, video tapes, and all other records and data compilations kept by electronic, photographic, or mechanical means; and any things similar to any of the foregoing however denominated by you, whether a draft or final version, and whether or not such documents were intended to be internal, interoffice or intra-office and whether or not such documents are claimed to be privileged against discovery on any grounds.

b.     Copies of such documents upon which appear any initialing, notation, handwriting, or revision of any kind not appearing on the original;

c.     All such documents, whether prepared by you, your agents, representatives, attorneys, or employees, for their own use or for transmittal in any manner;

d.     Documents wherever located, whether in the files of any agent, attorney, representative, or employee of the respondent, or in any file whatsoever in the possession, direction, custody, or control of the respondent.

9.     The term "relate(s)" or "related to" shall be defined to mean discuss, describe, refer to, reflect, substantiate, evidence, or be in any way logically or factually connected with the matter discussed.

10.     If you cannot provide an exact answer to an interrogatory, please provide your best estimate of the information requested. If you cannot provide an estimate, please identify the person or entity that can provide said information.

11.     If you object to any interrogatory or request and/or withhold information or documents under any claim of privilege please do the following:

a.     If you provide an answer subject to or "without waiving" your objection or claim or privilege, state whether you are

(1)     providing all responsive documents or information anyway, or

(2)     withholding documents or information.

b.     If you withhold any documents covered by a request, identify each document for which the privilege is claimed, together with the following information, where appropriate, with respect to each such document; date, author, recipient, persons to whom copies were furnished, basis on which the privilege is claimed, the paragraph or subparagraph of this request to which each document responds, and sufficient description of the subject matter of the document (without disclosing its contents) to allow its description to the court for a ruling on the claim of privilege.

12.     For each requested document that is no longer in existence or which cannot be located, identify the document, state when and how it passed out of existence or why it can no longer be located and the reasons therefor, and identify each person having knowledge concerning such document and what has happened to it.

13.     The interrogatories and requests set forth herein are continuing in nature and you are to provide supplementary responses upon receipt of any information or documents by you or your counsel that would permit you to respond to requests not answered or to alter or to add to responses already answered.  Supplementary responses are to be provided as soon as they become known to you or your counsel and in all events before any evidentiary proceeding that may be ordered by the Court.

E X H I B I T    B

BARBARA L. HARTUNG

ATTORNEY AT LAW

1001 EAST MAIN STREET
SUITE 504
RICHMOND, VIRGINIA 23219
(804) 649-1088

May 12, 1999

Robert J. Erickson, Deputy Chief
Criminal Division, Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D. C  20530

RE:  Cory Johnson v. Samuel Pruett
Civil No. 3:97 CV 895 (E.D. Va., Richmond)

Dear Mr. Erickson:

As you know, I have been assigned along with Edward Scher, Esq. by the district court to represent Cory Johnson in federal habeas.  Mr. Johnson was convicted of seven capital murders charged under 21 U.S.C. section 848(e), engaging in a continuing criminal enterprise under 21 U.S.C. sec. 848(a), and related offenses and sentenced to death in June, 1992, after a jury trial in Richmond before the Hon. James R. Spencer.  The convictions and sentence were affirmed on appeal, United States v. Tipton, 90 F.3d 861 (4th Cir. 1996), and his petition for certiorari was denied.

I write to request any materials favorable to Mr. Johnson relevant to either guilt or punishment that have not been disclosed thus far.  The attorneys who prosecuted this case, Howard C. Vick and William H. Parcell, III, are no longer with the U.S. Attorney's Office.  Hence, this letter is sent to your attention for distribution to the appropriate party.

The United States Supreme Court in Kyles v. Whitley, 115 S. Ct. 1555 (1995), a capital case, stated no new law but rather reaffirmed the prosecutorial obligations of disclosure set forth in a series of cases: Brady v. Maryland, 373 U.S. 83 (1963), United States v. Agurs, 427 U.S. 97 (1976), and United States v. Bagley, 473 U.S. 667 (1985).  The basic Brady principles include the following.  1)  There is no distinction between exculpatory and impeachment evidence for Brady purposes.  2)  The duty of disclosure exists irrespective of any request by the defendant.  3)  All favorable evidence relative to guilt or punishment is material, and error occurs "if there is a reasonable probability" that with disclosure to the defense the result would have been different.  In Kyles the Court explicitly stated that proof of materiality does not require proof by a preponderance of the evidence that disclosure would result in acquittal. Nor does it require the defendant to demonstrate that the evidence would be insufficient to convict once the inculpatory evidence affected by the nondisclosure is removed from the case, i.e., materiality is not determined by a sufficiency of the

evidence test.  Moreover, materiality is to be judged by viewing all nondisclosed evidence collectively rather than item by item.

While reaffirming these basic principles, the Kyles court also emphasized the obligations imposed on prosecutors to weigh the net effect of all nondisclosed evidence, to learn of favorable evidence known to government agents (including police), and to make disclosure "when the point of 'reasonable probability is reached.'"  A prosecutor cannot avoid learning about evidence which may affect confidence in the outcome of the trial or the punishment.

Moreover, a prosecutor has a continuing duty of disclosure.  See Imbler v. Pachtman, 424 U.S. 423, 427 n. 25 (1976) (prosecutor's obligation to disclose all significant evidence suggestive of innocence or mitigation continues after conviction); Mooney v. Holohan, 294 U.S. 103, 108 (1935).  The government's obligation to produce exculpatory and impeachment material does not end with the trial.  See also Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir. 1992)(Brady obligation continues throughout federal habeas proceedings).

The Rules of the Supreme Court of Virginia address these same concerns.  DR 8-102(4) specifically requires the prosecutor or other government lawyer to "make timely disclosure . . . of the existence of evidence . . . that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."  The Rules in EC 8-10 address the responsibilities of the prosecutor and include the following:  "The prosecutor should make timely disclosure to the defense of all information required by law.  Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecution's case or aid the accused."

Against this background, I am now requesting that you inspect and review all materials and evidence in the possession, custody or control of the government or its agents and disclose all previously nondisclosed and/or newly discovered materials and evidence known to the government or its agents pursuant to the principles of Kyles/Brady that are material to the issues of Mr. Johnson's guilt or sentence. These materials may include, but are not limited to, the following:

1.  All reports of physical or mental examinations, scientific tests, or experiments conducted in connection with the investigation of the offense, including but not limited to:

a)  All fingerprint and palmprint exemplars, fingerprint samples, comparisons and opinions of fingerprint experts, and all documents relating to those opinions;
b)  All psychological tests or polygraph examinations performed upon any prosecution witness and all documents

2

referring or relating to such tests;

c)   All ballistic tests and/or examinations conducted on any weapon or ammunition or portion thereof connected to the offense.

2.   Any and all records and information revealing prior criminal convictions or guilty verdicts or juvenile adjudications, including but not limited to the "rap sheet" of each prosecution witness through the current date.

3.   Any and all records and information revealing prior or subsequent misconduct, criminal acts, or bad acts of each prosecution witness, including without limitation allegations of criminal conduct of which the prosecution knows or through reasonable diligence should have reason to know.

4.   Any and all considerations or offers of consideration given during the course of the investigation and trial of this case by any law enforcement officials, including prosecutors or agents, police, or informers, to or on behalf of any witness the prosecutor called at trial, or any such consideration or promises expected or hoped for by any such witness at any future time.  Such consideration refers to anything which arguably could be of value or use to a witness, including, but not limited to formal or informal, direct or indirect, promises of immunity, leniency, favorable treatment, or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative or other matter involving state or federal government, any other authority or other parties; payments of money, rewards or fees, witness's fees, and special witness's fees; provisions of food, clothing, transportation, legal services, or other benefits; placement in a special protection program, informer status of the witness, and letters to anyone informing the recipient of the witness's cooperation; recommendations concerning employment; and anything else which arguably could reveal an interest, motive, or bias in the witness in favor of the prosecution or against Johnson or act as an inducement to testify or to color the witness's testimony.

5.   Any and all statements - formal and informal, oral or written - by the prosecution, its agents and representatives to any person (including counsel for such person) whom the prosecution called as a witness at trial pertaining in any way to the possibility, likelihood, course, or outcome of any government action - state or federal, criminal or civil - against the witness or anyone related by blood or marriage to the witness.

6.   All proffers made by a witness in the course of

3

negotiating a cooperation agreement.

7.  Any and all threats, express or implied, direct or indirect, or other coercion directed against any witness the prosecutor called at trial; criminal prosecutions, investigations, or potential prosecutions pending or which could be brought against such witnesses, any probationary, parole, deferred prosecution, or custodial status of any such witness; and any other pending or potential legal disputes or transactions involving any such witness and the state or federal government, or over which the state or federal government had real, apparent or perceived influence.

8.  A list of any and all requests, demands, or com plaints made to the prosecution by any witness which arguably could have been developed on cross-examination to demonstrate any hope or expectation on the part of the witness for favorable government action in his behalf (regardless of whether or not the government had agreed to provide any favorable action).

9.  Any material not otherwise listed which reflects or evidences the motivation of the witness either to cooperate with the prosecution or any bias or hostility against Johnson.

10.  A copy of all medical and psychiatric reports known to the government concerning any witness the prosecutor called at trial which arguably address the witness's credibility, ability to perceive, or to relate or recall events.

11.  The existence and identification of each occasion on which a witness has testified before any court, grand jury, or other tribunal or body, or otherwise officially narrated in relation to Johnson, his co-defendants, the investigation, or the facts of this case.

12.  Identification of all judicial proceedings in any criminal cases involving (as a witness, unindicted co-conspirator, aider or abettor, or defendant) any person who was a prosecution witness at the trial in this action;

13.  The existence and identification of each occasion on which a witness who is or was an informer, accomplice, or co-conspirator, has testified before any court, grand jury, or other tribunal or body;

14.  A full and complete statement of any and all criminal conduct of which the government has knowledge that has been committed by any witness the government called in its case-in-chief at trial or pre-trial hearing regarding

4

which there has been no conviction, whether or not these crimes were or are presently the subject of a promise, reward, or inducement, and whether or not these crimes are presently the subject of a pending criminal charge;

15.  A statement whether or not the government requested or authorized the payment of any sums of money to any informant or cooperating witness who agreed to testify for the government, who participated in the investigation which generated the indictment and charges of conviction, or to any other propective witness;

16.  Any logs, records, or other documents relating to the payment of any sums of money to any individual set forth in the preceding paragraph and the source of such payment;

17.  Any written or oral statement, whether or not reduced to writing, made by any prosecution witness which in any way contradicted or was inconsistent with or different from other oral or written statements made by that witness, or in which that witness admits poor memory, and any such statements made by any person, whether a witness or not, which in any way contradicted, was inconsistent with, or different from any statements made by a prosecution witness.

18.  A statement as to whether any prosecution witness, including any informant, made any misleading statements, misrepresentations by omission, or provided any other information during the course of the investigation or trial which proved to be false.  If any such statements or omissions were made, or any false information provided, identify that false statement, omission or false information.

19.  The names and addresses of all persons whom the prosecution, its agents and representatives believed at any time during the investigation of this matter had relevant knowledge and/or information with reference to the offense of conviction but whom the prosecution did not call as witnesses at trial.

20.  Any requests prepared by the government for permission to grant immunity or leniency for any witness, whether or not such request was granted;

21.  Copies of any and all records of law enforcement agencies reflecting intradepartmental disciplinary action taken against any law enforcement official who testified in this trial or participated in the investigation.

For your convenience, a list of the individuals who testified for the government in either the guilt or sentencing

5

phases of the trial is attached.

I explicitly request that all files, records, evidence, and any materials related to this case be preserved whether those materials are now in your possession or in the possession of your agents.

I am authorized to represent that Mr. Johnson's co-defendants, Richard Tipton and James H. Roane, Jr., join in these requests on behalf of their clients.

Very truly yours,

Barbara L. Hartung
1001 E. Main Street, #504
Richmond, VA  23219
(804) 649-1088

Edward E. Scher
Thorsen, Marchant & Scher, LLP
316 W. Broad Street
Richmond, VA  23220-4219

Attorneys for Mr. Johnson

cc:    Donald R. Lee, Jr.
       Macaulay, Lee & Powell, LC
       1015 East Main Street
       Richmond, VA  23219
       Attorney for Richard Tipton

       Paul F. Enzinna, Esq.
       Miller, Cassidy, Larroca & Lewin, LLP
       2555 M Street, N.W.
       Washington, D.C.  20037-1302
       Attorney for James H. Roane, Jr.

6

UNITED STATES v. CORY JOHNSON, ET AL.
Crim. No. 3:92CR68

Prosecution Witnesses

Gregg T. Scott
Dennis P. Malone
Anthony Howlen
Richard E. Bice
James E. McMillian, Jr.

William Thomas
Antwoine Brooks
R.T. Fleming
Charles Townes
Jeanne Keim

Maurice Saunders
Jeanette Pauley
A. D. Merz
Fred Bolling
Johnny L. Byrd

Sherry L. Gay
Wayne Hines
Richard Farmer
George Wynn
Rebecca Talley

Hussone C. Jones
Denise R. Berkley
Rodney Rodriquez
Ralph Fleming
John Dorman

Paul Tuttle
Pamela D. Williams
Robert Davis
Ronita Hollman
David Burt

Thomas Searles
Anne D. Jones
Dennis K. Moody
Stanley Smithers
Mary Johnson

William C. Brereton
Gary Brunelli
Sterling R. Hardy
Martha J. McCoy
Montez Z. McCoy

Jerry Gaithers, Jr.
C.T. Woody, Jr.
Marcella F. Fierro
James Keefer
Charlotte D. Moore

Santo Gutierres
Cynthia Riley
Walter Tuck
Gwendolyn Greene
Nellie Pulley

Carolyn Chiles
David S. Tweedie
Greg Noble
Leroy Slater
Valerie Butler

Thomas P. Leonard
Douglas W. Cunningham
Paris L. Robinson
Willie Seward

## E X H I B I T    C

### <u>JURY QUESTIONNAIRE</u>

1.    During the course of the trial (including jury deliberations), did any person who was not connected with the trial speak to you about the trial or attempt to question you about the trial?  If yes, give the person's name, approximate date of the contact, and substance of the conversation.

2.    During the course of the trial (including jury deliberations), did any person who was connected with the trial (for example, a court officer, witness, attorney, or court clerk) speak to you about the trial or attempt to question you about the trial?  If yes, give the person's name, approximate date of the contact, and substance of the conversation.

3.    During the course of the trial (but prior to deliberations), did any fellow juror discuss the trial or testimony with you or make comments about the substance of the trial or testimony?

4.    During the trial and jury deliberations (both guilt phase or sentence phase), did any fellow juror mention or discuss news coverage of the trial (including TV and press coverage)?  If so, give the juror's name and substance of the conversation.

5.    During the course of the trial and deliberations, did you or any other juror visit any of the locations discussed by the witnesses during their testimony?  If so, describe the circumstances, approximate date of visit, and name of juror.

6.    During the course of the trial and deliberations, did any juror reveal information about one or more of the defendants or about the crimes charged?  If so, give the juror's name and give the substance of the conversation.

7.    During the trial and deliberations, did any juror state that he knew one or more of the witnesses who testified or any of attorneys involved in the trial?  If so, give juror's name and the substance of the conversation.

8.    During jury deliberations, did the jurors consult any materials that were not part of the trial evidence (for example, books, articles, newspapers)?  Describe what happened.

9.    During the trial or deliberations, did you overhear any conversation about the defendants, the witnesses, the charges, or the possible sentences?  Describe what happened.

10.    Did anything occur during the trial or the deliberations that you would like to bring to the court's attention?  Describe.

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 1999, a copy of the foregoing Petitioner's Joint Motion For Leave To Take Discovery was mailed to:

Robert J. Erickson, Deputy Chief
Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Bldg.
601 D Street, N.W.
Washington, D.C.  20530

Donald R. Lee, Jr., Esq.
Frederick R. Gerson, Esq.
McCauley, Lee & Powell
1015 E. Main Street, 4th Floor
Richmond, VA  23219

Scott L. Nelson, Esq.
Paul F. Enzinna, Esq.
Michael J. Barta, Esq.
Miller, Cassidy, Larroca & Lewin
2555 M Street, N.W.
Washington, D.C. 20037

Barbara L. Hartung