# EXHIBIT 79

# Senate

## THURSDAY, MAY 24, 1990

*(Legislative day of Wednesday, April 18, 1990)*

The Senate met at 8:30 a.m., on the expiration of the recess, and was called to order by the President pro tempore.

The PRESIDENT pro tempore. The Senate will come to order. As we prepare to reverence Him who hast been our dwelling place in all generations, the Senate Chaplain will deliver the prayer, Dr. Halverson.

### PRAYER

The Chaplain, the Reverend Richard C. Halverson, D.D., offered the following prayer:

Let us pray:

The son of our man who presides at the guard desk, Art Fleming, will have surgery tomorrow. Let us just have a moment of silent prayer remembering him.

*The Lord is thy keeper: the Lord is thy shade upon thy right hand. The sun shall not smite thee by day, nor the moon by night. The Lord shall preserve thee from all evil: He shall preserve thy soul. The Lord shall preserve thy going out and thy coming in from this time forth, and even for evermore.*—Psalm 121:5-8.

Eternal God, omnipotent, omniscient, and omnipresent, as the Senators disperse for their varied activities during this recess, may this promise of the Psalmist be fulfilled in their lives. Bless their time with their families and opportunities with constituents and whatever responsibilities fall to them. Help them to find time for rest and recreation and renewal. And bring them safely back to the tasks which await them.

"The Lord bless you, and keep you: The Lord make His face to shine upon thee, and be gracious unto thee: The Lord lift up His countenance upon thee, and give thee peace." Amen.

The PRESIDENT pro tempore. The Senate will be in order.

### RESERVATION OF LEADER TIME

The PRESIDENT pro tempore. Under the previous order the leadership time is reserved.

### OMNIBUS CRIME BILL

The PRESIDENT pro tempore. The Senate will now resume consideration of S. 1970, which the clerk will report.

The assistant legislative clerk read as follows:

A bill (S. 1970) to establish constitutional procedures for the imposition of the sentence of death, and for other purposes.

The Senate resumed consideration of the bill.

Pending:

Thurmond amendment No. 1690, to add a "right versus wrong" standard to the term mentally retarded.

The PRESIDENT pro tempore. The pending amendment is the amendment by Mr. THURMOND, amendment No. 1690, on which there will be 90 minutes of debate equally divided and controlled by Mr. THURMOND and Mr. BIDEN. Mr. THURMOND is recognized.

Mr. THURMOND. Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The absence of a quorum has been suggested, and the clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. THURMOND. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. THURMOND. Mr. President, the underlying bill contains as title I, a modified version of the Federal Death Penalty Act, which I introduced. There are several serious problems with this version of the death penalty and this amendment addresses one of them.

I am opposed to the provision in the underlying bill, S. 1970, which would categorically prohibit the execution of a capital defendant solely because he claims he is mentally retarded without regard to whether the defendant knew the difference between right and wrong.

The amendment I am offering to the bill modifies the underlying death penalty language and is based upon the constitutionally recognized principle that punishment must be directly related to the defendant's personal culpability. It would require that no person could be executed who was mentally retarded and who wholly lacks the capacity to appreciate the wrongfulness of his actions. In other words, it would prohibit the execution of mentally retarded persons who do not know the difference between right and wrong.

This principle was recently affirmed by the Supreme Court of the United States in the case of Penry versus Lynaugh. In this case, Mr. Penry was sen-

tenced to death in Texas for having brutally raped, beaten, and stabbed to death, with a pair of scissors, Pamela Carpenter, the sister of former Redskins kicker Mark Moseley.

The issue before the Supreme Court was whether Penry was sentenced to death in violation of the eighth amendment because the jury was not instructed that it could consider and give effect to mitigating evidence related to his moderate mental retardation when deciding whether the death penalty should be imposed.

The Court held that the jury, in a capital case, must be allowed to consider and give effect to mitigating evidence of mental retardation. In fact, the Court remanded the case to the Texas State court for a new sentencing hearing.

Mr. President, the Penry decision appropriately recognized that it is cruel and unusual punishment to execute severely retarded persons and those lacking in the capacity to appreciate the wrongfulness of their actions.

I do not dispute this holding. The Court went on to note that such retarded persons would not be convicted today since the modern insanity defense generally includes "mental defect" as part of the legal definition of insanity.

In addition, retarded persons would not be considered since the case of Ford versus Wainwright prohibits the execution of persons who are unaware of their punishment and why they are being punished. Proponents of this amendment would have the Nation believe the Supreme Court has authorized the execution of severely retarded individuals. This is not the case. Where the Supreme Court and this bill's proponents part company is on the issue of whether the eighth amendment categorically prohibits the execution of all mentally retarded capital murderers regardless of whether the murderer knew the difference between right and wrong and was capable of conforming his conduct to the requirements of law.

The Supreme Court held that the eighth amendment does not prohibit the execution of such individuals. The Court concluded that it cannot be said that all mentally retarded people, by virtue of their mental retardation alone, inevitably lack the ability to understand the difference between right

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

S 6874                     CONGRESSIONAL RECORD — SENATE                     *May 24, 1990*

and wrong and conduct themselves accordingly.

Mr. President, the Court went on to hold that the concept of "mental age" or "intelligence quotient" is an insufficient basis for the eighth amendment rule since it is imprecise, and does not adequately account for individuals' varying abilities.

I would like to repeat that because I think that is a very key point in this matter.

The Court went on to hold that the concept of "mental age" or "intelligence quotient" is an unsufficient basis for an eighth amendment rule since it is imprecise, and does not adequately account for individuals' varying abilities. Proponents of this legislation would have an IQ test, or a mental age determination by a partisan witness, determine whether a sentence of death is appropriate rather than the determination of jurors and judges sworn to uphold the law. The issue of whether these defendants knew right from wrong would be tossed aside.

Finally, opponents of this amendment suggest that there is a national consensus against executing any, and all, capital murderers who are retarded. Yet, the Supreme Court in Penry found this not to be the case. In fact, only one in three States currently have categorical prohibitions against the execution of the mentally retarded.

In closing, the decision whether to sentence a capital murderer to death should not rest on the imprecise findings of psychologists. Every Senator here today knows that all death row inmates will claim they are mentally retarded and will be able to hire unlimited psychologists who will agree with them. The decision whether to give a particular defendant the death penalty should rest upon the—whether he knew right from wrong and could conform his behavior to the law. The more Congress takes away these decisions from the juries and gives them to statisticians and psychologists, the more we throw into serious question the principles that underlie our criminal justice system.

For these reasons, I urge my colleagues to vote for this amendment.

Mr. President, no right thinking human being wants to execute a person who does not know right from wrong. But just to claim that they are mentally deficient without an appropriate standard does not make sense. In other words, if a man goes out here and kills seven or eight people and then tries to go in court and claim mental retardation without the question being decided as to whether he knew what he was doing—and knew right from wrong, then the Supreme Court says that he can be held responsible for his actions. If he did not know right from wrong, then he would not be held legally responsible. That is the issue here today.

Are we going to follow the Supreme Court's ruling when a man is charged with a crime to say whether he knew right from wrong? If he did not know right from wrong, that is one thing. If he did know right from wrong and he knew what he was doing when he murdered the innocent, why should he not be held responsible? We feel that is the only sensible course to take.

This matter has gone on for years and years in different States and different courts. The Supreme Court has ruled that you will not hold a man responsible if he does not know right from wrong. You will hold him responsible if he does know right from wrong. What fairer test could you have?

This is the standard in most States, it is the standard the Supreme Court of the United States has held is a proper test. We feel that that this amendment that I have offered should be adopted.

I urge my colleagues to take the view the Supreme Court has taken, and the courts in most of the States have taken, and follow this course.

Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The absence of a quorum has been suggested. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BIDEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

The Senator from Delaware is recognized.

Mr. BIDEN. Mr. President, I would like to make it clear what I think this debate and this amendment is all about. This is not about being against the death penalty. So I think it is important we start off there.

I have introduced a bill with the cosponsorship of many of my colleagues that increases the number of offenses for which death is a possible penalty. But I have always believed when we are talking about the death penalty that we should be sure that when that ultimate sanction is being imposed we are as reasonable, we are as fair, and we are as judicious as we possibly can be. And, as a society, once having decided that that ultimate sanction will be applied, we should at least have it reflect, in the process of deciding that, the values that we as a nation and we as civilized people stand for.

I realize there are many among us who disagree with me and with the Presiding Officer and others in this body and suggest that the death penalty under any circumstances for any reason is not a legitimate reflection of what the values of this society should be, and there is healthy and honest disagreement on that point. But I happen to think that there are certain crimes and acts for which society has the right to impose the ultimate sanction.

But, Mr. President, when one concludes that that sanction should be imposed, there are limits upon which one would consider imposing it. For example, no one would consider, to take the extreme—and I do not think anyone disagrees with this—no one would consider that if a 6-year-old or a 5-year-old child committed murder, that we would go out to the public gallows and string up a 6-year-old.

I do not think anyone, on the other hand, would suggest if anyone who was clearly mentally retarded, clearly lacking the intelligence quotient to be able to comport themselves in any way remotely like what we in society would think would be normal behavior—not because of anything they did themselves, not because of anything that they intended, just because they were born that way—that that person should be strung up or sat in an electric chair or given a lethal injection.

So I suspect as we debate this issue and as we come to resolution on it shortly, we are all going to have to reach down inside and decide are there circumstances under which we would need to put someone away because they are such a threat to society, because they are dangerous—are there circumstances where we would put them away, but conclude that we should not put them to death; whereas, someone else, a different age, with a different mental capacity, we might very well conclude they should be put to death? So, what we are talking about here is not death penalty versus no death penalty. We will have that argument later.

We have outstanding colleagues on this floor who believe with every fiber in their being the death penalty is immoral, a negative reflection of the values of Judeo-Christian ethics, and others do not. That is the debate on death. This is a debate on humanity. This is not about death. This is about measuring ourselves in the degree to which we are humane.

It seems to me my distinguished colleague, Senator THURMOND, and I have reached a compromise—at least he and I have—on the death penalty bill. He and I agree on the number of crimes to which the death penalty shall be extended. He and I agree that we should not put someone to death for having committed a crime while they are a minor. We may put them in jail for the rest of their lives, but we do not put them to death. He agrees with that.

What we are disagreeing about here is whether or not someone who is not criminally insane, not the victim of temporary insanity, not someone who acted in the heat of passion, but someone who is mentally retarded, who does not have the mental capacity to achieve the ability to act, ever, as an adult. We all know people that way. We all know families into which people are born who do not have a high enough intelligence quotient to

*May 24, 1990*       CONGRESSIONAL RECORD — SENATE       S 6875

ever achieve a degree of maturation about which society would say we can justly and fairly measure their actions against every other person in society, notwithstanding they do not have the mental capacity. Nothing in the world that they can do—nothing—can bring them to the point where they will be able to achieve the degree of maturity that their brothers and sisters in the same families, that their mothers or fathers, or that anyone else can.

As I said, some antideath people may think if we are going to have the death penalty the retarded should be eligible, too, as well as those prodeath people who think that as well. But I think we are being incredibly naive, and saying so much about ourselves as a nation that is negative, if we cannot distinguish, if we cannot understand that there are graduations of culpability, and that there should be circumstances under which we as a civilized nation say, my God, am I going to put to death someone with a 45 or a 50 I.Q., who can barely walk and talk, because they committed an offense that resulted in the death of someone else?

We may have to take that person and say take them off the street and they will be put away forever and a day. But, my God, I cannot fathom the notion of strapping down someone with a 60 I.Q. in a chair and saying now you are going to die for your sins against humanity. From their perspective there has already been a sin against humanity committed and it was one committed on them when they were born.

Let me tell my colleagues what else this is not about, and I make this point again: It is not about mental insanity, it is not about instability, it is not about emotional upset; this amendment has nothing to do with John Hinckley; this amendment has nothing to do with the insanity defense; this has nothing to do with temporary insanity or mental derangement. This is about mental retardation, a permanent condition of being stunted in your mental growth. That is what it is about.

If we say here it is humane not to put to death a 15-year-old person who commits an offense, why would we put to death a 30-year-old person, a 40-year-old person, with the mental capacity and growth of a 14-year-old? Why would we do that? Why do we say that if a child commits an offense we will not hang him, but if it is done by a 50-year-old man or a 50-year-old woman with a mental capacity less than that child, oh, we will hang that one?

(Mr. REID assumed the chair.)

Mr. BIDEN. Mr. President, is physical maturation a test of one's ability to function in society? If we do that, then we should go along with a tape measure and decide everybody who is 6 feet should be held at a higher standard, no pun intended, than someone 5 foot 10; someone who is 6 foot 3 at a higher standard than someone 5 foot 7.

This is crazy. What are we? What possible benefit do we get as a nation? What do we say about ourselves when, for the possible one person in probably 20 years who will fall under this Federal death penalty provision for the mentally retarded, we insist as a nation to write on our books that we are going to put mentally retarded people to death.

What I am about to say I think is very important. There is no dispute over what the meaning of retardation is, no dispute, Even the Supreme Court who said you can execute the retarded recognize we all know the definition of retarded. The definition is a person with an IQ of 70 or less, or put another way, with a mental capacity, with a mental age of 12 or less.

Think about how incongruous we are about to become if we vote for this amendment. We are going to say we cannot put to death someone who is less than 17 years old at the time they committed the offense, yet every psychologist, psychiatrist, every physician, everyone agrees that someone lacking the IQ of 70 cannot and does not achieve the socialization, the maturity, the intellectual capability of anyone over the age of 12. We all agree to that. We all understand that.

So we are going to say in the same bill, put them to death at age 12, in terms of their capability. Keep in mind, now, we are not talking about some sort of artsy craftsy liberal notion of was this person insane at the moment. I have 14 psychiatrists who say he is, and 12 that say he is not. I have nine that say what triggered him was his flashback at a moment to an event when he was 7 years old that caused him great pain, and all that malarkey.

We are not talking about that. We are not saying that at all. We are saying if you march into a courtroom a child who happens to be 40 years old, you can look at him, you can talk to him, you can tell that person has an exceedingly low IQ. We are saying we are going to put that person to death.

Senator THURMOND and I are not fighting over the definition of mental retardation. We both know what it means. Our debate is over whether or not we should execute the retarded. Senator THURMOND says that if the retarded person knows the difference between right and wrong, they should be eligible for the death penalty.

I say that we should ban the execution of the retarded, period. It is barbaric. Keep in mind, a 15-year-old knows the difference between right and wrong, and we are all agreeing we are not going to put a 15-year-old to death.

A 10-year-old can know the difference between right and wrong. There is no dispute about that. But we are agreeing, whether they do or not, we are not going to put them to death as a society. We are not going to say, "Ten-year-old kid, you did it; you're dead." Everyone in here is saying we

are not going to do that. We are talking about someone who is not insane, not temporarily insane, not temporarily deranged. What we are saying now is very basic and very simple: If you are so mentally stunted in your growth, and observably so; if you have the inability because of your diminished mental capability of ever achieving a level of maturation above the age of someone who is 10 of 12 or 14—we do not even get that high—we are not going to put you to death. We will put you in prison for life with no possibility of probation or parole, but we are just not going to do that.

This is coming from a guy who supports the death penalty. Let my colleagues who are listening to this make no mistake. It is the Biden death penalty bill that we are voting for. It is the Biden death penalty bill that increases the number of offenses for which someone can be put to death. And it is Biden who is saying, but for God's sake, if we acknowledge you should not put children to death, acknowledge we should not as a nation put to death the mentally retarded.

One other point I want to make to my colleagues, this is not a case about dueling experts. Now we are each going to bring into court our experts. It is kind of hard to fake your IQ. You have to be awfully smart to be able to fake for your whole life that your IQ is below 70. I never could quite understand the rationale for trying to do that your whole life, because that is what we are talking about.

It is not someone who walks in and says, "By the way, my client, look at her; she has an IQ of 70. She took a test in the pyschologists's office and she flunked."

They roll in five people who say, "How come I saw that kid go through high school with me? How come that person was able to do—"

A person is not going to fake having an IQ below 70. So this is not about dueling experts: My expert says this person is insane; my expert says this person is not insane. Forget the experts. They are out of it. This is simple common sense and humanity.

By the way, let us talk about what the Supreme Court said, because we all around here, myself included, my colleague Senator THURMOND and my colleague Senator HATCH, quote the Supreme Court in tones of reverence when we agree with them. And when we do not agree with them, like Senator DANFORTH does not, and others do not, on their ruling relative to segregation, we intone them about nine arrogant people sitting on the bench. We can do it all in the same day, in the same breath.

Right now, you will hear the Supreme Court intoned. The Supreme Court says it is all right to put mentally retarded people to death. Just because the Supreme Court said we can, that does not mean we should, because what the Supreme Court went on to

say was that the decision is not up to them.

All the Court said was we could execute a retarded person if we wished; that the moral decision was ours because we in this body, and our colleagues in the House, are supposed to reflect the moral values of the Nation. The Court said, if you do not think there is a moral value consequence, we cannot write it into the law.

Or conversely: Because you did not express whether or not there should be a moral prohibition and a legal prohibition as a society from executing 12-year-olds, mental 12-year-olds and physical 12-year-olds, because of that, the Court said you can do it.

Last year when we passed the death penalty for drug kingpins, we prohibited the execution of the retarded. We made that choice. We did it last year.

For all those of my colleagues going around with good reason and saying they supported that bill that Biden and many others had in there last year that included death for drug kingpins—the thing the President keeps saying he wants and he forgets he has—when my colleagues voted for that, they voted to say we are not going to execute someone who is mentally retarded.

We made that choice once already. My colleagues have already voted once for sanity, for social sanity. Let us make that same choice again.

Let us show that our support for the death penalty is bounded by humanity, that we support the death penalty, but it is bounded by humanity. Let us forbid the execution of people who mentally, under a measure agreed upon by all, are children under the age of 12. We do not execute children. Let us not execute people who never get beyond that stage in their life through absolutely no fault of their own.

In conclusion, there are other death penalty States that ban execution of the retarded, I might add for my colleagues. This is not something wacky. This is not something crazy. This is not something that some of my liberal friends have come to me and said, "Joe, I can support your death penalty ban, but put this in so we can show it up." I never heard anybody talk about the border States in the South being particularly antideath. The State of Georgia says hang them unless they are mentally retarded. The State of Maryland says death unless they are mentally retarded—not insane, mentally retarded. The State of Kentucky says death but not for mentally retarded. The State of Tennessee says death but not for the mentally retarded.

I believe the reason why many more States have not passed such a law is there is the implicit assumption that we would not put to death people who are under the age of 12 in their capability by any measure. These are people who from the time they were born, in most cases, were never able to achieve, never able, through no fault

of their own, to reach any degree of maturity. I only hope that they will resist the Thurmond amendment and support the Biden death penalty bill with which the Senator from South Carolina is now only in disagreement on two points, this being one of them.

I yield the floor.

The PRESIDING OFFICER. Who yields time?

Mr. THURMOND. Mr. President, I yield the distinguished Senator from Utah as much time as he requires.

The PRESIDING OFFICER. The Senator from Utah is recognized.

Mr. HATCH. Mr. President, I think it is time to put this in perspective. If the Biden amendment stays in the way it is and we do not vote for the Thurmond amendment, then I guarantee that in every case they are going to claim mental retardation. Seventy percent of all of the convicted murderers in this country today claim mental retardation, maybe not even at trial but long after trial because of the suffering and pain that they have experienced.

All the distinguished Senator from South Carolina would like to do is allow the mental retardation defense for defendants who do not know right from wrong. But his point is this: If they know right from wrong, they ought to face the consequences. The majority of prisoners on death row today claim that they are retarded, not that they do not know right from wrong, not that they did not commit the murder or murders as is the case; as many, I understand, as 70 percent of them. I can bet you that almost 100 percent will claim it if S. 1970 is enacted and the Thurmond amendment is not added to it.

Let us understand something. The trial comes up. Defendants can raise any issue about mental capacity, disability, or retardation they want. The jury will determine whether that person is mentally retarded enough to not know right from wrong in most jurisdictions in this country. They have a full at bat for showing mental retardation and influencing the jury. They can bring in all the psychiatrists they want, all the social workers, friends and family, all the associates. They can bring in experts galore. The jury then decides, "No, you knew what you were doing. You cold-bloodedly murdered that person, and we find you guilty."

Then the sentencing comes up. They have a right to come in and do it all over again. They can then go completely through it again with psychiatrists, social workers, all the experts they want to bring in to show mitigation. The jury says, "No, you knew what you were doing. You killed these people. You did it in cold blood. It was a cold-blooded murder, and we find, after all of this testimony"—this is a jury of peers—"death is the sentence you should have."

The Biden amendment in this bill then goes and gives them a third time,

only it says it a little bit differently. It says, if you can show you are mentally retarded, you cannot be executed. You will stay in jail the rest of your life, but do you not have to suffer the death penalty. This is better than habeas corpus for prisoners. They can raise it at any time.

We went through habeas corpus yesterday, and we are going to vote on it again today, but we went through habeas corpus yesterday and we know that just the appeal process in the Gacy case took 9 years. The trial started in 1980, as I recall, and it went 9 years, to 1989, before the Supreme Court rejected the appeal on the matters affecting the trial. The habeas process starts this year, and, if it is like William Andrews in Utah, you can count on 10 more years after this year and maybe way beyond that if the current Graham habeas language is kept in this bill. That is about 27 years at that point, and he is still not executed. I can guarantee you in that 27 years they will be back in time and time again, time and time again claiming mental retardation. And if they can find a sympathetic forum, they are going to get off from what the jury of their peers decided, what the Court decided, what the appellate process decided, what the habeas process decided, in countless appeals, even if the Graham habeas amendment is what we wind up with in this bill.

All the distinguished Senator from South Carolina is saying is, look, we will give consideration to mental retardation, but, if they know right from wrong, they should not be able to use that ad infinitum and they should not be able to use that over and over again until they finally are able to convince somebody down the road, be it a 27-year period, or 17-year period as in the case of Andrews, or 9-year period as in the case of Gacy that is going on forever—if they find some sympathy in that 27 years, they can then get off from the heinous murder that they have caused.

This is a soft, artsy, liberal approach that is for one reason and one reason only, and that is—and it is a legitimate reason if you believe this way—the folks who advocate it do not want the death penalty under any circumstances, and this is just another way that they can prevent the death penalty.

Mr. BIDEN. Will the Senator yield for a question, a very short one?

Mr. HATCH. Go ahead, on the Senator's time.

Mr. BIDEN. On my own time. Does the Senator think we should put to death a 12-year-old child who knows right from wrong and says, "Daddy, I'm shooting you," boom? I do not think we should put to death a person who is mentally retarded.

I yield the floor.

Mr. HATCH. Wait. Who does not know the difference between right and wrong?

Mr. BIDEN. What is the distinction, if I may ask my friend?

Mr. HATCH. The distinction is that the law takes empathy and has sympathy for children and the law does not have the same degree of sympathy for adults who know right from wrong even though they might not be geniuses.

Mr. BIDEN. Even though they are mentally retarded?

Mr. HATCH. Mental retardation, who determines that? Are we going to determine it by objective tests, because there are none. Are we going to determine that because there is some scientific way of determining mental retardation? There is no way of doing that. It comes down to what experts say, and you have experts on both sides of that question. And, if they can, in that 27-year period I have just outlined, find some sympathetic group, liberal, if· you will, they are going to get off. It is that simple. The American people say, we are sick of it. We have jails competely full of these people who have committed cold-blooded, premeditated murder who are adults who know right from wrong, and the majority of them claim they are mentally retarded.

Seventy percent have made claims at one time or another, as I understand it. Look at S. 1970, the Supreme Court ruling in the recent case of Penry versus Lynaugh. In that case, the Court held that the eighth amendment does not categorically prohibit the execution of mentally retarded capital murderers. The Court stated that it may indeed be cruel and unusual punishment to execute persons who are wholly lacking in the capacity to appreciate the wrongfulness of their actions. Such persons however are not likely to be convicted or face the prospect of punishment today, since the modern insanity defense generally excludes mental defect as part of the legal definition of insanity.

Ford versus Wainwright prohibits the execution of persons who are unaware of their punishment. They should not suffer.

There are plenty protections for mental retardation in the law today. I agree with those. I would even go farther. If the crime is not heinous, if it is not willfully meditated, heinous, vicious crimes, I would have a difficult time using the death penalty under those circumstances. But where you have a heinous, vicious, willful, premeditated crime, where the person knows right from wrong, they should not escape from the consequences just because somebody else claims they are mentally retarded.

I remember when people felt that Steinmetz, the greatest mathmetician in the world at the time—because he did not make good grades in certain areas of schooling—was mentally retarded. He turned out to be one of the greatest geniuses in the history of the world.

We all know that every criminal claims that he is not responsible for what happened because of what happened in his past. The court has provided guidance in each case. A criminal cannot be executed if he or she was insane at the time the murder took place, or at the time of trail. The language of the amendment of the Senator from South Carolina follows the courts' criteria. As such, the defendant's mental condition will not be ignored. It has to be considered as a mitigating factor.

So, to summarize, I believe truly mentally retarded people who do not know what they were doing should not be sentenced to death. I agree with that. Any humane person would. But there has to be a standard. That standard ought to be, if they know right from wrong, they should not be able to escape the responsibility for it.

Dalton Prejean willfully and premeditately killed a police officer, a Louisiana State trooper. What was his defense? He was mentally retarded.

I have to admit, if he was truly mentally retarded and did not know right from wrong and the jury determined that, he should have gotten life in prison or have been put in a mental institution. But he knew right from wrong. The jury knew he knew right from wrong. The jury knew that he knew what he was doing. He was not mentally retarded enough to not know what he was doing.

That is all the distinguished Senator from South Carolina is saying. If they are mentally retarded, they do not know what they are doing, you are right, Senator BIDEN. But, if they are mentally retarded or claimed they are, they know what they are doing, they did it in a willful, vicious, premeditated way, by gosh, society ought to be able to have this option to prevent it in the future, because mentally retarded people who know right from wrong can be deterred from doing these things if they know there is an ultimate sanction against what they are doing.

But the real issue is this. People who are not mentally retarded, but who will act like they are, who will claim that they are, and who can get any kind of a psychiatrist they want to say that they are, these people will be making these claims ad infinitum, long after the trial where they are protected on the insanity defense, long after the sentences where they are protected on the insanity defense, and long after any mitigating circumstances thereafter, or all of these repetitive habeas appeals or petitions in accordance with the Graham amendment, if that is what we adopt here today.

The fact of the matter is, we have to set some standards that society can live with, that protects society. That is all the distinguished Senator from South Carolina is doing. He is not saying we are insensitive to mental retardation, nor that we are insensitive to murder, nor that we are insensitive

to our fellow human beings being killed in a premeditated way, nor that we are insensitive to not doing what we can for those people by stopping it and deterring it. That is why we have the death penalty. It works. Prejean is never going to kill another trooper again.

There are all kinds of other illustrations just like it. In every case, you are going to find these people claiming mental retardation, except where it is patently clear that they cannot. It is just another way of trying to prevent the death penalty. It is clear that is what it is.

I ask my colleagues to listen to the distinguished Senator from South Carolina. He is right on this issue. We ought to support him. Those who are totally against the death penalty, they are going to vote the other way. We understand that. They are principled in doing so. Wrong, but principled.

The fact of the matter is, let us not be misled by this type of an argument that these mentally retarded people are all going to claim. Many, many more are going to get off. There are going to be other Prejeans who kill troopers. People will say, why were we not doing something about it when we had the chance. This is the time to do it. The only way you can do anything about it is to vote for the Thurmond amendment.

I reserve the remainder of our time.

The PRESIDING OFFICER. Without objection, the Senator from Massachusetts is recognized for 10 minutes, the time to be charged to Senator BIDEN.

Mr. KENNEDY. Thank you very much, Mr. President.

I want to state at the outset that I do not come to this debate without strong personal feelings since I have a sister who is mentally retarded. So I have spent some time learning about the affliction and I have strong feelings about this particular amendment.

It is truly amazing to me, Mr. President, that we would be addressing this particular amendment of the Senator from South Carolina on this measure. In 1988, we passed the drug bill containing the first Federal death penalty provision since Furman and Gregg. In that law we excluded from the possible application of the death penalty those with mental retardation. I have to ask my colleagues who are supporting this particular proposal: What has happened in this country over the period of the last 2 years that should lead us now to make sure that we are going to be able to give the ultimate penalty, the ultimate penalty to those who have mental retardation? Where is the crime wave by the mentally retarded? Where is it, Mr. President? What has happened in the last 2 years since the Senate went on record in the 1988 omnibus drug bill against execution of the retarded? That bill did not say we will not punish the retarded; it

S 6878                    CONGRESSIONAL RECORD — SENATE                    *May 24, 1990*

did not say we could not give lifetime in prison to those individuals who have the mental capacity of a 12-year-old. It did not say that.

But the pending amendment says that if they have retardation but can tell the difference between right and wrong, they are going to be eligible for the ultimate penalty of death.

In fact, Mr. President, this is not just a little add-on to the mental retardation provision in S. 1970. Include those words of the Senator from South Carolina, and you change the ball game in a very dramatic and significant way. The reason is that the Thurmond amendment describes an empty set. We ought to understand that from various court holdings. If you cannot tell the difference between right and wrong, you probably will not be tried in the first place, whether you are mentally retarded or not. You are probably criminally insane or incompetent to stand trial.

So let us understand the significance of the few little words, the difference between right and wrong. Generally speaking, maybe with rare exceptions, if you cannot tell the difference between right and wrong, you do not go to trial, mentally retarded or not.

So, Mr. President, these few words about telling the difference between right and wrong added to the words that exist in the current proposal effectively say you can go ahead and execute just about anyone, mentally retarded or not.

Mr. President, an argument has been made here on the floor of the U.S. Senate that all criminals are going to say that they are mentally retarded, and therefore escape blame. This is ridiculous on its face and the argument would not be made by anyone who understands mental retardation. Under the existing legislation, the burden of persuasion is upon the defendant to demonstrate that he is mentally retarded and lacks the IQ of 70, part of the definition which has been accepted by the Supreme Court of the United States. We heard just now that there is no definition. That is not so.

The Supreme Court of the United States has recognized that there is a definition, and referenced it in the Penry case. That is the same kind of definition that is included and referred to in the Biden bill currently. It has been accepted by the American Psychiatric Association and by the American Association on Mental Retardation.

Effectively, if you are going to be able to qualify as mentally retarded, you have to demonstrate over the course of a lifetime that you have needed treatment. You cannot just go in and say I am mentally retarded. Any court would throw you out. You have to demonstrate over a lifetime of examinations or medical treatment, over a lifetime, that you have these deficiencies.

So anyone that says that, well, you are going to be found guilty and then you are going to say mental retardation, does not understand what mental retardation is about, has no idea what it is about. None.

Mr. President, it is extraordinary to me that we say on the one hand we will not apply the death penalty to someone who is 16 years old, on one part of the bill, and say, OK, over here someone who only has the mental capability and intelligence of a 12-year-old, we are going to fry them. I cannot understand the logic of that. I just cannot understand that, Mr. President.

This is really a proud moment in the U.S. Senate as we are about to enter the 21st century, about the only democracy in the world that has the death penalty, and we are debating now whether we are going to execute the mentally retarded. That says a lot about our society, about the United States of America. Where are we? Where are we, Mr. President?

The proponents of the amendment say: Let us go ahead and execute those individuals. Let us go ahead. But what are, we trying to accomplish? Are we going to try to deter with the punishment of the death penalty, that we are going to take individuals of 70 IQ or less, and we are going to deter them because we here in the United States are passing a death penalty? Does anybody believe that is going to deter the mentally retarded? Of course, it is not. Are we declaring here in the U.S. Senate that we want retribution on those mentally retarded, so we are going to execute them? That is real retribution for our society. Mr. President, that says more about our society today than anything else.

I hope that we will accept the challenge of the Supreme Court in the Penry case, which is very clear. The Court in that particular decision was inviting legislatures to act and respond. A number of the legislatures have done it. Four States have acted and responded, and we have a responsibility to act and respond as well with the criteria that we want in terms of the death penalty.

I believe that what is included in the current legislation, its definition of mentally retardation, is a definition that has been accepted by the Association of Mental Retardation, the American Bar Association, referenced by the Supreme Court of the United States, and would, I believe, be accepted by the broad scope of American public opinion. By adding the language of the Senator from South Carolina, we are effectively gutting any kind of effective protection for the mentally retarded. I hope that the amendment will be rejected. I yield back the remainder of my time.

The PRESIDING OFFICER. Who yields time?

Mr. THURMOND. I yield 5 minutes to the Senator from Wyoming.

The PRESIDING OFFICER. The Senator from Wyoming is recognized for 5 minutes.

Mr. SIMPSON. Mr. President, I have listened to my friend from Massachusetts, who I work with in so many areas and who I enjoy so very much. He is a spirited legislator, and I was off the floor the other day musing in the library when I suddenly heard this ringing voice coming from inside the Chamber—as if the very pillars were to be pulled in upon each other. It was my friend from Massachusetts.

He and I have had spirited debates like that, and he speaks with great passion. He speaks from a source that none of us will really ever know in these areas, because of the loss of two dear and stalwart brothers at the hands of two really sick people. So, that is something we have to weigh and consider always when we hear our friend from Massachusetts speak. That passion is something none of us would ever even perceive.

With that in perspective, to get back to this issue—and it is tough one—for we are talking about killing people. But we are also talking about killing people who have killed other people. And we are talking about people who did it in a hideous, vicious, brutal, and foul way. That is what we are talking about.

My friend says, "What has happened in America? What has happened at this time of our life as a Nation?" I guess the answer is, and it has to be heard, "Too many people are getting away with murder." It is that simple. Too many people are getting away with murder. They are clever. They have a battery of attorneys who join them. We fund attorneys in this country to help the poor and the destitute with divorce, and rent, and problems of everyday life, and for some reason, they all gravitate to these screwballs. They help them petition, and petition, and petition, ad infinitum. That is a sick part of what has happened in society. We set up a system to take care of people and all those funds and energies have been subverted by people who just cannot wait to get in and see if we can find another Birdman or somebody else. At best, you get about 1 out of 1,000.

But I tell you, we must remember that before you can be charged for first degree murder, you must have known the difference between right and wrong. The prosecution must prove it to a jury. The Government must prove that the defendant did the act and did it knowing right from wrong. That is the law. Also, to be convicted of first-degree murder and be sentenced to death, the defendant had to have committed the murder in an especially cruel and beastly and vicious manner. That is now the law.

It is not like the 8-year-old or the 12-year-old shooting his dad and going, "Zap, you are gone, dad." That is not it. Maybe I am the only one that ever was involved in a couple of first degree murders. I have dealt with heavy lidded, slack jawed people, who sat

*May 24, 1990*     CONGRESSIONAL RECORD — SENATE     S 6879

there after raping and pounding some woman to pieces and I said, "Why did you do that?" And he said, "I like it.". And I said; "You sick slob."

I remember doing that with one man, and the "shrink" ran in from the other room and said, "You cannot call him a sick slob." I said, "I just did." And he said, "Oh, now we are going to have to go now and repair 283 hours of psychotherapy."

I said, "I am not sorry that I did that, but since I was court appointed here, I thought I would ask that. Now I have another question, Doctor. What is there to make us feel certain that he won't do it again?" Then the doctor said, "Oh, I hope you would have asked that question outside of his presence. That will set him back another 10 years."

Well, it must have.

Anyway, he was released and he went back into society and he got a job and his roommate did not know what his past was—thank heavens. He got through that period of his life, and then he married. Then he came home 1 day after a day at his job and he sliced his wife up into 83 sections and plastered her on the wall.

So for every story you have to tell me, I have one to tell you. That is what often irritates people on the other side. There are some people in life who are humans only in the name of anatomical essence. Other than that, they are bums, animals, and beasts, and they ought to be salted away.

Mr. President, I support capital punishment. This is crucial to meaningful crime control. I understand, though, that this is a deep and personal moral issue, too—my own father stands exactly and diametrically apart from me on this issue. When he was Governor of Wyoming, he refused to carry out the final act of capital punishment— he commuted the sentences of several on death row. So I understand fully the reasons of those who honestly and openly oppose capital punishment.

I, on the other hand, feel that capital punishment is an important deterrent to crime. I support that concept— there is also an important factor of "social retribution" served by capital punishment.

We should not allow our compassion for the life of a convicted man to dilute our revulsion and disgust at what that individual has done. Capital punishment is reserved for only the most heinous of crimes. These are crimes so brutal, so devious, so evil, that even the strongest-willed individual is sickened by the act.

These murderers are human only biologically—they are animals in terms of behavior. Too many of these individuals commit their atrocities, are apprehended, and sit smugly in court laughing at society and the judicial system—they know that they will likely die of old age before society has its due. They have no remorse or regret. There is no atonement in these

people. They are evil through and through, and society is better off without them.

By their own actions, these individuals have let it be known that they will kill again if given the chance— either while in prison or out on parole, they will kill again. The only certain method to assure that these persons do not kill again is through the use of capital punishment.

Government has another role in this issue. The families of the victims of these atrocities are now looking to Government to keep its end of the contract. The victims' families are following the rule of law, they are asking society—Government—us—to do what we promised and mete justice out where this particular form of justice is warranted.

Think very carefully about the kind of beings that are subject to the ultimate sanction. We are not talking about, as prosecuters say: the "garden variety muderer." What we are talking about in capital murders are the most cruel, the most vicious, the most beastly acts of inhumanity imaginable.

These murderers have made their views of the value of human life very clear: to them, human life has no value; to these murderers, human life is beneath contempt, it is something to be "snuffed out" with absolutely no remorse what so ever. Many of these murderers enjoy killing; they may even delight in it! Many want to do it again. Many have. And some of those who are interminably delaying their executions with countless frivolous appeals will kill again, even while they are in prison.

As long as these particular individuals live, society is at risk. We should not waste our compassion on these individuals.

Direct your compassion, instead, to the families and loved ones of the victims of these heinous acts. Consider the suffering that is with them every time an execution is delayed on a string of frivolous appeals. Have compassion for these people, if you have no compassion for the suffering of the victim.

Juries may not consider the suffering of the victim during the guilt phase of a murder trial. Consider also, and have special compassion for, the families and loved ones of future victims. Even if those are the families and loved ones of prisoners who, themselves, are at risk during their terms of incarceration.

We constantly talk about the rights of individuals. A criminal trial is carefully conducted to ensure that the rights of a defendant are guaranteed and scrupulously protected. Great pains are taken to make very sure that a conviction is based purely on the evidence—a great deal of potential evidence is never presented to a jury because of the overwhelming concern for the defendant's rights.

That is why the Thurmond amendment is important—crucial—if we are

going to enact meaningful legislation. This amendment clarifies language that would frustrate the desires of the American people.

Many are going to suggest that we are going to be executing mental incompetents if this amendment is passed. That is simply not true. The crafters of the language we are trying to amend know that and the opponents of the Thurmond amendment know that.

The simple fact is this: mental competency must be proven, not argued, but proven, at the beginning of the trial stage. It must also be proven during the sentencing phase. That is already the law.

As the language currently stands, the most heinous, devious, clever and deceptive butchers on death row will be able to fake mental retardation to avoid the only penalty which is appropriate for their acts of butchery. That is what we are talking about. Insidiously clever butchers, and only those kinds of people, get the death penalty. All that we are trying to do with this amendment is to make it clear that the death penalty will not be imposed if it can be proven to the court that the murderer, at the time of execution was completely and wholly "lacking in the [mental] capacity to appreciate the wrongfulness of his act."

Do not allow yourselves to be duped into believing that such a person could ever be convicted of murder in the first degree, a person must be proven to have acted with the knowledge and intent of killing. Planned, premeditated, and carefully orchestrated acts of butchery. As the law is today, a convicted murderer can not be given the death penalty if they do not comprehend right from wrong.

Society has rights, too. Society's concerns are not voiced in a criminal trial. The courts are charged with the duty of enforcing the law and protecting individual rights. It is only here, in Congress, that the rights of society are considered. It is in this body where the rights of society must be debated.

We are charged with the duty of protecting the rights of society. So far, I fear, we have fallen behind in ensuring the right of society to be protected from vicious crime. We have a constitutional and moral obligation to the law-abiding citizens of this country to make sure that they are not put at risk of life and limb needlessly. We now have a unique opportunity to partially fulfill that obligation and enact tough, meaningful, and constitutional criminal law reform. By voting for the Thurmond amendment, we are telling the country that we do, indeed, take our responsibilities seriously.

The PRESIDING OFFICER. The time has expired.

Who yields time?

Mr. THURMOND. Mr. President, I yield 5 minutes to the able Senator from Mississippi.

S 6880 CONGRESSIONAL RECORD — SENATE *May 24, 1990*

The PRESIDING OFFICER. The Senator from Mississippi is recognized for 5 minutes.

Mr. LOTT. Thank you, Mr. President, and I thank Senator THURMOND for yielding me this time.

I say to my colleagues, over the past 40 years we have lost control of crime in this country. Society is suffering because of what is happening over all these past 40 years. The courts have made it impossible for us to do the job we need to do in fighting crime in this country. Victims are being ignored. The people who have to pay the true penalty for these crimes that we are talking about and law enforcement officials have been damned with laws that make it impossible for them to do their job.

We have set up procedures to protect the criminals and not just the petty criminal, the hardened, repetitive raper, murderer, drug pusher, the system is set up to protect their rights. What about the rights of society? What about the rights of the victims? What about the ability of law enforcement officials to do their job?

The court systems is collapsing, prisons are bulging, overcrowded with courts saying you cannot have the systems where the jails are not adequate for prisoners.

I had a situation recently in my own State where we were housing some Federal prisoners and the Federal officials called and said, "We are not going to allow them to stay any longer because the jails are not air-conditioned." We are worried about prisoners not having air-conditioning when people out in society working and paying the bills do not always have air-conditioning.

We have a cost of $1.1 billion a year just to house these prisoners. It was asked earlier this morning what has happened to this country. I will tell you what has happened to this country. Crime has happened to this country and the people are fed up with it. They want something done.

What does this amendment do? Is it so dastardly? It says, "and is wholly lacking in the capacity to appreciate the wrongfulness of his actions." Is that asking too much? What is mentally retarded? I still think there is a world of question about where that level is. Is it a 20 IQ, 50? Maybe 70? The Senator referred earlier here as 70 being the magic mark. Or is it 90?

Let us just follow what the Supreme Court and what the law has been interpreted to mean. In the Penry decision, if these criminals have the ability to understand right from wrong, the wrongfulness of their act, they should pay for these ghastly, heinous crimes that they have committed. We have a court system. They can make these decisions.

When we have a person that is only moderately retarded, can he appreciate the wrongfulness of his acts? We can all cite these crimes that have been committed that will turn your stomach. People have had enough in this country. In State after State where for years they could not have capital punishment, they are now going back to it.

There was this recent case in Louisiana where for months, years, there was a fight to prevent the execution of a criminal who had been repetitive in his actions, but the Governor made the decision and the appellate courts made the decision they should go forward with this execution.

We need a minimal standard. Yes, we should consider mental retardation. It is a factor that should be considered and the courts can do that. But if they know what they are doing they should pay the price.

It is time I say to my colleagues, the American people demand that we do more in fighting crime in this country. We have an opportunity with this legislation to address a myriad of questions to put criminals in jail and to excute those criminals who need to be executed.

We cannot have the insanity plea or mental retardation plea or, gee wheez, I am sorry, suffice to punish these criminals that are causing so many problems in this country.

So I say to my colleagues, I urge the adoption of this minimal standard that the Senator from South Carolina has proposed here this morning.

I yield my time.

The PRESIDING OFFICER. Who yields time?

Mr. THURMOND. Mr. President, I yield 2 minutes to the distinghished Senator from Utah.

The PRESIDING OFFICER. The Senator is recognized for 2 minutes.

Mr. HATCH. Mr. President, why does not the other side just admit that they are against the death penalty? They have a principled position there. I disagree with it but it is principled. They use anything to get rid of the death penalty in any way, in any instance.

As a matter of fact, there will be a big loophole if S. 1970 stays the way it is, if we do not put the Thurmond "right or wrong" language in. That language is better than current law or habeas because it means that after they have had a full trial and they brought up all the psychiatrists, social workers, and everybody else they can, to show the person really did not know what that person was doing or was mentally retarded or whatever, and the jury rejects that, and then they have a full hearing on sentencing with all the mitigation brought out and the jury rejects that and sentences the person to death, then from that point on, anytime a capital defendant can show any change, they can raise the point that the person is mentally retarded. As soon as they find, during those years and years and decades under current law, one group that will say he is mentally retarded for any reason, then they can stop the death penalty in that case.

All Senator THURMOND is trying to say is look, and this is the bottom line—neither Senator THURMOND nor I, nor anyone else who is supportive of Senator THURMOND's position, none of us want mentally retarded persons to be sentenced to death, none of us do if they do not know right from wrong, and if a jury of their peers agree, that is the botton line.

The PRESIDING OFFICER. The Senator's time has expired.

Who yields time?

Mr. THURMOND. How much time do we have remaining?

The PRESIDING OFFICER. Three and a half minutes.

Mr. THURMOND. Mr. President, say this: We want to keep the present law. They want to change the present law. If a man is charged with a crime—and I am told according to the statistics about 70 percent of those who are charged with murder claim they are mental retarded—if they are truly mentally retarded and do not know right from wrong, we do not want them executed.

Our amendment does not do that. The amendment says if they do know right from wrong and they have committed a serious murder, a vicious, heinous murder, they should face the ultimate punishment. Under this bill, they would not face capital punishment.

I thought we were going to pass a tough crime bill. If this amendment is adopted, you will have a tougher crime bill on this subject. Make up your minds. Do you want a tougher crime bill or not? Do you favor the death penalty or not?

I have a feeling some of the people taking a position against this amendment do not favor the death penalty under any condition. If a defendant knows right from wrong and commits a serious crime, he should have to pay the ultimate penalty. That is all we are asking. The Supreme Court has decided that. That is the law now. It is the law in most States. Why do the opponents want to undo it?

I say a man who is guilty should not be allowed to claim mental retardation when the facts do show he knew right from wrong. Why should we just pass a law that categorically under all circumstances makes one who is mentally retarded but knows right from wrong, not responsible?

Mr. President, that does not make sense. This Senate knows it does not make sense. Again, if he is truly mentally retarded, does not know right from wrong, our bill does not affect that person at all. But if an individual claims mental retardation when he knows right from wrong, if sentenced to the ultimate punishment, then we feel that decision should stand.

I say let us stand by the present law on this. Do not weaken the law. Why pass a crime bill if you are going to come in here and weaken current law? We thought we were going to pass a

*May 24, 1990*    CONGRESSIONAL RECORD — SENATE    S 6881

stronger crime bill. This will be a weaker crime bill.

Mr. President, it would be a great mistake not to adopt this amendment. The Supreme Court of the United States has laid down the rule. All we are asking is to stand by that rule. They have approved it. Let us stand by it. Let us protect the law abiding people. Those who are guilty cannot be allowed to avoid appropriate punishment by claiming they are mentally deficient when they are not, when the courts have found they know right from wrong. If they know right from wrong, they are responsible; if they do not know right from wrong, they are not responsible. That is all my amendment does, Mr. President.

The PRESIDING OFFICER. The Senator's time has expired. All time controlled by the Senator from South Carolina has expired.

The Senator from Delaware has 8½ minutes.

Mr. BIDEN. Mr. President, I yield myself 3 minutes.

Everyone gets emotional on this subject, but it is time I think we set a few facts straight. First, this does not change the law. The only Federal law on the books relating to death says you cannot put a mentally retarded person to death. That is the law. Boom, point one.

Second, they do not go free. Nobody, nobody, nobody is suggesting that anyone, mentally retarded or not, will go free.

Third, my friend from Mississippi, the home of Faulkner, would have, in the "Sound and the Fury," put Ben to death. Ben knew right from wrong. But he was mentally retarded.

Under this law, if it is changed, if we changed the Federal law now, we say we can put a mentally retarded person to death. If you watch "L.A. Law," old Benny, he is right for the block. He knows right from wrong. He knows you put your hand on the copy machine, instead of your nose or ears. He knows you do not go and knock people down. But he is mentally retarded as portrayed. Just like the 12-year-old kid and the 16-year-old kid who work in that office knows right from wrong.

We are saying here, all my colleagues looking very smug on this, and saying we are going to get tough. Well, if it is get tough, let us eliminate the provision saying you do not put children to death, you do not put children to death. Lay them out there, too; smack them up against the wall. Strap them in, I say to my friend from Wyoming; let them fry. Let us do that, too. They know right from wrong.

Is anyone here suggesting a 16-year-old does not know right from wrong? But we are agreeing in this bill, even though they know right from wrong, they cannot be put to death. Anyone suggesting a 17-year-old does not know right from wrong? But we are agreeing, in this tough bill, we will not put them to death. And you all are voting for that.

Anybody suggesting that a 14-year-old, any of these pages, do not know right from wrong? But you are agreeing that none of them can be put to death. So you are either having a double standard here or you just do not like mentally retarded people, you have some kind of prejudice or something. I do not know what else it is.

Because you are saying, you are acknowledging, a 12-year-old knows right from wrong, but we are not going to put him to death. You are acknowledging, in your own bill, a 17-year-old knows right from wrong, a 16-year-old knows right from wrong, but we are not going to put them to death. No, we say we are not going to do that because they are 16, because they are 15, because they are 12, because they are 10. But you are saying that if someone—and, by the way, faking mental retardation is a lifetime's work. That is a good one. Faking mental retardation. Fake your way through an IQ of 60. It is easily rebuttable. Come in and say they have an IQ of 60. You can present evidence and say, by the way, how come this guy graduated at the top of our class; how come this guy holds a job as an assistance to Senator BIDEN or Senator SIMPSON; how do they do that?

What are we talking about? You do not fake mental retardation. You either are or you are not.

And so I say to my friend from Mississippi, we have to get tough, we have to start helping victims. I agree. That is why I hope he will agree to put more money in the victims fund in the bill this year, which he does not like to do, I might add. Let us help victims.

We also want to go out and help law enforcement. Well, I say to my friend from Mississippi, let us help them. Vote for the Biden amendment for $900 million for them. Vote to take away those guns that are killing them. Let us help law enforcement.

What is all this stuff? This is about a simple proposition, and that is as a society we have collectively in here and in this Nation made a judgment: we will not put children to death, even though they know right from wrong, even though they may commit a heinous crime, even though they may be an ax murderer; that is what these gentleman and I are voting for.

Now if we say that, what is this tremendous leap? If I can quote in another context, for another reason, a Supreme Court Justice talking about pornography said, "I cannot define it, but I know it when I have seen it." Have any of you never seen a mentally retarded person? They know right from wrong; most know right from wrong. But, nonetheless, they are mentally retarded. Which means not that they are psychotic, not that they are insane, not that they have antisocial behavior that puts them in a category that says they should be not guilty of by reason of mental insanity but because they simply do not have enough gray matter to be able to ever

in their entirety of their life, in their whole life, to achieve an ability to operate in society beyond that of a 12-year-old. My God, what have we come to?

I yield what remaining time I have, if I do, to the Senator from Massachusetts.

The PRESIDING OFFICER. The Senator from Massachusetts is recognized.

Mr. KENNEDY. I cannot improve on the case that the Senator from Delaware has made, Mr. President.

I yield back to him or yield the balance of the time.

Mr. BIDEN. Is there any time left?

The PRESIDING OFFICER. Two minutes.

Mr. BIDEN. Does the opposition have any time?

The PRESIDING OFFICER. No.

Mr. BIDEN. I yield back my time.

The PRESIDING OFFICER. Both sides have yielded their time. Under the agreement, at 10 a.m., the question will recur on the motion to reconsider the vote by which amendment No. 1687 was defeated.

Mr. GRASSLEY. Mr. President, I rise to support the amendment offered by my colleague from South Carolina [Mr. THURMOND].

Societies are created for the mutual protection of the individuals who are the elements of any given society. Where the safety of its citizenry can no longer be guaranteed, a society can no longer justify its reason for existing.

In providing its individual members protection, society must do what is necessary within its legal framework to deter those who would break its laws and to punish, in an appropriate manner, those who choose to do so.

Along with controlling behavior, a criminal law structure worth enforcing must promote respect for life, moral integrity, and property rights.

In a country that cherishes a separation between the state and any officially sanctioned religious practice, the criminal law is one of the few available institutions through which society can make a moral statement and hope to promote the goals I have just mentioned above.

A society makes a moral statement when it punishes. Therefore, to be successful, a society must establish punishments appropriate to what has been offended.

As the scholar Walter Berns once wrote:

If human life is to be held in awe, the law forbidding the taking of it must be held in awe; and the only way it can be made to be awful or awe inspiring is to entitle society to inflict the penalty of death.

Mr. President, it is not enough to proclaim the sanctity and importance of innocent life. Innocent life must be—and can only be—secured by a society that is willing to impose its severest penalty upon those who threaten such life.

As Professor Berns observed:

We think that some criminals must be made to pay for their crimes with their lives, and we think that we, the survivors of the world they violated, may legitimately extract that payment because we, too, are their victims. By punishing them, we demonstrate that there may be laws that bind men across generations as well as across and within nations, that we are not simply isolated individuals, each pursuing his selfish interests.

Consequently, imposition of the death penalty may be necessary, in certain circumstances, to adequately protect society in the future from the possible actions of those who have already committed capital crimes.

Mr. President, by an overwhelming majority, the American public supports the imposition of capital punishment. The American people are usually out in front of politicians on the issues that matter the most—issues of basic fairness, equality, and true justice.

As for the ultimate criminal sanction—the death penalty—the American people are not out to fill some psychological blood lust.

However, they do know that when it comes to heinous, outrageous, and abominable criminal acts, the death penalty is necessary, appropriate, and in these certain circumstances the only just punishment.

To attach a lesser sanction against such criminal acts would, in my view, undermine our system of justice and its ability to deter crimes.

Worse, the lack of the capital sentencing option is an abdication of one of our most fundamental duties: the protection of the people.

To advocate the use of society's ultimate criminal sanction is not something I take lightly. But the Constitution permits us the option to end a convicted criminal's life if certain prescribed procedures are followed, including appropriate and constitutional due process procedural safeguards.

As a longstanding and strong supporter of the death penalty, I do not believe in an across-the-board absolute prohibition against imposing the death penalty based solely on mental impairment.

I opposed a similar provision in the Judiciary Committee because the issue should not simply be one of whether a capital defendant is mentally retarded, but whether or not the defendant understands the difference between right and wrong.

This issue was considered by the Supreme Court in Penry versus Lynaugh, in 1989. In this case, the Court, when addressing the issue of imposing the death penalty on an individual who is mildly retarded articulated a standard of whether the defendant knows the difference between right and wrong.

The Court held that if a mentally retarded individual has the cognitive and moral capacity to act with a degree of culpability associated with the death penalty, it may be imposed.

It should be acknowledged that proponents of the categorical prohibition against the execution of mentally deficient capital murderers are also, for the most part, against the death penalty.

As a part of their campaign against the death penalty, they would have us believe the Supreme Court has authorized the execution of severely retarded individuals. This simply is not true. In fact, the Court noted that retarded persons would not be convicted today because the modern insanity defense includes "mental defect" as part of the legal definition of insanity.

Further, the case of Ford versus Wainwright prohibits the execution of those who are unaware of their punishment and why they might suffer its consequences. True insanity is and should be a valid mitigating factor in the fact finder's deliberations.

Therefore, it would be inappropriate to find that all mentally impaired people—by virtue of their mental impairment alone—inevitably lack the ability to understand the difference between right and wrong, nor do they understand the ultimate consequences of their choice of conduct.

The Thurmond amendment now before us embodies the holding of the Court in its decision in Penry. Senator THURMOND offered similar language, which I supported, to the general Federal death penalty bill during its consideration by the Senate Judiciary Committee.

The effect of the Thurmond amendment would be to prohibit the execution of those who are mentally deficient and who lack the ability to appreciate the wrongfulness of their actions.

I believe this provision should be a part of any general Federal death penalty statute because it recognizes that severely mentally deficient individuals who do not understand the difference between right and wrong should not and would not be subject to society's ultimate criminal sanction.

The Thurmond amendment is humanitarian. It protects the valid rights of the mentally deficient who do not know the wrongfulness of their actions. It allows the finder of fact to consider the ability of the defendant to know the difference between right and wrong.

However, it also recognizes when Congress seeks to categorically limit or totally eliminate important fact determinations from juries, it tends to give these decisions to statisticians and psychologists. I believe to do so throws into serious question the principles that underlie the operation of our criminal justice system.

Mr. President, in our system of justice, computers do not hand down sentences. So there is no role for statisticians or social scientists in the courtroom. Rather, for more than 200 years, our system has dispensed justice through the efforts of prosecutors, judges, and juries. They take an oath to serve the ends of justice.

Lady Justice, unlike the social scientists, is blind. She dispenses justice without regard to color, race, religion, gender, or national origin. Lady Justice hears only the facts of the case. She serves the facts, not some political agenda.

The Congress should not impose an arbitrary, across-the-board, and blanket standard—against the valid will and common sense of the people—upon prosecutors, judges, and juries.

If a defendant knows the difference between right and wrong, and commits a heinous and abominable crime of murder, he is responsible for the consequences of his own actions. And he should be liable to society's ultimate criminal sanction.

I urge my colleagues to support the Thurmond amendment.

Mr. BIDEN. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BIDEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. LIEBERMAN). Without objection, it is so ordered.

VOTE ON MOTION TO RECONSIDER

The PRESIDING OFFICER. The question is on agreeing to the motion to reconsider the vote by which the amendment numbered 1687 was defeated.

The yeas and nays have been ordered and the clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. CRANSTON. I announce that the Senator from Hawaii [Mr. AKAKA] is necessarily absent.

Mr. SIMPSON. I announce that the Senator from Rhode Island [Mr. CHAFEE] is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber who desire to vote?

The result was announced, yeas 52, nays 46, as follows:

[Rollcall Vote No. 106 Leg.]

YEAS—52

| | | |
|---|---|---|
| Armstrong | Gorton | Murkowski |
| Bond | Gramm | Nickles |
| Boren | Grassley | Nunn |
| Boschwitz | Hatch | Pressler |
| Breaux | Heflin | Rockefeller |
| Burns | Heinz | Roth |
| Byrd | Helms | Rudman |
| Coats | Hollings | Shelby |
| Cochran | Humphrey | Simpson |
| Cohen | Johnston | Specter |
| D'Amato | Kassebaum | Stevens |
| Danforth | Kasten | Symms |
| Dixon | Lott | Thurmond |
| Dole | Lugar | Wallop |
| Domenici | Mack | Warner |
| Durenberger | McCain | Wilson |
| Exon | McClure | |
| Garn | McConnell | |

NAYS—46

| | | |
|---|---|---|
| Adams | Bingaman | Burdick |
| Baucus | Bradley | Conrad |
| Bentsen | Bryan | Cranston |
| Biden | Bumpers | Daschle |

| | | |
|---|---|---|
| DeConcini | Kerrey | Pell |
| Dodd | Kerry | Pryor |
| Ford | Kohl | Reid |
| Fowler | Lautenberg | Riegle |
| Glenn | Leahy | Robb |
| Gore | Levin | Sanford |
| Graham | Lieberman | Sarbanes |
| Harkin | Metzenbaum | Sasser |
| Hatfield | Mikulski | Simon |
| Inouye | Mitchell | Wirth |
| Jeffords | Moynihan | |
| Kennedy | Packwood | |

### NOT VOTING—2

| | |
|---|---|
| Akaka | Chafee |

So the motion was agreed to.

The PRESIDING OFFICER. The Chair recognizes the majority leader.

Mr. MITCHELL. I ask unanimous consent that the vote on the Thurmond amendment, No. 1687, occur at 11 a.m. this morning, and that the vote now scheduled to occur at 11, occur immediately following the disposition of the Thurmond amendment.

The PRESIDING OFFICER. Is there objection?

Mr. SPECTER. Reserving the right to object, Mr. President, I do not understand. What time would the vote be on the underlying amendment?

Mr. MITCHELL. At 11 o'clock this morning.

Mr. President, I withdraw my request and I ask that we have a voice vote on the question.

The PRESIDING OFFICER. Is there objection?

Mr. SPECTER. Reserving the right to object, I did not hear what the Senator said.

Mr. MITCHELL. I asked to be done what the Senator just asked me to do.

Mr. SPECTER. Then I will not object.

### AMENDMENT NO. 1687

The PRESIDING OFFICER. The question is now on agreeing to amendment No. 1687.

The amendment (No. 1687) was agreed to.

Mr. HATCH. I move to reconsider the vote.

Mr. DOLE. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. MITCHELL. Mr. President, may I have the attention of Members of the Senate.

The PRESIDING OFFICER. The Chair recognizes the majority leader.

Mr. MITCHELL. Mr. President, the Senate is about to recess to permit Senators to attend the ceremony outside on the Capitol steps honoring 40 years of American military heroism. These are the men and women who, in the post World War II period, have given their lives and their limbs to defend our Nation. I hope that as many Members of the Senate as possible will take the time and trouble to just walk a few steps outside of this Senate Chamber to help us pay tribute to these courageous men and women. That is the reason the Senate will go into recess momentarily, and I urge and encourage my colleagues to attend.

### RECESS UNTIL 11 A.M.

The PRESIDING OFFICER. Under the previous order, the Senate will now stand in recess until the hour of 11 a.m.

Thereupon, the Senate, at 10:26 a.m., recessed until 11:01 a.m.; whereupon, the Senate reassembled when called to order by the Presiding Officer [Mr. CRANSTON].

### AMENDMENT NO. 1690

The PRESIDING OFFICER. The question occurs now on the Thurmond amendment, No. 1690.

Mr. SPECTER. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The question is on agreeing to the amendment of the Senator from South Carolina [Mr. THURMOND].

The yeas and nays have been ordered and the clerk will call the roll.

The legislative clerk called the roll.

Mr. BOREN (after having voted in the affirmative). On this vote I have a pair with the distinguished Senator from Hawaii [Mr. AKAKA]. If he were present and voting, he would vote "nay." If I were at libety to vote, I would vote "yea." I withdraw my vote.

Mr. CRANSTON. I announce that the Senator from Hawaii [Mr. AKAKA], is necessarily absent.

Mr. SIMPSON. I announce that the Senator from Rhode Island [Mr. CHAFEE], is necessarily absent.

I further announce that, if present and voting, the Senator from Rhode Island [Mr. CHAFEE], would vote "nay."

The PRESIDING OFFICER (Mr. KERREY). Are there any other Senators in the Chamber who desire to vote?

The result was announced—yeas 38, nays 59, as follows:

#### PRESENT AND GIVING A LIVE PAIR, AS PREVIOUSLY RECORDED—1

BOREN, for

[Rollcall Vote No. 107 Leg.]

#### YEAS—38

| | | |
|---|---|---|
| Armstrong | Heflin | Nickles |
| Bond | Helms | Pressler |
| Burns | Hollings | Robb |
| Byrd | Humphrey | Roth |
| Coats | Kasten | Rudman |
| Cochran | Lieberman | Shelby |
| Dixon | Lott | Simpson |
| Exon | Lugar | Symms |
| Garn | Mack | Thurmond |
| Gorton | McCain | Wallop |
| Gramm | McClure | Warner |
| Grassley | McConnell | Wilson |
| Hatch | Murkowski | |

#### NAYS—59

| | | |
|---|---|---|
| Adams | Cohen | Ford |
| Baucus | Conrad | Fowler |
| Bentsen | Cranston | Glenn |
| Biden | D'Amato | Gore |
| Bingaman | Danforth | Graham |
| Boschwitz | Daschle | Harkin |
| Bradley | DeConcini | Hatfield |
| Breaux | Dodd | Heinz |
| Bryan | Dole | Inouye |
| Bumpers | Domenici | Jeffords |
| Burdick | Durenberger | Johnston |

| | | |
|---|---|---|
| Kassebaum | Mikulski | Rockefeller |
| Kennedy | Mitchell | Sanford |
| Kerrey | Moynihan | Sarbanes |
| Kerry | Nunn | Sasser |
| Kohl | Packwood | Simon |
| Lautenberg | Pell | Specter |
| Leahy | Pryor | Stevens |
| Levin | Reid | Wirth |
| Metzenbaum | Riegle | |

### NOT VOTING—2

| | |
|---|---|
| Akaka | Chafee |

So, the amendment (No. 1690) was rejected.

Mr. KENNEDY. Mr. President, I move to reconsider the vote by which the amendment was rejected.

Mr. BIDEN. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. Under the previous order, the Senator from Florida is to be recognized to offer an amendment on which debate is limited to 2 hours equally divided and controlled by the Senator from Florida and the Senator from Delaware.

Mr. BIDEN. Mr. President, I ask unanimous consent that I be given 1 minute to make a brief explanation of something said earlier in the debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BIDEN. Mr. President, during the debate on the last amendment I said:

We are saying here, all my colleagues looking very smug on this, and saying we are going to get tough. Well, if it is get tough, let us eliminate the provision saying you do not put children to death, you do not put children to death. Lay them out there, too; smack them up against the wall. Strap them in, I say to my friend from Wyoming; let them fry. Let us do that, too. They know right from wrong.

My friend from Wyoming and others may have thought I was implying that I thought he wished to see children who committed a capital offense put to death. That was not my intention. That is not what I meant to say. I do not think I did say that. I know better, as well as anyone here, my friend from Wyoming has a great deal of compassion and wisdom. I would not even remotely suggest that that is what he had in mind.

It was by way of trying to compare the law saying minors do not get put to death, to what we would be saying had we voted the other way. I thank my colleague.

The PRESIDING OFFICER (Mr. FORD). The time of the Senator has expired.

Mr. BIDEN. Mr. President, I ask unanimous consent my friend from Wyoming be able to proceed for 1 minute.

The PRESIDING OFFICER. Without objection, the Senator may proceed for 1 minute.

Mr. SIMPSON. Mr. President, that is a very kind gesture on behalf of the Senator from Delaware. It is much appreciated and relieved. It was not quite necessary. I understood the spirit and the energy of the debate, and he is a