# EXHIBIT 83

APPLIED NEUROPSYCHOLOGY, *16*: 114–123, 2009
Copyright © Taylor & Francis Group, LLC
ISSN: 0908-4282 print/1532-4826 online
DOI: 10.1080/09084280902864451



Ψ Psychology Press
Taylor & Francis Group

# Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases

### Marc J. Tassé

*University of South Florida, Tampa, Florida*

There are essentially three main prongs to the definition and diagnosis of the condition known as mental retardation: deficits in intellectual functioning, deficits in adaptive behavior, and onset of these deficits during the developmental period. The U.S. Supreme Court ruled in 2002 in a decision known as *Atkins v. Virginia* that it was essentially cruel and unusual punishment to execute a person with mental retardation, thus violating the Eighth Amendment of the American Constitution. For the purpose of this article, we focused on the issues as they relate to the second prong of the definition of mental retardation, that is, adaptive behavior. We present and discuss the primary concerns and issues related to the assessment of adaptive behavior when making a diagnosis of mental retardation in an *Atkins* claim case. Issues related to standardized assessment instruments, self-report, selection of respondents, use of collateral information, malingering, and clinical judgment are discussed.

*Key words:*    *adaptive behavior, assessment, Atkins, death penalty, diagnosis, forensic, intellectual disability, mental retardation*

## INTRODUCTION

Mental retardation[1] is a condition that has been referenced in texts and writings since the dawn of man (Scheerenberger, 1983). There are essentially three main prongs to the definition and diagnosis of the condition known as mental retardation: deficits in intellectual functioning, deficits in adaptive behavior, and onset of these deficits during the developmental period. The U.S. Supreme Court ruled in 2002 in a decision known as *Atkins* that is was cruel and unusual punishment to execute a person with mental retardation, thus violating

the Eighth Amendment of the American Constitution. Not surprisingly, there was a swell in the number of referrals and requests for mental retardation evaluations in death penalty cases immediately following this ruling. When making a mental retardation determination within a criminal justice context, the most challenging characteristic for attorneys, judges, and jurors to correctly understand, and for expert clinicians to adequately assess and interpret. is adaptive behavior. This article will focus on discussing the diagnostic issues around the construct of adaptive behavior.

Adaptive behavior is defined as the collection of conceptual, social, and practical skills that have been learned by people to function in their everyday lives (Luckasson, Borthwick-Duffy, Buntinx, Coulter, et al., 2002). Adaptive behavior is a required diagnostic criterion of all systems defining mental retardation (see American Psychiatric Association, 2000; Luckasson et al., 2002; World Health Organization, 1992). Some confusion once existed regarding problem behavior and adaptive behavior, largely because of the misnomer "maladaptive

---

[1]The term "mental retardation" has acquired such a negative stigma over the years that most professional organizations (American Association on Intellectual and Developmental Disabilities, American Psychological Association) and governmental agencies (e.g., National Institutes of Health, President's Committee for Persons with Intellectual Disability) have adopted "intellectual disability" as the new terminology to designate the condition previously known as mental retardation.

Address correspondence to Marc J. Tassé, Phd, Florida Center for Inclusive Communities–UCEDP, University of South Florida, 13301 Bruce B. Downs Blvd., Tampa, FL 33612. E-mail: mtasse@fmhi.usf.edu

behavior" that was once used to designate problem behaviors such as self-injurious behavior, aggression, stereotypies, destruction of property, etc. "Maladaptive behavior" is a separate and independent construct of adaptive behavior (Luckasson et al., 2002; Schalock, Buntinx, Borthwick-Duffy, Luckasson, et al. 2007). The presence or absence of "maladaptive behaviors" has little relationship to an individual's adaptive functioning. These behaviors can occur in individuals with poor adaptive behavior (e.g., someone bangs their head because they are unable to communicate that they have a headache), and they can occur in individuals with good adaptive behavior, but for whom they are associated to a cooccurring mental health problem (e.g., depression and aggressive behavior). "Maladaptive behaviors" are not part of the diagnostic criteria of mental retardation.

The American Association on Intellectual and Development Disabilities (AAIDD) was the first organization, almost 50 years ago, to introduce adaptive behavior as a diagnostic criteria of mental retardation (see Heber, 1959, 1961). In fact, Heber (1959) first defined adaptive behavior much the same way as it is currently defined in the most recent edition of the AAIDD Terminology and Classification manual (Luckasson et al., 2002). Heber (1959) first introduced the concept of adaptive behavior into the AAIDD terminology and classification manual as reflected by impairments in "maturation, learning, and social adjustment." These three domains were later collapsed into a unitary construct identified as "adaptive behavior" (Heber, 1961). More than 40 years later, AAIDD has returned to Heber's (1959) original conceptualization of adaptive behavior as practical, conceptual, and social skills. Although the U.S. Supreme Court declined to provide a specific definition of mental retardation in their *Atkins* decision, they did cite both the American Psychiatric Association (2000; Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition [DSM-IV-TR]) and the AAIDD (Luckasson Coulter, Polloway, Reiss, et al., 1992) diagnostic criteria. Writing for the majority, Justice Stevens stipulated that "As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction, the become manifest before age 18" (*Atkins v. Virginia*, 536 U.S. 304, 2002, p. 318).

There are two other large organizations that have conducted systematic reviews of the literature and proposed guidelines for defining mental retardation: the American Psychological Association's Division 33 and the Social Security Administration. The American Psychological Association's (APA) Division 33 (Intellectual and Developmental Disabilities) panel reviewed the literature and proposed a definition and diagnostic criteria for mental retardation. Their definition was published as a chapter in a handbook on mental retardation (see Barclay, Drotar, Favell, Foxx, et al., 1996). The APA Division 33 panel proposed a three-prong definition of mental retardation that was congruent with the American Psychiatric Association (2000), World Health Organization (1992), and AAIDD (Luckasson et al., 2002) definitions. The APA Division 33 definition included significant deficits in intellectual functioning, significant deficits in adaptive behavior, and an onset of these significant limitations during the developmental period (see Barclay et al., 1996).

The U.S. Social Security Administration (SSA) convened a panel of experts to review the existing literature and propose recommendations to the SSA regarding criteria to identify individuals as having mental retardation (see Reschly, Myers, & Hartel, 2002). Although not meant as a diagnostic system but as recommendations to develop the eligibility criteria to receive SSA benefits under the classification of mental retardation, Reschly and his colleagues proposed a definition that included the same three prongs (Intellectual functioning, adaptive behavior, and age of onset).

Although there remains minor discrepancies in how each of these systems has operationally defined each of the three prongs, the consensus regarding the diagnosis of mental retardation is that there needs to be the presence of deficits in both intellectual functioning and adaptive behavior, and these deficits must have originated during the developmental period. It should be noted that "originated during the developmental period" does not preclude making a first time diagnosis of mental retardation when an individual is an adult. The clinician must, however, adequately document that the deficits in intellectual and adaptive functioning were present before the end of the developmental period.

AAIDD (formerly, the American Association on Mental Retardation) is generally regarded as the leading authority in defining mental retardation. The APA publishes the main diagnostic manual for the field of psychiatry entitled the Diagnostic and Statistical Manual for Mental Disorders, which is currently in its fourth edition. It should be pointed out that the DSM-IV-TR contains information on almost 300 disorders, of which, mental retardation is one. The AAIDD has been solely focused for the past 100 years on defining mental retardation. It is not surprising that, historically, the APA and the DSM panel have largely adopted the AAIDD definition and diagnostic criteria of mental retardation in their revisions of the DSM. This is illustrated in the most recent revision of the DSM, the DSM-IV-TR. The DSM-IV-TR (American Psychiatric Association, 2000) adopted the AAIDD (Luckasson et al., 1992) definition and changed it's conceptualization of adaptive behavior to reflect Luckasson et al.'s (1992) definition of adaptive behavior, which consisted of 10 adaptive skill areas. The AAIDD

116     TASSÉ

1992 manual (Luckasson et al., 1992) defined the second prong of the definition as "limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work" (p. 1).

Probably due to a misplaced comma, the DSM-IV-TR actually defined adaptive behavior deficits as limitations in two or more of 11 skill areas (instead of 10 skill areas), having placed a comma between "health" and "safety" (American Psychiatric Association, 2000, p, 49). The DSM-IV-TR can be cited as follows:

> Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (American Psychiatric Association, 2000, p. 49).

The DSM-IV-TR diagnostic criteria and, the then most current AAIDD diagnostic criteria (Luckasson et al., 1992) were virtually identical. In the 10th edition of its Terminology and Classification manual in 2002 (see Luckasson et al., 2002), AAIDD moved away from the 10 adaptive skill areas to a more psychometrically grounded definition of adaptive behavior consisting of three domains: conceptual, practical, and social adaptive skills. It should be noted that many had acknowledged that the previous 10 adaptive skill areas were not supported by the existing psychometric literature in the field (Heal & Tassé, 1999; Luckasson et al., 2002; Spreat, 1999; Thompson, McGrew, & Bruininks, 1999; Widaman & McGrew, 1996).

Although the assessment of intellectual functioning has a longer history than does the assessment of adaptive behavior, the psychometric properties of adaptive behavior instruments have improved significantly since the Vineland Social Maturity Scale (Doll, 1936) was first published. When Edgar Doll first published the Vineland Social Maturity Scale in 1936 (this test later evolved into the Vineland Adaptive Behavior Scales), he defined a construct that he labeled "social competence." The first version of his instrument consisted of items organized into six broad domains (self-help: general, dressing, and eating; self-direction; communication; socialization; motor; and work). Doll (1953) defined social competence as "the functional ability of the human organism for exercising personal independence and social responsibility" (p. 10). Doll's vision of assessing social competence (now called adaptive behavior) remains ingrained in today's definitions of adaptive behavior and assessment instruments. For example, Doll wrote: "Our task was to measure attainment in social competence considered as habitual performance rather than as latent ability or capacity" (Doll, 1953, p. 5). This view is consistent with AAIDD's long standing position that adaptive behavior assessment must focus on the individual's typical performance and not maximal ability (see Luckasson et al., 2002).

The reliance on standardized measures of adaptive behavior as part of the mental retardation diagnostic process was first prescribed by Barclay et al. (1996) in their definition endorsed by APA's Division 33. AAIDD (Luckasson et al., 2002) and Reschly, Myers, and Hartel (2002) reiterated the importance of establishing that the individual has "significant limitations" in adaptive behavior based on the results of an individually administered measure of adaptive behavior. Luckasson et al. also emphasized the importance of using standardized adaptive measures that had been normed on the general population and assessed the broad array of adaptive behavior, including conceptual, practical, and social skills.

The use of a standardized adaptive behavior scale is often insufficient to capture all aspects of an individual's adaptive behavior. Elements of adaptive behavior that are related to adult social adaptive skills or higher order interpersonal skills are lacking from most existing adaptive behavior scales (Duffy, 2007; Luckasson et al., 2002; Reschly, Myers, & Hartel, 2002). Greenspan (Greenspan, 1981; Greenspan, 2006; Greenspan, 2008; Greenspan, Loughlin, & Black, 2001; Greenspan & Switzky, 2006) has devoted much of his career to studying and publishing on concepts that are often present in individuals with mild mental retardation, but under-represented in standardized adaptive behavior scales: social competence, gullibility, naïveté, and lack of wariness.

We will not provide an exhaustive review of the existing adaptive behavior instruments in this article. The interested reader is encouraged to consult previously published articles that have already provided excellent reviews (Luckasson et al., 2002; Reschly, Myers, & Hartel, 2002; Stevens & Price, 2006). Rather, we will focus on discussing measurement issues that are most relevant when assessing adaptive behavior for the purpose of making or ruling out a diagnosis of mental retardation.

Our recommendations are applicable to any clinical diagnosis of mental retardation but we will pay special attention to the particular challenges that are posed when the assessed individual is facing criminal charges and is incarcerated at the time of the evaluation. Several authors have long argued the mitigating circumstances of mental retardation for individuals involved in the criminal justice system (Ellis & Luckasson, 1985; Keyes, Edwards, & Perske, 1997). Since the *Atkins* decision there has been an increased interest in mental retardation in individuals in capital cases or in those awaiting the death penalty. Any case involving a diagnosis of mental retardation should be considered as "high

stakes," and, as such, clinicians should always use the utmost prudence and rigor in conducting these diagnostic evaluations. Nonetheless, no one can deny that an "Atkins claim" is the highest of high stakes.

Making a diagnosis of mental retardation in individuals who have severe or profound deficits in intellectual functioning and adaptive behavior is relatively easy. Conversely, it is relatively straightforward to rule-out a diagnosis of mental retardation for someone whose general intellectual functioning and adaptive behavior levels are all measured to be in the low average range. Some of the more challenging conditions for making or ruling-out a diagnosis of mental retardation include individuals whose intellectual functioning and adaptive behavior are at or around the cut-off of two standard deviations below the population mean (Reschly, Myers, & Hartel, 2002; Schalock et al., 2007). It should be noted that the vast majority of individuals with mental retardation (i.e., 85%) are in this range of functioning, at times referred to as "mild mental retardation" (American Psychiatric Association, 2000). The vast majority of "Atkins claims," if not all, will likely involve individuals who have intellectual and adaptive functioning levels that are near the diagnostic cut-off range.

## ASSESSMENT OF ADAPTIVE BEHAVIOR

Anyone conducting an adaptive behavior assessment is strongly encouraged to consult the chapter by Harrison and Raineri (2008) on the Best Practices in the Assessment of Adaptive Behavior. This chapter reviews the salient assessment issues to consider when assessing adaptive behavior for the purpose of diagnosing or ruling out mental retardation in an individual.

Two of the more challenging aspects of any adaptive behavior assessment of an individual who is incarcerated include: the assessment of the individual's present functioning and the assessment of the individual's typical behavior in meeting community demands and expectations. By definition, the construct of adaptive behavior involves age-indexed skills that are learned and performed to meet the demands and expectations of society and the community across life settings (i.e., home, school, work, community). Thus, assessment of adaptive behavior for the purpose of making a diagnosis of mental retardation involves assessing the individual's present, typical behavior. as well as the individual's functioning as it occurs in the community. It is not a measure of capacity or knowledge, but in fact is a measure of what the individual typically does and what is the degree of independence in performing these skills.

Other important aspects of adaptive behavior assessment that need to be addressed when making or ruling out a diagnosis of mental retardation include:

- assessment the individual's adaptive behavior in relation to his age group and culture
- use of standardized adaptive behavior scale that was normed on the general population
- obtaining corroborating information to support the information obtained on the standardized assessment

Stevens and Price (2006) recommended that future research in the area of adaptive behavior assessment should develop norms on prison populations. This author strongly disagrees with this notion. Norming an adaptive behavior scale on people living in prisons would have as much value as norming a new IQ test on people living in prisons. One would only know if the assessed person is more *intelligent* or more *adapted* than prison inmates. An adaptive behavior instrument normed solely on inmates or another institutional population (e.g., State Mental Retardation Center) would have little relevance when attempting to measure the skills someone has learned and performs to meet societal demands and expectations for someone his or her age and cultural group.

The Adaptive Behavior Scale–Residential and Community Edition (ABS-RC:2; Nihira, Leland, & Lambert, 1993) is normed on individuals with mental retardation (living in the community and in institutional/residential settings). Because of this reason it is an inappropriate instrument to be used in assessing adaptive behavior for the purpose of making or ruling out a diagnosis of mental retardation. However, the ABS-RC:2 has a recognized clinical value when used to assess an individual's adaptive behavior to establish intervention goals and determine the individual's adaptive functioning when compared to other adults with mental retardation.

Fabian (2005) raised the question of the relevance of current adaptive behavior scales since none included individuals on death row in their normative samples. This pushes the aforementioned point one step further. It is important to keep in mind that there are approximately 300 million Americans, of which approximately 3 million have a diagnosis of mental retardation (see Larson et al. 2001). Of that number, a miniscule fraction of all Americans or Americans with mental retardation live on a death row. It is probably safe to say that there will never be a standardized adaptive behavior scale (or a standardized IQ test for that matter) that has any significant representation of individuals living on a death row in its normative sample. The bigger threat to our ability to rely unequivocally on the resulting scores obtained on standardized adaptive behavior scales is more likely to stem from the violations of the instrument's administration procedures. These include: being unable to assess the individual's present adaptive behavior, being unable to assess the adaptive behavior as it

118    TASSÉ

typically occurs in a naturalistic setting such as the community at large, using the instrument to conduct direct testing of an individual's adaptive skills, conducting an adaptive behavior semi-structured interview without having properly established and maintained rapport with the respondent, and relying on protocols in which the respondent provided numerous "guessed" estimates rather than relying on actual observation of the individual's behavior (Harrison & Oakland (2003) cautioned against the results stemming from protocols on which the respondent guessed on more than three items in a skill domain).

## USE OF CONVERGENT INFORMATION

There exists no one standardized adaptive behavior scale that captures the entire spectrum of adaptive behavior across all age groups (Luckasson et al., 2002; Thompson, McGrew, & Bruininks, 1999). This does not, however, negate the importance of using such measures when possible. Rather, any comprehensive evaluation of adaptive behavior should seek to corroborate information obtained on standardized measures from sources such as: school records, employment history, social security administration records, medical records, and interviews with respondents who know the individual well but who might not be able to provide comprehensive information sufficient to complete all domains on an adaptive behavior scale. In addition to the use of standardized measures of adaptive behavior, it is crucial to obtaining corroborating information from other sources. For example, the individual's school records can provide a wealth of information regarding conceptual, practical, and social skills. It will be necessary to also consult social security administration records, driving record, employment history, medical records, and social and family history. In addition to interviewing individuals to complete a standardized adaptive behavior scale, it is vital to conduct clinical interviews of relatives, friends, teachers, coaches, employers, roommates, etc. in order to obtain some qualitative information regarding the individual's adaptive behavior. This information can be crucial in providing corroborating information regarding areas of limitations and strengths.

Thus, in addition to an appropriate standardized adaptive behavior scale, any comprehensive assessment of adaptive behavior assessment should include the following information:

- qualitative adaptive behavior interviews with multiple informants who have observed the assessed person in different contexts (e.g., home, school, work, leisure, community)
- review of family history

- review of available school records (e.g., transcripts, psychoeducational evaluations, Individual Education Plans, etc.)
- review of available medical records
- review of all federal and state agency records (e.g., Social Security Administration, Department of Social Services, Department of Motor Vehicles, State Department of Mental Retardation/Developmental Disabilities, Division of Vocational Rehabilitation, prison records, etc.)
- review of employment history/records
- review of all previous psychological/psychiatric/psychosocial evaluations

## ADMINISTRATION OF A STANDARDIZED ADAPTIVE BEHAVIOR SCALE

There are at present perhaps four well-known and often-used standardized adaptive behavior scales for the purpose of making or ruling out a diagnosis of mental retardation: Scales of Independent Behavior–Revised (SIB-R; Bruininks, Woodcock, Weatherman, Hill, 1996), Adaptive Behavior Assessment System–2nd Edition (ABAS-2; Harrison & Oakland, 2003). Vineland Adaptive Behavior Scales–2nd Edition (Vineland-II; Sparrow, Cicchetti, & Balla, 2005), and Adaptive Behavior Scale–School Edition (ABS-S:2; Lambert, Nihira, & Leland, 1993). The latter instrument, although used with some frequency in the schools, it is less well known in the forensic setting.

## SEMI-STRUCTURED INTERVIEWS VERSUS RATING SCALE ADMINISTRATIONS

All these instruments can be used as a rating scale—that is, given directly to the respondent who reads and responds to the items on their own. It should however be noted that most would agree that there is added value to administering these instruments via a semi-structured interview. For example, the SIB-R provides an easel for interview administration and recommends using the interview format with respondents who do not have prior experience with adaptive behavior assessments (Bruininks, Woodcock, Weatherman, & Hill, 1996). Harrison and Oakland (2003) pointed out that their scale is written at a fifth-grade reading level and some respondents may have difficulty reading and rating the item stems. Perhaps the most comprehensive analysis of the merits of a semi-structured interview administration of an adaptive behavior scale is provided by Sparrow and her colleagues (2005) in the Vineland-II Manual. The Vineland-II Manual recommends use of a semi-structured interview format over the rating scale

format when the adaptive behavior assessment is for purposes of establishing or ruling out a diagnosis of mental retardation. Sparrow et al., stated "the strength of the semi-structured interview format in eliciting accurate, in-depth descriptions of the individual's functioning make it the preferred method when the results will inform diagnostic decisions."

Other advantages of administering a standardized adaptive behavior scale via a semi-structured interview, instead of giving the rating scale directly to the respondent to complete on their own, include the following:

- reduces likelihood of reading error on the part of the respondent
- provides an immediate opportunity to address questions about an item stem or provide clarifying information if the respondent appears confused or uncertain regarding the content of the item
- provides the examiner with the opportunity to observe the latency between the reading of the item and the response, which gives an indication of the time taken to think about the item stems before providing a response
- allows the examiner to monitor the respondent's attention and tailor the pace of administration to the respondent's needs
- allows the examiner the opportunity to probe some responses and assess the reliability of the respondent

### Selection of Respondents

The ideal respondents are individuals who have the most knowledge of the individual's everyday functioning across settings. Typically, the individual's parents or caregivers are the persons with the most opportunity to observe the assessed individual in his/her everyday functioning. As the individual becomes an adult, this role may shift to a spouse or roommate. Other individuals who may provide valuable adaptive behavior information include: older siblings, grandparents, aunts/uncles, neighbors, teachers, coaches, employers, coworkers, friends, or other adults who may have had multiple opportunities over an extended period of time to observe the individual in his everyday functioning in one or more contexts (e.g., home, leisure, school, work, community).

### Correctional Officers as Respondents

Correctional officers and other prison personnel should probably never be sought as respondents to provide information regarding the adaptive behavior of an individual that they've observed in a prison setting. The only extreme circumstance when one might consider interviewing a member of the prison personnel regarding an inmate's adaptive behavior would be if there is absolutely no one alive who can provide any information regarding the individual's functioning prior to incarceration. The main hesitation to involving prison personnel as respondents is related to the nature and contingencies of the prison setting. The prison setting is an artificial environment that offers limited opportunities for many activities and behaviors defining adaptive behavior. In the end, adaptive behavior information obtained from prison personnel should be limited to activities or behaviors that they have had the opportunity to directly observe the individual perform. It should be noted that items cannot be truncated or substituted for setting equivalents. For example, the ABAS-II has an item on the Community Use subscale that assesses the individual's performance regarding mailing a letter in a mailbox or the local post office. This would be an item that is most likely impossible to observe in a prison setting and should not be substituted for anything other than what the stem specifies.

### Faking Adaptive Deficits

We usually associate malingering or "faking bad" to the feigning of symptoms to appear ill to obtain something desired (e.g. compensation) or to avoid a punishment (e.g., prosecution; American Psychiatric Association, 2000). There is some concern that the individual being assessed for a mental retardation determination might malinger on the IQ test or self-report fewer adaptive skills than he actually possesses in order to meet criteria for a diagnosis of mental retardation. When assessing intellectual functioning, clinicians will generally include one or more measures of effort in an attempt to gauge whether or not the individual is trying his best. Depending on the outcome on these measures, the examiner will generalize that effort to the individual's performance on the test of intelligence.

Malingering may also be a real issue in the case of a self-reported assessment of adaptive behavior. Some adaptive behavior instruments may be more vulnerable than others to a malingered self-report (Doane & Salekin, in press). Relying solely on the individual's self-report is fraught with problems (Patton & Keyes, 2006; Schalock et al., 2007). In fact, as many researchers have documented numerous times, individuals with low IQ may not always be reliable self-reporters. For example, Edgerton (1967) documented that individuals with mild mental retardation often over-estimated their skills and abilities and attempted to conceal their disability to avoid stigmatization. According to Edgerton's groundbreaking research, individuals with mental retardation are perhaps more likely to "fake good" on measures of adaptive behavior.

120   TASSÉ

If conducted improperly, adaptive behavior interviews of individuals with mental retardation can yield invalid results. One study comparing self-reported adaptive behavior with respondent ratings showed that individuals with mental retardation showed good agreement with the respondent's ratings of the individual's adaptive behavior (Voelker et al., 1990). Research has also shown that individuals with mental retardation are particularly susceptible to acquiescence and leading questions (Everington & Fulero, 1999; Finlay & Lyons, 2002; Perry, 2004). Individuals with mental retardation often respond in the affirmative to questions they don't fully understand or might not be sure of the correct answer (Finlay & Lyons, 2002). Someone unfamiliar with these characteristics of individuals with mental retardation may misinterpret the individual's actual adaptive behavior. Having reviewed records and interviewed other respondents before conducting the self-report may provide insight into evaluating the reliability of the self-report and provide point upon which to probe the individual to verify the skill. The only standardized adaptive behavior scale that was normed using self-report data is the ABAS-II (Harrison & Oakland, 2003).

It is more common that the respondent is someone other than the assessed individual. The clinician must always assess the respondent's reliability in providing adaptive behavior information. In the capital cases there is a particular worry regarding the bias introduced by family members in reporting on the adaptive behavior of their loved one. This might be interpreted as a form of malingering by proxy, where a parent might want to under-report adaptive skills to intentionally lower their loved one's adaptive behavior performance, in order to increase the likelihood of a diagnosis of mental retardation and result in a reprieve of the death penalty. Again, best practice is to obtain adaptive behavior information from multiple respondents and multiple sources in order to obtain a complete evaluation and identify areas of convergence (Harrison & Oakland, 2003; Schalock et al., 2007).

### Retrospective Assessment

A retrospective assessment of adaptive behavior is often considered as the only viable option when the assessed individual is incarcerated. Interviewing a respondent while asking them to recall a time prior to the individual's incarceration is the proposed means of capturing the individual's typical adaptive behavior in the community and establishing a retrospective diagnosis (Schalock et al., 2007). It should be noted that there is no research available examining the reliability or error rate of adaptive behavior assessments obtained retrospectively. At issue is the respondent's ability to correctly recall from memory the assessed individual's actual performance.

Memory degradation is a real issue and we do not have any solid research regarding the forgetting curve (Memon & Henderson, 2002) regarding someone's recollection of another person's adaptive behavior.

A retrospective adaptive behavior assessment can be challenging (Everington & Olley, 2008). To assist the clinician with this difficult task, Schalock et al. (2007) recommended specific guidelines to follow when making a retrospective diagnosis of mental retardation, including using multiple respondents and multiple contexts and assessing adaptive functioning within the general community and within the individual's age peers and cultural group. This last point is in reference to the expectations being different in certain cultural groups for specific adaptive behaviors, from mainstream America. For example, using a fork and knife to eat may not be a prerequisite to be adaptive to societal demands in certain cultures (e.g., Asian). To these guidelines, one might add the following instructions when conducting a retrospective adaptive behavior assessment:

- Identify a clear time period during which you want the respondent to focus their report of the individual's adaptive behavior. For example, you might instruct the respondent to recall the assessed individual before he was incarcerated.
- Build rapport with the respondent and ask them to think about where the assessed person was living at that specified time, working, etc. These points of reference will be important to assist the respondent to recall that time period.
- Periodically, remind the respondent that they are assessing the individual's adaptive behavior in that specific time period.

There may be instances when completing a standardized adaptive behavior scale is not possible. It might be that there is no one alive or available to participate as a respondent. Another reason might be that the respondents available are not able to provide a comprehensive picture of the individual's adaptive behavior such that they can complete all the information needed on a standardized scale. It is important for the clinician to use his or her clinical judgment in determining when it is viable to conduct a standardized adaptive behavior scale and when it is not. In the latter case, it is possible to conduct a series of semi-structured interviews with multiple respondents who have reliable information about specific periods of time (e.g., when he was in elementary school) or have knowledge of the individual in one specific context (e.g., when he worked at the local car wash). This information, along with case records, can be helpful in contributing to developing a report regarding the individual's adaptive behavior.

## The Role of Clinical Judgment

Professionals should always use clinical judgment throughout the process of making or ruling out a diagnosis of mental retardation. One uses their clinical judgment in selecting an appropriate adaptive behavior assessment instrument, identifying who to interview as a respondent, assessing the respondent's reliability, identifying and reviewing available records, and analyzing and interpreting all the available information to form an opinion. Schalock and Luckasson (2005) defined clinical judgment as being founded upon clinical expertise in a particular area and that clinical judgment is based upon a thorough analysis of extensive data. Equally important, these authors state that "Clinical judgment should not be thought of as a justification for abbreviated evaluations, a vehicle for stereotypes or prejudices, a substitute for insufficiently explored questions, an excuse for incomplete or missing data, or a way to solve political problems" (p. 6). Hence, clinical judgment should not be used as a shield when one draws conclusions that are not supported by the assessment results, observations, and/or case records.

## DISCUSSION

Making a diagnosis of mental retardation is often challenging and should only be conducted by qualified professionals. Most individuals with mental retardation will have strengths and areas of ability (see Luckasson et al., 2002). These strengths may confound a layperson or a professional with limited clinical experience with individuals who have mild mental retardation. These laypersons may erroneously interpret these pockets of strengths and skills as inconsistent with mental retardation because of their misconceptions regarding what someone with mental retardation can or cannot do. For example, many laypeople believe that individuals with mental retardation cannot read. In fact, it is well established that adults with mild mental retardation can achieve reading and writing commensurate with a grade equivalent of fifth or sixth grade (American Psychiatric Association, 2000; Barclay et al., 1996).

Mental retardation is a clinical diagnosis that should be made or ruled out based on a rigorous and comprehensive professional evaluation of the individual's intellectual functioning and adaptive behavior. If there is a presence of significant deficits, there must be an ascertainment that these deficits were manifest prior to age 18. A person who has been appropriately diagnosed with mental retardation should be identified as having mental retardation regardless of the individual's living arrangement, accommodations, or supports in place that could very well result in better functioning. AAIDD (Luckasson et al., 2002) reminded everyone in their section on the assumptions regarding mental retardation that "Within an individual, limitations often coexist with strengths," and "With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve" (Luckasson et al., 2002, p. 1).

Adaptive behavior is best represented by conceptual, practical, and social skills that an individual has learned and typically performs in order to meet societal demands in naturalistic settings (Luckasson et al., 2002). When we assess adaptive behavior for the purpose of making or ruling out a diagnosis of mental retardation, the use of standardized adaptive behavior scales is often central since they provide an objective metric with which to determine whether or not the individual's limitations are significantly below the average of the general population. The information obtained from standardized adaptive behavior scales should be corroborated with information from other sources, such as interviews with other informants and a thorough review of records and previous evaluations.

Assessment of adaptive behavior needs to be conducted using a combination of standardized adaptive behavior scales, adaptive behavior interviews of multiple informants who have observed the individual in different contexts, and a review of all available records. The standardized instrument is not error-free. The results obtained on a standardized adaptive behavior scale must be interpreted in relation to the instrument's reliability and resulting standard error of measurement. Self-ratings on standardized adaptive behavior scales are fraught with potential problems and should be interpreted with caution.

Any breach in administration procedures of a standardization assessment instrument should be clearly documented in the clinician's report, and the results should be interpreted with a certain degree of prudence. Because of the nature of Atkins claims, it is often necessary to conduct a retrospective adaptive behavior assessment. Retrospective adaptive behavior assessments should be well-documented with respect to respondents interviewed, procedure used, assessed time-frame (e.g., when individual was 17 years old), normative group used to interpret results, and source of convergent information that corroborates or contradicts results obtained. As with any type of adaptive behavior assessment, multiple respondents should be used and these respondents should preferably have had the opportunity to observe the assessed individual in different contexts. Results from a retrospective evaluation should be interpreted with caution.

Making a diagnosis of mental retardation is not like baking a cake, where one opens a book, follows the

122     TASSÉ

prescribed instructions, and out comes the certainty of whether or not a diagnosis such as mental retardation exists. Making a diagnosis of mild mental retardation is one of the more challenging diagnoses to make (Schalock et al., 2007). Most forensic psychologists have broad clinical training as well as training and experience to work with the courts and criminal defendants. Mental retardation professionals often have training and experience in working with individuals with and without mental retardation, but lack the training regarding the forensic science. The *Atkins* Supreme Court decision has resulted in the bridging of two fields: forensic psychology and the interdisciplinary field of mental retardation. Perhaps it is time to answer Everington and Olley's (2008) call for forensic and mental retardation professionals to join forces and provide leadership in developing practice guidelines for the diagnosis of mental retardation in the forensic setting. Such proposed practice guidelines should build upon an established national standard for diagnosing mental retardation (such as the AAIDD system), or else we risk creating a clinical diagnosis and a forensic diagnosis of mental retardation.

## REFERENCES

American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorders* (4th ed. text revision; DSM-IV-TR). Washington, DC: Author.

*Atkins v. Virginia*, 536 U.S. 304 (2002).

Barclay, A. G., Drotar, D. D., Favell, J., Foxx, R. M., Gardner, W. I., Iwata, B. A., Jacobson, J. W., Matson, J. L., Mulick, J. A., Ramey, S. L., Routh. D. K., Schroeder, S. R., Sprague, R. L., Switsky, H. N., & Thompson, T. (1996). Definition of mental retardation. In J. W. Jacobson & J. A. Mulick (Eds.), *Manual of diagnosis and professional practice in mental retardation* (pp. 13–47). Washington, DC: American Psychological Association.

Bruininks, R. H., Woodcock, R., Weatherman, R. F., & Hill, B. K. (1996). *Scales of Independent Behavior Revised (SIB-R)*. Itasca, IL: Riverside Publishing.

Doane, B. M., & Salekin, K. L. (in press). Susceptibility of current adaptive behavior measures to feigned deficits. Law and Human Behavior.

Doll, E. A. (1936). *The Vineland Social Maturity Scale: Revised condensed manual of directions*. Vineland, NJ: The Vineland Training School.

Doll, E. A. (1953). *Measurement of social competence: A manual for the Vineland Social Maturity Scale*. Vineland, NJ: Educational Publishers, Inc.

Duffy, S. A. (2007). Adaptive behavior. In J. W. Jacobson, J. A. Mulick, & J. Rojahn (Eds.), *Handbook on intellectual and developmental disabilities* (pp. 279–291). Washington, DC: Springer.

Edgerton, R. B. (1967). *The cloak of competence: Stigma in the lives of the mentally retarded*. Berkeley: University of California Press, Ltd.

Ellis, J., & Luckasson, R. (1985). Mentally retarded criminal defendants. *George Washington Law Review*, 53, 414–493.

Everington, A., & Fulero, S. M. (1999). Competence to confess: Measuring understanding and suggestibility of defendant with mental retardation. *Mental Retardation*, 37, 212–220.

Everington, A., & Olley, J. G. (2008). Implications of *Atkins v. Virginia*: Issues in defining and diagnosing mental retardation. *Journal of Forensic Psychology Practice*, 8(1), 1–23.

Fabian, J. M. (2005). Life, death, and IQ; it's much more that just a score: The dilemma of the mentally retarded on death row. *Journal of Forensic Psychology Practice*, 5(4), 1–36.

Finlay, W. M. L., & Lyons, E. (2002). Acquience in interviews with people who have mental retardation. *Mental Retardation*, 40, 14–29.

Greenspan, S. (2008). Foolish action in adults with intellectual disabilities: The forgotten problem of risk-unawareness. In L. M. Glidden (Ed.), *International review of research in intellectual and developmental disabilities*.

Greenspan, S. (1981). Social competence and handicapped individuals: Practical implications of a proposed model. In B. K. Keough (Ed.), *Advances in special education* (Vol. 3) (pp. 41–82). Greenwich, CT: JAI Press.

Greenspan, S. (2006). Functional concepts in mental retardation: Finding the natural essence of an artificial category. *Exceptionality*, 14, 205–224.

Greenspan, S., Loughlin, G., & Black, R. (2001). Credulity and gullibility in persons with mental retardation. In L. M. Glidden (Ed.), *International review of research in mental retardation*. New York: Academic Press.

Greenspan, S., & Switzky, H. (2006). In H. N. Switzky & S. Greenspan (Eds.), *What is mental retardation: Ideas for an evolving disability in the 21st century*. Washington, DC: American Association on Mental Retardation.

Harrison, P. L., & Oakland, T. (2003). *Adaptive behavior assessment system, Second edition: Manual*. San Antonio, TX: Harcourt Assessment, Inc.

Harrison, P. L., & Raineri, G. (2008). Best practices in the assessment of adaptive behavior. In A. Thomas & J. Grimes (Eds.), *Best practices in school psychology* (5th ed.) (pp. 605–616). Bethesda, MD: NASP Press.

Heal, L. W., & Tassé, M. J. (1999). The culturally sensitive individualized assessment of adaptive behavior. In R. L. Schalock (Ed.), *Adaptive behavior and its measurement: Implications for the field of mental retardation* (pp. 185–208). Washington, DC: American Association on Mental Retardation.

Heber, R. (1959). A manual on terminology and classification in mental retardation: A monograph supplement. *American Journal on Mental Deficiency*, 64 (Monograph Suppl.).

Heber, R. (1961). *A manual on terminology and classification in mental retardation* (Rev. ed.). Washington, DC: American Association on Mental Deficiency.

Keyes, D., Edwards, W., & Perske, R. (1997). People with mental retardation are dying, legally. *Mental Retardation*, 35, 59–63.

Lambert, N., Nihira, K., & Leland, H. (1993). *Adaptive Behavior Scale–School edition (ABS-S:2)*. Austin, TX: Pro-Ed Publishing.

Larson, S. A., Lakin, K. C., Anderson, L., Kwak, N., Lee, J. H., & Anderson, D. (2001). Prevalence of mental retardation and developmental disabilities: Estimates from 1994/1995 National Health Survey Disability Supplement. *American Journal on Mental Retardation*, 106, 231–252.

Luckasson, R., Coulter, D. L., Polloway, E. A., Reiss, S., Schalock, R. L., Snell, M. E., Spitalnik, D. M., & Stark, J. A. (1992). *Mental retardation: Definition, classification, and systems of supports* (9th ed.). Washington, DC: American Association on Mental Retardation.

Luckasson, R., Borthwick-Duffy, S., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Schalock, R. L., Snell, M. E., Spitalnik, D. M., Spreat, S., & Tassé, M. J. (2002). *Mental retardation: Definition, classification, and systems of supports* (10th ed.). Washington, DC: American Association on Mental Retardation.

Memon, A., & Henderson, S. E. (2002). What can psychologists contribute to the examination of memory and past mental status? In R. I. Simon & D. W. Shauman (Eds.), *Retrospective assessment of mental states in litigation: Predicting the pas*t pp. 307–334). Washington, DC: American Psychiatric Publishing, Inc.

Nihira, K., Leland, H., & Lambert, N. (1993). *Adaptive Behavior Scale–Residential and community edition (ABS-RC: 2)*. Austin, TX: Pro-Ed Publishing.

Patton, J. R., & Keyes, D. W. (2006). Death penalty issues following Atkins. *Exceptionality*, *14*, 237–255.

Perry, J. (2004). Interviewing people with intellectual disabilities. In E. Emerson, C. Halton, T. Thompson, & T. Parmenter (Eds.), *International handbook of applied research on intellectual disabilities* (pp. 115–132). West Sussex, UK: John Wiley & Sons Ltd.

Reschly, D. J., Myers, T. G., & Hartel, C. R. (Eds.) (2002). *Mental retardation: Determining eligibility for social security benefits*. Washington, DC: National Academy Press.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's guide to mental retardation: definition, classification, and systems of supports: Applications for clinicians, educators, disability program managers, and policy makers (10th ed.)* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., & Luckasson, R. (2005). *Clinical judgment*. Washington, DC: American Association on Mental Retardation.

Scheerenberger, R. (1983). *A history of mental retardation: A quartar century of progress*. Baltimore: Bookes.

Sparrow, S. S., Cicchetti, D. V., & Balla, D. A. (2005). *Vineland-II: Vineland Adaptive Behavior Scales*. (2nd ed.). Minneapolis, MN: Pearson Assessments.

Spreat, S. (1999). Psychometric standards of adaptive behavior assessment. In R. L. Schalock (Ed.), *Adaptive behavior and its measurement: Implications for the field of mental retardation* (pp. 103–118). Washington, DC: American Association on Mental Retardation.

Stevens, K. B., & Price, J. R. (2006). Adaptive behavior, mental retardation, and the death penalty. *Journal of Forensic Psychology Practice*, *6*(3), 1–29.

Thompson, J. R., McGrew, K. S., & Bruininks, R. H. (1999). Adaptive and maladaptive behavior: Functional and structural characteristics. In R. L. Schalock (Ed.), *Adaptive behavior and its measurement: Implications for the field of mental retardation* (pp. 15–42). Washington, DC: American Association on Mental Retardation.

Voelker, S. L., Shore, D. L., Brown-More, C., Hill, L.C., Miller, L. T., & Perry, J. (1990). Validity of self-report of adaptive behavior skills by adults with mental retardation. *Mental Retardation*, *28*, 305–309.

Widaman, K. F., & McGrew, K. S. (1996). The structure of adaptive behavior. In J. W. Jacobson & J. A. Mulick (Eds.), *Manual of diagnosis and professional practice in mental retardation* (pp. 97–110). Washington, DC: American Psychological Association.

World Health Organization. (1992). *The international classification of diseases* (10th revision; ICD-10). Geneva, Switzerland: Author.