AO 243 (Rev. 5/85)

### MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 𝔻𝕚𝕤𝕥𝕣𝕚𝕔𝕥 ℭ𝕠𝕦𝕣𝕥 | District Eastern District of Virginia |
|---|---|

| Name of Movant Cory Johnson | Prisoner No. | Case No. 3:92CR68-2  3:97CV895 |
|---|---|---|

Place of Confinement
Mecklenburg Correctional Center, Boydton,VA

F I L E D

JUN - 1 1998

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| UNITED STATES OF AMERICA | V. | Cory Johnson (name under which convicted) |
|---|---|---|

## MOTION

1. Name and location of court which entered the judgment of conviction under attack United States District Court, Eastern District of Virginia,Richmond, VA

2. Date of judgment of conviction June 1, 1993

3. Length of sentence Death with concurrent sentences of Life plus 85 years

4. Nature of offense involved (all counts) CCE Murder, 21 USC 848(e)(7 counts); engaging in CCE, 21 USC 848(a)(1 count); conspiracy to possess cocaine base with intent to distribute, 21 USC 846 (one count); violence in aid of racketeering, 18 USC 1959 (11 counts); use of firearm, 18 USC 924(c) (5 counts); possession of cocaine base w/intent to distribute, 21 USC SEC. 841(a)(1)(2 counts)

5. What was your plea? (Check one)
    (a) Not guilty ☒X
    (b) Guilty ☐
    (c) Nolo contendere ☐

    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

    _____

    _____

    _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
    (a) Jury ☒
    (b) Judge only ☐

7. Did you testify at the trial?
    Yes ☐ No ☒X

8. Did you appeal from the judgment of conviction?
    Yes ☒ No ☐

AO 243 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court __U.S. COURT OF APPEALS FOR THE FOURTH CIRCUIT__

(b) Result __Affirmed__

(c) Date of result __July 8, 1996 (reh. den. 10/28/96; cert. denied 6/2/97)__

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☐ No ☒X

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court _____

(2) Nature of proceeding _____

_____

(3) Grounds raised_____

_____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

_____

(3) Grounds raised_____

_____

_____

_____

AO 243

AO 243 (Rev. 5/85)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.      Yes ☐ No ☐
(2) Second petition, etc.   Yes ☐ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

AO 243 (Rev. 5/85)

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: _____ SEE ATTACHED _____

_____

Supporting FACTS (state *briefly* without citing cases or law) _____

_____

_____

_____

_____

_____

B. Ground two: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

C. Ground three: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

AO 243 (Rev. 5/85)

D. Ground four: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

        SEE ATTACHMENT

_____

_____

_____

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
    Yes ☐ No ☒X

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

    (a) At preliminary hearing   John J. Byrnes, Federal Defenders
        52 Duane Street (10th), New York, NY  10007

    (b) At arraignment and plea   Craig Cooley, 3000 Idlewood Avenue, Richmond, Va.
        23221; John F. McGarvey, 320 W. Broad St., Richmond, VA  23220

    (c) At trial   Craig Cooley, 3000 Idlewood Ave., Richmond, VA   23221;
        John F. McGarvey, 320 W. Broad St., Richmond, VA  23220

    (d) At sentencing   Craig Cooley, 3000 Idlewood Avenue, Richmond, VA 23221;
        John F. McGarvey, 320 W. Broad Street, Richmond, VA  23220

(6)

AO 243 (Rev. 5/85)

(e) On appeal Craig Cooley, 3000 Idlewood Avenue, Richmond, VA   23221

John McGarvey, 320 W. Broad Street, Richmond, VA   23220

(f) In any post-conviction proceeding _____

_____

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☒ No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

_____

(b) Give date and length of the above sentence: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

BARBARA L. HARTUNG

I declare under penalty of perjury that the foregoing is true and correct. Executed on

5/29/88
(date)

City/County of Meck. Commonwealth/State of VA.
Sworn to and subscribed before me this 29th day
of May , 1988. Witness my hand and official seal.

_____
Judy V. Bigger , Notary Public

Embossed Hereon Is My
Commonwealth of Virginia Notary Public Seal
My Commission Expires February 28, 19
JUDY V. BIGGER

_____
Signature of Movant
COREY JOHNSON

<u>ATTACHMENT TO MOTION UNDER 28 USC SEC. 2255</u>

<u>JOHNSON V. PRUETT</u>
No. 3:97CV895
Crim. No. 3:92CR68

12.  <u>GROUNDS FOR RELIEF</u>

1.   The Government Knowingly Or Negligently Used False Evidence To Portray Johnson As The Leader Of A Continuing Criminal Enterprise Based in New York And/Or New Jersey.

Government witnesses gave false testimony concerning Johnson's participation in a group called the New York Boyz and concerning the organization and leadership of that group. A government witness testified falsely about the existence and organization of this alleged CCE. Another witness described drug purchases by the defendant and others from an individual who was incarcerated at the time of the alleged purchases. The prosecutors knew or should have known the testimony was false. Presentation of this testimony violated the Fifth Amendment rights to due process and a fair trial.

The petitioner's investigation has revealed that key witness Sterling Hardy testified, in large part, from information he received from the government concerning facts of the case and not from his own personal knowledge.

2.   The Evidence Was Legally Insufficient To Convict Johnson As A Supervisor of A Continuing Criminal Enterprise Under 21 U.S.C. section 848.

The government's evidence failed to establish an element of the offense, i.e., that Johnson supervised the required five individuals. The government presented inadmissible testimony that was not based on personal knowledge of the witnesses and was misleading, ambiguous, and prejudicial. The government alleged that Johnson supervised many individuals who did not legally qualify as supervisees. The court gave erroneous instructions on the supervision element. Johnson was convicted in violation of his due process rights under the Fifth Amendment.

3.   Prosecutorial Misconduct Deprived Johnson Of His Rights To Due Process And A Fair Trial.

The prosecutors engaged in a course of misconduct

8

including but not limited to the following: improper, misleading, and inflammatory argument; vouched for the prosecution witnesses and for their belief in Johnson's guilt; gave unsworn testimony throughout the trial; referred in argument to inadmissible, misleading, and prejudicial evidence and introduced misleading, inadmissible, and prejudicial evidence; improperly argued to the jury that certain persons were CCE supervisees when, as a matter of law, they could not be supervisees; caused government witnesses to testify in an inadmissible, misleading and prejudicial manner; misled the jury with evidence and arguments; and presented testimony without proper legal foundation throughout the trial.

4.    Trial And Appellate Counsel Provided Ineffective Assistance In Violation Of The Sixth Amendment.

Trial counsel, who was also appellate counsel, provided ineffective assistance at all stages of Johnson's trial and appeal, including but not limited to the following. Counsel unreasonably: failed to move for a change of venue despite inflammatory media coverage; failed to request the reverse-Witherspoon question during voir dire; failed to object to the government's peremptory strikes against women; failed to object to Johnson's absence from voir dire; failed to conduct a factual investigation and failed to request the appointment of an investigator to challenge the CCE evidence; failed to object to improper and highly prejudicial conduct and arguments by the prosecutors; failed to object to improper evidence; failed to challenge or rebut the evidence of supervision; failed to present evidence and argument that Johnson was incapable of supervising and/or not likely to be a supervisor; failed to argue and present evidence that Johnson may be mentally retarded; failed to present evidence on prison conditions and lack of future dangerousness; failed to object to improper jury instructions and request proper instructions; failed to make appropriate motions before, during and after trial; and failed to raise meritorious issues on appeal.

5.    Discrimination Against Women

At trial, the prosecution disproportionately exercised peremptory strikes against women in violation of the Equal Protection Clause. Johnson anticipates that discovery will demonstrate that there was no neutral rationale for the exercise of peremptory strikes and that the strikes represented intentional exclusion of female jurors.

9

6.   Juror Misconduct Violated Johnson's Rights To An Impartial Jury and To Due Process of Law.

The jurors and their verdicts were tainted by exposure to and consideration of extraneous testimony and evidence during the trial and during deliberations in violation of the Fifth and Sixth Amendments.

7.   Denial Of Statutory Right To Justice Without Discrimination

African-Americans, including Johnson, have been disproportionately and discriminatorily selected for prosecution under federal death penalty legislation in violation of the right to justice without discrimination.

8.   Johnson Is Actually Innocent of the CCE Convictions

9.   Section 848's Delegation Of Authority to Prosecutors To Create Non-Statutory Aggravators Is An Unconstitutional Delegation Of Authority That Violates The Separation Of Powers.

This issue was raised on appeal by counsel but without benefit of the U.S. Supreme Court's decision in Loving v. United States, 116 S.Ct. 1737 (1996). The Fourth Circuit decided this issue without reference to Loving. The Loving decision demonstrates that this delegation of authority, as opposed to the delegation of authority at issue in Loving is an unconstitutional violation of the separation of powers principle.

10.  Johnson Adopts By Reference Those Claims Presented By His Co-Petitioners, Tipton and Roane, To The Extent That They Are Applicable To Him.

13.  Grounds not previously presented:

a.   Ineffective assistance of counsel:  not presented on appeal because 4th Circuit law precludes raising issue on direct appeal and reserves it for sec. 2255.

b.   Prosecutorial misconduct:  not presented on appeal because information supporting it was not available in the trial record and further discovery remains necessary; to the extent that misconduct appears in the record, not presented on appeal due to ineffective assistance of counsel.

10

c.    Juror Misconduct:    not presented on appeal because information supporting it was not available in the trial record and further discovery remains necessary.

d.    Insufficient Evidence:    not presented on appeal due to ineffective assistance of counsel at trial and on appeal.

e.    Actual Innocence: relies on information not available at trial, could not be presented on appeal, and relies on further investigation.

f.    Delegation  of  authority  to  create  non-statutory aggravating circumstances:    Presented and decided on appeal but argued prior to the U.S. Supreme Court decision in Loving v. United States, 116 S. Ct. 1737 (1996), and decided by the Fourth Circuit without reference to that case, which was decided just prior to the Fourth Circuit's decision.


By Order dated May 26, 1998, the Hon. James R. Spencer granted petitioner an extension of time to June 15, 1998, to file his habeas petition.  A copy of the Order is attached.  In accordance with that Order, petitioner will file a Memorandum of Law in support of this Motion on or before June 15, 1998.

11

## CERTIFICATE OF SERVICE

I hereby certify that one copy of the attached Motion Under 28 USC Section 2255 of Petitioner with Attachment (4 pages) Cory Johnson was served by mail on June 1, 1998, on counsel for the Respondent, Robert J. Erickson, Department of Justice, 10th and Constitution Avenues, N.W., Washington, D.C. 20530.

BARBARA L. HARTUNG

12

MAY 2 6 1998

CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| CORY JOHNSON | Petitioner, | |
| v. | | Civil Action Number 3:97CV895 |
| SAMUEL PRUETT, WARDEN | Respondent. | Criminal Action Number 3:92CR68 |
| RICHARD TIPTON | Petitioner, | |
| v. | | Criminal Action Number 3:92CR68-01 |
| RONALD ANGELONE | Respondent. | |
| JAMES H. ROANE, JR. | Petitioner, | |
| v. | | Criminal Action Number 3:92CR68 |
| UNITED STATES OF AMERICA | Respondent. | |

## ORDER

As the Court has granted the Government's motion for an extension to respond to the petitioners' motion to interview jurors, the petitioners are hereby notified that the Court is extending the due date of their petitions for writ of habeas corpus under 28 U.S.C. § 2255. The petitioners must file their petitions on or before June 15, 1998.

The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

It is SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

MAY 26 1998
_____
DATE



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED
SEP 2 4 1998
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| CORY JOHNSON,                    ) | |
|             Petitioner,          ) | Crim. No. 3:92CR68 |
| v.                               ) | |
|                                  ) | Civil No. 3:97CV895 |
| SAMUEL PRUETT, WARDEN,           ) | |
|                                  ) | |
|             Respondent.          ) | |

FIRST AMENDMENT TO INITIAL PETITION FOR WRIT OF

HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION

<u>2255 AND TO MEMORANDUM IN SUPPORT OF PETITION</u>

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, currently held at Sussex State Prison, Waverly, Virginia, and under sentence of death, hereby amends his previously filed petition for a writ of habeas corpus pursuant to 28 U.S.C. Section 2255 and memorandum in support thereof. Respondent has not yet filed a responsive pleading[1].

Petitioner asserts the various grounds for granting a writ of habeas corpus both individually and cumulatively. Because of the cumulative nature of the alleged errors and the prejudice resulting therefrom, Petitioner hereby incorporates by reference in every paragraph or subparagraph of his initial petition, memorandum in support, and this first amendment every other paragraph or

---

[1] Counsel for Respondent was granted until September 29, 1998, to file his response. Petitioner has no objection to an extension of time to file Respondent's answer in view of this Amendment.

1

subparagraph of his initial petition, memorandum in support, and this amendment, and any subsequent amendment thereto.

I.    The Subsequent Trial Of *Johnson's Co-defendant, Vernon Lance Thomas*, Revealed Additional Facts Supporting The Claims Set Forth In Johnson's Initial Petition.

Vernon Lance Thomas was indicted with Johnson. JA 73. His case was severed, and he was tried in this Court after Johnson's trial. The trial transcript for that related case, *United States v. Vernon Lance Thomas*, provides additional evidence supporting Johnson's Petition on a number of claims.

The Government's two star witnesses against Johnson, Priscilla Green and Jerry Gaiters, both testified in *Thomas,* and their testimony is the focal point of the analysis that follows.

A.    Ms. Green's Testimony In *Thomas* Reveals That She Lied In Johnson's Trial, And That Johnson Was Not A CCE Supervisor.

The facts set forth below amend and supplement Johnson's Claim II, the legal insufficiency of the evidence on the supervision element, Claim III, actual innocence of the CCE convictions and subsequent death sentence, and Claim V, prosecutorial misconduct throughout Johnson's trial.

Background. Priscilla Green provided dramatic, damning evidence against Johnson in connection with his CCE murder convictions. She had been crippled by gun shots. In essence, Green claimed in her testimony that those shots were fired by Johnson and that she saw Johnson in the act of executing other people. Tr. 2546, 2557-59. She was surely the Government's most

2

sympathetic and damaging trial witness against Johnson.

Ms. Green lied at Johnson's trial. As a threshold matter, Ms. Green's testimony in *Thomas* proves that she lied in Johnson's trial. After giving her damning testimony against Johnson, defense counsel attempted a cross-examination. During cross-examination at Johnson's trial, Ms. Green expressly denied that she had ever sold cocaine. Tr. 2546. This testimony was false, as demonstrated by her testimony in *Thomas*, in which she admitted that she had sold cocaine. *United States v. Vernon Lance Thomas*, Trial Tr. 421-2.

Because Green lied during Johnson's trial, Johnson was denied the opportunity to effectively challenge her credibility on a critical issue--her involvement in drug dealing. Ms. Green's false testimony on this point ultimately may have affected the sentence Johnson received. Had the jurors known that Green voluntarily engaged in the same criminal activities that Johnson was charged with, they may have been less inclined to impose death. This information amends and supplements Johnson's Claims II and III, alleging insufficient proof, innocence of the CCE convictions and of the death sentence.

Thomas, not Johnson, was the principal supervisor of drug activities. Beyond revealing her false testimony against Johnson, Ms. Green's testimony in *Thomas* demonstrated that Lance Thomas, not Johnson, was the principal supervisor of the drug activities involved. Specifically, Green testified that Thomas was "mostly" the head man, because "he mostly controlled the drugs.... [Thomas]

3

controlled the drugs because he had it bagged up and gave it out to the people to sell." *Thomas*, Trial Tr. 424-5.

Ms. Green's testimony during *Thomas* (like Gaiters' testimony in the Johnson trial that persons other than Johnson "was like the boss. . . . [t]hey ran things") supports Johnson's claim of actual innocence -- *i.e.*, that the CCE supervisors were persons other than Johnson. Had she given truthful testimony concerning Thomas's leadership during Johnson's case, when combined with Gaiters' testimony concerning the leadership by others, her testimony would have substantially strengthened Johnson's defense (and weakened the government's case) and enabled a jury to conclude either that Johnson was not a CCE supervisor or, even if he was, that he was not sufficiently responsible to support a death sentence. Green's later testimony amends and supplements Johnson's Claims II and III.

Prosecutorial misconduct. Ms. Green's testimony supports a claim of prosecutorial misconduct in two respects. It is difficult to imagine that the Government did not know (i) that Ms. Green sold drugs and that she testified falsely in Johnson's trial when she denied selling drugs; or (ii) that she would ultimately put most of the responsibility for supervision of drug activities on Thomas. Nevertheless, this information was not revealed to Johnson's defense counsel or to the jury during Johnson's trial.

A conviction obtained through the use of evidence the prosecutor knows is false violates due process and must fail under the Fifth and Fourteenth Amendments. Napue v. Illinois, 360 U.S. 264, 269 (1959); Kyles v. Whitley, 115 S. Ct. 1555 (1995). Under

4

such circumstances, the conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. <u>United States v. Bagley</u>, 473 U.S. 667, 678-80 & n. 9 (1985); <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)(citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)); <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935). Where it is established that the government knowingly permitted the introduction of false testimony, reversal is virtually automatic." <u>United States v. Stofsky</u>, 527 F.2d 237, 243 (2d Cir. 1975), <u>cert. denied</u>, 429 U.S. 819 (1976)(citing <u>Napue</u>, 360 U.S. at 269); <u>see</u> <u>also</u> <u>Miller v. Pate</u>, 386 U.S. 1, 7 (1967). Thus, Green's subsequent testimony and information provides grounds to amend and supplement Johnson's Claim V, alleging prosecutorial misconduct in the presentation of her testimony.

Furthermore, the government presented and argued two different accounts of the CCE supervision activities, the first at Johnson's trial and the second at Thomas' trial. The government's shifting position in its presentation of testimony and argument made Johnson's trial and conviction fundamentally unfair and produced a result that cannot be relied on. The principles governing the prosecution's responsibility in such instances were stated by the Second Circuit Court of Appeals in <u>United States v. GAF Corp.</u>, 928 F.2d 1253, 1260 (2d Cir. 1991):

> Although the government is not bound by what it previously has claimed its proof will show any more than a party which amends its complaint is bound by its prior claims, <u>the jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it</u>

5

currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts. See [United States v.] McKeon, 738 F.2d [26] at 31 [2d Cir. 1984].

* * *

. . . [I]f the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury is entitled to be aware of what the government has previously claimed, and accord whatever weight it deems appropriate to such information. There is merit still in that "rough and ready" view of the adversary process which leaves parties to bear the consequences of their own acts. [928 F.2d at 1262].

The prosecutor's improper manipulation of material evidence at two separate murder trials was the basis for granting the writ in Troedel v. Wainwright, 667 F. Supp.1456 (S.D. Fla. 1986), aff'd. 828 F.2d 670 (11th Cir. 1987). In the trial of defendant Hawkins, the prosecutor presented expert testimony that either Hawkins or Troedel had fired the murder weapon or had been close when a weapon was fired. The prosecutor also presented testimony of a witness, Tillman, who stated that on the night of the murder Hawkins had asked for a gun and said he wanted to shoot two men who owed him money. On redirect, the prosecutor bolstered Tillman's testimony. At Troedel's trial, the same prosecutors called Tillman, who repeated his prior testimony. On summation the prosecutors distanced themselves from his account, whereas in the prior trial they had embraced it. Furthermore, at Troedel's trial the expert witness now testified that Troedel had fired the murder weapon and that Hawkins could have been contaminated by proximity to the weapon. At a federal evidentiary hearing, the expert witness testified that there was no scientific basis for concluding that

6

Troedel had fired the murder weapon. The district court concluded that the prosecutor presented misleading testimony, knew that it was misleading, and that the testimony was material since it could have affected the judgment of the jury. As a result, Troedel's trial was "rendered fundamentally unfair by the State's use of misleading testimony." Id. at 1460. The Court of Appeals affirmed the granting of the writ. Accord United States v. Udechukwu, 11 F.3d 1101, 1105-06 (1st Cir. 1993)(improper conduct for prosecutor to imply or suggest to jury the opposite of what he knows to be true).

The prosecutors in Johnson's trial engaged in the same improper behavior. The prosecution witness Green denied any drug dealing in Johnson's trial but admitted to that illegal activity at Thomas's trial. The same witness named Thomas, not Johnson, as the principal supervisor of the drug activities charged in the indictment. Johnson's jurors never heard this testimony from Green. The testimony was material, certainly would have affected the judgment of Johnson's jury, and Johnson's trial was rendered fundamentally unfair and the results unreliable by the government's manipulation of the evidence. See Miller v. Pate, 386 U.S. 1 (1967). This evidence provides an additional claim for relief based on prosecutorial misconduct, Johnson's Claim V.

The alleged supervisees were mere resellers of drugs.

Johnson's opening brief at Part II argues extensively that the Government's evidence and argument concerning CCE supervisees consists principally of mere drug resellers, who are not capable of

7

being CCE supervisees.  Ms. Green's testimony in *Thomas* bolsters this argument.  There, she testified that the activities of four so-called CCE supervisees -- herself, Curt Thorne, "Papoose" (Robert Davis), and Mousey Armstrong -- were limited to selling drugs.  *Thomas* Tr. 424.  This information amends and supplements Johnson's Claims II and III set forth in his Initial Petition.

B.    Gaiters' Testimony In *Thomas* Reveals That He Lied In The Trial Against Johnson And That Johnson Was Not A CCE Supervisor

Background.  Jerry Gaiters was a less sympathetic witness than Ms. Green, but his testimony was similarly essential to Johnson's CCE murder convictions.  Gaiters testified in both cases pursuant to a plea agreement.  Pursuant to that agreement, he pled guilty to conspiracy and multiple counts of murder in furtherance of a CCE. Tr. 2309-10.  Gaiters testified that he saw Johnson shoot Mousey Armstrong and Bobby Long (both of which were CCE murders for which Johnson received the death sentence).  Tr. 2343-47.  He also gave testimony concerning specific facts relating to the murder of Mousey Armstrong, which the Government relied upon to demonstrate that he was one of Johnson's CCE supervisees.

Gaiters lied at Johnson's trial.  Johnson was a key witness for the Government, claiming to be an eyewitness against Johnson for the capital murder of Mousey Armstrong and Bobby Long. However, it is apparent from the *Thomas* trial that Gaiters did not testify truthfully against Johnson.  As discussed in Johnson's opening brief at page 60, Gaiters testified against Johnson that he was directed by Johnson to get Mousey Armstrong out of her house so

8

Johnson could shoot her; and that Gaiter's trial testimony conflicted with his grand jury testimony. During the *Thomas* trial, however, Gaiters testified to an entirely different story: *that he did not know that Johnson was going to hurt or kill Ms. Armstrong.* *Thomas*, Trial Tr. 569.

Thus, Gaiters has now testified under oath three times concerning his role in the Mousey Armstrong murder, and he has told three different stories. His inability to tell the same story twice demonstrates that his testimony against Johnson is likely a fabrication. At minimum, it casts substantial doubt on his veracity and these contradictions were not presented to Johnson's jury. This information amends and supplements Johnson's Claims II and III, alleging insufficient proof, innocence of the CCE convictions and of the death sentence.

For the reasons set forth above when discussing Green's inconsistent testimony, Gaiters' testimony strongly suggests that the Government knew that his testimony at Johnson's trial was false. Thus, Gaiters' testimony at Thomas's trial supports an additional claim of prosecutorial misconduct, Claim V in the Initial Petition.

Johnson was not Gaiters' CCE supervisor. Gaiters' testimony against Johnson concerning the murder of Mousey Armstrong was critical from another standpoint: as discussed in Johnson's opening brief at page 60, the Government had relied upon his testimony as the sole basis to claim that he was a CCE supervisee of Johnson. Gaiters' most recent story that he did not know that Johnson was

9

going to hurt or kill Armstrong, as he testified during the *Thomas* trial, could not possibly support the Government's argument that he was a CCE supervisee due to his actions in concert with Johnson relating to the Armstrong murder. This information amends and supplements Johnson's Claims II and III in his Initial Petition.

II.  Prosecutorial Misconduct In Connection With The Terms "Worker" and "Partner"

Johnson's opening brief at page 141 explains the Government's practice during the trial of having its witnesses use the misleading and ambiguous terms "worker" and "partner" to establish the element of CCE supervision. During Johnson's trial, the Government repeatedly attempted to demonstrate to the jury that prosecutors had not suggested these terms to its witnesses. For example, Government witness Hussone Jones testified as follows:

> Q:   Now, in anticipation of your testimony has anyone told you to use the term worker or partner?
>
> A:   No.

Tr. 1546. The Government attempted on at least one other occasion during the trial to reinforce the notion that it did not suggest these terms to its witness. Tr. 2108.[2]

Various excerpts of grand jury testimony, however, show that the terms were suggested by the Government through leading questions during grand jury proceedings. For example, Hussone

---

[2]   This was during the testimony of Stanley Smithers. As discussed in Johnson's opening brief at 52-53, Smithers testified that he used that term to mean a drug reseller.

10

Jones -- the very witness referred to in the preceding paragraph -- did *not* use these terms during his grand jury testimony. These terms were used by the Government in leading questions, and were accepted by Jones in his answers. *See* Exhibit 11, attached to Johnson's opening brief. If the Government then showed Jones his grand jury testimony prior to his trial testimony, then it would appear that the Government knowingly planted these terms in his mind for use at trial. Likewise, during grand jury testimony, the Government suggested these terms to other Government witnesses. *See*, e.g., Exhibit 12, attached to Johnson's opening brief. This information amends and supplements Johnson's Claim V, alleging prosecutorial misconduct.

III. The Prosecutors Violated 18 U.S.C. Section 201(c)(2) When Obtaining and Presenting The Testimony Of Several Cooperating Witnesses At Johnson's Trial. Defense Counsel Failed To Object And Were Ineffective Under Strickland v. Washington.

The prosecutors gave and/or promised favorable treatment to several key prosecution witnesses in exchange for their testimony at Johnson's trial. In doing so, the prosecutors violated 18 U.S.C. Section 201(c)(2) which states:

> Section 201.    Bribery of public officials and witnesses
>                     *     *     *
> (c)    Whoever --
>
>      (2) directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either house or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for

11

> or because of such person's absence therefrom;
>
> *   *   *
>
> shall be fined under this title or imprisoned for not more than two years, or both.

The statute explicitly prohibits attaching any promise, offer, or gift to a witness's testimony in any legal proceeding. There can be no quid pro quo for testimony, including the testimony of government witnesses. Nor can a promise be motivated by a witness's testimony.

The prosecutors violated this statute when presenting the testimony of several witnesses who were central to the case against Johnson. Greg Scott testified pursuant to an agreement with the government. He stated that in exchange for his testimony the government "will speak up for me in behalf of somehow I'll get a deal," i.e., "to reduce my sentence." JA 1727-28. Scott was promised government assistance at his upcoming sentencing. Robert Davis testified that he had been placed in the Witness Protection Program, received lodging, and no prosecutions had been brought against him as conditions of his testimony. JA 2765, 2784. Dennis Moody testified that the government had promised to place him in the Witness Protection Program only after he had given testimony at Johnson's trial. JA 2860-62. The connection between testimony and promised benefit could not be clearer. Stanley Smithers testified that as a condition of his testimony he too had been placed in the Witness Protection Program. JA 2930. Valerie Butler testified that she was placed in the Witness Protection Program (JA 3514) and had never been charged for criminal offenses she committed (JA

12

3566).    Under these conditions, Butler testified for the government.

Sterling Hardy, who had been charged in the indictment with Johnson, entered into a plea agreement with the government.  His agreement provided that all state charges would be dropped (JA 3045) and that the government would make a motion for a sentence reduction after he had testified at Johnson's trial.  JA 3056-60. Jerry Gaiters, charged as a co-defendant, also entered a plea in this case and like Hardy was awaiting sentence.  In exchange for his testimony, the government had agreed to recommend a sentence reduction.  "When it is time to come do sentencing, they will talk to see if I can get a lesser sentence."  JA 3140.  "You are cooperating because you don't want to get the maximum penalty; is that correct?  [Gaiters]:  Right."  JA 3202.

The prosecutors' actions were a clear violation of 18 U.S.C. section 201(c)(2).  The testimony of these witnesses should have been prohibited.  See United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), vacated and reh. en banc granted, 144 F.3d 1361 (10th Cir. July 10, 1998).  For the reasons set forth in Singleton, adopted in full and incorporated here, Johnson was denied a fair trial and due process in violation of his rights under the Fifth and Sixth Amendments.  Therefore, Johnson amends and supplements his Initial Petition and Memorandum to add this violation by the prosecution as Claim V (M), alleging prosecutorial misconduct.  The writ must be granted on this basis, and the convictions and sentences vacated.

13

In addition, Johnson amends and supplements his Initial Petition to add a claim of ineffective assistance of counsel, Claim IV (A. 9). Based on the foregoing, Johnson alleges that defense counsel rendered ineffective assistance when they failed to object to the prosecutors' actions and the testimony of the witnesses named above on grounds that the testimony was obtained in violation of section 201(c)(2). Johnson was prejudiced by counsels' failure to object as the testimony of the named witnesses was central to his conviction on all counts and to his resulting death sentences. The writ must be granted on this ground.

IV.   Typographical Errors In Johnson's Opening Brief

Page 56, first full paragraph, last sentence, should read: "A lengthy list of examples of violations of FRE 602 -- in the context of the CCE supervision element and otherwise -- is set forth below starting at page 135."

Respectfully submitted,

CORY JOHNSON

By: /s/ Barbara L. Hartung

Barbara L. Hartung
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA  23219
(804) 649-1088

Edward E. Scher
VSB 23064
Thorsen Marchant & Scher, LLP
316 West Broad Street
Richmond, VA  23220-4219

Counsel for Cory Johnson

September 23, 1998

14

## CERTIFICATION

I hereby certify that one copy of the First Amendment To Initial Petition For Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2255 And To Memorandum In Support Of Petition was sent by facsimile and was mailed on September 24/th, 1998, to counsel for the Respondent:

Robert J. Erickson
Deputy Chief, Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D.C.  20530
(202) 514-2841

/Barbara L. Hartung

15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

CORY JOHNSON,                          )
                                       )
          Petitioner,                  )     Crim. No. 3:92CR68
v.                                     )
                                       )     Civil No. 3:97CV895
SAMUEL PRUETT, WARDEN,                 )
                                       )
          Respondent.                  )

STATE OF VIRGINIA          )
                           )
COUNTY OF SUSSEX           )

## AFFIDAVIT OF COREY JOHNSON

I, Corey Johnson, petitioner in this action, being duly sworn, state:

1.   I have read the foregoing First Amendment To Initial Petition For Writ of Habeas Corpus;

2.   I hereby state, under penalty of perjury, that the facts contained in the Petition are true to the best of my knowledge; and

3.   I hereby state that I am entitled to relief for the reasons set forth in this First Amendment and in my Initial Petition And Memorandum In Support.

_Corey Johnson_
Petitioner Corey Johnson
Sussex I Correctional Center
Waverly, Virginia

-2-

Sworn to and subscribed to before me on
this 23RD day of September, 1998.

_____
Notary Public

My commission expires on: MARCH 31, 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MAR 15 1999

| | |
|---|---|
| CORY JOHNSON, | ) |
| Petitioner, | ) |
| | ) Crim. No. 3:92CR68 |
| v. | ) |
| | ) Civil No. 3:97CV895 |
| SAMUEL PRUETT, WARDEN, | ) |
| Respondent. | ) |

MOTION FOR LEAVE TO AMEND AND
SECOND AMENDMENT TO INITIAL PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION
2255 AND TO MEMORANDUM IN SUPPORT OF PETITION

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, currently held at Sussex I State Prison, Waverly, Virginia, and under sentence of death, hereby moves the Court pursuant to Fed.R.Civ.P. Rule 15(a) for leave to amend his previously filed petition for a writ of habeas corpus pursuant to 28 U.S.C. Section 2255 and memorandum in support thereof. Petitioner is filing his Reply to the Government's Response to his habeas corpus petitioner on March 15, 1999. This second amendment presents issues raised in Mr. Johnson's initial Petition and Memorandum and in his Reply. Hence, there will be no undue prejudice to the Government by this Second Amendment.

Petitioner asserts the various grounds for granting a writ of habeas corpus both individually and cumulatively. Because of the cumulative nature of the alleged errors and the prejudice resulting therefrom, Petitioner hereby incorporates by reference his initial petition, memorandum in support, first amendment, and reply in this second amendment, and any subsequent amendment thereto.

I.   Johnson Is Exempt From Execution Under 18 U.S.C.
     Sec. 3596(c) and 21 U.S.C. Sec. 848(1) Based On
     <u>Long Standing, Well Documented Mental Impairments.</u>

Under federal law, a mentally retarded defendant cannot be executed.  21 U.S.C. sec. 848(1); 18 U.S.C. sec. 3596(c)[added 9/13/94].   The Government recognized this prohibition in its Response.  Govt. Response at 229.  However, there is no case law defining the meaning of "mental retardation" under the applicable statutes and the outer boundaries under the law have not been defined.  As set forth in the Initial Memorandum (at 108-111) and in his Reply, Mr. Johnson has exhibited the distinguishing characteristics associated with mental retardation for most of his life.

Johnson's defense expert explained at his trial that mental retardation is determined by several factors.  One is intelligence:

> Individuals that fall in the range of 70-75 can be considered in the range of mental retardation.  And then of course, anything lower than that indicates mental retardation.

J.A. at 4515 (testimony of Dr. Dewey Cornell); <u>DSM-IV</u> (4th ed. 1994) at 39-40 (mental retardation may include those with IQ of 70-75 when coupled with significant deficits in adaptive behavior).

Johnson's I.Q. testing history demonstrated the following.  In February 1982 when he was 13 years old, Johnson was given the WISC-R, a test designed to measure a child's I.Q., and achieved a full scale I.Q. score of 88.  The test evaluator described this score as within the low average range of intellectual functioning. (Reply, Ex. 14).  A second WISC-R was given in March 1985, only three years later, when Johnson was 16 years old.  <u>This time Johnson achieved a full scale I.Q. of only 69-74, placing him in the mentally</u>

retarded range (JA 4433), and was described by the evaluator as "Deficient-Borderline range." (Reply, Ex. 14). Shortly prior to Johnson's capital trial, he took the WAIS-R intelligence test, which is the adult version of the WISC-R. JA. 4505. He was then 23 years old and in October 1992 achieved a full scale I.Q. score of 77. (Reply, Ex. 14). The evaluator, Dr. Dewey Cornell, concluded that Johnson was in the "borderline mentally retarded range." (JA 4515, 4517: 70-75 I.Q. can be considered in the range of mental retardation). No explanation was offered for Mr. Johnson's widely differing I.Q. scores.

Where an individual has significant adaptive impairments, the criteria of mental retardation may be met even if the individual has a higher IQ range. DSM-IV at 45. The American Association On Mental Deficiency ("AAMD") reports that the upper limit [of 70 as a standard for retardation] is intended as a guideline; it could be extended upward through IQ 75 or more, depending on the intelligence test used." Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 422 n. 44 (1985)

The second factor associated with mental retardation is impaired adaptive functioning:

> [Y]ou need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level.

J.A. at 4515-16. Johnson satisfied this second factor. For example, a school report from 1986 when Johnson was 17 years old

set forth as one of his goals learning to "handle money so he can shop for himself" and "learn enough simple arithmetic that he will be able to figure out correct change." See Johnson Reply, Ex. 15. Using this second characteristic, Johnson fell within the mentally retarded group.

While not stated by Cornell, the third factor in determining mental retardation is an intelligence test score in the mental retardation range before the age of 18. (DSM-IV at 39). Johnson also satisfied this factor. He had tested in the I.Q. range of 69-74 in 1985 when he was 16 years old. Thus, the only factor that precluded a finding of mental retardation at the time of Johnson's capital trial was the 1992 I.Q. score. Cornell testified:

> The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

J.A. 4517. One or two questions could have accounted for the two point difference in I.Q. when Cornell administered the test.

A finding that the third characteristic of mental retardation has been met obviously depends upon the validity of the testing instrument and/or the test administrator. The American Association On Mental Deficiency (now Retardation), the principal professional organization in the field, has placed the upper limit on mental retardation at an IQ of 75 or more, depending on the reliability of the intelligence test. Classification In Mental Retardation 1, (H. Grossman ed. 1983).

As Johnson argued in his Memorandum, research by James Flynn

in 1984 and 1988 documented a phenomenon of IQ gains over time that are tied to the age of the testing instrument. Johnson Memo, Ex. 7 at 2. In view of Prof. Flynn's research, Johnson's 1992 I.Q. test cannot be accepted as the final determination of Johnson's status. And there may be additional deficiencies in the testing process as yet unidentified.

Johnson's trial counsel never questioned the validity of the tests conducted on Johnson and, therefore, never argued that Johnson was ineligible for execution under the applicable federal statutes. Given the importance of this issue, an evidentiary hearing is required to examine the issues raised here and to determine whether Johnson is in fact ineligible for execution under federal law.

This additional claim presents an issue raised in Johnson's initial Petition in his related ineffective assistance argument. Respondent is on notice of the substance of the claim here and will not be unfairly prejudiced by this amendment. Therefore, this Court should grant the motion to amend for good cause shown and in the interests of justice.

II.   The Government Violated Brady v. Maryland, 373 U.S. 83 (1963), And Its Progeny When It Failed To Disclose Exculpatory And Impeachment Materials To Johnson's Counsel.

In addition to the specific Brady violations set forth in the pleadings of Johnson and his co-petitioners, Tipton, and Roane, Johnson alleges additional Brady/Bagley/Kyles violations by the government. Johnson requires discovery and an evidentiary hearing in order to demonstrate the factual basis for these additional

claims and to set forth the prejudice to his case. Johnson moves to amend at this time in light of the recent argument before the U.S. Supreme Court in Strickler v. Greene, No. 98-5864 (March 3, 1999), where at least one Justice suggested that a petitioner must raise a Brady claim in post-conviction proceedings even though the factual basis of the claim may not be immediately available to the petitioner and awaits further discovery. To avoid a potential default of this claim, Johnson raises it now.

Respondent is on notice of the general substance of this claim and will not be unfairly prejudiced by this amendment. Therefore, this Court should grant the motion to amend for good cause shown and in the interests of justice.

Respectfully submitted,

CORY JOHNSON

By: _____

Barbara L. Hartung
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA 23219
(804) 649-1088

Edward E. Scher
VSB 23064
Thorsen Marchant & Scher, LLP
316 West Broad Street
Richmond, VA 23220-4219
(804) 644-0711

Counsel for Cory Johnson

March 15, 1999

CERTIFICATION

I hereby certify that one copy of the Motion To Amend And Second Amendment To Initial Petition For Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2255 And To Memorandum In Support Of Petition was mailed on March 15, 1999, to:

Robert J. Erickson
Deputy Chief, Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D.C.  20530
(202) 514-2841

Counsel for Respondent

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta
Miller, Cassidy, Larroca & Lewin, L.L.P.
2555 M Street, N.W.
Washington, DC  20037
(202) 293-6400

Counsel for James H. Roane, Jr.

Donald R. Lee, Jr.
Frederick R. Gershon
Macaulay, Lee & Powell
1015 East Main Street - 4th
Richmond, VA  23219
(804) 649-2128

Counsel for Richard Tipton

_____
Barbara L. Hartung

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED

OCT - 1 1999

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CORY JOHNSON,                              )
                                          )
            Petitioner,                    )       Crim. No. 3:92CR68
v.                                         )
                                          )       Civil No. 3:97CV895
UNITED STATES[1],                          )
                                          )
            Respondent.                    )
                                          )

PETITIONER JOHNSON'S
THIRD AMENDMENT TO INITIAL PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION
2255 AND MEMORANDUM IN SUPPORT OF PETITION

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, currently held at the Federal Correctional Institution, Terre Haute, Indiana, under sentence of death, submits this Third Amendment to his previously filed petition for a writ of habeas corpus pursuant to 28 U.S.C. Section 2255 and memorandum in support thereof. On August 3, 1999, this Court granted Johnson leave to amend his petition and ordered the amendment filed no later than Friday, October 1, 1999.

Petitioner asserts the various grounds for granting a writ of habeas corpus both individually and cumulatively. Because of the cumulative nature of the alleged errors and the prejudice resulting therefrom, Petitioner hereby incorporates by reference his initial petition, memorandum in support, and all subsequent amendments and pleadings in support of his motion for habeas relief. He also

---

[1] As noted in the text, Johnson is no longer in custody in a Virginia prison. With this pleading, the caption has been corrected to reflect the United States as Respondent.

incorporates each of the grounds for relief stated by his codefendants Richard Tipton and James Roane, Jr., to the extent that they apply to him.

Johnson was convicted under 21 U.S.C. sec. 848(c), which prohibits participation in a continuing series of narcotics violations that meet specified criteria. Upon conviction, he was sentenced to death.

CLAIM XII:    THE DISTRICT COURT FAILED PROPERLY TO INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO TRIAL BY JURY.

In <u>Richardson v. United States</u>, ___ S. Ct. ___ (1999), 1999 WL 342214 (U.S.), the Supreme Court held that a jury in a federal Continuing Criminal Enterprise ("CCE") case [21 U.S.C. sec. 848] must unanimously agree not only that the defendant committed some 'continuing series of violations,' but must unanimously agree on which specific 'violations' make up that 'continuing series.' In reaching that decision, the Court interpreted the CCE statute and held that each violation in the series constitutes a separate element of the offense. The jury must specify which of the violations charged make up the continuing series. The Court explained:

> Our decision will make a difference where . . . the Government introduces evidence that the defendant has committed more underlying drug crimes than legally necessary to make up a 'series.' (We assume, but do not decide, that the necessary number is three, the number used in this case.)

<u>Id.</u> at 4.                    *  *  *

2

> To hold that each 'violation' here amounts to a separate element is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. To hold the contrary is not.

Id. at 5. With this decision, the Court resolved a split in the circuits. Compare, e.g., United States v. Edmonds, 80 F.3d 810, 822 (3rd Cir. 1996) (en banc) (jury must unanimously agree on which 'violations' constitute the series), with United States v. Hall, 93 F.3d 126, 129 (4th Cir. 1996) (unanimity with respect to particular 'violations' is not required). The Richardson Court specifically reserved the question of whether such an error may be "harmless."

A.    The Proceedings Below

On direct appeal, Johnson had raised this very issue. He argued that the district court committed plain error in failing to instruct that a CCE conviction required jury unanimity as to which narcotics violations constituted the series[2]. The district court had given only a general unanimity instruction. JA 4057. ("Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous.")

The district court's charge on Count 2, the CCE count, failed to treat the defendants separately and was particularly likely to

---

[2] Where an issue has been decided on direct appeal and there is a subsequent change of law, the petitioner may raise the issue again under sec. 2255. See Davis v. United States, 417 U.S. 333, 342; Sales v. United States, 139 F.3d 322, 324-25 (2d Cir.), cert. denied, 118 S. Ct. 2377 (1998); Underwood v. United States, 15 F.3d 16, 18 (2d Cir. 1993); English v. United States, 998 F.2d 609, 612-13 (8th Cir. 1993).

confuse the jury. Thus, the jury could convict without making the necessary finding that each defendant committed a "continuing series of violations." The charge contained the following relevant provisions:

> Now, in order to sustain its burden of proof for the crime of engaging in a Continuing Criminal Enterprise as charged in Count Two of the indictment, the government must prove the following five essential elements with respect to each individual defendant charged beyond a reasonable doubt: One, the defendant committed a felony violation of the federal narcotics laws; <u>two, such violation was part of a continuing series of related violations of federal narcotics laws; three, the continuing series of violations was undertaken by the defendants</u> in association or in concert with five or more other persons; four, the defendant was an organizer of these five or more other persons, or occupied a management or supervisory position with respect to these five or more other persons; five, the defendant obtained substantial income or resources from the continuing series of narcotic violations.
>
> *          *          *
>
> The first phrase: "Felony violation." The phrase "felony violation of the federal narcotics laws" as used in these instructions means the commission of any act specifically prohibited by certain sections of the United States Code for which a defendant could be imprisoned for more than one year. The distribution or possession with intent to distribute cocaine or crack cocaine in violation of 21 U.S. Code Section 848(a)(1) is a felony violation of the narcotics laws.
>
> What is a continuing series of violations? A continuing series of violations means at least three violations of the federal drug laws as charged in Counts One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two, and Thirty-three of the indictment before you. It also requires a finding that those violations were connected together as a series of related or ongoing activities as distinguished from isolated and disconnected acts.

JA 4035-36 (emphasis added).

The district court's jury charge posited 13 violations that

4

were alleged to satisfy the "continuing series" requirement[3]. Of the 13 violations listed, only Counts 1, 31, and 32, charged Johnson with violations of sec. 841(a)(1) or sec. 846 (prohibiting distribution, possession with intent to distribute, or conspiracy to do so) as charged in the indictment. The charge included counts not charged against Johnson (Counts 3, 5, and 33). The remaining counts charged intentional murder by one "engaged in a CCE" or "working in furtherance" of the CCE under sec. 848(e), although not alleged in Count Two of the indictment. Further confusing the issue, the district court erred when charging on the third element when the court stated that the prohibited continuing series of violations "was undertaken by the defendants," rather than by each individual defendant. JA 4035.

The jury delivered a general verdict finding Johnson "guilty" of the CCE (Count 2). The jury never specified which three or more predicate acts the jury found had satisfied the continuing series requirement. As the Supreme Court observed in Richardson, there is a real risk that juror disagreement about a defendant's role in specific violations will be hidden absent a unanimity requirement. In addition, where multiple criminal acts are involved, the risk is increased that "jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony, say, of bad reputation, that where there is smoke there

---

[3] The charge impermissibly amended the indictment that had alleged only violations of sec. 841 and 846 in Count Two. Count Two failed to identify what three (or more) violations by Johnson were alleged to comprise the requisite continuing series under the CCE statute.

5

must be fire." <u>Richardson</u> at 5.  In Johnson's case, there was the additional risk that the jurors considered violations not charged against Johnson when finding three violations that satisfied the CCE statute.  See <u>United States v. Edmonds</u>, 80 F.3d 810, 823 (3rd Cir. 1996) (reasonable likelihood that jury interpreted the district court's general unanimity instruction to require agreement only that <u>some</u> three predicate violations occurred and not that the <u>same</u> three violations occurred).

Furthermore, the CCE statute requires not just three violations but three <u>related</u> and continuing violations.  Without knowing which three (or more) violations by Johnson the jurors found to have satisfied the continuing series requirement, it is <u>impossible</u> to review the jury's determination that the three were <u>related</u> as required for a CCE conviction.

The Fourth Circuit reviewed the issue under the plain error rule since no objection had been raised at trial[4].  <u>United States v. Tipton</u>, 90 F.3d 861, 885 (4th Cir. 1996), <u>cert.</u> <u>denied</u>, 117 S. Ct. 2414 (1997).  Noting that the circuits were split on the issue, the Fourth Circuit did not rule on the unanimity question but, instead, addressed only the issue of prejudice.  The Court held

---

[4]  Although the law of the Circuit at the time of Johnson's trial did not support the motion, the Circuits were in conflict on the issue.  Counsel rendered ineffective assistance when he failed to raise the claim at trial.  Petitioner has raised a claim of ineffective assistance concerning the jury instructions in his initial Memorandum in support Claim IV(7).  He now amends that claim to allege ineffective assistance in failing to request a jury instruction requiring unanimity on the predicate acts that constitute the "continuing series" under the CCE statute (Claim IV(7)(c).  Johnson was prejudiced for the reasons stated herein.

<u>6</u>

that actual prejudice could not be demonstrated since:

> [T]he jury unanimously found each [defendant] guilty of at least five predicate violations: the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the sec. 848(e) murders as variously charged to them.

Ibid. In light of Richardson, the Fourth Circuit erred in its analysis. The district court's error in refusing the instruction was "structural," and therefore subject to automatic reversal, without any inquiry into prejudice[5].

B.    The Erroneous CCE Charge Was A Structural Defect

"Although most constitutional errors have been held amenable to harmless error analysis, some will always invalidate the conviction." Sullivan v. Louisiana, 508 U.S. 275, 279 (1993). Errors that "necessarily render a trial fundamentally unfair," and which "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair," require reversal in all cases, independent of any showing of actual prejudice. Rose v. Clark, 478 U.S. 570, 577-78 (1986).

The error at issue here -- the Court's failure to instruct the jury that to convict Cory Johnson of involvement in a CCE, it was required to agree unanimously on which specific "violations" made up the "continuing series of violations" required by the CCE statute -- was clearly not in the class of "trial errors which

---

[5] Moreover, even if harmless error analysis were appropriate here (which it is not), the error was far from harmless.

7

occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.'" Sullivan, supra, 508 U.S. at 307-08. Rather, it belongs to the class of "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless error standards." Id. at 307 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-09 (1991)).

A criminal defendant is, of course, entitled to have a jury consider the evidence, and decide whether the defendant's acts constitute a crime. But errors occurring in the course of trial, such as the improper admission of particular evidence, may be assessed under the harmless error standard, because an appellate court reviewing the case "simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [improper evidence] was harmless beyond a reasonable doubt. Arizona v. Fulminante, 499 U.S. 279, 310 (1991).

In addition, however, a criminal defendant is entitled to acquittal unless the jury determines guilt unanimously. By contrast to situations in which an appellate court may determine for itself whether, in light of properly admitted evidence, the improper admission of particular evidence was harmless beyond a reasonable doubt, a jury that does not act unanimously produces 'consequences that are necessarily unquantifiable and indeterminate," and therefore not amenable to harmless error analysis. Sullivan, supra, 508 U.S. at 282. For example, a general verdict of guilty rendered by a jury that had been

8

instructed that a simple majority was sufficient for conviction could not be upheld under harmless error analysis, no matter how strong the evidence against the defendant. This is so because the question facing the appellate court is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered . . . was surely unattributable to the error." Sullivan, supra, 508 U.S. at 279.

The right to a unanimous verdict is so critical that it is one of the few rights that may not be waived, in any circumstances. United States v. Ullah, 976 F.2d 509, 513 (9th Cir. 1992); United States v. Gipson, 553 F.2d 453, 456 n.4 (5th Cir. 1977). As then-Judge Kennedy stated, the requirement of a unanimous verdict underlies the very framework of our criminal system:

> The dynamics of the jury process are such that often only one or two members express doubt as to the view held by a majority at the outset of deliberations. A rule which insists on unanimity furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the entire jury. The requirement of jury unanimity thus has a precise effect on the fact-finding process, one which gives particular significance and conclusiveness to the jury's verdict. Both the defendant and society can place special confidence in a unanimous verdict. . .

United States v. Lopez, 581 F.2d 1338, 1341-42 (9th Cir. 1978). In our system, it is insufficient for conviction that a jury merely agree that the defendant is an evildoer. See, e.g., Lanzetta v. New Jersey, 306 U.S. 451 (1939). Since the criminal law punishes acts, rather than persons, the jury must first agree, unanimously, on "just what a defendant did as a step preliminary to determining

9

whether the defendant is guilty of the crime charged." <u>United States v. Gipson</u>, 553 F.2d 453, 457-58 (5th Cir. 1977).

By failing to instruct the jury that it could convict on the continuing criminal enterprise counts only if it agreed unanimously on the three specific, related, underlying violations alleged to make up the "continuing series of violations" necessary to prove a CCE, 21 U.S.C. sec. 848(c)(2), the trial court deprived Johnson of his right to trial by jury in violation of the Sixth Amendment.

The conviction should be vacated and the relief requested granted.

Respectfully submitted,

CORY JOHNSON

By: _Barbara L. Hartung_

Barbara L. Hartung
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA  23219
(804) 649-1088

Edward E. Scher
VSB 23064
Thorsen Marchant & Scher, LLP
316 West Broad Street
Richmond, VA  23220-4219
(804) 644-0711

Counsel for Cory Johnson

October 1, 1999

10

## CERTIFICATION

I hereby certify that one copy of Petitioner Johnson's Third Amendment To Initial Petition For Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2255 And To Memorandum In Support Of Petition was mailed on October 1, 1999, to:

Robert J. Erickson
Deputy Chief, Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D.C.  20530
(202) 514-2841

Wingate Grant
Assistant U.S. Attorney
U.S. Attorney's Office
600 E. Main Street
Suite 1800
Richmond, VA  23219
(804) 819-5400

Counsel for Respondent

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta
Miller, Cassidy, Larroca & Lewin, L.L.P.
2555 M Street, N.W.
Washington, DC  20037
(202) 293-6400

Counsel for James H. Roane, Jr.


Donald R. Lee, Jr.
Frederick R. Gershon
1015 East Main Street - 4th
Richmond, VA  23219
(804) 649-2128

Counsel for Richard Tipton

_____
Barbara L. Hartung

11

**FILE COPY**

FILED
MAY - 1 2003
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA )
)
v. )          CASE NO. 3:92CR68
)
RICHARD TIPTON a/k/a "WHITEY" )
CORY JOHNSON a/k/a "O" )
JAMES ROANE. a/k/a "J.R." )

## ORDER

In accordance with the accompanying Memorandum Opinion, it is ordered that:

1.    The United States' motion for summary judgment is granted in part and denied in part.

2.    Johnson and Tipton's grounds for § 2255 relief are dismissed and their motions pursuant to 28 U.S.C. § 2255 are denied.

3.    All of Roane grounds for § 2255 relief will be dismissed except for his claim that he was denied effective assistance of counsel in conjunction with the charges pertaining to the murder of Douglas Moody (Claim IV.B.2) and his claim that he is actually innocent of the murder of Moody (Claim VIII).

4.    Tipton's request to conduct additional discovery is denied.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and counsel for the United States.

It is so ORDERED.

_James R. Spencer_
United States District Judge

Richmond, Virginia
Date: 5-1-03

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

F I L E D

MAY - 1 2003

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA      )
                                    )
v.                                       )          CASE NO. 3:92CR68
                                    )
RICHARD TIPTON a/k/a "WHITEY"     )
CORY JOHNSON a/k/a "O"            )
JAMES ROANE. a/k/a "J.R."         )

## MEMORANDUM OPINION

The matter is before the Court on the 28 U.S.C. § 2255 motions filed by Tipton, Johnson, and Roane (collectively "the Defendants") and the United States' motions for summary judgment.[1] Tipton, Johnson and Roane's grounds for relief are set forth in appendices A, B, and C respectively. For the reasons set forth below, the Court finds that the United States is entitled to summary judgment on all claims except for a portion of Roane's claim that he was denied effective assistance of counsel in conjunction with the charges pertaining to the murder of Douglas Moody (Claim IV.B.2) and Roane's claim that he is actually innocent of the murder of Moody (Claim VIII).

## I.    STANDARD FOR SUMMARY JUDGEMENT

It is the responsibility of the party seeking summary judgment to inform the Court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[O]nce the moving party has met its burden under Rule 56(c), the adverse party 'may not rest upon the mere

---

[1] The general facts that led to the Defendants' convictions and sentences of death are set forth in United States v. Tipton, 90 F.3d 861 (4th Cir. 1996) and will not be repeated here. References to the "record" in this opinion do not include the evidence introduced at the evidentiary hearing conducted on June 21, 2002.

1

allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" Catawaba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(quoting Fed. R. Civ. P. 56(e)). In determining whether a particular claim is subject to summary judgment the Court "must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

The Defendants contend that summary judgment is premature because they need to conduct further discovery. The Defendants' unsworn arguments regarding discovery (which already have been rejected by this Court in denying their motions for discovery) do not provide an adequate basis for forestalling a decision on the motion for summary judgment. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996). A demand for additional "discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit . . . and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)). Because the Defendants have not met the burden of demonstrating that they are entitled to discovery, see Rule 6(a) Governing § 2255 Proceedings, and have not complied with the requirements of Fed. R. Civ. P. 56(f), the Defendants' request to forestall summary judgment until they can conduct additional discovery will be denied.

## II. PROCEDURAL STANCE OF THE DEFENDANTS' CLAIMS

Review of many of the Defendants' claims is precluded because the claim was rejected on direct appeal, see Boeckenhaupt v. United States, 537 F.2d 1182 (4th Cir. 1976)(intervening change

2

in the law is required to relitigate issues in § 2255 motion that were rejected on direct appeal), or the claim could have been raised at trial and direct appeal, but was not. United States v. Frady, 456 U.S. 152, 168-69 (1982). Specifically, the following claims will be dismissed because they were rejected on direct appeal and the Defendants failed to direct the Court to a change in the law that requires the Court to revisit the claim: Tipton Claims V.B.3.b, V.G, V.H; Johnson Claims II.C.2, VIII, IX; and Roane Claim V, and those aspects of the juror misconduct claims relating to mid-trial publicity and juror Cooke, Tipton Claim V.A, Johnson Claim VII, and Roane Claim III.[2]  See United States v. Wiley, 245 F.2d 750, 752-53 (8th Cir. 2001)(concluding new facts do not require review of claims rejected on direct appeal), cert. denied, 122 S. Ct. 818 (2002).

The Government correctly notes that the Defendants have defaulted the following claims by failing to raise the claim either at trial or on direct appeal:  Tipton Claims V.B.3.a.i, V.B.3.a.ii-iv, V.B.3.c, V.E. 1-15, V.J, V.K, V.L; Johnson Claims II.C.1.a-c, II.C.3.a, II.C.3.b, V.A-V.M, VI, XII, XIII; Roane Claims I.a, I.d, II, VII. Frady, 456 U.S. at 168-69. The Court may grant relief on the foregoing claims only if the Defendant demonstrates that either cause and actual prejudice, or actual innocence excuse his default. See Bousley v. United States, 523 U.S. 614, 622 (1998). Hence, with respect to these defaulted claims, if the Defendant fails to demonstrate that either novelty, or ineffective assistance of counsel, or actual innocence, or some other cause, excuses his default, the claim will be dismissed without further discussion. As discussed below, except for part of Roane's Claim VIII, the Defendants' proffered excuses are unconvincing and are rejected.

---

[2] The Government also is correct that the new facet of the Defendants' juror misconduct claim, is defaulted because it could have been raised at trial and on direct appeal but was not. Frady, 456 U.S. at 168-69. The Defendants fail to demonstrate any cause to excuse the new aspect of the juror misconduct claim.    See Order entered June 10, 1998 and infra Sec. XII and XIII.

3

## III. RELIEF BASED ON <u>APPRENDI</u> v. <u>NEW JERSEY</u>
Johnson Defaulted Claim XIII
Tipton Defaulted Claim V.L
Roane Defaulted Claim VII

Title 21 U.S.C. § 848(e) provides that any person who, while engaged in or working in furtherance of a continuing criminal enterprise ("CCE"), "intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual" may be sentenced to death or a term of imprisonment from twenty years to life. However, before the death penalty may be imposed, the jury is required to find the presence of certain aggravating factors enumerated in 21 U.S.C. § 848(n). In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." <u>Id.</u> at 490. The Court also explained that "the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." <u>Id.</u> at 489 n. 15 (quoting <u>United States v. Reese</u>, 92 U.S. 214, 232-33 (1875)). Relying on the foregoing statement from <u>Apprendi</u>, the Defendants contend that their convictions and sentences of death are unconstitutional because the indictment failed to charge the aggravating factors that were essential to the imposition of a death sentence.

The United States responds that such a claim is defaulted, barred by the new rule doctrine of <u>Teague v. Lane</u>, 489 U.S. 288 (1989), and lacks merit. <u>See United States v. Sanders</u>, 247 F.3d 139, 144-46 (4th Cir.), <u>cert. denied</u>, 122 S. Ct. 573 (2001). Because the United States' procedural arguments carry the day, it is unnecessary to address the merits of the Defendants' substantive claim.

### A. Novelty As Cause

4

The Defendants assert that their failure to raise the claim on direct appeal should be excused because the legal basis for their claim was not available at the time of direct appeal. In <u>Reed v. Ross</u>, 468 U.S. 1 (1984), the Supreme Court held that a claim that "is so novel that its legal basis is not reasonably available to counsel" may constitute cause to excuse a procedural default. <u>Id.</u> at 16. While novelty continues to be a valid cause for excusing a procedural default, the Supreme Court has narrowed the reach of <u>Reed</u> by expanding the interpretation of when a claim may be reasonably available. <u>See</u> <u>United States v. Bousley</u>, 523 U.S. 614, 622 (1998). In <u>Bousley</u> the Court rejected the petitioner's assertion that a <u>Bailey</u>-type challenge to his § 924(c) conviction prior to the decision in <u>Bailey v. United States</u>, 516 U.S. 137 (1995) was not reasonably available, because the "Federal Reporters were replete with cases involving challenges to the notion that 'use' is not synonymous with mere 'possession'." <u>Id.</u> at 622. The Court then explained that, even if it appears "futile" to attempt a particular legal argument, that perceived futility "cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" <u>Id.</u> at 623 (quoting <u>Engle v. Isaac</u>, 456 U.S. 107, 130 n. 35 (1982)).

Following this refined view of novelty, the Fourth Circuit rejected a defendant's assertion that his <u>Apprendi</u> claim was not reasonably available at the time of his sentencing in 1998. <u>See</u> <u>United States v. Sanders</u>, 247 F.3d 139, 145 (4th Cir.), <u>cert. denied</u>, 122 S. Ct. 573 (2001). The court explained that the <u>Apprendi</u> claim was available in 1998, because

> the germ of Sander's <u>Apprendi</u> claim had sprouted at the time of his conviction and there is no reason why he could not have raised it then. Although the court may not have been likely to accept Sanders' argument, Sanders plainly had at his disposal the essential legal tools with which to construct his claim.

<u>Id.</u> at 146(citing <u>United States v. Smith</u>, 241 F.3d 546, 548 (7th Cir.), <u>cert. denied</u>, 122 S. Ct. 267

(2001)).

The Supreme Court's decision in McMillan v. Pennsylvania, 477 U.S. 79 (1986), provided Tipton, Johnson and Roane with the necessary tools to construct their Apprendi claim. "No one can read McMillan without learning that the Court was open to the argument that the Constitution requires a fact which does increase the available sentence to be treated as an element of the crime." Almendarez-Torres v. United States, 523 U.S. 224, 256 (1998)(Scallia, J.)(dissenting). Thus, because "the foundation for Apprendi was laid long before 1992," the Defendants cannot assert the claim was not reasonably available at the time of their trial and appeal. Sanders, 247 F.3d at 145(quoting Smith, 241 F.3d at 548). The Defendants' assertion of novelty as cause is rejected.

The Defendants assert that they are actually innocent of all their convictions under 21 U.S.C. § 848 and thus this Court is permitted to review their defaulted claims. As discussed below at Section VI, such an assertion, with the exception of Roane's claims pertaining to the murder of Douglas Moody, is utterly without merit. Nevertheless, even though Roane's assertion of innocence regarding that murder is meritorious, this Court is still foreclosed from granting Roane, Tipton, or Johnson relief on their Apprendi related claim because of the new rule doctrine.

**B.    Apprendi Created A New Rule Of Constitutional Procedure That Is Not Retroactive To Cases On Collateral Review**

New rules of constitutional criminal procedure are generally not applied retroactively on collateral review. See Teague v. Lane, 489 U.S. 288, 312 (1989). Apprendi's requirement that any fact, (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, constitutes a new rule of criminal procedure that is not retroactive to cases on collateral review. United States

6

v. Sanders, 247 F.3d 139, 146-48 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). The Defendants counter that the extension of Apprendi they seek - that all facts necessary to the imposition of a capital sentence must be found by the grand jury and charged in the indictment–is a new rule of substantive, rather than procedural, criminal law. See United States v. Bousely, 523 U.S. 614, 620 (1998)(concluding Teague analysis is not applicable where the Court simply decides the meaning of a criminal statute). The Defendants are wrong. Sanders, 247 F.3d at 147(holding that Apprendi "constitutes a procedural rule because it dictates what fact-finding procedure must be employed to ensure a fair trial" and that it "is certainly a new rule of criminal procedure"); United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001), cert. denied, 122 S. Ct. 1327 (2002).

Next, the Defendants assert that the new rule they seek is retroactive because it falls within Teague's second exception to non-retroactivity. In order to qualify under that exception, the new rule must be such that, without it, "'the likelihood of an accurate conviction is seriously diminished'" and the rule must "'alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.'" Sanders, 247 F.3d at 148 (quoting Teague, 489 U.S. at 313 and Sawyer v. Smith, 497 U.S. 227, 242 (1990) respectively)). In Sanders, the Fourth Circuit assumed that a "rule that certain sentencing factors must be proven beyond a reasonable doubt will promote marginally more accurate results." 247 F.3d at 149-50. However, the court then concluded that such a rule lacked the trappings of a truly "watershed" rule because it would not impact all criminal defendants, it would not taint a defendant's entire conviction, and it did not contribute significantly to the core fundamental rights such as the right to counsel, trial by jury, and a finding of guilt beyond a reasonable doubt, but merely answered a subsidiary question about one of those core rights. Id. at 150-51; see O'Dell v. Netherland, 521 U.S. 151, 167 (1997)(noting that qualifying rule should

7

be a "sweeping" change that applies to a large swath of cases rather than a "narrow right" that applies only to a "limited class" of cases); United States v. Mandanici, 205 F.3d 519, 529 (2d Cir.)(discussing eleven new rules or proposed new rules which the Supreme Court has declined to apply retroactively), cert. denied, 531 U.S. 879 (2000).

It logically follows that, if the necessity of a petit jury finding beyond a reasonable doubt on all factors that increase a defendant's maximum sentencing exposure are not of sufficient primacy and centrality to satisfy Teague's second exception, then the narrower rule that the Defendants demand, which merely requires a grand jury finding by a preponderance of the evidence on the aggravating factors necessary for the imposition of capital sentence factors, is not. See United States v. Cotton, 122 S. Ct. 1781, 1784-86 (2002)(concluding omission from the indictment of certain facts necessary to imposition of a particular sentence did not deprive court of jurisdiction to impose that sentence); Basden v. Lee, 290 F.3d 602, 619 (4th Cir. 2002)(concluding Apprendi based challenges to an indictment are not retroactive to cases on collateral review), cert. denied, 123 S. Ct. 446 (2002). Unlike the straightforward application of Apprendi rejected in Sanders, the extension the Defendants seek would contribute little or nothing toward ensuring an accurate conviction or sentence; the aggravating factors ultimately are found by a jury, beyond a reasonable doubt, before the imposition of a capital sentence. See Jones v. Smith, 231 F.3d 1227, 1238 (9th Cir. 2000)(holding that "the Apprendi rule, at least as applied to the omission of certain necessary elements from the state court information, is neither implicit in the concept of ordered liberty nor an absolute prerequisite to a fair trial"); United States v. Moss, 252 F.3d 993, 998 (11th Cir. 2001)(stating that "we do not believe Apprendi's rule recharacterizing certain facts as offense elements that were previously thought to be sentencing factors resides anywhere near that central core of fundamental rules that are absolutely

8

necessary to insure a fair trial"), cert. denied 122 S. Ct. 848 (2002). Accordingly, the Defendants'

Apprendi based claims are barred by the new rule doctrine and will be dismissed.

## IV.    ISSUES RELATED TO THE SELECTION OF THE JURY

### A.    Counsel Failed To Move For A Change of Venue
Johnson Claim IV.A.2
Tipton Claim V.F.1.a
Roane Claim IV.A

The Defendants assert that counsel were deficient for failing to move for a change of venue

in light of the pretrial publicity. In order to demonstrate he was denied his right to the effective

assistance of counsel, a defendant must show that counsel's representation was deficient and that the

deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984).

The deficient performance facet of the Strickland test "requires showing that counsel made errors

so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." Id. To satisfy this facet of Strickland, the defendant must demonstrate that "counsel's

representation fell below an objective standard of reasonableness." Id. at 687-88. Furthermore, in

order to avoid the distorting effects of hindsight, the Court is required to evaluate "the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the

time of counsel's conduct." Strickland, 466 U.S. at 690.

In order to carry a motion for a change of venue prior to trial, counsel is required to

demonstrate that the publicity is so inherently prejudicial that trial proceedings must be presumed

to be tainted. See United States v. Baker, 925 F.2d 728, 732 (4th Cir. 1991). However, "[o]nly in

extreme circumstances may prejudice be presumed from the existence of pretrial publicity itself."

Id. (qouting Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987)). Instead, "a trial court customarily

9

should take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists." Baker, 925 F.2d at 732. A defendant would then be entitled to a change of venue if "voir dire reveals that an impartial jury cannot be impaneled." Id.

In assessing whether a change of venue is warranted, not only the volume, but the character and timing of media coverage are critical factors. See Murphy v. Florida, 421 U.S. 794, 801 n. 4 (1975) (important to distinguish between factual and inflammatory publicity); Baker, 925 F.2d 732-33. "The recency of alleged prejudicial publicity is important because '[o]bviously where considerable time has elapsed since publication, the probability or likelihood of impact is appreciably lessened.'" Baker, 925 F.2d 732-33(quoting Wansley v. Slayton, 487 F.2d 90, 93 (4th Cir. 1973)). The Defendants rely on fourteen newspaper articles to support their claim that a motion for change of venue was warranted. Of those articles, eleven were printed at least five months prior to the start of the trial in January of 1993. The twelfth article appeared on January 10, 1993, the day that jury selection began, and was largely factual. The thirteenth article concerned a shot fired at detectives carrying witnesses and was printed on January 23, 1993. The final article was the article that appeared on February 9, 1993. With only a single, largely factual article appearing in the five months preceding their trial, counsel reasonably eschewed pursuing a motion for a change of venue based on pretrial publicity. See Mu'Min v. Pruett, 125 F.3d 192, 199 (4th Cir. 1997)(concluding the 47 articles published over three months prior to defendant's trial did not create a presumption that the court could not select an impartial jury).

Nor did the actual voir dire suggest that it would be necessary to change venue in order to obtain a fair and impartial jury. Of the four jurors, and one alternate juror, who had been exposed to pretrial publicity, each unequivocally stated that nothing in the media coverage would prevent him

10

or her from being a fair and impartial juror. Additionally, the Court's opening instructions further reassured counsel that a change of venue was not necessary to avoid any inflammatory media coverage. At the beginning of the trial, the Court instructed the jury "not to read or listen to anything touching on this case in any way." Tr. at 762. "Now as I said –and this is very important, so I am going to repeat it . . . .You should be insulated from outside forces. And what happens in this courtroom should be what makes up the body of knowledge that will bring you to your conclusions and determinations." Tr. 766. In light of the foregoing, the Defendants have failed to demonstrate that counsel was constitutionally deficient for not moving for a change of venue or that they were prejudiced by counsel's failure to do so. The above listed claims will be dismissed.

**B.     The Prosecution's Purported Use of Peremptory Strikes Against Women in Violation of J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994).³**
Johnson defaulted Claim V.K, VI
Tipton defaulted Claim V.E.1&12
Roane defaulted Claim II

The prosecution used two peremptory challenges to remove men and eight peremptory challenges to remove women. The Defendants did not raise any objection at trial to the prosecution's purportedly improper use of peremptory challenges. Subsequent to the Defendant's trial, the Supreme Court held that intentional discrimination on the basis of gender by the use of peremptory strikes in jury selection violates the Equal Protection Clause. J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994). When the Defendants sought to raise the issue on appeal based on the disproportionate number of challenges the prosecution exercised against women, the Fourth Circuit concluded that, "the bare showing of gender discrimination first attempted on this direct appeal does not suffice either to allow first instance consideration by this court (as appellants concede), nor to warrant a remand for first instance consideration by the district court." United States v. Tipton, 90

11

F.3d 861, 881 (4th Cir. 1996).

Each of the Defendants asserts that the prosecutor engaged in misconduct by using his peremptory strikes to remove women from the jury. These claims are defaulted because counsel failed to make a contemporaneous objection. The Defendants rely on the constitutionally deficient performance of trial counsel, see Tipton Claim V.F.1.c and Johnson Claim IV.A.4, and novelty to establish cause to excuse their default.

1.  **Purported Deficient Performance of Counsel for Failing to Raise J.E.B. Or Prosecutorial Misconduct Claim**
    Tipton Claim V.F.1.c
    Johnson Claim IV.A.4

At the time of the Defendants' trial, the Supreme Court had yet to grant certiorari in J.E.B., and the Ninth Circuit was the only Federal Circuit court to extend Batson to strikes based on gender. See United States v. De Gross, 913 F.2d 1417 (9th Cir. 1990), and 960 F.2d 1433, 1437-1443 (1992) (en banc) (extending Batson v. Kentucky, 476 U.S. 79 (1986), to prohibit gender-based peremptory challenges in both criminal and civil trials). The Fourth Circuit had explicitly rejected attempts to extend Batson to peremptory challenges based on gender and the language of that decision hardly encouraged counsel to continue to raise the issue. See United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir. 1988). "[W]e find no authority to support an extension of Batson to instances other than racial discrimination." Id. (emphasis in original); see also id. at 1042-43; United States v. Mitchell, 886 F.2d 667 (4th Cir. 1989)(rejecting defendants attempt to extend Batson to peremptory challenges based on age).[3] In light of the Fourth Circuit's explicit rejection of attempts to extend

---

[3] At the time of the Defendants' trial, the Seventh Circuit agreed with the Fourth Circuit. United States v. Nichols, 937 F.2d 1257, 1262-1264 (7th Cir. 1991) (declining to extend Batson to gender), cert. denied, 502 U.S. 1080 (1992); see also United States v. Broussard, 987 F.2d 215, 218-220 (5th Cir. 1993) (same).

Batson to gender, the Defendants cannot demonstrate that the failure of counsel to object to the prosecution's strikes of female jurors fell below the wide range of professionally competent performance. See United States v. McNamara, 74 F.3d 514, 517 (4th Cir. 1996)(concluding counsel is not deficient for following the controlling circuit law at the time of trial); Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995); Honeycutt v. Mahoney, 698 F.2d 213, 216-17 (4th Cir. 1983). Accordingly, the Defendants' claims that they were denied effective assistance by counsel's failure to object at trial to the prosecution's use of peremptory strikes against female jurors will be dismissed.

### 2. Novelty As Cause For Failure to Raise the J.E.B claims

The Defendants next suggest that, if counsel was not deficient for failing to raise the J.E.B. claim, then surely its novelty must constitute cause excusing their default. This is not so. See Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995)(rejecting a similar argument and concluding that "a necessarily stringent procedural hurdle, coupled with a similarly important deference to attorney performance" precluded petitioner from raising challenge for the first time on habeas).

The Defendants contend that the absence of a contemporaneous objection is excused because the claim was not reasonably available in light of the Fourth Circuit's position in United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir. 1988). As discussed in conjunction with the Defendants' Apprendi claim, "a claim that 'is so novel that its legal basis is not reasonably available to counsel' may constitute cause for a procedural default." Bousley v. United States, 523 U.S. 614, 622 (1998)(quoting Reed v. Ross, 468 U.S. 1, 16 (1984)). However, novelty or "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Bousely, 523 U.S. at 623(internal citations and quotations omitted)(rejecting petitioner's assertion

13

that his Bailey claim was not reasonably available at the time of his trial). Here, the Defendants had at their disposal not only the Batson decision, but also a federal circuit court decision and several state court decisions that had concluded that Batson extended to strikes based on gender.[4] Such authorities provided the Defendants with sufficient tools to challenge any improper gender based exercise of peremptory challenges. See United States v. Sanders, 247 F.3d 139, 145 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). Hence, the Defendants' assertion that the legal basis for their J.E.B. claim was not reasonably available must fail. The Defendants' assertions of cause are rejected. The substantive prosecutorial misconduct claims are defaulted and will be dismissed.

C.    **Trial Counsels' Errors Resulted In The Defendants' Exclusion From Voir Dire And The Loss Of The Right To Participate In Jury Selection**
Tipton Claim V.F.1.d
Johnson Claim IV.A.5
Roane IV.C.

On direct appeal the Defendants asserted that their absence from portions of voir dire violated their rights under the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and their right to be present under Fed. R. Crim. P. 43(a). Because the Defendants did not raise a contemporaneous objection at trial, the Fourth Circuit reviewed for plain error. The Fourth Circuit concluded that in order to obtain relief on such a claim, the Defendants would be required to demonstrate "'actual prejudice, i.e., that their absences ' affected the outcome of the [trial],' or 'probably influenced the verdict[s]' against them either on the guilt or sentencing phases." United States v. Tipton, 90 F.3d 861, 875 (4th Cir. 1996)(qouting United States v. Olano, 507 U.S. 725, 734-35 (1993)). The court then concluded that the Defendants could not meet this

---

[4] Di Donato v. Santini, 283 Cal.Rptr. 751 (1991), review denied (Cal., Oct. 2, 1991); People v. Mitchell, 593 N.E.2d 882 (Ill App. 1992), aff'd in part and vacated in relevant part, 614 N.E.2d 1213 (Ill. 1993); People v. Irizarry, 165 App.Div.2d 715, 560 N.Y.S.2d 279 (1990) .

14

burden simply by suggesting that if they had been present, the panel would have been composed of different jurors.

> If no more is shown, for example, than that jurors 1, 3, and 5 would have been excluded, this could not suffice to show that their presence caused the finally unfavorable "outcome." Something more, for example, that jurors 1, 3, and 5 in the above hypothetical were demonstrably biased, surely must be shown, and even that might not, under all the circumstances, suffice.

Tipton, 90 F.3d at 876.

Johnson and Tipton assert that had they been present for the entire voir dire, they would have insisted that three of the seated jurors be excused or struck: (1) Frances Hodson, because her husband had killed their son then committed suicide; (2) Bonita Faircloth because her best friend's mother had recently been raped and murdered; and (3) Jerome Harrison, because his brother was a patrolman on the Richmond police force. On direct appeal, Roane suggested that he would have struck these same jurors, to which the Fourth Circuit responded that "even if this were accepted as fact, it would not suffice as a showing of actual prejudice. Nor would the stated bases for his challenges--relationships to law enforcement officers and to the victim of a rape-murder--suffice without more to tip the balance." Id. at 876 n. 7. The Defendants have not supplemented their § 2255 motions with any additional evidence that jurors Harrison, Hodson or Faircloth, or any of the other jurors that sat, had any demonstrable bias. Nor have the Defendants presented any compelling argument as to why the Court should doubt the jurors' sworn assurance that they could render a fair and impartial judgment. Cf. Williams v. Netherland, 181 F. Supp.2d 604, 613-15 (E.D. Va. ) (finding juror had implied bias based on her repeated failure to answers questions in an objectively truthful manner), aff'd, 39 Fed.Appx 830 (4th Cir. 2002). Hence, the suggestion that the Defendants

15

were prejudiced by the presence of above listed jurors is rejected.

Next, the Defendants suggest that the jurors might have drawn negative inferences regarding their absence from particular portions of the voir dire. See United States v. Camacho, 955 F.2d 950, 955-56 (4th Cir. 1992). Here, unlike Camacho, the Defendants were not absent for the entirety of voir dire. Each of the Defendants was personally and immediately present during some portions of the overall voir dire from whom all of the regular and alternate jurors were ultimately selected. Furthermore, since the Defendants were present during some portions of the voir dire, there is no reason the jurors would believe the Defendants absence from certain portions of voir dire was any different from a bench conference. Finally, unlike Camacho the burden is on the Defendants to demonstrate prejudice, which they have not done;[5] the Defendants failed to explain how the result of their trial might have been different if they had been present for all of voir dire. The above described claims will be dismissed.

4. **Defense Counsel Failed To Request Voir Dire Pursuant To Morgan v. Illinois, 504 U.S. 719 (1992).**
   Johnson Claim IV.A.3
   Tipton Claim V.F.1.b

Capital defendants have a "right to an inquiry sufficient to ensure--within the limits of reason and practicality--a jury none of whose members would 'unwaveringly impose death after a finding of guilt' and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." United States v. Tipton, 90 F.3d 861, 878 (4th Cir. 1996)(quoting Morgan

---

[5] Nor can the Defendants satisfy the prejudice component simply by alleging the lack of an objection forced their direct appeal of the issue to be subjected to a more stringent standard of review. See Smith v. Yago, 888 F.2d 399, 405 (6th Cir. 1989)(holding that "the district court applied an improper standard of prejudice by looking only to the outcome of Smith's direct appeal and not to the outcome of the entire criminal proceeding").

16

v. Illinois, 504 U.S. 719, 733-34 (1992)). Tipton and Johnson contend that counsel were deficient and they were prejudiced because counsel failed to ensure that every juror was specifically asked whether he or she would always impose a sentence of death if they found the defendant guilty of capital murder. As recounted by the Fourth Circuit on direct appeal, the record forecloses Tipton and Johnson's unsupported speculation that omissions by counsel resulted in a jury that might have contained individuals who would have been subject to removal under Morgan. Tipton, 90 F.3d at 878-79. "[T]he district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would always vote for the death penalty." Tipton, 90 F.3d at 879.

Undeterred, Tipton and Johnson argue that prejudice is self-evident because the jury sentenced them to death despite the fact that it found twelve mitigating factors as to Tipton and eighteen mitigating factors as to Johnson. To the contrary, the jury's verdicts demonstrate that its members were not automatically predisposed to impose the death penalty after finding a defendant guilty of a capital crime: the jury failed to recommend the death penalty for three of the six capital counts on which Tipton was convicted and for two of the three capital counts on which Roane was convicted. See Stamper v. Muncie, 944 F.2d 170, 177 (4th Cir. 1991)(concluding jury's verdict refuted suggestion that jury would automatically impose the death penalty). The Defendants cannot demonstrate any prejudice flowing from the purported omissions of counsel, hence their claims will be dismissed.

## V.    CLAIMS OF ERROR RELATED TO THE CCE CONVICTION

In order to convict a defendant of engaging in a continuing criminal enterprise the government must prove:

> (1)[the] defendant committed a felony violation of the federal drug
> laws; (2) such violation was part of a continuing series of violations

17

of the drug laws;  (3) the series of violations were undertaken by defendant in concert with five or more persons;  (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989).  As on appeal, the Defendants' challenges are focused on the second, third, and fourth elements.

> **A.** **Counsel Failed To Demand A Unanimity Instruction On The Predicate Acts That Constitute CCE Continuing Series Element**
> Johnson Claim IV.A.7.a          Defaulted Claim XII
> Tipton Claim V.F.1.g.4          Defaulted Claim V.K
> Roane                           Defaulted Claim VI

After the Defendants were convicted and sentenced, the Supreme Court held in Richardson v. United States, 526 U.S. 813 (1999), that in a prosecution for engaging in a CCE under 21 U.S.C. § 848, the jury "must agree unanimously about which three crimes the defendant committed," to satisfy the statutory requirement that the defendant's behavior is "part of a continuing series of violations" described in 21 U.S.C. § 848(c)(2). Id. at 818-24.  Although they had not requested such an instruction at trial, on appeal the Defendants asserted that the failure to give a special unanimity instruction constituted plain error.  United States v. Tipton, 90 F.3d 861, 884 (4th Cir. 1996).  The claim was rejected:

> the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element . . . . By its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations:  the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the § 848(e) murders as variously charged to them.  Assuming, without deciding, that unanimity on at least three predicate violations is required to convict, it is clear that unanimity occurred here as to each appellant so that no actual prejudice from the failure so to instruct could be shown.  See United States v. Olano, 507 U.S. 725, 734 (1993) (burden is on defendant to show actual prejudice from forfeited error).

18

Id. at 885.

In their present motions, the Defendants assert that they were deprived of the effective assistance of counsel by counsel's failure to demand a unanimity instruction on the predicate violation element. However, in order to prevail on such a claim, the Defendants must demonstrate that they were prejudiced by that omission. United States v. Stitt, 250 F.3d 878, 883 (4th Cir. 2001)(rejecting assertion that Richardson error is a structural defect), cert. denied,122 S. Ct. 153 (2002). And, as discussed above, the verdict forecloses the Defendants' assertion that they were prejudiced by counsels' omission. Accordingly, because the Defendants have not demonstrated any prejudice their claims will be dismissed.

## B.     Instructions On The Supervision Element

The Defendants' direct challenges to the jury instructions are defaulted. Therefore, the following discussion is primarily confined to assessing whether the failure to raise a particular challenge constitutes ineffective assistance of counsel sufficient to excuse the default.

### 1.     Counsel Was Deficient For Failing To Demand That The Court Instruct The Jury That The Government Must Prove The Element Of Management As Part Of The Element of Supervision For A CCE Organizer

| Johnson Claim II.C.4.e | Defaulted Claim II.C.1.c |
| Tipton Claim V.B.3.d.iv, V.F.1.g.3 | Defaulted Claim V.B.3.a.iv |

The Court instructed the jury that in order to convict the Defendants on the CCE Count, the Government must prove beyond a reasonable doubt that "the defendant was an organizer of these five or more other persons, or occupied a position of management or a supervisory position with respect to these five or more other persons." Tr. at 3209. The Court then explained that:

> The term "organizer" and the term "supervisory position" and "position of management" are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by

19

a person who occupies some position of management or supervision.

An organizer can be defined as a person who puts together a number of people engaged in separated activities and arranges them in their activities and in one essentially orderly operation or enterprise.

A supervisory position can be defined as one who manages or directs or oversees the activities of others.

Tr. at 3212.

The Defendants contend that the given instructions were insufficient because under the syntax of the statute, the jury must be instructed that even an organizer must exercise managerial authority over those whom he organizes. See United States v. Lindsey, 123 F.3d 978, 986 (7th Cir. 1997); United States v. Jerome, 942 F.3d 1328, 1332 (9th Cir. 1991)("We read the statutory language 'or any other position of management' to indicate that an 'organizer' must exercise some sort of managerial responsibility."). However, at the time of the Defendants' trial, the Fourth Circuit had concluded that "while proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, such proof is not required to show that a defendant acted as an organizer." United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989). Despite this authority, the Defendants were able to obtain the above described instruction which stated that the term organizer "impl[ied] the exercise of power or authority by a person who occupies some position of management or supervision." Tr. at 3212. Counsel was not deficient for obtaining an instruction more favorable than the law in the Fourth Circuit demanded. Accordingly, the above described claims will be dismissed.

### 2. Counsel Failed To Demand a Buyer-Seller Instruction

Johnson Claim II.C.4.e.
Tipton Claim V.B.3.d.iv; V.F.1.g.3

Defaulted II.C.1.a
Defaulted Claim V.B.3.a.(i)

The "mere showing of a buyer-seller relationship, without more, is not sufficient under 21

20

U.S.C. § 848" to demonstrate that a Defendant acted as a supervisor, manager, or organizer. United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1988). Thus, Johnson and Tipton fault counsel for not demanding an instruction which stated that individuals who had only buyer-seller relationships with them were not supervised or organized by them.

In United States v. Hall, 93 F.3d 126 (4th Cir. 1996), the court had instructed the jury that "the term organizer and the term supervisory position and position of management are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by a person who occupies some position of management or supervision." Id. at 130. Hall asserted that the jury should have further been told that "individuals who had only buyer-seller relationships with Hall were not supervised or organized by him." Id. In rejecting that assertion the Fourth Circuit concluded,

> [t]he instructions plainly allowed the jury to understand the supervisory requirement. The 'usual and ordinary' meaning of manager or supervisor does not include a mere buyer-seller relationship. Buyer-seller relationships are not characterized by 'the exercise of power or authority.' Jurors are competent to understand and apply ordinary concepts like organizer, supervisor and management.

Id. at 130-31. This Court gave instructions identical to the instructions approved by the Fourth Circuit in Hall. Tr. at 3212. Accordingly, Tipton and Johnson have failed to demonstrate that counsel were deficient or they were prejudiced by the lack of a buyer-seller instruction and their claims suggesting the same will be dismissed.

### 3. Counsel Was Deficient For Failing To Demand Additional Instructions On the Identity of the Five Supervisees

Johnson Claim II.C.4.g, IV.A.7.b
Tipton V.B.3.d.vi; V.F.1.g.1,

Defaulted Claim II.C.1.b.(i&ii)
Defaulted V.B.3.a.ii,V.B.3.a.iii

Tipton and Johnson assert that the prosecution presented the jury with numerous individuals

21

who as a matter of law could not count as supervisees. Therefore, Tipton and Johnson contend that counsel were deficient for failing to demand that the Court (1) instruct the jurors that certain of the named individuals could not count as supervisees, see United States v. Barona, 56 F.3d 1087, 1096-7 (9th Cir. 1995), and (2) instruct the jurors that they must unanimously agree on the identities of the five individuals supervised by each defendant, see United States v. Jerome, 942 F.2d 1331 (9th Cir. 1991)[6]. Tipton and Johnson's claims in this regard are meritless because (1) they erroneously assume that the given instructions permitted the jury to select people who could not qualify as supervisees; (2) contrary to Jerome's and Barona's fixation, the supervision element of the CCE statue is concerned with the number of supervisees rather than the identities of those individuals; and (3) they cannot demonstrate a reasonable probability that they each supervised less than five individuals.

First, Tipton and Johnson's demand for additional instructions, particularly the Barona instruction, rests on the flawed assumption that the given instructions would permit the jurors to choose as supervisees individuals who could not be supervisees. The given instructions did not permit the jurors to select as supervisees individuals who could not legally qualify as supervisees. If the evidence was insufficient to prove that any of the alleged individuals was in fact a supervisee, then reasonable counsel would assume that a jury following the Court's instructions would discard

---

[6] In Jerome, the government had referred in closing argument to individuals for whom defendant's organization/supervision would have been logically impossible--they were only "the suppliers of his suppliers" in the drug distribution chain. 942 F.2d at 1330. The Ninth Circuit concluded that because the government had presented the jury with a confusing array of individuals, some of whom could be counted as persons managed by a CCE defendant and some of whom, as a matter of law, could not be counted toward the supervision element, "the jurors had to be instructed that they must unanimously agree as to the identity of each of the five people Jerome organized, managed or supervised." Id. at 1331.

22

that individual from its count. See United States v. Griffin, 502 U.S. 46, 59 (1991)(concluding that lay juries can be presumed to have rejected factually unsupported grounds, but not legally inadequate ones such as, e.g., one that "fails to come within the statutory definition of the crime").[7] Nor can counsel be faulted for not demanding additional instructions on the possibility that the jury would disregard those instructions in favor of the prosecution's argument because the Court repeatedly instructed the jury that "your source as to the law is the Court", not the lawyers. Tr. at 887. See Tr. 3193-95; United States v. Tapia, 738 F.2d 18, 21 (1st Cir. 1984) (prosecutor's rendition of his version of controlling legal principles not prejudicial when "the judge made clear to the jury that it was the judge's description of the law--not that of either counsel--that was to control").

Second, Tipton and Johnson's assertion that counsel were not acting competently because they failed to demand relief pursuant to Barona and Jerome ignores the legal landscape at the time of Defendants' trial in February of 1993. See United States v. McNamara, 74 F.3d 514, 517 (4th Cir. 1996). Although Jerome had been decided by the date of the Defendants' trial, every other Court of Appeals that had addressed the issue had concluded that, "the requirement of action in concert with five or more other persons . . . aims the statute at enterprises of a certain size, so the identity of the individual supervisees is irrelevant."[8] Richardson v. United States, 526 U.S. 813, 829

---

[7] Tipton and Johnson contend that the Government presented the jury with individuals, who "could not as a matter of law be supervisees." However, their arguments as to the vast majority of these individuals rest on the premise that the evidence was insufficient to prove that the individual was a supervisee rather than that it was logically/legally impossible for the individual to be a supervisee.

[8] Indeed, the Fourth Circuit affirmed that view in this very case. On direct appeal the Defendants argued that, because the prosecution presented the jury with some individuals who could not be counted as supervisees, it was plain error not to instruct the jurors that they must unanimously agree as to the identity of each of the five people each Defendant organized, managed or supervised. See Roane's Reply Brief at 27(citing United States v. Jerome); see also

23

(1999)(Kennedy, J., dissenting)(citing cases). See United States v. Cole, 857 F.2d 971, 973 n.1 (4th Cir. 1988)(rejecting defendant's assertion that the jury was required to return a special interrogatory on the CCE count that listed the individuals which he supervised); cf. United States v. Chaklias, 971 F.2d 1206, 1215 (6th Cir. 1992)(concluding it was not plain error for court to fail to instruct jury as to identity of persons whom defendant could not have been considered to have been managing when court gave instructions very similar to those given here). Accordingly, counsel were not deficient for failing to demand the instructions demanded here by Tipton and Johnson.

Tipton and Johnson also assert that the propriety of a unanimity instruction regarding the supervisees must be reevaluated in light of the decision in Richardson v. United States, 526 U.S. 813 (1999), which held that unanimity is required for the three predicate crimes element. They are wrong. United States v. Stitt, 250 F.3d 878, 886 (4th Cir. 2001), cert. denied,122 S. Ct. 153 (2002). Even after Richardson, the "identity of individual supervisees is irrelevant." Id. Stitt teaches that Tipton and Johnson cannot demonstrate prejudice in conjunction with their challenges to the supervision element simply by suggesting that the jurors were confused about who could be counted as a supervisee.

> Precise details, like the identities of the underlings supervised by the defendant, are not essential elements of the CCE but rather "merely historical facts as to which the jurors could have disagreed without undermining their substantial agreement as to the ultimate and essential fact of whether the requisite size and level of control existed."

Stitt, 250 F.3d at 887(quoting United States v. Jackson, 879 F.2d 85, 89 (3d Cir. 1989)). Rather,

---

Roane's Opening Brief at 87(citing Jerome). The Fourth Circuit rejected that claim and concluded that the focus of "this element is on the size of the enterprise . . . rather than the identities of those who make up the requisite number." United States v. Tipton, 90 F.3d 861, 886 (4th Cir. 1996).

24

it is incumbent upon the Defendants to demonstrate that absent the purportedly improper conduct of counsel or the Government, there is a reasonable probability that the jury would not have concluded that each Defendant supervised or organized the requisite floor of five individuals. This they cannot do. See infra Section V.C. Hence, the above listed claims will be dismissed because the Defendants have demonstrated neither deficiency nor prejudice.

## C. Claims Pertaining To Proof Of The Supervision Element

As a prelude to their challenges pertaining to the sufficiency of evidence on the CCE count, the Defendants assert that the prosecution engaged in misconduct in the manner in which it proved the CCE count. The Defendants assert that these defaulted claims of misconduct are excused by the ineffective assistance of counsel. Specifically, the Defendants fault counsel (1) for not objecting to the witnesses' use of the terms "partner" and "worker" as violating Fed. R. Evid. 701 and (2) for not objecting to the testimony by numerous witnesses that was not based on a foundation of personal knowledge.

### 1. Counsel Failed To Object To Testimony That Purportedly Violated Fed. R. Evid. 602.

| | | |
|---|---|---|
| Johnson II.C.4.b. | Defaulted | II.C.3.a, V.I |
| Tipton V.B.3.d.(i) | Defaulted | V.B.3.c.(i), V.E.11 |

The Federal Rules of Evidence provide that "[a] witness may not testify about a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. However, the "threshold of Rule 602 is low", United States v. Hickey, 917 F.2d 901, 904 (6th Cir. 1990), thus, a Court may accept a witness's unelaborated assertion of personal knowledge "when other evidence indicates that the witness had a personal connection to the subject matter, there is nothing to suggest that the witness likely did not have or could not have had such knowledge, and its probable absence could be easily shown."

25

United States v. Davis, 792 F.2d 1299, 1304-05 (5th Cir. 1986). Furthermore, "[b]ecause most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences." United States v. Joy, 192 F.3d 761, 767 (7th Cir. 1999), cert. denied, 530 U.S. 1250 (2000).

Johnson and Tipton list numerous instances where they allege the prosecutor elicited or sought to elicit testimony from a witness that violated Fed. R. Evid. 602. The vast majority of these instances simply did not warrant an objection by counsel because there was a foundation for the testimony or the witness could likely provide one. For example, Johnson and Tipton assert that Denise Berkley testified without any basis of personal knowledge that each Defendant supported himself by selling cocaine. Tr. at 1674-75. However, Berkley previously had testified that she saw Johnson and Tipton selling drugs, Tr. at 1667-68, and "every day" for a couple of months the Defendants would give her crack 4 or 5 times for performing chores, Tr. at 1669-70. Additionally, in faulting counsel for failing to object to the admission of testimony, Tipton and Johnson fail to acknowledge that "the personal knowledge requirement of Rule 602 does not apply to statements of a co-conspirator admissible as non-hearsay under Rule 801(d)(2)(E)." United States v. Goins, 11 F.3d 441, 444 (4th Cir. 1993). Thus, Tipton and Johnson unreasonably chide counsel for not objecting each time one of their lackeys testified regarding the position or function of the Defendants and other individuals in their drug enterprise. The witnesses could readily supply the necessary foundation for testimony that the Defendants were "partners," or that certain individuals were "workers" because these witnesses were themselves members of the drug conspiracy and the record reflects that the conspirators regularly referred to each other in such terms. See Goins, 11 F.3d at 444; Davis, 792 F.2d at 1304; see also United States v. Cantu, 167 F.3d 198, 204 (5th Cir.

26

1999)(permitting witness to testify that individual "worked" for the defendant).

Only in the following few instances does the transcript suggest the propriety of an objection pursuant to Fed. R. Evid. 602 would be well-grounded in law:

> Stanley Smithers' testimony that the Defendants purchased drugs when they were not in his presence and his testimony that Keith Ross and Mousey Armstrong were selling cocaine which they obtained from Johnson; Papoose Davis' testimony that Nat Rozier used to bring people by to purchase crack; Priscilla a/k/a "Pepsi" Greene's testimony that Talley and Chiles used to drive the Defendants to New York to pick up drugs; and Pepsi Greene's testimony regarding the motivation for the Moody murder.

However, with the exception of Pepsi Greene's testimony regarding the Moody murder, the aforedescribed testimony was cumulative of other testimony and was not crucial to the case against the Defendants.

Tipton and Johnson correctly note that Pepsi Greene did not provide a full foundation for her testimony that Little Doug Moody and Peyton Maurice Johnson were killed because Tipton and Johnson "didn't want Maurice and Little Doug to work in that area." Tr. at 2553. However, it is one thing to demonstrate an objection would have been feasible, and quite another to demonstrate the objection would preclude the admission of the testimony which in turn would alter their convictions and sentences. The record reflects that Greene had intimate knowledge of the workings of the CCE and of the events preceding the Moody murder and thus could likely have provided a foundation for her statement. Additionally, as discussed infra at Section VII, there was ample evidence which linked the Moody murder to the plan of Tipton, Johnson and Roane to take over the drug traffic in the Newtowne area. Hence, Tipton and Johnson have not demonstrated that Pepsi Greene could not have supplied a foundation for the testimony described above, much less that if that single remark was excluded there is a reasonable probability their convictions and sentences would have been any

different. In summary, the majority of this ineffective assistance claim will be dismissed because counsel was not deficient and as to remaining instances where counsel failed to object for a lack of demonstrable prejudice.

### 2. Counsel Failed To Object To Testimony That Purportedly Violated Fed. R. Evid. 701

Johnson II.C.4.b            Defaulted II.C.3.a, V.I
Tipton V.B.3.d.i,           Defaulted V.B.3.c(i), V.E.13

Federal Rule of Evidence 701 limits lay testimony to those opinions or inferences which are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed. R. Evid. 701. A witness' testimony that he considered himself or others to work for the Defendants does not run afoul of either of the requirements of Fed. R. Evid. 701. See United States v. Freerman, 619 F.2d 1112, 1120 (6th Cir. 1980)(permitting witnesses to testify as to their perception of the defendants' relationship). The Advisory Committee's Notes explain that natural characteristics of the adversary system, such as cross-examination and closing argument will point up the weakness of empty assertions and exclusion should be reserved for those instances where the opinions constitute "meaningless assertions which amount to little more than choosing up sides." Fed. R. Evid. 701 advisory committee's notes. Here, counsel followed the foregoing admonition and used cross-examination and closing argument to suggest that the terms worker or employee did not imply the exercise of control by the Defendants. See e.g., Tr. at 2378-80, 2405-08; Tipton Closing Tr. at 3035 ("This worker-partner stuff is baloney. He wasn't their boss. He was their supplier."); Tr. at 3053-55; Johnson Closing Tr. at 3063-68. Moreover, counsel reasonably eschewed objecting to the use of the terms "partner" or "worker" because the witnesses were not offering a legal conclusion but were simply using the terms coined/employed by members of the conspiracy to describe the relationships

28

of different members of the drug conspiracy.[9]  Accordingly, counsel were not deficient for failing to object to the use of the term worker or partner by the witnesses.  The above described claims will be dismissed.

### 2(a).    The Prosecutors misled the jury by suggesting that they had not influenced witnesses to use terms "partner," "worker," and "employee."
Johnson Defaulted Claim V.J

Charles Townes, Hussone Jones, and Denise Berkley reiterated Antwoine Brooks' testimony that the terms worker and partner originated from the members of the enterprise, not from the prosecution, and swore that they had not been persuaded to use such terms by the prosecution. Despite this explicit testimony, Johnson asserts that counsel should have known that the prosecution encouraged the witnesses to use those terms by inserting the terms into their questioning of Jones and Townes before the grand jury.  In light of the trial testimony directly refuting such a claim of misconduct, counsel can hardly be deemed deficient for failing to raise such a claim based on the nebulous evidence offered by Johnson.  Accordingly, Johnson's assertions of cause to excuse his default are rejected.  Claim V.J is defaulted and will be dismissed.

### 3.    Counsel Were Deficient For Failing To Demonstrate That Each Defendant Supervised Less Than Five Individuals
Johnson II.C.4.c, IV.A.6
Tipton V.B.3.d.(ii), V.F.3.a, V.F.1.f
Roane IV.D

The Defendants contend that the Government's proof of the supervision was based entirely

---

[9] Antwoine Brooks, was the first witness to explain what the terms meant in conjunction with the CCE in Richmond. Tipton asked Brooks to be his "partner" in selling crack in Central Gardens.  Brooks explained that he and Tipton recruited Maurice Saunders and Hussone Jones as workers. The workers were fronted $300 crack. The workers were responsible for selling the crack and returning $200 to the partners. When asked on cross-examination if someone had suggested that he use the term "worker," Brooks responded, "[w]e just came up with it. It is true. They worked for us at the time." Tr. at 1085.

29

on misleading testimony. Specifically, the Defendants assert that the term worker simply meant the purchasing of drugs on credit and does not demonstrate a supervisory relationship. The Defendants' argument in this regard ignores the abundance of testimony that indicated that the partners exercised control or supervision over the workers in addition to just providing them drugs on credit. The Defendants' arrangement with their dealers went beyond simple fronting and constituted a consignment or franchise type of operation, with the Defendants retaining ultimate control over the drugs.[10] Brooks explained that people who were simply fronted drugs were not considered workers. Tr. at 1105. And, the workers consistently testified, not that they purchased drugs from the partners, but rather sold drugs "for" the partners. See, e.g., Tr. at 1542, 1682-83, 2324. Furthermore, Brooks indicated the consignment relationship between partners and workers was an exclusive relationship. Tr. at 1103-4; see United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989)(concluding the defendant exercised control over purchaser whose relationship was "analogous to an exclusive franchise dealership"). Maurice Saunders, a "worker", explained that he was not permitted to obtain crack from sources other than a partner. Tipton told Saunders, on more than one occasion, "You deal only with me if you value your life." Tr. at 1322. In any event the provision of drugs on consignment to workers was not the only evidence the government adduced to show that each Defendant supervised, organized or managed in excess of five individuals.

> The record reveals--certainly supports findings beyond a reasonable doubt--that these 'retailers,' in more than sufficient numbers as to each of the appellants, acted as 'workers' who were either or both organized, supervised, and managed by appellants while acting as principal 'partners' in a concerted drug trafficking enterprise, and that

---

[10] While such a consignment relationship is not sufficient in and of itself to establish supervision, it is probative of that issue. See United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989)(citing United States v. Possick, 849 F.2d 332 (8th Cir. 1988)).

> some of these people served variously not only as street dealers for the enterprise but as sometime chauffeurs, hideout providers, weapons-keepers, and general underlings for each of the appellants.

United States v. Tipton, 90 F.3d 861, 890 (4th Cir. 1996). No argument by counsel could have overcome the fact that each Defendant personally organized, managed or supervised in excess of five individuals.[11] Accordingly, the Defendants have failed to demonstrate that they were prejudiced by any purportedly deficient effort by counsel to challenge the supervision element. The above described claims will be dismissed.

### 4. Johnson Contends That Counsel Was Deficient For Failing To Introduce Evidence That Demonstrated That He Was Mentally Incapable Of Acting As An Organizer.
Johnson Claim-II.C.4.a

Johnson asserts that counsel should have adduced evidence of Johnson's low intelligence and learning disabilities to persuade the jury that he was mentally incapable of acting as a CCE organizer. Assuming such evidence would have been admissible in the guilt phase, it would have opened the door to a host of prejudicial evidence and its value to the defense was minimal. Regardless of what any social worker or psychologist may have opined, the record amply demonstrates Johnson was a partner in the CCE and independently directed the activities of his many underlings. Counsel was not deficient for reserving the evidence of Johnson's mental deficiencies, one of the few bolts of

---

[11] The transcript is simply littered with testimony supporting the supervision element. See e.g.: Tipton,Tr. at 1061, 1147, 1161, 1165-66, 1173, 1193, 1196-97, 1199, 1200, 1325, 1330, 1542, 1544, 1545-46, 1556, 1565, 1574-78, 1582, 1683-84, 1689-91, 1888, 2330, 2494, 2546-48, 2550, 2703, 2706-8 ; Johnson Tr. at 1162, 1582-83, 1683-84, 1690-92, 1705-8, 1711, 1720, 1888, 1891, 1895,1897, 1899, 1901, 1921, 2321-22, 2340, 2343, 2374, 2546-48, 2550, 2698, 2703, 2706, 2709, 2720; Roane Tr. at 1574, 1682, 1684, 1689, 1705-8, 1888-89, 1895, 1897, 2163, 2172, 2318, 2324, 2337, 2417, 2546, 2550, 2551, 2708. The foregoing evidence also demonstrates that lack of merit of the assertion that the evidence was insufficient to support the supervision element. See Johnson Claim II.C.2, Tipton Claim V.B.3.b.

31

mitigation, for use to maximum effect at the inevitable sentencing proceeding. Claim II.C.4.a will be dismissed.

D.    **Purported Use Of False Testimony To Prove The Existence Of The CCE**

The Defendants assert that the government knowingly elicited false testimony from Gregg Scott, Maurice Saunders, and Priscilla "Pepsi" Greene. If the Defendant shows that: (1) the testimony was false, see Boyd v. French, 147 F.3d 319, 329-30 (4th Cir. 1998); and (2) the prosecutor or other government official knew, or should have known, the testimony was false; see Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988); Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir. 1975)(noting that "a recantation, particularly by an accomplice should be received skeptically"), then the conviction must be set aside if (3) there "is any reasonable likelihood that false testimony could have affected the judgment of the jury." See United States v. Bagley, 473 U.S. 667, 679 (1985). However, a prosecutor's mere suspicion about testimony is not enough. See, e.g., Hoke v. Netherland, 92 F.3d 1350, 1360 (4th Cir. 1996)(citing Bank of Nova Scotia v. United States, 487 U.S. 250, 261 (1988) ("Although the Government may have doubts about the accuracy of certain aspects of [evidence], this is quite different from having knowledge of falsity.")). And, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Grilley, 814 F.2d 967, 971 (4th Cir. 1987). The Defendants have garnered affidavits and other documents which they assert demonstrate that Maurice Saunders, Gregg Scott and Pepsi Greene testified falsely.

1.    **Gregg Scott's Testimony Linking Tipton And His Codefendants To The New York Boyz Was False, And The Government Knew Or Should Have Known That It Was False**
Johnson Claim I.B
Tipton Claim V.C.1.b
Roane  Claim I.C.1

32

The Defendants assert that Scott lied when he: (1) stated that he grew up at 155th and Amsterdam in New York; (2) described the New York Boyz as a gang; (3) swore that the New York Boyz met to discuss retaliating against individuals who threatened other members of the gang; and (4) testified falsely when he said he received guns from "Light". The first two statements the Defendants describe as false amount to a difference of opinion, rather than a perjurious statement of a fact. See United States v. Ellis, 121 F.3d 908, 927-8 (4th Cir. 1997). Additionally, the fact that Tipton and Johnson were associated with a gang in New York/New Jersey area that supplied the Defendants with drugs is beyond dispute.[12] See United States v. Smith, 223 F.3d 554, 574 (7th Cir. 2000), cert. denied, 122 S. Ct. 2658 (2002). In short, the Defendants have failed to demonstrate Scott's first two statements were false, much less that the prosecution knew they were false.

The Defendants have submitted evidence that creates a question of fact as to whether Scott testified accurately about the retaliation meetings and receiving guns from "Light"[13]. However, the

---

[12] Anthony Howlen testified that both Tipton and Johnson were members of the gang known as the New York Boyz; Anthony Howlen and Richard Brice, a security guard, testified to a retaliatory gang attack over drug matters that involved both Johnson and Tipton; Officer Malone testified that a search of a residence Johnson shared with Scott, Lance Thomas and other purported New York Boyz, turned up guns and a substantial amount of crack; and multiple witnesses testified as to Tipton's comments regarding the New York Boyz, and his ability to call upon them for drugs and assistance. See also Tr. at 1072-73, 1684.

[13] At trial Scott was cross-examined regarding his statement that the New York Boyz would meet to discuss retaliating against any individual who threatened one of the members. Counsel asked Scott to describe those incidents where retaliation had taken place. Scott testified that "Smooth" was cut in a fight, after which Scott, Smooth, "Light," "Law," "L.A.", Lance Thomas, Cory Johnson, "Heavy D" and "Gary William" discussed retaliating against the guys who stabbed "Smooth" (Darryl Williams) and, thereafter, attacked the guys who had stabbed "Smooth." Tr. at 968-69. The Defendants have submitted affidavits, wherein "Light", "Hess", "L.A.", and "Smooth" swear that they were never involved in group discussions of retaliation. Tipton Reply Mem. App. at 1, 4, 5 and 6. "Smooth" further avers that he was never stabbed in his life. Id. at 6. Additionally, in his affidavit, "Light", a/k/a, Rufus Alvarez, a/k/a John Matthews, avers that he did not give any guns to Scott. Id. at 1 ¶ 10.

33

Defendants have offered no proof which suggests the prosecution knew, or should have known that these aspects of Scott's testimony were false. Cf. United States v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992)(concluding petitioner was entitled to hearing where he alleged that prosecution had reviewed files which indicated witness was testifying falsely). Instead, the Defendants speculate that the prosecution knew the testimony was false because it was beneficial to the prosecution. The Defendants then direct the Court to the affidavit of Government witness Sterling Hardy which they suggest demonstrates that the prosecutors pressured witnesses to testify falsely and fed the witnesses the testimony they wanted. The affidavit does not demonstrate that the prosecution knowingly elicited false testimony from Hardy, much less support the claim currently before the Court, that the prosecution knew Gregg Scott testified falsely.[14] Hardy's hopelessly muddy remark that the

---

[14] Indeed, Hardy's affidavit, when compared to his trial testimony, belies the suggestion that the prosecutors permitted or encouraged Hardy to testify falsely to any fact. In his affidavit, Hardy swears that,

> The prosecutors wanted me to say that Richard Tipton was present at the Southside shooting when Torrick Brown was killed. I told them Richard was not there, and I did not want to lye[sic]on him. The prosecutors also wanted me to say that Richard Tipton was present when Louis Johnson was killed. I again told them that Richard was not there.
> I was not clear on many of the particulars, [h]owever after Mr. Vick and Mr. Parcell clarified them I was able to testify the way they wanted me to. They told me to tell the truth and be honest, but if I did, I would not have testified the way they wanted me to.
> It was my understanding that Mr. Toby Vick instructed my attorney Mr. Everhart to have me say nine words. I did not know what nine words I needed to say until Mr. Everhart told me. He told me to say "James had problems in the Southside, go get Cory and Lance Thomas."

Johnson Reply Memo Ex. A, Aff. 8.
At trial Hardy did not provide any testimony placing Tipton at the scenes of the Torrick Brown and Johnson murders. Nor did Hardy testify that anyone had instructed him to get Johnson and Lance Thomas to help Roane kill Torrick Brown. Furthermore, at trial, Hardy

34

prosecutors "told me to tell the truth and be honest, but if I did, I would not have testified the way they wanted me to," does not warrant a different conclusion. Such "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice" to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing. See United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987). Simply put, the Defendants have failed to provide any factual anchor for the theory that prosecutors orchestrated false testimony from Scott. See Blackledge v. Allison, 431 U.S. 63, 80 (1976). The above listed claims will be dismissed.

> 2.      **Maurice Saunders' Testimony Linking Tipton to "Light" and Large Sums of Money Was False**
> Johnson Claim I.C
> Tipton ClaimV.C.1.a
> Roane  Claim I.C.2

The Defendants assert that Saunders testified falsely concerning his two trips to New York where he assisted in the purchase of cocaine and purported to see New York Boy, "Light." This claim flows from an apparent misstatement by the prosecutor in questioning Saunders about the date of the first of these two trips:

> Q.     I direct your attention to after Christmas of 1991; did you have an occasion to make a trip to New York with "Hess"?
> A.     Yes, I did.
> Q.     What was the purpose of that trip?
> A.     To bring back crack cocaine and some vials.
> Q.     Who were you getting the crack cocaine for?
> A.     For Rich[Tipton].

---

specifically and repeatedly disavowed that anyone had told him how he should testify. Tr. at 2193, 2202, 2243.

Tr. at 1330.[15] Saunders explained that he and Hess went to an apartment building at 155th and Amsterdam to purchase the crack.

Q.    Who did you see there?
A.    I saw a few other people. Pointed out to me was a guy named "E.B." and pointed out to me was a dude named – he said "Light," I think it was "Light". I'm not sure.

Tr. at 1331. Hess then went into the apartment with $18,000 and emerged with roughly a kilo of crack. Tr. at 1333.

About a month after the first trip, Saunders accompanied Tipton, with $40,000, to New York, back to the same apartment building to buy two and half kilograms of cocaine. Tr. at 1336-37.

Q.    Who did you see up there?
A.    I saw the same faces.
Q.    Did you see "Light" again?
A.    Yes. I did.

Tr. at 1336-37.

The Defendants insist that Saunders testified falsely when he said he observed "Light" on each of these trips. In support of this claim, the Defendants direct the Court to (1) an affidavit from "Light" and criminal records which demonstrate that "Light" was incarcerated from December 3, 1990 to April 2, 1996, the period wherein the drug buying trips purportedly occurred and (2) an affidavit from Hess wherein he swears that he never pointed out "Light" to Saunders and that they

---

[15] By his question, the prosecutor suggested to Saunders that the first buying trip took place after Christmas in 1991. However, the whole of Saunders' testimony indicates the trip actually took place in late November or early December of 1990 and the second trip took place in January or February of 1991. Specifically, Saunders stated that he went to New York at about the same time Tipton promoted him and after he moved in with Tipton. Tr. at 1321, 1325. The move and promotion occurred in late November, Tr. at 1324, or early December of 1990. Tr. at 1320-21. Indeed, Hussone Jones, Saunders' brother, swore the first trip took place in the fall of 1990, around Christmas. Tr. at 1550.

36

merely purchased clothes, rather than crack on their trip.     The Defendants have not adduced any evidence that the prosecution was, or should have been aware of "Light's" incarceration[16] at the time of the buying trips. See Horton v. United States, 983 F. Supp. 650, 654-55 (E.D. Va. 1997)(rejecting petitioner's assertion that, for Brady purposes, federal prosecutor is charged with knowledge of state prison records) or had obtained information from "Hess" regarding his version of the first trip to New York. Instead, the Defendants assert that the prosecution knew that Saunders' testimony in this regard was false because it had "orchestrated" Saunders' testimony to corroborate Scott's testimony, i.e., that the prosecution told Saunders to tell the jury that he had seen "Light" on his trips to New York. Neither this palpably incredible allegation nor the inconclusive affidavit from Sterling Hardy substantiate the charge that the prosecutors were aware of any inaccuracies with regard to Saunders' testimony. See McBride v. United States, 446 F.2d 229, 232 (10th Cir. 1971)(summarily dismissing § 2255 motion for failure to specifically advise the district court as to how he intended to factually prove his allegation of a knowing use of perjured testimony). The lack of proof on this score dooms the knowing use of false testimony claims. Accordingly, the above listed claims will be dismissed.

3.     **Counsel Were Deficient For Failing To Request An Investigator And For Failing To Conduct An Adequate Investigation**

Johnson Claim IV.A.1
Tipton Claim V.F.1.e
Roane IV.B.1

Tipton sought and was granted the appointment of an investigator to assist in the Richmond aspects of the case. However, Tipton now contends, along with Johnson and Roane, that counsel

---

[16] From December 3, 1990 until April 2, 1996, John Matthews a/k/a "Light" was detained, under the name of Rufus Alvarez, in Mercer County, New Jersey on a variety of drug related charges including conspiracy to distribute cocaine and maintaining a controlled dangerous substance production facility.

37

should have requested investigative assistance with respect to the New York and New Jersey aspects of the case. The Defendants suggest that had counsel investigated this aspect of the conspiracy they would have discovered evidence to impeach the Government's witnesses. For example, the Defendants note that several of the reputed New York Boyz dispute their membership in an "organized" gang that distributed drugs or engaged in planned retaliatory violence.

The Defendants' assertion that they were prejudiced by the failure to introduce the evidence discovered by habeas counsel disregards the negative repercussions of introducing such evidence and overstates their impeachment value to the case as a whole. First, the suggestion that the Defendants were prejudiced by counsel's failure to locate and call as witnesses, New York Boyz, Lamont Sabb ("L.A."), Larry Williams ("Law"), Darryl Williams ("Smooth"), Jorge Delao ("Hess or James Wilkerson") and John H. Matthews ("Light") ignores the fact that the <u>Strickland</u> prejudice inquiry also accounts for the damaging evidence that could be elicited from each such individual upon cross-examination. <u>See</u> <u>Whitley v. Bair</u>, 802 F.2d 1487, 1494-97 (4th Cir. 1986)(emphasizing court must evaluate the negative aspects of any purportedly omitted mitigating evidence in evaluating prejudice). For example, although some of the above individuals denied being a member of a formal group called the New York Boyz or being involved in group discussions of retaliation, they do not dispute the fact that they hung out with Tipton and Johnson, were involved in the sale of drugs, and pooled their money with Tipton and Johnson to purchase additional drugs. <u>See</u> Tr. 907. Nor does John Matthews a/k/a "Light" deny that, for a time, he was Tipton's regular source of crack. Tr. at 918.

Additional investigation might have yielded the record of "Light's" incarceration, a fact which might have been introduced without additional damage to the defense. However, Saunders

38

admitted that his identification of "Light" was questionable and impeachment on that matter hardly undermines confidence in their convictions.[17] For example the proffered testimony does not negate: Anthony Howlen's testimony that Johnson and Tipton were part of the New York Boyz and sliced him with razors when he interfered with their attempts to sell drugs in New Jersey; the repeated references to the New York Boyz during the course of the Richmond based activities; Tipton's threats to invoke the assistance of his New York associates if retaliatory actions were required; the appearance of New York Boyz Lance Thomas and Hess in Richmond; and the repeated trips by Tipton and Johnson from Richmond to New York to obtain drugs. Moreover, none of the proffered testimony undermines the voluminous evidence that during 1991 and 1992, the Defendants operated a continuing criminal enterprise in Richmond which distributed drugs through a series of workers and murdered numerous individuals in order to ensure the success of that enterprise. Therefore, the Defendants have failed to demonstrate they were prejudiced by counsel's purported omissions and their claims will be dismissed.[18]

_____

[17] On direct examination, Saunders acknowledged that his identification was based on the fact that someone "pointed out to me . . . a dude named – he said 'Light,' I think it was 'Light'. I'm not sure." Tr. 1331. On cross-examination, Saunders acknowledged that, on his trips to New York, he heard a lot of names he did not connect with faces. Further, Saunders admitted that it is entirely possible, on the second trip, that Tipton obtained cocaine from someone other than "Light". Tr. 1366-69.

[18] The Defendants assertions of deficiency on the part of trial counsel are equally unconvincing. None of the Defendants couple the deficient investigation claim with evidence that suggested to counsel that an independent investigation into New York/New Jersey aspects would be helpful to the defense. See Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992)(noting a reasonable defense does not "contemplate the employment of wholly unlimited time and resources"). While Johnson's trial counsel disparages the quality of his own pretrial preparation, see Johnson Memo Ex. 10, the tenor of the cross-examination reflects that counsel for Tipton and Johnson, whether from information provided by the government or their clients, had detailed knowledge of the activities and events in New York and New Jersey. See e.g. Tr. at 935-40, 967, 975-76. Additionally, Roane's counsel had little reason for allocating resources into

39

4. **Purported False Testimony By Priscilla "Pepsi" Greene[19]**

   a. **The Government allowed Greene to testify falsely regarding her drug dealing activities**

Johnson Claim V.N
Tipton V.C.3
Roane Claim I.C.3.a

The Defendants contend that the purported difference between Greene's testimony regarding her drug dealing activities at their trial and the subsequent trial of their codefendant, Lance Thomas, demonstrate that Greene lied at their trial. At the Defendants' trial, Greene testified as follows:

Q. How long were you involved with "O," "Whitey" and "J.R.," were you involved in the sale of cocaine with them?
A. I never sold cocaine.
Q. Did you help Curt Thorne when he sold cocaine?
A. Yes.

Tr. at 2546. At Lance Thomas' trial, Pepsi Greene, consistent with her prior testimony, explained that she merely helped Curt Thorne to sell drugs.

Q. Do you know how Curt Thorne supported himself?
A. Yes. Curt sold drugs for "Whitey" and "O."
Q. What kind of drugs did he sell for "Whitey" and "O"?
A. Crack, cook'-em-up.
Q. Did you help Curt in any way sell the drugs?
A. Yes.
Q. What did you do for him?
A. Well, people would come to the door, maybe sometimes I would pass the

---

investigating the events in New York and New Jersey, because it was undisputed that Roane was not involved with Johnson and Tipton when they were selling drugs in New York/New Jersey. See Strickland v. Washington, 466 U.S. 668, 691 (1984). In short, the Defendants fail to demonstrate that prior to trial facts known to counsel suggested that independent investigation into the New York/New Jersey activities would be beneficial. Hence, the foregoing claim of ineffective assistance cannot succeed because the Defendants have not demonstrated that counsel were deficient.

[19] Roane's contention that Pepsi Greene provided false testimony regarding his role in the murder of Doug Moody is addressed infra at Section VII.B.

40

cocaine to them and get the money.

Thomas Tr. at 421-22. The Defendants' claim of perjury is based on Greene's initial denial at their trial that she sold cocaine. In Greene's perception she did not sell cocaine, she merely helped her boyfriend, Curt Thorne, sell cocaine. See United States v. Derrick, 163 F.3d 779, 828-29(4th Cir. 1998)(emphasizing that an allegation of perjury as to a matter of perception fails absent conclusive proof that the witness testified falsely as to her belief, rather than that she was merely mistaken in her subjective assessment of the facts). Whatever the distinction in these activities, the claim lacks merit because the prosecution made sure the jury was not misled as to Greene's drug dealing activities. See United States v. Vaziri, 164 F.3d 556, 564 (10th Cir. 1999). Because the prosecution corrected Greene's misleading statements that she was not involved in selling drugs, and Greene did not otherwise testify falsely, the Defendants' claim of prosecutorial misconduct pertaining to this portion of Greene's testimony lacks merit and will be dismissed.

> **b.** **The prosecution permitted Greene to testify falsely regarding the primacy of Thomas' role in the enterprise/ the Government engaged in misconduct by presenting two different version's of Tipton's role in the conspiracy at Lance Thomas' trial**
> Johnson Claim V.O
> Tipton Claim V.C.3,V.D.3, V.D.4, V.E.16
> Roane Claim I.c.3.b

At their trial, Greene testified that Tipton, Johnson, and Roane were "partners." Tr. at 2547. Additionally, in response to the question if she knew from whom Sandra Reavis received drugs, Greene stated, "'O.' Because 'O' was the head man." Tr. at 2552. Greene was not questioned regarding Thomas' role in the drug enterprise.

At Thomas' trial, Priscilla Greene testified that, around November of 1991, through Curt Thorne's drug selling activities, she met Tipton, Johnson and Roane. Thomas Tr. at 423. About a

41

month or two after that, Greene met Lance Thomas. Thomas Tr. at 424. Greene then explained that Thorne, "Papoose" Davis and others were merely sellers, while "[t]hey was like the head people." Thomas Tr. at 424. The prosecutor then asked Greene to explain who she meant by they.

> Q. Who were the head people?
> A. "Whitey," "O," – Whitey," "O," "J.R.," "V" because "V" mostly, after he came down he mostly controlled the drugs."

Thomas Tr. at 424-25. She then explained that Thomas "controlled the drugs because he had it bagged up and gave it out to people to sell." Thomas Tr. at 425. Contrary to the Defendants' current suggestion, Greene did not contradict her prior testimony that the Defendants were "partners" nor did she contend that Thomas took over leadership of the organization and managed Tipton, Johnson and Roane. Rather, Greene's later testimony, merely reflects that in January and February of 1992, within the partnership, Thomas was primarily tasked with the duty of distributing the drugs to the workers. Assumption of this task by Thomas, left the other Defendants more time to pursue the other increasing needs of the enterprise such as obtaining cocaine, collecting drug debts, eliminating the competition, and killing suspected snitches.[20] Accordingly, the above listed claims will be dismissed because the Defendants have not demonstrated that the prosecution presented misleading, much less false testimony from Greene.

In his index of claims, Tipton alleged that Greene's purportedly false statements discussed above demonstrated that the Government had violated Brady v. Maryland, 373 U.S. 83 (1963). See Tipton Claims V.D.3, V.D.4. The three components to a Brady claim are (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it

---

[20] Nor is there any plausible suggestion that Greene's testimony at Thomas' trial is somehow exculpatory.

must have been suppressed by the government, whether willfully or inadvertently; and (3) it must be material. See Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 555 (4th Cir. 1999). "Suppressed evidence is 'information which had been known to the prosecution but unknown to the defense.'" Id. at 556(quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). Tipton fails to demonstrate that this evidence meets any of the above elements. The respective roles of Greene and Thomas in distributing drugs was common knowledge to the members of the drug conspiracy. Tr. at 1690, 2708; Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002), cert. denied, No. 02-7101, 2003 WL 99455 (U.S. Jan 13, 2003). Moreover, Greene's statements from the Thomas' trial do not diminish Greene's credibility or Tipton's guilt and do not create any possibility of a different result at either the guilt or sentencing phases. Accordingly, Claims V.D.3 and V.D.4 will be dismissed.

## VI.    ACTUAL INNOCENCE
        Tipton Claim V.I
        Johnson Claim III
        Roane VIII

"Claims of actual innocence, whether presented as freestanding ones, see Herrera v. Collins, 506 U.S. 390, 417, (1993), or merely as gateways to excuse a procedural default, see Schlup v. Delo, 513 U.S. 298, 317 (1995), should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998). In Schlup, the Supreme Court held that the proper test for whether a habeas petitioner has established that his case is "extraordinary" enough to fall into that "narrow class of cases," which "implicat[e] a fundamental miscarriage of justice," is whether that petitioner has shown that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schulp, 513 U.S. at 327. Thus, in order to have his procedurally defaulted claims reviewed in these proceedings, the Defendants must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id.; see also O'Dell v.

43

Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996).

This exacting standard requires the petitioner to bring to the federal habeas court probative, reliable, new evidence which establishes the claim of innocence. See Weeks v. Bowersox, 119 F.3d 1342, 1352 (8th Cir. 1997)(en banc). And, as explained by the Supreme Court:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup, 513 U.S. at 324. And, of course, the new evidence "not presented at trial" must also have been evidence that was excluded or not available at the time of trial. Id. at 327-28. The habeas court then must evaluate "petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Schlup, 513 U.S. at 328 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

The Defendants assert that they are actually innocent of being an organizer of a continuing criminal enterprise violation. Their new reliable evidence of innocence consists of the same frail evidence they offer to prove their claims that Government witnesses perjured themselves. The Defendants' new evidence and the host of arguments presented in the papers does nothing to dispel the overwhelming evidence documentary and testimonial evidence that they are guilty of running a CCE and of the CCE related murders for which they stand convicted. Accordingly, with the exception of Roane's claim that he is actually innocent of the murder of Doug Moody, the

44

Defendants' claims of actual innocence will be dismissed.

## VII.     THE MOODY MURDER

### A.     Evidence Of The Moody Murder At Trial

In early 1992, Ronita Hollman and Doug Moody were selling drugs in the Newtowne area for Peyton Maurice Johnson. Tr. at 1992-93. Tipton, Johnson, and Roane decided to take over the drug trade in Newtowne. Tr. at 1156-58, 2330. As part of this plan, Roane and Tipton approached Hollman to lure her away from her association with Peyton Johnson and to sell drugs for them. Tr. at 1962-63. Tipton told Hollman about his plans for the Newtowne area and informed her that they were willing to kill people to accomplish those plans. Tr. at 1963. Shortly, thereafter Tipton, Johnson, and Roane began to eliminate their competition in the Newtowne area.

On or about January 6, 1992, Cory Johnson and Roane left two handguns with their underling, Robert Papoose Davis. Tr. at 1894. On January 11 or January 12, 1992, Roane retrieved one of the guns from Davis. Tr. at 1895. Douglas Moody was murdered shortly after midnight on January 13, 1992. See Gov't Trial Exhibit 119. Moody had been shot once and stabbed repeatedly.

Shortly after midnight on January 13, 1992, Denise Berkley testified that she was smoking crack at a building on the corner of Clay and Harrison Streets. Tr. at 1694. Berkley heard a shot followed by the breaking of a window from the back of the building. Tr. at 1696. After disposing of her drugs, Berkley went outside and saw Roane repeatedly stabbing Doug Moody while Moody pleaded for Roane to stop. Tr. at 1697-98. Roane then approached Pepsi Greene, gave her the knife and told her to get rid of it. Tr. at 1699. Later that evening, Berkley went to a house on Moore Street, where Tipton was talking excitedly about how he had tried to shoot Moody at the house on Harrison Street.

Pepsi Greene testified that she was on the corner of Clay and Harrison Street when she heard two or three shots. Tr. at 2549. Pepsi then saw Roane and Tipton exit the house from where the shots were fired. Tr. at 2549. After five or ten minutes, Pepsi, accompanied by Roane, went to Curt Thorne's house, where Roane directed Pepsi to get him the big knife he stored there. Tr. at 2550-51, 2572-3. Later that night, Roane returned the knife, now covered with blood, to Pepsi and told her to dispose of it. Tr. at 2551-52.

Papoose Davis also testified that, on January 13, 1992, following the Moody murder, he heard Tipton and Roane conversing as follows, "Yeah, I got him, I got him . . . we can't stay out here this is hot anyway." Tr. at 1896. Davis lived within a block or two of the Moody murder. Tr. at 2560.

The next day, January 14, 1992, Berkley was present while Tipton, Johnson and Roane loaded firearms in a house on Norton Street. Tr. at 1705-6. Later that evening, Roane and Johnson retrieved the guns. Tr. at 1707-08. Roane asked Berkley if she had seen Peyton Maurice Johnson. Tr. at 1708-09. Berkley told him she had just seen him go around the corner. Tr. at 1709. Roane then located Peyton Maurice Johnson in a tavern. Within minutes of Roane departing the tavern, Cory Johnson entered the tavern and fatally shot Peyton Maurice Johnson with an automatic weapon.

**B.    Purported Perjury By Pepsi Greene**
Roane Claim I.c.3.c

Roane contends that Greene's testimony from Lance Thomas' trial demonstrates that she lied at his trial regarding the events of the Moody murder. However, Roane does not direct the Court to any testimony from the Thomas trial that contradicts her earlier testimony. Rather, Roane directs the Court to testimony from Thomas' trial where Greene admits, 15 minutes prior to the shooting of Doug Moody, she was in Curt Thorne's apartment, with Curt. Roane and Doug Moody arrived

46

and "they excused me out of the house." Thomas Tr. at 426. After the shots were fired, Curt ran out of the house followed by Roane. Thomas Tr. at 426. Roane fails to demonstrate how Greene's subsequent testimony contradicted her testimony at his trial; why Greene was on the corner at the time of the shooting was not explored at Roane's trial.[21] Accordingly, Roane's Claim I.c.3.c will be dismissed because he has failed to demonstrate that Greene testified falsely.

**C.     Actual Innocence And Ineffective Assistance Of Counsel In Conjunction With The Moody Murder**
        Roane Claim IV.B.2

Roane contends that his counsel failed to conduct an adequate investigation and defense into the murder of Doug Moody. For ease of analysis, this claim is best divided into three subparts: (a) counsel's failure to adduce available testimonial and documentary evidence to support an alibi; (b) counsel's failure to discover the testimony of an eyewitness who swears that Tipton and Johnson, not Roane, murdered Moody; and (c) general critiques of the quality of counsel's cross-examination and argument. While the trial record largely belies Roane's general critiques of counsel's performance, Roane has tendered evidence which offers substantial support to the first two aspects of this claim and his assertion that he is actually innocent of the murder of Doug Moody.

**1.     Counsel's Performance At Trial**

At trial, David Baugh, one of Roane's attorneys, effectively cross-examined both Berkley and Greene, developing the inconsistencies between their accounts and the accounts of other witnesses. Furthermore, Baugh called Gina Taylor, a neighbor who had attempted to aid the

---

[21] Roane suggests that Greene concealed this information at his trial because she wished to prevent the exposure of Thorne's possible role in the murder of Moody. That suggestion is belied by the record; Greene acknowledged that Thorne was present at the site of Moody's murder in her statement to the police and implicitly in her testimony at trial. See Tr. at 2570-80; Clerk's Record # 778 Ex. A & B.

47

wounded Moody. Taylor testified that she had seen the individual jabbing the prostrate Moody. Taylor testified that the assailant was only about five feet six inches tall and was definitely not Roane. Baugh followed up this description by presenting evidence that two hours before the murder, a person named Keith had come to Moody's mother's house looking for him, and that a week prior, Keith's friends, armed with machine guns, had kicked in the door of Moody's mother's residence while attempting to find Moody. Baugh then called Detective Dalton who stated the foregoing information initially had led the police to suspect Keith Barley, a small featured black juvenile male, as Moody's murderer. Roane's complaints about the quality of Baugh's courtroom performance, with exception of the lack of an objection to Pepsi Greene's statement regarding the motivations for the Moody murder, fail to point up any significant deficiency on the part of counsel.

Pepsi Greene stated Peyton Maurice Johnson and Doug Moody were killed because "O and Whitey and them didn't want Maurice and 'Little Doug' to work that area." Tr. at 2553. Assuming that counsel was deficient for failing to object to this statement on the ground that there was no foundation, Roane fails to demonstrate that an objection might have resulted in the exclusion of Greene's statement, much less altered the outcome of the proceedings. Although Rule 602 provides that a witness' testimony must be based on personal knowledge, it "does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible . . . only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." M.B.A.F.B. Federal Credit Union v. Cumis Insurance Society, Inc., 681 F.2d 930, 932 (4th Cir. 1982). Roane fails to direct the Court to any evidence that suggests Greene's challenged statement was based on speculation rather than the conversations of her coconspirators. Moreover, even if Roane could have excluded Greene's

48

statement he cannot demonstrate prejudice. As recited above, there was ample circumstantial evidence, from numerous witnesses which demonstrated that the Doug Moody murder and the Peyton Johnson murder (that occurred the following day) were part of the Defendants' plan to eliminate competition in the Newtowne area. Accordingly, Roane was not prejudiced by counsel's failure to object to the foregoing statement.

**2.    Failure To Present Alibi Evidence**

Roane contends that his counsel was deficient for failing to present evidence that he was at a hotel on the night of Doug Moody's murder. An attorney's failure to present available exculpatory evidence is ordinarily deficient, "unless some cogent tactical or other consideration justified it." Washington v. Murray, 952 F.2d 1472, 1476 (4th Cir. 1991). In his affidavit, Baugh acknowledges that,

> [p]rior to trial, James Roane told me that at the time Douglas Moody was murdered he was at a Richmond motel. I attempted to obtain records from the motel confirming that fact, but was unsuccessful. Mr. Roane identified a witness to that fact, whom I interviewed. She confirmed Mr. Roane's account but stated that she did not want to testify. I do not recall why I did not subpoena her or call her as a witness.

Roane Opening Memo. Ex. H at ¶ 3. Neither Baugh nor the record suggests any tactical reasons for not calling this unnamed woman who would have provided Roane with an alibi for the Moody murder. Additionally, Roane has produced hotel records from the Howard Johnson hotel at 3207 North Boulevard that support his claim that he was at a hotel at the time of the Moody murder. See Roane Reply Memo Ex. A. The records reflect that on January 2, 1992 and January 12, 1992, a Mr.

49

Chiles[22], rented a room and then checked out the following day. Id. The records are accompanied by a letter from the present management indicating they were readily available in 1992. Id.

Giving Roane the benefit of all favorable inferences, the record before the Court indicates that Roane's counsel performed deficiently when he failed to produce available testimonial and documentary evidence of an alibi. See Bruce v. United States, 256 F.3d 592, 599-600 (7th Cir. 2001); Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992). The Government fails to direct the Court to evidence to counter the suggestion that the failure to produce this evidence was attributable to bad judgment and an inadequate investigation. Furthermore, it is difficult to discount the effect of this alibi evidence in light of the disputed direct eyewitness testimony regarding the description of the individual who stabbed Moody to death. A plausible alibi might sufficiently bolster Gina Taylor's testimony that Roane was not the attacker to create a reasonable probability of a different result. See Bruce., 256 F.3d at 599-600 (remanding for evidentiary hearing to determine whether defendant prejudiced by counsel's failure to call alibi witness); Griffin, 970 F.2d at 1358. Accordingly, the Government's motion for summary judgment on Roane's claim that counsel was deficient in his investigation of the Moody murder will be denied.

### 3.    Demetris Rowe

Roane contends that the inadequacy of counsel's pretrial investigation is further evidenced by counsel's failure to locate and call as a witness Demetris Rowe. Roane has tendered an affidavit from Rowe, who swears that she witnessed the Moody murder from across the street on a porch.

---

[22] One of Roane's minions, who acted as a driver, was named Linwood Chiles. The registration card for January 2, 1992 is under the name of Linwood Chiles. The registration card and receipt for January 12, 1992, is under the name Larry Chiles. Both registration cards contain the same address for Mr. Chiles.

50

Specifically, Rowe avers that,

> At the time of the killing, I had been on the porch for several hours. Earlier, I had seen "Whitey" and "O" enter an apartment at the back of [the] house. A couple of hours later, I saw Doug Moody enter the same apartment. A few minutes later, I heard noises of a fight from the apartment, and saw Doug Moody come out of the apartment. Moody was bloody, and staggering. He was followed closely by "Whitey" and "O." Moody went into the yard, and then, the alley, where "Whitey' and "O" attacked him. A woman came out of the house next door and tried to help Moody.
>     I did not see James Roane, Sandra Reavis, Pepsi Greene or Denise Berkley at the scene of Douglas Moody's murder.

Roane Third Amend. Memo. Ex. A, Clerk Record #849.

The United States has not specifically addressed counsels' failure to discover Rowe's testimony in its motion for summary judgment. Hence, this Court may only summarily dispose of this claim without an evidentiary hearing only if, "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255 Raines v. United States, 423 F.2d 526, 531 (4th Cir. 1970). In this regard, Roane persuasively argues that Rowe's proffered testimony creates a reasonable probability of a different result. Similarly, the record does not conclusively refute Roane's suggestion that the failure to discover Rowe's testimony is attributable to an unreasonable failure[23] by counsel to canvass the vicinity of the Moody murder to locate eyewitnesses to the crime who could exculpate his client.

Roane further contends that Rowe's testimony demonstrates that he is actually innocent of the Moody murder. In order for Roane to have his defaulted claims excused, based on his assertion

---

[23] The information known to counsel justified such an investigation. Specifically, prior to trial, counsel had the testimony of an apparently disinterested eyewitness, Gina Taylor, who insisted that Roane did not commit the murder. Second, counsel had the detailed account of the alibi from his client. Third, counsel's initial investigation, corroborated the details of the account provided by Roane.

51

of actual innocence, Roane must eventually persuade the Court that "it is more likely than not that no reasonable juror would have convicted him" had Rowe testified in accordance with her affidavit. See O'Dell v. Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996). However, to survive summary judgment, Roane is required merely to produce evidence, which if credited, creates a material question of fact as to whether no reasonable juror would have convicted him. Certainly Rowe's belated testimony can be viewed with some scepticism and is not entirely supportive of the evidence of his innocence offered at trial.[24] Schulp, 513 U.S. at 332(noting the court may consider "the timing of the submission and the likely credibility of the affiants" in assessing probable reliability of new evidence). However, Roane's conviction turns primarily on a credibility contest between the testimony of Pepsi Greene and Denise Berkley and Gina Taylor. And, in this setting Pepsi Greene's credibility is bolstered by the statement she gave to the police prior to sustaining brain damage. See Schulp, 513 U.S. at 328 (actual innocence review includes evidence tenably claimed to have been wrongly excluded). Nevertheless, in light of the ample, but limited, evidence marshaled against Roane, Rowe's testimony, if credited, constitutes the sort of concrete eyewitness testimony deserving of a hearing. See Armine v. Bowersox, 128 F.3d 1222, 1227-28 (8th Cir. 1997). Accordingly, the foregoing claims will be dismissed in part. Roane is entitled to an evidentiary hearing on his assertions that he is actually innocent of the Moody murder and that he was denied effective assistance of counsel in defense of that crime.

## VIII. THE TALLEY MURDER

At approximately 8:00 a.m., on January 5, 1992, the police found Doug Talley stabbed to

---

[24] Rowe's proffered testimony is inconsistent with defense witness Gina Taylor's testimony that she saw a single small individual, who she did not recognize, stabbing Moody. Gina Taylor had had a romantic relationship Tipton.

52

death in his car, on the southside of Richmond.  On the floor in the rear of the car, the police found an army field jacket belonging to Johnny Lee Byrd.  In the jacket, the police found Byrd's glasses, some pills and a dull, rusty, six inch long knife(hereinafter the "Byrd knife").  The police tested the knife and although the presence of blood was detected, tests to determine the species of origin were inconclusive.  Clerk's Record #778, Ex C.  Additionally, police were unable to recover any "latent prints of value for identification purposes" from the Byrd knife.  Id.

At trial, Johnny Lee Byrd testified he had been selling drugs with Talley for a few days, when on January 3, 1992, Tipton asked to borrow his field jacket.  Later that day, Byrd and Talley went to Papoose Davis, on four or five occasions, to obtain drugs to sell.  Thereafter, Byrd smoked some of the drugs he obtained and spent the money he had earned from selling the drugs so that he was unable to repay Davis or the Defendants.

On January 4, 1992, Talley accompanied by Tipton, Roane and Johnson came looking for Byrd.  Byrd was hiding because he was unable to repay the Defendants for the drugs that had been provided to him.  When the Defendants could not find Byrd at his residence, Roane punched Talley in the eye.[25]  Then, Tipton, Roane, Johnson, and Talley drove off.

Hussone Jones testified that on January 4, 1992, Tipton told Jones to get in his car and follow Tipton and Roane who were going to ride with Doug Talley.  Between 3 a.m. and 5 a.m. on January 5, 1992, Talley stopped on a corner on the southside of Richmond .  Jones pulled in behind Talley's car, within a "car or two lengths." Tr. at 1571.  Roane and Tipton got out of Talley's car and then got back in.  Roane sat behind Talley and Tipton sat in the passenger seat.  Roane grabbed Talley around the neck and Tipton started stabbing Talley in the body.  "After awhile," Roane released

---

[25] A bruise over Talley's eye is clearly visible in the autopsy pictures.  Gov't Ex. 4-3.

53

Talley and got in the car with Jones.

At Roane's direction, Jones pulled up beside Talley's car. By this point, Tipton had gotten out of Talley's car and continued to stab Talley, who "was hanging out of the car." Tr. at 1575. Tipton's final stab stuck in Talley's head, and Tipton had to push his foot against the door to get the knife out. Tipton kicked the car door in an attempt to shut Talley's body in the car, but the door would not shut. Tipton, Roane and Jones, left the scene with Talley's body still hanging out of the door.

Tipton told Jones to take them to "Wildman's" house. After dropping off Roane, Tipton and Jones arrived at Wildman Stevens' house. Jones testified that Tipton gave Stevens the knife to wash off while he took a shower.

Tipton and Roane allege that the prosecution knew or should have known that Jones' description of the Talley murder and the events immediately following it were false. Additionally, Titpon contends that his counsel provided ineffective assistance in defending Tipton on the Talley murder.

### A.    Purportedly False Description of the Stabbing
Tipton Claim V.C.2,
Roane Claim I.c.4

Tipton and Roane assert the description of the stabbing was false because "the crime scene video and the location where Talley's car and body were discovered would have revealed that the position of the streetlights did not allow a clear view of the events. The most [Jones] could have seen were shadows and silhouettes." Tipton Opening Memo at 70. The record reflects that Jones was within ten to twenty feet of the stabbing. Although the crime scene video does not reveal any streetlights within fifty feet of where Talley's car and body were found, it offers persuasive evidence

54

that Jones would have been able to clearly witness the stabbing. In the video, filmed about four hours after the murder, the interior car light is on (Talley's head and arm prevented the door from closing). See Gov't'Trial Ex. 119. Thus, Jones would have had an illuminated view of the stabbing, after Roane exited Talley's car and subsequently when Talley or Tipton opened the driver's door.

Next, the Defendants cite Dr. Fierro's testimony for the proposition that Talley was either stabbed from behind by a right-handed assailant or stabbed from the front by a left-handed assailant. Asserting that he is right-handed, Tipton argues that Jones' account of the stabbing must have been false and the prosecutor must have known of its falsity. Contrary to the Defendants' suggestion, Dr. Fierro's testimony does not contradict, Hussone Jones' description of the mode of attack employed by Talley's murderer.

Q. You keep pointing to the right side of your neck. Were the majority of his injuries received from the right side of his body?
A. Yes.
Q. Would that indicate to you that his attacker was to his right, to his left, behind, or in front of him?
A. It either means that someone is behind him stabbing this way, or in front of him stabbing this way. (Witness indicating.)

Tr. at 2066. Dr. Fierro's testimony did not suggest that Tipton, who was initially sitting on the right of Talley, could not stab Talley on the right side of his body. Additionally, although Talley had 47 stab wounds to his right scalp and neck, the remainder of the wounds were distributed across his body and head.[26] Such a diffusion of wounds is consistent with Jones' description that, by the end of the stabbing, Talley had struggled partly out of the car and Tipton had left the car and continued to stab Talley from outside the vehicle. And, Jones' description of a stab wound penetrating the skull

---

[26] Talley had 11 stabs wounds on the front of his chest and neck, 14 stab wounds to his his face, 9 to his right upper back, and 3 stabs to his right wrist

55

was confirmed by the autopsy.

In addition to the autopsy, the minutiae of Jones' account were corroborated by the crime scene and the testimony of Charles Townes. Just as Jones described, Talley's car was parked near a corner, Talley was left hanging out of the door, and the car door bore a dent from where Tipton had attempted to kick the door shut. Furthermore, the police recovered Tipton's blood-smeared finger print from the door of Talley's car. Finally, Jones' account of the stabbing was confirmed by Charles Townes. Tipton told Townes that Jones was present while Tipton stabbed Doug Talley in the head, in Talley's car, on the southside of Richmond. The record conclusively refutes Tipton and Roane's assertions that Jones testified falsely regarding his viewing of the Talley murder or that the prosecution knew Jones testified falsely in that regard.

Next, Roane and Tipton allege that the prosecution knew that Jones testified falsely about Tipton giving the murder weapon to Wildman Stevens' to wash. The only admissible evidence they offer to support this is a vague affidavit wherein Stevens swears that "Richard never gave me a knife to wash. I have never seen Richard with a knife. I recalled Mr. Toby Vick asking a lot of questions." Tipton Reply Memo App. at 8. The United States has responded by submitting the affidavit of Toby Vick and contemporaneous notes of his interview with Stevens. Vick swears that "[t]here was no information other than that contained within my written notes that was given to me by Mr. Stevens which was germane to the issue. There was nothing of an exculpatory nature contained in Mr. Stevens' statement to me." Govt's Resp. Ex. B.[27]  Vick's notes do not indicate

---

[27] It is unclear when Vick interviewed Stevens. Jones initially failed to reveal his role in the Talley murder to the prosecution or the grand jury. Tr. at 1596-97, 1615, 1646. Until Jones revealed his role in the Talley murder, the record does not suggest the prosecution would have a reason to question Stevens about the night of the Talley murder.

56

Stevens was questioned or provided any information about a knife or the Talley murder. The record does not demonstrate any knowing use of false testimony by the United States. Moreover, in light of the overwhelming evidence that corroborated Jones' account of the Talley murder, there is no "reasonable likelihood" any testimony about events at Wildman's house "could have affected the judgment of the jury," with regard to the conviction of Roane and Tipton for the Talley murder. See United States v. Bagley, 473 U.S. 667, 679 (1985). Tipton's Claim V.C.3 and Roane's Claim I.c.4 will be dismissed.

B.    **The Prosecution Suppressed "Wildman" Stevens' Statement Regarding The Events At His Home Following The Talley Murder**
      Tipton Claim V.D.1
      Roane Claim I.b.

Roane and Tipton assert that the same facts which demonstrate that the prosecution knew Jones lied about the events at Stevens' house constitute a Brady violation. Specifically, Vick was obliged to inform the defense that Stevens had denied receiving a knife from Tipton. However, as described above, there is no evidence that Stevens actually conveyed such information to Vick. Accordingly the above listed claims will be dismissed because the prosecution had no exculpatory information from Stevens.

C.    **Counsel Failed To Adequately Defend Tipton On The Charge That He Murdered Talley**
      Tipton Claims V.F.1.h

In support of this claim, Tipton asserts that counsel (1) should have called Victoria Harris as an alibi witness, (2) should have called Wildman Stevens as a witness to refute Jones' testimony, (3) should have pointed out that it was too dark for Jones to have observed the stabbing, (4) should have performed independent testing on the knife found in Johnny Lee Byrd's jacket to determine whether it was the murder weapon, and (5) should have requested the appointment of a fingerprint

57

expert.

Conspicuously absent from these criticisms is any evidence from Tipton that he told his counsel that the foregoing avenues of investigation would have been fruitful.   See Lackey v. Johnson, 116 F.3d 439, 152 (5ᵗʰ Cir. 1997)(counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel).  For example, there is no evidence that Tipton told counsel that Victoria Harris could provide him with an alibi[28] or that Wildman Stevens would contradict Hussone Jones' description of the events following the Talley murder. Nevertheless, Tipton maintains that counsel's duty to conduct a reasonable investigation required him to seek out and interview Stevens.  This is not true.  Counsel had no reason to believe that it would be fruitful to interview Stevens when the Government's evidence indicated that Stevens was simply another CCE minion.  Tipton has not shown counsel was deficient for failing to interview or call Stevens and Harris as witnesses.   Additionally, because Talley's car was illuminated by the interior car light, counsel wisely eschewed contending that Jones' description of the stabbing was a fabrication.

Similarly, counsel had little reason to believe the independent forensic analysis urged here by Tipton would aid Tipton's defense to the Talley murder.[29]  For example, Tipton contends counsel

---

[28]   Tipton has failed to produce an affidavit or any other evidence to support his claim that Victoria Harris could provide an alibi.  See Fed. R. Civ. P. 56(e).

[29] At trial, defense counsel suggested through cross-examination and argument that the knife found in the pocket of Byrd's jacket was the murder weapon.  Counsel then called Detective Cox who testified that they had questioned Byrd in conjunction with the Talley murder and that Byrd had provided inconsistent statements regarding the identity of the person to whom he had supposedly lent his jacket.  And in closing argument, counsel for Roane and Tipton called to the jury's attention the similarity in the width of the knife recovered from Byrd's jacket and the stab wounds described by Dr. Fierro.

58

should have conducted an independent forensic and fingerprint analysis of the Byrd knife and the blood on that knife. Counsel's decision to forego independent forensic testing was entirely reasonable in light of his knowledge that pretrial testing was unable to ascertain the species of the blood on the knife and indicated that "no latent prints of value for identification purposes are present." Clerk's Record #778, Ex C; see Jones v. Murray, 947 F.2d 1106, 1112 (4th Cir. 1991)(concluding counsel reasonably relied on state experts in foregoing an investigation of mental health defenses).[30] Nevertheless, Tipton argues that even if the latent fingerprints were not sufficient to provide a positive match they might have been sufficient to eliminate him as the subject who left the fingerprints. Counsel reasonably eschewed this investigation -- no one suggested that Tipton had used the Byrd knife to murder Talley.[31] Thus, instead of wasting time and resources on an investigation that was unlikely to provide exculpatory information,[32] counsel chose to exploit the Government's failure to conduct the additional testing to undermine its proofs with respect to the

---

[30] Counsel had no reason to suspect the state employees who conducted the tests were incompetent or biased in the performance of their duties. The record indicates the testing was performed at a time when the police were still questioning Byrd as a suspect with regard to the Talley murder.

[31] Nor can Tipton demonstrate any prejudice flowing from the lack of an independent forensic examination of the Byrd knife . On May 3, 2000, the Court granted Tipton's request to have the knife examined by his expert. Thereafter, the Court forwarded the knife and other materials pertaining to the murder of Talley to Tipton's forensic expert, Herbert MacDonnell. MacDonnell's examination of the knife did not produce any new exculpatory information nor did it identify the species of the blood on the knife. See Clerk's Record # 822, Ex. 1. Instead, without explaining what tests he conducted, MacDonnell speculates that, perhaps, DNA testing might reveal the nature of the blood found on the knife blade.

[32] Counsel had good reason to believe that additional expert testimony would constrict the range of available defenses. Specifically, while counsel freely suggested to the jury that Byrd murdered Talley, counsel knew that Byrd had passed a lie detector test with regards to that murder. Tr. at 5. Additionally, the dull rusty knife recovered from Byrd's jacket is not entirely consistent with the "sharp blade" that had been used to kill Talley. Tr. at 2069(Dr. Fierro).

59

Talley murder. See Smith v. Stewart, 140 F.3d 1263, 1273 (9th Cir. 1998)(in rejecting ineffective assistance claim, court notes that counsel "was happier to have [missing witness] as an empty chair to which he could point, without facing the danger of refutation"). Thus, in his closing argument, counsel employed these omissions to great effect noting the prosecution's failure to tell the jury about the Byrd knife even though it was "obvious[]" from Dr. Fierro's testimony that the knife could have been the murder weapon. Tr. at 3041-42. Counsel then suggested that the prosecution had not performed any tests to determine if the Byrd knife was the murder weapon because such tests might be inconsistent with the prosecution's "Get Whitey" theory. Counsel made a similar inference about the failure of the police to determine whether the substance from which Tipton's fingerprint was lifted was in fact blood.

Undeterred, Tipton contends that counsel should have retained an expert to testify that Tipton's fingerprint recovered from the window of Talley's car could have been made prior to the Talley murder. Counsel was able to elicit testimony on this point from the prosecution's expert who admitted that he could not tell if the fingerprint recovered from Talley's car had been made in December or January. Such a brief jab at the prosecution's evidence was a sounder tact than prolonged expert testimony on the theoretical life span of fingerprints on glass or disputing the prosecution's assertion that the print found was superimposed in blood in light of the crime scene photos. Those photos reflect that Tipton's latent print was found superimposed in a reddish brown substance that looks identical to the blood that was smeared all over the crime scene. See Gov't Ex. 1-1 through 1-7. Tipton has not demonstrated that counsel was deficient in his investigation and presentation of a defense to the Talley murder. For these same reasons, Tipton's request to conduct additional discovery and testing regarding Byrd's jacket and/or Byrd's other personal items obtained

60

from the Talley car will be denied. See Clerk's Record 822. Moreover, in light of Tipton's bloody fingerprint at the crime scene, Jones' well-corroborated eyewitness account of the murder, and Tipton's confession of the murder to Charles Townes, Tipton has failed to demonstrate a reasonable probability that any further investigation by counsel would have altered the jury's findings. The above described claims will be dismissed.

D. **Counsel Was Deficient For Failing To Object To Incorrect Instructions Regarding The Enterprise Element Of the RICO Charges**
Tipton Claim V.F.1.g.2

Title 18 U.S.C. § 1959 penalizes certain violent crimes, such as the Talley murder, when they are committed for the purposes of gaining entrance to or maintaining or increasing one's position in "an enterprise engaged in racketeering activity." In order to secure a conviction under § 1959, "the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." United States v. Turkette, 452 U.S. 576, 583 (1981)(explaining the distinction between the two elements). When instructing the jury on the elements of a § 1959 offense, the Court twice misspoke, referring to racketeering activity when it should have said "an enterprise engaged in racketeering activity". Tr. at 3220. However, the instructions as a whole told the jury that it must find both the existence of an enterprise engaged in racketeering activity and the criminal acts that constitute the racketeering activity, see United States v. Tipton, 90 F.3d 861, 888 (4th Cir. 1996). Moreover, in light of the abundance of evidence demonstrating that the racketeering enterprise existed, Tipton has not explained, much less demonstrated, a reasonable probability that more accurate instructions would have resulted in his acquittal on the RICO counts. Accordingly, the above claim will be dismissed.

## IX. THE STONEY RUN MURDERS (Curt Thorne and Linwood Chiles)

## A.     Evidence At Trial

On February 19, 1992, at approximately 10:15 p.m., Curt Thorne, Linwood Chiles, Gwen Greene and Pepsi Greene were shot in Chiles' station wagon, on Stoney Run Road.[33] Pepsi Greene testified that she, Gwen, Thorne, Chiles and Johnson were driving when they pulled in "something like an alley." Tr. at 2558. A gray car pulled in behind them. Johnson told Chiles to place his head on the steering wheel, then Johnson put a gun to Chiles' head and shot him.

Gwen Greene testified that, immediately prior to being shot, Tipton called to her from outside the vehicle, she then saw Tipton wearing blue jeans and a brown jacket with a hood.[34] This description of Johnson's accomplice to the Stoney Run murder was confirmed by Walter Tuck, a passing motorist, who observed a medium complexioned black male, wearing a brown jacket, walking away from the murder scene.

Additionally, the Government's evidence indicated that Tipton's arrival at the murder scene in the gray vehicle was part of a plan he and Johnson had coordinated to provide a getaway car. Specifically, Valerie Butler testified that at 4:00 p.m., on February 19, 1992, Johnson borrowed her gray car and then called Tipton. Johnson then appeared at Nita Bracey's house around 7:30 p.m. with Curt Thorne. At 8:00 p.m., Johnson dropped Butler off at her home and told her he needed to

---

[33] Officer Cynthia Riley testified that she received a call to respond to the shooting at 10:36 p.m. Tr. at 2519. Walter Tuck testified that he saw a lady lying in the road with blood around her head and the radio announced the time as 10:17 p.m. Tr. at 2529-31.

[34] Tipton asserts that only a single gun, that was later recovered from Johnson, was used in the Stoney Run murders. Although the portions of the record cited by Tipton attribute some of the recovered bullets to a Glock later retrieved from Johnson, the ballistic evidence does not demonstrate whether all the bullet fragments recovered from the crime scene came from the Glock recovered from Johnson. In contrast, the possibility of a second shooter is suggested by Thorne's autopsy which reflected that he had been hit by bullets fired from two different directions.

62

keep her car because he wasn't finished with it. Johnson then picked up Curt Thorne and drove to an apartment on the Southside of Richmond where they waited for Chiles and the Greene sisters to arrive. When Chiles and the Greene sisters arrived, Johnson paged Tipton, who was driving around with Charles Townes, John Knight, and Thomas "Stoodie" Green.[35] Tr. at 1188. Upon receiving the page, Tipton called Johnson back and then got in the car and said "'C.O. just got all four of them'. Studie [Stoodie] said, 'Who?' He said, 'Linwood, Curt,' and then he had cut it short." Tr. at 1189. Townes and Knight then dropped Tipton and Stoodie Green off at an apartment in the Southside of Richmond and drove home. Townes and Knight arrived home at 9:45 p.m.[36] Meanwhile, Tipton had left the apartment and was driving to aid Johnson in eliminating Thorne, Chiles, and the Greene sisters.

### B.    Alleged Brady Violation
Tipton Claim V.D.2

In Claim V.D.2, Tipton contends that the Government suppressed, in violation of Brady, the exculpatory statements of his alibi witnesses to the Stoney Run murders. Specifically, Tipton contends that, when he was paged by Johnson, the Stoney Run murders already had occurred, hence, he went back to the car and told Knight, Stoodie Green, and Townes that Johnson had killed four people. "Knight and Green [in turn] told government agents that Tipton said that Johnson had killed four people." Tipton Reply Memo at 52. This Brady claim is flawed. Here, Tipton obviously knew the identities of the parties who had heard his comments following the page from Johnson and was

---

[35] Townes testified that Tipton was wearing blue jeans and a gray hooded sweatshirt. Except for the color of the sweatshirt, the clothing is consistent with what Gwen Greene stated Tipton was wearing on the night of the murder.

[36] Townes was very sure about the time, because Knight had to work the next day.

63

free to question them. Such facts foreclose any Brady claim because, "where exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990). "Certainly, then, information that is not merely available to the defendant but is actually known by the defendant would fall outside of the Brady rule." Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002), cert. denied, No. 02-7101, 2003 WL 99455 (U.S. Jan 13, 2003). Additionally, Tipton has not tendered evidence that demonstrates that Stoodie Green provided the police with any statement containing exculpatory information regarding the Stoney Run murders. Moreover, as discussed below in connection with the related ineffective assistance claim, Green and Knight's vague proffers utterly fail to counter the direct and circumstantial evidence that Tipton was an active participant in the Stoney Run murders. Tipton's Claim V.D.2 will be dismissed.

## C. Counsels' Failure To Call Knight And Green As Defense Witnesses
Tipton Claim V.F.1.i

In Claim V.F.1.i, Tipton blames his counsel, rather than the Government, for failing to adduce purportedly exculpatory evidence from Knight and Stoodie Green. Conspicuously absent from the record is any evidence from Tipton that he told counsel that Stoodie Green or Knight could exonerate him from involvement in the Stoney Run murders. "In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel." Lackey v. Johnson, 116 F.3d 439, 152 (5th Cir. 1997). Counsel reasonably concluded from Tipton's silence that neither Green nor Knight could provide exculpatory information. Moreover, as discussed below, Tipton has failed to demonstrate that Green or Knight could counter the compelling

64

evidence of his involvement in the Stoney Run murders.

Tipton has submitted an affidavit wherein Stoodie Green avers that,

> I was with Richard Tipton, Charles Townes, and John Knight on February 19, 1992, the night Linwood Chiles and Curt Thorne were killed. I remember Richard received a page from someone and using the telephone. Later that evening we hear it on the news.
> I know Richard Tipton did not commit that crime . . . .
> I never heard Richard Tipton talk about killing people.

Tipton Reply Memo Ex. 10. Strikingly absent from Green's affidavit is an indication that Green could provide Tipton with an alibi for the interval between roughly 9:30 and 10:17 p.m. when the Stoney Run murders occurred. In the absence of that information from Green, Green's general denial of Tipton's guilt has little probative value. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960-61 (4th Cir. 1996). Nor does the affidavit of Alfred Brown prove that Green could offer a convincing alibi for Tipton.[37] Tipton Reply Memo Ex. 11. Brown's affidavit consists entirely of inadmissible hearsay. See Greensboro Prof. Firefighters Ass'n v. Greensboro, 64 F.3d 962, 967 (4th Cir. 1995); Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251-2 (4th Cir. 1991).

Tipton fails to demonstrate that John Knight could have contributed any more to his defense

---

[37] In his affidavit Brown states,
> Greene told me that on the afternoon of February 19, 1992, he was riding with Richard Tipton, John Knight and Charles Townes. They were in south Richmond when Richard Tipton received a page from Cory Johnson. After using the telephone, Richard returned to the vehicle and stated "four people just got killed."
> He also said that he and Richard remained together, and later that night they watched the report of the murders on the news.

Tipton Reply Memo Ex. 11.

65

than Stoodie Green. Knight avers that,

> On February 19, 1992, I was in the company of Thomas Green, Charles Townes, [and] Richard Tipton in South Richmond when Richard received a page. I stopped the car to allow him to use the telephone. He returned to my car and said four people had gotten killed.
> Shortly after that I drove them to Hillside court where Richard and Stoodie got out at a house.
> I returned to Central Gardens with Charles Townes.
> I was questioned by police and I gave the above statement to a detective.

Tipton Reply Memo Ex. 9. Conspicuously absent from Knight's proffered testimony is any reference to time. Regardless of what Tipton may have said upon his return to the vehicle, the evidence convincingly demonstrates that the murders did not occur until after Tipton received the page.

Saunders' testimony placed the page at about 9:30 p.m. Tuck, the passing motorist, indicated the murders had taken place just before 10:17 p.m. John Knight has not proffered any testimony that suggests he could have testified to Tipton's whereabouts during the interval of time between 9:30 p.m and 10:17 p.m. Furthermore, the circumstantial evidence, as recounted above, strongly supports the Government's theory that during the interval roughly from 9:30 p.m. to 10:17 p.m., Tipton had retrieved Valerie Butler's gray car and was following Chiles' station wagon, so as to provide Johnson a means to flee the crime scene. The theory that Tipton had planned the Stoney Run murders was further supported by Tipton's comments to Johnson that he "moved too fast; it was not supposed to be done there." Tr. at 1349 (Saunders' Testimony). Sterling Hardy also presented evidence that indicated the murder of Chiles was to be a joint venture planned by Johnson and Tipton. While incarcerated Sterling Hardy told Lance Thomas that he was concerned that Chiles

might testify against them. Tr. 2191. Thomas responded, "not to worry about that, because what he did for Cory and Whitey, that they will take care of that for them." Tr. at 2191. Finally, Gwen Greene's compelling testimony placed Tipton at the scene of the murders. Tipton has demonstrated neither deficiency nor prejudice. Tipton's Claim V.F.1.i will be dismissed.

## X.   THE PROSECUTION KNOWINGLY PERMITTED JERRY GAITERS TO TESTIFY FALSELY REGARDING THE MURDERS OF LONG, ARMSTRONG, AND CARTER
Johnson Claim V.P
Tipton Claim V.C.4

Jerry Gaiters testified that he aided Johnson in murdering Dorothy Armstrong. Relying on testimony from Lance Thomas' trial, Johnson claims that Gaiters perjured himself regarding when he knew that Johnson intended to kill Armstrong. Thomas Tr. at 569. The facts surrounding this claim are as follows. At Johnson's trial, Gaiters testified that he was talking to Linwood Chiles when Johnson asked him for directions to Armstrong's brother's house, Bobby Long. Gaiters told Johnson that he would take him over there. Tipton then pulled up in a car with a young fellow and Johnson and Gaiters got in the car. They drove to 1212 West Moore Street and retrieved a bag of guns. After dropping off the young fellow, they drove to Bobby Long's house. Johnson sat in the back seat playing with a Glock pistol he had retrieved from 1212 West Moore Street. Gaiters stated that he was kind of nervous because Johnson's manner led him to believe that he might be shot in the head.

When they arrived at Bobby Long's house, Johnson told Gaiters, "I want you to get 'Mousey' to bring out the house[sic]. When I shoot the bitch in the as[s] I want you to run back to the car." Tr. at 2343-44. Gaiters went to the door and induced Bobby Long to open the door. At which point,

67

Johnson burst into the room and killed Armstrong, Carter and Long using a Glock pistol. [38]

At Lance Thomas' trial, Gaiters testified that he initially believed that Johnson simply wanted to talk to Armstrong. Thomas Tr. at 569. Counsel then asked Gaiters whether "[a]t some point on the way over there [you knew] what 'C.O.' was going to do didn't you?" Thomas Tr. at 569. To which Gaiters responded, "no." Thomas Tr. at 569. Johnson and Tipton contend that Gaiters' denial of foreknowledge of the Armstrong murder demonstrates that Gaiters lied at their trial and requires that their convictions be set aside. They are wrong.

First, at the Defendants' trial, Gaiters testified that during the car ride to Long's home there was no conversation regarding hurting or killing Armstrong. Tr. at 2367. And Gaiters stated that he only realized the purpose of the trip, "when we got over there" and "were near the house" but not beforehand. Tr. at 2415. Thus, Gaiters' testimony at Thomas' trial was consistent with his testimony at Johnson's trial, that he did not grasp that Johnson intended to shoot Armstrong until they approached Long's residence.

Second, even if the testimony could be deemed to be inconsistent, it would still fall short of demonstrating that Gaiters testified falsely, much less that the government knew that Gaiters was testifying falsely. See United States v. Grilley, 814 F.2d 967, 971 (4th Cir. 1987)("Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.") .

Third, even if Gaiters lied regarding the exact moment he became aware of the plan to murder Armstrong, there is no possibility that exposing such a lie to the jury would have altered

---

[38] Denise Berkley testified that Johnson wanted to kill Armstrong because Armstrong had welched on a drug debt.

68

Tipton's and Johnson's convictions and sentences. Defense counsel fully exposed Gaiters dissembling regarding his culpability for the murder of Dorothy Armstrong. See e.g., Tr. 2363-64, 2373-77, 2380-94. Exposing another misrepresentation of that ilk by Gaiters would not significantly diminish Gaiters' credibility regarding the roles Tipton and Johnson played in the murder of Armstrong, Long, and Carter. Cf. United States v. Hoyte, 51 F.3d 1239, 1243 (4th Cir. 1995)(discussing effect of cumulative impeachment evidence). Gaiters' testimony on that score was thoroughly confirmed by Charles Townes and the ballistics evidence. Charles Townes testified that immediately prior to the murders, Tipton and Johnson told him they were going to Church Hill to murder Armstrong. Subsequent to the murders, Tipton provided Townes with an account of the murders which largely corroborated Gaiters' testimony. And, the ballistics evidence corroborated Gaiters' account of the murder. Gaiters asserted that Johnson used a Glock pistol, retrieved from 1212 West Moore Street, to kill Dorothy Armstrong. The ballistic evidence reflected that the bullets that killed Dorothy Armstrong came from a Glock that was hidden at 1212 West Moore Street. Denise Berkley swore that Johnson was the only person who knew where the Glock was hidden. Claims V.P, and V.C.3 will be dismissed.

## XI. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Each Defendant received one or more sentences of death.[39] Johnson, Tipton, and Roane argue

---

[39] Ultimately, the jury recommended the death sentence for Johnson on all seven of the § 848(e) capital murders for which he had been convicted, those of Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson. The jury recommended the death sentence for Tipton on three of the capital murders, those of Talley, Chiles, and Thorne, of the six for which he had been convicted. The jury recommended the death sentence for Roane on one of the capital murders, that of Moody, of the three for which he had been convicted. A full description of the aggravating and mitigating factors found as to each defendant is stated at United States v. Tipton, 90 F.3d 861, 894-95 (4th Cir. 1996).

69

that if counsel had put forth a reasonable effort the result might have been different. The Court disagrees with the Defendants' critiques of counsel's performance and the suggestion that a different result was obtainable but for counsel errors. Counsel for each Defendant did an excellent job at sentencing. The sentences of death are not attributable to counsel's omissions, but to the absence of evidence or argument that could counter the Government's compelling case that death was the appropriate punishment for the each Defendant's brutal, remorseless behavior.

## A.     Purported Deficiencies By Roane's Counsel

The jury only sentenced Roane to death for his murder of Doug Moody. As a necessary predicate for that sentence, the Government was required to prove that Roane had committed the murder after substantial planning and premeditation. See 21 U.S.C. § 848(k)&(n)(8). Roane contends, in light of the centrality of this issue, counsel was deficient for failing to challenge the Government's proof of the issue at sentencing and for conceding in his closing arguments that the Government had proved the required aggravating factors.

### 1.     Counsel's Failure To Challenge Substantial Planning Aggravating Factor
Roane Claim IV.E.4

Counsel's concession of this issue was reasonable in light of the ample evidence that demonstrated substantial planning and his sentencing phase strategy of focusing the jury's attention on the humanity of this client rather than the inhumanity of his actions. In rejecting his challenge to the substantial planning factor on appeal, the Fourth Circuit aptly summarized the evidence on this point as follows:

> the jury had before it information that well before Moody's murder, a motive for it, to which Roane was privy with Tipton and Cory Johnson, had developed. Specifically, trial evidence showed that

70

> Moody and his superior, Peyton Johnson, a rival drug dealer, were thought by Tipton, Cory Johnson, and Roane to be standing in the way of their taking over the Newtowne drug market whose development·was Roane's special function. Evidence from the guilt phase revealed . . . that. Tipton and Johnson "and them didn't want Maurice [Peyton Johnson] and 'Little Doug' [Moody] to work in that area ... selling cocaine." From this and other information respecting the details of Moody's murder, the jury properly could find that the visit of Roane and Tipton to [the] apartment on the night of his murder was for the pre-planned, premeditated purpose of murdering him. It showed that they went there armed with the pistol used by · Tipton in wounding Moody although members of the enterprise did not as a matter of policy ordinarily carry weapons. It showed that Moody's initial wounding and eventual killing were in the pattern of the comparable enterprise-related, cold-blooded assassinations of Talley some ten days earlier and of Moody's superior, Peyton Johnson, the night after Moody was killed . . . . the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation by Roane. And on that issue the jury had ample information upon which to base its finding beyond a reasonable doubt that Moody's murder was "substantially planned and premeditated" by Roane in concert with Tipton.

United States v. Tipton, 90 F.3d 861, 896 (4th Cir. 1996). Despite this evidence and the jury's prior conclusion that he had murdered Moody as part of their drug dealing enterprise, Roane insists counsel should have argued at sentencing that the evidence did not demonstrate that he murdered Moody as a part of a turf battle. Counsel wisely eschewed such a doomed tact.

The best hope for Roane was to emphasize the evidence in mitigation rather than challenge the prosecution's solid case on the substantial planning aggravating factor. See Carter v. Johnson, 131 F.3d 452, 466 (5th Cir. 1997)(concluding it was reasonable for counsel to concede client's culpability in order to establish credibility with the jury); Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995)(concluding counsel reasonably conceded defendant's guilt on the kidnaping charge to retain credibility during the sentencing phase). Thus, at sentencing when the prosecution emphasized that

71

death was the appropriate sentence based on the numerous violent acts of the Defendants, counsel conceded the acts of the defendants were bad, but emphasized that during the sentencing the jury was "to determine whether or not there is something about their lives and individuality that should justify not killing them. We are not here to look at the acts again. We are here to look at the people." Tr. 3928. In light of the foregoing, counsel's failure to challenge the substantial planning aggravating factor and focus on the mitigating evidence was neither prejudicial or deficient. See Truesdale v. Moore, 142 F.3d 749, 754 (4th Cir. 1998); Pruett v. Thompson, 996 F.2d 1560, 1571 n. 9 (4th Cir. 1993). Claim IV.E.4 will be dismissed.

2.  **Purported Deficiencies In Investigating And Presenting Evidence Of Roane's Mental And Emotional Background**
    Roane Claim IV.E.1-2

Although counsel adduced evidence regarding Roane's severe poverty, organic brain damage, neglect and abuse, humiliation at the hands of his peers, exposure to community and family violence, learning disabilities, self-medication, and the system's failure to respond to these problems, in Claim IV.E.1, Roane vaguely complains counsel's presentation prevented the information from reaching the jury in a cogent form and omitted other critical evidence. Such charges are heavy with adjectives but light on facts and rely primarily on the affidavit of Dr. Lee Norton, who swears that the mitigation case presented by the defense was incomplete and failed to help the jury understand the mitigation evidence presented. Norton fails to support such criticism with the purported omitted mitigating evidence or with any new insights into the relevance of Roanes' experiences and deficits.

For example, Norton criticizes the quality of the investigation into Roane's background. However, the record demonstrates that counsel and his mitigation experts reviewed thousands of

72

pages of records and interviewed numerous witnesses in preparation for sentencing. At sentencing, Crystal Noakes, a social worker, described Roane's disturbing family background in great detail, including the fact that he had three uncles who were institutionalized, that his mother had been placed in foster care, and that his father left his mother and was convicted of robbery and murder. Despite these efforts, Roane contends that counsel was deficient for not reviewing the medical records, the school records, and the foster care records of Roane's mother; medical records and prison records of Roane's father; and the records documenting the mental illness of Roane's uncles.

The trial record reflects that counsel had uncovered the essential facts regarding these relatives. Additionally, Roane's mother refused to provide any information regarding her time in foster care and the Government has tendered evidence indicating that counsel actively pursued Roane's mother's medical and school records and his father's prison record. See Govt's Response at Ex. C; see also Tr. at 3723. With much on his plate, and his further inquiry into these areas stymied, counsel apparently concluded further investigation into the background of these relatives was not worth the time and effort. That decision appears to be entirely reasonable. "Just as counsel is not obliged to advance every available nonfrivolous argument, so counsel is not necessarily ineffective for failing to investigate every conceivable matter inquiry into which could be classified as nonfrivolous." Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992). Roane fails to overcome the "heavy measure of deference" that is accorded counsel's judgment not to pursue further investigations into these tangential matters. See Strickland v. Washington, 466 U.S. 668, 691 (1984). Additionally, Roane fails to demonstrate that the omitted records would have yielded any significant mitigating evidence, much less that counsel should have been aware of that fact.

Next, Roane charges that his counsel failed to elicit expert testimony that explained to the

73

jury the relevance of his self-medication, his relationship with his codefendants, his sexual abuse and his witnessing violence in his youth. The relevant impact of all these factors was addressed at sentencing. Dr. William Lordi testified that Roane suffered from brain damage and Attention Deficit Disorder which resulted in paranoia and other personality problems.[40] Dr. Lordi explained that people with Attention Deficit Disorder, like Roane, often self-medicate with drugs or alcohol and that Roane's criminal association with Tipton and Johnson was a natural consequence of Roane's mental disorders and his desire to create the family structure he never had.

Additionally, Dr. Lordi and Crystal Noakes documented and explained the high incident of trauma Roane had experienced growing up. Dr. Lordi and Noakes testified that Roane had been sexually abused by a family friend on a continuous basis from age four to six and that Roane's early antisocial behavior of setting fires was the result of such abuse. Noakes testified that Roane was traumatized by the death of 30 friends and relatives. Counsel made the obvious point that persons subjected to such persistent violence become desensitized to it. Roane criticizes counsel for "failing to make reference to the literature regarding the effects of exposure to violence on cognitive and emotional development," Roane Opening Memo. Ex. Aff. of Dr. Norton at ¶ 10, but fails to support that critique with citation to the literature or any specific proffer as to the content of that literature.

Having failed to demonstrate any omissions on the part of counsel's case in mitigation, Roane proceeds to challenge counsel's selection of witnesses. For example, Roane asserts that counsel should have called a more experienced expert than Crystal Noakes. The record does not suggest any reason why counsel's selection of Noakes was deficient. Indeed, counsel used Noakes'

---

[40] Dr. Semone confirmed Dr. Lordi's diagnosis and testified that Roane's spiral towards crime was entirely predictable and was not volitional or attributable to any moral weakness on Roane's part or the part of his family.

lack of criminal experience to emphasize Noakes' neutrality, noting that Roane's experts were not simply hired guns who regularly testified for defendants.[41]  Roane fails to demonstrate that the selection of Noakes was detrimental, much less that it was deficient.

Finally, in Claim IV.E.2, Roane contends counsel was deficient for failing to present testimony from members of Roane's family. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990)(noting that a claim that counsel was deficient for failing to call a witness must be accompanied by a specific proffer of the omitted witnesses' testimony). Roane's proof on this issue is limited to an affidavit from his mother, wherein she swears that she could have,

> described for the jury [Roane's] mental and emotional problems and our attempts to receive help for them.  I could have described the circumstances of James' upbringing, as well as his effort to obtain additional education.  I also would have told the jury that James is a human being, and that his family cares for him and begged the jury not to sentence him to death.

Roane Opening Memo Ex. Aff. Jeanette Roane at ¶ 4.  Counsel was able to elicit this sympathetic information from its expert witnesses, and those experts laid part of the blame for Roane's condition at the feet of his mother who they suggested was too overwhelmed by her seven children to provide adequate care for Roane.  Tr. at 3721, 3725, 3743-45, 3789-92.  As the deficiencies of Roane's mother played a prominent role in the defense theory of mitigation, it was reasonable for defense counsel to conclude that Jeanette Roane might undermine that theory by casting her actions in a more favorable light.  See Beaver v. Thompson, 93 F.3d 1186, 1196 (4th Cir. 1996)(concluding reliance on the credibility of reports and documents from disinterested parties rather than risk that

---

[41] Counsel selected Noakes after the mitigation expert originally engaged by the defense, Dr. Lee Norton, withdrew because the Court limited his hours.  The record reflects that Crystal Noakes, a specialist in assessing dysfunctional families, was recommended to counsel by the Governor's Commission on Mental Health and Retardation.

defendant's family members might be discredited or testify adversely to defendant's interests on cross-examination was reasonable trial strategy); Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991)(counsel reasonably eschewed calling father for fear he might downplay traumatic childhood of the defendant). Furthermore, counsel was able to convey to the jury that Roane's family loved and supported him without exposing Roane to the risk of placing family members on the witness stand. During her testimony, Crystal Noakes pointed out Roane's mother and other family members who were in the audience. And, Noakes concluded her testimony by telling the jury that Roane has a "very loving family, very loving attitude. They care about James." Tr. at 3796. In short, the record reflects that counsel reasonably eschewed presenting testimony that stood to do more harm than good. Roane's Claims IV.E.1-2 will be dismissed for failure to demonstrate deficiency or prejudice.

**B.    Counsels' Failure To Introduce Evidence Of The Conditions The Defendants Would Face In Prison**
Tipton V.F.2.b
Johnson IV.B.2,
Roane IV.E.3

Each of the Defendants fault counsel for not presenting evidence regarding the conditions they would face in prison. Even if such evidence were admissible, counsel reasonably chose to forego such tepid evidence in light its potential to expose them to damning evidence and argument from the prosecution. Defense attempts to suggest that the Defendants' confinement was sufficient punishment would permit the prosecution to introduce how the Defendants behaved while confined. Specifically, the Government indicated that both Roane and Tipton had a history of assaultive behavior while incarcerated. The Court had precluded the Government from introducing this evidence because the prosecution failed to include future dangerousness as an aggravating factor

76

in the death notice. Counsel for Roane had further reason to forego such evidence since he had introduced evidence that Roane preferred jail to his home. Additionally, a defense expert on prison conditions would provide the prosecution with another opportunity to remind the jury that Tipton, Johnson and Roane had a proven inclination to engineer murders from behind prison walls. See United State v. Johnson, 223 F.3d 665, 673-78 (7th Cir. 2000)(noting that it is nigh impossible to prevent inmates from transmitting lethal messages to individuals outside the prison), cert. denied, 122 S. Ct. 71 (2001). Finally, any evidence on the harshness of prison conditions would have permitted the prosecution to compare such conditions to the circumstances of the numerous victims of their crimes, particularly the incapacitated Greene sisters. Accordingly, counsel for the Defendants were not deficient for failing to introduce evidence of the Defendants' prison conditions.[42] Additionally, the Defendants cannot demonstrate prejudice because any mitigating benefit from such evidence was far outweighed by the harmful evidence and arguments that would have accompanied its introduction. See Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986)(emphasizing court must evaluate the negative aspects of any purportedly omitted mitigating evidence in evaluating prejudice). Accordingly, the above described claims will be dismissed.

### C. Tipton's Counsel Failed To Present An Adequate Case In Mitigation
Tipton Claim V.F.2.a

Tipton contends that counsel failed to present sufficient evidence of his dysfunctional family life and his tender side. The record refutes such a claim. Mitigation evidence on this score was presented by Tipton's cousin, Tina Wilkinson, Hans Selvog, a clinical psychologist, and Brenda

---

[42] The assertion by Johnson's trial counsel that the failure to introduce this evidence was not the result of strategic or tactical decisions does not alter the Court's conclusion that such an omission was not deficient.

Williams, a family friend. Wilkinson testified that Tipton grew up in a home in which his mother was regularly beaten, first by Tipton's father and later by his mother's live-in boyfriend; that Tipton's mother and her boyfriend were addicted to heroin and used the drug on a daily basis; that Tipton was present when his uncle committed suicide with a shotgun; that Tipton's mother used to punch him; and that Tipton learned to take care of himself because of his adverse upbringing.

Wilkinson's testimony of Tipton's disturbing upbringing was reinforced by Selvog, a clinical social worker who had interviewed Tipton and his relatives. Selvog described at length Charlene Tipton's (Tipton's mother) heroin addiction, including instances where she overdosed in front of Tipton and confined Tipton to the closet while she conducted all night drug parties. Selvog also related that Charlene would discipline Tipton by punching him in the face, and that Charlene was not attentive to Tipton's medical needs. Selvog testified that Tipton left his mother, but that his paternal grandmother, Ruby Tipton, refused to take him in. Thereafter, Tipton moved in with his father's girlfriend, Brenda Williams, in Richmond, Virginia. Tipton was happy to live with Williams but, recognizing that his presence was a financial burden to her, he told her he thought it was best if he moved on.

Brenda Williams then testified that while he lived with her, Tipton got a job, helped around the house and played with her children. Williams confirmed that Tipton left her home because he did not want to be a financial burden to her.

Based on the foregoing testimony, defense counsel argued, inter alia, that the following nonstatutory mitigating factors mitigated against a death sentence for Tipton:

Tipton was subjected to emotional and physical abuse and neglect as a child and was deprived of parental guidance that was needed; Tipton suffers from frontal lobe brain dysfunction that went untreated

78

> when he was a child; Tipton was introduced to addictive drugs and alcohol while still a child; Tipton grew up in an impoverished, violent and brutal environment, and was exposed to extreme violence as a child and throughout his life.

Tipton Opening Memo Ex. H. The jury agreed; 10 or 12 jury members found each of the foregoing factors mitigated against a sentence of death and refused to impose such a sentence on Tipton for the murders of Long, Armstrong, and Carter.

In his present claim, Tipton contends counsel was deficient for not calling his mother, grandmother and Victoria Harris. Tipton contends that had counsel called his mother and grandmother as witnesses they would have recounted his terrible childhood and begged for his life, while Harris would testify that Tipton lived with her for a time and she once saw him crying while reading a book about self-image. First, the decision not to call Tipton's mother, or maternal grandmother or Harris is reasonable because their testimony would have been cumulative of the evidence regarding Tipton's dysfunctional family and his sensitive side already heard by the jury. See Bacon v. Lee, 225 F.2d 470, 481-82 (4th Cir. 2000), cert. denied 532 U.S. 950 (2001). Second, Tipton has not supported his assertion that the omitted testimony was qualitatively superior to the presented mitigation evidence. See Neal v. Puckett, 239 F.3d 683, 694 (5th Cir. 2001)(noting court should consider "quality and volume" of omitted mitigating evidence)(citing Williams v. Taylor, 520 U.S. 362, 397-99 (2000)). For example, Tipton has not submitted affidavits from any of these individuals which demonstrate that they were willing to testify consistent with his allegations. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thirdly, the record suggests that the decision not to call Tipton's mother or Tipton's grandmother was reasonable because they may have tempered the description of Tipton's childhood and their absence would enforce the idea that Tipton had been

abandoned by his family. Selvog indicated that Charlene Tipton and Ruby Tipton(the paternal grandmother) were not cooperative in preparing Tipton's defense. And, Tipton's mother requested Wilkerson to "make me look good" when she testified. Tr. at 3445. Hence, the absence of testimony by Tipton's immediate family emphasized that Tipton had been "abandoned" by his family, Tr. at 3909, 3911, and permitted counsel to bring this point home to the jury by asking "[w]here was his mother . . . . When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she was not here." Tr. at 3917. In light of the foregoing, counsel was not deficient nor was Tipton prejudiced by the absence of the witnesses he urges here. Tipton's Claim V.F.2.a. will be dismissed.

D.    **Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test, And, In Fact, Was Below 77**

Johnson Claim IV.B.1, Claim XI

Federal law provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(l); 18 U.S.C. § 3596(c). The Supreme Court has indicated that "[t]o be classified as mentally retarded, a person generally must have an IQ of 70 or below." Penry v. Lynaugh, 492 U.S. 302, 308, n. 1 (1989)(citing American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation at 11 (H. Grossman ed. 1983)). In 1992, the association revised its classification to identify individuals with an IQ of 75 or below as presumptively retarded. See Tr. at 3690; Atkins v. Virginia, 122 S. Ct. 2242, 2245 n. 5 (2002).

In 1982, based on his performance on the WISC-R I.Q. test, Johnson was found to have an IQ of 88. See Exhibit 14, Johnson's Reply Memo. When he was retested in 1985, Johnson was found to have an IQ of 69-74. Id. Counsel recognized the critical import of evidence that would

80

demonstrate that Johnson was retarded. Therefore, in preparation for trial, on October 10, 1992, a defense expert, Dr. Cornell, administered a Wechsler Adult Intelligence Scale test ("WAIS test") to Johnson. Based on his performance on that test, Johnson was found to have an IQ of 77. Tr. at 3685.

Dr. Cornell was aware that if Johnson was found to have an IQ of 75 or lower, Johnson might be deemed mentally retarded and not eligible for the death penalty. Therefore, Dr. Cornell rechecked Johnson's scores, saw Johnson a second time, and consulted with colleagues in order to assure that Johnson's score of 77 was accurate. These efforts failed to reveal any evidence that undermined his conclusion that Johnson had an IQ of 77 and was not mentally retarded.

In Claim XI, Johnson contends his execution is barred because he is mentally retarded. In support of this claim, Johnson directs the Court to a paper published in 1996, subsequent to his trial, that states,

> Individuals appear to gain approximately 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

See Johnson Opening Memo Ex. 7, at 2, The Psychological Corporation, An Introduction to the Wechsler Adult Intelligence Scale, 3ed. (WAIS-III), Tulsksy, Phd.(1996)). In support of the foregoing proposition, the 1996 paper cites to two articles published in 1984 and 1987.[43] However, Dr. Cornell's testimony that he checked his finding and consulted colleagues before concluding that Johnson was not mentally retarded belies the suggestion that Dr. Cornell's analysis did not account

---

[43] Flynn, J.R., The Mean IQ of Americans: Massive Gains From 1932-1978, Psychological Bulletin 95, 29-31 (1984); Flynn, J.R., Massive IQ Gain in 14 Nations: What IQ Tests Really Measure, Psychological Bulletin 101, 171-191 (1988).

for possible variations in his testing instrument. Nor has Johnson tendered any testimony from Dr. Cornell expressing doubt about his prior conclusion that Johnson is not mentally retarded. Finally, in preparation for his § 2255 motion, Johnson was granted another full opportunity to demonstrate that he is mentally retarded. See Clerk's Record #700 A & B, 701. Thereafter, Johnson rejected the Court's invitation to submit any new evidence of his mental retardation. See Clerk's Record # 870-874. Hence, the record before the Court demonstrates that Johnson is not mentally retarded. Claim XI will be dismissed.

Undeterred by his own evidence that indicates he is not mentally retarded, in Claim IV.B.1, Johnson contends that counsel was deficient for failing to argue at sentencing that Johnson could not or at least should not be executed because Johnson was mentally retarded. Johnson contends that counsel was deficient for not realizing that Johnson's score on his latest WISC-R IQ test overstated his IQ. In support of this assertion, Johnson tenders an affidavit from trial counsel, who swears that he was not aware of any studies that suggested the IQ tests taken by Johnson may have over estimated Johnson's IQ. Johnson asserts that in light of his 1985 IQ test indicating he had an IQ of 69-74, and the 1992 test that showed Johnson was within a few points of being considered mentally retarded, counsel should not have relied on his expert's conclusion that Johnson was not retarded. Johnson asserts that counsel should have checked behind Dr. Cornell and discovered the studies that suggested the WAIS-R test inflated IQ scores and thereafter argued to the jury and the Court that Johnson was mentally retarded.

With regard to the competency of counsel's performance, the critical question here is whether, in light of the information described above, counsel's reliance on Dr. Cornell's evaluation of Johnson's IQ was reasonable. "[C]ounsel has a duty to make reasonable investigations or to make

82

a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. 668, 691 (1984). In this regard, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. Hence, where counsel is presented with a mental health report that refutes prior indications that his client had a potential mental health defense, counsel generally is not required to "second guess the contents of [the] report . . . . [and] spend valuable time pursuing what appeared to be an unfruitful line of investigation." See Wilson v. Greene, 155 F.3d 396, 403 (4th Cir. 1998)(rejecting inmate's claim that counsel should have pursued mental health defenses where psychological report indicated inmate was competent to stand trial and not suffering from a significant mental disease or defect at time of the crime). Thus, the courts have consistently upheld as reasonable defense counsel's decision to abandon a particular mental health defense where expert examination determines such a defense is unfeasible. See Pruett v. Thompson, 996 F.2d 1560, 1574 (4th Cir. 1993); Washington v. Murray, 952 F.2d 1472, 1482 (4th Cir. 1992)(concluding counsel was not deficient for failing to suspect that subsequent experts would disagree with the diagnosis provided by the defense expert prior to trial).

Johnson fails to direct the Court to any laxity that should have caused counsel to doubt Dr. Cornell's conclusion that Johnson was not mentally retarded. Indeed, the record demonstrates that Dr. Cornell reached that conclusion after a careful analysis and consultation with colleagues. In light of Dr. Cornell's stated diligence and the standard for competent performance recited above, counsel was not deficient for failing to discover any purported overestimate of Johnson's IQ.

Johnson also suggests that despite Dr. Cornell's conclusion that Johnson was not mentally retarded, counsel should have nevertheless argued to the jury that Johnson was mentally retarded.

83

Such a tactic fails to account for the loss of credibility that would flow from counsel arguing that his client was mentally retarded when his own expert disputed that conclusion. Instead, at sentencing, counsel conceded that Johnson was not mentally retarded but that the same lack of blameworthiness that had led Congress to preclude the execution of the mentally retarded, warranted a life sentence for Johnson. In this vein, counsel emphasized that Johnson missed the technical definition of mental retardation by a mere two points on his latest IQ evaluation and suffered from severe learning disabilities. Such a tactic was entirely reasonable. Johnson's Claim IV.B.1 will be dismissed.

## XII. INEFFECTIVE ASSISTANCE OF COUNSEL AS CAUSE EXCUSING PROCEDURAL DEFAULT OF PROSECUTORIAL MISCONDUCT CLAIMS
### Tipton V.B.3.d.v, V.F.1.j
### Johnson II.C.4.f, IV.A.8,

In the above listed claims, Tipton and Johnson generally fault counsel for failing to stop the purported onslaught of prosecutorial misconduct. In order to prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that: " (1) the prosecutor's remarks and conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Golding 168 F.3d 700, 702 (4th Cir. 1999)(internal quotations omitted). Here, Tipton and Johnson contend that both of the above components were satisfied because during the guilt phase the prosecutors vouched for their witnesses, suggested that a government witness had passed a polygraph test, introduced inadmissible evidence that the Defendants were threats to the lives of witnesses, improperly emphasized that Tipton and the other defendants did not testify, treated Tipton and the other Defendants as a group, and duped the trial court into believing witnesses were in the witness

protection program in order to deny the Defendants access to the witnesses.[44] Of course, the question here is not whether the prosecution engaged in misconduct, but whether that misconduct, either individually or collectively, was so egregious that counsel's failure to challenge the misconduct at trial or on appeal denied Tipton and Johnson the right to effective assistance of counsel. It is to that question that the Court now turns.

A.  **Counsel Failed To Object To The Testimony Of Several Cooperating Witnesses Whose Testimony Violated 18 U.S.C. § 201(c)(2).**
Tipton V.F.1.k.          Defaulted Tipton V.E.15
Johnson                  Defaulted Johnson V.M
Roane IV.F               Defaulted Roane I.d.[45]

These claims are grounded in the now vacated panel decision in United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), vacated on reh.'g en banc, 165 F.3d 1297, 1299 (10th Cir. 1999). Title 18 U.S.C. Section 201(c)(2) does not prohibit the United States from offering leniency in exchange for testimony, see United States v. Richardson, 195 F.3d 192, 196-97 (4th Cir. 1999), or "from acting in accordance with the long-standing practice and statutory authority to pay fees, expenses, and rewards to informants even when the payment is solely for testimony, so long as the payment is not for or because of any corruption of the truth of testimony." United States v. Anty, 203 F.3d 305, 311 (4th Cir. 2000). None of the Defendants have demonstrated that the United States

---

[44] The Defendants' claims that the prosecution engaged in misconduct by introducing testimony without foundation and otherwise engaged in misconduct with regards to the CCE charges were rejected supra at Section V.C and V.D . Tipton and Johnson also assert the prosecution engaged in the following misconduct at sentencing: the prosecution made unsupported argument regarding the conditions Johnson and Tipton would face in prison; the prosecution misled the jury into believing it had a duty to impose the death sentence; the prosecution argued that sentencing should be based on deterrence. The claims that the prosecution engaged in misconduct at sentencing are addressed infra at XII.C.4.

[45] Roane suggests that novelty rather than ineffective assistance of counsel excused his default.

85

offered a witness inducements "for or because of any corruption of the truth of [the] testimony." Id. Accordingly, the Defendants cannot demonstrate that counsel were deficient or that they were in any way prejudiced by the failure to raise the claim. The above described claims will be dismissed.

**B.    Purported Prosecutorial Misconduct With Regards To The Witness List**

Tipton Defaulted V.E.5.
Roane Defaulted I.a

Tipton and Roane assert that "the prosecution improperly duped the trial court into permitting it to withhold its witnesses' addresses because they ostensibly had been placed in the federal witness protection program when in fact they had not." Tipton's Index of claims at 15-16. This claim lacks a basis in fact. The record before the Court indicates that the prosecution clearly indicated on the witness list that some witnesses were actually in the "Witness Protection Program" while others were merely "in protective custody" or "in protection." Clerk's Record # 393 at 2; # 416. The Court's Order of January 5, 1993 recognized the distinction between witnesses in protective custody or protection and those formally in the Witness Protection Program. Clerk's Record # 397 at 1. The order did not direct the United States to provide defense counsel with any access to witnesses listed in the "Witness Protection Program" while the United States was required to make arrangements to permit defense counsel to meet with the witnesses "in protection" or "protective custody." Id. Nevertheless, the record indicates that the government provided defense counsel with an opportunity to speak with all witnesses in any protective status prior to trial. However, the majority of witnesses declined to speak with defense counsel. On appeal counsel claimed that the Court erred by failing to provide him with addresses of the witnesses in the Witness Protection Program or some other form of protection. The Fourth Circuit rejected that claim noting that "[a]ccess was ultimately

86

provided, and though appellants quarrel with its timing and its circumstances, they have offered nothing indicating that they were actually harmed by the delay." United States v. Tipton, 90 F.3d 861, 889 (4th Cir. 1996). Thus, counsel reasonably eschewed pressing the claim urged here by Roane and Tipton because the prosecution did not engage in any misconduct and they cannot demonstrate how they were harmed by the prosecution's conduct. Additionally, Roane and Tipton allege that this claim is not defaulted because the facts supporting this claim were not available at the time of his appeal. They fail to identify any recently discovered facts that support such an allegation of cause. Accordingly, the above described claims are defaulted and will be dismissed.

## C.    Purportedly Improper Comments By The Prosecution

Even when the prosecution makes inappropriate remarks, a defendant is not entitled to relief unless the offending remarks or conduct "prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995). The following factors are relevant to that inquiry:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters . . . . (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel . . . , and (6) whether curative instructions were given to the jury.

See United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)(internal quotations and citations omitted). "These factors are examined in the context of the entire trial, and no one factor is dispositive." Id. However, the prosecutorial misconduct claims are defaulted and Tipton and Johnson must demonstrate cause and prejudice to excuse their default. As the discussion below

87

reflects, while some of the prosecution's comments were improper, in no single instance (or collectively), do the aforedescribed factors so favor a finding of prejudice that counsel was deficient for failing to pursue the claim of prosecutorial misconduct.

1.    **The Prosecution Introduced Inadmissible Evidence Through Which They Vouched That The Defendants Were Threats To The Lives Of The Witnesses**
Tipton Defaulted    V.E.4.
Johnson Defaulted    V.B

Johnson and Tipton complain that the Government improperly elicited testimony from Johnny Byrd, Hussone Jones, Denise Berkley, Denis Moody, Valerie Butler, Robert Davis, Stanley Smithers and Montez McCoy regarding their protective custody status to suggest to the jury that the Defendants posed an ongoing threat to the lives of these witnesses. "The Government may appropriately introduce evidence of their witnesses' participation in the Witness Protection Program in order to counter any inference of improper motivation or bias and, under some circumstances, may present this evidence on direct examination in anticipation of a defense attack upon the witnesses' credibility." United States v. Melia, 691 F.2d 672, 675 (4th Cir. 1982). The key question on this score is whether the prosecution was not merely using such testimony to rebut, "the appearance of special treatment and improper motivation" but was unfairly exploiting the inference that fear of a particular defendant caused the witness to seek the state's protection. Id. at 675-6.

In the Defendants' opening statements and questions on cross-examination, defense counsel suggested that the Government's principal witnesses were testifying because they were simply "bounty hunters" seeking financial rewards and personal gain in exchange for their testimony. See, e.g., 837, 849-54. Thereafter, the Court refused the Government's request to allow its witnesses to testify as to their protective custody status, unless and until, the defense opened the door on cross-

88

examination. Thus, when the defense counsel elicited that the Government was paying Hussone Jones' rent, on redirect Jones explained that he was in danger and had been placed in the Witness Protection Program. Denise Berkley's testimony about which the Defendants currently complain followed a similar sequence of events.[46] Although Berkley and Jones mentioned concerns for their safety, the prosecution did not attempt in either case to capitalize on these comments.

However, with respect to Denis Moody, Valerie Butler, Robert Davis[47], Stanley Smithers, and Montez McCoy, the prosecution jumped the gun and on direct examination elicited testimony about their participation in the Witness Protection Program or about perceived threats to their safety. On direct examination, the prosecution asked Davis why he was testifying, to which he responded, "[m]y brother and sister got killed. And I felt I would be next." Tr. at 1906-7. On direct examination, Stanley Smithers explained that a state court had continued a show cause against him because he was currently in the Witness Protection Program. Tr. at 2099. On direct examination, eight year old Montez McCoy testified that the Marshals had moved his family to New York. Tr. at 2276. On direct examination, Valerie Butler explained that her children were not living with her because she was in the Witness Protection Program. Tr. at 2686. Although the above comments were technically improper and intentionally introduced, its potential for unfair prejudice was partly mitigated by the jury's understanding that the prosecution was countering the defense's repeated

---

[46] On cross-examination, the defense elicited from Denise Berkley that the United States had relocated her and paid the majority of her bills. Defense counsel further suggested by the tenor of his questioning that the promise of such support was made as an initial inducement to get Berkley to cooperate. On redirect, Berkley explained that she received support because she feared for her safety and had asked to be placed in the Witness Protection Program.

[47] On cross-examination, defense counsel did attempt to impeach Davis regarding the benefits he had received in exchange for his testimony. Tr. at 1933-34, 1952.

89

assertion that the witnesses were simply bounty hunters out for personal gain. See United States v. Young, 470 U.S. 1, 12-13, 17 (1985). Moreover, any impression that the Defendants posed a threat to the lives of the witnesses was not the result of the isolated comments cited above but the abundance of properly admitted evidence reflecting that Johnson and Tipton did not want to leave any untrustworthy witnesses to their crimes. For example, Montez McCoy's comment that he had been moved to New York can hardly been deemed to have unfairly prejudiced the defense in light of Butler's testimony regarding a three way phone call between Tipton, Johnson and Roane during which Tipton had told Roane and Johnson that they were dumb for not killing Montez McCoy and the other witnesses to the Torrick Brown murder. Roane then responded that he wanted to kill Martha McCoy and people were trying to locate her for that purpose. Tr. at 2728-29. Butler's testimony in this regard was corroborated by Hussone Jones who testified that he heard Tipton say that Roane "should go back and get the kids" because there "[c]ouldn't be a witness" if there were "[n]o survivors." Tr. at 1580. Similarly, the record reflected that Chiles and Talley were murdered in part to stop them from testifying. Sterling Hardy testified that, while in jail, he told Lance Thomas that he was worried that Linwood Chiles was going to testify "against everybody." Tr. at 2191. Thomas told Hardy not to worry because Tipton and Johnson would "take care of" Chiles. Tr. at 2191. And, Johnson told Charles Townes he killed Chiles because he thought Chiles was talking to the police. Tr. at 1191-92; see Tr. at 2707. The record also suggests that Talley was murdered because Tipton and Roane thought he was involved with the police. Tr. at 1566-67. In summary, it would be nigh impossible to demonstrate unfair prejudice from the brief references to the safety concerns of witnesses because the Defendants were on trial for murdering several potential witnesses. The record was replete with admissible evidence of their efforts to eliminate anyone who

posed a threat to the continued vitality of their drug enterprise and the defense invited many of the prosecution's closing comments by its repeated references to the witnesses as bounty hunters. Tipton and Johnson have not demonstrated that counsel were or that they were prejudiced by the failure to pursue the issue at trial or on appeal. The above listed claims will be dismissed.

2. **The Prosecutors Suggested That A Government Witness Had Passed A Polygraph Test**

Johnson Defaulted V.F.
Tipton Defaulted V.E.8

On redirect examination of Jerry Gaiters, the prosecutor asked Gaiters if he fully cooperated with the police with respect to the murder of Katrina Rozier and did everything that was requested of him, "including taking a test." Tr. at 2428. Gaiters responded yes to each of these questions. Id. Counsel objected and moved for a mistrial. Id. The Court sustained the objection but denied the motion for a mistrial.

The Government concedes, as it must, that the reference to the polygraph was deliberate and improper. However, counsel reasonably eschewed requesting a specific curative instruction since such an instruction could likely draw more attention to Gaiters' ambiguous remark. Nor does this single reference to a "test," pertaining to the uncharged criminal conduct of the murder of Rozier, provide counsel with a strong claim for relief. See United States v. Tedder, 801 F.2d 1437, 1445 (4th Cir. 1986)(rejecting request for mistrial because brevity of polygraph remark without reference to results of test and witness' lengthy examination mitigated potential for prejudice). Hence, appellate counsel's failure to raise the issue on appeal was not deficient. See Plath v. Moore, 130 F.3d 595, 600-01 (4th Cir. 1997)(concluding petitioner could not demonstrate prejudice flowing from counsel's failure to object to brief reference to polygraph exam where results of exam were not mentioned and jury had ample opportunity to assess the witness' credibility); see also Arnold v. Evatt, 113 F.3d

91

1352, 1363 (4th Cir. 1997). Accordingly, the above described claims will be dismissed.

3. **Purported Improper Remarks By the Prosecution During The Guilt Phase Arguments**

a. **Counsel were deficient for failing to object to prosecutor's improper closing arguments regarding the supervision element**

Johnson II.C.4.d        Defaulted II.C.3.b
Tipton V.B.3.d.(iii)    Defaulted V.B.3.c.(ii)

After recapping the Government's evidence on the continuing series element, the prosecutor went on to the third and fourth elements[48] where he stated:

> The next thing we must have proven to you in order to find them guilty of a CCE is that it was undertaken with five or more people acting in conjunction. And, in deciding this remind yourself of the testimony of Gregg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. You had Denise Berkley, Priscilla Greene, Curt Thorne, Linwood Chiles, Jerry Gaiters, Sterling Hardy, "Papoose" Davis, Hussone Jones, Charles Townes, "Man Man," Maurice Saunders, Antwoine Brooks. You had the people from Charles City that were testified about. You had Pam Williams, Charlotte Moore, Greg Noble, Sam Taylor, and a number of others you have heard testimony

---

[48] In order to convict a defendant of engaging in a continuing criminal enterprise the Government must prove:
(1) defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.
United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989).

92

about.[49]

So that aspect of the CCE is also very clearly proven in this case. That is not an issue.

What is an issue -- let me back up as to the five or more people. You need not find that everyone of these people charged with the CCE, and charged with the CCE are "Whitey," "C.O." and James Roane, you need not find that each and everyone one of these people supervised five or more persons themselves. You need only find as a group, there were five or more people involved in the distribution of cocaine, [hereinafter the **first comment**] just here in the City of Richmond.

But what will be an issue and what you do need to determine in order to determine that indeed a CCE was operated by these people, Continuing Criminal Enterprise was operated by these people, is whether "Whitey," "C.O.," and "J.R." occupied a position of organizer or supervisor. And I suggest to you in that regard, the testimony is also clear and unequivocal. They came down with their source of supply from New York, their source of cocaine, and they orchestrated, organized the people we have already mentioned to you in a distribution outlet, a distribution network. Each and every witness who took that stand testified remarkably consistently concerning the relationship of one with another; that "J.R.," "O," and "Whitey," "V" were partners or bosses; that they were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of Richmond. That's all that is required by the law. [the **second comment**] It is not required by the law, as will be argued, I suggest, that they need to provide explicit directions in and orders to each and every one of the people who sold cocaine for them. Although there has been testimony that indeed they supplied directions and orders to each and everyone of these people, that is not necessary for you to find them guilty of operating a Continuing Criminal Enterprise. The language is clear there. All you need to find is that they organized people. And indeed the evidence is clear and unequivocal that they organized a number of people here in the City of Richmond to sell drugs.

---

[49] Johnson and Tipton claim that as a matter of law none of the listed individuals were capable of being a CCE supervisee. As discussed in Section V, the Defendants cannot demonstrate any prejudice on this issue because the jury was properly instructed on the supervision element and there was an abundance of evidence supporting the conclusion that Berkley, Thorne, Gaiters, Chiles, Davis, Jones, Townes, Saunders and numerous others were supervisees.

93

Tr. at 2983-86. The Tipton and Johnson argue that the prosecutor's statements misstated the law and encouraged the jury to convict the Defendants without proof that each Defendant acted as a supervisor or organizer with respect to five or more persons. Additionally, Tipton and Johnson assert that counsel should have objected to the following argument in rebuttal which they contend was inappropriate because the prosecutor sought to avoid the issue of supervision by focusing on inflammatory issues and suggesting that because the case involved drug distribution the jury should convict the Defendants.

> My colleagues have told you and told you and told you how there is no organization here. There is no management. There is no supervision. They say all those things have to be done. It is not true. [the **third comment**] Judge Spencer will tell you what the law is and I will suggest to you the law is that it only requires a person, to organize, to supervise or to supervise five or more people in a criminal activity. Mr. Cooley's little cute WonderBread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. Because we are talking about illegal crack cocaine. We are talking about killings. And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy to distribute crack cocaine and to make money. [the **fourth comment**] It is not about the legal bread business or Safeway. It is a good analogy, but it does not make any difference. We are talking about apples and oranges. We are talking about a criminal enterprise and a criminal nature. He is talking about a legitimate business. [the **fifth comment**]

Tr. at 3187-88.

Taken in context, the second and third highlighted comments do not mislead the jury as to the supervision element. Rather, these comments simply remind the jury that the supervision element is disjunctive and the Government satisfies the element by demonstrating that the Defendant organized or managed or supervised five or more persons. The fourth and fifth comments were a fair response by the prosecutor to counsel's analogy that there was no supervision because their

94

relationship to the workers was analogous to the Wonderbread-man who simply delivers his bread to the grocery store. Moreover, "the question we have to ask is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." Bussard v. Lockhart, 32 F.3d 322, 324 (8ᵗʰ Cir. 1994 ). see United States v. Young, 470 U.S. 1, 13 (1985). Here, counsel reasonably eschewed objecting to the second through fifth comments because they were sufficiently within the bounds of fair argument.

Although the first highlighted comment is not an accurate statement of the law, Tipton and Johnson were not prejudiced by the absence of an objection. As noted previously, the Court instructed the jury that the supervision element required the Government to prove that each defendant individually supervised or organized five individuals. Tr. at 3211-12. The Court repeatedly instructed the jury that "your source as to the law is the Court,"not the lawyers. Tr. at 887, see also Tr. 758-59, 972, 3193-95, And, the prosecutor reiterated that instruction.

> The Court will instruct you as to what the law is. What I say is the law, what any one of these counsel says is the law, is not necessarily what the law is. What the Court instructs you that the law is is what the law is. What the Court tells you is the law is the law that you must follow.

Tr. at 2961.[50] The Court's instructions, and the prosecutor's admonitions foreclose any suggestion that the jury applied the prosecution's single inaccurate statement of the law, rather than the appropriate instruction supplied to them by the Court. Accordingly, neither Tipton nor Johnson have demonstrated that they were prejudiced by counsel's failure to take action with respect to the first

_____

[50] The prosecutor prefaced his CCE argument with a reminder to the jury that "the Court is going to apprize you of what the law is." Tr. at 2982.

95

comment. The above listed claims will be dismissed.

      b.    **The prosecutors misled the jury by vouching (often in inflammatory terms) to their personal belief in the Defendant's guilt and the veracity of the prosecution witnesses**
Johnson Defaulted Claim V.A
Tipton Defaulted Claim V.E.3

It is improper for a prosecutor to vouch for, or bolster the testimony of, its own witnesses. United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). "Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997). In asserting that appellate counsel were deficient for failing to pursue the claim urged here, Tipton and Johnson overstate the occasions the prosecutor engaged in impermissible vouching and ignore the abundance of curative instructions provided by the Court.

During closing argument, the prosecution made the following highlighted comments, which Tipton and Johnson assert were improper vouching.

> Closing statement is . . . to give us an opportunity to argue to you what <u>we believe</u>, <u>what inferences we believe</u> you should draw from the evidence . . .

Tr. at 2956-7.

> There is no 848 murder here, no murder in furtherance of a Continuing Criminal Enterprise charged here, because <u>we know</u>, it was murder over a woman. <u>We know</u> that Robin Cooper was the cause of that murder of Torrick Brown . . . [w]e also know that despite the fact that that murder occurred . . . and was done by James Roane other members of the conspiracy joined him to help that murder.

Tr. at 3003-4. The mere use of the words "we believe" or "we know" does not constitute improper

96

vouching or bolstering because it was not done to suggest a personal belief in the credibility of a particular witness or imply to the jury that information known to the government but not placed before the jury corroborates the prosecution's version of events. See United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (noting that prosecutor's use of the phrase "I think" in an innocuous, conversational sense "d[id] not suggest an attempt to replace the evidence with the prosecutor's personal judgments"). Indeed, in both of the instances complained of above, the prosecutor's argument in the surrounding text directed the jury to consider the evidence as the barometer for judging what it should know or believe.[51]

The highlighted remark set forth below, though perhaps a misstep by the prosecutor, did not provide Johnson or Tipton with a viable basis for challenging their convictions.

> There is no evidence, ladies and gentleman, with the exception of Hardy, Sterling Hardy and Gaiters, that any of the people brought forth by the government and placed in this witness stand to provide evidence to you knowingly and willingly engaged in a murder . . . .
>
> * * * *
>
> . . . the government has told these people that the words that they give to you from that witness stand will not be used to prosecute them, with the exception of Hardy and Gaiters, who were knowingly involved in murders by their own testimony, who are facing sentencing in this Court, by this Judge, for their involvement in those murders. Ladies and gentlemen, again I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you. It is not an exact science. Use-immunity agreements had to be given. We feel like we gave use immunity only to those people who were not the murderers in this case. There has been no evidence that anyone other than Richard Tipton, Cory Johnson, Lance Thomas, Sterling Hardy and Jerry Gaiters were involved in the murders.

---

[51] Nor was the prosecution's references to the portions of the witnesses' plea agreements that required them to testify truthfully good fodder for an appeal. Tr. at 2968; see United States v. Henderson, 717 F.2d 135, 137-8 (4th Cir. 1983); Jenner v. Class, 79 F.3d 736, 739 (8th Cir. 1996).

Tr. at 2966-68. While the comment may be read to suggest factors not presented to the jury played a part in the distribution of use immunity, the unfair prejudicial effect was marginal because (1) it was isolated; (2) it did not deflect any plausible suggestion of guilt from one of the witnesses[52] onto the defendants; (3) the evidence of Johnson and Tipton's guilt of the murders was overwhelming; and, (4) the jury was instructed that comments of the attorneys were not evidence and that "the testimony of one who provides evidence against a defendant . . . for immunity from punishment . . . must always be weighed by the jury with greater care and caution than the testimony of an ordinary witness . . . . such testimony is always to be received with caution and weighed with great care." Tr. at 3199-32000.

Indeed, the protective hedge of instructions issued by the Court provided a strong disincentive to appellate counsel hoping to demonstrate prejudice flowing from any improper comments by the prosecution. See Bennet v. Angelone, 92 F.3d 1336, 1346-7 (4th Cir. 1996); United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994). At the outset of the trial, the Court explained that:

> Certain things are not evidence and it is important that you understand what is not evidence . . . . First of all, statements, arguments, questions by lawyers are not evidence. Objections to the questions are not evidence . . . . You should not be influenced by the objection or the Court's ruling on it. If the objection is sustained, ignore the question. If the objection is overruled, treat the answer like any other.

Tr. at 759. After opening statements, the Court admonished the jury that,

> [t]he evidence in this matter is what comes from the witness stand,

_____

[52] Although the defense counsel tried to implicate Byrd in the Talley death, as reflected supra, Tipton's guilt on that matter was overwhelming.

> the exhibits, and any stipulations. The statements, comments, arguments by lawyers are not evidence and should not be accepted as such. A classic example is that we had a couple of objections.

Tr. at 887-88. Finally, after closing arguments in the penalty phase, the Court instructed the jury:

> it is your duty to determine the facts. And in so doing, you must only consider the evidence that I have admitted in the case. The term 'evidence' includes the sworn testimony of the witnesses and the exhibits admitted into the record, and any stipulations or agreements between the parties.
>
> Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case. . . . What the lawyers say is not binding upon you.

Tr. at 3194-95. Given the instructions provided to the jury and the evidence arrayed against their client, counsel wisely refrained from pursuing the claims urged here by Tipton and Johnson.

For example, Tipton and Johnson fault counsel for failing to raise on appeal an exchange where the prosecution purportedly vouched for Gaiters by the manner in which it asked questions.[53] In light of the fact the objection was sustained and that Woody's subsequent proper testimony corroborated Gaiters' account, and the Court's instructions, any unfair prejudice to the defense was unmeasurable.[54] Next, Johnson and Tipton contend that the prosecution engaged in misconduct

---

[53] The prosecution asked Detective Woody whether Gaiters "is telling the truth" regarding the Armstrong, Long, and Carter murders. Tr. at 2442-43. Counsel objected and the objection was sustained. Tr. at 2443. Detective Woody then testified that Gaiters had consistently described the motive and the manner in which Johnson had committed the triple murder. Tr. at 2443.

[54] The defense later called Woody as a witness. In response to defense questions, Woody testified that in consideration for information, the police had dropped a number of petty charges against Gaiters. Counsel asked whether a number of more serious charges including a murder charge, a rape charge and a robbery charge against Gaiters also had been dropped. Woody responded affirmatively to this question. On cross-examination, the prosecution asked if the murder, rape and robbery charges were dismissed in consideration for cooperation or because the "investigation revealed that he had not committed" the particular crime. Tr. at 2855. Woody responded that the charges were dismissed based on Gaiters' apparent lack of culpability rather

99

when it asked Roane's psychiatric expert whether he considered Roane to be "a virtual killing machine." Tr. at 3770. The Court sustained the objection. While the prosecution's question was improper, appellate counsel for Johnson and Tipton were hardly deficient for failing to pursue the issue on appeal; the question was not directed to their client, the objection was sustained, and the Court instructed the jury to ignore a question if any objection is sustained. The Defendants also complain about the manner in which the prosecution twice phrased its objections. Even if such remarks were improper, they were hardly worthy of appellate consideration. See Tr. at 1983, 2053-54.

Finally, Johnson and Tipton complain that the prosecution engaged in misconduct during the sentencing phase when twice during opening argument, and once during closing argument he referred to them as "mass murderers." Counsel reasonably abstained from appealing the issue because that appears to be a fair description of their clients. In light of the instructions provided, the context of the purportedly improper comments and the abundance of evidence, counsel reasonably decided not to appeal the issues urged by Tipton and Johnson in Claims V.E.3 and V.A and such claims will be dismissed.

c.    **The prosecutors misled the jury by treating the Defendants as a group, rather than as individuals**
Tipton Defaulted Claim V.E.9
Johnson Defaulted Claim V.G.

During guilt phase closing arguments, the prosecution told the jury that,

> What happened on January 14? James Roane, Cory Johnson, and Richard Tipton and 'V' Mack get Pam Williams to go buy this Intratec and the AA Arms handguns. What do they do with these guns next? They take them to 'Papoose' Davis' house . . . [Tipton's

_____

than for any consideration for his cooperation.

100

counsel's objection to the use of 'they' overruled] . . . They come up there that day on January 14th, get the guns, and go take a life, that of Peyton Maurice Johnson. They come back and brag about their marksmanship.

Tr. at 3176. Johnson contends that the prosecutor misled the jury because there was no evidence linking him to Williams' purchase of the handguns and Tipton contends there is no evidence that he shot Peyton Johnson. Johnson is simply wrong. Although Roane and Thomas accompanied Williams to the gun shop, Johnson gave Williams crack cocaine in partial payment for her aid in obtaining the guns and told Williams' boyfriend that Williams was required to complete the transaction when she attempted to back out of purchasing the guns.

Although it may be reasonably inferred that Tipton approved of the murder of Peyton Maurice Johnson, it was imprecise and sloppy for the prosecution to suggest, during guilt phase closing argument, that Tipton had actually shot Peyton Johnson.[55] However, in light of the abundance of evidence of guilt, the precise verdict forms, and Court's instructions[56], appellate counsel would have had an impossible task in demonstrating their clients were prejudiced by the

---

[55] Tipton and Johnson also restate their complaint, rejected above (see supra first comment and fifth comment Section XII.C.3.a), that the prosecutor misstated the law when he suggested the supervision element was satisfied if the Defendants had collectively supervised five persons.

[56] At the beginning of the trial, the Court instructed the jury that, "Each defendant's case should be considered independently." Tr. at 35. After opening statements the Court stated, "one final thing before I make the admonishment and let you go: the defendants are charged in a number of Counts, and there are obviously four defendants. Each defendant is entitled to individual consideration. They cannot be grouped. When the time comes for you to decide guilt or innocence, you will consider each defendant individually, as it relates to each count in which that defendant may be charged." Tr. at 888. And the jury was admonished in closing instructions that "the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty should not control your verdict as to any other offense or any other defendant." Tr. at 3231.

101

prosecutor's occasional collective references to the Defendants. Tipton and Johnson's challenges to the prosecutor's collective references during the sentencing phase are addressed below.

4.    **Alleged Improper Comments By The Prosecution During The Penalty Phase**

a.    **The prosecutors misled the jury by treating the Defendants as a group, rather than as individuals**
Tipton Defaulted Claim V.E.9
Johnson Defaulted Claim V.G.

One of the nonstatutory aggravating factors was that the defendant was a knowing and willing member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.[57] In opening statement at the sentencing phase, the prosecution suggested this factor was satisfied because, "it is clear that each one of them intended to kill other people to hide this conspiracy. They intended to kill Martha McCoy and her children because they survived and were witnesses." Tr. at 2228. "Remember under the law of conspiracy, they are guilty of each and every one of the acts that they did together."Tr. at 3330.[58] Contrary to Tipton and Johnson's suggestion, the underlined comment was permissible because it does not encourage the jury to collectively assign blame based on membership in a conspiracy but based on jointly committed actions.

---

[57] To support that factor, the Government reintroduced the guilt phase evidence. The Government also presented further evidence that Johnson, Tipton, and Roane, while incarcerated, had planned to kill several witnesses: Johnson told another inmate he planned to kill Detective Woody; Roane told Douglas Cunningham, Martha McCoy's boyfriend, there was $10,000 "hit" on McCoy's life if she testified, and that McCoy's uncle "was going to be the next one," Tr. 3361; Tipton told Cunningham, "that something was going to happen to me if I was to testify," Tr. at 3359; and Willie Seward overheard Tipton using the phone to tell someone that "he wanted Detective Woody killed . . ." Tr. at 3385.

[58] Shortly thereafter, the prosecutor stressed that each defendant was "due individual consideration in your rendering of your verdict." Tr. 3332.

102

Next, Johnson and Tipton contend that the prosecutor made a number of collective references in closing argument that were improper. "They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people." Tr. at 3903; "We have been in trial for five weeks, the same length of time within a week that these three people killed ten —[59]." Tr. at 3945. "They know how to do these crimes." Tr. at 3948. Appellate counsel did not ignore these above comments by the prosecution. Rather, appellate counsel cited these comments to support their primary challenge to the Defendants' sentence; that the failure to conduct separate penalty hearings denied them individualized consideration. See Roane App. Brief at 120. In rejecting that argument the Fourth Circuit concluded that "the court's frequent instructions on the need to give each defendant's case individualized consideration sufficed to reduce the risk to acceptable levels." United States v. Tipton, 90 F.3d 861, 892 (4th Cir. 1996)(noting any risk of unfair prejudice was diminished by the separate packets of penalty verdict forms for each Defendant and the Court remonstrances to the Government to "be specific" and to "do it individually" when objections were made). Appellate counsel's use of the prosecution's improper collective references to support his challenge to the joint penalty hearing, rather than in support of a separate claim of prosecutorial misconduct, reflects effective appellate advocacy. Moreover, the Court's repeated instructions foreclose any suggestion of prejudice.[60] Hence, Johnson and Tipton's assertion that ineffective assistance of counsel excuses their default is rejected because they have not demonstrated

---

[59] At this point, Tipton's counsel objected to the use of "these" and the amount of murders. The Court sustained the objection.

[60] The Court's closing instructions repeatedly emphasized that each defendant was to be judged individually. Tr. 3985-86, 4002. The Court repeated during closing instructions that the arguments of lawyers were not evidence and it is the juror's recollection of the evidence that controls. Tr. at 3996.

103

that counsel was deficient or that they were prejudiced. Tipton's Claim V.E.9 and Johnson's claim Claim V.G will be dismissed.

    b.    **The prosecutor misled the jury by improperly emphasizing that the defendants did not testify**
Defaulted Tipton V.E.7
Defaulted Johnson V.E

Tipton and Johnson assert that the prosecutor engaged in misconduct when he repeatedly commented upon their silence. The most egregious of these comments occurred during the closing argument. The prosecutor noted that Tipton had told his experts about the deprivation of his youth which his experts had then conveyed to the jury, yet, "[h]ave you once seen from that witness stand this week an iota of remorsefulness from that man?" Tr. at 3897. Counsel objected. The Court sustained the objection and admonished the prosecutor "don't get stupid in the end of this, please." Id. Immediately, upon the conclusion of the prosecutor's argument the Court instructed the jury as follows:

> Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense expert and they took the stand and discussed that. He then followed that up with "But you haven't seen one iota of remorse from the witness stand."
> You cannot, you will not, ever require a defendant to take the stand. The defendant doesn't have to testify. The defendant doesn't have any burden to prove that he should not be put to death. The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.
> As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of counsel is just that. It is not evidence. And you must consider it in that light. But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse. Do you understand?

Tr. at 3906-7. Later, the Court denied the Defendants' motion for mistrial. Tipton's counsel

104

appealed that decision and the Fourth Circuit summarily rejected the claim. United States v. Tipton, 90 F.3d 861, 901 n.25 (4th Cir. 1996).

Tipton and Johnson contend that appellate counsel should have shorn up this claim by pointing to other instances where the prosecutor purportedly made improper comments about their silence. The following rule is used to assess whether argument by the prosecution constitutes an improper comment on the defendant's failure to testify, "[w]as the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1996)(quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973)). In answering that question, the Court must look to the context in which the comment was made. See Francais, 82 F.3d at 78. Because, as reflected below, the other remarks, in context, are not indicative of a manifest intent to comment upon the defendants' failure to testify and are more readily understood to comment upon the evidence and defense counsel's arguments, counsel reasonably eschewed pursuing the claims urged here by Johnson and Tipton. See Bates v. Lee, 308 F.3d. 411, 420-22 (4th Cir. 2002).

During the sentencing phase closing arguments, the prosecution summarized Johnson's case in mitigation as follows,

> As to Mr. Cory Johnson, he too says, "I've had a bad youth. I've got a learning disability. I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentleman. The testimony of the doctors who testified for him have made it clear that he knew right from wrong.

Tr. at 3898. The foregoing statement does not seek to impugn Johnson's silence. In fact, its most natural reading is to encourage the jury to give Johnson's statements conveyed though his experts

105

the same weight as if Johnson had made them directly from the witness stand. Cf. United States v. Walker, 272 F.3d 407, 415 (7th Cir. 2001)(concluding similar attribution of testimonial evidence to defendant during closing argument was not outside the bounds of closing argument), cert. denied, 122 S. Ct. 1456 (2002).

Next, Johnson and Tipton complain that the prosecutor commented upon their silence, when during closing argument at the guilt phase, he argued that

> I suggest to you that the evidence has been clear and unequivocal . . . . That 11 people lie dead in the streets of Richmond, Virginia because those men with others, including "V," wanted to make themselves rich selling drugs, wanted to protect their drug business . . . .I suggest to you that . . . as to Count One of the indictment, the conspiracy count, that those gentlemen haven't truly argued to you, in either opening or in the questions presented to the witnesses during the trial, that they are not guilty of Count One. They have implicitly conceded that indeed that they have sold drugs, that indeed they sold drugs together. Count One in this case has been implicitly conceded by defendants James Roane, Cory Johnson –

Tr. at 2960. At this point the Court overruled an objection by Roane's counsel. The prosecution then continued,

> And I suggest to you through opening and through questioning of the witnesses in this case, there can be no great issue as to the guilt of James Roane, Richard Tipton, and Cory Johnson as to . . . the conspiracy count. Each of them admitted tacitly, if not implicitly, that they sold drugs. Each of them admitted tacitly, if not implicitly, that they were together often. Each of them has admitted tacitly, if not implicitly that they sold drugs together in concert with each other.

Tr. at 2961-62. Placed in context, the remarks are not of such character that the jury would naturally and necessarily take them to be a comment on the failure of the accused to testify; the highlighted remarks direct the jury to consider the evidence adduced and the comments by defense counsel, not the Defendants' silence, in evaluating whether the Defendants were guilty of

106

conspiracy.[61] Therefore, the comments are not inappropriate. See United States v. Mietus, 237 F.3d. 866, 871-72 (7th Cir. 2001); Oken v. Corcoran, 220 F.3d 259, 270-71 n. 7 (4th Cir. 2000); Francis, 82 F.3d 77, 78 (4th Cir. 1996); see also Tr. at 2976. To the extent the prosecution's comments may have otherwise been improper, counsel reasonably forsook appealing the issue in light of the evidence of guilt on the conspiracy charge and their concessions during their own opening statements and closing arguments that their clients were guilty of conspiracy to distribute drugs, but not of running a CCE.

Finally, Tipton and Johnson complain about an exchange that occurred during guilt phase closing argument. Counsel for Sandra Reavis stated, "But remember, Cory Johnson said that he never gave drugs to Sandra Reavis to sell. So this contradicts what Valerie Butler had to say." Tr. at 3163. The prosecutor objected by stating, "I don't remember Cory Johnson testifying, your Honor." Id. The Court sustained the objection. Defense counsel apologized and corrected his statement by stating, "Cory Johnson told Rodney Tucker, who testified here, that he never gave Sandra Reavis any drugs." Tr. at 3163-64. "No manifest intent exists where there is another, equally plausible explanation for the remark." See United States v. Calderon, 127 F.3d 1314, 1338 (11th Cir. 1997). The prosecutor's attempt to correct a misstatement by defense counsel does not manifest an improper intent to comment on Johnson's failure to testify. See United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994)(noting context of prosecutor's statement indicated an intent to

_____

[61] Counsel for each defendant conceded in opening argument that his client sold drugs. During questioning of Government witnesses, defense counsels' questions generally focused on negating the substantial income and supervision element of the CCE count, rather than disputing that the petitioners were engaged in the concerted distribution of cocaine. Tipton also called Gloria Bridges as a witness. Bridges testified on direct examination that she came to know Titpon because he sold drugs.

object to form of the question rather than comment upon the defendant's silence). To the extent, the objection reminded the jury that Johnson had failed to testify, it did not encourage the jury to draw any negative inference from that omission and the Court repeatedly had admonished the jury that it could not draw such an inference. Accordingly, the above claims will be dismissed because Tipton and Johnson cannot demonstrate appellate counsel were deficient for not pursuing the claims.

      **c.** **The prosecution improperly made unsupported comments during closing argument regarding the conditions the Defendants would face in prison if given a life sentence.**
Johnson Defaulted V.D
Tipton Defaulted V.E.2

During closing argument the prosecutor asked the jury to ponder what the Defendants' conditions would be if they were sentenced to life in prison.

> I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

Tr. at 3904. Defense counsel objected and the Court sustained the objection. Tr. at 3904. While the foregoing comments were improper, it did not provide counsel with a substantial claim for relief on appeal. The Court had made clear to the jury that the verdict was to be based on the evidence, the arguments of the lawyers were not evidence and it was not to consider matters to which objections had been sustained. Accordingly, counsel was not deficient for failing to raise the issue on appeal.

      **d.** **The prosecution improperly argued that sentencing should be based on deterrence**
Johnson Defaulted V.H
Tipton Defaulted V.E.10

108

Tipton and Johnson contend that they were denied individualized consideration because the prosecutor twice urged the jury to consider deterrence during closing argument at the sentencing phase. The limited law on the subject indicates that a defendant's right to individualized consideration is not violated when the prosecutor urges the jury to consider whether a sentence of death in this instance would further the specific deterrent purpose of the statute. See Brooks v. Kemp, 762 F.2d 1383, 1407 (11th Cir. 1985)(en banc), cert. granted, Kemp v. Brooks, 478 U.S. 1016 (1986)(vacating Brooks and remanding for further consideration in light of Rose v. Clark, 478 U.S. 570 (1986)), reinstated on remand, Brooks v. Kemp, 809 F.2d 700 (11th Cir. 1987)). Here, when the prosecutor began to make comments that could be construed as a general deterrence argument, he was cut short by an objection. Thereafter, the prosecutor focused his comments on why the deterrence goals of the CCE death penalty statute favored the imposition of a sentence of death for the acts committed by Tipton and Johnson. In light of the single comment about general deterrence, the sustained objection to that comment, and the extensive instructions on the Defendants' entitlement to individualized consideration, appellate counsel reasonably forsook the claims urged here by Johnson and Tipton.

e.     **The prosecutors misled the jury into believing that it had a duty to convict the Defendants and impose a death sentence**
Tipton Defaulted Claim V.E.6
Johnson Defaulted Claim V.C

Tipton and Johnson assert that the prosecution affirmatively misrepresented the law to suggest to the jury that it was legally required to convict the Defendants and impose a sentence of death. See Potts v. Zant, 734 F.2d 526, 535-6 (11th Cir. 1984)(prosecutor engaged in misconduct by suggesting prior state supreme court decisions mandated imposition of death penalty in this case), vacated on other grounds, 478 U.S. 1017 (1986). Tipton and Johnson base these arguments on the prosecutor's

109

repeated references to "duty."[62] As reflected below, the challenged comments were proper because they emphasized that the jurors' duty to convict and impose the death penalty derived from their sworn obligation to fairly apply the evidence in light of the applicable law. See <u>Davis v. Kemp</u>, 829 F.2d 1522, 1527 (11th Cir. 1988)(concluding defendant not denied individualized consideration by

---

[62] The highlighted comments to which Tipton and Johnson object are set forth below.

> You have taken an oath and you can't shirk from that oath. That oath says that you will truly render facts to a verdict. When you do that, <u>you have no choice but to find these defendants guilty of each and every count of the indictment.</u>

Tr. at 3021(guilt phase sentencing).

> Now it is time for you to go back and do your duty. Each of you during the voir dire . . . stated that in the appropriate case, given the appropriate circumstances, that you could indeed render a verdict of death against a defendant . . . . I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant. You took an oath. It is an awesome responsibility. It is an awesome duty. But nonetheless, it is just that a duty. <u>Your duty, ladies and gentleman of the jury, given the argument that you have heard, requires no less verdict than death.</u>

Tr. at 3881-82.

> . . . <u>it is an awesome duty you have undertaken. But the law is clear that in some cases the death penalty should be imposed. It is the will of Congress. It is the law you must follow.</u> What you must determine, is given the evidence that you have heard, is this one those appropriate cases? And I suggest to you, ladies and gentleman, it is the appropriate case . . . . <u>Ladies and gentleman, it is a strong duty you have. But it is just that. It is a duty. This case warrants the imposition of the maximum punishment possible, the imposition of the death penalty as to each defendant.</u>

Tr. at 3905-6.

110

prosecutor's argument that jurors had an obligation to impose the death penalty if they believed it was warranted by the defendant's crime and the evidence introduced at sentencing); cf. United States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993)(concluding it was not inappropriate for prosecutor to remind jurors of their oath to render a verdict without fear or favor).

Moreover, the Court's numerous instructions throughout the trial refuted any suggestion that the law required that the Defendants receive a sentence of death. "I want to emphasize that even if a jury makes such findings, it is never required to impose a sentence of death upon a defendant." Tr. at 36; 496-97. Again, at the beginning of the sentencing phase the Court reminded the jury that, "[i]t is the government that bears the burden of persuading you beyond a reasonable doubt that a sentence of death is justified as to each defendant." Tr. at 3307. "[E]ven if you do make the findings required by law as prerequisites to the imposition of the death penalty, no jury is ever required to impose the death penalty." Tr. at 3309. And, "[i]t is the government that must persuade you that the death penalty is justified as to each individual defendant. In short, a defendant is not required to prove that he should be allowed to live." Tr. at 3313. And, "you cannot return a decision imposing the death penalty absent a unanimous finding of the existence of certain aggravating factors, no jury is ever required to impose the death penalty, even if it does make such findings." Tr. at 3315. Hence, Tipton and Johnson's attempt to excuse their default is rejected because they have not demonstrated counsel were deficient or that they were prejudiced by any omission of counsel.

D.     **Cumulative Claims of Error With Regards To Prosecutorial Misconduct And CCE Convictions**
Tipton Claim V.B.3.d.v. V.F.1.j            Tipton Defaulted V.E.14
Johnson Claim II.C.4.f, IV.A.8, IV.C       Johnson Defaulted V.L

Whether the prosecutor's improper conduct is isolated or extensive is one of the six factors relevant to assessing whether a defendant was prejudiced by improper comments by the prosecution.

111

See United States v. Wilson, 135 F.3d 291, 298 (4th Cir. 1998). Thus, Tipton and Johnson contend appellate counsel should have exploited this factor and challenged all of the purportedly improper conduct on appeal.[63] In this regard, Tipton and Johnson must demonstrate their present claims of error were clearly more promising than the substantial claims counsel raised on direct appeal. See Bell v. Jarvis, 236 F.3d 139, 164 (4th Cir. 2000)(en banc), cert. denied, 122 S. Ct. 124 (2001); Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989)(counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims"). Neither Tipton nor Johnson meets this burden. The fact that habeas counsel has seen fit to regurgitate many of the same issues pressed by appellate counsel certainly belies the suggestion that appellate counsel made poor choices on appeal. Moreover, the appellate record confirms that counsel pursued the most promising claims for relief on direct appeal. See Smith v. Murray, 477 U.S. 527, 536 (1986)("Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") Appellate counsel reasonably chose to pursue promising claims of instructional errors, separation of powers and errors during voir dire that would entitle their clients to relief under a more lenient showing of prejudice than would be required to prevail on a prosecutorial misconduct claim. See, e.g., United States v. Tipton, 90 F.3d 861, 872-882, 895, 897-98 (4th Cir. 1996). Accordingly, the above listed claims will be dismissed because Tipton and Johnson have failed to demonstrate deficiency on the part of counsel.

## XIII.  CUMULATIVE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL
Tipton Claims V.B.3.d.vii, V.F.4

---

[63] That portion of these claims which challenges counsels' conduct at trial is rejected for the reasons previously stated by the Court.

Johnson IV.D, IV.C

The Defendants contend that the cumulative effect of all counsel's errors prejudiced them. The cumulative analysis the Defendants seek is not permitted for those claims where the Court rejected their assertion that counsel performed deficiently. Fisher v. Angelone, 163 F.3d 835, 852-3 (4th Cir. 1998). "Attorney acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" Id. (qouting Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996). Having reviewed those relatively few instances where the Court rejected an individual claim solely for a lack of prejudice, the Court finds even when considered collectively there is no reasonable possibility that the result of the Defendants' convictions or sentence would be different.[64]  See Huffington v. Nuth, 140 F.3d 572, 583 (4th Cir. 1998).  The Defendants' guilt and culpability were confirmed by numerous credible witnesses. The testimony of the witnesses was well corroborated by the physical evidence including forensic testing, receipts for firearms, the video tape of the murder scenes, and the testimony of other witnesses. The above claims will be dismissed.

## XIV.  THE DEFENDANTS' ADOPTION BY REFERENCE OF CODEFENDANTS' CLAIMS
Tipton V.J
Johnson X
Roane IX

In their initial § 2255 motion, each Defendant asserts that he adopts by reference any claims by his copetitioners to the extent such claims are applicable to him.[65]   By Order entered December

---

[64] Roane did not list in his index a separate claim of cumulative ineffective assistance. The Court's rejection of Roane's assertion of collective prejudice does not encompass Roane's Claim IV.B.2 pertaining to the murder of Douglas Moody.

[65] United States v. Merlino, 2 F.Supp.2d 647, 669 (E.D. Pa. 1997)(denying as inappropriate defendant's request to join codefendants' § 2255 motions).

113

11, 2000, the Court directed each Defendant to provide an index of his claims. Clerk's Record # 830. That order further required each Defendant to list each of his grounds for relief including the subparts thereto and to cite to the portions of the record where the claim is raised and discussed.[66] This opinion has addressed every separate ground for relief listed by Tipton, Johnson, and Roane in his respective index. In light of the specific pleading requirements for § 2255 motions and this Court's orders, the oblique references to the unspecified claims of codefendants do not warrant further individual consideration. Cf. Gray v. Netherland, 99 F.3d 158, 165-66 (4th Cir. 1996)(concluding habeas petitioner had not properly raised claim in federal court where he failed to articulate how the fact and law combined to violate his rights). Claims V.J , X and IX will be dismissed for the reasons previously stated in conjunction with each claim specifically raised by Johnson, Tipton and Roane.

Tipton and Johnson's motion for relief pursuant to 28 U.S.C. § 2255 will be denied. Roane's motion for 28 U.S.C. § 2255 relief is denied in part.

An appropriate Order shall issue.

_____
United States District Judge

Richmond, Virginia
Date: 5-1-03

---

[66] The Court warned the parties that review of their claims would be limited to those portions of the record designated in their individual index.

114

APPENDIX A
RICHARD TIPTON'S GROUNDS FOR RELIEF[1]

V.A    JUROR MISCONDUCT VIOLATED TIPTON'S RIGHT TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

V.B.3.a[2]    The Jury Was Not Properly Instructed As To The Supervision Element:

(i)    The trial court failed to instruct the jury that a mere buyer/seller of drug relationship is insufficient to establish the "organization, supervision, or management" element under section 848;

(ii)    The trial court failed to instruct the jury that some persons alleged to be CCE supervisees were, as a matter of law, incapable of being CCE supervisees;

(iii)    The trial court failed to instruct the jury that it must unanimously agree to the identity of each of the five supervisees;

(iv)    The trial court failed to instruct the jury that the government must prove "management" to satisfy the organizer/supervisor element of a CCE.

V.B.3.b    There Was Insufficient Evidence To Support The Supervision Element Because The Government Failed To Prove Tipton Supervised Five Persons.

V.B.3.c    The Prosecutorial Misconduct Relating To The Supervision Element:

(i)    The Prosecution used unsupported, ambiguous, and misleading testimony to prove "supervision";

(ii)    The Prosecution used improper and prejudicial argument, misleading the jury, about the supervision element.

V.B.3.d    Ineffective Assistance of Counsel At Trial and On Appeal:

(i)    Counsel failed to object to the repeated use of improper and prejudicial evidence;

(ii)    Counsel failed to determine and demonstrate that there were less than five supervisees;

(iii)    Counsel failed to object to the prosecutor's closing argument on the supervision element;

(iv)    Counsel failed to seek proper jury instructions on the supervision element;

(v)    Counsel failed to stop the onslaught of prosecutorial misconduct;

(vi)    Counsel failed to seek relief available pursuant to Barona and Jerome;

(vii)    Counsel's errors, viewed individuallly or collectively, require the Court to grant relief.

V.C.1    Tipton's Right To Due Process Was Violated Because The Government Knew Or Should Have Known that:

---

[1] Tipton's claims are identified by the letters and numerals used by Tipton in his index of claims.

[2] Section V.B. 1 & 2 discuss legal principals and background and do not set forth claims.

i

    a.    Maurice Saunder's Testimony Linking Tipton to "Light" and Large Sums of Money Was False; .

    b.    Greg Scott's Testimony Linking Tipton and his Codefendants to the New York Boyz Was False.

C.2    Hussone Jones' Testimony That Tipton Stabbed Douglas Talley Was False.

C.3    Priscilla "Pepsi" Greene Testified Falsely Regarding Her Drug Dealing Activities And The Hierarchy Of The Drug Dealing Enterprise In Richmond.

C.4    Jerry Gaiters Testified Falsely Regarding His Foreknowledge Of The Murder Of Dorothy Armstrong.

V.D.    The Government Failed to Turn Over Exculpatory Evidence In Violation of Brady v. Maryland:

    1.    The Government Withheld Evidence that Tipton Could Have Used To Impeach The Testimony of Hussone Jones About The Murder Of Douglas Talley;

    2.    The Government Suppressed Evidence that Gave Tipton An Alibi For The Stoney Run Shooting Deaths of Linwood Chiles and Curt Thorne;

    3.    The Government Suppressed Evidence that Could Have Been Used To Impeach Priscilla GreenE Testimony That She Did Not Sell Drugs;

    4.    The Government Suppressed Evidence that Pointed to Co-Conspirator Lance Thomas As The Principal Of The Drug Activities Charged In The Indictment;

V.E. Prosecutorial Misconduct

    1.&12.  The Prosecution Improperly Discriminated Against Women.

    2.    The Prosecutors Made Inflammatory Arguments To The Jury, Unsupported By The Evidence, Regarding The Conditions Tipton Would Face If Given A Life Sentence.

    3.    The Prosecutors Misled The Jury By Vouching, In Inflammatory Terms, To Their Personal Belief Regarding Tipton's Guilt And The Veracity Of Witnesses.

    4.    The Prosecutors Introduced Inadmissible Evidence Through Which They Vouched That Tipton And The Other Defendants Were Threats To The Lives Of Witnesses

    5.    The Government Committed Misconduct When It Formulated And Produced Its Witness List.

    6.    The Prosecutors Misled The Jury Into Believing That It Had A Duty To Convict And Impose A Death Sentence.

    7.    The Prosecutors Misled The Jury By Improperly Emphasizing That Tipton And The Other Defendants Did Not Testify.

    8.    Prosecutors Suggested That A Government Witness Passed A Polygraph Test.

    9.    The Prosecutors Misled The Jury By Treating Tipton And The Other Defendants As A Group, Rather Than As Individuals.

    10.    The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence.

    11.    The Prosecutors Presented Testimony Without Foundation.

    13.    The Prosecutors Committed Misconduct With Respect To The CCE Supervision

14. Element. The Scope Of The Government's Misconduct Prejudiced Tipton And Requires The Court To Grant The Writ.

15. Prosecutors Violated 18 U.S.C. § 201(c)(2) When Obtaining And Presenting The Testimony Of Several Cooperating Witnesses.

16. The Government Improperly Manipulated Material Evidence Regarding The Alleged CCE By Presenting Two Different Accounts At Tipton's And Lance Thomas' Trial Through The Testimony Of Priscilla Greene.

V.F. INEFFECTIVE ASSISTANCE OF COUNSEL

1.a Counsel Failed to Move for a Change of Venue Despite Inflammatory Media Coverage.

1.b Defense Counsel Failed to Request Voir Dire Pursuant to Morgan v. Illinois.

1.c Defense Counsel Failed to Object to the Prosecution's Strikes Against Female Jurors.

1.d Trial Counsel's Errors Resulted in Tipton's Exclusion From Voir Dire, and The Loss Of His Right To Participate In Jury Selection.

1.e Defense Counsel Failed to Investigate Whether in Fact the CCE Existed in New York And New Jersey.

1.f Defense Counsel Failed to Challenge the Government's Evidence that Tipton Was A Supervisor Of A CCE.

1.g Ineffective Assistance of Counsel With Respect To Jury Instructions:

1 Defense Counsel Failed To Request An Unanimity Instruction On The CCE Elements.

2 Defense Counsel Failed To Object To And Ask For A Proper Jury Instruction On The RICO Enterprise Element.

3 Defense Counsel Failed to Object To And Ask For A Proper Jury Instruction On The Supervision Elements Of The CCE Charges.

4 Tipton's Counsel Were Ineffective When They Failed To Request An Instruction that the Jurors Must Unanimously Agree On The Violations That Make The Continuing Series Element Of A CCE.

1.h Counsel Failed to Adequately Defend Tipton on the Charge That He Murdered Douglas Talley.

1.i Defense Counsel Failed to Prepare an Adequate Defense To The Stoney Run Murders.

1.j. Defense Counsel Failed to Object to the Improper and Highly Prejudicial Conduct and Arguments By The Prosecutors Throughout Tipton's Trial.

1.k. Defense Counsel Failed to Object to the Testimony Of Several Cooperating Witnesses Pursuant to 18 U.S.C. § 201(c)(2).

2.a. Counsel Failed to Investigate and Prepare an Adequate Mitigation Defense

2.b. Counsel Failed to Present Evidence of Tipton's Prison Conditions If Sentenced To Life Without Parole And Effect On Question Of Future Dangerousness.

3.a.  Tipton's Appellate Counsel Was Ineffective Because He Failed to Demonstrate that the Government's Evidence, As A Matter of Law, Did Not Prove The CCE Supervision Element.

3.b.  Tipton's Appellate Counsel Was Ineffective Because They Failed to Demonstrate that the Government's Evidence Was Not Sufficient As A Matter of Law to Prove That Tipton Murdered Talley.

4.  The Cumulative Effect of Counsel's Errors Prejudiced Tipton.

V.G.  THE UNBRIDLED DISCRETION TO FORMULATE NON-STATUTORY AGGRAVATING FACTORS GIVEN TO PROSECUTORS UNDER SECTION 848 REPRESENTS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY.

V.H  TIPTON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION.

V.I  TIPTON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS.

V.J  TIPTON ADOPTS BY REFERENCE ANY CLAIMS RAISED BY JOHNSON AND ROANE TO THE EXTENT THAT THEY APPLY TO HIM.

V.K.  THE DISTRICT COURT INCORRECTLY INSTRUCTED THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF TIPTON'S SIXTH AMENDMENT RIGHT TO TRIAL BY A JURY.

V.L  TIPTON IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000) .

iv

APPENDIX B
JOHNSON'S GROUNDS FOR RELIEF[1]

I.  THE GOVERNMENT KNOWINGLY OR NEGLIGENTLY USED FALSE EVIDENCE TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF HIGHLY ORGANIZED CONTINUING CRIMINAL ENTERPRISE HAVING ITS ROOTS IN NEW YORK AND/OR NEW JERSEY.

    B.  Greg Scott's Trial Testimony Linking Johnson And His Co-Defendants To The New York Boyz Was False, And The Government Knew or Should Have Known That It Was False.

    C.  Maurice Saunder's Trial Testimony Linking Tipton to "Light" And To Large Sums Of Money Was False, And The Government Knew Or Should Have Known It Was False.

II.  THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE UNDER 21 U.S.C. SECTION 848.

    C.1  The Jury Was Not Properly Instructed As To The Supervision Element

        a.  The trial court failed to instruct the jury that a Buyer-Seller Relationship is insufficient to establish the organization, supervision, or management element;

        b.  The trial court failed to instruct the jury:

            (i)  that some persons alleged to be CCE supervisees were incapable of counting as supervisees as a matter of law;

            (ii)  failed to instruct the jury that it must unanimously agree to the identity of each of the five supervisees.

        c.  The trial court failed to instruct the jury that the government must prove the element of management as part of the element of supervision for a CCE organizer;

    C.2  There Was Insufficient Evidence To Support the Supervision Element.

    C.3  Prosecutorial Misconduct Relating To Supervision Element:

        a.  Improper use of unsupported ambigous testimony;

        b.  Improper argument concerning the supervision element;

    C.4  Ineffective Assitance of Counsel At Trial and Appeal:

        a.  Counsel should have shown that Johnson was incapable of being a supervisor or at least not likely to be a supervisor;

        b.  Counsel failed to object to repeated improper evidence;

        c.  Counsel failed to demonstrate that the proof against Johnson did not establish five supervisees;

        d.  Counsel failed to object to the prosecutor's closing argument on the

---

[1] Johnson's claims are identified by the letters and numerals used by Johnson in his index of claims.

i

supervision element;

e.   Counsel failed to request proper jury instructions on the supervision argument of the CCE statute;

f.   Trial counsel failed to stop the onslaught of prosecutorial misconduct;

g.   Counsel failed to seek relief available under Barona and Jerome.

III.   JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS

IV.   TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL

A.   Guilt Phase Ineffectiveness:

1.   Defense counsel failed to request the appointment of an investigator and failed to conduct an adequate investigation;

2.   Defense counsel failed to move for a change of venue;

3.   Defense counsel failed to request voir dire pursuant to Morgan v. Illinois 504 U.S. 719 (1992);

4.   Defense counsel failed to object to the prosecution's strikes against women jurors;

5.   Defense counsel failed to object to Johnson's absence from voir dire and Johnson lost his right to participate in jury selection;

6.   Defense counsel failed to challenge the Government's evidence that Johnson was a supervisor of a CCE;

7.   Defense counsel failed to object or ask for proper jury instructions on the substantive counts charged;

a.   Defense counsel failed to request a unanimity instruction on the CCE elements;

b.   The jury was not properly instructed as to the supervision element of the CCE charges.

8.   Defense counsel failed to object to improper and highly prejudicial conduct and arguments by the prosecutors throughout Johnson's capital trial;

B.   Counsel Provided Ineffective Assistance of Counsel At The Sentencing Phase

1.   Defense counsel failed to argue that Johnson's mental ability was not accurately reflected by his I.Q. test, and, in fact, was below 77;

2.   Defense counsel failed to present evidence of Johnson's prison conditions if sentenced to life;

C.   Ineffective Assistance of Counsel on Appeal;

D.   The Cumulative Effect of Counsel's Errors Prejudiced Johnson.

V.   PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL

A.   The Prosecutors Misled the Jury By Vouching In Inflammatory terms, To Their Personal Belief In Johnson's Guilt And The Veracity of Their Witnesses.

B.   The Prosecutors Introduced Inadmissible Evidence Suggesting That Johnson And

The Other Defendants Threatened The LiveS Of Witnesses.

C. The Prosecutors Misled The Jury Into Believing It Had A Duty To Convict And Impose A Death Sentence.

D. The Prosecutors Misled The Jury by Making Misleading And Inflammatory Arguments To The Jury, Unsupported by the Evidence Regarding The Conditions Johnson Would Likely Face If Given A Life Sentence.

E. The Prosecutors Improperly Emphasized That Johnson And The Other Defendants Did Not Testify.

F. The Prosecutors Suggested That A Government Witness Had Passed A Polygraph Test.

G. The Prosecutors Improperly Treated Johnson And The Other Defendants As A Group, Rather Than As Individuals.

H. The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence.

I. Misconduct Relating To Testimony Without Foundation.

J. The Prosecutors Misled The Jury By Suggesting That They Had Not Influenced Witnesses To Use The Terms "Partner", "Worker", And "Employee".

K. The Government excluded Women From The Jury In Violation of J.E.B. v. Alabama, 114 S.Ct. 1419 (1994).

L. Misconduct Relating To The CCE Supervision Element.

M. The Prosecutors Violated 18 U.S.C. § 201(c)(2) By Obtaining And Presenting The Testimony Of Several Cooperating Witnesses.

N. The Prosecutors Presented The False Testimony Of Priscilla "Pepsi" Greene.

O. The Prosecution Engaged In Misconduct By Presenting Materially Different Accounts Of The CCE Supervision Activities At Co-Conspirator Thomas' Subsequent Trial.

P. The Prosecution Engaged In Misconduct By Presenting The False Testimony Of Jerry Gaiters.

VI. THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN SELECTING THE JURY.

VII. JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION.

IX. SECTION 848'S DELEGATION OF AUTHORITY TO PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATORS IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY THAT VIOLATES THE SEPARATION OF POWERS.

X. JOHNSON ADOPTS THOSE CLAIMS OF TIPTON AND ROANE THAT ARE

iii

APPLICABLE TO HIM.

XI.    JOHNSON IS EXEMPT FROM EXECUTION UNDER 18 U.S.C. § 3596(C) AND 21 U.S.C. § 848(1) BY VIRTUE OF MENTAL RETARDATION.

XII.   THE DISTRICT COURT FAILED TO PROPERLY INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO TRIAL BY JURY.

XIII.  JOHNSON IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

iv

APPENDIX C
JAMES ROANE'S GROUNDS FOR RELIEF

To the extent possible, Roane's claims are identified by the letters and numerals used by Roane in his index of claims.

I.     PROSECUTORIAL MISCONDUCT
    a.     The Prosecution Misled The Court As To Which Witnesses Were In The Witness Protection Program;
    b.     The Prosecution Failed To Provide The Defendants With Exculpatory Information In Violation of <u>Brady v. Maryland</u> -The Government Withheld Evidence that Roane Could Have Used To Impeach The Testimony of Hussone Jones About The Murder Of Douglas Talley;
    c.     The Prosecution Introduced Evidence That They Knew Or Should Have Known Was False:
        1.     Greg Scott's Trial Testimony Linking the Defendants To The New York Boyz Was False, And The Government Knew Or Should Have Known That It Was False.
        2.     Maurice Saunders' Trial Testimony Linking Tipton to "Light", And To Large Sums Of Money Was False, And The Government Knew Or Should Have Known It Was False;
        3.     Priscilla Greene Testified Falsely Regarding:
            a.     Her innocence in selling drugs;
            b.     Regarding the Primacy of Johnson's role in the enterprise;
            c.     Roane's role in the murdering Doug Moody.
        4.     Hussone Jones' Description Of The Talley Murder.
    d.     Prosecutors Violated 18 U.S.C. § 201(c)(2) When Obtaining And Presenting the Testimony Of Several Cooperating Witnesses.

II.    THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN THE SELECTION OF THE JURY

III.   THE JURY WAS TAINTED BY OUTSIDE INFLUENCES

IV.    INEFFECTIVE ASSISTANCE OF COUNSEL
    A.     Trial Counsel Failed To Seek A Change of Venue.
    B.     Defense Counsel Failed To Conduct An Adequate Investigation Of:
        1.     The Events In New York/New Jersey;
        2.     The Moody Murder.
    C.     Defense Counsel Waived Roane's Right To Be Present During Voir Dire.
    D.     Trial Counsel Failed To Challenge The Government's Evidence That Roane Supervised Or Managed Five Or More Persons.
    E.     Trial Counsel Failed To Present An Adequate Penalty Phase Case.
        1.     Counsel Failed To Investigate And Present Evidence Of Roane's Mental And Emotional Background.

        2.     Counsel Failed To Present Testimony From Roane's family.

        3.     Counsel Failed To Present Evidence Regarding The Conditions That Roane Would Face Prison In Prison.

        4.     Counsel Failed To Address The Absence Of Evidence Of Substantial Planning

    F.    Failed To Object To Prosecution's Purchasing Testimony From Cooperating Witnesses

V.    ROANE WAS DENIED HIS RIGHT TO JUSTICE WITHOUT DISCRIMINATION

VI.    THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE (As defined by Richardson v. United States 526 U.S. 813 (1999)

VII.    ROANE IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

VIII.    ROANE IS ACTUALLY INNOCENT OF THE CCE VIOLATIONS AND THE MURDER OF DOUG MOODY

IX.    ROANE ADOPTS BY REFERENCE ALL CLAIMS BY HIS CODEFENDANTS TO THE EXTENT THEY ARE APPLICABLE TO HIM