IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

|  |  |  |
|---|---|---|
| In re: COREY JOHNSON | ) | |
| | ) | |
| | ) | No. 21-2 |
| Movant | ) | |
| | ) | |

**United States' Response in Opposition
to Defendant's Motion to Stay Execution**

Corey Johnson murdered eight people, permanently maimed others, and held a leadership role in a continuing criminal enterprise that ran for multiple years during which, as the jury found, he supervised five or more people in drug trafficking, earning substantial income. Johnson's murders were premeditated, involved substantial planning, and advanced the goals of the drug organization he helped lead, as the jury concluded in imposing seven death sentences over 27 years ago.

Now, less than a week from his scheduled execution, Johnson has filed an application for a successive petition under 28 U.S.C. § 2255 together with his second of three stays of execution submitted in quick succession to this Court. In this action, Johnson seeks to re-litigate the question of his intellectual disability, an issue which has been teed up since his original capital sentencing (where he presented evidence about his mental capacities but conceded that he was not intellectually disabled) and which the district court and this Court have already adjudicated in his first § 2255. Johnson invokes expert reports that he gathered over four years ago in 2016 in

1

connection with a now-withdrawn clemency request, arguing that these reports are "newly discovered evidence" within the meaning of § 2255(h)(1), thus justifying his eve-of-execution stay request. Johnson also asserts that the Supreme Court's 19-year old decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), was "previously unavailable" to him within the meaning of § 2255(h)(2), even though this Court applied *Atkins* in rejecting his intellectual-disability claims in his first § 2255. *See United States v. Roane*, 378 F.3d 382, 408–09 (4th Cir. 2004). The law is clear that Johnson's belated and repetitive efforts to stay his execution must fail.

Johnson's claims are also unpersuasive on the merits. Johnson contends, for example, that his tendency to be "a follower" who was "manipulated by others" demonstrates his intellectual disability, Johnson Br. at 10, but those claims are belied by his multi-year leadership of a criminal enterprise and commission of eight murders. Both the district court and this Court found more than sufficient evidence of Johnson's leadership role in the drug trafficking organization. And Johnson's murders reflect the deliberate and calculated behavior to which the law assigns the highest level of culpability—not the conduct of a person who, "by reason of their condition, [is] likely unable to make the calculated judgments that are the premise for deterrence rationale." *Hall v. Florida*, 572 U.S. 701, 709 (2014). Johnson murdered Peyton Maurice Johnson because he was a rival drug dealer, murdered Louis J. Johnson because he was perceived as a threat, murdered Dorothy Mae

Armstrong because she owed a $400 drug debt and was believed to be cooperating with the police, murdered Bobby Long because he witnessed Johnson killing Armstrong, murdered Anthony Carter because he was also a witness, executed Linwood Chiles because he was believed to be cooperating with police, and also murdered Curtis Thorne because he was on the scene. Gwen and Priscilla Green, who were also present on the scene when Chiles and Thorne were murdered, were shot and seriously injured, surviving only because of luck. These were not the actions of an intellectually disabled man.

This Court should deny Johnson's request for a stay. Johnson's request for equitable relief is inexcusably delayed, does not meet the requirements of § 2255, and fails on the merits. The balance of equities leads to the same conclusion. More than 27 years after his conviction, over a dozen family members of Johnson's murder victims are traveling to Terre Haute this week to witness the execution of his sentence. The time has come for these proceedings to end.

## Procedural History

The government's brief opposing a stay in No. 20-15 describes the facts and basic procedural history of Johnson's case. As is particularly relevant here, the issue of Johnson's mental capacity has been litigated multiple times, including in his capital penalty proceedings and in his initial Section 2255 proceeding.

3

As discussed in further detail below, Johnson presented evidence at his capital penalty proceeding of a learning disability that, his expert opined, rendered him "unprepared to function in society, unprepared to survive on his own when he left institutional care . . . and made him unable to cope and adapt to society in a way that a normal individual would." Def. Ex. 7 (2/10/93 Trial Tr. 3574). Johnson agreed that he was not "mentally retarded," but "argue[d] that the same reasons underlying the prohibition against executing the intellectually disabled mitigated against the imposition of the death penalty" in his case. *United States v. Johnson*, 2021 WL 17809, at *3 (E.D. Va. Jan. 2, 2021). The jury, which unanimously imposed seven death penalties, rejected that contention.

Johnson's initial post-conviction proceedings spanned 1998-2004, and in those proceedings he contended that his intellectual disability precluded his execution and that his counsel had been ineffective in failing to make that argument during his sentencing. *See id.* The district court "permitted multiple amendments to the First § 2255 Petition and granted Defendant 'another full opportunity to demonstrate that he is mentally retarded.'" *Id.* (quoting First § 2255 Op. at 82). One of Johnson's arguments in support of that position was that had his prior IQ testing results been adjusted pursuant to the "Flynn Effect," he would be deemed intellectually disabled. *See* Johnson Br. at 17. The district court considered those arguments and rejected Johnson's intellectual-disability claims on the merits,

because "the record before the Court demonstrates that Johnson is not mentally retarded." First § 2255 Op. at 82.

This Court affirmed in a lengthy opinion. *Roane*, 378 F.3d at 408–09. As relevant here, Johnson argued that "he is mentally retarded and that, under federal law, he cannot be executed[] … [and] that his counsel were ineffective for failing to argue this point during sentencing." *Id.* at 408. Like the district court, this Court disagreed:

> Under federal law, "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(l); *see also Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of mentally retarded defendant constitutes cruel and unusual punishment under Eighth Amendment). The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.
>
> Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:
>
> > Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

> Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Accordingly, Johnson is not barred from execution due to mental retardation.

*Id*. at 408–09 (internal citations omitted).

This Court also rejected Johnson's related ineffective assistance of counsel argument:

> Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess that report. In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

*Id*. at 409 (internal citations omitted).

That was in 2004. Johnson states that in 2006, he obtained new counsel, who located additional records relevant to his claim of intellectual disability. Johnson Br. at 19. He does not indicate when counsel found those records. In 2016, Johnson filed a petition for clemency that attached expert reports from Dr. Reschly, Dr. Olley, and Dr. Siperstein, among other materials. He later withdrew his clemency petition.

6

On November 20, 2020, the government informed Johnson that it had set his execution date for January 14, 2021. Over three weeks late, on December 14, 2020, Johnson filed in the district court a motion to vacate under § 2255, arguing that his intellectual disability precluded his execution under the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3596(c). The district court dismissed that petition on Saturday, January 2, 2021, and Johnson filed a notice of appeal. Late on the night of January 8, 2021, Johnson also filed a motion to stay his execution in that case, which is pending before this Court in No. 20-15.

Between the night of January 7 and the early morning hours of January 8, 2021, Johnson initiated this case and filed a motion to stay his execution.

## Argument

To obtain a stay of execution, a defendant bears the burden of demonstrating that (1) he has a "strong" likelihood of success on the merits of his claim; (2) he "will be irreparably injured absent a stay"; (3) a stay will not "substantially injure the other parties interested in the proceeding"; and (4) "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotations omitted). The burdens of proof and persuasion are on the inmate seeking injunctive relief, not on the government, and the inmate must carry that burden "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A court cannot enjoin a defendant's execution "without finding that he has a significant possibility of success on the

7

merits[.]" *Dunn v. McNabb*, 138 S. Ct. 369 (2017).[1] Johnson cannot make such a showing.

**A.    Johnson's inexcusable delay weighs strongly against equitable relief.**

A stay of execution "is not available as a matter of right[,]" *Hill v. McDonough*, 547 U.S. 573, 584 (2006), and "last-minute stays" of executions "should be the extreme exception, not the norm." *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (citation omitted). In fact, "the last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019).[2] The Supreme Court has repeatedly "reiterated the importance of these principles[.]" *Long v. Sec.y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir.), *cert. denied sub nom. Long v. Inch*, 139 S. Ct. 2635 (2019).

---

[1] For example, the Supreme Court recently vacated a stay of execution where the court of appeals found the defendant's claims were "worthy of further exploration" and that a stay would permit more "time for consideration and deliberation." *Purkey v. United States*, 964 F.3d 603, 618 (7th Cir.), *stay vacated*, 141 S. Ct. 195 (2020).

[2] As an example of such unjustified delay, the Supreme Court in *Bucklew* cited its reversal of a lower court's entry of a stay of execution brought 10 days prior to an execution for a murder committed 24 years prior. *See Bucklew*, 139 S. Ct. at 1134 (citing *Dunn v. Ray*, 139 S. Ct. 661 (2019)); *see also Dunn v. Price*, 139 S. Ct. 1312 (2019) (considering last-minute nature of stay application in vacating lower court's entry of stay of execution).

When a defendant's conviction and sentence have been upheld on direct appeal and collateral review, a court must recognize the government's "strong interest in proceeding with its judgment" and must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim" on which a stay application is based. *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004); *see Bucklew*, 139 S. Ct. at 1133–34 (explaining that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence" that has been upheld on direct appeal and collateral review, and "[c]ourts should police carefully against attempts to use [further] challenges as tools to interpose unjustified delay") (quotation marks omitted). Because the government has a "significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson*, 541 U.S. at 650.

Johnson's current claims certainly "could have been brought" much earlier, as they concern a condition that, he claims, he has had since childhood. Indeed, Johnson *did* raise claims in his initial § 2255 petition that were, in substance, identical to the instant claims. But Johnson initiated this action late on January 7, 2021, seven days before his scheduled execution. He offers no reasonable explanation for his delay. Even on his own account, Johnson relies on evidence that

he has possessed for at least four years and on case law that has been on the books for a decade or more. That Johnson has chosen not to avail himself of multiple opportunities to seek relief until now—on the eve of his execution date—suggests that his motion is a delay tactic rather than a reflection of meritorious claims. As the Supreme Court has instructed, that "attempt at manipulation" is "grounds for denial of a stay." *Bucklew*, 139 S. Ct. at 1134.

**B.    Johnson has not shown a significant possibility of success on the merits.**

Johnson's application fails at the first step: he has failed to demonstrate any likelihood of success on the merits, let alone a "significant possibility" of success.

**1. Johnson cannot satisfy § 2255.**

Before an inmate may file a successive motion in the district court, "§ 2255(h) requires a federal prisoner to make a prima facie showing in the Court of Appeals that (1) 'newly discovered evidence' proves he was not guilty of his offense or (2) a 'previously unavailable rule of constitutional law made retroactive by the Supreme Court entitles him to relief." *Farkas v. Butner*, 972 F.3d 548, 555 (4th Cir. 2020) (citations and internal quotation marks omitted). Section 2255(h) was introduced as part of the AEDPA, and the "AEDPA aimed to prevent serial challenges to a judgment of conviction, in the interest of reducing delay, conserving judicial resources, and promoting finality." *Banister v. Davis*, 140 S. Ct. 1698, 1707 (2020). The AEDPA "made the limits on entertaining second or successive habeas

10

applications more stringent than before" under abuse-of-the-writ principles that "limit[ed] a [habeas applicant's] ability to file repetitive petitions." *Id*. (quoting *McCleskey v. Zant*, 499 U.S. 467, 483 (1991)).

Section 2255(h)(2) provides that a defendant may pursue a successive § 2255 when the defendant relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2). To obtain authorization to file a successive § 2255, Johnson "must show that his claim relied on a new and retroactive rule of constitutional law," and he "must make 'a sufficient showing of possible merit to warrant a fuller exploration by the district court.'" *In re Irby*, 858 F.3d 231, 233 (4th Cir. 2017) (citation omitted). "[M]ere citation of a new rule in a successive motion is not sufficient." *Id*. (citation omitted). This Court will not "authorize a successive § 2255 motion that is plainly barred as a matter of law." *In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014). Moreover, "while the prima facie showing is a *necessary condition* to receive prefiling authorization, the statute does not *limit* this court to considering *only* this necessary condition." *In re Phillips*, 879 F.3d 542, 546 (4th Cir. 2018) (citing *In re Vassell*, 751 F.3d at 271).

To satisfy § 2255(h)(2), Johnson invokes the Supreme Court's opinion in *Atkins*. But *Atkins* adds nothing to the claims that he already litigated in his first § 2255. In his first § 2255, Johnson relied on statutory law—the FDPA and

ADAA—to establish that an intellectually disabled defendant cannot be executed. *Atkins*, which was decided while Johnson's first § 2255 was pending, establishes "the same standard" as the FDPA and ADAA provisions on which Johnson relied. *Bourgeois v. Watson*, 977 F.3d 620, 631 (7th Cir.), *cert. denied*, 141 S. Ct. 507 (2020). Indeed, *Atkins* was decided years before this Court affirmed the denial of Johnson's initial § 2255 petition, and this Court therefore cited *Atkins* itself for the proposition that the "execution of [a] mentally retarded defendant constitutes cruel and unusual punishment under Eighth Amendment." *Roane*, 378 F.3d at 408. Johnson therefore cannot contend that *Atkins* was not "previously available" to him.

Given that Johnson was actively litigating a § 2255 raising an intellectual disability claim when *Atkins* was decided, and nothing in the opinion adds anything material to his arguments, Johnson similarly cannot show that *Atkins* "marks a 'clear break with the past'" compared to what he argued in his first § 2255, a standard courts have applied in assessing what was previously unavailable to an inmate. *In re Turner*, 267 F.3d 225, 228 n.1 (3d Cir. 2001) (quoting *Reed v. Ross*, 468 U.S. 1, 17 (1984)). In the analogous context of the language of 28 U.S.C. § 2244(b)(2), this Court has held that "the word 'previously' refers to the last federal proceeding—including a [prima facie application] proceeding—in which the applicant challenged the same criminal judgment. Consequently, constitutional rules that were established at the time of the applicant's last [prima facie application] motion were

12

not 'previously unavailable.'" *In re Williams*, 364 F.3d 235, 239 (4th Cir. 2004). There is no basis to give the words "previously unavailable" a different meaning in § 2255(h)(2), and under the standard from *In re Williams*, Johnson cannot obtain a successive § 2255 by invoking *Atkins*. This conclusion reflects "longstanding principles of habeas practice that were incorporated into the AEDPA" from the abuse-of-the-writ doctrine. *Id.*

Johnson contends that case law since *Atkins*, most significantly a 2009 opinion from the District of Maryland, helped expand upon the standards for evaluating intellectual disability and thereby rendered his claim "available." *See* Johnson Br. 27-30. But § 2255(h)(2) requires reliance on a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court," and Johnson does not even contend that the lower court cases on which he relies satisfy that standard. And in any event, Johnson identifies no legal error—even under the 2009 District of Maryland standards, or any others, on which he relies—in the district court's or this Court's adjudication of his intellectual-disability claims in 2003 and 2004, respectively. Most significantly, neither court rejected as a matter of law the Flynn effect argument that Johnson presented at that time, instead concluding that the balance of the evidence simply did not demonstrate intellectual disability. *See, e.g.*, *Roane*, 378 F.3d at 408-409.

13

Section 2255 also requires that a petition relying on a new rule of constitutional law be filed within one year of "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." § 2255(f)(3). As this Court's opinion in *Vassell* shows, that statute of limitations may properly be considered in deciding whether to authorize a successive § 2255. Johnson makes no effort to argue that his petition would be timely under that statute, and no such argument exists. *Atkins* was decided 19 years ago, and even the lower-court cases on which Johnson relies were decided over a decade ago. *See* Johnson Br. 27-30. Johnson's failure to satisfy § 2255(f), alone, is fatal to his petition, and he therefore cannot demonstrate the likelihood of success necessary to obtain a stay.

Johnson also contends that he can pursue an Eighth Amendment claim that his sentencing proceeding was unreliable under § 2255(h)(1), which permits second or successive motions based on "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." § 2255(h)(1). But Johnson does not rely on newly discovered evidence, instead relying on expert opinions that he has possessed for years and that, in turn, rely on evidence that has long been available. His approach to what counts

14

as "newly discovered evidence" would allow a defendant to pursue a successive § 2255 whenever that defendant found some evidence that was "newly discovered" in the sense that it was not presented at trial. That reading of the statute would eviscerate the limits on habeas relief. "Section 2255(h)(1), however, obliges a defendant to identify what the new evidence is and to show 'that he could not have discovered this information through the exercise of due diligence prior to the filing of his first § 2255 motion.'" *Mata v. United States*, 969 F.3d 91, 94 (2d Cir. 2020) (quoting *Herrera-Gomez v. United States*, 755 F.3d 142, 148 (2d Cir. 2014)).

Johnson also cannot satisfy § 2255(h)(1) by invoking new medical literature concerning the Flynn effect. Johnson already litigated and lost that issue in his first § 2255, raising the very same argument, and neither the district court nor this Court rejected the Flynn effect. And to the extent Johnson relies more generally on the development of medical literature on intellectual disability, his position reflects a "sweeping argument that a fresh intellectual-disability claim arises every time the medical community updates its literature," which is fundamentally inconsistent with AEDPA. *Bourgeois*, 977 F.3d at 638.

Johnson's claim is also barred by Section 2255(f)(4), which requires that a petition based on "new evidence" must be filed within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." Here, Johnson's "new" reports date from

15

2016, and the medical literature on which he relies is even older. He cannot possibly show that his newly discovered evidence was only available to him through the exercise of due diligence within the past year, and he makes no effort to do so. Nor can Johnson offer a valid reason for springing reports he has possessed for years on this Court one week prior to his execution date. Because his claims will necessarily fail under § 2255, they cannot be the basis for a stay of execution.

**2. Even if Johnson could satisfy the requirements of § 2255, his intellectual disability claim is meritless.**

The district court and this Court were correct in rejecting Johnson's intellectual-disability claims in his first § 2255 petition. By filing this action seven days before his execution, Johnson has deliberately deprived the courts and the government of the time to conduct a fine-grained analysis of each of his arguments. Fortunately, however, the extensive evidence from prior proceedings establishes that Johnson does not possess an intellectual disability that precludes the application of the death penalty.

Johnson was convicted of being an "organizer, supervisor, or manager with respect to five or more persons" in a continuing criminal enterprise—specifically, "a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992" and that spanned multiple states. *United States v. Tipton*, 90 F.3d 861, 868, 890 (4th Cir. 1996). This Court found "more than sufficient" evidence to support the supervisory aspect of this charge, as the "record reveals—certainly supports findings

16

beyond a reasonable doubt—that" Johnson, James Roane, and Richard Tipton supervised multiple "'workers'" while "acting as principal 'partners' in a concerted drug trafficking enterprise, and that some of these [workers] served variously not only as street dealers for the enterprise but as sometime chauffeurs, hideout providers, weapons-keepers, and general underlings for each" defendant. *Id.* at 890. As the district court aptly stated, "[t]he transcript is simply littered with testimony supporting the supervision element" under § 848(c). Def. Ex. 73 (District Ct. op. at 31 n.11 (citing for Johnson's conviction, Trial tr. at 1162, 1582–83, 1683–84, 1690–92, 1705–8, 1711, 1720, 1888, 1891, 1895, 1897, 1899, 1901, 1921, 2321–22, 2340, 2343, 2374, 2546–48, 2550, 2698, 2703, 2706, 2709, 2720)).

That evidence is fundamentally inconsistent with Johnson's current claim that he is so intellectually disabled that he cannot function in society, is easily manipulated by others, and ultimately lacks the "moral culpability" for his crimes that justifies imposition of the death penalty. *Hall*, 572 U.S. at 709 (explaining that "[r]etributive values are … ill-served by executing those with intellectual disability" because "[t]he diminished capacity of the intellectually disabled lessens moral culpability"). Indeed, in cross-examining Johnson's expert during the penalty proceeding, the government asked, "[i]f the testimony was that indeed Cory was one of the people who organized and supervised people to distribute drugs, that's inconsistent with mild mental retardation, or close to it." Trial tr. at 3701. Johnson's

17

expert responded, "I would be very skeptical of that, yes." *Id.* The jury acted well within its discretion in weighing the evidence that Johnson presented on his intellectual abilities and concluding that the seven death sentences were warranted.

In opining on whether Johnson has an intellectual disability that precludes a death sentence, the new experts on whom he relies studiously avoid discussing whether Johnson's multi-year criminal conduct can be squared with their conclusions about his intellectual disability. Johnson's new experts never confront the voluminous trial record and ignore the jury's factual findings, upheld by this Court on appeal.

Instead, Johnson's new experts focus on Johnson's expert at trial, Dr. Dewey Cornell, a professor at the University of Virginia, but they ultimately fail to undermine Dr. Cornell's careful analysis. Dr. Cornell had at the time of Johnson's trial conducted forensic examinations of between 400 to 500 criminal defendants for both the defense and the government, and had testified 40 to 50 times. Trial Tr. at 3563–64. And in reaching his conclusions in Johnson's case, Dr. Cornell evaluated not just Johnson's IQ results, but also well over 500 pages of records, as well as interviews of multiple people, and he referred Johnson to a neuropsychologist for evaluation. *See, e.g.*, Trial Tr. at 3568–71. Dr. Cornell spoke to six people who had previously prepared reports about Johnson, Trial Tr. at 3581, and conducted multiple tests beyond the IQ test, Trial Tr. at 3682–85. Thus—contrary to one of Johnson's

new expert reports—Dr. Cornell did not "conclude[d] that the IQ score of 77 was the end of the inquiry [in] determin[ing] that Corey Johnson did not have intellectual disability." Def. Ex. 2(b). Instead, when Dr. Cornell was asked during his testimony, "IQ is only one of a number of factors that are to be considered when determining whether someone is mentally retarded or not?", he responded, "[t]hat's probably the main one and first one, but it is not the only factor." Trial tr. at 3704.

When Dr. Cornell ultimately concluded that Johnson "is just above the level of mental retardation," Trial Tr. at 3691, he appreciated that if Johnson could be categorized as mentally retarded, he would not be death-eligible. Dr. Cornell testified that "I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty. So I checked my scores, went back, and saw [Johnson] a second time. I consulted with colleagues. I wanted to make sure that this was an accurate score. Because the definition of mental retardation is not a hard and fast absolute. It is a grey area." *Id.*

Some of the "new evidence" that Johnson now offers involve cherry-picked IQ test results, discarding or revising downward his IQ scores—including the score of 77 that Johnson obtained *after* he was facing capital charges in this case, when his incentive to malinger was at its peak. *See, e.g.*, *Webster v. Watson*, 975 F.3d 667, 686 (7th Cir. 2020) ("As for the I.Q . tests administered after the murder,

19

Webster undeniably had an incentive to malinger.") Other "new evidence" is facially unpersuasive, such as ratings of Johnson's intellect that one of Johnson's new experts collected from three people—a relative of Johnson's, a close family friend, and a former teacher—who were asked to recall Johnson's childhood decades ago. All of these people would be aware of Johnson's death sentence; they would all have a reason to be sympathetic to Johnson; they would all understand why they were being asked to make the ratings; and they would all have little difficulty appreciating what types of answers would help Johnson avoid his death sentences. Moreover, the expert gathering these ratings had himself already announced his conclusion that Johnson has an intellectual disability and been retained by the defense to give that opinion. These are not circumstances that promote an objective evaluation.

Ultimately, Johnson's allegations do not undermine the determinations of his unanimous jury, the district court, and this Court that Johnson can, and should, face the death penalty. Johnson has had nearly three decades to attack his death sentence. This Court should reject his fusillade of last-minute, stale claims.[3]

---

[3] Johnson repeatedly asserts that he is the only death-sentenced prisoner who has pursued, or can pursue, claims like these. *See, e.g.*, Johnson Stay App. at 2 ("Mr. Johnson is the only remaining intellectually disabled person under a federal death sentence who was tried before *Atkins*."); Johnson Br. App'x at 4 ("Mr. Johnson is uniquely situated. No other current federal death-row inmate can press the claim he advances here; only he was convicted before the relevant Supreme Court precedent discussed below."). Johnson does not cite evidence to support these claims, and they

## C. The balance of equities and public interest also weigh against a stay.

Beyond Johnson's extraordinary delay in bringing these claims and the fact that his claims cannot succeed on the merits, the equities strongly weigh in favor of denying a stay.

The government has a compelling interest in the timely enforcement of criminal sentences that have been upheld through extensive appellate and post-conviction proceedings in federal courts. *Bucklew*, 139 S. Ct. at 1133. Once, as here, pos-tconviction proceedings "have run their course," "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, delay "inflict[s] a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)).

The other stay factors similarly do not support relief here, for many of the same reasons that were true of Johnson's first stay application, which is also before

---

are dubious. There remain eight inmates on federal death row who were sentenced before *Atkins*, and at least one of them has pursued a claim relating to potential intellectual disability in post-conviction proceedings. See Amended Section 2255 Petn of Billie Jerome Allen, No. 7-CV-27 (E.D. Mo.) at 39 (Feb. 11, 2008). In addition, the federal government has commuted the sentence of at least one such death row inmate, Abelardo Arboleda Ortiz, after he filed a clemency petition that made a credible claim of intellectual disability

this Court. That Johnson faces irreparable harm from his execution is not dispositive; if it were otherwise, then no death sentence would ever be enforced. *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995). However, there can be no dispute that the public interest favors enforcement here. The public and the many victims' family have an overwhelming interest in implementing the capital sentence imposed more than a quarter-century ago. *See, e.g.*, *Bucklew*, 139 S. Ct. at 1133-34. Johnson is a convicted serial killer who murdered and maimed multiple people on different occasions, and whose victims included innocent bystanders. Their families have waited decades for the sentence to be enforced and are traveling this week to Terre Haute, Indiana for the execution.

Thus far, no court has found any of Johnson's many attempts to challenge his convictions and sentences warrant relief. Johnson's latest challenge is similarly meritless. The record and timeline in this case make clear that Johnson's tactics "are designed to delay [a] lawful execution[] indefinitely." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 129 (D.C. Cir. 2020) (Katsas, J., concurring). This Court "should not assist in that undertaking." *Id.*

### Conclusion

For the reasons explained above, this Court should deny Johnson's application for a stay of execution.

22

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:       /s/
         Richard D. Cooke
         Joseph Attias
         Assistant United States Attorney
         U.S. Attorney's Office
         Eastern District of Virginia
         919 East Main Street, Suite 1900
         SunTrust Building
         Richmond, Virginia 23219
         (804) 819-5400

## Certificate of Service and Compliance

I certify that this motion contains 5,576 words, and as per undersigned counsel's correspondence with the Court, this Response will be followed by a motion to exceed the length limitations. I also certify that on January 10, 2021, I filed electronically the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.

_____/s/_____

Richard D. Cooke
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of Virginia
919 East Main Street, Suite 1900
SunTrust Building
Richmond, Virginia 23219
(804) 819-5471
richard.cooke@usdoj.gov
