**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-2

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**IN RE COREY JOHNSON,**

**Movant.**

_____

**CAPITAL CASE**

**REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY OF
EXECUTION PENDING CONSIDERATION AND DISPOSITION OF
MOTION FOR AUTHORIZATION AND UNDERLYING MOTION
PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY
TO BE EXECUTED UNDER THE EIGHTH AMENDMENT**

_____

Donald P. Salzman
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7983
Fax: (202) 661-9063
Email: donald.salzman@skadden.com

*Counsel for Corey Johnson*

**INTRODUCTION**

The government's attempt to run roughshod over the applicable legal standards and misstate or simply ignore the substance of Mr. Johnson's arguments for authorization under 28 U.S.C. § 2255(h), in order to execute a demonstrably intellectually disabled man, must fail. Claiming he "deliberately deprived the courts and the government of the time to conduct a fine-grained analysis" of his arguments, Opposition ("Opp.") at 16, the government urges the Court to see Mr. Johnson's disqualifying disability through the outmoded and unscientific lens of many decades ago and based on misrepresentations of the record, and to ignore the absence of a hearing below. The Court should reject such urging.

As the Court knows, the proper lens through which this Court must evaluate Mr. Johnson's stay motion is whether he made a substantial showing of his *prima facie* case for authorization. Motion for Authorization ("MFA") at 20-22. This, Mr. Johnson has clearly done as to both of his claims, providing persuasive evidence for authorization under § 2255(h)(2) that he meets the diagnostic criteria for intellectual disability and for authorization under § 2255(h)(1) that his sentence is unreliable in light of scientific developments and newly discovered IQ scores. As explained below, if anything, the government's recitation of rejected standards proves the need for further exploration of his claims in district court.

2

I.    **THE GOVERNMENT'S ASSERTIONS CONCERNING MR. JOHNSON'S INTELLECTUAL DISABILITY ARE SCIENTIFICALLY OUTDATED AND FACTUALLY INACCURATE**

The government's arguments on the merits of Mr. Johnson's intellectual disability show a shocking disregard for the law and modern medical standards, and a fundamental misunderstanding of intellectual disability.

A.    **The Government Essentially Argues for the Application of the Rejected *Briseno* Factors**

The government's principal argument is that Mr. Johnson's status as a "supervisor" under 21 U.S.C. § 848(c) disproves his intellectual disability. Opp. at 16-17. The standard the government advances here is concerningly similar to the factors set forth in *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004), including: "formulat[ing] plans and carr[ying] them through," "conduct show[ing] leadership," and committing an offense "requir[ing] forethought, planning, and complex execution of purpose." The Supreme Court in *Moore v. Texas*, 137 S. Ct. 1039, 1046 (2017), repudiated this approach as "wholly nonclinical," *id.* at 1053, and creating "an unacceptable risk that a person with intellectual disability will be executed" in violation of the Eighth Amendment, *id.* at 1044. The government would have this Court, on a motion for authorization, revert to an outdated, non-clinical approach rejected by the Supreme Court.

Finally, after arguing elsewhere that intellectual disability must have its onset before 18, the government, here, incongruously focuses on Mr. Johnson's

conduct as an adult. It disregards entirely the exhaustive records from before he was 18 that clearly indicate his adaptive deficits. MFA at 7-12.

### B. The Government Mischaracterizes and Misinterprets Mr. Johnson's IQ Scores

Current standards are clear: IQ scores derived from old testing instruments must be corrected for the Flynn Effect. Ex. 75 at 37 (AAIDD-11 Manual); Ex. 77 at 37 (DSM-5); 2255 Mot. III.B.1.a. No court has considered Mr. Johnson's IQ scores adjusted for the Flynn Effect. *Id.* at II.B-E; III.B.1.a. Despite the government's obfuscation efforts, a plain reading of Dr. Cornell's testimony—that Mr. Johnson was "just above the level of mental retardation," "two points above that," "a matter of one or two questions on an intelligence test," and that Dr. Cornell "checked [his] scores, went back, and saw [Mr. Johnson] a second time," "consulted with colleagues," and "wanted to make very sure that this was an accurate score," Ex. 7 (2/10/93 Trial Tr. at 3691-92)—in no way suggests that he applied the Flynn Effect (or took any of the other steps required to see if Mr. Johnson met the medical criteria for the diagnosis).[1]  The Flynn Effect is a mathematical formula prescribed by the AAIDD-11 and DSM-5 to effectuate required correction of an IQ score based on the age of the test; it is not an issue of

---

[1] It is noteworthy that Dr. Cornell is not an expert in intellectual disability, as his publicly available biography reflects.

consulting with colleagues, looking at the number of questions that would have resulted in a different diagnosis, or checking scores for accuracy.

Even if the IQ score of 77,[2] on which Dr. Cornell relied, accounted for the Flynn Effect, it is irrelevant. Once an individual establishes one score below 75—here, Mr. Johnson's 69 IQ score—the court must consider adaptive functioning, the second—and clinically most important—prong of the diagnostic test. *See Hall v. Florida*, 572 U.S. 701, 722-23 (2014). Dr. Cornell did not address that prong; nor has any court assessed Mr. Johnson's significant adaptive deficits recitation of rejected standards.[3]

## C. The Government Ignores Modern Medical Consensus Regarding Adaptive Behavior Diagnostics.

The government's attack on the retrospective use of standardized adaptive behavior instruments further betrays its disturbing misunderstanding of the medical consensus regarding intellectual disability diagnostics. The government argues that Dr. Olley's ABAS-II results are "facially unpersuasive" and the "circumstances"

---

[2] Dr. Cornell's score of a 77, properly corrected to 73 with the Flynn Effect, is not an outlier. It, like the three valid scores from his childhood, puts Mr. Johnson in the diagnostic range for intellectual disability.

[3] The government's assertion about cherry-picking IQ scores is preposterous. The 2255 Motion include every IQ score identified for Mr. Johnson. Similarly, the government's argument about Mr. Johnson's supposed malingering in connection with Dr. Cornell's test ignores three valid and reliable IQ test scores, scores both impervious to malingering accusations and consistent with Dr. Cornell's IQ result.

do not "promote an objective evaluation." Opp. at 20. Far from unpersuasive, their

retrospective use with knowledgeable individuals by an experienced expert

applying clinical judgment is consistent with current standards. Critically, Dr.

Olley's ABAS-II results are corroborated by the plethora of contemporaneous

childhood records documenting Mr. Johnson's significant adaptive deficits. Ex. 77

at 37 (DSM-5); *see also* 2255 Mot. at III.B.1.c, III.A.1, and III.A.2.b. The

government's argument is not only unpersuasive, it affirmatively ignores legal and

medical standards.[4]

---

[4] The government's discussion of the Allen and Ortiz cases is highly misleading.
Unlike Mr. Johnson, Mr. Allen filed his initial § 2255 post-*Atkins*. The government
correctly notes that Allen's counsel originally highlighted an 82 IQ and that he
"may be mentally retarded," Am. Mot. Under 28 U.S.C. § 2255 to Vacate at 39,
*Allen v. United States*, No. 07-27 (E.D. Mo. Feb. 11, 2008), ECF No. 60, but fails
to mention that, after it questioned how even Allen's Flynn-corrected IQ
demonstrated intellectual disability, *id.* Gov't's Resp. at 127 (E.D. Mo. Oct. 31,
2008), ECF No. 79, Allen abandoned the claim. In *Ortiz*, the President granted
clemency while Ortiz was litigating his first § 2255 proceeding and *after* both an
evidentiary hearing on intellectual disability and a circuit remand for additional
factual development.  (Moreover, the government agreed to a full evaluation by an
expert of its choosing who also found Mr. Ortiz to be intellectually disabled.)
There is nothing dubious about Mr. Johnson's assertion: he is the only remaining
intellectually disabled federal death-sentenced inmate tried before *Atkins* and could
become the only federal prisoner ever to be executed without meaningful review of
his *Atkins* claim.

## II.     MR. JOHNSON'S CLAIMS MEET § 2255(h)

### A.     Mr. Johnson's Intellectual Disability Claim Meets § 2255(h)(2)

The government argues for a bright-line rule that because *Atkins* was decided during Mr. Johnson's § 2255 proceedings, it was not previously unavailable to him. Opp. at 12. It also suggests that Mr. Johnson's argument fails because the federal capital cases he cites are not Supreme Court cases made retroactive. *Id*. at 13. This misses the point.

Mr. Johnson's claim does not rely on later lower-court cases establishing new rules; he instead has shown that, because of the unique nature of federal capital cases and the slow development of substantive capital law in those cases, the *Atkins* rule itself (even though issued earlier) was not "feasible" until well after his § 2255 was completed. The government utterly ignores that legal theory and supporting cases. Mr. Johnson's pleading makes a *prima facie* showing and deserves authorization.

### B.     Mr. Johnson's Eighth Amendment Reliability Claim Meets § 2255(h)(1)

The government incorrectly argues that § 2255(h)(1) precludes authorization of Mr. Johnson's Eighth Amendment reliability claim. The government misunderstands the issue. Mr. Johnson asserts that the combination of scientific developments and newly-discovered evidence (including IQ scores) has rendered his sentencing unreliable. This is not an attempt to "relitigate" an old claim or an

7

argument that updated literature allows "a fresh intellectual-disability claim" Opp. at 15 (citation omitted); it is in fact a claim that has never before been pled (much less established with evidence). It only arose because of post-trial and post-2255 medical and psychological developments, and it supports authorization much the same way advances in forensic evidence do. *Gimenez v. Ochoa*, 821 F.3d 1136, 1144 (9th Cir. 2016). As Mr. Johnson has shown, this newly-discovered evidence post-dated his § 2255 and thus this claim could not have been presented in prior proceedings.

The government's reliance on two Second Circuit cases is misplaced. Those cases denied authorization by incorporating statutory provisions explicitly related to 28 U.S.C. § 2254 cases. *See Herrera-Gomez v. United* States, 755 F.3d 142, 147 (2d Cir. 2014) (due diligence requirements of "28 U.S.C. § 2244(b) were incorporated by reference into § 2255(h)"). The government cites no Fourth Circuit case for this proposition because it cannot: as previously shown, this Court has not applied § 2244(b) to claims by federal prisoners.

Finally, the government simply ignores the newly-discovered evidence that is most problematic for its case. For example, it never once mentions the 72/73 IQ score from Corey's childhood or the fact that the newly-discovered evidence shows *every one of his valid IQ scores obtained prior to age 18 was in the intellectually*

*disabled range*. This alone demonstrates a *prima facie* case supporting

authorization.

### III.    MR. JOHNSON HAS BEEN DILIGENT IN PURSUING HIS GOOD FAITH LEGAL CLAIMS

The government argues Mr. Johnson's filings are dilatory and his pleadings

are a "tactic" harming the government by delaying its interest in "finality" and

"enforcing its criminal judgments." Opp. at 9-10. The litigation history of Mr.

Johnson's case belies the government's assertion that a short delay will cause

significant harm to its interests. Only after it announced Mr. Johnson's execution

on November 20, 2020, did the government begin to exhibit urgency to enforce

this judgment.  Mr. Johnson has been in continued litigation since his 1993

conviction and the few weeks pro bono counsel took to prepare and file relevant

legal challenges do not prove a lack of diligence.

Mr. Johnson's petition for certiorari from his initial § 2255 motion was

denied on October 3, 2005. Two months later, he filed suit challenging the federal

lethal injection protocol in the D.C. federal court, and, soon thereafter, the D.C.

court enjoined the setting of an execution date. The litigation continued for the

next fifteen years, almost entirely due to the government's delay: Starting March 4,

2011—when the Attorney General announced that the BOP lacked the ability to

proceed under the then-current protocol, Joint Status Report, *Roane v. Barr*, No.

05-2337 (D.D.C. Apr. 29, 2011), ECF No. 281—and for the next *eight years*, the

government merely provided status updates informing the D.C. district court it was still in the process of creating a new protocol). *Id.* Joint Status Report (D.D.C. May 1, 2019), ECF No. 383. While stays for those men dissolved, Mr. Johnson has continued challenging aspects of the government's plans and procedures throughout.

The government however waited more than another year to request vacatur of Mr. Johnson's injunction. Defs.' Mot. to Vacate Prelim. Inj., *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (D.D.C. July 31, 2020), ECF No. 173. It then argued that the injunction was stale because the prior protocol was "no longer in use," *id.* at 7, an admission that its request could have been filed more than a year prior. The district court granted the motion on September 20, 2020, but held that the basis for vacatur actually arose at the time the government abandoned use of the three-drug protocol. *Id.* Mem. Op. at 5 (D.D.C. Sept. 20, 2020), ECF No. 265. In other words, the government could have successfully vacated it at least *nine* years earlier; it simply chose not to.

The government then waited another three months before setting Mr. Johnson's execution date, after business hours the Friday before Thanksgiving, shortly before two major U.S. holidays and in the middle of the worst pandemic in more than 100 years.

10

To be clear, Mr. Johnson is not suggesting the government had an obligation to move more expeditiously or that it was in his interest for them to do so. He is merely highlighting the hypocrisy of the government's new-found zeal for speedy enforcement of its 1993 judgment. The balance of equities on this issue are in Mr. Johnson's favor.

The government also faults Mr. Johnson for not seeking authorization earlier and states that he "offers no reasonable explanation for his delay." Opp. at 9. This is inaccurate. Mr. Johnson reasonably believed that, once his execution became imminent, he would be allowed to raise his intellectual disability claim pursuant to 18 U.S.C. § 3596 and § 848, and he did so promptly after receiving notification. That pleading remained pending before the district court for almost three weeks until it was denied as an unauthorized successor on Saturday, January 2, 2021. Order (E.D. Va. Jan. 2, 2021), ECF No. 102. Mr. Johnson promptly filed a notice of appeal but also prepared the instant motion for authorization request, which he filed five days after the district court's ruling.

Mr. Johnson believed (and still maintains) that § 3596 and § 848 provide the avenue to examine the issue of his intellectual disability, consistent with the *government's* position for almost two decades.

> From the language of these subsections and as is signaled by the title of the statute, it should be clear that neither mental retardation nor pregnancy precludes the **imposition** of the death penalty under the

11

statute, rather it prevents and/or may delay the **implementation** of the death penalty.

Exhibit 1 (Excerpt of Gov't's Resp. in Opp'n to "Am. Mot. of Bruce Carneil

Webster to Vacate Conviction and Sentence and for New

Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Fed. R. Crim.

P." at 44, *Webster v. United States*, No. 4-94-CR-0121-Y (N.D. Tex. Nov.

14, 2002) (emphasis added). It also remains the government's position in cases

other than Mr. Johnson's. Just two days ago the government argued to this Court

that the statutory provisions (which include the determination of intellectual

disability) occur only after exhaustion of post-conviction review, "[w]hen the

sentence is to be implemented" by the Marshal, "long after the sentence was

imposed." Reply Br. of Appellant at 6, *United States v. Higgs*, No. 20-18 (4th Cir.

Jan. 9, 2021), ECF No. 32 (quoting *Higgs* Br.) Only in Mr. Johnson's case does it

argue the opposite.

Absent a stay, Mr. Johnson would be executed despite significant evidence

of his intellectual disability. The government's delay and lack of urgency

demonstrate its hypocritical position. In a capital case raising an issue of

ineligibility for the death penalty, a court "must be particularly certain that the

legal issues have been sufficiently litigated, and the criminal defendant accorded

all the protections guaranteed him by the Constitution." *In re Campbell*, 750 F.3d

523, 535 (5th Cir. 2014) (citation omitted). Corey Johnson has never had an

affirmative case of intellectually disability considered by any court. The balance of harms strongly favors staying Mr. Johnson's execution.

## IV.   THE STATUTE OF LIMITATIONS UNDER 28 U.S.C. § 2255(F) IS NOT A BARRIER TO AUTHORIZATION

The government asserts § 2255(f) bars Mr. Johnson's claims. Opp. at 14. The circuits are split on whether this argument is properly considered within the context of an authorization request. *E.g.*, Brian R. Means, Federal Habeas Manual § 11:85, Affirmative Defenses (May 2020 Update). However, even under this Circuit's precedent, Mr. Johnson's claim should be authorized; he can make a *prima facie* showing that his claims are not barred by the expiration of the statute of limitations under the "actual innocence" gateway through which a capital § 2255 movant may pass in order to prevent a fundamental miscarriage of justice— he is ineligible for the death penalty and cannot, therefore, be executed.[5]

In *McQuiggin v. Perkins*, the Supreme Court held that a claim of actual innocence enables a federal court to adjudicate a habeas petition filed outside the

---

[5] Notably, while § 2254 petitioners have opportunities for review in state courts prior to seeking federal redress, Mr. Johnson, as a federal prisoner under death sentence solely limited to § 2255 review, does not. *See, e.g.*, *Prieto v. Zook*, 791 F.3d 465, 466-68 (4th Cir. 2015) (discussing treatment of capital habeas petitioner's *Atkins* claim in Virginia courts and, subsequently, federal courts); *compare* § 2244(d)(2) ((statute of limitations tolled for state prisoners during pendency of state post-conviction or other collateral review), *with* § 2255(f)).

statute of limitations. 569 U.S. 383, 386-87 (2013). The Court framed its decision as an exercise of the traditional, equitable power of federal courts in the context of habeas corpus litigation—a power consistently exercised, both before and after passage of the AEDPA—to allow claims of actual innocence to overcome procedural bars, including state-imposed filing deadlines. *See id.* at 391-94. Based on this tradition, the Court, noting that this "miscarriage of justice" exception to procedural barriers survived the AEDPA's passage,[6] explained that the AEDPA was intended to achieve its objectives without "undermining basic habeas corpus principles and while seeking to harmonize the new statute with prior law." *Id.* at 397-98 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

Mr. Johnson's claims, centered on his ineligibility for the death penalty due to his intellectual disability, are rooted in law that pre-dates and coexists with the AEDPA without impeding on the statute's objectives. *See id.* at 397 ("[W]e will not construe a statute to displace courts' traditional equitable authority absent the

---

[6] While the *Perkins* Court identified statutory modifications to the availability of the miscarriage of justice exception for § 2254 petitioners with respect to second-or-successive petitions, citing § 2244(b)(2)(B) and (e)(2), *see Perkins*, 569 U.S. at 396-97, those sections by their plain language apply only to claims brought by state prisoners, MFA at 32-34, and reflect Congressional intent to ensure that the exception remained available to § 2255 movants like Mr. Johnson who are not subject to the same claim successor bar. Regardless of whether the exception is available at all to § 2254 petitioners, there is no question that it survived for capital § 2255 movants, and indeed, this Court has not precluded application of the exception for such movants under § 2255(h).

clearest command." (citation omitted)). In *Sawyer v. Whitley*, 505 U.S. 333 (1992), the Court held that the miscarriage of justice exception applies to a habeas petitioner's challenge to his eligibility for the death penalty just as it does to challenges to an underlying conviction. *Id.* at 339-44. That limited exception remains available to capital § 2255 movants like Mr. Johnson who meet an exacting standard, and has been recognized, and distinguished from the non-capital context, in this Court and others. *See, e.g.*, *Prieto v. Zook*, 791 F.3d at 469 (citing *Sawyer*, noting, "in a capital case, a habeas petitioner can make a showing of 'actual innocence,' and qualify for the [miscarriage of justice] exception, by proving through 'clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty . . .'") (citations omitted); *see also, e.g.*, *United States v. Foote*, 784 F.3d 931, 941 (4th Cir. 2015) (noting "concept of actual innocence to sentencing [extends] only [to] capital sentencing"); *Gibbs v. United States*, 655 F.3d 473, 478-79 (6th Cir. 2011) (citing *Sawyer*, distinguishing availability of actual innocence exception for petitioner ineligible for death penalty from sentencing guidelines context). Nor are the federalism or comity concerns that constrain review of state proceedings at issue here.

This case is unique. It is a vestige of the earliest years of the federal death penalty, the first case tried federally of an individual with intellectual disability,

15

years before *Atkins*. It is the only federal case where an undeniably strong case of intellectual disability has not been considered by any court. If Mr. Johnson is executed he will become the only federal prisoner in the modern era to have had no hearing on the evidence establishing his impairment. In such a case the interest in finality of the judgment should yield to the individual interest in justice. *Perkins*, 569 U.S. at 393-94. Because Mr. Johnson has made the requisite *prima facie* showing to obtain review under § 2255(h) that he is ineligible for the death penalty, and in light of the extraordinary circumstances discussed herein, the Court should stay his execution and permit his claims to be considered, notwithstanding § 2255(f).

Dated: January 11, 2021                    Respectfully submitted,


                                           /s/ Donald P. Salzman
                                           Donald P. Salzman
                                           Jonathan Marcus
                                           David E. Carney
                                           Skadden, Arps, Slate, Meagher & Flom LLP
                                           1440 New York Avenue, NW
                                           Washington, DC 20005
                                           Telephone: (202) 371-7983
                                           Fax: (202) 661-9063
                                           Email: donald.salzman@skadden.com

                                           *Counsel for Corey Johnson*


16

## CERTIFICATE OF COMPLIANCE

1.      This reply contains 3506 words, excluding the parts of the reply exempted from the word count by Fed. R. App. P. 27(d)(2), 32(f).  Mr. Johnson will file herewith a motion to exceed the word count limit.  The government has advised counsel that it does not oppose such a motion to exceed.

2.      This reply complies with the font, spacing, and type size requirements set forth in Fed. R. App. P.  32(a)(5) and (a)(6).

/s/ Donald P. Salzman

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of January 2021, I electronically filed

the foregoing with the Clerk of Court using the CM/ECF system, which will then

send notification of such filing to all parties and counsel included on the Court's

Electronic Mail notice list.

/s/ Donald P. Salzman
Donald P. Salzman
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7983
Fax: (202) 661-9063

Email: donald.salzman@skadden.com